**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION** | ) ) ) ) ) ) ) ) ) ) | **MDL NO. 2193**<br><br>**CONSOLIDATED<br>CLASS ACTION COMPLAINT**<br><br>**Centralized before the Honorable<br>Rya W. Zobel**<br><br>**JURY TRIAL DEMANDED** |
| **This Document Relates To:**<br><br>**All Actions** | | |

Plaintiffs, by their attorneys, hereby consolidate the complaints filed in the following actions:

*Johnson, et al., v. BAC Home Loans Servicing, LP*, Case No. 1:10-cv-10316 (D. Mass.) (filed Feb. 23, 2010);

*Kahlo, et al. v. Bank of America NA, et al.*, Case No. 2:10-cv-00488 (W.D. Wash.) (filed Mar. 22, 2010);

*Brewer, et al. v. Bank of America, NA, et al.*, Case No. 3:10-cv-01884 (N.D. Cal.) (filed Apr. 30, 2010);

*Follmer, et al. v. Bank of America, NA, et al.*, Case No. 2:10-cv-01435 (D. Ariz.) (filed July 7, 2010);

*Haber, et al. v. Bank of America, NA, et al.*, Case No. 2:10-cv-03524 (E.D. Pa.) (filed July 19, 2010);

*Mikhail, et al. v. Bank of America, NA, et al.*, Case No. 2:10-cv-03630 (D.N.J.) (filed July 19, 2010);

*Soper, et al. v. Bank of America, NA, et al.*, Case No. 2:10-cv-01194 (W.D. Wash.) (filed July 22, 2010);

*Matthews v. BAC Home Loans Servicing, LP, et al.*, Case No. 2:10-cv-05506 (C.D. Cal.) (filed July 26, 2010);

*George v. BAC Home Lending Services, Inc.*, Case No. 1:10-cv-00546 (S.D. Ala.) (filed Sept. 1, 2010);

*Langen v. Bank of America, NA, et al.*, Case No. 3:10-cv-01067 (D. Or.) (filed Sept. 8, 2010);

*Wilkerson v. Bank of America Home Loans Servicing, LP et al*, Case No. 3:10-cv-04294 (N.D. Cal.) (filed Sept. 22, 2010);

*Wood v. Bank of America, NA et al.*, Case No. 2:10-cv-00145 (S.D. Ga.) (filed Sept. 27, 2010);

*Lightman, et al. v. Bank of America, NA, et al.*, Case No. 2:10-cv-05109 (E.D. Pa.) (filed Sept. 29, 2010);

*Goldman v. Bank of America, NA, et al.*, Case No. 9:10-cv-81264 (S.D. Fla.) (filed Oct. 26, 2010);

*Kunsky v. Bank of America, NA, et al.*, Case No. 1:10-cv-11875 (D. Mass.) (filed Nov. 2, 2010);

*Freeman v. BAC Home Loan Servicing, LP, et al.*, Case No. 1:10-cv-05380 (E.D.N.Y.) (filed Nov. 19, 2010);

*Brooking, et al. v. Bank of America, NA, et al.*, Case No. 1:10-cv-01360 (E.D. Va.) (filed Dec. 2, 2010);

*Brozak v. Bank of America, NA, et al.*, Case No. 1:10-cv-07677 (N.D. Ill.) (filed Dec. 2, 2010);

*Alvarenga, et al. v. Bank of America, NA, et al.*, Case No. 10-48210, 4:10-ap-04380 (Bktcy. N.D. Cal.) (filed Dec. 8, 2010);

*Fraser v. Bank of America, NA, et al.*, Case No. 4:10-cv-02400-AGF (E.D. Mo.) (filed Dec. 22, 2010);

*Morrow v. BAC Home Loans Servicing, LP*, Case No. 3:10-cv-02045-JCH (D. Ct.) (filed Dec. 29, 2010);

*Nelson v. BAC Home Loans Servicing, LP,* Case No. 1:11-cv-10089 (D. Mass.) (filed Jan. 14, 2011);

*Lopez v. Bank of America N.A., et al.,* Case No. 2:11-cv-00059  (D. Wis.) (filed Jan. 20, 2011); and

*Moussa v. Bank of America N.A., et al.,* Case No. 8:11-cv-00175 (D. Md.) (filed Jan. 21, 2011).

By this consolidation, the allegations in each of these class action complaints are intended to be preserved as if reasserted and alleged herein.  The named plaintiffs and those similarly situated in each and every one of these consolidated actions ("Plaintiffs") allege the following based, among other things, on the investigation made by Plaintiffs by and through their attorneys:

## INTRODUCTION

1.     Plaintiffs bring this class action on behalf of themselves, and similarly-situated individuals as described in the paragraphs set forth herein.   This consolidated complaint challenges the failure of Defendant Bank of America Bank, N.A. acting independently and through its subsidiary Defendant BAC Home Loans Servicing, LP (referred to jointly as "BOA" where not otherwise described in their individual capacities) to honor both the terms of their agreement with the United States Treasury for the intended benefit of homeowners, as well as their failure to honor agreements directly with individual homeowners to modify mortgages and thereby to prevent unnecessary foreclosures.

2.     Plaintiffs' claims are simple – when a financial institution enters into a contract in which it promises to modify a loan and prevent an unnecessary foreclosure, homeowners expect that promise to be kept.  This is especially true when the financial institution has entered into, and accepted benefits from a federal program specifically targeted at preventing foreclosure and allowing certain homeowners to maintain ownership of their homes.

3.     In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets.  By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

4.     Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  Companies that accepted money under TARP are subject to mandatory inclusion in HAMP as are certain classes of loans,

namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

5.      Bank of America signed a Servicer Participation Agreement ("SPA") with the U.S. Treasury on April 17, 2009 (attached as Exhibit 1 and incorporated by reference) agreeing in its capacity as loan servicer[1] to comply with HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.  The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- provide a permanently modified loan to those homeowners who comply with the requirements during the trial period.  Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

---

[1] "Servicer" is the industry term for a financial institution that acts as agent for the owner of a loan to perform many of the functions that deal directly with the homeowner, including processing of payment, loss mitigation and overseeing foreclosure.

6.      HAMP and its associated directives also set prohibitions against certain conduct including instituting or continuing foreclosure proceedings while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

7.      Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

8.      Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.  However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as BOA to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure.  This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by BOA because BOA does not carry a significant risk of loss in the event of foreclosure.  On information and belief, BOA does not own a significant majority of the loans on which it functions as servicer.

9.      Economic factors that discourage BOA from meeting its obligations under HAMP by facilitating loan modifications include the following:[2]

- BOA may be required to repurchase loans from the investor in order to permanently modify the loan.  This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

---

[2] *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

- The monthly service fee that BOA, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool.  Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that BOA charges borrowers that are in default constitute a significant source of revenue to it.  Aside from income BOA directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan.  The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

10.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States.  BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by BOA, who are eligible for permanent loan modifications, and who have met the requirements for participation in HAMP, have not received permanent loan modifications to which they are entitled.

6

11.     In addition to its obligations based on its contract with the Treasury Department, as a participating servicer in HAMP, BOA entered into a standardized contract with Plaintiffs and thousands of homeowners for a temporary trial modification of their existing note and mortgage.  Each such modification agreement promises that if the borrower complies with the terms of the temporary modification agreement and the borrower's representations on which the offer of a modification was based continue to be true in all material respects, then the borrower will receive a permanent modification on the same terms.  The contract, known as a "Trial Period Plan" ("TPP") Agreement, is for a finite time period – normally three months –and specifies that "TIME IS OF THE ESSENCE."  The Trial Period Plan ("TPP") Classes, defined below, made the required payments under their TPP Agreements and expected to receive either a final modification or a denial of eligibility before the end of the trial period.  Neither was forthcoming.  Despite Plaintiffs' efforts, BOA has ignored its contractual obligation to modify their loans permanently.

12.     Because BOA is not meeting its contractual obligations, hundreds of thousands of homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, BOA has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from BOA.  Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are unfair and deceptive under state laws.

### JURISDICTION AND VENUE

13.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that these complaints are putative class actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are 100 or more members in the proposed classes and at least one member of the class of plaintiffs is a citizen of a State different from any defendant. BAC is, on information and belief, a citizen of North

Carolina. Plaintiffs are citizens of Massachusetts, Washington, Alabama, Arizona, California, Connecticut, Florida, Georgia, Illinois, New Jersey, New York, Oregon, Pennsylvania, Missouri, Maryland, Wisconsin and Virginia.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), both because Defendants transact substantial business in this district, and based on the transfer order of the Judicial Panel on Multidistrict Litigation.

## PARTIES

15.     Individual and Representative Plaintiff Fausto Cabrera is a citizen of Massachusetts. Mr. Cabrera is a representative of the Massachusetts statewide class.

16.     Individual and Representative Plaintiff Vellyn Antonelli is a citizen of Massachusetts. Ms. Antonelli is a representative of the Massachusetts statewide class.

17.     Individual and Representative Plaintiff Carmen Fox is a citizen of Massachusetts. Ms. Fox is a representative of the Massachusetts statewide class.

18.     Individual and Representative Plaintiffs Mark Angelopoulos and Diane Anderson are citizens of Massachusetts. Mr. Angelopoulos and Ms. Anderson are representatives of the Massachusetts statewide class.

19.     Individual and Representative Plaintiffs Katie and John Buckley are citizens of Massachusetts. Mr. and Mrs. Buckley are representatives of the Massachusetts statewide class.

20.     Individual and Representative Plaintiff Leta Allen is a citizen of Massachusetts.  Ms. Allen is a representative of the Massachusetts statewide class.

21.     Individual and Representative Plaintiffs Margaret and James Cooley are citizens of Massachusetts. Mr. and Mrs. Cooley are representatives of the Massachusetts statewide class.

22.     Individual and Representative Plaintiffs Kamie and Daniel Kahlo are citizens of Washington. Mr. and Ms. Kahlo are representatives of the SPA Class and Subclass and Washington statewide Class for the purpose of consumer protection violations.

23.     Individual and Representative Plaintiff Britta Brewer is a citizen of California. Ms. Brewer is a representative of the SPA Class and Subclass and California statewide Class for the purpose of consumer protection violations.

24.     Individual and Representative Plaintiff Stacey Madamba is a citizen of California. Ms. Madamba is a representative of the SPA Class and Subclass and California statewide Class for the purpose of consumer protection violations.

25.     Individual and Representative Plaintiffs Tarry and Nancy Miller are citizens of California. Mr. and Mrs. Miller are representatives of the California statewide Class.

26.     Individual and Representative Plaintiff Teresa Follmer is a citizen of Arizona. Ms. Follmer is a representative of the Arizona statewide Class.

27.     Individual and Representative Plaintiffs Katie and John Lividotti are citizens of Arizona. Mr. and Mrs. Lividotti are representatives of the SPA Class and Subclass Arizona statewide Class for the purpose of consumer protection violations.

28.     Individual and Representative Plaintiff Tamara Golden is a citizen of Arizona.  Ms. Golden is a representative of the Arizona statewide Class.

29.     Individual and Representative Plaintiffs Joseph and Gina Haber are citizens of Pennsylvania. Mr. and Mrs. Haber are representatives of the Pennsylvania statewide Class.

30.     Individual and Representative Plaintiffs Donald and Maria Hall are citizens of Pennsylvania.  Mr and Mrs. Hall are representatives of the Pennsylvania statewide Class.

31.     Individual and Representative Plaintiff Gail Shulski is a citizen of Pennsylvania.  Ms. Shulski is a representative of the SPA Class and the Pennsylvania statewide Class for the purpose of consumer protection violations.

32.     Individual and Representative Plaintiff Jason Volpe is a citizen of Pennsylvania.  Mr. Volpe is a representative of the Pennsylvania Statewide Class.

33.     Individual and Representative Plaintiffs Isaac and Marlen Mikhail are citizens of New Jersey. Mr. and Mrs. Mikhail are representatives of the New Jersey statewide Class.

34.     Individual and Representative Plaintiffs Anthony and April Soper are citizens of Washington. Mr. and Mrs. Soper are representatives of the Washington statewide Class and the National ECOA Class.

35.     Individual and Representative Plaintiff Debra Matthews is a citizen of California. Ms. Matthews is a representative of the California statewide Class.

36.     Individual and Representative Plaintiff Jesus Carrillo is a citizen of California.  Mr. Carrillo is a representative of the California statewide Class.

37.     Individual and Representative Plaintiff Elena Renne is a citizen of California. Ms. Renne is a representative of the California statewide Class.

38.     Individual and Representative Plaintiff Kimberley George is a citizen of Alabama. Ms. George is a representative of the Alabama statewide Class.

39.     Individual and Representative Plaintiff James Langen is a citizen of Oregon. Mr. Langen is a representative of the Oregon statewide Class.

40.     Individual and Representative Plaintiff Gretha Wilkerson is a citizen of California.  Ms. Wilkerson is a representative of the SPA Class and California statewide Class for the purpose of consumer protection violations.

41.     Individual and Representative Plaintiff Melissa Wood is a citizen of Georgia. Ms. Wood is a representative of the Georgia statewide Class.

42.     Individual and Representative Plaintiffs Mitchell and Mindy Lightman are citizens of Pennsylvania.  Mr. and Mrs. Lightman are representatives of the Pennsylvania statewide Class.

43.     Individual and Representative Plaintiff Shari Goldman is a citizen of Florida. Ms. Goldman is a representative of the Florida statewide Class.

44.     Individual and Representative Plaintiff Darren Kunsky is a citizen of Florida. Mr. Kunsky is a representative of the Florida statewide Class and the National ECOA Class.

45.     Individual and Representative Plaintiff Marie Freeman is a citizen of New York. Ms. Freeman is a representative of the New York statewide Class.

46.     Individual and Representative Plaintiffs April and Michael Taddeo are citizens of New York. Mr. and Mrs. Taddeo are representatives of the New York statewide Class.

47.     Individual and Representative Plaintiff Andrew Bianchi is a citizen of New York. Mr. Bianchi is a representative of the New York statewide Class.

48.     Individual and Representative Plaintiffs Jean and Tae Young Rho are citizens of New York. Mr. and Mrs. Rho are representatives of the New York statewide Class.

49.     Individual and Representative Plaintiffs Robert and Susan Brooking are citizens of Virginia. Mr. and Mrs. Brooking are representatives of the Virginia statewide Class and the Virginia ECOA Class.

50.     Individual and Representative Plaintiff Carrie Lee Arthur is a citizen of Virginia. Ms. Arthur is a representative of the Virginia statewide Class and the Virginia ECOA Class.

51.     Individual and Representative Plaintiff Nicole Sharrett is a citizen of Virginia. Ms. Sharrett is a representative of the Virginia statewide Class and the Virginia ECOA Class.

52.     Individual and Representative Plaintiff Aissatou Balde is a citizen of Virginia. Mr. Balde is a representative of the Virginia statewide Class and the Virginia ECOA Class.

53.     Individual and Representative Plaintiff Ahmad Taheri Ghomi is a citizen of Virginia. Mr. Ghomi is a representative of the Virginia statewide Class and the Virginia ECOA Class.

54.     Individual and Representative Plaintiff Deborah Brozak is a citizen of Illinois. Ms. Brozak is a representative of the SPA Class and the SPA Subclass, as well as the Illinois statewide Class for the purpose of consumer protection violations.

55.     Individual and Representative Plaintiffs Manuel and Magali Alvarenga are citizens of California. Mr. and Mrs. Alvarenga are representatives of the California statewide Class.

56.     Individual and Representative Plaintiff Susan Fraser is a citizen of Missouri.  Ms. Fraser is a representative of the SPA Class and the SPA Subclass, as well as the Missouri statewide Class for the purpose of consumer protection violations.

57.     Individual and Representative Plaintiffs Kim Morrow and Ken Clark are citizens of Connecticut. Ms. Morrow and Mr. Clark are representatives of the Connecticut statewide Class.

58.     Individual and Representative Plaintiffs Matthew Nelson and Angelica Huato-Nelson are citizens of California. Mr. Nelson and Mrs. Huato-Nelson are representatives of the California statewide Class.

59.     Individual and Representative Plaintiffs Enrique and Mistee Lopez are citizens of Wisconsin. Mr. and Mrs. Lopez are representatives of the Wisconsin statewide Class and the National ECOA Class.

60.     Individual and Representative Plaintiffs Antoun and Sabah Moussa are citizens of Maryland. Mr. and Mrs. Moussa are representatives of the Maryland statewide Class and the Maryland ECOA Class.

61.     Defendant Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

62.     Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

63.     At all times herein mentioned, Defendants, Bank of America, N.A. and BAC Home Loans Servicing, LP, both individually and collectively, are and were agents and/or joint venturers of each other, and in doing the acts alleged herein were acting within the course and scope of such agency.

64.     Each Defendant had actual and/or constructive knowledge of the acts of the other Defendant as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

## FACTUAL BACKGROUND

### A.     The Foreclosure Crisis

65.     Over the last three years, the United States has been in a foreclosure crisis.  In late 2009, a congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure or default.[3]

66.     For the third quarter of 2010, foreclosure filings-default notices, scheduled auctions and bank repossessions were reported on 930,437 properties in the 3rd quarter.  One in every 139 U.S. housing units received a foreclosure filing in this quarter.[4]

67.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

68.     The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*,

---

[3] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  *Available at* http://cop.senate.gov/reports/library/report-100909-cop.cfin.
[4] Reality Trac Staff, *Foreclosure Activity Increases 4% in Third Quarter* (October 14, 2010). *Available at* http://www.realtytrac.com/content/press-releases/q3-2010-and-september-2010-foreclosure-reports-6108.

Working Paper No. 573.2 at 9, Figure 30,[5] (citing a Credit Suisse study showing monthly

mortgage rate resets).

**B.**      **Creation of the Home Affordable Modification Program**

69.      Congress passed the Emergency Economic Stabilization Act of 2008

on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of

2009 on February 17, 2009 (together, the "Act").  12 U.S.C. § 5201 *et seq.* (2009).

70.      The purpose of the Act is to grant the Secretary of the Treasury the

authority to restore liquidity and stability to the financial system, and ensure that such

authority is used in a manner that "protects home values" and "preserves homeownership."

*Id.*

71.      The Act grants the Secretary of the Treasury the authority to establish

the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the

Secretary may purchase or make commitments to purchase troubled assets from financial

institutions.  *Id.*

72.      Congress allocated up to $700 billion to the United States Department

of the Treasury for TARP.  12 U.S.C. § 5225.

73.      In exercising its authority to administer TARP, the Act mandates that

the Secretary "shall" take into consideration the "need to help families keep their homes and

to stabilize communities."  12 U.S.C. § 5213(3).

74.      The Act further mandates, with regard to any assets acquired by the

Secretary that are backed by residential real estate, that the Secretary "shall implement a plan

that seeks to maximize assistance for homeowners" and use the Secretary's authority over

servicers to encourage them to take advantage of programs to "minimize foreclosures."  12

U.S.C. § 5219.  The Act grants authority to the Secretary of the Treasury to use credit

---

[5] *Available at* http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413

enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

75.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

76.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

77.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

78.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

79.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

**C.     Duties of a Participating Servicer Under HAMP**

80.     Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer."  On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a SPA with the federal government.  *See* Exhibit 1 attached hereto.

81.     As a Congressional Oversight Panel evaluating HAMP noted, "[p]articipation in the program by servicers is voluntary, but once a servicer elects to participate, adherence to the program standards is mandatory for all the servicer's loans."

Congressional Oversight Panel, December 14, 2010 report at 4 (hereinafter December 14 Report).[6]

82.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation," *see* SPA § 1.A, and are incorporated by reference herein. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." SPA §§ 1.A., 2.A.[7]

83.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." SD 09-01 (Exhibit 2) at 1. This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments." *Id*.

84.     The Program Documentation requires Participating Servicers to evaluate *all loans* that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. SD 09-01 (Exhibit 2) at 4. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must

---

[6] *Available at* http://cop.senate.gov/reports/library/report-121410-cop.cfm.
[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation-Frequently Asked Questions ("HAMP FAQS," attached hereto as Exhibit 4), Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5). The Program Documentation has been consolidated by the U.S. Treasury Department into a single document known as the Making Home Affordable Handbook version 3.0 ("Handbook," attached hereto as Exhibit 6). These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as in this Complaint.

collect income and hardship information to determine if the borrower is eligible for a HAMP modification.  *Id*. at pp. 3-4.

85.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") agreement.  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[8]

86.     A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met.  Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

87.     Each and every one of the Plaintiffs made an application that included personal financial information, tax information, and a statement attesting to their hardship.

88.     Once the participating servicer has determined a borrower meets HAMP's threshold requirements, based on both information already in its possession and information submitted by the applicant homeowner, the servicer must then determine if the borrower is eligible to receive a HAMP modification, the goal of which is to modify the terms of the loan such that for the first five years, the monthly mortgage payment is equal to 31 percent of the borrower's income.

89.     The servicer does this by applying the steps enumerated in the Program Documentation to the loan, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.

---

[8] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

This process is known as the "waterfall." These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *See* SD 09-01 (Exhibit 2) at 8-10; *see also* Ex. 3 at 2. BOA does not have discretion as to how this formula is applied – HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached.

90.    If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a TPP Agreement if the modification provides a net present benefit to the mortgage holder. This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a TPP Agreement.

91.    The TPP Agreement describes a three or four month trial period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. BOA uses a standard form agreement to offer TPP Agreements to eligible homeowners. One such example of a form TPP Agreement is attached hereto as Exhibit 7. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

92.    The very first sentence of the form TPP Agreement used by BOA states: "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

93.    Section 3 of the form TPP Agreement repeats this promise: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be

18

true in all material respects, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."

94.     Further, the form TPP Agreement defines a finite "trial period" (usually three months but in some cases, four months), states that "TIME IS OF THE ESSENCE" and identifies the "modification effective date" as the first day of the month following the month in which the final trial payment is due.

95.     If the homeowner executes the TPP Agreement, complies with all documentation requirements verifying the information on which the initial finding of eligibility was made and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification.  The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP.  Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of: (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is fixed for the remainder of the term.  *See* SD 09-01 (Exhibit 2) at 9.

96.     The TPP Agreement requires homeowners to undertake several duties that they are not otherwise obligated to undertake.  Section 1 of the TPP Agreement required the homeowner to agree to undergo credit counseling, if they were asked to do so.  Vellyn Antonelli and James Langen, among other class members, were asked to and did in fact complete credit counseling.  In addition, the TPP Agreement requires homeowners to submit financial documentation that they were not otherwise required to provide, to set up newly established escrow accounts, and to make legally binding representations about their personal circumstances.

97.     Subject to adjustments that can be made to account for documented and verified changes in circumstances, HAMP directs that the terms of the Trial Plan are automatically made permanent upon a homeowner's successful completion of the Plan.  SD 09-01 states that "[i]f the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan."  Ex. 2 at p. 18.

**D.     BOA has Failed to Meet its HAMP Obligations as Promised under the SPA**

98.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.  SPA, Ex. 1 at ¶ 5(b).

99.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services.  *Id.* at ¶ 5(d).

100.     Bank of America has routinely failed to meet its obligations under HAMP.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from BOA after providing the requested information.  Borrowers who attempt to contact BOA by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.  BOA regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

101.     Further, Program Documentation includes an entire set of notice requirements that BOA routinely ignores, including the provision of clear explanations when

a homeowner is denied participation in HAMP, as evidenced by the individual allegations set forth below and in the underlying complaints. HAMP requires a participating servicer to send a Borrower Notice to every homeowner that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation. SD 09-08 (Ex. 5) at p. 1.

       102.    In addition, BOA's conduct has run afoul of the following prohibitions in HAMP rules, as evidenced by the individual allegations set forth below and in the underlying complaints:

- Proceeding with a foreclosure sale.  Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options.  *See* Ex. 4 at Q63; *see also* SD 09-01 (Ex. 2) at p. 14.

- Requiring borrowers to make an initial contribution payment pending the processing of the trial period plan before the plan starts.  Ex. 4 at Q. 83.

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period.  Ex. 8 at Q1230-02.

- Reporting borrowers as delinquent to credit reporting bureaus without explanation.  For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period.  For borrowers who are delinquent when they enter the trial period, the servicer should report in such a manner that accurately reflects the borrower's current workout status.  SD 09-01 Ex. 2 at p. 22.

- Assessing prepayment penalties for full or partial prepayment as part of the modification.  Ex. 4 at Q. 25.

103.    Former BOA employees have confirmed that BOA is not complying with HAMP in a manner that can only be considered deliberate.  BOA's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications.  Instead, BOA has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

104.    One former employee described BOA commonly encouraging or even requiring homeowners to resubmit financial information each time the customer called in to inquire about a pending modification.  Any change in financial information – even a small change – then causes BOA to restart the application process under the pretext of changed factual information.

105.    BOA customer service representatives are instructed to mislead homeowners who call to inquire about loan modifications for which they have applied.  According to former employees, customer service representatives regularly inform homeowners that modification documents were not received on time or not received at all when, in fact, all documents have been received.  Similarly, homeowners are regularly told that documents were sent on a particular date when, in fact, BOA had not sent the documents at all.  With few exceptions, the named plaintiffs in these matters were subjected to redundant, ambiguous and threatening demands for documents by BOA– documents that had already been submitted, that were not required to determine eligibility under HAMP guidelines, or that were unnecessary "updates" of previous documents.

106.    For example, as described in her underlying complaint, Debra Matthews endured a marathon of violations from BOA.  Having first applied for a HAMP modification in March 2009, Ms. Matthews endured *nineteen months* of rejection, inaccurate and inconsistent responses, and program violations before she was finally placed into a trial period in October 2010.  Ms. Matthews, working through an advocate had to resend her application at least six times because BOA claimed to have no record of it.   The frustration

experienced by Ms. Matthews is typical of Plaintiffs' and class members' experience with BOA.

107.    A former BOA employee has confirmed that BOA regularly ignores completed loan modifications by not properly reflecting the modification in its computer system.  BOA continues to treat the loan as delinquent by sending delinquency notices, reporting homeowners as delinquent to credit reporting agencies, and by instituting foreclosure proceedings.

108.    A former employee has confirmed that BOA regularly fails to properly credit payments homeowners make under a TPP Agreement.  BOA commonly applies payments to late fees or foreclosure fees and then deems a payment the homeowner made under a trial plan to be insufficient.  BOA's regular practice is to place payments a homeowner makes into a suspense account or "partial payment balance account" and not to credit the homeowner's regular mortgage account.  This results in BOA treating a homeowner who has made timely payments under a TPP Agreement as delinquent, in violation of HAMP rules.

109.    A former employee has confirmed that BOA does not properly employ the "waterfall" formula mandated by HAMP.  In addition, at least one former employee recalls seeing homeowners' financial records manipulated in BOA's computer system to the homeowners' detriment.

110.    Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, a former employee reports that BOA's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation thereby further damaging the homeowners' credit and therefore making alternative options to resolve delinquencies, such as refinancing, difficult or impossible.  Similarly, other forms of credit can and do become more expensive.

111.     Former BOA employees attest to seeing records regarding hundreds of homeowners in Trial Plans but recall none who had a trial plan properly converted to a permanent plan following three or even four successful payments.  According to the experience of one former employee, the vast majority of homeowners who seek a HAMP modification with BOA do not ever receive a permanently modified loan but are instead delayed indefinitely.

112.     Like many servicers, BOA has chosen not to comply with the obligations it undertook to participate in HAMP by entering into the SPA.  As a Congressional Oversight Panel recently found, the failure of servicers to follow through with HAMP's requirements has resulted in the program failing to help the vast majority of homeowners facing foreclosure. Congressional Oversight Panel, December 14, 2010 report at 4 (hereinafter "COP Report").[9]

113.     Despite HAMP's straightforward premise of providing loan modifications to prevent foreclosures, its prohibitions against foreclosing on a homeowner in the midst of applying for a HAMP modification, and its requirement that all other foreclosure alternatives be exhausted as a prerequisite to foreclosure, the number of foreclosure completions has actually risen since the time HAMP went into effect and since Bank of America began participating.  *Id*. at 9.

114.     In evaluating HAMP to date, the Congressional Oversight Panel specifically found that its shortcomings were largely due to the role mortgage servicers such as BOA have played in the process and their interest in turning substantial profit from foreclosure related fees.  The Panel found that the Treasury department has "failed to hold loan servicers accountable when they have repeatedly lost borrower paperwork or refused to perform loan modifications."  *Id*. at 5.  The Panel thus noted a "need for greater

---

[9] *Available at* http://cop.senate.gov/reports/library/report-121410-cop.cfm.

accountability in HAMP, particularly with regard to the activities of participating servicers."
*Id*. at 7.

      **E.**          **BOA Routinely Breaches its TPP Agreements**

      115.    Standing independent of BOA's failure to follow the rules of HAMP as promised in the SPA is BOA's routine breach of the form TPP Agreement.

      116.    Each and every named plaintiff in the TPP Class was determined by BOA to have met the threshold requirements for HAMP, as described above, prior to being tendered a TPP Agreement.

      117.    As described above, the form TPP Agreement contemplates a finite trial period, during which BOA is permitted to verify the information used to make the initial finding of eligibility and test the borrower's ability to make monthly payments at the modified level.  Under the terms of the TPP Agreement, BOA is not entitled to an ongoing and open-ended period of time in which to review and re-review the borrower's eligibility.

      118.    The COP Report specifically cited Bank of America as having a markedly low rate of converting TPP Agreements into permanent modifications.  Whereas the top servicers had conversion rates of 89 and 95 percent, "Bank of America's rate is closer to 30 percent."  *Id.* at 21-22.  Bank of America, standing alone, accounts for more than half of the total backlog of all participating servicers in the number of trial modifications that they have failed to convert into permanent modifications.

      119.    BOA understood that the TPP Agreement required it to tender permanent modifications to borrowers who successfully completed their three or four month trial period.  BOA represents on its website, and in other standardized written and oral communications, that borrowers who successfully make the trial period payments will be given a permanent loan modification.  The BOA website states, without qualification:  "If you successfully make your Trial Period Plan payments during the trial period, you will be

approved for a permanent modification of your loan."[10]   A separate page on Bank of
America's website outlines the HAMP program as follows:

- Step 1:  If you meet the minimum eligibility requirements, call us to request a Home
  Affordable Modification. We'll review your situation, confirm that you meet the
  requirements for this program and then send you a financial information packet.

- Step 2:  Once you've received your packet, you'll need to fill-out the forms and
  collect your documents. Sign and return the information to us as soon as possible. We
  can't evaluate you for a trial modification without all of your required documentation.

- Step 3:  If you qualify for the program, you'll enter a trial period of at least 3 months.
  Making all of your payments during this trial period will demonstrate that you can
  afford the modified payments and that they work within your budget.

- Step 4:  **If you successfully make all of your Trial Period Plan payments, you will
  receive a Modification Agreement defining the changes.**  After this document has
  been signed, notarized and returned to us, your modification will be officially made
  permanent.[11]

120.     Nevertheless, BOA has routinely breached its obligations under the
TPP Agreement by failing either to tender HAMP-compliant modifications or denials to
Plaintiffs prior to the close of the trial period.

121.     This is unsurprising given the U.S. Treasury's reporting of BOA's
overall performance under HAMP.  In November 2010, the U.S. Treasury reported that Bank
of America ranked third-worst of all servicers with a conversion rate of trial plans to
permanent modifications of just 29%.  Worse still, the report indicates that Bank of America
was the single worst servicer in performing under HAMP when measured by the number of
customers who have not been tendered permanent modifications, despite their having reached
the end of their trial period.  Bank of America has over *four times* as many of these
customers (19,795) as the next worst violator (JP Morgan Chase – 4642).  The Treasury
Report is attached hereto as Exhibit 8.

---

[10] Bank of America website, *available at* http://homeloanhelp.bankofamerica.com/en/home-affordable-
modification.html (last viewed January 19, 2011).
[11] Bank of America website, *available at* http://homeloanhelp.bankofamerica.com/en/home-affordable-
modification.html (last viewed January 19, 2011) (emphasis added).

122.    In order to perform under the terms of the TPP Agreement, BOA must tender a permanent modification that complies with HAMP rules and Program Documentation by the end of the trial period.  If BOA believes, based on new and different information it gathers from the homeowner during the trial period, that its initial determination of eligibility was incorrect, it is obligated to notify the homeowner of that fact prior to the end of the trial period.  If BOA fails to do so, it has breached the TPP Agreement and waived its ability to claim ineligibility or non-compliance in the future.

F.      **BOA's Actions Caused Injury to Plaintiffs**

123.    Plaintiffs have suffered injury caused by BOA's actions, including but not limited to longer loan payoff times, improper negative reporting to credit bureaus, monetary damages from higher principle balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.  Further, in many instances, BOA actually encouraged or instructed borrowers to default on their loans in order to "qualify" for assistance, when in fact HAMP requires only that an "imminent risk of default" be attested to.

124.    Moreover, whenever BOA breaches the TPP Agreement and delays the tender of a permanent HAMP modification beyond the close of the trial period, the terms of such a modification are less beneficial to the homeowner than they otherwise would be had BOA properly performed.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

125.    BOA's behavior has also left class members in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward trial period-level payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

## CLAIMS OF NAMED PLAINTIFFS

126.    Each of the named plaintiffs is the owner-occupant of a residential home encumbered by a first-lien loan of less than $729,750 that was originated prior to January 1, 2009, and that is serviced by BOA. The mortgage loans secured by each named plaintiff's home was either in default or was at imminent risk of default at the time each named plaintiff applied to BOA for a HAMP loan modification.

127.    Each of the named plaintiffs who represents a statewide TPP class has received a form TPP agreement substantially similar to the example attached hereto as Exhibit 7, a copy of which is in BOA's possession, and which is incorporated herein by reference.

### *Fausto Cabrera*

128.    BOA is the servicer of a loan made to Fausto Cabrera in 2005. Sometime after taking out the loan, Mr. Cabrera began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

129.    Mr. Cabrera applied for a HAMP modification in 2009.  After applying for a HAMP modification, Mr. Cabrera was determined initially eligible by BOA and sent a TPP Agreement in May 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. Cabrera accepted, executed and returned the TPP Agreement to BOA.

130.    Mr. Cabrera's TPP Agreement described a trial period that was to run from July 2009 through September 2009. Mr. Cabrera made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

131.    Since the TPP period began, and at all times relevant, Mr. Cabrera has responded to all document requests made by BOA by timely supplying the requested documents.  Mr. Cabrera supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

132.    Mr. Cabrera received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

133.    During Mr. Cabrera's trial period, attorneys acting on behalf of BOA continued foreclosure proceedings against his home.

### *Vellyn Antonelli*

134.    BOA is the servicer of a loan made to Vellyn Antonelli in 2006. Sometime after taking out the loan, Ms. Antonelli began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

135.    Ms. Antonelli applied for a HAMP modification in 2009.  After applying for a HAMP modification, Ms. Antonelli was determined initially eligible by BOA and sent a TPP Agreement in July 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Antonelli accepted, executed and returned the TPP Agreement to BOA.  In addition, Ms. Antonelli was asked by BOA to complete, and did complete, credit counseling, as she agreed to do under the terms of her TPP Agreement.

136.    Ms. Antonelli's TPP Agreement described a trial period that was to run from August 2009 through October 2009. Ms. Antonelli made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

137.    Since the TPP period began, and at all times relevant, Ms. Antonelli has responded to all document requests made by BOA by timely supplying the requested

documents.  Ms. Antonelli supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

138.    Ms. Antonelli received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of her trial period.

139.    Despite the above facts, attorneys acting on behalf of BOA commenced foreclosure proceedings against Ms. Antonelli's home in February 2010.

### Carmen Fox

140.    BOA is the servicer of a loan made to Carmen Fox in 2005.  Sometime after taking out the loan, Ms. Fox began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

141.    Ms. Fox applied for a HAMP modification in 2009.  After applying for a HAMP modification, Ms. Fox was determined initially eligible by BOA and sent a TPP Agreement in October 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Fox accepted, executed and returned the TPP Agreement to BOA.

142.    Ms. Fox's TPP Agreement described a trial period that was to run from December 2009 through February 2010. Ms. Fox made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

143.    Since the TPP period began, and at all times relevant, Ms. Fox has responded to all document requests made by BOA by timely supplying the requested documents.  Ms. Fox supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

144.    Ms. Fox received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of the trial period.

145.    During Ms. Fox's trial period, attorneys acting on behalf of BOA continued foreclosure proceedings against her home.

### *Mark Angelopoulos and Diane Anderson*

146.    BOA is the servicer of a loan made to Mark Angelopoulos and Diane Anderson in 2005.  Sometime after taking out the loan, Mr. Angelopoulos and Ms. Anderson began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

147.    Mr. Angelopoulos and Ms. Anderson applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in June 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. Angelopoulos and Ms. Anderson accepted, executed and returned the TPP Agreement to BOA.

148.    The TPP Agreement of Mr. Angelopoulos and Ms. Anderson described a trial period that was to run from August 2009 through October 2009. Mr. Angelopoulos and Ms. Anderson made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

149.    Since the TPP period began, and at all times relevant, Mr. Angelopoulos and Ms. Anderson have responded to all document requests made by BOA by timely supplying the requested documents.  Mr. Angelopoulos and Ms. Anderson supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

150.    Mr. Angelopoulos and Ms. Anderson received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

151.   During the trial period of Mr. Angelopoulos and Ms. Anderson, attorneys acting on behalf of BOA continued foreclosure proceedings against their home.

### Katie and John Buckley

152.   BOA is the servicer of a loan made to Katie and John Buckley in 2007. Sometime after taking out the loan, Mr. and Mrs. Buckley began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

153.   Mr. and Mrs. Buckley applied for a HAMP modification in 2009. After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in September 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Buckley accepted, executed and returned the TPP Agreement to BOA.

154.   The TPP Agreement of Mr. and Mrs. Buckley described a trial period that was to run from November 2009 through January 2010.  Mr. and Mrs. Buckley made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

155.   Since the TPP period began, and at all times relevant, Mr. and Mrs. Buckley have responded to all document requests made by BOA by timely supplying the requested documents.  Mr. and Mrs. Buckley supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

156.   Mr. and Mrs. Buckley received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

157.   Following the trial period of Mr. and Mrs. Buckley, and despite the above facts, attorneys acting on behalf of BOA commenced foreclosure proceedings against their home.

*James and Margaret Cooley*

158.    BOA is the servicer of a loan made to James and Margaret Cooley in 2006.  On information and belief, BOA obtained the servicing rights on this loan from Wilshire Credit Corporation ("Wilshire"), its subsidiary or sister company, in February 2010. Sometime after taking out the loan, Mr. and Mrs. Cooley began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

159.    Mr. and Mrs. Cooley applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by Wilshire and sent a TPP Agreement in November 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Cooley accepted, executed and returned the TPP Agreement to Wilshire.

160.    The TPP Agreement of Mr. and Mrs. Cooley described a trial period that was to run from December 2009 through March 2010.  Mr. and Mrs. Cooley made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Wilshire and/or BOA.

161.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Cooley have responded to all document requests made by Wilshire and BOA by timely supplying the requested documents.  Mr. and Mrs. Cooley supplied information to Wilshire and BOA that was truthful to the best of their knowledge throughout the HAMP process.

162.    Despite the fact that BOA was bound to honor Wilshire's agreement, Mr. and Mrs. Cooley received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

163.    Following the trial period of Mr. and Mrs. Cooley, and despite the above facts, BOA threatened foreclosure proceedings against their home.

### *Leta Allen*

164.    BOA is the servicer of a loan made to Leta Allen in 2006.  Sometime after taking out the loan, Ms. Allen began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

165.    Ms. Allen was solicited by BOA to apply for a HAMP modification in 2009.  After applying for a HAMP modification, Ms. Allen was determined initially eligible by BOA and sent a TPP Agreement in January 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Allen accepted, executed and returned the TPP Agreement to BOA.

166.    Ms. Allen's TPP Agreement described a trial period that was to run from March 2010 through May 2010. Ms. Allen made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

167.    Since the TPP period began, and at all times relevant, Ms. Allen has responded to all document requests made by BOA by timely supplying the requested documents as soon as they were in her possession.  Ms. Allen supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

168.    Ms. Allen received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of the trial period.

169.    Following Ms. Allen's trial period, attorneys acting on behalf of BOA commenced foreclosure proceedings against her home.

### *Kamie and Daniel Kahlo*

170.    BOA is the servicer of a loan made to Kamie and Daniel Kahlo in 2001.  Sometime after taking out the loan, Mr. and Mrs. Kahlo began experiencing hardships that caused difficulty in making monthly payments on their mortgage.  Representatives of

BOA encouraged Mr. and Mrs. Kahlo to default on their loan in order to become eligible for loss mitigation alternatives.

171.    Mr. and Mrs. Kahlo applied for a HAMP modification in June 2009.

172.    During this application process, and at all times relevant, Mr. and Mrs. Kahlo have responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding their income and financial circumstances.  Mr. and Mrs. Kahlo supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

173.    On August 30, 2009, Mr. and Mrs. Kahlo received a Terms and Conditions Agreement that Bank of America termed an "offer to modify the Mortgage" to be deemed accepted once signed and returned.  Based on statements made by BOA, including statements included in correspondence sent to the Kahlos, statements made by BOA describing HAMP in public, and statements on BOA's website described above, the Kahlos understood their agreement to constitute a HAMP-compliant modification.

174.    Mr. and Mrs. Kahlo returned a signed Terms and Conditions Agreement the following day thereby acknowledging their acceptance of Bank of America's offer.  They further tendered initial "good faith" payments that Bank of America demanded. The Kahlos made each of the monthly payments in full and on time in the amounts stated in the Agreement.  Bank of America accepted each payment.

175.    BOA failed to follow applicable HAMP guidelines in processing Mr. and Mrs. Kahlo's application for a HAMP modification, as laid out in the Program Documentation and promised in the SPA.  This has caused Mr. and Mrs. Kahlo injury.

### *Britta Brewer*

176.    BOA is the servicer of a loan made to Britta Brewer in 2004. Sometime after taking out the loan, Ms. Brewer began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

177.    Ms. Brewer applied for a HAMP modification in September 2009.

178.     During this application process, and at all times relevant, Ms. Brewer has responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding her income and financial circumstances.  Ms. Brewer supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

179.     Ms. Brewer was told that she had successfully entered into a trial period.   Bank of America instructed Ms. Brewer to begin making modified loan payments of $1,977 per month for the next three months and, if she made timely payments, she would receive documents to permanently modify the mortgage loan under HAMP.  This statement induced her to make modified payments.  Ms. Brewer tendered timely payments of $1,977 to Bank of America in full and on time, each month, beginning in November 2009.  BOA accepted each payment.

180.     BOA failed to follow applicable HAMP guidelines in processing Ms. Brewer's application for a HAMP modification, as laid out in the Program Documentation and promised in the SPA.  This has caused Ms. Brewer injury.

181.     Like thousands of other BOA customers, Ms. Brewer has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and continued cooperation with BOA.  Ms. Brewer has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification.

### Stacey Madamba

182.     BOA is the servicer of a loan made to Stacey Madamba in 2007. Sometime after taking out the loan, Ms. Madamba began experiencing hardships that caused difficulty in making monthly payments on her mortgage.  Representatives of BOA encouraged Ms. Madamba to stop paying on her loan in order to become eligible for loss mitigation alternatives.

183.     Ms. Madamba applied for a HAMP modification in October 2009.

184.    During this application process, and at all times relevant, Ms. Madamba has responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding her income and financial circumstances.  Ms. Madamba supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

185.    Ms. Madamba received two "Terms and Conditions Agreements" (one for each of two loans on her home) that Bank of America termed an "offer" to be deemed accepted once signed and returned.  The Agreements instructed Ms. Madamba to make modified loan payments by specific dates.  Ms. Madamba signed and returned the Terms and Conditions Agreements thereby manifesting acceptance.  Ms. Madamba tendered all payments specified in the Agreements in full and on time.  BOA accepted each payment.

186.    BOA failed to follow applicable HAMP guidelines in processing Ms. Madamba's application for a HAMP modification, as laid out in the Program Documentation and promised in the SPA.  This has caused Ms. Madamba injury.

187.    Like thousands of other BOA customers, Ms. Madamba has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and continued cooperation with BOA.  Ms. Madamba has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification.

### Tarry and Nancy Miller

188.    BOA is the servicer of a loan made to Tarry and Nancy Miller in 2006. Sometime after taking out the loan, Mr. and Mrs. Miller began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

189.    Mr. and Mrs. Miller applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in September 2009 that is substantially identical to the form TPP

Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Miller accepted, executed and returned the TPP Agreement to BOA.

190.    The TPP Agreement of Mr. and Mrs. Miller described a trial period that was to run from September 24, 2009 through December 2009.  Mr. and Mrs. Miller made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

191.    Throughout the HAMP process, Mr. and Mrs. Miller have responded to all document requests made by BOA by timely supplying the requested documents.  Mr. and Mrs. Miller supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

192.    Mr. and Mrs. Miller were tendered a permanent loan modification in December 2009, which they accepted, executed and returned to BOA.  Mr. and Mrs. Miller began performing under this permanent modification agreement by making timely monthly payments.

193.    Despite this permanent modification, attorneys acting on behalf of BOA commenced foreclosure proceedings against Mr. and Mrs. Miller's home in March 2010.  BOA has since repudiated the permanent modification agreement and told the Millers that they are in default.

194.    BOA failed to follow applicable HAMP guidelines in processing the Millers' permanent modification, as laid out in the Program Documentation and promised in the SPA.  This has caused the Millers injury.

195.    Like thousands of other BOA customers, the Millers have been living in limbo, with a home in the foreclosure process, despite their compliance with HAMP requirements and acceptance of a permanent modification.  The Millers invested their limited resources in this cooperation based on a promise that doing so would result in more than an illusory permanent loan modification.

38

### Teresa Follmer

196.     BOA is the servicer of a loan made to Teresa Follmer in 2007. Sometime after taking out the loan, Ms. Follmer began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

197.     After initially being improperly turned away by BOA's representatives, Ms. Follmer applied for a HAMP modification in 2009.  After applying for a HAMP modification, Ms. Follmer was determined initially eligible by BOA and sent a TPP Agreement in October 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Follmer accepted, executed and returned the TPP Agreement to BOA.

198.     Ms. Follmer's TPP Agreement described a trial period that was to run from December 2009 through February 2010. Ms. Follmer made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

199.     Since the TPP period began, and at all times relevant, Ms. Follmer has responded to all document requests made by BOA by timely supplying the requested documents as soon as they were in her possession.  Ms. Follmer supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

200.     Ms. Follmer received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of the trial period.

201.     Following Ms. Follmer's trial period, attorneys acting on behalf of BOA commenced foreclosure proceedings against her home.

### Katie and John Lividotti

202.     BOA is the servicer of a loan made to Katie and John Lividotti in 2007.  Sometime after taking out the loan, Mr. and Mrs. Lividotti began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

203.    Mr. and Mrs. Lividotti began applying for a HAMP modification in October 2009.

204.    During this application process, and at all times relevant, Mr. and Mrs. Lividotti have responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding their income and financial circumstances.  Mr. and Mrs. Lividotti supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

205.    Mr. and Mrs. Lividotti were informed by letter in February 2010 that they had been approved for a modification, and instructed them to make modified payments by specified dates.  The Lividottis tendered payments specified in this agreement in full and on time.  BOA accepted each payment.

206.    Mr. and Mrs. Lividotti were never provided a reason why they did not receive a written TPP Agreement.  Instead, after making modified payments pursuant to written correspondence from BOA, BOA repudiated the modification approval and referred them to foreclosure.

207.    BOA failed to follow applicable HAMP guidelines in processing Mr. and Mrs. Lividotti's application for a HAMP modification, as laid out in the Program Documentation and promised in the SPA.  This has caused Mr. and Mrs. Lividotti injury.

208.    Like thousands of other BOA customers, Mr. and Mrs. Lividotti have been living in limbo, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements and continued cooperation with BOA.  Mr. and Mrs. Lividotti have invested their limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification.

### Tamara Golden

209.    BOA is the servicer of a loan made to Tamara Golden in 2006. Sometime after taking out the loan, Ms. Golden began experiencing hardships that caused her to have difficulty making monthly payments on his mortgage.

40

210.    Ms. Golden applied for a HAMP modification in 2009.  After applying for a HAMP modification, Ms. Golden was determined initially eligible by Defendant and sent a TPP Agreement in November 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Golden accepted, executed and returned the TPP Agreement to BOA.

211.    Ms. Golden's TPP Agreement described a trial period that was to run from January 2010 through March 2010. Ms. Golden made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

212.    Since the TPP period began, and at all times relevant, Ms. Golden has responded to all document requests made by BOA by timely supplying the requested documents.  Ms. Golden supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

213.    Ms. Golden received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of her trial period. Also, Bank of America failed to provide notice that complied with the ECOA and applicable regulations.

214.    Like thousands of other BOA customers, Ms. Golden has been living in limbo, without any assurances that their home will not be foreclosed, despite the above-alleged facts.  Ms. Golden has invested has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail.

### *Joseph and Gina Haber*

215.    BOA is the servicer of a loan made to Joseph and Gina Haber in 2005. Sometime after taking out the loan, Mr. and Mrs. Haber began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

216.    Mr. and Mrs. Haber applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by BOA and sent

a TPP Agreement in June 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above Mr. and Mrs. Haber accepted, executed and returned the TPP Agreement to BOA.

217.    The TPP Agreement of Mr. and Mrs. Haber described a trial period that was to run from June 2009 through August 2009. Mr. and Mrs. Haber made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

218.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Haber have responded to all document requests made by BOA by timely supplying the requested documents.  Mr. and Mrs. Haber supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

219.    Mr. and Mrs. Haber received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

220.    After the trial period of Mr. and Mrs. Haber was concluded – and after they had continued to perform at the trial period payment level for one year, attorneys acting on behalf of BOA commenced foreclosure proceedings against the Haber home. Since the filing of the Habers' action, BOA has halted these foreclosure proceedings and offered the Habers a non-HAMP loan modification agreement.  However, this non-HAMP loan modification agreement sets forth a grossly inflated unpaid principal balance on the Habers' Loan.  The Habers sent a letter informing BOA of this fact and requesting that BOA provide them with an itemization of the charges underlying the inflated unpaid principal balance.  To date, BOA has not responded to the Habers' letter.

### *Maria and Donald Hall*

221.    BOA is the servicer of a loan made to Maria and Donald Hall.  On information and belief, BOA obtained the servicing rights on this loan from Wilshire Credit Corporation ("Wilshire"), its subsidiary or sister company, in 2010.  Sometime after taking

out the loan, Mr. and Mrs. Hall began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

222.    Mr. and Mrs. Hall applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by Wilshire and sent a TPP Agreement in July 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Hall accepted, executed and returned the TPP Agreement to Wilshire.

223.    The TPP Agreement of Mr. and Mrs. Hall described a trial period that was to run from September 2009 through November 2009.  Mr. and Mrs. Hall made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA and/or Wilshire.  At the close of the trial period, Wilshire sent the Halls a letter indicating that they had successfully completed their trial period.

224.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Hall have responded to all document requests made by Wilshire and BOA by timely supplying the requested documents.  Mr. and Mrs. Hall supplied information to Wilshire and BOA that was truthful to the best of their knowledge throughout the HAMP process.

225.    Despite the fact that BOA was bound to honor Wilshire's agreement, Mr. and Mrs. Hall received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period. Instead, once the servicing of the Halls' loan was transferred to BOA, the Halls were notified by BOA representatives that their TPP Agreement would not be honored and that they were ineligible for a HAMP modification.

226.    Following the trial period of Mr. and Mrs. Hall, and despite the above facts, BOA initiated foreclosure proceedings against their home.

### Gail Shulski

227.    BOA is the servicer of a loan made to Gail Shulski in 2006.  On information and belief, BOA obtained the servicing rights on this loan from Wilshire Credit Corporation ("Wilshire"), its subsidiary or sister company, in 2010.

228.    In 2009, Wilshire initiated foreclosure proceedings against Ms. Shulski.  During the course of these proceedings in 2009, Ms. Shulski sought a loan modification from Wilshire and was told that she would be considered for a HAMP modification.  By January 2010, Wilshire had still not informed Miss Shulski as to whether she was eligible for HAMP.

229.    In February 2010, Ms. Shulski received notice from Wilshire that the servicing of her loan had been transferred to BOA.  Ms. Shulski immediately informed BOA that she had been under review by Wilshire for a HAMP modification and repeatedly requested that BOA give her an answer regarding her eligibility.  In response, BOA demanded documents that Ms. Shulski had already supplied to Wilshire.  Ms. Shulski supplied these documents to BOA but, despite doing so, never received an answer from BOA on her HAMP eligibility.

230.    As a result, fearing the loss of her house to foreclosure, Ms. Shulski filed for bankruptcy in April 2010.  Following her discharge from bankruptcy, in or about September 2010, she has again made numerous requests to BOA regarding her HAMP eligibility.  As before, BOA has not responded.

### Jason Volpe

231.    BOA is the servicer of a loan made to Jason Volpe in 2007.  On information and belief, BOA obtained the servicing rights on this loan from Wilshire Credit Corporation ("Wilshire"), its subsidiary or sister company, in 2010.  Sometime after taking out the loan, Mr. Volpe began experiencing hardships that caused difficulty in making monthly payments on his mortgage.

232.    Mr. Volpe applied for a HAMP modification in 2009.  After applying for a HAMP modification, he was determined initially eligible by Wilshire and sent a TPP Agreement in November 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above. Mr. Volpe accepted, executed and returned the TPP Agreement to BOA.

233.    The TPP Agreement of Mr. Volpe described a trial period that was to run from December 2009 through February 2010. Mr. Volpe made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

234.    Since the TPP period began, and at all times relevant, Mr. Volpe has responded to all document requests made by Wilshire and BOA by timely supplying the requested documents. Mr. Volpe supplied information to Wilshire and BOA that was truthful to the best of his knowledge throughout the HAMP process.

235.    Despite the fact that BOA was bound to honor Wilshire's agreement, Mr. Volpe received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period. Instead, once the servicing of his loan was transferred to BOA, Mr. Volpe was notified by BOA representatives that their TPP Agreement would not be honored.  Instead, BOA required Mr. Volpe to execute a new TPP Agreement, which he did.  BOA has also breached this second TPP Agreement.  In neither case did BOA provide notice that complied with the ECOA and applicable regulations.

236.    BOA has now issued Mr. Volpe a notice of intent to foreclose.  Mr. Volpe has invested his limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail.

### *Isaac and Marlen Mikhail*

237.     BOA is the servicer of a loan made to Isaac and Marlen Mikhail in 2005.  Sometime after taking out the loan, Mr. and Mrs. Mikhail began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

238.     Mr. and Mrs. Mikhail applied for a HAMP modification in 2009. After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in November 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above Mr. and Mrs. Mikhail accepted, executed and returned the TPP Agreement to BOA.

239.     The TPP Agreement of Mr. and Mrs. Mikhail described a trial period that was to run from December 2009 through February 2010. Mr. and Mrs. Mikhail made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

240.     Since the TPP period began, and at all times relevant, Mr. and Mrs. Mikhail have responded to all document requests made by BOA by timely supplying the requested documents.  Mr. and Mrs. Mikhail supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

241.     Mr. and Mrs. Mikhail received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

242.     After the trial period of Mr. and Mrs. Mikhail was concluded, BOA threatened foreclosure proceedings against the Mikhail home, despite their continued payments at the trial period payment amount.

### *Anthony and April Soper*

243.     BOA is the servicer of a loan made to Anthony and April Soper in 2007.  Sometime after taking out the loan, Mr. and Mrs. Soper began experiencing hardships

that caused difficulty in making monthly payments on their mortgage, although they were not in default prior to their involvement in the HAMP process.

244.    Mr. and Mrs. Soper applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in December 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Soper accepted, executed and returned the TPP Agreement to BOA.   Mr. and Mrs. Soper were not delinquent on their loan at this time.

245.    The TPP Agreement of Mr. and Mrs. Soper described a trial period that was to run from December 2009 through March 2010. Mr. and Mrs. Soper made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

246.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Soper have responded to all document requests made by BOA by timely supplying the requested documents.  Mr. and Mrs. Soper supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

247.    Mr. and Mrs. Soper received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.  Also, BOA failed to provide notice that complied with the ECOA and applicable regulations.

248.    After the trial period of Mr. and Mrs. Soper was concluded, BOA initiated foreclosure proceedings against the Soper home, despite their continued payments at the trial period payment amount.

### Debra Matthews

249.    BOA is the servicer of a loan made to Debra Matthews.  Sometime after taking out the loan, Ms. Matthews began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

250.     Ms. Matthews applied for a HAMP modification in 2009.  After applying for a HAMP modification and enduring fifteen months of being told by BOA that she was not eligible for HAMP, Ms. Matthews was determined initially eligible by BOA and entered into a trial period in August 2010.  Based on statements made by BOA, including statements included in correspondence sent to Ms. Matthews, statements made by BOA describing HAMP in public, and statements made on BOA's website described above, Ms. Matthews understood the trial period plan to constitute a promise that her compliance with the terms of the trial plan would result in a HAMP-compliant permanent modification.

251.     Ms. Matthews' trial period was to run from October 2010 through December 2010. Ms. Matthews made each of the monthly payments during the trial period, as well as additional payments beyond the trial period, which were accepted by BOA.

252.     Throughout the HAMP process, and at all times relevant, Ms. Matthews has responded to all document requests made by BOA by timely supplying the requested documents. Ms. Matthews supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

253.     Ms. Matthews received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

254.     Ms. Matthews has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail.

### *Jesus Carrillo*

255.     BOA is the servicer of a loan made to Jesus Carrillo.  Sometime after taking out the loan, Mr. Carrillo began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

256.     Mr. Carrillo applied for a HAMP modification in 2009.  After applying for a HAMP modification, Mr. Carrillo was determined initially eligible by BOA and sent a TPP Agreement in March 2010 that is substantially identical to the form TPP

Agreement described in Paragraphs 91-97 above.  Mr. Carrillo accepted, executed and returned the TPP Agreement to BOA.

257.    Mr. Carrillo's TPP Agreement described a trial period that was to run from April 2010 through June 2010. Mr. Carrillo made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

258.    Since the TPP period began, and at all times relevant, Mr. Carrillo has responded to all document requests made by BOA by timely supplying the requested documents.  Mr. Carrillo supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

259.    Mr. Carrillo received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of the trial period.

260.    During Mr. Carrillo's trial period, BOA tendered Mr. Carrillo a non-HAMP modification and was unable to explain why it had not tendered him a permanent modification that complied with HAMP's rules and the Program Documentation.

### Elena Renne

261.    BOA is the servicer of a loan made to Elena Renne.  Sometime after taking out the loan, Ms. Renne began experiencing hardships that caused difficulty in making monthly payments on her mortgage.  Representatives of BOA encouraged Ms. Renne to stop paying on her loan in order to become eligible for loss mitigation alternatives.

262.    Ms. Renne applied for a HAMP modification in August 2009.  After applying for a HAMP modification and enduring fifteen months of waiting, Ms. Renne was determined initially eligible by BOA and entered into a trial period in December 2010. Based on statements made by BOA, including statements included in correspondence sent to Ms. Renne, statements made by BOA describing HAMP in public, and statements made on BOA's website described above, Ms. Renne understood the trial period plan to constitute a

promise that her compliance with the terms of the trial plan would result in a HAMP-compliant permanent modification.

263.    Ms. Renne's trial period was to run from January 2011 through March 2011.  To date, Ms. Renne has made the required monthly payments during the trial period, which were accepted by BOA.

264.    Throughout the HAMP process, and at all times relevant, Ms. Renne has responded to all document requests made by BOA by timely supplying the requested documents.  Ms. Renne supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

265.    Ms. Renne has not yet received the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility.

266.    Instead, despite making these payments, on or about January 7, 2011, a foreclosure notice was "tacked" to her door, stating that the property would be sold on February 3, 2011.  Ms. Renne's calls to BOA have yielded no assurance that the foreclosure will be stopped, despite her ongoing trial period.  Ms. Renne has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail.

### *Kimberley George*

267.    BOA is the servicer of a loan made to Kimberley George in 2004. Sometime after taking out the loan, Ms. George began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

268.    Ms. George applied for a HAMP modification in 2009.  After applying for a HAMP modification, she was determined initially eligible by BOA and sent a TPP Agreement in August 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. George accepted, executed and returned the TPP Agreement to BOA.

269.     The TPP Agreement of Ms. George described a trial period that was to run from September 2009 through November 2009. Ms. George made each of the monthly payments described in the TPP Agreement, at which point BOA instructed her to stop making payments in order that the terms of her permanent modification could be calculated based on her then balance.

270.     Since the TPP period began, and at all times relevant, Ms. George has responded to all document requests made by BOA by timely supplying the requested documents.  Ms. George supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

271.     Ms. George received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

272.     After the trial period of Ms. George was concluded, BOA initiated collection and foreclosure proceedings against her home.

**_James Langen_**

273.     BOA is the servicer of a loan made to James Langen in 2006. Sometime after taking out the loan, Mr. Langen began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

274.     Mr. Langen applied for a HAMP modification in 2009.  After applying for a HAMP modification, Mr. Langen was determined initially eligible by BOA and sent a TPP Agreement in September 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. Langen accepted, executed and returned the TPP Agreement to BOA.

275.     Mr. Langen's TPP Agreement described a trial period that was to run from September 2009 through December 1, 2009. Mr. Langen made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period,

which were accepted by BOA.  In addition, Mr. Langen was asked by BOA to complete, and did complete, credit counseling, as he agreed to do under the terms of his TPP Agreement.

276.   Since the TPP period began, and at all times relevant, Mr. Langen has responded to all document requests made by BOA by timely supplying the requested documents.  Mr. Langen supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

277.   Mr. Langen received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

278.   Following the trial period, Mr. Langen continued to spend countless hours and resources in a frustrating effort to receive a permanent HAMP modification, to no avail.

### Gretha Wilkerson

279.   BOA is the servicer of a loan made to Gretha Wilkerson.  Sometime after taking out the loan, Ms. Wilkerson began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

280.   Ms. Wilkerson began applying for HAMP in early 2009.

281.   During this application process, and at all times relevant, Ms. Wilkerson has responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding her income and financial circumstances.  Ms. Wilkerson supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

282.   Ms. Wilkerson did not receive a TPP Agreement, but was instead faced with a confusing, contradictory and threatening series of responses.  Ms. Wilkerson was never provided a meaningful reason why she was not eligible for a written TPP Agreement.

283.    BOA failed to follow applicable HAMP guidelines in processing Ms. Wilkerson's application for a HAMP modification, as laid out in the Program Documentation and promised in the SPA.  This has caused Ms. Wilkerson injury.

284.    Like thousands of other BOA customers, Ms. Wilkerson has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and continued cooperation with BOA.  Ms. Wilkerson has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification.

### Melissa Wood

285.    BOA is the servicer of a loan made to Melissa Wood.  Sometime after taking out the loan, Ms. Wood began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

286.    Ms. Wood applied for a HAMP modification in 2009.  After applying for a HAMP modification, Ms. Wood was determined initially eligible by BOA and sent a TPP Agreement in December 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Wood accepted, executed and returned the TPP Agreement to BOA.

287.    Ms. Wood's TPP Agreement described a trial period that was to run from January 2010 through March 2010. Ms. Wood made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

288.    Since the TPP period began, and at all times relevant, Ms. Wood has responded to all document requests made by BOA by timely supplying the requested documents.  Ms. Wood supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

289.	Ms. Wood received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of the trial period.

290.	Following Ms. Wood's trial period, and despite the above alleged facts, attorneys acting on behalf of BOA restarted foreclosure proceedings against her home.

### *Mitchell and Mindy Lightman*

291.	BOA is the servicer of a loan made to Mitchell and Mindy Lightman in 2007.  Sometime after taking out the loan, Mr. and Mrs. Lightman began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

292.	Mr. and Mrs. Lightman first applied for a HAMP modification in 2009.  After applying for a HAMP modification and experiencing a lengthy delay, they were determined initially eligible by BOA and sent a TPP Agreement in April 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Lightman accepted, executed and returned the TPP Agreement to BOA.

293.	The TPP Agreement of Mr. and Mrs. Lightman described a trial period that was to run from May 2010 through July 2010. Mr. and Mrs. Lightman made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

294.	Since the TPP period began, and at all times relevant, Mr. and Mrs. Lightman have responded to all document requests made by BOA by timely supplying the requested documents.  Mr. and Mrs. Lightman supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

295.	Mr. and Mrs. Lightman received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

296.	Following the trial period of Mr. and Mrs. Lightman, attorneys acting on behalf of BOA restarted foreclosure proceedings against their home.

### Shari Goldman

297.    BOA is the servicer of a loan made to Shari Goldman in 2004. Sometime after taking out the loan, Ms. Goldman began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

298.    Ms. Goldman applied for a HAMP modification in January 2010. After applying for a HAMP modification, Ms. Goldman was determined initially eligible by BOA and sent a TPP Agreement in January 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Goldman accepted, executed and returned the TPP Agreement to BOA.

299.    Ms. Goldman's TPP Agreement described a trial period that was to run from February 2010 through May 2010. Ms. Goldman made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

300.    Since the TPP period began, and at all times relevant, Ms. Goldman has responded to all document requests made by BOA by timely supplying the requested documents.  Ms. Goldman supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

301.    Ms. Goldman received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible prior to the expiration of the trial period.

302.    Following Ms. Goldman's trial period, attorneys acting on behalf of BOA commenced foreclosure proceedings against her home.

### Darren Kunsky

303.    BOA is the servicer of a loan made to Darren Kunsky.  Sometime after taking out the loan, Mr. Kunsky began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

304.    Mr. Kunsky applied for a HAMP modification in 2009.  After applying for a HAMP modification, Mr. Kunsky was determined initially eligible by BOA and sent a TPP Agreement in April 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. Kunsky accepted, executed and returned the TPP Agreement to BOA.  Mr. Kunsky was not delinquent on his loan at this time.

305.    Mr. Kunsky's TPP Agreement described a trial period that was to run from May 2010 through July 2010.  Mr. Kunsky made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

306.    Since the TPP period began, and at all times relevant, Mr. Kunsky has responded to all document requests made by BOA by timely supplying the requested documents.  Mr. Kunsky supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

307.    Mr. Kunsky received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.  Also, BOA failed to provide notice that complied with the ECOA and applicable regulations.

308.    Despite the fact that Mr. Kunsky was current on his mortgage at the time he entered into his TPP Agreement, BOA has now wrongfully informed Mr. Kunsky that he is not eligible for HAMP on the basis of owner occupancy and his loan is in default.  Mr. Kunsky continued to spend hours and resources in an effort to receive a permanent HAMP modification, to no avail.

### *Marie Freeman*

309.    BOA is the servicer of a loan made to Marie Freeman in 2006.  On information and belief, BOA obtained the servicing rights on this loan from Wilshire Credit Corporation ("Wilshire"), its subsidiary or sister company, in 2010.  Sometime after taking

out the loan, Ms. Freeman began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

310.    Ms. Freeman applied for a HAMP modification in 2009.  After applying for a HAMP modification, she was determined initially eligible by Wilshire and sent a TPP Agreement in October 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Freeman accepted, executed and returned the TPP Agreement to Wilshire.

311.    The TPP Agreement of Ms. Freeman described a trial period that was to run from November 2009 through January 2010. Ms. Freeman made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Wilshire and/or BOA.

312.    Since the TPP period began, and at all times relevant, Ms. Freeman has responded to all document requests made by Wilshire and BOA by timely supplying the requested documents. Ms. Freeman supplied information to Wilshire and BOA that was truthful to the best of her knowledge throughout the HAMP process.

313.    Despite the fact that BOA was bound to honor Wilshire's agreement, Ms. Freeman received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period. Instead, once the servicing of her loan was transferred to BOA, Ms. Freeman was notified by BOA representatives that their TPP Agreement would not be honored and that she was ineligible for a HAMP modification. Also, Wilshire and BOA failed to provide notice that complied with the ECOA and applicable regulations.

314.    Even while the trial period of Ms. Freeman was still underway, and despite the above facts, BOA pursued foreclosure proceedings against her home. Ms. Freeman has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail.

### *April and Michael Taddeo*

315.    BOA is the servicer of a loan made to April and Michael Taddeo in 2006.  Sometime after taking out the loan, Mr. and Mrs. Taddeo began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

316.    Mr. and Mrs. Taddeo applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in December 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above. Mr. and Mrs. Taddeo accepted, executed and returned the TPP Agreement to BOA.

317.    The TPP Agreement of Mr. and Mrs. Taddeo described a trial period that was to run from January 2010 through March 2010. Mr. and Mrs. Taddeo made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

318.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Taddeo have responded to all document requests made by BOA by timely supplying the requested documents. Mr. and Mrs. Taddeo supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

319.    Mr. and Mrs. Taddeo received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

320.    Mr. and Mrs. Taddeo have invested their limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail.

### *Andrew Bianchi*

321.    BOA is the servicer of a loan made to Andrew Bianchi in 2005. Sometime after taking out the loan, Mr. Bianchi began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

322.    Mr. Bianchi applied for a HAMP modification in 2009.  After applying for a HAMP modification, Mr. Bianchi was determined initially eligible by BOA and sent a TPP Agreement in September 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. Bianchi accepted, executed and returned the TPP Agreement to BOA.

323.    Mr. Bianchi's TPP Agreement described a trial period that was to run from October 2009 through December 2009.  Mr. Bianchi made each of the payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

324.    Since the TPP period began, and at all times relevant, Mr. Bianchi has responded to all document requests made by BOA by timely supplying the requested documents.  Mr. Bianchi supplied information to BOA that was truthful to the best of his knowledge throughout the HAMP process.

325.    Mr. Bianchi received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible prior to the expiration of his trial period.

326.    Following the successful completion of his trial period, BOA has now wrongfully informed Mr. Bianchi that he is not eligible for HAMP.  Mr. Bianchi continued to spend countless hours and resources in a frustrating effort to receive a permanent HAMP modification, to no avail.

### *Jean and Tae Young Rho*

327.    BOA is the servicer of a loan made to Jean and Tae Young Rho in 2007.  Sometime after taking out the loan, Mr. and Mrs. Rho began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

328.    Mr. and Mrs. Rho applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in February 2010 that is substantially identical to the form TPP Agreement

described in Paragraphs 91-97 above. Mr. and Mrs. Rho accepted, executed and returned the TPP Agreement to BOA.

329.    The TPP Agreement of Mr. and Mrs. Rho described a trial period that was to run from April 2010 through June 2010. Mr. and Mrs. Rho made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

330.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Rho have responded to all document requests made by BOA by timely supplying the requested documents. Mr. and Mrs. Rho supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

331.    Mr. and Mrs. Rho received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

332.    Mr. and Mrs. Rho have invested their limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail.

### *Robert and Susan Brooking*

333.    BOA is the servicer of a loan made to Robert and Susan Brooking in 2007. Sometime after taking out the loan, Mr. and Mrs. Brooking began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

334.    Mr. and Mrs. Brooking applied for a HAMP modification in 2009. After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in August 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above. Mr. and Mrs. Brooking accepted, executed and returned the TPP Agreement to BOA.  Mr. and Mrs. Brooking were not delinquent on their loan at this time.

335.    The TPP Agreement of Mr. and Mrs. Brooking described a trial period that was to run from September 2009 through November 2009. Mr. and Mrs. Brooking made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

336.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Brooking have responded to all document requests made by BOA by timely supplying the requested documents. Mr. and Mrs. Brooking supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

337.    Mr. and Mrs. Brooking received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.  Also, BOA failed to provide notice that complied with the Virginia ECOA.

338.    Following Mr. and Mrs. Brooking's trial period, and despite the above alleged facts, attorneys acting on behalf of BOA restarted foreclosure proceedings against their home.

### Carrie Lee Arthur

339.    BOA is the servicer of a loan made to Carrie Lee Arthur in 2007. Sometime after taking out the loan, Ms. Arthur began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

340.    Ms. Arthur applied for a HAMP modification in 2009.  After applying for a HAMP modification, she was determined initially eligible by BOA and sent a TPP Agreement in February 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Arthur accepted, executed and returned the TPP Agreement to BOA.   Ms. Arthur was not delinquent on her loan at this time.

341.    The TPP Agreement of Ms. Arthur described a trial period that was to run from March 2010 through June 2010. Ms. Arthur made each of the monthly payments

described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

342.    Since the TPP period began, and at all times relevant, Ms. Arthur has responded to all document requests made by BOA by timely supplying the requested documents. Ms. Arthur supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

343.    Ms. Arthur received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.  Also, BOA failed to provide notice that complied with the Virginia ECOA.

344.    Following the trial period of Ms. Arthur, and despite the above facts, BOA threatened foreclosure proceedings against her home.

### Nicole Sharrett

345.    BOA is the servicer of a loan made to Nicole Sharrett in 2006. Sometime after taking out the loan, Ms. Sharrett began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

346.    Ms. Sharrett applied for a HAMP modification in 2009.  After applying for a HAMP modification, she were determined initially eligible by BOA and sent a TPP Agreement in January 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Sharrett accepted, executed and returned the TPP Agreement to BOA.   Ms. Sharrett was not delinquent on her loan at this time.

347.    The TPP Agreement of Ms. Sharrett described a trial period that was to run from February 2010 through May 2010. Ms. Sharrett made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

348.    Since the TPP period began, and at all times relevant, Ms. Sharrett has responded to all document requests made by BOA by timely supplying the requested

documents. Ms. Sharrett supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

349.   Ms. Sharrett received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.  Also, BOA failed to provide notice that complied with the Virginia ECOA.

350.   Following the trial period of Ms. Sharrett, and despite the above facts, BOA threatened foreclosure proceedings against her home.

### Aissatou Balde

351.   BOA is the servicer of a loan made to Aissatou Balde.  Sometime after taking out the loan, Ms. Balde began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

352.   Ms. Balde applied for a HAMP modification in 2009.  After applying for a HAMP modification, she was determined initially eligible by BOA and sent a TPP Agreement in February 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Ms. Balde accepted, executed and returned the TPP Agreement to BOA.

353.   The TPP Agreement of Ms. Balde described a trial period that was to run from March 2010 through May 2010. Ms. Balde made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

354.   Since the TPP period began, and at all times relevant, Ms. Balde has responded to all document requests made by BOA by timely supplying the requested documents. Ms. Balde supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

355.   Ms. Balde received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the

expiration of the trial period.  Also, BOA failed to provide notice that complied with the
Virginia ECOA.

356.    Following the trial period of Ms. Balde, and despite the above facts,
BOA threatened foreclosure proceedings against her home.

### Ahmad Taheri Ghomi

357.    BOA is the servicer of a loan made to Ahmad Taheri Ghomi in 2008.
Sometime after taking out the loan, Mr. Ghomi began experiencing hardships that caused
him to have difficulty making monthly payments on his mortgage.

358.    Mr. Ghomi applied for a HAMP modification in 2009.  After applying
for a HAMP modification, Mr. Ghomi was determined initially eligible by BOA and sent a
TPP Agreement in July 2009 that is substantially identical to the form TPP Agreement
described in Paragraphs 91-97 above.  Mr. Ghomi accepted, executed and returned the TPP
Agreement to BOA.

359.    Mr. Ghomi's TPP Agreement described a trial period that was to run
from August 2009 through October 2009. Mr. Ghomi made each of the payments described
in the TPP Agreement, as well as additional payments beyond the trial period, which were
accepted by BOA.

360.    Since the TPP period began, and at all times relevant, Mr. Ghomi has
responded to all document requests made by BOA by timely supplying the requested
documents.  Mr. Ghomi supplied information to BOA that was truthful to the best of his
knowledge throughout the HAMP process.

361.    Mr. Ghomi received neither the tender of a permanent loan
modification that complied with HAMP rules, nor notification that he was ineligible prior to
the expiration of his trial period. Also, BOA failed to provide notice that complied with the
Virginia ECOA.

362.    Following Mr. Ghomi's trial period, BOA threatened foreclosure
proceedings against his home.

### Deborah Brozak

363.    BOA is the servicer of a loan made to Deborah Brozak.  Sometime after taking out the loan, Ms. Brozak began experiencing hardships that caused difficulty in making monthly payments on her mortgage.

364.    Ms. Brozak applied for a HAMP modification in February 2010.

365.    During this application process, and at all times relevant, Ms. Brozak has responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding her income and financial circumstances.  Ms. Brozak supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

366.    Ms. Brozak did not receive a written TPP Agreement, but was instead faced with a confusing, contradictory and threatening series of responses, including being told over the telephone that she had successfully entered into a trial period – a statement that induced her to continue making modified payments.  Ms. Brozak was never provided a reason why she was not given a written TPP Agreement.  BOA later repudiated its oral representations that Ms. Brozak was placed in a trial period.

367.    BOA failed to follow applicable HAMP guidelines in processing Ms. Brozak's application for a HAMP modification, as laid out in the Program Documentation and promised in the SPA.  This has caused Ms. Brozak injury.

368.    Despite the above-alleged facts, on or about October 5, 2010, BOA filed a complaint in foreclosure against Ms. Brozak in the Circuit Court for Cook County, Illinois.

### Manuel and Magali Alvarenga

369.    BOA is the servicer of a loan made to Manuel and Magali Alvarenga on a home they first purchased in 1991.  On information and belief, BOA obtained the servicing rights on this loan from Wilshire Credit Corporation ("Wilshire"), its subsidiary or sister company, in February 2010.  Sometime after taking out the loan, Mr. and Mrs.

Alvarenga began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

370.    Mr. and Mrs. Alvarenga applied for a HAMP modification in 2009. After applying for a HAMP modification, they were determined initially eligible by Wilshire and sent a TPP Agreement in September 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Alvarenga accepted, executed and returned the TPP Agreement to Wilshire.

371.    The TPP Agreement of Mr. and Mrs. Alvarenga described a trial period that was to run from October 2009 through January 2010.  Mr. and Mrs. Alvarenga made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Wilshire and/or BOA.

372.    Since the TPP period began, and at all times relevant, Mr. and Mrs. Alvarenga have responded to all document requests made by Wilshire and BOA by timely supplying the requested documents.  Mr. and Mrs. Alvarenga supplied information to Wilshire and BOA that was truthful to the best of their knowledge throughout the HAMP process.

373.    Despite the fact that BOA was bound to honor Wilshire's agreement, Mr. and Mrs. Alvarenga received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

374.    Following the trial period of Mr. and Mrs. Alvarenga, and despite the above facts, BOA commenced foreclosure proceedings against their home.

### Susan Fraser

375.    BOA is the servicer of a loan made to Susan Fraser.  Sometime after taking out the loan, Ms. Fraser began experiencing hardships that caused difficulty in making monthly payments on her mortgage.  Ms. Fraser lives in the home with her five children, and her hardship was exacerbated by a cancer diagnosis for her eldest son.

376.    Ms. Fraser applied for a HAMP modification in 2009.  After applying for a HAMP modification and enduring months of frustrating contacts with BOA, it tendered a non-HAMP compliant modification agreement July 2009.

377.    Ms. Fraser made each of the monthly payments in her agreement, which were accepted by BOA.  After her repeated inquiries, Ms. Fraser was informed by representatives of BOA that an error had been committed in connection with her account and that her modification was not valid.  In July 2010, BOA sent Ms. Fraser a new modification agreement, which also failed to comply with HAMP.  Ms. Fraser accepted, executed and returned this agreement to BOA.  Nevertheless, Ms. Fraser's monthly mortgage statements continue to reflect a non-modified monthly payment as due and her loan as in default.  Ms. Fraser has made repeated inquiries to BOA with regard to these statements.  Despite these efforts, Ms. Fraser has been given no assurances that her loan has actually been modified, nor been given an explanation as to why she was not entered into HAMP after applying for the program.

378.    Throughout the HAMP process, and at all times relevant, Ms. Fraser has responded to all document requests made by BOA by timely supplying the requested documents. Ms. Fraser supplied information to BOA that was truthful to the best of her knowledge throughout the HAMP process.

379.    Ms. Fraser has received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility.

380.    Ms. Fraser has invested her limited resources in this cooperation based on a promise that doing so would result in a permanent loan modification, to no avail. Instead, she has seen a significant negative impact on her credit score, as evidenced by her denial to act as co-signer on an apartment for her cancer-stricken son, and other credit denials she experienced in 2010.  Ms. Fraser is living in limbo, without any assurance that her home will not be foreclosed.

*Kim Morrow and Ken Clark*

381.    BOA is the servicer of a loan made to Kim Morrow and Ken Clark in 2005.  Sometime after taking out the loan, Ms. Morrow and Mr. Clark began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

382.    Ms. Morrow and Mr. Clark applied for a HAMP modification in 2009. After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in March 2010 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above. Ms. Morrow and Mr. Clark accepted, executed and returned the TPP Agreement to BOA.

383.    The TPP Agreement of Ms. Morrow and Mr. Clark described a trial period that was to run from April 2010 through June 2010.  Ms. Morrow and Mr. Clark made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

384.    Since the TPP period began, and at all times relevant, Ms. Morrow and Mr. Clark have responded to all document requests made by BOA by timely supplying the requested documents. Ms. Morrow and Mr. Clark supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

385.    Ms. Morrow and Mr. Clark received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.

386.    Following the trial period, BOA pressured Ms. Morrow and Mr. Clark to accept a loan modification that did not comply with HAMP rules.  Ms. Morrow and Mr. Clark therefore received poorer modification terms than they were otherwise entitled to as a result of BOA's breach.

### Matthew Nelson and Angelica Huato-Nelson

387.    BOA is the servicer of a loan made to Matthew and Angelica Nelson in 2007.  Sometime after taking out the loan, the Nelsons began experiencing hardships that caused difficulty in making monthly payments on their mortgage.

388.    The Nelsons applied for a HAMP modification in 2009.  After applying for a HAMP modification, they were determined initially eligible by BOA and placed into a trial modification in June 2009.

389.    Throughout the HAMP process, the Nelsons have responded to all document requests made by BOA by timely supplying the requested documents.  The Nelsons supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

390.    The Nelsons were tendered a permanent loan modification in October 2009, which they accepted, executed and returned to BOA.  The Nelsons began performing under this permanent modification agreement by making timely monthly payments.

391.    Despite the Nelsons' execution and return of the permanent modification, in November 2010, BOA notified has since repudiated the permanent modification agreement and told the Nelsons that they are in default.

392.    BOA failed to follow applicable HAMP guidelines in processing the Nelsons' permanent modification, as laid out in the Program Documentation and promised in the SPA.  This has caused the Nelsons injury.

393.    Like thousands of other BOA customers, the Nelsons have been living in limbo, with a home in the foreclosure process, despite their compliance with HAMP requirements and acceptance of a permanent modification.  The Nelsons invested their limited resources in this cooperation based on a promise that doing so would result in more than an illusory permanent loan modification.

*Enrique and Mistee Lopez*

394.    BOA is the servicer of a loan made to Enrique and Mistee Lopez. Sometime after taking out the loan, Mr. and Mrs. Lopez began experiencing financial hardships that caused difficulty in making monthly payments on their mortgage.

395.    Mr. and Mrs. Lopez began applying for a HAMP modification in June 2009.

396.    During this application process, during the trial period and at all times relevant Mr. and Mrs. Lopez responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding their income and financial circumstances. Mr. and Mrs. Lopez supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

397.    After applying for a HAMP modification, Mr. and Mrs. Lopez were determined initially eligible by BOA and sent a TPP Agreement in December 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above. Mr. and Mrs. Lopez accepted, executed and returned the TPP Agreement to BOA.  Mr. and Mrs. Lopez were not delinquent on their loan at this time.

398.    The TPP Agreement of Mr. and Mrs. Lopez described a trial period that was to run from January 2010 through March 2010.  Mr. and Mrs. Lopez made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

399.    Mr. and Mrs. Lopez received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the expiration of the trial period.  Also, BOA failed to provide notice that complied with the ECOA and applicable regulations.

400.    In November 2010, BOA sent to Mr. and Mrs. Lopez a notice of intent to accelerate the loan demanding $9000.  Mr. and Mrs. Lopez have received collection calls

up to ten times per week.  Despite having been current on their mortgage at the time they entered into their TPP Agreement, and despite making all payments it required, the Lopez family is now faced with the prospect of losing their home to BOA in foreclosure.

### Antoun and Sabah Moussa

401.    BOA is the servicer of a loan made to Antoun and Sabah Moussa in 2005.  Sometime after taking out the loan, Mr. and Mrs. Moussa began experiencing financial hardships that caused difficulty in making monthly payments on their mortgage.

402.    Mr. and Mrs. Moussa began applying for a HAMP modification in June 2009.

403.    During this application process, during the trial period and at all times relevant, Mr. and Mrs. Moussa responded to all document requests made by BOA by timely supplying the requested documents, including a HAMP hardship affidavit, and documents regarding their income and financial circumstances.  Mr. and Mrs. Moussa supplied information to BOA that was truthful to the best of their knowledge throughout the HAMP process.

404.    After applying for a HAMP modification, they were determined initially eligible by BOA and sent a TPP Agreement in December 2009 that is substantially identical to the form TPP Agreement described in Paragraphs 91-97 above.  Mr. and Mrs. Moussa accepted, executed and returned the TPP Agreement to BOA.   Mr. and Mrs. Moussa were not delinquent on their loan at this time.

405.    The TPP Agreement of Mr. and Mrs. Moussa described a trial period that was to run from January 2010 through March 2010. Mr. and Mrs. Moussa made each of the monthly payments described in the TPP Agreement, as well as additional payments beyond the trial period, which were accepted by BOA.

406.    Mr. and Mrs. Moussa received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification of ineligibility prior to the

expiration of the trial period.  Also, BOA failed to provide notice that complied with the ECOA and applicable regulations.

407.     Following BOA's notice of intent to accelerate the loan of Mr. and Mrs. Moussa, on December 14, 2010, a BOA representative informed the Moussas that BOA would soon begin foreclosure proceedings against them.  Despite having been current on their mortgage at the time they entered into their TPP Agreement, and despite making all payments it required, the Moussa family is now faced with the prospect of losing their home to BOA in foreclosure.

## CLASS ACTION ALLEGATIONS

408.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

409.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on their own behalf and on the behalf of all other members of the classes described below.

## A.     SERVICER PARTICIPATION AGREEMENT ("SPA") CLASS AND SUBCLASS

410.     "SPA CLASS": Plaintiffs seek certification of a national class of consisting of all homeowners whose mortgage loans have been serviced by one or both Defendants and who, since April 13, 2009, have requested and been eligible to be considered for a loan modification under HAMP and whose loan was not modified in accordance with HAMP because they have not been offered a HAMP compliant TPP.

411.     "SPA SUBCLASS":  Plaintiffs further seek certification of a subclass of the SPA class consisting of individuals who received a temporary loan modification agreement from BOA that was not compliant with HAMP guidelines because such agreement was not a TPP.

412.    Excluded from the SPA Class and Subclass are governmental entities, Defendants, their affiliates and subsidiaries, BOA's current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

413.    Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants. Plaintiffs believe that the Class and Subclass encompass many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

414.    All members of the Class and Subclass have been subject to and affected by the same conduct.  The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on uniform loan modification processing requirements.  There are questions of law and fact that are common to the Class and Subclass, and that predominate over any individual questions.  These questions include, but are not limited to the following:

a.    The nature, scope and operation of BOA's obligations to homeowners under HAMP;

b.    Whether BOA breached contractual duties that were intended for the benefit of Class and Subclass members;

c.    Whether the manner in which BOA has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

d.    Whether BOA's conduct constitutes unfair or deceptive practices in violation of applicable consumer protection statutes of various states; and

e.    Whether the Court can order damages and enter injunctive relief.

415.    The claims of the individual named Plaintiffs who represent the Class and Subclass are typical of the claims of the Class and Subclass and do not conflict with the

interests of any other members of the Class in that the named Plaintiffs and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence of a permanent modification.

416.    The individual named Plaintiffs who represent the Class and Subclass will fairly and adequately represent the interests of the Class and Subclass, respectively. They are committed to the vigorous prosecution of the Class's claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

417.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

418.    This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

419.    BOA has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

### B.  TRIAL PERIOD PLAN ("TPP") CLASSES

420.    Plaintiffs seek certification of fifteen statewide classes of individuals whose home mortgage loans have been serviced by BOA and who, since April 13, 2009, have entered into a TPP Agreement with BOA and made all payments required by their TPP Agreement, other than borrowers to whom BOA timely tendered either:

a.  A Home Affordable Modification Agreement that complied with HAMP rules; or
b.  A written denial of eligibility.

421.    Excluded from the TPP Classes and are governmental entities, Defendants, their affiliates and subsidiaries, BOA's current employees and current or former

officers, directors, agents, representatives, their family members, the members of this Court and its staff.

422.    Each TPP Class also includes individuals who received a permanent loan modification that was not compliant with HAMP rules and/or a permanent loan modification that BOA later repudiated.

423.    These fifteen statewide classes shall be referred to collectively herein as the "TPP Classes" and include statewide classes in Massachusetts, Washington, California, Arizona, Pennsylvania, New Jersey, Alabama, Oregon, Georgia, Florida, New York, Virginia, Connecticut, Wisconsin, and Maryland.

424.    The Named Plaintiffs in the TPP Classes sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

425.    Plaintiffs do not know the exact size or identities of the TPP Classes, since such information is in the exclusive control of Defendant.  Plaintiffs believe that each TPP Class encompasses many thousands of individuals and whose identities can be readily ascertained from Defendants' books and records.  Therefore, each TPP Class is so numerous that joinder of all members is impracticable.

426.    All members of the TPP Classes have been subject to and affected by the same conduct.  The claims are based on standard form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the TPP Classes, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

   a.    the nature, scope and operation of Defendant's obligations to homeowners under HAMP;

b.      whether Defendants' receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendants to offer class members a permanent HAMP modification;

c.      whether Defendants' failure to provide permanent HAMP modifications in the circumstances described herein and in the underlying complaints amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

d.      whether Defendants' conduct violates applicable state consumer protection laws and corresponding regulations; and

e.      whether the Court can order damages and enter injunctive relief.

427.    The claims of the TPP Class Named Plaintiffs are typical of the claims of the TPP Classes and do not conflict with the interests of any other members of the class in that both the Named Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

428.    The named Plaintiffs will fairly and adequately represent the interests of the TPP Classes.  They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

429.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

430.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

431.    BOA has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## C.        ECOA CLASSES

432.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

433.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of three classes (the "ECOA Classes") initially defined as follows:

1.   "The National ECOA Class": All natural persons who on any date on or after April 17, 2009, (a) with regard to a mortgage loan secured by their personal residence and serviced by BOA which was not delinquent or in default; (b) were denied by BOA for a loan modification under the Making Home Affordable Program / HAMP; and (c) did not receive within 30 days of that denial, a written notice from BOA that provided a statement of reasons for the denial and additional statutory disclosures required by ECOA; and (d) are not residents of Virginia or Maryland.

2.   "The Virginia ECOA Class": All natural persons who on any date on or after April 17, 2009, (a) with regard to a mortgage loan secured by their personal residence and serviced by BOA which was not delinquent or in default; (b) were denied by BOA for a loan modification under the Making Home Affordable Program / HAMP; and (c) did not receive within 30 days of that denial, a written notice from BOA that provided a statement of reasons for the denial and additional statutory disclosures required by ECOA; and (d) are residents of Virginia.

3.   "The Maryland ECOA Class": All natural persons who on any date on or after April 17, 2009, (a) with regard to a mortgage loan secured by their personal residence and serviced by BOA which was not delinquent or in default; (b) were denied by BOA for a loan modification under the Making Home Affordable Program / HAMP; and (c) did not receive within 30 days of that denial, a written notice from BOA that provided a statement of reasons for the denial and additional statutory disclosures required by ECOA; and (d) are residents of Maryland.

434.    Excluded from each of the ECOA Classes are governmental entities, Defendants, their affiliates and subsidiaries, BOA's current employees and current or former

officers, directors, agents, representatives, their family members, the members of this Court and its staff.

435.    Plaintiffs do not know the exact size or identities of the members of the proposed classes, since such information is in the exclusive control of Defendants. However, on information and belief, Plaintiffs allege that they encompass many hundreds of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed classes are so numerous that joinder of all members is impracticable.

436.    Common questions of law and fact exist as to all members of the ECOA classes.  These questions predominate over the questions affecting only individual members. All members have been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

a.    The review and interpretation of form contracts and uniform loan modification processing requirements;

b.    Whether BOA's rejection of class member applications for HAMP loan modifications constituted adverse actions;

c.    Whether in their application for the loan modifications consumers were applying for credit under the ECOA;

d.    Whether it was BOA's practice or policy to fail to send adverse action notice letters that complied with the ECOA; and

e.    Whether the Court can order Defendants to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

437.    The designated representative Plaintiffs' claims are typical of the claims of each class member because each Plaintiff and each member of each class did not receive an adverse action notice.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the Class.

438.    The designated representative Plaintiffs are adequate representatives of each of the classes because their interests coincide with, and are not antagonistic to, the

interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in such litigation, and they intend to prosecute this action vigorously.

439.    The designated representative Plaintiffs and their Counsel will fairly and adequately protect the interests of class members.

440.    As alleged previously, there are significant questions of law and fact common to the Class members, such that certification is appropriate under Fed. R. Civ P. 23(b)(3). These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The claims in this case and the circumstances of class members are such that individual prosecution would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if the members themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof.

441.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds generally applicable to the classes, making appropriate equitable injunctive relief.

## COUNT I

### By The Spa Class

### Breach Of Contract / Breach Of Duty Of Good Faith And Fair Dealing Arising Out Of BOA's Performance Of The Servicer Participation Agreement

442.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

443.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the SPA Class described above.

444.   The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiffs and the Class of eligible homeowners are intended beneficiaries, and under which BOA has undertaken duties to act for the benefit of Plaintiffs and the Class.

445.   By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, BOA covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

446.   BOA has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications that comply with terms as calculated in accordance with the methods specified in the Supplemental Directives incorporated into the SPA.

447.   BOA routinely and regularly breaches its duties under the SPA by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; failing to provide written notices required by HAMP; and by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and failing to follow through on written and implied promises.

448.    Plaintiffs suffered harm and are threatened with additional harm from BOA's breach.  Had BOA complied with the terms of the SPA, Plaintiffs and all class members would have been given the opportunity to obtain modified mortgage loans on terms specifically designed to be affordable based on their respective financial circumstances.  On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes that would have been avoided.

## COUNT II

### By the TPP Classes

### Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing for Violations of Law arising from TPP Agreements

449.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

450.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the TPP Classes described above.  The relevant common law in the state of each TPP Class is materially identical for the purposes of this claim.

451.    As described above, the standard TPP Agreements sent by BOA to each Plaintiff constitutes a valid offer.

452.    By executing the TPP Agreements and returning them to BOA along with the supporting documentation, Plaintiffs accepted BOA's offers.

453.    Alternatively, Plaintiffs' return of the TPP Agreements constitutes an offer.  Acceptance of these offers occurred when BOA accepted Plaintiffs' TPP payments.

454.    The TPP Agreements were supported by consideration.  First, Plaintiffs' TPP payments to BOA constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.  Further, the TPP Agreement requires homeowners to undertake several duties that they are not otherwise obligated to undertake.  Section 1 of the TPP Agreement required the homeowner to agree to

undergo credit counseling, if they were asked to do so.  Vellyn Antonelli and James Langen, among other class members, were asked to and did in fact complete credit counseling.  In addition, the TPP Agreement required homeowners to submit financial documentation that they were not otherwise required to provide, to set up newly established escrow accounts, and to make legally binding representations about their personal circumstances. These actions constitute both a detriment to the Plaintiffs and a benefit to BOA.

455.    Plaintiffs and BOA thereby formed valid contracts.

456.    To the extent that the contract was subject to a condition subsequent by providing BOA an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP Agreements, to determine its sufficiency, this condition was waived by BOA in that it failed to timely raise it and/or it is estopped to assert it as a defense to Plaintiffs' claims.

457.    By failing to offer Plaintiffs permanent HAMP modifications, BOA breached those contracts.

458.    Plaintiffs remain ready, willing and able to perform under the contracts.

459.    Plaintiffs have suffered harm and are threatened with additional harm from BOA's breach, including but not limited to longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a

difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

460.    By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. Some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

461.    In addition, some members of the TPP Class, such as Tarry and Nancy Miller were harmed when BOA breached permanent loan modification agreements that it had entered into with homeowners, as set forth above.  Such permanent agreements constituted bargained-for exchanges that were independently supported by consideration, including the newly modified payments.  By repudiating the Millers' permanent loan modification, BOA caused the Millers damages in the form of further delinquency, charges and fees that would not otherwise have accrued.

462.    Further, some members of the TPP Class were harmed when BOA failed to meet the obligations created by TPP Agreements extended by Wilshire, which BOA was bound to honor.

463.    BOA is obligated by contract and common law to act in good faith and to deal fairly with each borrower so as to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.  *See e.g.*, *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

464.    BOA routinely and regularly acts in bad faith and breaches this duty for its own economic benefit by:

  a.    Failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs and members of the class;

b.      Failing to properly train and supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

c.      Failing to permanently modify loans and/or provide alternatives to foreclosure and using unfair means to keep Plaintiffs and the class in trial periods of indeterminate lengths, including, without limitation, routinely demanding information it already possesses and failing to communicate accurately or consistently with borrowers about the status of their loan modification applications;

d.      Making inaccurate calculations and determinations of Plaintiffs' eligibility for permanent modifications;

e.      Encouraging and/or allowing its employees and agents to make inaccurate statements regarding Plaintiffs' and class members' eligibility for permanent loan modifications under HAMP;

f.      Failing to follow through on written and implied promises;

g.      Failing to follow through on contractual obligations; and

h.      Failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

465.    As a result of these failures to act in good faith and the absence of fair dealing, BOA caused Plaintiffs harm, as alleged above.  BOAs' bad faith was thus to Plaintiffs' detriment.

## COUNT III

### By the SPA Subclass

### Breach of Contract

466.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

467.    The SPA Subclass Plaintiffs bring this claim on their own behalf and on behalf of each member of the SPA Subclass described above.  The relevant common law in the state of each member of the SPA Subclass is materially identical for the purposes of this claim.

468.     As described above, each member of the SPA Subclass received a modification agreement ("MA") that included a promise of a permanent modification if the borrower complied with the MA.

469.     Each member of the SPA Subclass accepted the offer made in the MA.

470.     The MAs were supported by consideration. The SPA Subclass Plaintiffs' MA payments to BOA constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home. In addition, the MAs required homeowners to submit financial documentation that they were not otherwise required to provide, to set up newly established escrow accounts, and to make legally binding representations about their personal circumstances. These actions constitute both a detriment to the Plaintiffs and a benefit to BOA.

471.     The SPA Subclass Plaintiffs and BOA thereby formed valid contracts.

472.     By failing to offer the SPA Plaintiffs permanent loan modifications, BOA breached those contracts.

473.     The SPA Subclass Plaintiffs have suffered harm and are threatened with additional harm from BOA's breach, including but not limited to longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

474.    By making MA payments, the SPA Subclass Plaintiffs forewent other remedies that might be pursued to save their home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. Some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

**COUNT IV**

***By TPP Classes***

***Promissory Estoppel, in the alternative***

475.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

476.    The TPP Class Plaintiffs bring this claim on their own behalf and on behalf of each member of the TPP Classes described above. The relevant common law in the state of each TPP Class is materially identical for the purposes of this claim.

477.    BOA, by way of its TPP Agreements, made representations to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications.

478.    BOA's TPP Agreements were intended to induce Plaintiffs to rely on them and make monthly TPP payments.

479.    Plaintiffs did indeed rely on BOA's representation, by submitting TPP payments.

480.    Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

481.    Plaintiffs' reliance was to their detriment.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their detrimental reliance is measured

by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their detrimental reliance is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.  Such detriment includes longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.  Further, Plaintiffs have lost the opportunity to fund other strategies to deal with their default and to avoid foreclosure.

## COUNT V

### By the SPA Subclass

### Promissory Estoppel, in the alternative

482.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

483.    The SPA Subclass Plaintiffs bring this claim on their own behalf and on behalf of each member of the SPA Subclass described above. The relevant common law in the state of each SPA Subclass member is materially identical for the purposes of this claim.

484.    BOA made representations to the subclass Plaintiffs that if they made payments, they would receive permanent loan modifications.

485.    BOA's representations were intended to induce the Subclass Plaintiffs to rely on them and make monthly payments.

486.    The Subclass Plaintiffs did rely on BOA's representations, by submitting payments.

487.    The Subclass Plaintiffs reliance was reasonable in light of the language of BOA's promises.

488.    The Subclass Plaintiffs' reliance was to their detriment.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their detrimental reliance is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their detrimental reliance is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.  Such detriment includes longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.  Further, Plaintiffs have lost the opportunity to fund other strategies to deal with their default and to avoid foreclosure.

## COUNT VI

***By Statewide Classes In Massachusetts, Washington, California, Arizona, Pennsylvania, New Jersey, Oregon, Florida, New York, Illinois, Connecticut, Missouri, Maryland And Wisconsin***

***Violation Of State Consumer Protection And Unfair And Deceptive Acts And Practices Laws***

489.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

490.    The named Plaintiffs in each of the fourteen states enumerated above bring this claim on their own behalf and on behalf of each member of the corresponding statewide class.

491.    BOA's conduct as set forth herein constitutes the offering, advertising and sale of goods, services and merchandise.

492.   BOA's conduct as set forth herein occurred in the course of trade or commerce.

493.   BOA's conduct as set forth herein affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

494.   Plaintiffs are consumers.

495.   Plaintiffs sought to obtain BOA's goods and services primarily for personal, family or household use.

496.   BOA made false, deceptive and misleading statements and omissions about material aspects of the goods and services described herein.

497.   BOA made these statements and omissions knowingly and willfully and with the intent that Plaintiffs and consumers would rely on them and would enter into contracts or obligations as a result.

498.   BOA's conduct was likely to induce reliance and to create confusion and misunderstanding.

499.   Plaintiffs did rely on BOA's statements and omissions.

500.   BOA's conduct as set forth herein is deceptive, unfair and unconscionable.

501.   BOA's conduct as set forth herein is not required, permitted or authorized by any state or federal law.

502.   BOA's conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

503.   As a result of BOA's conduct, Plaintiffs suffered damages and ascertainable losses including:

a.   wrongful foreclosures;

b.   otherwise avoidable losses of homes to foreclosure;

c.   less favorable loan modifications;

       d.     increased fees and other costs to avoid or attempt to avoid foreclosure;

       e.     loss of savings in fruitless attempts to secure loan modifications;

       f.     loss of opportunities to pursue other refinancing or loss mitigation strategies;

       g.     significant stress and emotional distress;

       h.     accrued interest and increased principal balances; and

       i.     less favorable modification terms.

504.    BOA's conduct as set forth and as alleged in the underlying complaint, herein violates Ariz. Rev. Stat. §§ 44-1521-1534.

505.    BOA's conduct as set forth herein and as alleged in the underlying complaints violates Cal. Bus. & Prof. Code § 17200 *et seq.*  BOA's misrepresentations and omissions described herein and as alleged in the underlying complaints are likely to deceive the reasonable consumer.  BOA's misrepresentations described herein and as alleged in the underlying complaints are objectively material to the reasonable consumer, and therefore reliance upon such representations may be presumed as a matter of law.  Plaintiffs suffered injury in fact and lost money and/or property as a result of BOA's conduct.

506.    BOA's conduct as set forth herein and as alleged in the underlying complaints is unlawful in that it also violates the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.* by, without limitation, making false, deceptive or misleading representations in connection with the collection of a debt, using false representations or deceptive means to collect or attempt to collect on a debt, and using unfair or unconscionable means to collect or attempt to collect a debt.  BOA is a "debt collector" within the meaning of California Civil Code § 1788.2(c). The monies allegedly owed by Plaintiffs and Plaintiff Class members to BOA are "debts" within the meaning of California Civil Code § 1788.2(d).

507.    BOA's conduct as set forth herein constitutes both unfair and deceptive acts or practices in violation the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a *et seq*. and applicable regulations.  BOA's conduct as set forth herein constitutes both unfair and deceptive acts or practices in violation the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a *et seq*. and applicable regulations ("CUTPA").  As with all of the alleged consumer violations in this complaint, these allegations of the Connecticut statewide class are based on more than mere breach of contract.  BOA's conduct demonstrates the type of aggravating factors that have been found to violate CUTPA.  BOA's unfair or deceptive acts or practices for profit, by knowingly, willfully, intentionally, maliciously, wantonly, and repeatedly breaching its contracts and the covenant of good faith and fair dealing with Plaintiffs, are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous and offend Connecticut's public policy, in that BOA wrongfully generated millions of dollars in additional profits at the expense and to the detriment of Plaintiffs' rights, thereby causing Plaintiffs substantial financial injury.

508.    BOA's conduct as set forth herein and as alleged in the underlying complaints violates the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*.

509.    BOA's conduct as set forth herein and as alleged in the underlying complaints violates the Illinois Consumer Fraud Act, 815 ILCS 505/2 *et seq*.

510.    Defendant's conduct as set forth herein and as alleged in the underlying complaints violates the Maryland Consumer Protection Act, MD. Code Ann Com. Law II § 13-301 *et seq*.

511.    BOA's conduct as set forth herein and as alleged in the underlying complaints violates the Massachusetts Consumer Protection Act, G.L. c. 93A, § 2 and applicable regulations including 940 C.M.R. §§ 3.05, 3.16, 8.06, & 25.03.  BOA's conduct was also deceptive under this statutory and regulatory scheme because it reasonably caused

applicable named plaintiffs and members of the applicable class to act differently than they otherwise would have.

512.     The Plaintiffs complied with the pre-suit notice requirement of Mass. G.L. c. 93A § 9(3) on February 25, 2010.  BOA's refusal to grant relief upon demand was and is in bad faith, with knowledge or reason to know that the act or practice complained of violated G.L. c. 93A, § 2.

513.     BOA's conduct as set forth herein violates the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq*.

514.     BOA's conduct as set forth herein and as alleged in the underlying complaints violates the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*.

515.     BOA's conduct as set forth herein and as alleged in the underlying complaints violates the New York General Business Law § 349 *et seq*.  The alleged conduct has a broad impact on consumers at large.

516.     BOA's conduct as set forth herein and as alleged in the underlying complaints violates the Oregon Unlawful Trade Practices Act, O.R.S. 646.605 *et seq*.

517.     Specifically, BOA's conduct as set forth herein violates O.R.S. 646.608(e) and (k).

518.     BOA's conduct as set forth herein and as alleged in the underlying complaints violates Pennsylvania's consumer protection statute, 73 P.S. § 201-2(4)(v), 73 P.S. § 201-2(4)(xxi), and 73 P.S. § 201-9.2.

519.     BOA's conduct as set forth herein and as alleged in the underlying complaints violates the Washington Consumer Protection Act, R.C.W. 19.86.010 *et seq*.

520.     BOA's conduct as set forth herein involves fraudulent representations to the public, in the form of letters, forms, contracts and other materials intended to induce borrowers to participate in HAMP, in violation of Wis. Stat. § 100.18.

521.    Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## COUNT VII

### By TPP Classes for Alabama, Connecticut, Massachusetts and New York

### Breach of Covenant of Good Faith and Fair Dealing

522.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

523.    BOA is obligated by contract and common law to act in good faith and to deal fairly with each borrower. Under common law, a covenant of good faith and fair dealing is implied in every contract, including the TPP Agreements, which prevents one contracting party from unfairly frustrating the other party's right to receive the benefits of the contract. BOA is obligated to act in good faith and deal fairly with each borrower who entered into a TPP Agreement.

524.    BOA has violated and continue to violate this covenant of good faith and fair dealing by acting in bad faith and for its own economic benefit in its dealings with members of the applicable statewide classes by doing, *inter alia*, the following:

a.    Failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs and members of the class;

b.    Failing to properly train and supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

c.    Failing to permanently modify loans and/or provide alternatives to foreclosure and using unfair means to keep Plaintiffs and the class in trial periods of indeterminate lengths, including, without limitation, routinely demanding information it already possesses and failing to communicate accurately or consistently with borrowers about the status of their loan modification applications;

d.    Making inaccurate calculations and determinations of Plaintiffs' eligibility

93

for permanent modifications;

   e.   Encouraging and/or allowing its employees and agents to make inaccurate statements regarding Plaintiffs' and class members' eligibility for permanent loan modifications under HAMP;

   f.   Failing to follow through on written and implied promises;

   g.   Failing to follow through on contractual obligations; and

   h.   Failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

   525.   Applicable named plaintiffs and members of the applicable classes remain ready, willing and able to begin performance under permanent HAMP modifications.

   526.   As a result of BOA's breach of this implied covenant, applicable named plaintiffs and members of the applicable classes suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including payment of increased interest, delinquency- and foreclosure-related costs and fees, late fees, longer loan payoff times, higher principle balances, late fees, additional attorney's fees and other damages for breach of contract.

   527.   Applicable named plaintiffs and members of the applicable classes have been damaged by BOA's breach of the implied covenant of good faith and fair dealing in an amount to be proved at trial.

   528.   With respect to the Alabama statewide class, BOA at all relevant times owed class members an implied quasi-fiduciary duty of fairness and good faith as to all aspects of the mortgage agreement, including the management of their payments and the exercise of any power of sale clause contained in the mortgage.  The acts and omissions made by BOA in connection with management of Alabama class members' mortgages constitute a breach of the duty owed by BOA. Those acts and omissions include, but are not limited to, the following: the failure to comply with its own procedures and HAMP Program Documentation; the failure to comply with its own written agreements and statements

provided to class members; providing Alabama class members with false, inconsistent and misleading information regarding the status of modifications and foreclosures; and the institution of the foreclosure proceedings, publication of foreclosure notice and attempted foreclosure sale while class members were in compliance with the TPP Agreement. The trust imposed upon BOA by Alabama class members and by operation of law and equity has been breached by the said acts and omissions of BOA as alleged herein, and injury has resulted.

## COUNT VIII

### By the National ECOA Class and the Virginia and Maryland ECOA Classes
### Violation of the Equal Credit Opportunity Act

529.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

530.    The "Making Home Affordable Program Request For Modification and Affidavit" completed by the Plaintiffs and each putative class member was a completed application for credit. In each instance, the class member was asking BOA to obtain more favorable credit terms.

531.    At all times relevant hereto, it was BOA's practice or policy not to send timely notice letters to consumers when it denied their applications as alleged.

532.    BOA also failed to provide the statutory disclosures required by the ECOA to Plaintiffs and the class members as required under the ECOA.

533.    With regard to the National ECOA Class, the above-alleged actions and omissions of BOA violated the ECOA, 15 U.S.C. § 1691 *et seq.* and Regulation B, 12 C.F.R. § 202.9. The Plaintiffs and the putative class are entitled to attorney's fees and costs pursuant to 15 U.S.C. § 1691e(d).

534.    Further, with regard to the National ECOA Class, the above-alleged actions and omissions of BOA entitle the Plaintiffs and the putative class to actual and punitive damages pursuant to 15 U.S.C. § 1691e(a) and (b).

535.    With regard to the Virginia ECOA Class, the above-alleged allegations and omissions of BOA violated the Virginia Equal Credit Opportunity Act (VECOA), Virginia Code § 59.1-21.21:1. The Plaintiffs and the putative class are entitled to attorney's fees and costs pursuant to Virginia Code § 59.1-21.23.

536.    With regard to the Virginia ECOA Class, BOA is liable to the Plaintiffs and the putative class for punitive damages of $10,000.00 per violation pursuant to Virginia Code § 59.1-21.23. BOA's violations were widespread, without legal justification, and greatly impacted class members. Given the net worth of Bank of America, it is also unlikely that any lesser remedy would adequately deter it from further non-compliance.

537.    With regard to the Maryland ECOA Class, the above-alleged allegations and omissions of BOA violated the Maryland Equal Credit Opportunity Act, Md. Code Ann., Com. Law §§ 12-704(3).  The Plaintiffs and the putative class are entitled to attorney's fees and costs pursuant to Md. Code Ann., Com. Law §§ 12-707(e).

538.    Further, with regard to the Maryland ECOA Class, BOA is liable to the Plaintiffs and the putative class for punitive damages not to exceed the lesser of $100,000 or 1% of the net worth of BOA pursuant to Md. Code Ann., Com. Law §§ 12-707(c).  BOA's violations were widespread, without legal justification, and greatly impacted class members. Given the net worth of Bank of America, it is also unlikely that any lesser remedy would adequately deter it from further non-compliance.

539.    With regard to each of the ECOA classes, the Plaintiffs and the putative class are entitled to declaratory and injunctive relief requiring BOA's compliance with the ECOA pursuant to 15 U.S.C. § 1691e.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.      Certify this case as a class action and appoint the named Plaintiffs to be class representatives for each class for which they are designated and their counsel to be class counsel;

b.      Enter a judgment declaring the acts and practices of BOA complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members on the terms promised in class members' temporary modifications, together with an award of monetary damages and other available relief on those claims;

c.      Grant a permanent or final injunction enjoining BOA's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.      Order BOA to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.      Order specific performance of BOA's contractual obligations together with other relief required by contract and law;

f.      Award actual, exemplary and/or statutory minimum damages to those statewide classes alleging claims under Count VI;

g.      Award restitution and prejudgment interest;

h.      Award actual and punitive damages as described in Count VIII above;

i.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

j.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

Dated:  January 21, 2011

Respectfully Submitted,


*/s/ Gary Klein*
Roddy Klein & Ryan
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
727 Atlantic Avenue
2nd Floor
Boston, MA 02111
617.357.5500 (p)
617.357.5030 (f)
klein@roddykleinryan.com
kavanagh@roddykleinryan.com
costello@roddykleinryan.com


*/s/ Ari Y. Brown*
Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com


*Interim Co-Lead Counsel*


**Counsel for *Johnson, et al., v. BAC Home Loans Servicing, LP*, Case No. 1:10-cv-10316 (D. Mass.)**

Roddy Klein & Ryan
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
727 Atlantic Avenue
2nd Floor
Boston, MA 02111
617.357.5500 (p)
617.357.5030 (f)
klein@roddykleinryan.com
kavanagh@roddykleinryan.com
costello@roddykleinryan.com

National Consumer Law Center, Inc.
Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
7 Winthrop Square
4th Floor
Boston, MA 02110
617.542.8010 (p)
617.542.8028 (f)
srossman@nclc.org
cdelbaum@nclc.org

Neighborhood Legal Services
Michael Raabe (BBO 546107)
170 Common Street
Suite 300
Lawrence, MA 01840
978.686.6900 (p)
978.685.2933 (f)
mraabe@nlsma.org

**Counsel for *Kahlo, et al. v. Bank of America NA, et al.*,
Case No. 2:10-cv-00488 (W.D. Wash.)**

Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

**Counsel for *Brewer, et al. v. Bank of America, NA, et al.*,
Case No. 3:10-cv-01884 (N.D. Cal.)**

Hagens Berman Sobol Shapiro LLP
Jeff D. Friedman
715 Hearst Avenue
Suite 202
Berkeley, CA 94710
510.725.3000 (p)
510.725.3001 (f)
jefff@hbsslaw.com

Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

**Counsel for *Follmer, et al. v. Bank of America, NA, et al.*,
Case No. 2:10-cv-01435 (D. Ariz.)**

Hagens Berman Sobol Shapiro LLP
Robert Carey
Don Andrew St. John
11 W Jefferson Street
Suite 1000
Phoenix, AZ 85003
602.840.5900 (p)
602.840.3012 (f)
rcarey@hbsslaw.com
andy@hbsslaw.com

Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

**Counsel for *Haber, et al. v. Bank of America, NA, et al.*,
Case No. 2:10-cv-03524 (E.D. Pa.)**

The Law Office of Noah Axler LLC
Noah Axler
Two Penn Center Plaza
1500 JFK Boulevard
Suite 1110
Philadelphia, PA 19102

215.963.1411 (p)
215.525.9770 (f)
naxler@axlerlaw.com

Langer, Grogan & Diver P.C.
Irv Ackelsberg
1717 Arch Street
Suite 4130
Philadelphia, PA 19103
215.320.5660 (p)
215.320.5703 (f)
iackelsberg@langergrogan.com

**Counsel for *Mikhail, et al. v. Bank of America, NA, et al.*,
Case No. 2:10-cv-03630 (D.N.J.)**

Trujillo Rodriguez & Richards, LLC
Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, NJ 08033
856.795.9002 (p)
856.795.9887 (f)
lisa@trrlaw.com
nacchione@trrlaw.com

Bolognese & Associates, LLC
Anthony J. Bolognese
Joshua H. Grabar
Jonathan M. Stemerman
Two Penn Center
1500 JFK Boulevard
Suite 320
Philadelphia, PA 19102
215.814.6750 (p)
215.814.6764 (f)
abolognese@bolognese-law.com
jgrabar@bolognese-law.com
jstemerman@bolognese-law.com

**Counsel for *Soper, et al. v. Bank of America, NA, et al.*,
Case No. 2:10-cv-01194 (W.D. Wash.)**

Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown

1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

**Counsel for *Matthews v. BAC Home Loans Servicing, LP, et al.*, Case No. 2:10-cv-05506 (C.D. Cal.)**

Cotchett, Pitre & McCarthy
Niall P. McCarthy
Justin T. Berger
840 Malcolm Road
Suite 200
Burlingame, CA 94010
650.697.6000 (p)
650.692.3606 (f)
nmccarthy@cpmlegal.com
jberger@cpmlegal.com

Housing and Economic Rights Advocates
Maeve Brown
Elizabeth S. Letcher
Noah Zinner
P.O. Box 29435
1814 Franklin Street
Suite 1040
Oakland, CA 94612
510.271.8443 (p)
510.868.4521 (f)
mbrown@heraca.org
eletcher@heraca.org
nzinner@heraca.org

**Counsel for *George v. BAC Home Lending Services, Inc.*, Case No. 1:10-cv-00546 (S.D. Ala.)**

Underwood & Riemer, P.C.
Earl P. Underwood
Kenneth J. Riemer
James D. Patterson
166 Government Street
Suite 100
Mobile, AL 36602

251.432.9212 (p)
251.433.7172 (f)
epunderwood@alalaw.com
kjriemer@alalaw.com
jpatterson@alalaw.com

**Counsel for *Langen v. Bank of America, NA, et al.*, Case No. 3:10-cv-01067 (D. Or.)**

Law Office of Phil Goldsmith
Phil Goldsmith
Nanina Takla
1618 SW First Avenue
Suite 350
Portland, OR 97201
503.224.2301 (p)
503.222.7288 (f)
phil@lopglaw.com
nanina@lopglaw.com

Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

**Counsel for *Wilkerson v. Bank of America Home Loans Servicing, LP et al.*, Case No. 3:10-cv-04294 (N.D. Cal.)**

Amamgbo & Associates
Donald Amamgbo
P.O. Box 13315, PMB # 148
Oakland, CA 94661
510.615.6000 (p)
510.615.6025 (f)
donald@amamgbolaw.com

The Terrell Law Group
Reginald Terrell
P.O. Box 13315, PMB # 148
Oakland, CA 94661

510.237.9700 (p)
510.237.4616 (f)
reggiet2@aol.com

Walter Harper - Attorney At Law
Walter Harper
492 Staten Avenue, #702
Oakland, CA 94611
510.832.1561 (p)
toughlaw@sbcglobal.net

**Counsel for *Wood v. Bank of America, NA et al.*, Case No. 2:10-cv-00145 (S.D. Ga.)**

Clark & Williams, P.C.
Nathan T. Williams
#5 St. Andrews Court
Brunswick, GA 31520
912.264.0848 (p)
912.264.6299 (f)

Savage, Turner, Kraeuter, Pinckney, Britt & Madison
R. Bartley Turner
C. Dorian Britt
304 East Bay Street
PO Box 10600
Savannah, GA 31412
912.231.1140 (p)
912.232.4212 (f)
bturner@savagelawfirm.net
dbritt@savagelawfirm.net

**Counsel for *Lightman, et al. v. Bank of America, NA, et al.*, Case No. 2:10-cv-05109 (E.D. Pa.)**

Faruqi & Faruqi, L.L.P.
Jacob A. Goldberg
Sandra G. Smith
101 Greenwood Avenue
Suite 600
Jenkintown, PA 19046
215.277.5770 (p)
215.277.5771 (f)
jgoldberg@faruqilaw.com
ssmith@faruqilaw.com

Lightman & Manochi (of Counsel)
Gary P. Lightman
1520 Locust Street
12th Floor
Philadelphia, PA 19102
215.545.3000 (p)
215.545.3001 (f)
garyplightman@lightmanlaw.com

**Counsel for *Goldman v. Bank of America, NA, et al.*,
Case No. 9:10-cv-81264 (S.D. Fla.)**

Shepherd Finkelman Miller & Shah LLP (FL)
Jayne A. Goldstein
Nathan C. Zipperian
1640 Town Center Circle
Suite 216
Weston, FL 33326
954.515.0123 (p)
954.515.0124 (f)
jgoldstein@sfmslaw.com
nzipperian@sfmslaw.com

Shepherd Finkelman Miller & Shah LLP (PA)
Natalie Finkelman Bennett
James C. Shah
35 East State Street
Media, PA 19063
610.891.9880 (p)
610.891.9883 (f)
nfinkelman@sfmslaw.com
jshah@sfmslaw.com

Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

**Counsel for *Kunsky v. Bank of America, NA, et al.*, Case No. 1:10-cv-11875 (D. Mass.)**

Stern Shapiro Weissberg & Garin LLP
Jonathan Shapiro (BBO 454220)
90 Canal Street
Boston, MA 02114
617.742.5800 (p)
617.742.5858 (f)
jshapiro@sswg.com

Berger & Montague, P.C.
Sherrie R. Savett
Eric Lechtzin
1622 Locust Street
Philadelphia, PA 19103
215.875.3000 (p)
215.875.4613 (f)
ssavett@bm.net
elechtzin@bm.net

**Counsel for *Freeman v. BAC Home Loan Servicing, LP, et al.*, Case No. 1:10-cv-05380 (E.D.N.Y.)**

Abbey Spanier Rodd & Abrams, LLP
Stephen T. Rodd
Karin E. Fisch
Grace E. Parasmo
212 East 39th Street
New York, NY 10016
212.889.3700 (p)
212.684.5191 (f)
srodd@abbeyspanier.com
kfisch@abbeyspanier.com

MFY Legal Services, Inc.
Elise Brown
Adam Cohen (of counsel to Christopher Lamb)
299 Broadway4th Floor
New York, NY 10007
212.417.3753 (p)
212.417.3891 (f)
ebrown@mfy.org
acohen@mfy.org

**Counsel for *Brooking, et al. v. Bank of America, NA, et al.*, Case No. 1:10-cv-01360 (E.D. Va.)**

Surovell Markle Isaacs & Levy PLC
Kristi Cahoon Kelly
J. Chapman Petersen
Scott A. Surovell
4010 University Drive
2nd Floor
Fairfax, VA 22030
703.277.9774 (p)
703.591.9285 (f)
kcahoon@smillaw.com
jpetersen@smillaw.com
ssurovell@smillaw.com

Consumer Litigation Associates, P.C.
Leonard A. Bennett
12515 Warwick Boulevard
Suite 201
Newport News, VA 23606
757.930.3660 (p)
757.930.3662l (f)
enbennett@clalegal.com

Consumer Litigation Associates, P.C.
Matthew J. Erausquin
1800 Diagonal Road
Suite 600
Alexandria, VA 22314
703.273.7770 (p)
888.892.3512 (f)
matt@clalegal.com

The Law Office of Dale W. Pittman, P.C.
Dale W. Pittman
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
804.861.6000 (p)
804.861.3368 (f)
dale@pittmanlawoffice.com

**Counsel for *Brozak v. Bank of America, NA, et al.*, Case No. 1:10-cv-07677 (N.D. Ill.)**

Lite DePalma Greenberg, LLC
Katrina Carroll
One South Dearborn
Suite 2100
Chicago, IL 60603
312.212.4383 (p)
312.212.5919 (f)
kcarroll@litedepalma.com

Faruqi & Faruqi, L.L.P.
Jacob A. Goldberg
Sandra G. Smith
101 Greenwood Avenue
Suite 600
Jenkintown, PA 19046
215.277.5770 (p)
215.277.5771 (f)
jgoldberg@faruqilaw.com
ssmith@faruqilaw.com

The Law Office of Noah Axler LLC
Noah Axler
Two Penn Center Plaza
1500 JFK Boulevard
Suite 1110
Philadelphia, PA 19102
215.963.1411 (p)
215.525.9770 (f)
naxler@axlerlaw.com

**Counsel for *Alvarenga, et al. v. Bank of America, NA, et al.*, Case No. 4:10-ap-04380 (N.D. Cal.)**

Law Office of Sydney Jay Hall
Sydney Jay Hall
1308 Bayshore Highway
Suite 220
Burlingame, CA 94010
650.342.1830 (p)
650.342.6344 (f)
sydneyhalllawoffice@yahoo.com

**Counsel for *Fraser v. Bank of America, NA, et al.*, Case No. 4:10-cv-02400-AGF (E.D. Mo.)**

Carey Danis & Lowe

Michael J. Flannery
8235 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
314.725.7700 (p)
314.721.0905 (f)
mflannery@careydanis.com

**Counsel for *Morrow v. BAC Home Loans Servicing, LP*,
Case No. 3:10-cv-02045-JCH (D. Ct.)**

Eagan, Donohue, D'Occhio & Falsely, LLP
Peter M. Van Dyke
24 Arapahoe Road
West Hartford, CT 06107
860.232.7200 (p)
860.232.0214 (f)
pvd@eddf-law.com

**Counsel for *Nelson v. BAC Home Loans Servicing, LP*,
Case No. 1:11-cv-10089 (D. Mass.)**

Strange & Carpenter
Whatley Drake & Kallas, LLC
Patrick J. Sheehan (BBO 639320)
60 State Street
Seventh Floor
Boston, MA 02109
617.573.5118 (p)
617.573.5090 (f)
psheehan@wdklaw.com

Whatley Drake & Kallas, LLC
Edith M. Kallas
Joe R. Whatley, Jr.
1540 Broadway
37th Floor
New York, NY 10036
212.447.7070 (p)
212.447.7077 (f)
ekallas@whatleydrake.com
jwhatley@wdklaw.com

Seeger Weiss LLP
Stephen A. Weiss
James A. O'Brien III

One William Street
New York, NY 10044
212.584.0700 (p)
212.584.0799 (f)
sweiss@seegerweiss.com
jo'brien@seegerweiss.com

Strange & Carpenter
Brian R. Strange
Gretchen Carpenter
12100 Wilshire Boulevard
Suite 1900
Los Angeles, CA 90025
310.207.5055 (p)
310.826.3210 (f)
lacounsel@earthlink.net
gcarpenter@strangeandcarpenter.com

Public Counsel
Patrick M. Dunlevy
610 South Ardmore Avenue
Los Angeles, CA 90005
213.385.2977 (p)
213.385.9089 (f)
pdunlevy@publiccounsel.org

**Counsel for *Lopez v. Bank of America N.A., et al.,* Case No. 2:11-cv-00059  (D. Wis.)**

Hagens Berman Sobol Shapiro LLP
Karl P. Barth
Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
karlb@hbsslaw.com
steve@hbsslaw.com
ari@hbsslaw.com

**Counsel for *Moussa v. Bank of America NA, et al.,* Case No. 8:11-cv-00175 (D. Md.)**

Hagens Berman Sobol Shapiro LLP

Steve W. Berman
Ari Y. Brown
1918 8th Avenue
Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on January 21, 2011.

*/s/ Gary Klein*
Gary Klein