UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: Bank of America Home Affordable Modification Program (HAMP) Contract Litigation | No. 1:10-md-02193 |

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF MOTION TO DISMISS CONSOLIDATED
<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs in these consolidated cases seek to enforce the federal government's Home Affordable Modification Program ("HAMP") against Defendants Bank of America, N.A. ("BANA") and BAC Home Loans Servicing, LP (collectively "BAC").  The factual circumstances in which the Plaintiffs find themselves vary widely, as evidenced by the Consolidated Amended Complaint's ("CAC") 407 paragraphs of factual allegations and its multiple and often conflicting sets of classes and subclasses.  But at bottom, each Plaintiff alleges that Defendants were required to give him or her a permanent mortgage loan modification under HAMP and have thus far failed to do so.

In support of this notion, Plaintiffs advance several legal claims (breach of contract and of duty of good faith and fair dealing/promissory estoppel) based on two primary theories.  First, Plaintiffs allege that they are intended third-party beneficiaries of a Servicer Participation Agreement between BANA and the U.S. Treasury Department.  They are not, and this theory has been rejected by virtually all of the nearly two dozen federal district courts to have examined the issue, including two in this District.  It should similarly be rejected here.

Second, Plaintiffs seek to recover under the HAMP Trial Period Plans ("TPPs"), that some (but not all) Plaintiffs received from BAC.  These Plaintiffs assert that under the TPPs, BAC promised that if Plaintiffs made three trial payments and provided certain documents, Plaintiffs would be offered permanent loan modifications.  This claim also fails because, when viewed in the context of the HAMP program that required the use of the TPPs, these documents are nothing more than part of the application process to obtain a permanent modification, as several federal courts have concluded.  As such, they are not enforceable contracts.

Moreover, the TPPs were unambiguously conditioned on a long list of conditions precedent that Plaintiffs do not allege were fully satisfied.  Because those conditions were not

satisfied, Plaintiffs' argument that they may enforce the TPPs – even by way of a claim for promissory estoppel – must fail, and their claims based upon the TPPs must be dismissed.

Lastly, Plaintiffs' tacked-on consumer protection and Equal Credit Opportunity Act claims must be dismissed for a variety of reasons.  The CAC should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    *Allegations Regarding the Plaintiffs.*

The factual allegations regarding the named Plaintiffs are too lengthy to recite in detail, given the Court's page limitations and the number of Plaintiffs.  However, all Plaintiffs allege that they requested loan modifications because they could not afford their contractually required mortgage payments.  All Plaintiffs claim that they were either in default or would be imminently. *See generally* CAC ¶¶ 128-407.  The majority of the Plaintiffs were sent HAMP Trial Period Plans, their mortgage payments were substantially reduced for several months, and they were permitted to stay in their homes while their eligibility for permanent loan modifications was considered.  Other Plaintiffs received non-HAMP modification applications, and still others received no modification applications at all.  Despite these differences, each Plaintiff alleges BAC was required to give him or her a permanent HAMP modification.

### B.    *The Home Affordable Modification Program.*

In early 2009, the U.S. Treasury announced HAMP, a national modification program intended to help 3 to 4 million at-risk homeowners avoid defaulting on their mortgage loans by reducing their monthly payments.  CAC Exh. 2 (HAMP Supplemental Directive 09-01) at 1.  On March 4, 2009, the government published detailed program guidelines for HAMP, which it then supplemented on April 6, 2009.  *Id.*  Under the guidelines, borrowers who meet certain criteria may be eligible for a loan modification.  *Id.* at 2.  A servicer that participates in HAMP must

execute a Servicer Participation Agreement "with Fannie Mae in its capacity as financial agent for the United States." *Id.* BANA signed such a Servicer Participation Agreement. CAC ¶ 80; *see* CAC Exh. 1. Since its inception, there have been an extraordinary number of changes to HAMP, which is a constantly evolving program.[1]

Not all mortgage loans are eligible for HAMP, and a participating servicer is not required to modify every HAMP-eligible loan. A loan is eligible for HAMP consideration only if, among many other requirements, it "is delinquent or default is reasonably foreseeable," the borrower attests to lacking sufficient "assets to make the monthly mortgage payments," and the borrower provides "income documentation." CAC Exh. 2 at 2. If initial eligibility is satisfied, the servicer is obligated to *consider* the borrower for a HAMP modification, assuming it is not precluded from doing so by its other contractual arrangements or investor requirements. *Id.* at 1. If it elects to consider a borrower for HAMP, a servicer will use the borrower's income information to follow a series of steps (known as the "waterfall") in an effort to adjust the borrower's monthly mortgage payment to 31% of total pre-tax monthly income. *Id.* at 8-10.

One of the most critical HAMP program facts that Plaintiffs continually ignore is that during the period in which nearly all of the named Plaintiffs applied for HAMP consideration, servicers were permitted to place borrowers into a HAMP TPP based upon the borrower's *unverified* representation of income, and to collect later documents to verify that income. *Id.* at

---

[1] The various HAMP directives, including those attached to the Complaint, have been superseded by the Making Home Affordable Handbook, which is already on its third iteration. Links to the Handbook, the HAMP supplemental directives, and other guidance are available at https://www.hmpadmin.com/portal/programs/servicer.jsp (last visited February 18, 2011). Fannie Mae and Freddie Mac each have their own versions of HAMP, the guidance for which Servicers must follow separately from HAMP itself. *See* https://www.efanniemae.com/sf/mha/mhamod/ (links to Fannie Mae Servicing Guide Announcements/directives for implementing HAMP for Fannie Mae loans) (last visited February 18, 2011); http://www.freddiemac.com/singlefamily/service/mha_modification.html (links to Freddie Mac Seller/Servicer Guide Bulletins/directives for implementing HAMP for Freddie Mac loans) (last visited February 18, 2011).

5-6.[2]  Unsurprisingly, this process sometimes resulted in borrowers being ineligible for HAMP when their income was later verified, *see id.* at 18, including a number of the Plaintiffs here.

If application of the waterfall produces an affordable payment, the servicer also subjects the loan to a Net Present Value ("NPV") test.  *Id.* at 4-5.  If the NPV test produces a "negative" result (meaning that losses from foreclosure are less than losses from modification), the servicer may not modify the loan.  *Id.*  If the servicer decides to pursue modification, it may then send the borrower a HAMP TPP, under which the borrower makes reduced payments for three or more months.  *Id.* at 5, 17.  When sending a TPP to a borrower, the servicer must use the standardized forms provided by Treasury.  *Id.* at 15.

Upon receiving a TPP from the borrower, the servicer must confirm that the borrower meets the underwriting and eligibility criteria.  CAC Exh. 2 at 15.  If – *and only if* – the borrower meets the underwriting and eligibility criteria, the servicer should then sign and return the TPP to the borrower, at which point the trial period takes effect.  *Id.* at 15; *see also* CAC Exh. 7 at 1.  If the documents submitted evidence that the borrower does not meet the HAMP eligibility requirements, or if the borrower fails to make scheduled payments under the Trial Period Plan, the servicer must deny a permanent modification under HAMP.  CAC Exh. 2 at 5, 15.  In addition, HAMP (not the servicer) requires that borrowers with a monthly debt ratio of greater than 55 percent undergo debt counseling, and that escrow accounts be established for all TPPs. *Id.* at 11-12.  A borrower may receive a permanent HAMP modification only if he or she submits all the necessary documentation, is determined to be HAMP-eligible, and meets all requirements set forth in the Trial Period Plan.  *Id.* at 15, 18.

---

[2] Just one of many examples of Plaintiffs' attempts to obfuscate this critical undisputed fact is at ¶ 119 of the CAC, in which Plaintiffs make reference to 2011 BAC website statements that refer to certain *current* procedures related to when forms are received and decisions made.  They do not and cannot allege that these procedures were in place when any of them received their TPPs based on *unverified* income.

## ARGUMENT

**A.**     ***Plaintiffs Are Not Third-Party Beneficiaries of BANA's Servicer Participation Agreement with the U.S. Treasury.***

Count I of the CAC purports to state claims for breach of contract and breach of the duty of good faith and fair dealing.  As a basis for these claims, Plaintiffs assert that they are among the intended beneficiaries of a Servicer Participation Agreement ("SPA") entered into between BANA and the Treasury (attached to the CAC as Exhibit 1), and that Defendants breached the SPA "by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications that comply with terms as calculated in accordance with the methods specified in the Supplemental Directives incorporated into the SPA," among other things.  CAC ¶¶ 443-48. In the past year and half, however, virtually every federal district court addressing this identical claim, including at least two in this District, have dismissed claims alleging that borrowers are entitled to recover under an SPA between the Treasury and a loan servicer.[3]

That the courts nearly unanimously reject Plaintiffs' position is unsurprising.  As Judge Saris has previously explained, "the law requires special clarity to support a finding that the

---

[3] *See Speleos v. BAC Home Loans Servicing, L.P.*, No. 10-11503, 2010 WL 5174510, *3-5 (D. Mass. Dec. 14, 2010); *McKensi v. Bank of America, N.A.*, No. 09-11940-JGD, 2010 WL 3781841, *5-6 (D. Mass. Sept. 22, 2010); *Phipps v. Wells Fargo Bank, N.A.*, No. 10-2025, 2011 WL 302803, *6-8 (E.D. Cal. Jan. 27, 2011); *Wigod v. Wells Fargo Bank, N.A.*, No. 10 CV 2348, 2011 WL 250501, *5-6 (N.D. Ill. Jan. 25, 2011); *Nguyen v. BAC Home Loan Services, LP*, No. C-10-01712-RMW, 2010 WL 3894986, *4-6 (N.D. Cal. Oct. 1, 2010); *Hammonds v. Aurora Loan Services LLC*, No. EDCV 10-1025 AG (OPx), 2010 WL 3859069, *2-3 (C.D. Cal. Sept. 27, 2010); *Joern v. Ocwen Loan Servicing, LLC*, No. CV-10-0134-JLQ, 2010 WL 3516907, *5 (E.D. Wash. Sept. 2, 2010); *Vazquez v. Bank of America Home Loans, et al.*, No. 2:10-cv-00116-PMP-RJJ, 2010 WL 3385347, *1 (D. Nev. Aug. 23, 2010); *Wright v. Bank of America, N.A.*, No. CV 10-01723 JF (HRL), 2010 WL 2889117, *3-5 (N.D. Cal. July 22, 2010); *Hoffman v. Bank of America, N.A.*, No. C 10-2171 SI, 2010 WL 2635773, *3-5 (N.D. Cal. June 30, 2010); *Zendejas v. GMAC Wholesale Mortgage Corp.*, No. 1:10-CV-00184 OWW GSA, 2010 WL 2629899, *3-4 (E.D. Cal. June 29, 2010); *Simmons v. Countrywide Home Loans, Inc.*, No. 09 cv 1245 JAH (JMA), 2010 WL 2635220, *2-5 (S.D. Cal. June 29, 2010); *Simon v. Bank of America, N.A.*, No. 10-cv-00300-GMN-LRL, 2010 WL 2609436, *10 (D. Nev. June 23, 2010); *Marks v. Bank of America, N.A.*, No. 03:10-cv-08039-PHX-JAT, 2010 WL 2572988, *2-5 (D. Ariz. June 22, 2010); *Burtzos v. Countrywide Home Loans*, No. 09-CV-2027W (WMC), 2010 WL 2196068, *2 (S.D. Cal. June 1, 2010); *Benito v. IndyMac Mortgage Services*, No. 2:09-CV-001218-PMP-PAL, 2010 WL 2130648, *7-8 (D. Nev. May 21, 2010); *Lucero v. Countrywide Bank N.A.*, No. 09cv1742 BTM (BLM), 2010 WL 1880649, *3-4 (S.D. Cal. May 10, 2010); *Villa v. Wells Fargo Bank, N.A.*, No. 10CV81 DMS (WVG), 2010 WL 935680, *2-3 (S.D. Cal. Mar. 15, 2010); *Escobedo v. Countrywide Home Loans, Inc.*, No. 09cv1557 BTM(BLM), 2009 WL 4981618, *2-3 (S.D. Cal. Dec. 15, 2009).  *But see Marques v. Wells Fargo Home Mortgage, Inc.*, No. 09-cv-1985-L(RBB), 2010 WL 3212131, *3-7 (S.D. Cal. Aug. 12, 2010).

contracting parties intended to confer a benefit on a third party." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 339 F. Supp. 2d 165, 178 (D. Mass. 2004) (quoting *McCarthy v. Azure*, 22 F.3d 351, 356 (1st Cir. 1994)).  And, as the Ninth Circuit explained in *County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir. 2009), even more clarity is required when the government is one of the parties to the contract at issue:

> Demonstrating third-party beneficiary status in the context of a government contract is a comparatively difficult task. We have explained that parties that benefit from a government contract are generally assumed to be incidental beneficiaries, rather than intended ones, and so may not enforce the contract *absent a clear intent to the contrary*. This "clear intent" hurdle is not satisfied by a contract's recitation of interested constituencies, vague, horatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind. Rather, we examine the precise language of the contract for a "clear intent" to rebut the presumption that the third parties are merely incidental beneficiaries.

*Id.* (emphasis in original) (citations omitted).  As a matter of law, Plaintiffs cannot rebut the strong presumption that they are merely incidental beneficiaries of the SPA.  Rather than containing the "special clarity" necessary for Plaintiffs to enforce its terms, the SPA in fact evinces a clear intent to do just the contrary.

In determining whether BAC and the Treasury intended the SPA to benefit borrowers, the Court need go no further than § 11E of the SPA, which provides that the SPA "shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest." CAC, Exh. 1 at 10.  This language alone defeats Plaintiffs' third-party beneficiary claims.  In *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999), the Ninth Circuit rejected an intended beneficiary argument based on very similar language in a government contract.  The court concluded that "[t]his language clearly evinces the intent of the parties to limit intended beneficiaries to the contracting parties." *Id.* at 1212.  While the court conceded that the contract "operate[d] to the [third parties'] benefit . . . and was undoubtedly

entered into with [them] in mind," the language mandated the conclusion that the parties did not intend to extend the contract's benefits to those third parties. *Id.*; *see also Hodges v. Public Bldg. Com'n of Chicago*, 864 F. Supp. 1493, 1510 (N.D. Ill. 1994) (similar). By including substantially similar language in the SPA, BAC and the Treasury likewise evinced their intent to limit the intended beneficiaries of the SPA to the contracting parties. *See Escobedo v. Countrywide Home Loans, Inc.*, No. 09cv1557 BTM(BLM), 2009 WL 4981618, *2 (S.D. Cal. Dec. 15, 2009) (similar SPA language evidences parties' intent to limit benefit of contract).

The fact that the SPA was not intended to be enforced by third parties is equally evident from Section 7 of the SPA, which provides a dispute resolution mechanism for SPA claims – but between "Fannie Mae and Servicer" (i.e., BAC) only. CAC Exh. 1 at 7, § 7; *cf. Marks v. Bank of America, N.A.*, No. 03:10-cv-08039-PHX-JAT, 2010 WL 2572988, *4 (D. Ariz. June 22, 2010) ("[P]ermitting these individual claims would undermine Freddie Mac's role as the compliance officer for the HAMP."). Further, the SPA only permits legal action to be taken after the parties have taken "all reasonable steps to resolve disputes internally." CAC Exh. 1 at 7, § 7. Permitting third-party suits to enforce the SPA would lead to the absurd result that the actual parties to the agreement would be required to attempt to resolve disputes out of court, whereas third parties would face no such obstacle.[4] Count I must be dismissed.

## B.   *Plaintiffs Cannot Recover Under the HAMP Trial Period Plans.*

Perhaps recognizing the futility of their attempt to enforce HAMP by way of the SPA, in

---

[4] The sheer number of borrowers who could bring suit against the Treasury or BAC further supports the conclusion that borrowers such as Plaintiff cannot enforce the SPA. *See Santa Clara*, 588 F.3d at 1248 ("The breadth and indefiniteness of a class of beneficiaries is entitled to some weight in negating the inference of intended beneficiary status."). Three to four million homeowners might have standing to sue under SPAs under Plaintiffs' theory, far from the kind of "narrow, well-defined class" required for third-party beneficiary status. *Id.* at 1248; *see Marks*, 2010 WL 2572988 at *4 ("If the Court were to grant Plaintiff third-party beneficiary status, the Court would be opening the door to potentially 3-4 million homeowners filing individual claims."); *Villa v. Wells Fargo Bank, N.A.*, No. 10CV81 DMS (WVG), 2010 WL 935680, *3 n.1 (S.D. Cal. Mar. 15, 2010).

Counts II, IV, and VII Plaintiffs purport to enforce HAMP through breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel claims.  Each of these claims is premised upon the HAMP Trial Period Plans ("TPPs") that some of the Plaintiffs claim to have received from BAC.  Plaintiffs assert that in the TPPs, BAC "promise[d] a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements."  CAC ¶ 91.  This theory both misunderstands and contradicts the TPPs on which the claim is based.

      1.    <u>The Trial Period Plans are Part of Applications for Loan Modifications, Not Offers to Enter Contracts.</u>

The TPPs are not contracts or even offers for contracts.  Rather, based upon their terms and the context of the HAMP program, it is plain that the TPPs are "simply a part of the application process which plaintiff[s] [are] willing to complete in the hope that BAC would modify" their loans.  *Grill v. BAC Home Loans Servicing LP*, No. 10-CV-3057-FCD/GGH, 2011 WL 127891, *4 (E.D. Cal. Jan. 14, 2011).  That the TPPs are part of applications is evident on the face of the documents themselves, which explicitly provide that they are "not a modification of the Loan Documents," that the borrowers must first provide documents "to permit verification of my income" before BAC would even "determine *whether I qualify for the offer* described in this Plan," and that the borrower must "meet all of the conditions required for modification" under HAMP in order to qualify.  CAC, Exh. 7 at 1, 4 (emphasis added).  These provisions make clear that even before an offer for a modification would be forthcoming, the Plaintiffs would have to *qualify* for a modification offer under HAMP – it was simply not enough for Plaintiffs to sign the TPP, send in documents, and make the required payments.  *See Shurtliff v. Wells Fargo Bank, N.A.*, No. 1:10-CV-165 TS, 2010 WL 4609307, *3 (D. Utah. Nov. 5, 2010) ("[T]he Trial Agreement makes clear that the modification is subject to qualification . . . .").

8

For this reason, the TPPs cannot be binding contracts: they are unsupported by a necessary element of any contract, an offer.  There simply was not any "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited *and will conclude it*."  Rest. (2d) Contracts § 24 (emphasis added).  Rather, as set forth in the TPPs themselves, absolutely nothing would be concluded by Plaintiffs simply signing the TPPs, sending in various documents, and making trial payments.  Instead, the TPPs provided an application process by which Defendants would confirm whether Plaintiffs "qualif[ied] for [an] offer."  CAC Exh. 7, at 1; *Grill*, 2011 WL 127891 at *4.  That the TPPs are an intermediate step in the HAMP application process is confirmed by the HAMP guidelines.  *See* CAC, Exh. 2 at 15 (*after* receiving TPP from borrower, servicer "must confirm that the borrower meets the underwriting and eligibility criteria").  As such, the TPPs are "explicitly not an enforceable offer for loan modification."  *Vida v. OneWest Bank, F.S.B.*, No. 10-987-AC, 2010 WL 5148473, *6 (D. Or. Dec. 13, 2010); *Wigod v. Wells Fargo Bank, N.A.*, No. 10 CV 2348, 2011 WL 250501, *7 (N.D. Ill. Jan. 25, 2011) (opening statement of TPP stating "that to obtain a permanent modification, [Plaintiff] merely needed to make the four reduced payments required under the Trial Period Plan and supply accurate financial information" was at odds with "the remainder of the contract, which required her to meet *all* of HAMP's requirements" and could not reasonably be construed as an offer to modify contract).

2. <u>Because The TPPs Are Applications, They Are Unsupported By Consideration</u>.

Plaintiffs' alleged adherence to the application requirements of HAMP in the hope of obtaining a permanent modification cannot constitute the consideration necessary for a binding contract.  *See* Rest. (2d) Contracts § 17 ("[T]he formation of a contract requires a bargain in which there is . . . consideration.").  Plaintiffs contend that the TPPs are supported by the

following consideration:  (1) "TPP payments"; (2) an agreement to obtain credit counseling; (3)

submission of financial information; (4) establishment of escrow accounts; and (5) "legally

binding representations about [Plaintiffs'] personal circumstances."  CAC ¶ 454.  Each

contention is wrong.  Plaintiffs' TPP payments cannot constitute consideration because those

payments do "not represent 'anything other than what [Plaintiffs were] *already obligated to do*

under the terms of the Loan[s].'"  *Vida*, 2010 WL 5148473 at *7 (emphasis added) (quoting

*Barinaga v. JP Morgan Chase & Co.*, No. 10-CV-266-AC, 2010 WL 4338326, *5 (D. Or. Oct.

26, 2010)); *see also Bosque v. Wells Fargo Bank, N.A.*, No. 10-10311-FDS, 2011 WL 304725,

*6 (D. Mass. Jan. 26, 2011) (noting that "modified mortgage payments . . . would likely not

constitute cognizable consideration under the TPP.").  Nor do the other types of supposed

"consideration" suffice to create a binding contract.  Rather, every single one of those items was

affirmatively required under the HAMP guidelines before a borrower could even be considered

for a permanent HAMP modification.  *See generally* CAC, Exh. 2.  As such, they were not

bargained for consideration, but simply part of the application process, as discussed above.

*Grill*, 2011 WL 127891 at *4;[5] *see also Mizrahi v. Wells Fargo Home Mortg.*, No. 2:09-cv-

01387-RLH-LRL, 2010 WL 2521742, *3 (D. Nev. June 16, 2010).[6]

---

[5] Defendants acknowledge that two other judges in this district have concluded that contract claims based on TPPs may survive a motion to dismiss.  *See Bosque*, 2011 WL 304725, at *6; *Durmic v. J.P. Morgan Chase Bank, NA*, No. 10-CV-10380-RGS, 2010 WL 4825632, *3 (Nov. 24, 2010).  With respect to Judges Stearns and Saylor, Defendants submit that those cases were wrongly decided, as the courts did not consider the context surrounding the TPPs, including the fact that each of the items the courts assumed to be consideration supporting a contract were affirmatively required as a part of an application under HAMP.

[6] The breach of contract claim asserted on behalf of the so-called "SPA subclass" in Count III of the CAC must also be dismissed for lack of consideration. Though the CAC alleges that consideration existed in the form of (a) reduced payments; (b) submitting financial documentation; (c) setting up escrow accounts; and (d) making legally binding representations, CAC ¶ 470, neither of the named Plaintiffs who purport to be members of the class (Deborah Brozak and Susan Fraser, *see id.* ¶¶ 54, 56) allege that they were required to do any of the latter three in consideration of the alleged promise to modify their loans. *See id.* ¶¶ 363-68, 375-80. And, as already discussed, making substantially reduced payments cannot constitute consideration. *See Vida*, 2010 WL 5148473 at *7; *Bosque*, 2011 WL 304725 at *6. For substantially the same reason, the promissory estoppel claim asserted on behalf of this class in Count V must also be dismissed – Brozak and Fraser suffered no detriment by making payments *lower* than those they were otherwise required to under the terms of their existing mortgage agreements.

3.      The Trial Period Plans Do Not Guarantee Permanent Modifications Unless
        Conditions Precedent Are Met.

Even assuming that the TPPs could be construed as offers to enter a contract, rather than

part of an application process, Plaintiffs cannot recover under them.  The TPPs do not guarantee

a permanent loan modification unless a number of conditions precedent are met.[7]  *See Brown v.*

*Bank of New York Mellon*, No. 1:10-cv-550, 2011 WL 206124, *3 (W.D. Mich. Jan. 21, 2011)

("The trial period plan agreement did not guarantee that Plaintiff's loan documents would be

modified.").  As noted above, the TPPs provide that in order to receive a permanent

modification, a borrower must "qualify for the offer" and "meet all of the conditions required for

modification."  CAC, Exh. 7 at 1, 4.  *Not one* of the Plaintiffs seeking to recover under the TPPs

has alleged that he or she met the basic eligibility requirements set forth in HAMP and/or

qualified for the offer of a permanent modification.

The TPPs also provide that "[t]his Plan will not take effect unless and until both I and the

Servicer sign it and the Servicer provides me with a copy of this Plan with the Servicer's

signature."  *See* CAC, Exh. 7 at 2.  This provision was included for a reason – BAC cannot offer

modifications to every borrower who qualifies to receive a TPP based on their verbal

representations of income and makes his or her trial payments.  Instead, it must *verify* each

borrower's income and that each borrower meets a litany of eligibility requirements set by the

Treasury.  *See generally* CAC Exh. 2.  Only after completing that verification process can BAC

enter an agreement to provide a borrower with a permanent modification.  While no less than 34

of the Plaintiffs allege that they signed a TPP with virtually identical language to Exhibit 7, *not a*

---

[7] Neither Judge Saylor nor Judge Stearns were presented with this specific issue in the *Bosque* and *Durmic* cases.
Rather, Judges Stearns and Saylor ruled only that Plaintiffs had alleged (a) consideration for the TPPs; (b) essential
and material terms; and (c) legally cognizable damages. *Bosque*, 2011 WL 304725 at *6; *Durmic*, 2010 WL
4825632 at *3-4. While BAC disagrees with these conclusions, they do not shed any light on whether a contract is
formed in a case where, as here, a TPP sets forth a number of conditions precedent (such as execution by the
counter-party) that go unfulfilled.

11

*single one of those Plaintiffs* alleges – either in the CAC or in the underlying complaints – that he

or she in turn received a TPP signed by BAC.  Furthermore, while numerous of these Plaintiffs

attached their TPPs to their underlying complaints, *none* of those TPPs bears the signature of a

BAC representative.  Under the unambiguous language of the TPPs themselves, therefore, the

TPPs never took effect, and no contracts were formed.[8]  Indeed, the TPPs are clear that "[i]f prior

to the Modification Effective Date, . . . the Servicer does not provide [the borrower] a fully

executed copy of this Plan and the Modification Agreement . . . the Loan Documents will not be

modified and this Plan will terminate."  *Id.* at 3 (§ 2.F).  *See Torres v. Litton Loan Servicing, LP*,

No. 10-cv-01709-OWW-SKO, 2011 WL 149833, *3 (E.D. Cal. Jan. 18, 2011) (dismissing

breach of contract claim premised on TPP because complaint failed to allege that plaintiff

received executed copy of loan modification agreement, and TPP therefore never became

binding contract); *Shurtliff*, 2010 WL 4609307 at *3 (similar).

　　In addition to this straightforward language, the TPP also sets forth multiple *other*

conditions precedent that must be satisfied before a permanent modification will be forthcoming:

- The borrower must "provid[e] confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income," and certify that he or she will provide "documentation for **all** income that I receive," CAC, Exh. 7 at 2.

- The borrower must be "unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit," *id.*

- The borrower must live in the property as his or her principal residence, and the property must not be condemned, *id.*

---

[8] To the extent Plaintiffs seek to proceed on a promissory estoppel theory, no Plaintiff could reasonably have relied on a supposed promise in the TPP to modify his or her loan where the TPP made clear that numerous conditions precedent would have to be met before the a loan modification would result, and that the Plan would not even begin until BAC also signed it.  *Cf. Wigod*, 2011 WL 250501, at *7 (plaintiff "could not reasonably have relied on just the opening statement" of the TPP, which allegedly promised a permanent modification, "because it would have required her to ignore the remainder of the contract which required her to meet *all* of HAMP's requirements.") (emphasis in original).

- There must not have been any change of ownership of the property since the original note and mortgage were signed, *id.*

- All documents and information that the borrower provides to the servicer, "including the documents and information regarding [the borrower's] eligibility for the program," must be true and correct, *id.*

- The servicer must determine that the borrower's representations in Section 1 of the TPP continue to be true and correct, *id.* at 3.

- The Modification Effective Date must have passed, *id.*

Once again, not a single Plaintiff alleges that each and every one of these conditions was satisfied.  As such, the breach of contract, good faith and fair dealing and promissory estoppel claims based on the TPPs fail as a matter of law.

**C.     *Plaintiffs' Consumer Protection Claims Must Be Dismissed.***

     1.     <u>The Consumer Protection Claims Are An Impermissible End-Run Around HAMP's Lack of Private Right of Action.</u>

Having failed to enforce HAMP through their breach of contract, good faith and fair dealing and promissory estoppel claims, Plaintiffs make one final attempt to enforce HAMP by way of Count VI of the CAC, which seeks to capture in one count claims under the consumer protection statutes of 14 states (Arizona, California, Connecticut, Florida, Illinois, Maryland, Massachusetts, Missouri, New Jersey, New York, Oregon, Pennsylvania, Washington and Wisconsin). CAC ¶¶ 489-521.  Like the other claims set forth in the CAC, this hodgepodge of state law claims should be dismissed.[9]

First and fundamentally, there can be no dispute that Plaintiffs' various consumer protection act claims are nothing more than an attempt to enforce HAMP by way of state law claims.  The CAC contains no fewer than 18 paragraphs describing a servicer's duties under

---

[9] It is not possible for BAC to fully address the deficiencies in Plaintiffs' various consumer protection claims within the Court's page limits.  BAC highlights deficiencies here that are sufficient to grant the motion, but reserves the right to address other issues by way of another motion should these claims survive.

HAMP (from Plaintiffs' perspective at least) (CAC ¶¶ 80-97) and 17 paragraphs describing how BAC is allegedly "failing to meet its HAMP obligations" (CAC ¶¶ 98-114). Indeed, the CAC goes so far as to cite a Congressional Oversight Panel Report which criticizes the Treasury Department for its HAMP enforcement efforts. CAC ¶¶ 112-114. Plaintiffs have apparently decided to attempt to usurp Treasury's authority and enforce HAMP through their consumer protection claims. This they cannot do. *Marks*, 2010 WL 2572988, *2-7 (D. Ariz. June 22, 2010) (dismissing state law claims attempting to enforce HAMP because, among other reasons, HAMP enforcement is the domain of Treasury).

Numerous courts have dismissed similar state consumer protection act claims seeking to enforce claims based on HAMP, TARP and other federal programs. *Aleem v. Bank of America*, No. EDCV 09-01812-VAP (RZx), 2010 WL 532330, *3 (C.D. Cal. Feb. 9, 2010) ("UCL cannot create a private right of action where none exists under . . . HAMP"); *Puzz v. Chase Home Finance, LLC*, No. CV-10-1699-PHX-GMS, 2011 WL 395423, *4 (D. Ariz. Feb. 4, 2011) (dismissing Arizona Consumer Fraud Act claim attempting to enforce HAMP); *Ung v. GMAC Mortgage, LLC*, No. EDCV 09-893-VAP (OPx), 2009 WL 2902434, *4 (C.D. Cal. Sept. 4, 2009) (dismissing TARP-based state law claims). This Court should similarly dismiss all consumer protection act claims (except the Mass. Gen. L. c. 93A claim),[10] as improper attempts to enforce HAMP through state law.

2.    Several Consumer Protection Claims Do Not Cover the Alleged Conduct.

The consumer protection act claims for certain states must be dismissed for the additional reason that the defendants or acts in question are outside the scope of those state acts. Prior to February 23, 2010 (and thus *before* all allegations as to Oregon plaintiff Langen), the Oregon

---

[10] BAC seeks to dismiss the Ch. 93A claim on separate grounds discussed below.

Unfair Trade Practices Act, ORS 646.605 *et seq.* (CAC ¶¶ 516-17) did "not apply to loans or extensions of credit." *Lamm v. Amfac Mortgage Corp.*, 605 P.2d 730, 730 (Or. App. 1980). As such, the Oregon UTPA claim must be dismissed.[11]

The California Rosenthal Fair Debt Collection Practices Act ("RFDCPA") claim (CAC ¶ 506) must be dismissed because, as explained in *Grill*, "defendant BAC cannot be liable" under RFDCPA for conduct arising out of HAMP because any resulting "foreclosure is not a debt and BAC is not a debt collector within the meaning of the statute." 2011 WL 127891, at *9. *See also Jensen v. Quality Loan Service Corp.*, 702 F. Supp. 2d 1183, 1199-1200 (E.D. Cal. 2010) (similar); *Castaneda v. Saxon Mortg. Services, Inc.*, 687 F. Supp. 2d 1191, 1197 (E.D. Cal. 2009) ("residential mortgage loans [do] not fall within the RFDCPA").[12]

---

[11] O.R.S. 646.608(k) does apply to "false or misleading representations concerning the availability of credit" but, this section "is more reasonably interpreted as referring to credit only with respect to 'transaction(s) or obligation(s) incurred' in connection with the sale of goods." *Haeger v. Johnson*, 548 P.2d 532, 534 (Or. App. 1976).

[12] In addition, the consumer protection claims under Arizona, California, Illinois, Maryland, New Jersey, New York, Pennsylvania and Wisconsin law should be dismissed because Plaintiffs have failed to plead their allegations with the particularity required by Rule 9(b). *See, e.g., Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("we have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of" Cal. Bus. & Prof. Code § 17200 *et seq.*). *See also Silvas v. GMAC Mortgage, LLC*, No. CV-09-265-PHX-GMS, 2009 WL 4573234, *7 (D. Ariz. Dec. 1, 2009) (dismissing ACFA claim for failure to satisfy heightened pleading requirements under Rule 9(b)); *Durst v. Illinois Farmers Ins. Co.*, No. 05 C 574, 2006 WL 140546, *3 (N.D. Ill. Jan. 12, 2006) ("[P]laintiff must plead claims brought under the [Illinois Consumer] Fraud Act with particularity."); *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999); *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (dismissing claim under Maryland Consumer Protection Act for failure "to identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments . . . ."); *Naporano Iron & Metal Co. v. American Crane Corp.*, 79 F. Supp. 2d 494, 511 (D.N.J. 1999) ("Rule 9(b) requires [plaintiff] to allege the circumstances surrounding its NJCFA claim with particularity . . . ."); *Moses v. Citicorp Mortg., Inc.*, 982 F. Supp. 897, 903 (E.D.N.Y. 1997) ("Conclusory allegations have been held to be insufficient to state a claim under [New York General Business Law] Section 349."); Pa. R. Civ. P. 1019(b) ("Averments of fraud or mistake shall be averred with particularity."); *Eclipse Media, Inc. v. Quad/Creative, Inc.*, No. 01-1978, 2002 WL 1324271, *13 (Wis. Ct. App. June 18, 2002) (requiring heightened pleading under Wis. Stat. § 802.03(2) for Deceptive Trade Practices Act claims). The Complaint therefore was required to include "the who, what, when, where, and how" of the alleged wrongdoing. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Plaintiffs' general allegations of "long periods of time on hold" (CAC ¶ 100), instructions to "customer service representatives . . . to mislead homeowners" (CAC ¶ 105), and anonymous statements by a "former employee" (CAC ¶¶ 105, 108) do not provide the required specificity. *See, e.g., USAlliance Federal Credit Union v. CUMIS Ins. Soc., Inc.*, 346 F. Supp. 2d 468, 472 (S.D.N.Y. 2004).

3.       <u>Plaintiffs' M.G.L. c. 93A Claim Must Fail For A Lack of a Demand Letter</u>.

Plaintiffs' Massachusetts Consumer Protection claim (CAC ¶¶ 511-12), brought under

M.G.L. c. 93A, must be dismissed because Plaintiffs have failed to satisfy a critical prerequisite

– the 93A demand letter.  "At least thirty days prior to the filing" this suit, Plaintiffs were

required to deliver to BAC "a written demand for relief, *identifying the claimant* and reasonably

describing the unfair or deceptive act or practice relied upon and the injury suffered."  M.G.L. c.

93A, § 9(3).  This requirement is an "absolute prerequisite to an action asserted under G.L. c.

93A, § 9," and failure to satisfy it entitles a defendant to judgment as a matter of law.  *Ball v.*

*Wal-Mart, Inc.*, 102 F. Supp. 2d 44, 54 (D. Mass. 2000).  Plaintiffs claim that they complied with

this requirement (CAC ¶¶ 512), but do not say how.  Merely reiterating the elements of a claim is

not enough.  Plaintiffs do not allege, and cannot allege, that any of the named Plaintiffs issued a

demand letter.  The Chapter 93A claim therefore must be dismissed.

Plaintiffs will no doubt argue that they have satisfied the demand requirements because

one former plaintiff in a complaint (No. 1:10-cv-10316 (D. Mass.)) (the "Johnson Compl.") that

was consolidated into this action served a demand letter "on behalf of the class."  *See Bosque*,

2011 WL 304725, at *8 (demand letter sent by "class representative" sufficient to satisfy demand

requirement) (citing *Baldassari v. Public Fin. Trust,* 369 Mass. 33 (1975)).  But unlike in

*Bosque*, the person on whose demand letter plaintiffs rely, Ms. Johnson, is not a plaintiff.  BAC

responded to Ms. Johnson's demand letter and offered her relief – exactly as c. 93A was

intended.  Johnson Compl. ¶ 205. Ms. Johnson accepted that offer of settlement and dismissed

her claim.  The actual plaintiffs, therefore, cannot rely on her demand letter and their claims must

be dismissed.

The 93A demand letter of a non-party cannot satisfy the statute.  "[I]n judging the sufficiency of [a] precertification demand letter, [courts] look solely to the description of the individual claimant's own injury, and the central issue in this case becomes whether the demand letter sufficiently described the injury suffered by the plaintiff herself."  *Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068, 1075 (Mass. App. Ct. 2006).  This Court cannot determine whether the demand letter sufficiently described the alleged injury suffered by a plaintiff because no plaintiff sent the demand letter.  If Plaintiffs are allowed to bring 93A claims, then *any* person who claims to be a member of the putative class referenced in Ms. Johnson's demand letter – whether represented by the same counsel as Ms. Johnson or not – could bring Chapter 93A claims against BAC, without BAC having the requisite opportunity to review that person's claims and facts, or to make a settlement offer to that individual.  Such a result defeats the entire purpose of Chapter 93A's pre-suit demand letter: "to promote negotiation and settlement of claims and to allow the potential defendant the chance to make a reasonable offer of settlement in order to limit the damages a potential plaintiff might recover."  *Bassi v. Julian Crane & Equip. Corp.*, No. 02-0306, 2005 WL 3105676, *6 (Mass. Super. Oct. 26, 2005) (citing *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975)).

D.      ***Plaintiffs' ECOA Claims Must Be Dismissed.***

Count VIII of the CAC purports to state an "adverse action" claim on behalf of national, Virginia, and Maryland ECOA classes.  Adverse action claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA") involve notices required following denials of certain applications for credit.  Plaintiffs claim BAC failed to issue written notices "that provided a statement of reasons for the denial" of HAMP modifications, as allegedly

17

required by ECOA and the Virginia and Maryland equivalents.  CAC ¶¶ 432-441, 529-539.[13]

Thus, for the first time in these consolidated cases Plaintiffs recognize by this claim what BAC

has been arguing all along – that the HAMP TPP was part of an *application* for a loan

modification, not an enforceable contract.  In any event, the ECOA claim has limited reach in

these cases because, in the first instance, adverse action notices are not required when an

application for the extension of credit involves a borrower who is delinquent.  12 C.F.R. §§

202.9(a)(1), 202.2(c)(2)(ii).  Only the Sopers, Kunsky, and the Lopezes of the National ECOA

class allege they were not in default.  CAC ¶¶ 34, 44, 59.[14]

     The ECOA claim nevertheless fails as a matter of law.  Among ECOA's requirements is

that if a lender takes an "adverse action" on a "completed application for credit" it must provide

the applicant with a written statement of the reasons for the denial of the application within 30

days.  15 U.S.C. § 1691(d)(2); 12 C.F.R. §§ 202.2(f); 202.9(a).  The Federal Reserve Board,

which is responsible for the enforcement of  ECOA, has established through regulations, and a

recent advisory letter, that adverse action notices are only necessary in connection with loan

modifications where *all* elements of a four-part test are satisfied:  (a) there must be a request by a

consumer for an extension of credit, (b) there must be a credit application "made in accordance

with procedures used by a creditor for the type of credit requested," (c) there must be an "adverse

action" on the application, and (d) the borrower must not be "delinquent or in default on the

loan."  Letter from Sandra F. Braunstein, Director of the Division of Consumer and Community

Affairs, Federal Reserve Board (December 4, 2009) (available at

---

[13] Virginia Code § 59.1-21.21:1; Md. Code Ann. Com. Law §§ 12-704(3).  The state acts are similar, and if BAC
has complied with ECOA, it has complied with the Virginia and Maryland acts.  VA Code § 59.1-21.24; VA Code §
6.2-508; MD Code Com. Law § 12-704(2).  Note that VA Code § 59.1-21.21:1 *et seq.* was repealed by Acts 2010, c.
794, cl. 11, and replaced by VA Code 6.2-500 *et seq.*, effective as of Oct. 1, 2010.

[14] The Virginia ECOA Class (the Brookings, Arthur, Sharrett, Balde, and Ghomi) and the Maryland ECOA Class
(Mr. and Mrs. Moussa) Plaintiffs allege similarly.  CAC ¶¶ 49-53, 337, 343, 349, 355, 361, 406.

http://www.federalreserve.gov/boarddocs/caletters/2009/0913/caltr0913.htm), attached as

Exhibit A to the Declaration of Mark Tyler Knights; *see also* 12 C.F.R. §§ 202.2(c), (f), & (q).

Plaintiffs have failed to allege facts sufficient to support the second and third parts of the

test:  that their applications were complete and that there was an adverse action on their

applications.[15]  First, to support an ECOA claim, there must be a "completed application," and

BAC had "the latitude . . . to establish its own application process and to decide the type and

amount of information it will require from credit applicants."  Knights Decl., Exh. A at 1-2

(quoting Official Staff Commentary, 12 C.F.R. § 202.2(f)-1).  Plaintiffs failed to allege that they

completed all the application requirements established by BAC.  Plaintiffs allege that they

"responded to all document requests" made by BAC, and that they made their TPP payments

during their initial trial plans, but Plaintiffs do not allege that the application process was

complete. *See, e.g.*, CAC ¶¶ 243-248.  Indeed, as discussed at some length above, Plaintiffs have

failed to allege that they complied with all the conditions in the TPP.  Plaintiffs' generalized

claims thus do not allege that Plaintiffs' applications were complete.[16]

Second, Plaintiffs fail to allege an adverse action.  An adverse action occurs when, for

example, "a HAMP servicer evaluates a borrower's information according to HAMP guidelines,

declines the request, and communicates the decision to the borrower."  Knights Decl., Exh. A at

2.  None of the ECOA class Plaintiffs allege that such an event occurred.  Indeed, none allege

they were denied.  Instead, each alleges that he or she "received neither the tender of a

permanent loan modification that complied with HAMP rules, nor notification [of ineligibility]

---

[15] BAC does not concede that the other prongs of the test have been satisfied or that loan modification applications are even subject to ECOA adverse action requirements, despite the Braunstein letter.

[16] *See Sanders v. Ethington*, No. 2:10-cv-00183DAK, 2010 WL 5252843, *4 (D. Utah Dec. 16, 2010) (granting motion for judgment on the pleadings because plaintiffs' conclusory allegations did not support that a "completed application" was submitted); *Lilley v. JPMorgan Chase Bank*, No. 2:10-CV-483 TS, 2010 WL 4392561, *3 (D. Utah Oct. 28, 2010).  *See also Thompson v. Marine Midland Bank*, No. 99-7051, 198 F.3d 235, 1999 WL 752961 (2d Cir. Sept. 16, 1999) (unpublished).

*prior to the expiration of [the] trial period.*"  CAC ¶¶ 247, 307, 337, 343, 355, 361, 399, 406 (emphasis added).  This is not an allegation of an "adverse action" for which Plaintiffs did not receive timely notice.  It is an allegation that they did not receive the modification in the time period they hoped.  Such is not a ECOA violation.[17]

Moreover, Plaintiffs' general allegation that they "expected to receive either a final modification or a denial of eligibility before the end of the trial period" (CAC ¶ 11) does not provide the factual basis for an ECOA claim.  The end of Plaintiffs' initial trial period is not the deadline for notice under ECOA.  ECOA requires an adverse action notice, at the earliest, within 30 days of a completed application for credit.  12 C.F.R. § 202.9(a)(1).  By Plaintiffs' own admission, they were required to perform certain tasks *during* the trial period.  *See* CAC ¶ 11. The applications for a modification, therefore, could not be complete, and a final decision could not be certain, until some time after the end of the trial period *at the earliest*.  If any notice was required by ECOA, it was required no earlier than 30 days after a completed application – not prior to the end of the trial period.   The ECOA claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Consolidated Class Action Complaint in its entirety.

---

[17] In addition, by definition, there is no "adverse action" where a "creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." 12 C.F.R. § 202.2(c)(i).  Plaintiffs have not alleged that no counteroffers were made, or that counteroffers were given and declined.  Several Plaintiffs have expressly accepted non-HAMP modifications.  No ECOA notice is required in such circumstances.

Dated: February 22, 2011             Respectfully submitted,

BAC Home Loans Servicing, L.P.,

By its attorneys,

/s/ James W. McGarry
James W. McGarry (BBO No. 633726)
jmcgarry@goodwinprocter.com
Mark Tyler Knights (BBO No. 670991)
mknights@goodwinprocter.com
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231

## LOCAL RULE 7.1(A)(2) CERTIFICATE AND CERTIFICATE OF SERVICE

I hereby certify pursuant to District of Massachusetts Local Rule 7.1(A)(2) that I have conferred with counsel for Plaintiffs regarding the relief requested in this Motion and Plaintiffs have not assented to the relief requested.

I further certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 22, 2011.

/s/ James W. McGarry

LIBA/2153418.1

21