UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In re: Bank of America Home Affordable
Modification Program (HAMP) Contract
Litigation

No. 1:10-md-02193

## DECLARATION OF TAWNYA SCHOOLITZ

I, Tawnya Schoolitz, state as follows:

1.     I am a Vice President in the Workout Administration area for BAC Home Loans Servicing, LP ("BAC"). I have been employed by BAC for five years, and have served in my current position for one year. In this role, I am, and BAC employees who report to me are, responsible for, among other things, researching and reviewing BAC's records regarding the mortgage loans it services, including BAC's records regarding the Home Affordable Modification Program ("HAMP"). As a part of my job, I have become familiar with BAC's usages and practices regarding the servicing and modification of mortgage loans, and I am able to interpret and explain BAC's servicing records, including records related to HAMP. The employees who report to me are similarly experienced.

**INTRODUCTION**

2.     I have been informed that Plaintiffs in this Action filed a Motion for Preliminary Injunction. It is my understanding that the motion is supported by declarations from Sabah Moussa and 37 other "Movants," borrowers whose loans are serviced by BAC.

3.     It is my understanding that Sabah Moussa is a named Plaintiff in this Action. Similarly, "Movant" Kimberley George appears to be the same Kimberley George that is a named Plaintiff in this Action, based on the address she provided. The other "Movants" are hereinafter referred to, collectively, as the "36 Non-Party Borrowers."

4.     My team and I have reviewed and analyzed BAC's servicing records for Ms. Moussa, Ms. George and the 36 Non-Party Borrowers (collectively, the "Petitioning Borrowers"). This declaration is made based upon my personal knowledge and the review of those records by me and by others on my team, which records are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in

the business record, or from information transmitted by persons with personal knowledge; and

(b) kept in the course of BAC's regularly conducted business activities.  It is the regular practice

of BAC to make such records.  If called as a witness, I could and would testify to the following

facts.

**BACKGROUND INFORMATION ON HAMP**

5.        Under HAMP, borrowers who meet certain threshold requirements may be

eligible to have their mortgage loans permanently modified.  If a borrower meets the threshold

requirements – i.e., the loan is a first lien mortgage secured by a one- to four-unit property, the

property is the borrower's principal residence, the loan is delinquent or default is reasonably

foreseeable, and the current unpaid balance on the loan does not exceed certain amounts – then

loan servicers participating in HAMP will consider the loan for a modification.

6.        Before June of 2010, loan servicers such as BAC were encouraged to give

borrowers HAMP trial modifications pursuant to written Trial Period Plans ("TPPs") based on

borrowers' verbal or otherwise unverified representations as to their income.  In June of 2010,

the Treasury Department changed its directives as to unverified income and this practice ceased.

Accordingly, before June 2010, BAC regularly gave borrowers HAMP trial modifications

pursuant to TPPs – including most of the initial trial plans given to the Petitioning Borrowers –

based on the borrowers' unverified representations as to their income.

7.        During the trial period, BAC would then collect income documentation to, among

other things, verify the actual amount of the borrower's monthly income.  Under Supplemental

Directive 09-01, Servicers are not permitted to offer permanent modifications based on income

documentation that is more than 90 days old as of the determination of eligibility.  As such, it is

not uncommon that if a borrower delays in providing one or more pieces of required financial

3

information, the Servicer must then require the borrower to submit updated versions of previously sent documents.  This issue arose with a number of the Petitioning Borrowers.

8.      A TPP reduces a borrower's monthly mortgage payments to 31% of the borrower's represented monthly income for a trial period.  Under the HAMP guidelines, a servicer must include payments for taxes and insurance premiums (referred to hereafter as "escrow payments") in these 31% payments.  The remainder of the 31% payment is used to pay principal and interest on the loan.

9.      Under HAMP directives, a borrower who has received a trial modification is not eligible for a permanent HAMP modification if:

    a.   the borrower fails to make all timely trial payments (hereafter referred to as an "Payment Failure");

    b.   the borrower fails to provide all documentation necessary to verify his or her income, and certain other required documentation (hereafter referred to as an "Document Failure");

    c.   the borrower's verified income shows that the borrower's monthly payments under the original loan agreement did not exceed 31% of his or her gross monthly income (hereafter referred to as an "High Income to Loan Ratio");

    d.   the borrower's monthly payments cannot be reduced to 31% of his or her gross monthly income without resulting in:

        i.   a negative Net Present Value, i.e., it would cost more to modify the loan than to foreclose, (hereafter referred to as an "NPV Failure");

        ii.   forbearance of greater than 30% of the unpaid balance of the loan, (hereafter referred to as "Excessive Forbearance"); or

4

    iii. a loan-to-value ratio of less than 100% (hereafter referred to as "LTV Failure");

  e. any representation made by the borrower in the TPP is no longer true; or

  f. any original eligibility requirement for HAMP is no longer met.

  10. The calculation of whether a borrower's monthly payment exceeds 31% of his or her gross monthly income is based upon specified factors under the HAMP guidelines. For example, under HAMP Supplemental Directive 09-01, principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's associations fees are all included in the monthly payment. Conversely, Supplemental Directive 09-01 states that mortgage insurance premium payments or payments due to holders of subordinate liens are not included in payment calculations.

  11. HAMP directives require servicers to consider borrowers who do not qualify for HAMP for other foreclosure alternatives. BAC considers all non-HAMP eligible borrowers for these alternatives, including all Petitioning Borrowers. Many Petitioning Borrowers are still being considered for alternative programs. BAC also has a process in place to address appeals of HAMP ineligibility determinations.

**SUMMARY OF THE PETITIONING BORROWERS**

  12. All of the Petitioning Borrowers have mortgage loans serviced by BAC.

  13. Some of the borrowers have already been offered permanent modifications. For example, Debra Dahlmer was offered a permanent HAMP modification on April 7, 2011, within three months of returning her signed TPP. Dahlmer signed the permanent modification documents on April 15, 2011 and the modification is complete. BAC offered Charlotte James a permanent HAMP modification on December 4, 2010. On January 19, 2011, James informed

BAC that she did not wish to accept the offer. BAC received a signed TPP from Lalainya

Peeples in January, 2010 and offered Peeples a permanent HAMP modification on April 16,

2010, effective May 1, 2010, and conditioned on the satisfactory completion of the trial period.

Peeples failed to make a timely April trial period payment and was therefore ineligible.

      14.    The remainder of the Petitioning Borrowers have all been found ineligible for a

permanent HAMP modification, some more than once:

        a.  For example, David Rocca was sent a TPP in January of 2010. BAC did not

receive all of the necessary documents in response and asked for them on two

additional occasions. On July 13, 2010, Rocca was found to be ineligible for a

permanent HAMP modification due to Document Failure. On July 30, 2010,

Rocca asked to be reconsidered for a loan modification. BAC re-reviewed

Rocca's modification request, but Rocca had still failed to provide the necessary

documents and on August 31, 2010 was again determined to be ineligible for a

permanent HAMP modification due to Document Failure. BAC then pursued two

alternative solutions for Rocca, but Rocca was ineligible for the first because the

financial information in BAC's possession indicated that Rocca would not be able

to afford a modification and ineligible for the second because he again failed to

return the financial documents requested by BAC. At least ten (10) other

Petitioning Borrowers were ineligible because of Document Failure: Bereholm,

Brown, Conroy, Coulter, Denzer, R. George, Kelly, Mason, Rhoda, and Torrico.

Several other borrowers provided the required documents only after numerous

requests, therefore delaying BAC's response.

    b.  Victor Dugree also failed to provide all required documents, but after multiple

requests from BAC, eventually provided the missing material. Within one month

of receiving the missing material, BAC subjected Dugree's loan to an NPV test

(which returned a negative result) and notified Dugree of his ineligibility due to

NPV Failure. At least nine (9) other Petitioning Borrowers were ineligible

because of NPV Failure: Comia, Culliton, Davis, Delira, Kline, Pioli, Serrano,

Slyman, and Smith.

    c.  Gregory N. Hamilton also failed to provide all required documents, but after

multiple requests from BAC, eventually provided the missing material. Within

one month of receiving the missing material, BAC determined that the Hamiltons'

verified gross monthly income was almost one-third of the income the Hamiltons

had previously reported, and that, as a result, the monthly income was so low that

the Hamiltons' loan was ineligible for a permanent HAMP modification due to

Excessive Forbearance. BAC immediately notified the Hamiltons of their

ineligibility. Holli and Kelly Cipowski– for whom a permanent HAMP

modification would have required BAC to forebear $313,979.95, the entire

amount of the unpaid balance of the loan – were also found ineligible for

Excessive Forbearance. At least eight (8) other Petitioning Borrowers were

ineligible because of Excessive Forbearance: English, Gaffey, Greer, Helberg,

Martinez, Moussa, Rivas, and Tarin.

    d.  Elizabeth Anders also failed to provide all required documents, but after multiple

requests from BAC, eventually provided the missing material, which revealed that

her verified income was greater than the income she initially reported. Moreover,

7

LIBA/1965711.1

Anders failed to make her TPP payments and was found ineligible for Payment

Failure.  Anders appealed, and was declined due to a High Income to Loan Ratio.

At least two (2) other Petitioning Borrowers were ineligible because of High

Income to Loan Ratio: Martin and Stanley.

   e.   Kimberly George was also ineligible due to Payment Failure.  BAC extended

George's initial trial period, as permitted under Treasury's HAMP guidance,

because she had not yet submitted all the necessary documents.  When BAC did

so, BAC expressly told George she needed to keep making her trial period

payments.  George did not continue to make the necessary payments and was

found ineligible for a permanent HAMP modification due to Payment Failure.  In

addition to Anders and Kimberley George, at least three (3) other Petitioning

Borrowers were ineligible because of Payment Failure: Denzer, Mason, and

Stanley.

15.   In addition to Anders and Hamilton, at least four (4) other Petitioning Borrowers

had verified income that was different than the income they reported when they first requested a

HAMP modification: Cipowski, Comia, Helberg and Martin.

**EXAMPLES OF PETITIONING BORROWERS**

16.   *Elizabeth Anders* was sent a TPP in July of 2009.

   a.   Initially, BAC did not receive all of the documents from Anders as required by

the TPP.  BAC asked Anders again for the missing documents on at least two

additional occasions.

8

b. After collecting additional documents from Anders, BAC discovered that Anders' verified income was approximately 50% greater than the income Anders initially reported and that had been used to determine Anders' initial eligibility for a TPP.

c. Anders also failed to make the necessary trial period payments, and on May 7, 2010, BAC informed Anders that the loan was ineligible for a permanent HAMP modification because of Payment Failure.

d. After Anders was found ineligible for permanent HAMP modification, BAC informed her about a possible alternative modification. BAC informed Anders in a letter dated July 27, 2010, that she was ineligible for the alternative loan modification offered because she never returned the modification documents by the date specified. On August 4, 2010, Anders requested an appeal on her HAMP modification. On December 16, 2010, Anders' appeal was declined due to a High Income to Loan Ratio.

e. On February 14, 2011, BAC notified Anders of another modification possibility, and asked Anders to provide additional information accordingly. The consideration of this modification possibility is still pending.

17. *Kelli and Holli Cipowski* were sent a TPP in August of 2009.

a. Initially, BAC did not receive all of the documents from the Cipowskis as required by the TPP. BAC asked the Cipowskis again for the missing documents.

b. After collecting additional documents from the Cipowskis, BAC discovered that the Cipowskis' verified income was less than half the income the Cipowskis initially reported and that had been used to determine their initial eligibility for a TPP.

9

c. Based upon the Cipowskis' verifiable monthly income of $2,023.00, the Cipowskis' monthly mortgage payments would need to be reduced to $627.13 in order to meet HAMP's goal of reducing the Cipowskis' monthly payments to 31% of their monthly income. Because the Cipowskis' escrow payments are $830.21, the Cipowskis' monthly payments of principal and interest would have to be lowered below $0.00; in order to reach this result, and BAC would have to forbear $313,979.95—the entire amount of the unpaid balance of the Cipowskis' loan. In other words, in order to achieve an affordable payment for the Cipowskis under the HAMP guidelines, BAC would have to forbear more than 100% of the total unpaid balance of their loan.

d. On June 6, 2010, BAC informed the Cipowskis that the loan was ineligible due to Excessive Forbearance.

18. **_Victor Dugree_** was sent a TPP in January of 2010.

a. In August of 2009, prior to being sent at TPP, Dugree mailed BAC financial information, which BAC reviewed and in December 2009 used to conclude that Dugree did not qualify for the MHA program because his monthly payment was already less than 31% of his monthly income.

b. Dugree renewed his request for assistance shortly thereafter and informed BAC that his financial situation had changed. On January 4, 2010 Dugree was sent a TPP.

c. Dugree did not return all the requested documentation by the February 1, 2010 deadline. Dugree finally returned all the requested documents in May 2010, after two additional requests.

LIBA/1965711.1

    d.  After verifying Dugree's income, BAC subjected his loan to a NPV test.  The

          NPV test produced a negative result and on June 9, 2010, BAC notified Dugree of

          the loan's ineligibility for HAMP due to NPV Failure.

    e.  Dugree's monthly deficit exceeded tolerable standards for any other available

          loan modification.

19.    ***Kimberley George*** was sent a TPP in August of 2009.

    a.  Initially, BAC did not receive all of the documents from George as required by

          the TPP.  BAC asked George again for the missing documents.

    b.  On December 4, 2009, BAC sent George a letter extending her trial period, as

          permitted under Treasury's HAMP guidance, because George had not yet

          submitted all the necessary documents.  BAC informed George that she needed to

          continue making monthly trial period payments during the extension and provide

          the necessary documents.

    c.  BAC did not receive a mortgage payment from George after December 18, 2009.

    d.  On January 23, 2010, BAC sent George a letter notifying her that BAC had not

          received all of the trial period mortgage payments, including payments due during

          the extension of her trial period and that if she did not make the payments that

          were due, she was at risk of losing her eligibility for a permanent HAMP

          modification.

    e.  On May 21, 2010, BAC informed George that her loan was ineligible for a

          permanent HAMP modification due to Payment Failure.

    f.  BAC then reviewed George's financial information, but determined that George

          was ineligible for any other workout option and notified George of this result in a

letter dated June 28, 2010.  On September 30, 2010, BAC sent George a letter offering a non-HAMP modification that she could accept by returning the modification documents to BAC by October 14, 2010.  BAC did not receive the modification documents and, in a letter dated November 19, 2010, BAC informed George that she was ineligible for the alternative loan modification offered because she had not returned the modification documents by the date specified.

20.   ***Gregory N. Hamilton*** asked BAC for a HAMP modification in March of 2010.

   a.   On March 29, 2010, BAC responded to Hamilton's telephone request by sending a reactive solicitation, enclosing documents with which he could apply for a TPP. On May 18, 2010, BAC sent another letter to Hamilton enclosing materials with which he could apply for a modification under HAMP.

   b.   Starting in June of 2010 and continuing over the following months, BAC collected additional financial documents from Hamilton in order to evaluate his eligibility for a modification under HAMP.  On November 30, 2010, BAC notified Hamilton that he had finally submitted all the necessary documents.

   c.   After collecting additional documents from the borrower, BAC discovered that Hamilton' verified income was almost half the income Hamilton initially reported.

   d.   BAC was unable to create a monthly payment at 31% of the Hamilton' verified income without changing the terms of the loan beyond the requirements of the HAMP program.  Therefore, on December 21, 2010, BAC informed Hamilton that the loan was ineligible for a permanent HAMP modification due to Excessive Forbearance.

e.  BAC then evaluated Hamilton's eligibility for other modification options.  On March 1, 2011, BAC sent Hamilton a letter informing him that he had been approved for a non-HAMP loan modification, and gave Hamilton until March 13, 2011, to provide the required documentation.

f.  On March 11, 2011, Hamilton asked BAC for an extension of time to send the requested modification documents.  BAC agreed to give Hamilton until March 16, 2011 to return the requested modification documents.  On April 12, 2011 BAC reached Hamilton via telephone and Hamilton stated that he was "still undecided" as to whether or not he would accept the offer.  On April 22, 2011 BAC canceled the workout because they had not received the required documents from Hamilton.

21.  *Mary Katherine and Craig Peter Helberg* were sent a TPP in March of 2010.

a.  Initially, BAC did not receive all of the documents from the Helbergs as required by the TPP.  BAC asked the Helbergs again for the missing documents.

b.  After collecting additional documents from the Helbergs, BAC discovered that the Helbergs' verified income was almost half the income the Helbergs initially reported and that had been used to determine the Helbergs' initial eligibility for a TPP.

c.  BAC was unable to create a monthly payment at 31% of the Helbergs' verified income without changing the terms of the loan beyond the requirements of the HAMP program.  Therefore, on October 6, 2010, BAC informed the Helbergs that the loan was ineligible for a permanent HAMP modification due to Excessive Forbearance.

13

    d.  On February 11, 2011, BAC sent a letter to the Helbergs stating that BAC would review the borrower's appeal of the modification denial.

22.    ***Cheryl Martin*** was sent a TPP in July of 2009.

    a.  Initially, BAC did not receive all of the documents from Martin as required by the TPP.  BAC asked Martin again for the missing documents.

    b.  On December 4, 2009, BAC sent Martin a letter extending her trial period, as permitted under Treasury's HAMP guidance, because Martin had not yet submitted all the necessary documents.  BAC informed Martin that she needed to continue making monthly trial period payments during the extension and provide the necessary documents.

    c.  Martin did not make the trial plan payment due on January 1, 2010, and on January 23, 2010, BAC sent Martin a letter notifying her that BAC had not received all of the trial period mortgage payments, including payments due during her TPP extension.  BAC received the payment due on January 1, 2010 on January 28, 2010.

    d.  After collecting additional documents from Martin, BAC discovered that Martin's verified income was substantially higher than the income Martin initially reported and that had been used to determine Martin's initial eligibility for a TPP.

    e.  On June 3, 2010, BAC informed Martin that the loan was ineligible due to a High Income to Loan Ratio.

    f.  BAC then evaluated Martin's eligibility for other modification options.  On September 30, 2010, BAC sent Martin a letter informing her that she had been approved for a non-HAMP loan modification with monthly payments that were

less than the borrower's payments under the HAMP trial period, and gave Martin until October 14, 2010, to provide the required documentation.

g.  BAC did not received the signed modification documents, and on November 19, 2010, informed Martin that the loan was ineligible for the alternative loan modification offered because she had not returned the documents by the date specified.

23.  ***Terry Mason*** was sent a TPP in February of 2010.

a.  Initially, BAC did not receive all of the documents from Mason as required by the TPP.  BAC asked Mason again for the missing documents on at least four occasions.  While BAC was asking Mason to provide the missing documents, BAC did not receive a timely trial period payment and notified Mason that he was ineligible for a permanent HAMP modification due to Payment Failure.

b.  On August 23, 2010, Mason again contacted BAC.  BAC agreed to consider Mason for a traditional loan modification and requested additional documents from Mason.  On September 9, 2010, the modification was denied because Mason did not provide the documentation requested by BAC.

c.  On September 23, 2010, Mason appealed BAC's denial of the loan modification. On November 12, 2010, BAC considered and granted Mason's appeal.  On November 16, 2010, BAC received additional documents from Mason.  On January 11, 2011, BAC found that additional documents were still missing and again requested the missing documents from Mason.  On January 14, 2011, BAC denied Mason's appeal because of missing documents.

d. On February 17, 2011, BAC agreed to give Mason another second look and possible loan modification. On March 7, 2011, BAC again cancelled the modification attempt because Mason did not contact BAC as requested regarding loan modification and did not return loan financials.

e. On March 11, 2011, Mason contacted BAC and requested a loan modification. On March 22, 2011, BAC sent Mason a letter requesting financials, due by March 29, 2011. BAC received documents from Mason on March 29, 2011.

f. On April 5, 2011, BAC determined that Mason was ineligible for this modification because it violated investor guidelines. As a result, BAC declined Mason's application loan modification.

24. *Sabah and Antoun Moussa* were sent a TPP in December of 2009.

a. Prior to the sending the TPP to the Moussas, BAC had sent, and the Moussas had rejected, two different non-HAMP modifications.

b. BAC did not receive all of the documents from the Moussas as required by the TPP and asked for the missing documents on at least five additional occasions.

c. On June 4, 2010, BAC informed the Moussas that the loan was ineligible for a permanent HAMP modification because of Excessive Forbearance.

d. After the Moussas were found ineligible for permanent HAMP modification, BAC offered the Moussas an alternative modification. The Moussas declined that offer.

e. On January 19, 2011, BAC sent the Moussas a letter indicating that BAC needed various documents for the Moussas' HAMP 'second look.' BAC has not received a response to this request.

16

25. ***David Rocca*** was sent a TPP in January of 2010.

    a. Initially, BAC did not receive all of the documents from Rocca as required by the TPP. BAC asked Rocca again for the missing documents on at least two occasions.

    b. On July 13, 2010, Rocca was found to be ineligible for a permanent HAMP modification due to Document Failure.

    c. On July 30, 2010, Rocca contacted BAC and asked to be reconsidered for a loan modification. BAC then re-reviewed Rocca's modification request and the package of documents he had submitted. On August 31, 2010, BAC again determined that Rocca was ineligible for a permanent HAMP modification due to Document Failure. On the same day, BAC began the process of reviewing Rocca's loan for a non-HAMP modification.

    d. On October 21, 2010, BAC determined that Rocca was ineligible for a non-HAMP modification because the financial information in BAC's possession indicated that Rocca would not be able to afford a modification.

    e. On November 12, 2010, Rocca requested further assistance, and BAC again reviewed his loan for a modification. On December 21, 2010, Rocca's request for a modification was again declined based upon his failure to return the financial documents requested by BAC.


I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct this 29 day of April 2011.

Tawnya Schoolitz

17

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 29, 2011.

/s/ James W. McGarry