*EXHIBIT 6*







Making Home Affordable℠ Program

# Handbook for Servicers of Non-GSE Mortgages

Version 3.2
As of June 1, 2011

**FOREWORD** ............................................................................................................ **11**

**OVERVIEW** ............................................................................................................... **12**

**CHAPTER I:  MAKING HOME AFFORDABLE PROGRAM (MHA)** ........................... **17**

**1 SERVICER PARTICIPATION IN MHA** ................................................................... **18**

    1.1 SERVICER PARTICIPATION AGREEMENT ............................................................. 18
    1.2 SERVICER SAFE HARBOR............................................................................... 18
    1.3 INVESTOR SOLICITATION ............................................................................... 18
    1.4 TRANSFERS OF SERVICING ............................................................................ 19
    1.5 PROGRAM PARTICIPATION CAPS ..................................................................... 19
    1.6 COMPLIANCE WITH APPLICABLE LAWS .............................................................. 23
    1.7 DODD-FRANK CERTIFICATION REQUIREMENT...................................................... 24

**2 COMPLIANCE**.................................................................................................... **26**

    2.1 COMPLIANCE ASSESSMENTS .......................................................................... 26
    2.2 DOCUMENTATION ........................................................................................ 26
        2.2.1 Documentation Requirements for PRA...................................................... 29
        2.2.2 Documentation Requirements for UP ........................................................ 29
        2.2.3 Documentation Requirements for HAFA..................................................... 29
        2.2.4 Documentation Requirements for 2MP ...................................................... 30
        2.2.5 Documentation Requirements for HHF ...................................................... 31
    2.3 COMMUNICATION OF FINDINGS AND RESULTS .................................................... 31
    2.4 TREASURY FHA-HAMP AND RD-HAMP COMPLIANCE ....................................... 32
    2.5 FHA2LP COMPLIANCE ................................................................................ 33
    2.6 ANNUAL CERTIFICATION................................................................................. 34
        2.6.1 Initial Certification .................................................................................. 34
        2.6.2 Subsequent Certifications ....................................................................... 35
        2.6.3 Subsequent Events ................................................................................ 36
        2.6.4 Scope of the Certification ........................................................................ 36
            2.6.4.1 Scope of the Internal Controls Program ..........................................36
            2.6.4.2 Internal Controls Documentation ...................................................37
            2.6.4.3 Quarterly Reviews........................................................................37
        2.6.5 Reporting Noncompliance ....................................................................... 37
        2.6.6 Cover Letter to the Certification ............................................................... 38
        2.6.7 Termination of Obligation to Provide Certifications...................................... 38
    2.7 INTERNAL QUALITY ASSURANCE....................................................................... 38
        2.7.1 Establishment of a Quality Assurance Function ......................................... 38
        2.7.2 Scope of Quality Assurance Reviews ....................................................... 39
        2.7.3 Quality Assurance Review:  Methodology, Timing and Reporting................. 40

**3 ESCALATION OF BORROWER INQUIRIES**.......................................................... **41**

    3.1 TREASURY'S BORROWER SUPPORT CENTERS .................................................... 41
    3.2 SERVICER ESCALATED CASE MANAGEMENT ...................................................... 42
        3.2.1 Staffing Requirements............................................................................. 42
        3.2.2 Accessibility........................................................................................... 42
    3.3 ESCALATION RESOLUTION PROCESS ................................................................ 42
        3.3.1 Timing.................................................................................................... 43
        3.3.2 Authorization ......................................................................................... 43
        3.3.3 Case Resolution ..................................................................................... 43
        3.3.4 Substantially Similar Cases..................................................................... 44
    3.4  PROTECTIONS AGAINST UNNECESSARY FORECLOSURE....................................... 44
        3.4.1  Suspension of Referral to Foreclosure..................................................... 44
        3.4.2  Suspension of Scheduled Foreclosure Sale ............................................. 44

**CHAPTER II:  HOME AFFORDABLE MODIFICATION PROGRAM (HAMP)**............................. **45**

**1 ELIGIBILITY** ................................................................................................................ **46**

1.1 HAMP ELIGIBILITY CRITERIA........................................................................................... 46
1.2 ADDITIONAL FACTORS IMPACTING HAMP ELIGIBILITY ....................................................... 47

**2 COMMUNICATION AND BORROWER NOTICES** ................................................... **50**

2.1 SERVICER REQUIREMENTS .............................................................................................. 50
2.2 BORROWER SOLICITATION ............................................................................................... 51
  2.2.1 Reasonable Effort............................................................................................... 51
  2.2.2 Right Party Contact ............................................................................................ 52
  2.2.3 Exception to Notice Requirement....................................................................... 53
2.3 BORROWER NOTICES ...................................................................................................... 53
  2.3.1 Content of Borrower Notices .............................................................................. 53
  2.3.2 Non-Approval Notices ........................................................................................ 54
    2.3.2.1 Non-Approval Notice-Negative NPV Result ...........................................................55
      2.3.2.1.1 Dispute of Multiple NPV Data Inputs including the Property Value Input .......................55
      2.3.2.1.2 Insufficient Evidence ....................................................................................55
      2.3.2.1.3 NPV Evaluation Assistance from MHA Help ...............................................................55
      2.3.2.1.4 Servicer Not Required to Perform NPV Re-Evaluation ...................................................56
    2.3.2.2 Non-Approval Notice—Payment Default During the Trial Period ...........................................56
    2.3.2.3 Non-Approval Notice—Loan Paid Off or Reinstated .......................................................56
    2.3.2.4 Non-Approval Notice—Withdrawal of Request or Non-Acceptance of Offer ................................56
  2.3.3 Incomplete Information Notice ............................................................................ 56
  2.3.4 Disputed Property Value Input ............................................................................ 57
  2.3.5 Borrower NPV Calculator ................................................................................... 57

**3 PROTECTIONS AGAINST UNNECESSARY FORECLOSURE**............................... **58**

3.1 SUSPENSION OF A REFERRAL TO FORECLOSURE .............................................................. 58
  3.1.1 Certain Circumstances ....................................................................................... 58
  3.1.2 FDD Forbearance Plan ...................................................................................... 58
3.2 SUSPENSION OF FORECLOSURE PROCEEDINGS IN PROCESS ............................................. 58
3.3 SUSPENSION OF SCHEDULED FORECLOSURE SALE ........................................................... 59
3.4 MITIGATING FORECLOSURE IMPACT................................................................................... 59
  3.4.1 Simultaneous Trial Period Plan and Foreclosure Explanation ........................... 59
  3.4.2 Foreclosure Attorney/Trustee Communication ................................................... 60
  3.4.3 Certification Prior to Foreclosure Sale ............................................................... 60

**4 REQUEST FOR MODIFICATION** ............................................................................ **60**

4.1 REQUEST FOR MODIFICATION AND AFFIDAVIT (RMA) FORM ................................................ 60
  4.1.1 Hardship Affidavit .............................................................................................. 60
  4.1.2 Government Monitoring Data (GMD) ................................................................. 61
    4.1.2.1 Collection of GMD ........................................................................................62
    4.1.2.2 Borrower Declines to Provide GMD ......................................................................62
    4.1.2.3 GMD from Observation or Origination ...................................................................62
4.2 IRS FORM 4506-T OR 4506T-EZ ................................................................................... 63
4.3 EVIDENCE OF INCOME .................................................................................................... 63
4.4 REASONABLY FORESEEABLE OR IMMINENT DEFAULT........................................................... 63
4.5 ACKNOWLEDGMENT OF INITIAL PACKAGE ......................................................................... 63
4.6 REVIEW OF INITIAL PACKAGE .......................................................................................... 64

**5 VERIFICATION** ........................................................................................................ **64**

5.1 EVIDENCE OF INCOME .................................................................................................... 65
  5.1.1 Wage or Salary Income...................................................................................... 65
  5.1.2 Self-Employment Income ................................................................................... 66
  5.1.3 Other Earned Income ......................................................................................... 66
  5.1.4 Benefit Income ................................................................................................... 66
  5.1.5 Unemployment Benefits ..................................................................................... 67

5.1.6 Rental Income ................................................................................................. 67
5.1.7 Alimony, Separation Maintenance, and Child Support Income ..................... 67
5.1.8 Threshold for Documenting Passive and Non-Wage Income ......................... 67
5.1.9 Non-Borrower Household Income ................................................................. 67
5.1.10 Excluded Income ......................................................................................... 68
5.2 BORROWERS IN ACTIVE BANKRUPTCY-SUBSTITUTION OF EVALUATION DOCUMENTS ................ 68
5.3 OCCUPANCY VERIFICATION .................................................................................... 68
5.4 VERIFYING MONTHLY GROSS EXPENSES .................................................................... 69
5.5 FRAUD ............................................................................................................... 69
5.6 DOCUMENT PERFECTION ....................................................................................... 69
5.7 BORROWER SIGNATURES ....................................................................................... 70

6 UNDERWRITING ............................................................................................... 70

6.1 MONTHLY MORTGAGE PAYMENT RATIO ..................................................................... 70
6.1.1 Monthly Gross Income ................................................................................. 70
6.1.2 Monthly Mortgage Payment ......................................................................... 71
6.1.2.1 Pending ARM Resets .............................................................................. 71
6.1.2.2 Reasonable Efforts to Obtain Association Fee Information .......................... 71
6.1.2.3 Loan Secured by Property in a Leasehold Jurisdiction ............................... 71
6.2 COORDINATION WITH HOPE FOR HOMEOWNERS ........................................................... 71
6.3 STANDARD MODIFICATION WATERFALL ...................................................................... 72
6.3.1 Step 1—Capitalization ................................................................................. 72
6.3.2 Step 2—Interest Rate Reduction .................................................................. 73
6.3.3 Step 3—Term Extension ............................................................................... 73
6.3.4 Step 4—Principal Forbearance ..................................................................... 74
6.3.5 Principal Forgiveness ................................................................................... 74
6.3.6 Variation from Standard Modification Waterfall ............................................. 74
6.4 PRINCIPAL REDUCTION ALTERNATIVE ....................................................................... 75
6.4.1 Retroactive Consideration of Loans Participating in HAMP prior to the PRA Effective
        Date ............................................................................................................ 75
6.4.2 Retroactive PRA Policy ................................................................................ 75
6.4.3 Alternative Modification Waterfall ................................................................. 76
6.4.4 Variation from the Alternative Modification Waterfall Steps ........................... 77
6.4.5 Application of Deferred Principal Reduction .................................................. 77
6.4.6 Equity Share Arrangements .......................................................................... 77
6.5 PROHIBITIONS ON MODIFICATION WATERFALL STEPS .................................................... 78
6.6 PRINCIPAL FORBEARANCE ..................................................................................... 78
6.6.1 Principal Forbearance Limits ........................................................................ 78
6.6.2 Accounting Treatment of Principal Forbearance ........................................... 78
6.6.3 Reporting of Principal Forbearance to IRS .................................................... 79
6.7 COUNSELING REQUIREMENT ................................................................................... 79
6.7.1 Approved Counselors ................................................................................... 80
6.7.2 Paying for Counseling .................................................................................. 80
6.8 PROPERTY VALUATION ........................................................................................... 80

7 NET PRESENT VALUE (NPV) TESTING ................................................................ 80

7.1 BASE NPV MODEL ............................................................................................. 81
7.2 NPV MODEL UPDATES ......................................................................................... 81
7.3 CUSTOMIZATION OF BASE NPV MODEL ................................................................... 82
7.3.1 Compliance for Customized NPV Models ..................................................... 82
7.4 NPV INPUTS FOR THE DISCOUNT RATE ................................................................... 82
7.5 NPV INPUTS FOR MORTGAGE INSURANCE ................................................................ 83
7.6 NPV REQUIREMENTS FOR STATED INCOME TRIALS ..................................................... 83
7.6.1 Borrower Retests Use the Same NPV Model Version as First NPV Assessment ........ 83
7.6.2 Corrected Inputs .......................................................................................... 84
7.7 NPV REQUIREMENTS FOR DISPUTED INPUTS ............................................................. 84
7.8     NPV INPUTS FOR UNAVAILABLE OR LOW CREDIT SCORES .............................................. 84

**8 TRIAL PERIOD PLANS** .................................................................................................. **84**

8.1 TRIAL PERIOD PLAN NOTICE ....................................................................................... 84
8.2 EFFECTIVE DATE ........................................................................................................ 85
8.3 TRIAL PERIOD PAYMENTS ........................................................................................... 85
8.4 APPLICATION OF TRIAL PERIOD PAYMENTS ................................................................. 85
8.5 BORROWER IN BANKRUPTCY ...................................................................................... 86
8.6 BORROWER IN BANKRUPTCY—WAIVER OF TRIAL PERIOD PLAN ................................. 86
8.7 ALTERNATIVE LOSS MITIGATION OPTIONS .................................................................. 87
8.8 FDD FORBEARANCE PLAN DURING TRIAL PERIOD PLAN ............................................ 87
    8.8.1 Cancellation of Trial Period Plan ................................................................. 87

**9 PERMANENT MODIFICATION** ..................................................................................... **87**

9.1 MODIFICATION AGREEMENT ......................................................................................... 88
9.2 EFFECTIVE DATE OPTION—INTERIM MONTH ............................................................... 88
9.3 CONDITIONS OF MODIFICATION .................................................................................... 89
    9.3.1 First Lien Position ...................................................................................... 89
    9.3.2 Late Fees ................................................................................................. 89
    9.3.3 Administrative Costs ................................................................................... 89
    9.3.4 Interest Paid in Arrears .............................................................................. 89
    9.3.5 Monthly Statements ................................................................................... 89
    9.3.6 Interest Rate Cap and Interest Rate Lock Date .............................................. 89
    9.3.7 Escrow Accounts ....................................................................................... 90
        9.3.7.1 Escrow Analysis .............................................................................90
        9.3.7.2 Escrow Advances............................................................................90
        9.3.7.3 Escrow Shortages...........................................................................90
        9.3.7.4 Non-Escrowed Loans.......................................................................90
        9.3.7.5 Standard Escrow Provisions .............................................................90
        9.3.7.6 Escrow Changes.............................................................................91
        9.3.7.7 Prohibitions on Modifications that Increase Principal and Interest .........91
    9.3.8 Mortgages with No Due-on-Sale Provision .................................................... 91
    9.3.9 Assignment to MERS .................................................................................. 91
    9.3.10 Mortgage Insurer Approval........................................................................ 92
9.4 RE-DEFAULT AND LOSS OF GOOD STANDING ............................................................. 92
9.5 DELAYED CONVERSION............................................................................................... 92
9.6 PRINCIPAL CURTAILMENTS FOLLOWING MODIFICATION................................................. 93
9.7 FDD FORBEARANCE PLAN FOLLOWING MODIFICATION................................................. 93

**10 HAMP DOCUMENTS** .............................................................................................. **94**

10.1 AMENDING HAMP DOCUMENTS ............................................................................... 94
10.2 PRINCIPAL REDUCTION ALTERNATIVE DOCUMENTS .................................................. 95

**11 TREASURY REPORTING REQUIREMENTS** ........................................................... **95**

11.1 TRIAL PERIOD REPORTING REQUIREMENTS ............................................................. 96
11.2 LOAN SETUP REPORTING REQUIREMENTS ............................................................... 96
11.3 OFFICIAL MONTHLY REPORTING................................................................................ 96
11.4 ADDITIONAL DATA REQUIREMENTS REPORTING ........................................................ 96
    11.4.1 Reason Codes.......................................................................................... 97
    11.4.2 Coding Property Condition for the HAMP Reporting Tool ............................... 97
11.5 PRINCIPAL REDUCTION ALTERNATIVE REPORTING .................................................... 97
    11.5.1 Interim Period Reporting ........................................................................... 97
    11.5.2 Reporting PRA Retroactively ..................................................................... 98
11.6 ESCALATED CASES REPORTING ............................................................................... 98
    11.6.1 Summary Reporting .................................................................................. 98
    11.6.2 Reporting During Borrower Dispute Period................................................... 98

**12 EXTERNAL REPORTING REQUIREMENTS**............................................................. **98**

12.1 REPORTING TO MORTGAGE INSURERS...................................................................... 98

12.2 CREDIT BUREAU REPORTING ........................................................................... 98
  12.2.1 Trial Period Reporting ............................................................................. 99
  12.2.2 Post Modification Reporting ..................................................................... 99
  12.2.3 Principal Reduction Alternative Reporting ............................................... 100

**13 INCENTIVE COMPENSATION** ............................................................................ 100

13.1 SERVICER INCENTIVE COMPENSATION .............................................................. 100
  13.1.1 Completed Modification Incentive ............................................................ 100
  13.1.2 Current Borrower Incentive ...................................................................... 100
  13.1.3 "Pay for Success" Incentive ..................................................................... 101
13.2 BORROWER INCENTIVE COMPENSATION ............................................................ 101
13.3 INVESTOR INCENTIVE COMPENSATION .............................................................. 102
  13.3.1 Payment Reduction Cost Share ............................................................... 102
  13.3.2 Current Borrower Incentive ...................................................................... 102
  13.3.3 Home Price Decline Protection (HPDP) Incentives ................................. 102
    13.3.3.1 HPDP Calculation ..............................................................................102
    13.3.3.2 HPDP Accrual and Payments ............................................................103
  13.3.4 Principal Reduction Alternative Investor Incentive Payments................... 103
    13.3.4.1 Principal Reduction Incentive Schedule .............................................104
    13.3.4.2 Interim Period Incentive Compensation ..............................................104

**CHAPTER III:  HOME AFFORDABLE UNEMPLOYMENT PROGRAM (UP)** .......................... 105

**1 INTRODUCTION** ................................................................................................ 106

**2 ELIGIBILITY** ..................................................................................................... 106

2.1 UP ELIGIBILITY REQUIREMENTS ...................................................................... 106
2.2 ADDITIONAL FACTORS IMPACTING UP ELIGIBILITY ............................................. 107
2.3 ELIGIBILITY OF HAMP BORROWERS ................................................................. 108
2.4 BORROWER NOT ELIGIBLE FOR UP .................................................................. 108
2.5 BORROWER DECLINES UP .............................................................................. 108

**3 PROTECTIONS AGAINST UNNECESSARY FORECLOSURE** ........................................... 108

**4 UP FORBEARANCE PLANS** ................................................................................ 109

4.1 REQUEST FOR UP FORBEARANCE .................................................................... 109
4.2 UP FORBEARANCE PLAN TERMS ..................................................................... 109
  4.2.1 Duration .................................................................................................... 109
  4.2.2 Extension .................................................................................................. 109
  4.2.3 Monthly Payments .................................................................................... 109
  4.2.4 Late Fees .................................................................................................. 110
4.3 FORBEARANCE PLAN NOTICE (FPN) ................................................................ 110
4.4 COMMENCEMENT AND TIMING OF PAYMENTS .................................................... 110
4.5 TRANSITION FROM HAMP TO UP FORBEARANCE .............................................. 111
4.6 INTERACTION OF FDD FORBEARANCE PLANS WITH UP ...................................... 111

**5 TRANSITION FROM FORBEARANCE TO HAMP** ................................................... 111

**6 REPORTING REQUIREMENTS** .............................................................................. 112

6.1 TREASURY REPORTING .................................................................................... 112
  6.1.1 Summary Reporting ................................................................................... 112
  6.1.2 System Reporting ...................................................................................... 112
6.2 CREDIT BUREAU REPORTING ........................................................................... 112

## CHAPTER IV:  HOME AFFORDABLE FORECLOSURE ALTERNATIVES PROGRAM (HAFA)
................................................................................................................................... 113

## 1 INTRODUCTION ................................................................................................. 114

## 2 ELIGIBILITY ...................................................................................................... 114

## 3 HAFA CONSIDERATION ................................................................................... 115

## 4 COMMUNICATION AND BORROWER NOTICES ............................................. 116

4.1   ACKNOWLEDGMENT OF BORROWER REQUESTS ............................................. 116
4.2   NOTICE FOR BORROWERS NOT ELIGIBLE FOR HAFA ...................................... 116

## 5 PROTECTIONS AGAINST UNNECESSARY FORECLOSURE ........................... 117

## 6 HAFA EVALUATION AND CONDITIONS............................................................ 117

6.1 HAFA EVALUATION ....................................................................................... 117
  6.1.1 Documentation Requirements and Borrower Financial Information .......................... 117
  6.1.2 Property Valuation .................................................................................... 117
  6.1.3 Expected Recovery Analysis ...................................................................... 118
  6.1.4 Title Review ............................................................................................ 118
6.2 HAFA CONDITIONS ........................................................................................ 118
  6.2.1 Mortgage Insurer Approval ........................................................................ 118
  6.2.2 Payment Forbearance .............................................................................. 118
  6.2.3 Borrower Fees ........................................................................................ 118
  6.2.4 Release of Liens ...................................................................................... 118
    6.2.4.1 First Mortgage Lien .............................................................................. 118
    6.2.4.2 Subordinate Liens ............................................................................... 119
      6.2.4.2.1 Written Commitment from Subordinate Lien Holders ................................. 119
      6.2.4.2.2 Prohibition on Contributions ............................................................. 119

## 7 SHORT SALE PROCESS .................................................................................... 119

7.1 MINIMUM ACCEPTABLE NET PROCEEDS ......................................................... 119
7.2 ALLOWABLE TRANSACTION COSTS ................................................................ 120
7.3 ARM'S LENGTH TRANSACTION ....................................................................... 120
7.4 SHORT SALE AGREEMENT ............................................................................ 120
7.5 BORROWER OBLIGATIONS ............................................................................. 121
7.6 REASONS FOR TERMINATION ........................................................................ 122
7.7 OFFER RECEIPT AND RESPONSE .................................................................. 122
7.8 APPROVAL OR DISAPPROVAL OF SALE .......................................................... 122

## 8 ALTERNATIVE REQUEST FOR APPROVAL OF SHORT SALE .......................... 123

## 9 DEED-IN-LIEU PROCESS .................................................................................. 123

9.1 DIL LANGUAGE IN THE SSA .......................................................................... 123
9.2 DIL TERMS ................................................................................................. 123

## 10 HAFA DOCUMENTS ........................................................................................ 124

## 11 REPORTING REQUIREMENTS ........................................................................ 125

11.1 TREASURY REPORTING ............................................................................... 125
11.2 CREDIT BUREAU REPORTING ...................................................................... 125

## 12 INCENTIVE COMPENSATION ......................................................................... 126

12.1 BORROWER RELOCATION ASSISTANCE ........................................................ 126
12.2 SERVICER INCENTIVE ................................................................................. 126
12.3 INVESTOR REIMBURSEMENT FOR SUBORDINATE LIEN RELEASES ................. 126

**CHAPTER V: SECOND LIEN MODIFICATION PROGRAM (2MP)**........................................ **127**

**1 INTRODUCTION** .............................................................................................. **128**

**2 PARTICIPATION** ............................................................................................. **128**

**3 ELIGIBILITY** ................................................................................................... **128**

  3.1 2MP MODIFICATION AND EXTINGUISHMENT ELIGIBILITY CRITERIA ........................... 128
  3.2 ADDITIONAL FACTORS IMPACTING 2MP AND EXTINGUISHMENT ELIGIBILITY ............. 129
  3.3 BORROWER NOTICE FOR 2MP ......................................................................... 129

**4 2MP PROCESS** ............................................................................................... **130**

  4.1 MATCHING SECOND LIENS TO HAMP FIRST LIENS ............................................. 130
    4.1.1 LPS Matching ...................................................................................... 130
    4.1.2 Enhanced Matching Capabilities ........................................................... 131
  4.2 2MP TIMING................................................................................................. 131
    4.2.1 LPS Matches ....................................................................................... 131
    4.2.2 Matches Outside of the LPS Process ..................................................... 132
  4.3 RELIANCE ON FIRST LIEN DATA ....................................................................... 132
  4.4 FRAUD ....................................................................................................... 133

**5 MODIFICATION AND EXTINGUISHMENT** ......................................................... **133**

  5.1 2MP MODIFICATION STEPS ............................................................................. 133
    5.1.1 Step 1 – Capitalization ......................................................................... 133
    5.1.2 Step 2 – Reduce Interest Rate .............................................................. 134
      5.1.2.1 Step 2.A – For amortizing second liens (payment of both principal and interest)................134
      5.1.2.2 Step 2.B – For second liens with interest-only payments ...........................134
      5.1.2.3 Step 2.C – For partially amortizing second liens (such as convertible HELOCs) ................134
    5.1.3 Step 3 – Extend Term .......................................................................... 135
      5.1.3.1 Step 3.A – For amortizing second liens (payment of both principal and interest)................135
      5.1.3.2 Step 3.B – For second liens with interest-only payments ...........................135
      5.1.3.3 Step 3.C – For partially amortizing second liens (such as convertible HELOCs) ................135
    5.1.4 Step 4 – Principal Forbearance / Principal Forgiveness ............................. 135
  5.2 PARTIAL EXTINGUISHMENT OPTION .................................................................. 136
  5.3 FULL EXTINGUISHMENT OPTION ...................................................................... 136
    5.3.1 Extinguishment Timing ......................................................................... 136
  5.4 INVESTOR AND OTHER PROHIBITIONS ............................................................... 136

**6 2MP TRIAL PERIOD REQUIREMENTS**.............................................................. **136**

  6.1 DURATION OF 2MP TRIAL PERIOD .................................................................... 137
  6.2 2MP TRIAL PERIOD PAYMENTS ....................................................................... 137
  6.3 APPLICATION OF 2MP TRIAL PERIOD PAYMENTS................................................. 138
  6.4 BORROWERS IN ACTIVE BANKRUPTCY .............................................................. 138
  6.5 IMPACT OF PRA RETROACTIVITY ON 2MP TRIAL PERIOD ..................................... 138
  6.6 FDD FORBEARANCE PLAN DURING 2MP TRIAL PERIOD ....................................... 138
    6.6.1 Cancellation of 2MP Trial Period............................................................ 138

**7 PERMANENT MODIFICATION** ......................................................................... **139**

  7.1 2MP MODIFICATION AGREEMENT ..................................................................... 139
  7.2 EFFECTIVE DATE .......................................................................................... 139
  7.3 CONDITIONS OF MODIFICATION ....................................................................... 139
    7.3.1 Re-Subordinate Junior Liens .................................................................. 139
    7.3.2 Lien Release ....................................................................................... 139
    7.3.3 Closed-end Second Liens ...................................................................... 140
    7.3.4 Mortgage and Other Insurer Approval ..................................................... 140
    7.3.5 Assignment to MERS ............................................................................ 140
    7.3.6 Monthly Statements.............................................................................. 141
  7.4 RE-DEFAULT AND LOSS OF GOOD STANDING ..................................................... 141

7.5 Principal Curtailments Following 2MP Modification ................................................. 141
7.6 Impact of PRA Retroactivity on 2MP Modification...................................................... 141
7.7 FDD Forbearance Plan Following 2MP Modification ................................................. 142

**8 2MP DOCUMENTS** ................................................................................................... **142**

**9 2MP REPORTING REQUIREMENTS** ........................................................................ **143**

9.1 2MP Trial Period Reporting......................................................................................... 143
9.2 2MP Modification Reporting ....................................................................................... 143
9.2.1 2MP Modification and Extinguishment Set Up............................................................ 143
9.2.2 2MP Official Monthly Reporting.................................................................................. 144
9.2.3 2MP Reason Codes....................................................................................................... 144

**10 EXTERNAL REPORTING REQUIREMENTS**............................................................ **144**

10.1 Credit Bureau Reporting .......................................................................................... 144
10.1.1 Trial Period Reporting ............................................................................................... 144
10.1.2 Post Modification Reporting ...................................................................................... 144
10.1.3 Extinguishment Reporting ......................................................................................... 145

**11 INCENTIVE COMPENSATION** ................................................................................. **145**

11.1 Servicer Incentive Compensation ............................................................................ 146
11.1.1 Completed Modification Incentive ............................................................................. 146
11.1.2 Pay-for-Success Incentive ......................................................................................... 146
11.1.3 Extinguishment Incentive .......................................................................................... 146
11.2 Borrower Incentive Compensation ........................................................................... 147
11.3 Investor Incentive Compensation ............................................................................. 147
11.3.1 Payment Reduction Cost Share Incentive .................................................................. 147
11.3.2 Extinguishment Incentive .......................................................................................... 147

**VI: GOVERNMENT LOANS**.......................................................................................... **149**

**1 INTRODUCTION** ....................................................................................................... **150**

**2 ELIGIBILITY AND UNDERWRITING** ........................................................................ **150**

2.1 Treasury FHA-HAMP ................................................................................................. 150
2.2 RD-HAMP..................................................................................................................... 150

**3 PARTICIPATION, INCENTIVE COMPENSATION, TREASURY REPORTING
REQUIREMENTS, COMPLIANCE** ................................................................................ **150**

3.1 Participation................................................................................................................. 150
3.2 Incentive Compensation ............................................................................................ 151
3.2.1 Servicer Incentive Compensation ............................................................................... 151
3.2.2 Borrower Incentive Compensation .............................................................................. 152
3.2.3 Re-default and Loss of Good Standing ........................................................................ 152
3.3 Treasury Reporting Requirements .............................................................................. 152
3.4 Compliance.................................................................................................................. 153

**CHAPTER VII: TREASURY/FHA SECOND LIEN PROGRAM**...................................... **154**

**1 INTRODUCTION** ....................................................................................................... **155**

**2 PARTICIPATION**........................................................................................................ **155**

**3 ELIGIBILITY** .............................................................................................................. **155**

**4 EXTINGUISHMENT** ................................................................................................... **155**

4.1 Partial Extinguishment................................................................................................ 155
4.2 Conditions of Partial or Full Extinguishment ............................................................. 156
4.2.1 Lien Release ............................................................................................................... 156
4.2.2 Re-Subordinate Junior Liens....................................................................................... 156
4.2.3 Closed-end Second Liens ............................................................................................ 156

4.2.4 Mortgage Insurer Approval.........................................................................156

**5 REPORTING REQUIREMENTS** ............................................................................. **157**

5.1 TREASURY REPORTING...............................................................................157
5.2 REPORTING CONVERSION OF HAMP OR 2MP LOANS TO FHA REFINANCE ...........157
5.3 CREDIT BUREAU REPORTING .......................................................................157
5.3.1 Reporting Full Extinguishments ......................................................157
5.3.2 Reporting Partial Extinguishment....................................................158

**6 INCENTIVE COMPENSATION** .............................................................................. **158**

6.1 SERVICER INCENTIVE COMPENSATION..........................................................159
6.2 INVESTOR INCENTIVE COMPENSATION ..........................................................159

**CHAPTER VIII: INTERACTIONS WITH HFA HARDEST HIT FUND PROGRAMS** ................. **160**

**1 INTRODUCTION** .............................................................................................. **161**

**2 COMMUNICATION** ......................................................................................... **161**

2.1 COMMUNICATION BETWEEN SERVICERS AND HFAs...........................................161
2.2 COMMUNICATION BETWEEN SERVICERS AND BORROWERS ...................................161

**3 INTERACTIONS WITH HAMP** ........................................................................... **161**

3.1 INTERACTIONS WITH PRA ..........................................................................162

**4 INTERACTIONS WITH UP** ............................................................................... **163**

**5 INTERACTIONS WITH HAFA** ........................................................................... **163**

**6 INTERACTIONS WITH 2MP** ............................................................................. **164**

**7 GOVERNMENT INSURED OR GUARANTEED LOANS** ....................................... **164**

**8 INTERACTIONS WITH FHA2LP** ....................................................................... **164**

**9 TREASURY REPORTING REQUIREMENTS** ...................................................... **164**

**EXHIBITS** ........................................................................................................ **166**

**EXHIBIT A:  MODEL CLAUSES FOR BORROWER NOTICES**................................. **167**

**EXHIBIT B:  MODEL LETTER FOR SIMULTANEOUS TRIAL PLAN – FORECLOSURE PROCESS EXPLANATION** ................................................................................ **175**

**EXHIBIT C:  CHARACTERISTICS OF THE HPDP INCENTIVE CALCULATION** .................... **176**

**EXHIBIT D:  EXAMPLE HPDP CALCULATION** ...................................................... **177**

**INDEX**............................................................................................................ **178**

# FOREWORD

In February 2009, the Obama Administration introduced the Making Home Affordable Program, a plan to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure. In March 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry and subsequently updated and expanded that guidance in a series of policy announcements.

The Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages (Handbook) is intended to provide a consolidated resource for programmatic guidance related to the MHA Program for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages). Servicers of mortgage loans that are owned or guaranteed by Fannie Mae or Freddie Mac should refer to any relevant guidance issued by the applicable GSE. In addition to the applicable guidance in this Handbook, servicers of mortgage loans insured or guaranteed by a federal agency, such as the Federal Housing Administration or Rural Housing Service, should refer to any relevant guidance issued by the applicable agency

This Handbook incorporates and supersedes in their entirety the following Supplemental Directives (SDs), as well as related frequently asked questions (FAQs) and waivers: SD 09-01; 09-02; 09-03; 09-04; 09-05 Revised; 09-06; 09-07; 09-08; 09-09 Revised; 09-10; 10-01; 10-02; 10-03; 10-04; 10-05; 10-06; 10-07; 10-08; 10-09; 10-10; 10-11; 10-12; 10-13; 10-14; 10-15; 10-16; 10-17; 10-18; 11-01 and 11-02.  Should a servicer identify a discrepancy between this Handbook and a previously issued SD, FAQ or waiver, the servicer should rely on the guidance in this Handbook. Unless otherwise noted, each reference to a "Section" in a Chapter of this Handbook is a reference to the applicable Section of that Chapter. This Handbook constitutes Program Documentation under the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation Agreement.

To the extent that any SD, FAQ or waiver has not been incorporated into and superseded by this Handbook, it continues to apply, and any references in such documents to guidance that has been incorporated into this Handbook are deemed to refer to the applicable Chapter and Section of this Handbook containing such guidance.

This Handbook will be updated periodically with new policy or procedural changes as they are announced. Questions about the Handbook or compliance with Handbook guidance should be referred to the Program Administrator and the Compliance Agent, respectively. Fannie Mae serves as the Program Administrator and Freddie Mac serves as the Compliance Agent, each in its capacity as financial agent of the United States (as designated by Treasury).

# OVERVIEW

**Chapter I:  Making Home Affordable Program**
General guidance regarding the Making Home Affordable (MHA) Program. The guidelines set forth in this Handbook apply to all eligible Non-GSE Mortgages secured by one- to four-unit owner-occupied single-family properties.

**Chapter II:  Home Affordable Modification Program**
The Home Affordable Modification Program (HAMP), a national mortgage modification program, provides eligible borrowers the opportunity to modify their first lien mortgage loans to make them more affordable.  Under HAMP, servicers apply a uniform loan modification process to provide eligible borrowers with affordable and sustainable monthly payments for their first lien mortgage loans.  Affordability is achieved through the application of interest rate reduction, term extension, principal forbearance and principal forgiveness.

**Chapter III:  Home Affordable Unemployment Program**
The Home Affordable Unemployment Program (UP) provides assistance to borrowers who are unable to make their mortgage payments as a result of unemployment. UP grants qualified borrowers a forbearance period of at least three months, during which mortgage payments are reduced or suspended, allowing borrowers to seek employment without the fear that they will lose their homes to foreclosure.

**Chapter IV:  Home Affordable Foreclosure Alternatives Program**
The Home Affordable Foreclosure Alternatives (HAFA) Program provides opportunities for borrowers to transition to more affordable housing through a short sale or deed-in-lieu (DIL) of foreclosure when they can no longer afford to stay in their home but want to avoid foreclosure. HAFA provides financial incentives to servicers, investors, and borrowers that utilize a short sale or a DIL to avoid a foreclosure on a HAMP-eligible loan.

**Chapter V:  Second Lien Modification Program**
The Second Lien Modification Program (2MP) is designed to work in tandem with HAMP to offer borrowers with second mortgage liens even greater affordability.  Under 2MP, when a borrower's first lien is modified under HAMP and the servicer of the second lien is a 2MP participant, that servicer must offer to modify the borrower's second lien according to a defined protocol and/or to accept a lump sum payment from Treasury in exchange for full or partial extinguishment of the second lien. All servicers of eligible second lien Non-GSE Mortgages may participate in 2MP. A servicer need not service the related first lien or participate in HAMP in order to participate in 2MP.

**Chapter VI:  Government Loans**
Mortgage loans insured or guaranteed by a federal government agency, such as the Federal Housing Administration (FHA), the Department of Veterans Affairs (VA) or the Department of Agriculture's Rural Housing Service (RHS), are eligible for modification under HAMP to the extent the applicable agency has issued HAMP guidance.

FHA announced FHA-HAMP to provide assistance to borrowers with FHA-insured loans who are unable to meet their mortgage payments.  Treasury FHA-HAMP provides pay-for-performance compensation for borrowers and pay-for-success compensation to servicers for FHA-insured first lien Non-GSE Mortgages that are modified under FHA-HAMP on or after August 15, 2009.  For specific guidance related to eligibility, underwriting and administration of FHA-HAMP, servicers should consult the guidance issued by FHA in Mortgagee Letter 2009-23 and other existing or future guidance issued by FHA.

RHS announced Special Loan Servicing to provide assistance to borrowers with Single Family Housing Guaranteed Loan Program loans who are unable to meet their mortgage payments. RD-HAMP provides pay-for-performance compensation for borrowers and pay-for-success

compensation for servicers for RHS-guaranteed first lien Non-GSE Mortgages that are modified under Special Loan Servicing on or after September 24, 2010.  For specific guidance related to eligibility, underwriting and administration of Special Loan Servicing, servicers should consult the final rule published by RHS (75 Fed. Reg. 52,429 (August 26, 2010)) (Final Rule) and other existing or future guidance issued by RHS.

VA announced VA-HAMP to provide assistance to borrowers with VA guaranteed loans who are unable to meet their mortgage payments.  Treasury does not provide incentive compensation related to VA-HAMP.  For specific guidance related to eligibility, underwriting and administration of VA-HAMP, servicers should consult the guidance issued by VA in Circular 26-10-6 and other existing or future guidance issued by VA.

### Chapter VII:  Treasury/FHA Second Lien Program

The Treasury/FHA Second Lien Program (FHA2LP) is designed to work in tandem with the FHA Refinance of Borrowers in Negative Equity Positions (FHA Refinance) Program announced by FHA in Mortgagee Letter 2010-23.  FHA Refinance provides greater affordability for borrowers whose homes are worth less than the remaining amounts owed under their mortgage loans (negative equity).  FHA Refinance allows borrowers who are current and in a negative equity mortgage to restructure their debt and refinance into an FHA-insured loan where the unpaid principal balance (UPB) of the original first lien mortgage is written down by at least 10 percent and the amount of all mortgage debt, after the FHA refinance, does not exceed 115 percent of the current value of the property.

To facilitate this FHA refinance opportunity, Treasury provides incentives under FHA2LP to servicers and investors when there is a partial or full extinguishment of second lien mortgage loans as part of an FHA Refinance. All servicers of eligible second lien Non-GSE Mortgages may participate in FHA2LP.  A servicer need not service the related first lien or participate in HAMP in order to participate in FHA2LP.

### Chapter VIII:  MHA Interactions with the Hardest Hit Fund

The Housing Finance Agency Innovation Fund for the Hardest-Hit Housing Markets (Hardest Hit Fund or HHF) provides federal funding for innovative measures to help families in states that have been hit the hardest by the housing crisis and economic downturn.  In these states, state Housing Finance Agencies (HFAs) are implementing innovative programs to prevent foreclosures and stabilize housing markets.  HHF programs may target similar borrowers and have goals in common with initiatives under MHA.

When submitting proposals for funding, HFAs were encouraged to design programs that target borrowers who are not eligible for, or otherwise did not complete, a HAMP modification or other MHA program.  Nevertheless, the HHF programs may interact with aspects of MHA as HFAs try to leverage the resources provided by the MHA programs to expand the pool of borrowers that are eligible for HAMP or other MHA options.  In some cases, the assistance the HFAs provide under HHF can supplement and extend assistance provided through MHA.  To maximize the effectiveness of their foreclosure mitigation efforts, servicers should use reasonable efforts to ensure that federal funds are used efficiently and that HHF programs complement MHA programs.

**Supplemental Directives**

For reference purposes, a list of the SDs incorporated in and superseded by the guidance in this Handbook is provided in the following table.

| SD | Issue Date of SD | Effective Date of SD | Title of SD |
|----|------------------|----------------------|-------------|
| 09-01 | April 6, 2009 | April 6, 2009 | Introduction to the Home Affordable Modification Program |
| 09-02 | April 21, 2009 | April 21, 2009 | Fair Housing Obligations Under the Home Affordable Modification Program |
| 09-03 | July 6, 2009 | July 6, 2009 | Trial Period Guidance |
| 09-04 | July 31, 2009 | September 1, 2009 | Home Price Decline Protection Incentives |
| 09-05 Revised | March 26, 2010 | March 26, 2010 | Update to the Second Lien Modification Program |
| 09-06 | September 11, 2009 | December 1, 2009 | Data Collection and Reporting Requirements Guidance |
| 09-07 | October 8, 2009 | October 8, 2009/ March 1, 2010 | Streamlined Borrower Evaluation Process |
| 09-08 | November 3, 2009 | January 1, 2010 | Borrower Notices |
| 09-09 Revised | March 26, 2010 | April 5, 2010 | Home Affordable Foreclosure Alternatives – Short Sale and Deed-in-Lieu of Foreclosure Update |
| 09-10 | December 23, 2009 | December 23, 2009 | Temporary Review Period for Active Trial Modifications Scheduled to Expire on or before January 31, 2010 |
| 10-01 | January 28, 2010 | June 1, 2010 | Program Update and Resolution of Active Trial Modifications |
| 10-02 | March 24, 2010 | June 1, 2010 | Borrower Outreach and Communication |
| 10-03 | March 26, 2010 | August 15, 2009 | Modifications of Loans Insured by the Federal Housing Administration (FHA) |
| 10-04 | May 11, 2010 | August 1, 2010 | Home Affordable Unemployment Program |

| SD | Issue Date of SD | Effective Date of SD | Title of SD |
|---|---|---|---|
| 10-05 | June 3, 2010 | October 1, 2010 | Modifications of Loans with Principal Reduction Alternative |
| 10-06 | June 29, 2010 | June 29, 2010 | Guidance on Annual Servicer Certification Required by the Servicer Participation Agreement |
| 10-07 | August 2, 2010 | August 2, 2010 | Interactions with HFA Hardest-Hit Fund Programs |
| 10-08 | August 6, 2010 | September 27, 2010 | Treasury/FHA Second Lien Program (FHA2LP) to Support FHA Refinance of Borrowers in Negative Equity Positions |
| 10-09 | August 19, 2010 | August 19, 2010 | Handbook for Servicers |
| 10-10 | September 17, 2010 | September 24, 2010 | Modifications of Loans Guaranteed by the Rural Housing Service |
| 10-11 | September 21, 2010 | September 21, 2010 | Dodd-Frank Certification Requirement |
| 10-12 | September 24, 2010 | September 27, 2010 | Treasury/FHA Second Lien Program (FHA2LP) Effective Date |
| 10-13 | October 1, 2010 | October 1, 2010 | Program Participation Cap Adjustments Pursuant to the Servicer Cap Model |
| 10-14 | October 15, 2010 | October 1, 2010 | Principal Reduction Alternative Update |
| 10-15 | November 3, 2010 | February 1, 2011 | Case Escalation Process/Dodd-Frank Act NPV Notices |
| 10-16 | November 23, 2010 | November 23, 2010 | Policy Update |
| 10-17 | December 2, 2010 | December 2, 2010 | Handbook for Servicers Version 3.0 |
| 10-18 | December 28, 2010 | February 1, 2011 | HAFA – Policy Update |
| 11-01 | February 17, 2011 | May 1, 2011 | Dodd-Frank Certification, Internal Quality Assurance and Verification of Income Update |
| 11-02 | March 30, 2011 | June 1, 2011 | Administrative Clarifications |

**Website Resources**

For Non-GSE Mortgages, key servicer documents and tools relating to the MHA Program are housed and maintained on www.HMPadmin.com.  The site provides general guidelines and overview documents available to the public as well as secure access to core tools and documents needed to implement the MHA Program.

For GSE-specific information, servicers should refer to the:

- Fannie Mae Website (www.efanniemae.com) for Fannie Mae loans, or
- Freddie Mac Website (www.freddiemac.com) for Freddie Mac loans.

**Servicer Support**

| For questions regarding: | Contact: |
|---|---|
| • Supplemental Directives, policy clarifications, and loan-level questions for Non-GSE Mortgages <br><br> • All reporting to Treasury for Non-GSE Mortgages | HAMP Solution Center: support@hmpadmin.com <br><br> 1-866-939-4469 <br><br> 9:00 a.m. to 9:00 p.m. ET, Monday through Friday |



# Chapter I

## Making Home Affordable Program (MHA)

# 1 Servicer Participation in MHA

## 1.1 Servicer Participation Agreement

To participate in MHA for Non-GSE Mortgages, the servicer must register and execute a Servicer Participation Agreement, related documents, and, if applicable, one or more Service Schedules (SPA) with the Program Administrator on or before October 3, 2010. The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

The entity that has the direct contractual obligation to the investor to perform the servicing functions is the entity that will formally elect to participate in MHA by signing the SPA. This entity will sign the SPA regardless of whether (i) it has engaged one or more subservicers to perform some or all of the servicing functions on its behalf or (ii) it is subject to oversight by a master servicer that does not have a direct contractual obligation to the investor to perform the servicing functions. If the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA.

MHA reflects usual and customary industry standards for mortgage loan modifications, short sales and DILs contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. Participating servicers are required to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA.

## 1.2 Servicer Safe Harbor

As part of Helping Families Save Their Homes Act of 2009 (HFSTHA), Congress established the Servicer Safe Harbor by amending the Truth in Lending Act for the purpose of providing a safe harbor to enable such servicers to modify and refinance mortgage loans under a "qualified loss mitigation plan." Treasury has determined that each residential loan modification under HAMP (including Principal Reduction Alternative (PRA) modifications) and 2MP, each modification and refinance under FHA Refinance and FHA2LP, as well as each short sale and deed-in-lieu of foreclosure under HAFA and each forbearance plan under UP, is a "qualified loss mitigation plan" as defined in the Servicer Safe Harbor.

## 1.3 Investor Solicitation

Within 90 days of executing a SPA, the servicer must review all servicing agreements to determine investor participation in HAMP. Within 30 days of identifying an investor as a non-participant, the servicer must contact the investor in writing at least once, encouraging the investor to permit modifications under HAMP.

Servicers, within 120 days of signing the SPA, must create and maintain in their records an Investor Participation List containing the following information: (1) the number of investors for whom it services loans; (2) a list of those investors who do not participate in HAMP; (3) the number of loans serviced for each investor that does not participate in HAMP; and (4) pool-level identification data, such as pool name and pool number, for loans serviced for each investor that does not participate in HAMP or whose participation is subject to any limitations or restrictions. In addition, servicers must provide a copy of the servicing agreement or other pool documentation to Treasury or its agents upon request.

All servicers must update their Investor Participation Lists within 30 days of any change and maintain both the old and revised versions of the lists, which should clearly identify the time period during which each list was applicable, on a system that MHA-C may access upon request.

## 1.4 Transfers of Servicing

When a participating servicer transfers or assigns mortgage loans, or servicing rights relating to mortgage loans, that constitute Eligible Loans pursuant to the SPA, the transferee servicer must assume the transferor's obligations under the SPA with respect to the transferred Eligible Loans. A transferring servicer may not use a transfer to circumvent its existing obligations under the SPA. If the transferee servicer has signed its own SPA, the Eligible Loans involved in the transfer become subject to the transferee servicer's SPA. If a transferee servicer has not signed its own SPA, it will be required to execute an assignment and assumption agreement, the form of which is attached as an exhibit to the SPA.

A servicer may transfer an Eligible Loan free and clear of all SPA obligations only if one of the circumstances set forth in Section 3.1.1 of Chapter II exists with respect to such loan, and any applicable response period has elapsed, unless a borrower with continued eligibility requests consideration prior to the effective date of the servicing transfer. The transferee servicer is not required to execute an assignment and assumption agreement in order to transfer such loans.

All incentive payments made after successful completion of the trial period will be made to the servicer of record, as indicated on the records of the Program Administrator for Treasury. When negotiating a servicing transfer, the transferor servicer and the transferee servicer should make arrangements as appropriate to account for incentive payments accordingly.

## 1.5 Program Participation Caps

The amount of funds available to pay servicer, borrower and investor compensation in connection with each servicer's Services are capped pursuant to each servicer's SPA and pursuant to this Handbook (Program Participation Cap). Treasury established each servicer's Program Participation Cap as of September 30, 2010 using an allocation methodology by estimating the number of Services expected to be performed by each servicer during the term of the SPA. Notwithstanding anything to the contrary in the SPA, the Program Participation Cap can be adjusted (1) upwards or downwards, pursuant to a model (Servicer Cap Model) to be applied to all servicers currently participating in MHA or (2) downwards, based on Treasury's full book analysis of the servicer's loans.

The Servicer Cap Model is intended to adjust a servicer's Program Participation Cap pursuant to a non-discretionary model, which will, in general, re-allocate Program Participation Cap amounts among servicers depending on their effectiveness at performing Services. The aggregate amount of all Program Participation Caps will not increase at any time. The Servicer Cap Model is described below. The Servicer Cap Model will initially be calculated (Cap Determination Date) on a quarterly basis; however, Treasury may increase the frequency of calculation at any time. Upon each calculation of the Servicer Cap Model by Treasury, each participating servicer will promptly be notified of its new Program Participation Cap.

The funds remaining available for Services under a servicer's Program Participation Cap are reduced by the maximum amount of projected compensation payments potentially payable with respect to each Service. In the event the compensation actually paid with respect to a Service is less than the maximum amount of compensation payments potentially payable, the funds remaining available for a servicer's Services under the SPA are increased by the difference between such amounts.

In addition, Treasury may, from time to time and in its sole discretion, revise a servicer's Program Participation Cap downwards. The Program Administrator provides written notification to a servicer of all changes made to the servicer's Program Participation Cap. Once a servicer's Program Participation Cap is reached for the applicable period, a servicer must not enter into any agreements with borrowers intended to result in new Services, and no payments will be made with respect to any new Services.

The "Servicer Cap Model" shall be:

For each servicer participating in MHA and for each Cap Determination Date, the Program Participation Cap shall be equal to:

- If the Fully Funded Cap is equal to 1, then the Program Participation Cap for such servicer shall be equal to the Hard Cap Amount; or

- If (i) the Fully Funded Cap is equal to zero and (ii) the Current Cap Required for Available Headroom is greater than zero, then the Program Participation Cap for such servicer shall be equal to the Current Cap Required for Available Headroom; or

- If (i) the Fully Funded Cap is equal to zero, (ii) the Current Cap Required for Available Headroom is equal to zero, (iii) the Hard Cap Amount is greater than $100,000 and (iv) the Required Cap Reduction Amount is equal to zero, then the Program Participation Cap for such servicer shall be equal to the Hard Cap Amount; or

- If (i) the Fully Funded Cap is equal to zero, (ii) the Current Cap Required for Available Headroom is equal to zero, (iii) the Hard Cap Amount is greater than $100,000 and (iv) the Required Cap Reduction Amount is greater than zero, then the Program Participation Cap for such servicer shall be equal to the *greater* of (A) $100,000 or (B) the Hard Cap Amount for such servicer *minus* the Required Cap Reduction Amount.

**Defined Terms:** The following are the defined terms for the Servicer Cap Model. Any amount or percentage referenced therein shall be as of the applicable Cap Determination Date.

| Term | Definition |
|---|---|
| Aggregate Adjusted Hard Cap Amount Utilized | For any Cap Determination Date, the aggregate of all Adjusted Hard Cap Amount Utilized of all servicers participating in MHA. |
| Aggregate Current Unutilized Cap | For any Cap Determination Date, the aggregate of all Current Unutilized Cap amounts of all servicers participating in MHA on such Cap Determination Date. |
| Aggregate Hard Cap Amount | For any Cap Determination Date, the aggregate of all Hard Cap Amounts of all servicers participating in MHA. |
| Adjusted Hard Cap Amount Utilized | For each servicer and for any Cap Determination Date, the Current Cap Utilized, *provided*, that such amount shall not be less than $100,000. |
| Aggregate Max Current Cap | For any Cap Determination Date, the aggregate of all Max Current Cap Required for Available Headroom amounts of all servicers participating in MHA. |

| Term | Definition |
|---|---|
| Aggregate Percentage of Adjusted Hard Cap Amount Utilized | For any Cap Determination Date, the Aggregate Adjusted Hard Cap Amount Utilized expressed as a percentage of the Aggregate Hard Cap Amount. |
| Current Cap Required for Available Headroom | For each servicer and for any Cap Determination Date: <br><br> (a) if the Percentage of Hard Cap Amount Utilized is less than or equal to the Target Utilization Percentage of the Adjusted Hard Cap Amount Utilized, then the Current Cap Required for Available Headroom shall be equal to zero; or <br><br> (b) if the Percentage of Hard Cap Amount Utilized is greater than the Target Utilization Percentage of the Adjusted Hard Cap Amount Utilized, the Current Cap Required for Available Headroom shall be equal to such servicer's Current Cap Utilized expressed as a percentage of the applicable Target Utilization Percentage. |
| Current Cap Utilized | For each servicer and for any Cap Determination Date, the amount of the Hard Cap Amount for such servicer utilized, based on the Treasury system of record data on the number of modifications and other applicable MHA transactions (e.g., short sales and DIL) initiated on behalf of such servicer. |
| Current Unutilized Cap | For each servicer and for any Cap Determination Date: <br><br> (a) If such servicer's Current Cap Required for Available Headroom is greater than zero, then the Current Unutilized Cap for such servicer shall be equal to zero; or <br><br> (b) If (i) such servicer's Current Cap Required for Available Headroom is equal to zero *and* the Hard Cap Amount is equal to $100,000, then the Current Unutilized Cap for such servicer shall be equal to zero; or <br><br> (c) If (i) such servicer's Current Cap Required for Available Headroom is equal to zero *and* the Hard Cap Amount is greater than $100,000, then the Current Unutilized Cap for such servicer shall be equal to the product of (i) such servicer's Hard Cap Amount *minus* (ii) the *greater* of (A) $100,000 or (B) such servicer's Current Cap Utilized expressed as a percentage of the applicable Target Utilization Percentage. |

| Term | Definition |
|---|---|
| Excess Cap Allocation Amount | For any Cap Determination Date, shall be equal to the Aggregate Max Current Cap *minus* the Aggregate Hard Cap Amount. |
| Fully Funded Cap | For any Cap Determination Date, if Treasury has locked a servicer's Program Participation Cap at a fixed amount, and notified such servicer in writing that such Program Participation Cap is "fully funded", then such servicer's Fully Funded Cap shall have a value of 1.[1] If Treasury has *not* locked the applicable servicer's Program Participation Cap in the preceding manner, then such servicer's Fully Funded Cap shall have a value of zero. |
| Hard Cap Amount | For each servicer, the Hard Cap Amount for any Cap Determination Date (for purposes of applying the Servicer Cap Model as of that Cap Determination Date), is the amount that was notified to each servicer in writing by the Program Administrator, for the immediately preceding Cap Determination Date, pursuant to a periodic determination of Hard Cap Amounts of all participating servicers. Once the Servicer Cap Model is applied to all servicers on any Cap Determination Date, the Hard Cap Amount shall be the amount derived from the Servicer Cap Model and provided to each servicer in writing by the Program Administrator. |
| Max Current Cap Required for Available Headroom | For each servicer and for any Cap Determination Date, shall be equal to the greater of (i) such servicer's Hard Cap Amount or (ii) such servicer's Current Cap Required for Available Headroom. |
| Percentage of Hard Cap Amount Utilized | For each servicer and for any Cap Determination Date, such servicer's Adjusted Hard Cap Amount Utilized expressed as a percentage of such servicer's Hard Cap Amount. |
| Remaining Funds Percentage | For each servicer and for any Cap Determination Date: <br><br>(a) If the Current Unutilized Cap of such servicer is equal to zero, then the Remaining Funds Percentage for such servicer shall be equal to zero; or <br><br>(b) If the Current Unutilized Cap of such servicer is greater than zero, then the Remaining Funds Percentage for such servicer shall be equal to such servicer's Current Unutilized Cap expressed as a percentage of the Aggregate Current Unutilized Cap. |

---

[1] Such an event might occur because, for example, a servicer has no further loans eligible to be modified. Such a determination is in Treasury's sole discretion.

| Term | Definition |
|---|---|
| Required Cap Reduction Amount | For each servicer and for any Cap Determination Date: |
| | (a) If the Current Unutilized Cap of such servicer is equal to zero, then the Required Cap Reduction Amount for such servicer shall be equal to zero; or |
| | (b) If the Current Unutilized Cap of such servicer is greater than zero, then the Required Cap Reduction Amount for such servicer shall be equal to the *lesser* of (i) the product of the Remaining Funds Percentage and the Excess Cap Allocation Amount or (ii) the product of the Remaining Funds Percentage and the Aggregate Current Unutilized Cap. |
| Target Utilization Percentage | For any Cap Determination Date, the Target Utilization Percentage shall be: |
| | (a) if the Aggregate Percentage of Adjusted Hard Cap Amount Utilized is less than or equal to 80%, then the Target Utilization Percentage shall be 80%; or |
| | (b) if the Aggregate Percentage of Adjusted Hard Cap Amount Utilized is greater than 80% but less than or equal to 85%, then the Target Utilization Percentage shall be 85%; or |
| | (c) if the Aggregate Percentage of Adjusted Hard Cap Amount Utilized is greater than 85% but less than or equal to 90%, then the Target Utilization Percentage shall be 90%; or |
| | (d) if the Aggregate Percentage of Adjusted Hard Cap Amount Utilized is greater than 90% but less than or equal to 95%, then the Target Utilization Percentage shall be 95%; or |
| | (e) if the Aggregate Percentage of Adjusted Hard Cap Amount Utilized is greater than 95%, then the Target Utilization Percentage shall be 100%. |
| | On October 4, 2010, the Target Utilization Percentage shall be 80%. |

## 1.6 Compliance with Applicable Laws

Each servicer and any sub-servicer that the servicer uses will be subject to and must fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to MHA.

| Law | Description |
| --- | --- |
| Section 5 of the Federal Trade Commission Act | Prohibits unfair or deceptive acts or practices |
| The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act | Prohibits discrimination on a prohibited basis in connection with mortgage transactions |
| The Real Estate Settlement Procedures Act (RESPA) | Imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts |
| The Fair Debt Collection Practices Act | Restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another |
| Fair Lending Laws | Ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit red-lining. |
| Fair Credit Reporting Act | Regulates the collection, dissemination, and use of consumer information, including consumer credit information |

## 1.7 Dodd-Frank Certification Requirement

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) provides that no person is eligible to begin receiving assistance under the MHA Program if such person, in connection with a mortgage or real estate transaction, has been convicted within the last 10 years of any of the following:

- Felony larceny, theft, fraud, or forgery;
- Money laundering; or
- Tax evasion.

The Dodd-Frank Certification requirement became effective September 21, 2010. All HAMP and 2MP, TPPs, permanent HAMP, 2MP, Treasury FHA HAMP and RD-HAMP modifications, offers relating to such TPPs and permanent modifications, and HAFA short sale and DIL offers outstanding as of the effective date of this requirement are not impacted by the Dodd-Frank Certification requirement.

A servicer must obtain an executed Dodd-Frank Certification from each borrower in accordance with the guidance set forth in the table below. Servicers are required to date stamp the executed Dodd-Frank Certification upon receipt, whether or not the borrower has dated it. The Interim Period described in the table below is the period from September 22, 2010 through December 31, 2010. The Final Period is the period beginning January 1, 2011. The form of the Dodd-Frank Certification is available on www.HMPadmin.com.

An amended form of the Dodd-Frank Certification was released on February 17, 2011 and can be found on www.HMPadmin.com. Servicers must use the amended form beginning on and after May 1, 2011. To the extent a borrower delivered the original form of the Dodd-Frank Certification,

regardless of whether such borrower checked the boxes therein or dated it, the borrower shall be deemed to have complied with the Dodd-Frank Certification requirement.

| Program | Interim Period Requirement | Final Period Requirement |
|---|---|---|
| HAMP | Obtain completed Dodd-Frank Certification prior to permanent HAMP modification | Obtain completed Dodd-Frank Certification as part of Initial Package prior to offering TPP to borrower<br><br>For bankrupt borrowers where trial period is waived, obtain completed Dodd-Frank Certification prior to permanent HAMP modification |
| 2MP | If not obtained in connection with related HAMP evaluation, obtain completed Dodd-Frank Certification prior to permanent 2MP modification or extinguishment | If not obtained in connection with related HAMP evaluation, obtain completed Dodd-Frank Certification prior to offering 2MP trial period plan or prior to permanent 2MP modification or extinguishment, as applicable |
| HAFA | If not obtained in connection with related HAMP evaluation, obtain completed Dodd-Frank Certification prior to closing HAFA short sale or DIL | If not obtained in connection with related HAMP evaluation, obtain completed Dodd-Frank Certification prior to closing HAFA short sale or DIL |
| Treasury FHA-HAMP | Obtain completed Dodd-Frank Certification prior to reporting Treasury FHA-HAMP modification to Program Administrator | Obtain completed Dodd-Frank Certification prior to reporting Treasury FHA-HAMP modification to Program Administrator |
| RD-HAMP | Obtain completed Dodd-Frank Certification prior to reporting RD-HAMP modification to Program Administrator | Obtain completed Dodd-Frank Certification prior to reporting RD-HAMP modification to Program Administrator |
| FHA2LP | See applicable requirements published by FHA | See applicable requirements published by FHA |

As described above, if a 2MP servicer cannot verify that a completed Dodd-Frank Certification was obtained in connection with the related HAMP-modified first lien, the 2MP servicer is required to obtain a completed Dodd-Frank Certification.  When the 2MP servicer sends a communication to the borrower including the Dodd-Frank Certification and informs the borrower that its execution and return is a prerequisite to obtaining a 2MP trial period, permanent modification or extinguishment, the servicer must include a specific date by which the Dodd-Frank Certification must be received.  This date shall be no less than 30 calendar days from the date of the communication in which the servicer sends the Dodd-Frank Certification and requests its execution.  If the borrower has not completed and returned the Dodd-Frank Certification by the specified date, the servicer must make an additional attempt in writing to contact the borrower and again provide a specific date by which the completed Dodd-Frank Certification must be received, which shall be no less than 15 calendar days from the date of the second notice.  If the completed Dodd-Frank Certification is not received by the specified date, the servicer is no longer required to offer the borrower a 2MP trial period, permanent modification or extinguishment. Servicers should keep copies of the communications with the borrowers regarding the Dodd-Frank Certification in the servicing file.

## 2 Compliance

Treasury has engaged Freddie Mac as the Compliance Agent for the elements of MHA that are addressed in this Handbook. Freddie Mac has created an independent division, Making Home Affordable-Compliance (MHA-C) for this purpose. MHA-C conducts independent compliance assessments and servicer reviews to evaluate servicer compliance with the requirements of MHA.

### 2.1 Compliance Assessments

MHA-C conducts the following types of assessments:

- On-site Readiness, Governance, and Implementation reviews
- Remote and On-Site Loan File Reviews
- NPV Reviews
- Program Disbursement Reviews
- Targeted and Follow-Up Reviews

The scope of the compliance assessments includes but is not limited to the following:

- Consideration of Borrower and Property Eligibility
- Underwriting Guidelines
- NPV/Waterfall Processes
- Borrower Incentive Payments
- Servicer Incentive Compensation
- Investor Subsidy Calculations
- Data Integrity and Accuracy of Servicer Reporting
- Content and Distribution of Borrower Notices
- Complaint and Escalation Management
- Servicer Quality Assurance Processes
- Internal Control Design, Effectiveness, and Assessments
- Retention of Appropriate Documentation
- Adherence to Written Policies for Applicable Programs

For on-site reviews, MHA-C will strive to provide the servicer with 30 days' advance notice, but reserves the right to arrive unannounced. During the course of conducting compliance assessments, MHA-C will request such documentation, policies, procedures, loan files, and other materials necessary to conduct the review. As specified in the SPA, servicers are required to provide MHA-C with the documentation requested in a timely manner. Upon completing an assessment, MHA-C will provide the servicer with preliminary results as soon as possible in order to ensure that all relevant information has been considered.

### 2.2 Documentation

Servicers are required to maintain appropriate documentary evidence of their MHA-related activities, and to provide that documentary evidence upon request to MHA-C. Servicers must maintain required documentation in well-documented servicer system notes or in loan files for all MHA activities, for a period of seven years from the date of the document collection. Required general documentation applicable to all MHA Programs includes but is not limited to:

- Any internal or external materials developed by the servicer such as training materials, reports, memoranda, or other documentation.

- All policies and procedures related to the servicer's customer service hotline and escalations process and where applicable, reference the servicer's associated policies and procedures for modifying loans held in their own portfolio.

- Evidence of assessment of investor willingness to participate in MHA programs and any specific outreach to investors or attempts to obtain waivers on either a portfolio or loan-by-loan basis, including copies of any contracts with investors relied upon in denying modifications. This should include, where applicable, documentation relating to specific parameters or limitations on participation required by investors for steps in the waterfall.

- The servicer's process for pre-screening non-performing loans against the basic program requirements prior to referring any loan to foreclosure or conducting scheduled foreclosure sales.

- Documentation of all communications, solicitations and Borrower Notices, whether verbal (e.g., phone contact) or written (e.g., e-mail), with or to the borrower or authorized advisor. Appropriate documentation includes, but is not limited to, the dates of communications, names of contact person(s), and a summary of the conversation.

- Evidence of postponement of scheduled foreclosure sales in applicable scenarios as outlined in Section 3 of Chapter II.

- All written policies and procedures that describe the basis on which the servicer will determine a borrower's monthly gross income (or, in the case of co-borrowers or non-borrower occupants, the combined monthly gross income).

- Evidence that a credit score was unavailable for any borrower on the note and the proxy credit score that was used when performing the NPV evaluation.

- All documents and information received during the process of determining borrower eligibility, including:

  o Evidence of receipt of the Initial Package;

  o Borrower income verification;

  o Total monthly mortgage payment calculations;

  o Total monthly gross debt payment calculations;

  o NPV calculations (assumptions, inputs and outputs);

  o Evidence of application of each step of the standard modification waterfall, including any variations;

  o Evidence of application of each step of the alternative modification waterfall, including any variations;

  o Escrow analysis;

  o Escrow advances; and

  o Escrow set-up.

- Substitution of income documents for borrowers in active Chapter 7 or Chapter 13 bankruptcy.

- All policies and procedures related to the servicer's policies and procedures for modifying loans held in their own portfolio when relied upon in the decision-making process or when applying good business judgment.

- All documents and information related to the terms of the TPP Notice as well as the borrower's performance and monthly payments during the trial period.

- Waiver of the TPP for borrowers in active Chapter 13 bankruptcies.

- The outcome of each evaluation for modification in addition to the specific justification and the supporting details if the request for modification was denied.  Records must be retained to document the reason(s) for a TPP failure.

- All documents and information related to the terms of the permanent modification as well as the borrower's performance and monthly payments to retain good standing.

- All documents and information related to the servicer's consideration of the borrower for other loss mitigation alternatives.

- Written policies and procedures related to notification to the servicer's foreclosure attorney/trustee regarding a borrower's status under an MHA program.

- Certification prior to foreclosure sale as outlined in Section 3.4.3 of Chapter II.

- All documents and information related to receipt and distribution of the borrower, servicer and investor incentive payments.

- Servicers must also retain documentation of their analysis of the materiality of all instances of noncompliance or where controls are found to be ineffective.

- All policies and procedures related to the implementation, processes, controls (including design and effectiveness) and reporting for Escalated Cases.

- Documentation of all communications, whether verbal or written, with the borrower or authorized representative, MHA Help or HSC. Appropriate documentation includes, but is not limited to, the dates of communications, name(s) of contact person(s) and a summary of the conversation.

- Documentation and dates of the resolution of Escalated Cases.

- Documentation and dates of the Non-Approval Notice, including transmission of NPV values to borrowers, if applicable.

- Evidence of review or other controls that reasonably demonstrates the completeness and accuracy of the reporting and resolution of Escalated Cases.

- All policies and procedures related to appraisals.

- Copies of appraisals obtained in response to a borrower dispute of the property value input used in the NPV test.

- Copies of borrower communications disputing NPV inputs.

- Written policies and procedures relating to FDD forbearance plans, including:

  o Determining eligibility for the FDD forbearance;

- o Canceling existing TPPs and 2MP trial periods when borrowers accept FDD forbearance plans;

- o Terms of FDD forbearance plans offered to eligible borrowers;

- o Coordination with UP; and

- o TPP and 2MP trial period reconsideration, where applicable.

- Documentation of all steps performed in evaluating and processing requests for an FDD forbearance plan.

### 2.2.1 Documentation Requirements for PRA

In addition to the requirements in Section 2.2, required documentation for PRA includes, but is not limited to:

- The servicer's documented process for evaluating and approving borrowers for PRA including policies and procedures related to consistent application of PRA, variations of alternative modification waterfall steps, equity share arrangements, and the circumstances under which the servicer would reduce principal to create (i) a mark-to-market LTV ratio below 105 percent or (ii) a monthly mortgage payment ratio below the target monthly mortgage payment ratio.

- All documents and information related to the determination of eligibility for PRA, including the determination of eligibility for PRA retroactively for loans in trial period plans or permanent modifications prior to the PRA Effective Date.

- All documents and information related to the alternative modification waterfall and NPV process including accurately uploading required data into the HAMP Reporting Tool.

- For each loan file, copies of any equity share agreements between the investor and the borrower.

### 2.2.2 Documentation Requirements for UP

In addition to the requirements in Section 2.2, required documentation for UP includes, but is not limited to:

- Written policies and procedures relating to UP forbearance plans, including:

- o Determining eligibility for the program including: unemployment status; any requirement for receipt of unemployment benefits prior to commencement of the forbearance period; duration and status of unemployment benefits; waiver of the 31 percent mortgage payment ratio threshold; and forbearance term extension criteria;

- o Determining any borrower eligibility recertification and re-employment status;

- o Determining when an UP forbearance plan requires a payment and how the payment amount is determined; and

- o Canceling any existing TPP determined to be eligible for an UP forbearance plan.

### 2.2.3 Documentation Requirements for HAFA

In addition to the requirements in Section 2.2, required documentation for HAFA includes, but is not limited to:

- Written policies and procedures relating to HAFA, including:

    o Determining eligibility for the program including determining fair market value, recommended list price, approved sale proceeds and approved minimum net proceeds, as applicable;

    o Establishing guidelines for allowable payoffs to junior lien holders;

    o Determining when a monthly mortgage payment will be required during a short sale;

    o Determining, if applicable, when a borrower will be considered for a deed-for-lease or an opportunity to repurchase the property at some future time; and

    o Determining if and when a borrower that was determined to be ineligible for HAFA prior to February 1, 2011 will be re-evaluated.

- All records of borrower solicitations or borrower-initiated inquiries regarding HAFA.

- The date and outcome of the consideration and evaluation for foreclosure alternatives under HAFA and specific justification with supporting details if foreclosure alternatives were denied including all records related to the termination of the SSA or expiration of HAFA transactions without a completed short sale or acceptance of a DIL.

- All documents and information related to the extinguishment and release of subordinate liens in accordance with applicable laws.

- All documents and information received during the process of determining borrower eligibility, including evidence of receipt of required documents such as the Hardship Affidavit or RMA, and RASS or Alternative RASS as well as the evidence used to determine if the property was vacant.

- All documents and information related to the terms of the SSA or approval of the Alternative RASS.

- If a borrower will be renting or re-purchasing the property sold to a non-profit organization, evidence that such organization is a non-profit.

### 2.2.4 Documentation Requirements for 2MP

In addition to the requirements in Section 2.2, required documentation for 2MP includes, but is not limited to:

- Written policies and procedures relating to 2MP, including:

    o All documents and information received during the process of determining borrower eligibility, including evidence of application of each modification step.

    o All documents and information related to the monthly payments during and after any trial period, as well as incentive payment calculations and such other required documents.

    o Detailed records to document the reason(s) for any TPP failure.

    o All documents and information related to the appropriate treatment of second liens modified under 2MP where the modification of the first lien utilizes PRA.

- o All documents and information related to the extinguishment and release of second liens in accordance with applicable laws.

- In the case of a full extinguishment, copies of the most recent LPS match file on which the servicer relied to determine that the HAMP-modified first lien was reported as in good standing and was not paid off as of the effective date of the full extinguishment.

### 2.2.5 Documentation Requirements for HHF

In addition to the requirements in Section 2.2, required documentation for HHF includes, but is not limited to:

- Written policies and procedures relating to HHF interactions and participation, including, but not limited to:

  - o All relevant records of transactions, including printouts from related NPV runs done on behalf of an HHF Program, borrower authorizations, documentation of the amount of any assistance received from an HHF Program and reports to the Program Administrator reflecting loans that received HHF assistance;

  - o For interactions with HAMP all documentation of:

    - HHF assistance the borrower receives to facilitate a permanent modification; an extension of borrower notice requirements (as described in Section 2.3 of Chapter II);

    - HHF assistance and appropriate adjustments to UPB (as described in Section 3.1 of Chapter VIII); and NPV calculations used to determine eligibility for HAMP and PRA *prior to* as well as *after* the HHF Program's principal reductions

  - o For interactions with UP all documentation:

    - From the state HFA regarding guidance/instructions specific to timing and amount of the payment; of the eligibility for UP (based on the timing and unemployment status of the borrower at the time of evaluation); and

    - Of the evaluation for HAMP (as described in Section 5 of Chapter III after UP and HHF assistance ceases, if applicable (e.g. borrower continues to have a hardship);

  - o For interactions with HAFA all documentation from the HFA regarding guidance/instructions specific to the application, timing, and amount of the payments, if made to the servicer; and

  - o For interactions with 2MP all documentation that:

    - A 2MP match did not already occur or was ineligible before HFA assistance was extended; and

    - The second lien was released.

## 2.3 Communication of Findings and Results

The targeted time frame for providing the servicer assessment report to the servicer is 30 days after the completion of the review.  Treasury will receive a copy of the report five business days prior to the release of the report to the servicer.  There will be an issue and resolution appeal

process for servicer assessments.  Servicers will be able to submit concerns or disputes to an independent quality assurance team within MHA-C.

## 2.4 Treasury FHA-HAMP and RD-HAMP Compliance

FHA, RHS and Treasury have agreed that each will perform certain compliance activities for loans modified under Treasury FHA-HAMP and RD-HAMP as described in Chapter VI. FHA and RHS, as applicable, will:

- Validate that each modified loan is an eligible mortgage loan under the eligibility criteria set forth in Section 2.1 of Chapter VI and FHA-HAMP Mortgagee Letters or Section 2.2 of Chapter VI and the Final Rule;

- Establish a process to ensure that loans submitted to the HAMP Reporting Tool are properly modified under each of FHA's or RHS's own proprietary modification program requirements and under the requirements of Section 2.1 or Section 2.2 of Chapter VI;

- Notify the Program Administrator if any loans previously entered into the HAMP Reporting Tool are no longer valid under FHA-HAMP or Special Loan Servicing;

- Validate the submission of each such loan to the FHA Single Family Default Monitoring System (SFDMS) or RHS Guaranteed Loan System (GLS); and

- Assess each servicer's compliance with all FHA-HAMP or Special Loan Servicing requirements, as well as such servicer's internal control program under Treasury FHA-HAMP or RD-HAMP.

MHA-C will perform the following compliance activities with respect to Treasury FHA-HAMP and RD-HAMP loans, as applicable:

- Review servicers' cash records to determine if the related FHA-HAMP or Special Loan Servicing loan has been current for the appropriate period of time.

    o  If such loan has been current, then MHA-C shall:

        ▪ Calculate the six percent requirement for the servicer pay-for-success compensation and identify and report any discrepancies within the data in the HAMP Reporting Tool;

        ▪ Compare results of the six percent calculation with the Program Administrator's payment record for the servicer and identify and report any discrepancies; and

        ▪ Determine if the borrower pay-for-performance compensation was appropriately applied to the borrower's loan balance; and

    o  If such loan was not current, MHA-C will report that loan as a discrepancy.

Each servicer is required to develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to:

- Ensure effective delivery of Services in connection with Treasury FHA-HAMP and/or RD-HAMP and compliance with applicable Treasury FHA-HAMP and/or RD-HAMP documentation, including the FHA-HAMP Mortgagee Letters and the Final Rule and existing or future regulation or guidance issued by FHA or RHS for requirements related to eligibility, underwriting and administration of FHA-HAMP or Special Loan Servicing;

- Detect mortgage loan modification fraud; and

- Monitor compliance with applicable consumer protection and fair lending laws.

The internal control program must include documentation of the control objectives for Treasury FHA-HAMP and/or RD-HAMP activities, the associated control techniques, and mechanisms for testing and validating the controls.

Each servicer is also required to provide FHA or RHS, as applicable, with access to all internal control reviews and reports that relate in whole or in part to modifications under FHA-HAMP or Special Loan Servicing performed by it and any external parties or consultants hired by such servicer to enable FHA or RHS to fulfill its compliance duties.

## 2.5 FHA2LP Compliance

FHA and Treasury have agreed that each will perform certain compliance activities for FHA2LP. FHA will validate that each loan refinanced under FHA Refinance is an eligible mortgage loan under the eligibility criteria set forth in Section 3 of Chapter VII and the FHA Refinance ML and will notify Treasury in a timely manner if any fraud is discovered in origination of a new FHA Refinance loan. In addition, FHA will assess each originator's compliance with all FHA Refinance requirements, including such originator's internal control program.

Treasury's Compliance Agent for FHA2LP will perform the following activities with respect to FHA2LP loans:

- Review that a full or partial extinguishment of the related second lien occurred consistent with the amount reported by the FHA2LP servicer, and if applicable, appropriate reporting to the Program Administrator, occurred for any related HAMP or 2MP loans;

- Determine the accuracy and timeliness of remittance by the servicer of investor incentive payments;

- Evaluate documented evidence to confirm adherence by the participating servicer to FHA2LP requirements, including modified loan terms following a Partial Extinguishment, as set forth in Section 4.1 of Chapter VII;

- Review that the related borrower has been released from liability for the portion of second lien that was extinguished; and

- Review the effectiveness of each participating servicer's internal quality control plan for FHA2LP.

Each servicer is required to develop and implement an internal control program designed to:

- Ensure effective delivery of services in connection with FHA2LP and compliance with applicable FHA2LP documentation and reporting requirements, including the FHA Refinance ML and existing or future guidance issued by FHA for requirements related to eligibility, underwriting and administration of FHA Refinance;

- Monitor and detect mortgage loan fraud; and

- Monitor compliance with applicable consumer protection and fair lending laws.

The internal control program must include documentation of the control objectives for FHA2LP activities, the associated control techniques, and mechanisms for testing and validating the controls.

Each servicer is also required to provide FHA and Treasury's Compliance Agent for FHA2LP, as applicable, with access to all internal control reviews and reports that relate in whole or in part to refinances under FHA Refinance performed by it and any external parties or consultants hired by such servicer.

Servicers must keep copies of all lien releases, subordination agreements (if applicable) and other related documents in its files to be made available for verification by Treasury's Compliance Agent for FHA2LP. Servicers must retain all documents and information received during the process of determining borrower eligibility for FHA2LP, including lien release documentation and, if applicable, the HUD-1. In addition, servicers must retain required documents for a period of seven years from the date of the document collection.

## 2.6 Annual Certification

The SPA requires a servicer to submit an annual certification (Annual Certification) as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the SPA beginning on June 1, 2010 and again on June 1 of each year thereafter during the term of the SPA. The original form of Annual Certification is attached as an exhibit to the SPA and is available on www.HMPadmin.com. The guidance in this section amends and restates the original form of Annual Certification and the related delivery requirements and requires servicers to sign and deliver the initial and subsequent certifications to MHA-C within 90 calendar days of the effective date of the applicable certification.

### 2.6.1 Initial Certification

Each servicer is required to provide an initial certification (Initial Certification) after executing a SPA, which Initial Certification will cover the relevant MHA Programs as of a fixed effective date. The due date for the Initial Certification (Initial Certification Due Date) will be dependent upon the date on which the servicer executes the SPA for a respective MHA Program, and the date upon which an MHA Program becomes effective. The Initial Certification shall be delivered to MHA-C.

The table below sets forth the method to determine the Initial Certification Due Date. Each servicer should determine its related Initial Certification Due Date by the date on which it entered into its SPA under "SPA Execution Date." For the Initial Certification only, each servicer will certify that it was in compliance with, and the truth and accuracy of the representations and warranties related to, Program guidance as of the specific date as set forth in the table under "Initial Certification Effective Date." Other than as described below with respect to 2MP, MHA Programs that became effective two or more months prior to the Initial Certification Effective Date will be included in the Initial Certification. Some programs, such as Treasury FHA-HAMP, required a participating servicer to execute an Amended and Restated SPA or an additional Service Schedule, as applicable, in order to participate in the MHA Program; in those cases, if the Amended and Restated SPA or Service Schedule was signed two or more months prior to the Initial Certification Effective Date applicable to that servicer, then that MHA Program must also be included in the Initial Certification.

| SPA Execution Date | Initial Certification Effective Date | Programs to be Covered (Programs included if effective for 2 months or more before the Initial Certification Effective Date) | Initial Certification Due Date |
|---|---|---|---|
| On or before October 31, 2009 | As of June 30, 2010 | • HAMP<br>• HAFA<br>• Treasury FHA-HAMP* | September 30, 2010 |
| November 1, 2009 through | As of December 31, | • HAMP<br>• HAFA | March 31, 2011 |

| SPA Execution Date | Initial Certification Effective Date | Programs to be Covered (Programs included if effective for 2 months or more before the Initial Certification Effective Date) | Initial Certification Due Date |
|---|---|---|---|
| June 30, 2010 | 2010 | • Treasury FHA-HAMP*<br>• 2MP*<br>• UP | |
| July 1, 2010 through October 3, 2010 | As of June 30, 2011 | • HAMP<br>• HAFA<br>• Treasury FHA-HAMP*<br>• 2MP*<br>• UP<br>• PRA<br>• Any other MHA-related Programs implemented by Treasury prior to March 31, 2011 | September 30, 2011 |

*Amended and Restated SPA or Service Schedule, as applicable, required.

Example 1: If a servicer signed a SPA to participate in HAMP in April 2009, the servicer would be required to deliver an Initial Certification on September 30, 2010, stating that it was in compliance with, and the truth and accuracy of, the representations and warranties related to HAMP and HAFA guidance as of June 30, 2010.

Example 2: If a servicer signed a SPA to participate in HAMP in December 2009 and signed a Service Schedule to participate in Treasury FHA-HAMP in May 2010, the servicer would be required to deliver an Initial Certification on March 31, 2011, stating that it was in compliance with, and the truth and accuracy of, the representations and warranties related to HAMP, HAFA, UP and Treasury FHA-HAMP guidance as of December 31, 2010.

Example 3: If a servicer signed a SPA to participate in HAMP in April 2009 and signed an Amended and Restated SPA to participate in Treasury FHA-HAMP in May 2010, the servicer would be required to deliver an Initial Certification on September 30, 2010, stating that it was in compliance with, and the truth and accuracy of, the representations and warranties related to HAMP and HAFA (but not Treasury FHA-HAMP) guidance as of June 30, 2010.

With respect to 2MP, servicers that executed their SPA on or before October 31, 2009, regardless of when they executed their Amended and Restated SPA or Service Schedule, as applicable, to participate in 2MP, are not required to certify to their compliance with the 2MP guidelines in their Initial Certifications. Servicers that (i) executed their SPA (A) between November 1, 2009 through June 30, 2010 or (B) between July 1, 2010 through October 3, 2010 and (ii) elected to participate in 2MP two or more months before their Initial Certification Effective Date (i.e. as of December 31, 2010 or June 30, 2011, as applicable), must certify to their compliance with the 2MP guidelines in their Initial Certifications.

### 2.6.2 Subsequent Certifications

In addition to the Initial Certification, the servicer is required to certify (Subsequent Certification) on an annual basis as to their compliance pursuant to activities performed and obligations satisfied during the period from the effective date of the most recent prior Certification through and including the Subsequent Certification Effective Date. The Subsequent Certification shall be delivered to MHA-C. Initial Certifications and Subsequent Certifications are referred to in this Handbook as Certification(s).

Servicers are generally subject to a number of financial reporting and/or regulatory requirements, often based on the organization's fiscal year performance and due at, or shortly after, fiscal year end. As many of the procedures and related controls required for Certifications will be similar to those performed to satisfy other such requirements, a servicer may elect to time its Subsequent Certifications to the servicer's fiscal year end. This election will allow a servicer to incorporate

Subsequent Certifications into its normal reporting cycle. This option is not available for the Initial Certification.

This election, if made, will be a one-time election that will apply to all Subsequent Certifications and must be reported to MHA-C with the Initial Certification. However, this election may not extend the effective period of the first Subsequent Certification more than 15 months following the Initial Certification, and, depending on the timing of the servicer's fiscal year end, may require the first Subsequent Certification in less than 12 months.

By way of an example, and in order to provide additional clarity for servicers deciding whether to submit Subsequent Certifications as of their fiscal year end, the following table is provided as a guide for determining the first Subsequent Certification Effective Date:

| Initial Certification Effective Date | First Subsequent Certification Effective Date if Fiscal Year End is: | | | |
|---|---|---|---|---|
| | September | December | March | June |
| June 30, 2010 | September 30, 2011 | December 31, 2010 | March 31, 2011 | June 30, 2011 |
| December 31, 2010 | September 30, 2011 | December 31, 2011 | March 31, 2012 | June 30, 2011 |
| June 30, 2011 | September 30, 2012 | December 31, 2011 | March 31, 2012 | June 30, 2012 |

The due date for a servicer to deliver a Subsequent Certification (the Subsequent Certification Due Date) to MHA-C is not later than 90 calendar days after the Subsequent Certification Effective Date. If a servicer does not elect to time its Subsequent Certifications to its fiscal year end reporting cycle, or does not specify in the Initial Certification what the Subsequent Certification Due Date shall be, then (1) the servicer's Subsequent Certification Effective Date shall be the anniversary of the Initial Certification Effective Date and (2) the Subsequent Certification Due Date shall be not later than 90 calendar days after such Subsequent Certification Effective Date.

For any changes to existing programs announced by Treasury that may affect the timing or scope of the certification, the related Supplemental Directive will provide guidance as to the relevant certification effective dates and due dates for the Certifications relating to such programs.

### 2.6.3 Subsequent Events

Servicer activities in the period between the effective date of a Certification and the due date of the Certification will be subject to reporting in the next Subsequent Certification. However, if a servicer becomes aware of any information or events during the period allowed for delivery that would cause them to be unable to certify to the truth and accuracy of the representations and warranties included in the applicable Certification (either the Initial Certification or a Subsequent Certification), the servicer should notify MHA-C promptly and amend its Certification to include that information.

### 2.6.4 Scope of the Certification

### 2.6.4.1 Scope of the Internal Controls Program

Servicers are expected to establish and maintain internal controls that provide reasonable assurance that they are in compliance with MHA Program requirements. Further, servicers are required to certify that they have developed and implemented an internal controls program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as described in the SPA.

HAMP reflects usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements governing private label securitizations. While most servicers already have internal quality control programs in satisfaction of regulatory and investor requirements, servicers must develop, implement, maintain, and review internal controls that address the key activities identified in *Examples of Control Objectives*, available at www.HMPadmin.com that may be unique to the MHA Program(s).

### 2.6.4.2 Internal Controls Documentation

Servicers are required to maintain documentation of the internal control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls. Control objectives for each of the key program activities may include, but are not limited to, those included in *Examples of Control Objectives*, available at www.HMPadmin.com.

### 2.6.4.3 Quarterly Reviews

Servicers are expected to enforce and review the effectiveness of the internal controls program on a quarterly basis throughout the period covered by the related Certification. Servicers are also required to develop and execute a quality assurance program to assess documented evidence of loan evaluation, loan modification and accounting processes and to confirm adherence to MHA Program requirements. The quality assurance program should be included in the quarterly review of internal control processes, and should be assessed to ensure that it: (i) includes loans from all potentially relevant categories (*e.g.* past-due, TPPs, permanent HAMP modifications, HAMP denials, etc); (ii) is independent from the business lines; (iii) applies appropriate sampling methodology; (iv) reaches appropriate conclusions; (v) distributes reports to appropriate members of management; and (vi) performs appropriate trending reporting and follow-up activities in order to improve servicer performance (if necessary).

Servicers should consider the results of the quarterly reviews as part of the procedures performed to support the Annual Certification process. Servicers should consider whether any unresolved internal controls findings, either individually or in aggregate, have a material effect on their ability to certify as to their ongoing compliance, and if so, should report any such unresolved findings as described in Section 2.6.5.

### 2.6.5 Reporting Noncompliance

As required under the SPA, in the event that a servicer cannot certify as to its continuing compliance with, or the truth and accuracy of, one or more of the representations and warranties included in any Certification, that servicer should notify MHA-C immediately. In addition, in this instance, that servicer should modify the related cover letter to the Certification (as defined in Section 2.6.6). Each servicer is required to report instances of noncompliance that it believes have a material effect on its ability to comply with MHA program requirements and describe those instances as well as the factors it considered in determining materiality and evaluating noncompliance in a cover letter to the Certification (see Section 2.6.6). This evaluation of materiality may or may not be quantifiable in monetary terms and should include, but is not limited to, consideration of the nature and frequency of noncompliance as well as qualitative considerations, including the impact on MHA program goals and objectives.

When material instances of noncompliance are identified, the servicer's cover letter to the Certification should include a description of and the reason for noncompliance. Examples may include, but are not limited to, the following:

- Any representations and warranties, or covenants that cease to be true and correct;

- Any deficiencies in the design or operating effectiveness of the internal controls over MHA Program activities, including the servicer's quality assurance program; or

- Any overdue, un-remediated findings resulting from compliance assessments performed by MHA-C.

Servicers must maintain evidence of the control testing activities conducted in order to assess compliance and submit the annual certification.

### 2.6.6 Cover Letter to the Certification

Servicers should attach a separate cover letter to the Certification delivered to MHA-C. This cover letter should include, but is not limited to, the following:

- Description of any instances of noncompliance that the servicer believes have a material effect on its ability to comply with Program requirements as described in Section 2.6.5.

- Details of the action plan to remediate any such material noncompliance and the timeframe within which remediation will be complete.

- With respect to the cover letter accompanying the Initial Certification, the servicer's election, if made, to make Subsequent Certifications effective as of the servicer's fiscal year end.

### 2.6.7 Termination of Obligation to Provide Certifications

A servicer's obligation to provide a Certification to MHA-C will continue so long as its SPA has not been terminated. If a servicer's SPA is terminated before its Initial Certification Effective Date (as defined in Section 2.6.1), then (a) it must deliver an Initial Certification to MHA-C not later than 90 calendar days after its Initial Certification Effective Date, which shall in this case be defined as the termination date of the SPA and (b) it is no longer required to provide any Subsequent Certifications. If a servicer's SPA is terminated prior to any Subsequent Certification Effective Date (as defined in Section 2.6.2), then it must provide a final Subsequent Certification to MHA-C not later than 90 calendar days after its Subsequent Certification Effective Date, which shall in this case be defined as the termination date of the SPA.

## 2.7 Internal Quality Assurance

Each servicer must develop, document and execute an effective quality assurance (QA) program that includes independent reviews of each MHA program (e.g. HAMP, UP, 2MP, PRA, HAFA, Treasury FHA-HAMP, RD-HAMP and FHA2LP) in which the servicer is participating pursuant to an executed SPA to ensure that the servicer's implementation and execution of such program(s) conforms to the requirements of the SPA and this Handbook.

### 2.7.1 Establishment of a Quality Assurance Function

Each servicer must establish an internal QA function that:

- Is independent of the servicer's MHA management team;

- Is comprised of personnel skilled at evaluating and validating the processes, decisions and documentation utilized throughout the implementation of each applicable MHA program;

- Has the appropriate authority, privileges, and knowledge to effectively conduct internal QA reviews;

- Coordinates activities and validates results with other risk and control units within the servicer's organization including, but not limited to, internal audit, compliance, and operational risk;

- Evaluates whether management, at varying levels, is receiving appropriate information on a timely basis which would allow for the identification of process failures, backlogs, or unexpected results or impacts; and

- Evaluates the completeness, accuracy and timeliness of the servicer's response to MHA-C servicer-level review reports.

### 2.7.2 Scope of Quality Assurance Reviews

The QA function must conduct reviews that are commensurate with the size, complexity, and risk of the servicer's program activities. The QA function must also be capable of assessing the impacts and consequences of identified risks and weaknesses, especially those that may have adverse borrower impacts (e.g., non-approvals, foreclosures, broad-based exclusions, servicing transfers, fraud identification, etc.). The established QA function must evaluate all components of the servicer's participation in applicable MHA programs, including, but not limited to:

- Availability and responsiveness of servicing personnel to borrower inquiries, questions, and complaints , including Escalated Cases;

- Solicitation and outreach to potentially eligible borrowers;

- Determination of borrower eligibility for any MHA program;

- Pre-screening practices – verbal borrower evaluation for income exclusion and/or exclusion from solicitation due to known eligibility failures or automated programs used to target and identify potentially eligible or qualified individuals for MHA programs;

- Tracking and retention of documentation submitted by borrowers;

- Documentation and application of servicer-specific HAFA and PRA Policies;

- Documentation and application of investor-specific requirements for all MHA programs;

- Compliance with the requirements concerning Borrower Notices as described in Section 2.3 of Chapter II;

- Reporting of Government Monitoring Data as described in Section 4.1.2 of Chapter II;

- Reporting of reason codes as described in Section 11.4.1 of Chapter II;

- Adherence to prohibitions on referral of loans to foreclosure and conducting of scheduled foreclosure sales as described in Section 3 of Chapter II and elsewhere in the Handbook;

- Underwriting, including assessment of imminent default and hardship circumstances, calculation of borrower income, debts and escrow analysis; valuation of property; application of the standard modification waterfall and, if required, the alternative modification waterfall;

- Base NPV Model calculations:

  o For all servicers, the QA function must assess controls designed to ensure the accuracy of the Base NPV Model inputs and outputs and the appropriate use, management, and storage of NPV-related data.

○ In addition, for servicers that have recoded the Base NPV Model into their loss mitigation systems, the QA function must assess the servicer's model management and application development processes.

- Documentation of a request for and approval of a modification (or other loss mitigation option) by the mortgage insurer, investor and/or other interested party in a loss position;

- Conduct of trial period plans, including documentation, application of payments and use of suspense/unapplied funds accounts, credit reporting and conversion to permanent modification for both first and second lien mortgages as appropriate;

- Correctly matching the terms of a borrower's second lien modification with the terms of the borrower's first lien modification for purposes of processing 2MP modifications;

- Timely consideration of alternative loss mitigation options, as well as other foreclosure alternatives including HAFA, when a permanent modification is not appropriate;

- Management of Escalated Cases as described in Section 3;

- External reporting (e.g., to credit bureaus, mortgage insurers, investors and guarantors);

- Reconciliation and distribution of incentives payments;

- Reconciliation and correction of MHA data with the Program Administrator for the HAMP Reporting Tool;

- Maintenance of documentation appropriate to support MHA requirements and decisions; and

- Reporting of MHA data timely and accurately for recording in the HAMP Reporting Tool, including data related to incentive payments, and the process used to map program data from the servicer's loss mitigation system to the HAMP Reporting Tool.

### 2.7.3 Quality Assurance Review:  Methodology, Timing and Reporting

The QA plan must include a variety of audit techniques including loan file evaluations that are based on an appropriate sampling process: either statistically valid sampling with a 95 percent confidence level, or a stratified sample of loans. In either case, the sampling methodology must be documented and must include both random and risk-based selection criteria, as appropriate. The QA plan must ensure that other available information such as information relating to complaints or the results of prior reviews is documented and used as appropriate to determine the focus of QA activities and the loan sample criteria.

QA reviews must occur at least quarterly. Within 45 calendar days of QA review completion, a report must be distributed to the appropriate executives or board-level committees, including senior management independent of the area under review. The report must include at least the following:

- Results of the QA reviews;

- Results of the latest MHA-C servicer-level review reports;

- Trending reports:

- o Each trending report must summarize the data from the 12 months prior to the report date. The trending data must be used in management's assessment of the effectiveness of established MHA processes and training.

- Recommendations to improve internal oversight;

- Recommendations to improve MHA processes and training; and

- Remediation actions, if necessary.

The QA plan must include a rigorous follow up process (generally at 30-day increments after report issuance) to ensure that management is taking necessary remediation actions to address identified issues, including assigning a specific manager to implement process improvements and oversee remediation efforts addressing exceptions identified by QA. Remediation efforts must include re-evaluating loans not properly considered for MHA programs if appropriate.

Results of QA activities must be supported by adequate work papers and other documentation that is well organized and sufficiently detailed to allow a knowledgeable third party who did not participate in the review to assess the documentation and understand how the conclusions reached in the associated report are substantiated.

Results of QA activities, the written QA plan, and all associated documentation including work papers must be retained in accordance with the records retention provisions of the SPA and made available to MHA-C upon request.

# 3 Escalation of Borrower Inquiries

## 3.1 Treasury's Borrower Support Centers

The HOPE™ Hotline, a 24-hour telephone help-line operated by the non-profit, Homeownership Preservation Foundation, provides homeowners with free foreclosure prevention information and housing counseling referrals. Under contract with the Program Administrator, the HOPE™ Hotline assists borrowers with a preliminary assessment of their eligibility for MHA Programs and also connects borrowers with detailed program or denial questions to MHA Help, a team of housing counselors dedicated exclusively to working with borrowers and servicers to resolve MHA escalated cases. Treasury established a similar resolution resource, the HAMP Solution Center (HSC), to manage escalated cases received from housing counselors, government offices, and other third parties acting on behalf of a borrower.

Specially trained personnel at MHA Help and HSC handle Escalated Cases (as defined in Section 3.2), evaluating the circumstances and status of a borrower's request for assistance under an MHA Program and working with the servicer to identify and resolve the case in a manner consistent with MHA program guidelines. To facilitate review and response to cases escalated to servicers by HSC and MHA Help, servicers must report to HSC or MHA Help the status of referred Escalated Cases and, upon request, provide all necessary information required to assess the borrower's Escalated Case, including, but not limited to:

- Debt and income inputs, assumptions, and calculations used to evaluate the borrower;

- Name of the investor/guarantor and Pool ID if the reason for denial is "Investor/Guarantor Not Participating," unless restricted by confidentiality;

- Correspondence by either the borrower or the servicer relative to the applicable MHA Program evaluation;

- Timeline of events constructed by the servicer relative to the applicable MHA Program evaluation; and

- Other relevant data relied upon by the servicer in conducting the evaluation.

Servicers must permit calls with MHA Help or HSC to be recorded for quality control and training purposes.

## 3.2 Servicer Escalated Case Management

All servicers are required to have written procedures and personnel in place to provide timely and appropriate responses to borrower inquiries and disputes that rise to the level of an "Escalated Case," which includes:

- Allegations that the servicer did not assess the borrower for the applicable MHA Program(s) according to program guidelines;

- Inquiries regarding inappropriate program denials;

- Initiation or continuance of foreclosure actions in violation of Section 3 of Chapter II; or

- Cases referred to the servicer by HSC and MHA Help.

The servicer may handle Escalated Cases received from HSC, MHA Help, a borrower, an authorized advisor, Treasury, other federal agencies or elected officials (each, a Requestor).

### 3.2.1 Staffing Requirements

Servicers must designate one or more persons to comply with the requirements of this Section and to handle inquiries that rise to the level of an Escalated Case. Servicers must be sufficiently staffed to manage the escalation case load in accordance with the timing requirements of Section 3.3. The staff handling the Escalated Cases must be trained on the servicer's case escalation procedures, knowledgeable about MHA Program guidelines and possess the necessary authority to achieve a case resolution in accordance with this Section. For those servicers that are required to report data to the Program Administrator via the HAMP Weekly Servicer Survey, the staff handling the Escalated Cases must be servicer personnel that are independent from the servicer personnel that made the initial MHA eligibility determination on the loan.

### 3.2.2 Accessibility

The staff handling Escalated Cases must be accessible directly by phone and e-mail (may be a group e-mail address). Servicers are reminded that they must follow applicable laws to protect the privacy of borrowers.  In addition, the staff must have access to all pertinent borrower documentation and information in the servicing system and/or mortgage file and be capable of sending and receiving documentation and information that will support the resolution of an Escalated Case.

## 3.3 Escalation Resolution Process

The servicer must review each Escalated Case received from a Requestor against the information and documentation in the servicing system and/or mortgage file and data reported to the HAMP Reporting Tool to determine the accuracy of the inquiry and reach a resolution. As necessary, the servicer's evaluation will include, but is not limited to, review or recalculation of the HAMP modification waterfalls and NPV testing.

### 3.3.1 Timing

Escalated Cases should be date stamped upon receipt. Within five business days following receipt of an Escalated Case from a Requestor, the servicer must acknowledge the inquiry in writing via e-mail, fax or mail and must provide the Requestor and, as applicable, the borrower:

- A case reference name or number;

- A date by which the servicer will resolve the Escalated Case and provide a response (Resolution Date), which may not exceed 30 calendar days from the later of (i) the date the inquiry was received or (ii) if authorizations (including any necessary third party authorizations) are required, the date on which the authorizations are received by the servicer); and

- A toll-free escalation contact phone number at the servicer.

If the servicer fails to comply with the requirement to resolve the Escalated Case by the Resolution Date, the servicer must send an updated status in writing to the Requestor and, as applicable, the borrower, on the Resolution Date and every 15 calendar days thereafter until the Escalated Case is resolved. The updates must be sent via e-mail, fax or mail.

### 3.3.2 Authorization

Servicers must ensure that a borrower's information, including personally identifiable Information (PII), is not disclosed to any individual or entity, including the Requestor, unless the borrower and co-borrower have each authorized release of such information in writing. By signing an RMA or Hardship Affidavit, a borrower and co-borrower each authorizes the servicer to disclose PII and the terms of any MHA agreements to (i) representatives of Treasury; (ii) personnel of the Program Administrator and MHA-C; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services the first lien or subordinate lien mortgage loan(s) for the borrower; (iv) companies that perform support services in conjunction with MHA; and (v) any HUD-certified housing counselor. If a servicer is in receipt of an RMA or Hardship Affidavit signed by the borrower(s), no additional release is needed to disclose such information to MHA Help or HSC.

### 3.3.3 Case Resolution

An Escalated Case is considered to be resolved when the inquiry has been reviewed in accordance with the applicable MHA program guidelines and the servicer:

- Determines whether there should be any change in the original determination and identifies a proposed resolution that corresponds to one of the Resolution Categories listed below;

- Documents whether any change in the original determination is required and the proposed resolution in the servicing system and/or mortgage file including the date the servicer reached the proposed resolution and the basis for the resolution;

- Within 10 business days of identifying the proposed resolution, communicates in writing to the Requestor and, as applicable, the borrower, the determination of whether any change in the original determination is appropriate and the proposed resolution and next steps (if applicable, this communication may be a TPP Notice, Modification Agreement or short sale or deed-in-lieu agreement); and

- Takes the first action to implement the resolution.

The Resolution Categories are as follows:

- HAMP/2MP Trial

- HAMP/2MP Permanent Modification
- Alternative Modification
- Payment/Forbearance Plan
- Borrower Current
- Loan Payoff
- Short Sale/Deed in Lieu
- Foreclosure Initiated/Pending
- Foreclosure Completed
- Action Not Allowed – Bankruptcy in Process
- Non-MHA Issue(s)

If the case was referred by HSC or MHA Help, the servicer may not consider the case resolved unless HSC or MHA Help concurs with the proposed resolution, with evidence of this concurrence retained in the servicing file.  When seeking the concurrence of HSC or MHA Help, servicers must provide documentation supporting the basis for the proposed resolution.

### 3.3.4 Substantially Similar Cases

Servicers are not required to review a case, and a case will not be deemed an Escalated Case, when the substance of the inquiry pertains to the same borrower and loan and is substantially similar to a previously resolved Escalated Case. When a case is referred by HSC or MHA Help and the servicer has determined that the referral constitutes a substantially similar case, HSC or MHA Help must concur with the determination with evidence of this concurrence retained in the servicing file. When seeking the concurrence of HSC or MHA Help, servicers must provide documentation supporting the basis for the determination. The servicer must document in the servicing system and/or mortgage file the decision not to review a substantially similar case.

## 3.4   Protections Against Unnecessary Foreclosure

### 3.4.1  Suspension of Referral to Foreclosure

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale (except as provided under Section 3.4.2) unless and until the servicer has resolved the Escalated Case in accordance with Section 3.3.

### 3.4.2  Suspension of Scheduled Foreclosure Sale

When a servicer receives an Escalated Case from a Requestor after a foreclosure sale date has been scheduled and the Escalated Case is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to resolve the Escalated Case. Servicers are not required to suspend a foreclosure sale when an Escalated Case is received after the Deadline.

The servicer will not be in violation of this Section to the extent that a court with jurisdiction over the foreclosure proceeding (if any), or the bankruptcy court in a bankruptcy case, or the public official charged with carrying out the activity or event, fails or refuses to halt the sale after the servicer has made reasonable efforts to move the court or request the public official for a cessation of the sale.  The servicer must document in the servicing system and/or mortgage file if the foregoing exception to the requirement to suspend an existing foreclosure sale is applicable.

If an Escalated Case is pending at the time of a foreclosure sale, the servicer must still resolve the Escalated Case in accordance with Section 3.3 and, when appropriate, the servicer will be required to take corrective action even if the foreclosure sale has taken place.



**Chapter II**

**Home Affordable Modification Program (HAMP)**

# 1 Eligibility

## 1.1 HAMP Eligibility Criteria

A loan is eligible for Home Affordable Modification Program (HAMP) if the servicer verifies that all of the following criteria are met:

| First lien | The mortgage loan is a first lien mortgage loan originated on or before January 1, 2009. This includes mortgages secured by: <br><br>• Cooperative shares, <br><br>• Condominium units, and <br><br>• Manufactured housing (the first lien mortgage loan must be secured by the manufactured home and the land, both of which must be classified as real property under applicable state law). |
|---|---|
| Not previously HAMP modified | The mortgage loan has not been previously modified under HAMP. For more information, refer to the Continued Eligibility guidance in Section 1.2. |
| Delinquent or in imminent default | The mortgage loan is delinquent or default is reasonably foreseeable. Loans currently in foreclosure are eligible. |
| Owner-occupied, single family property | The mortgage loan is secured by a one- to four-unit property, one unit of which is the borrower's principal residence. Additionally, a loan may be considered for HAMP if: <br><br>• The property was originally non-owner occupied, but the servicer can verify that it is currently the borrower's principal residence. <br><br>• The borrower is temporarily displaced (e.g., military service, temporary foreign service assignment, or incarceration) but was occupying the property as his or her principal residence immediately prior to his or her displacement, intends to occupy the property as his or her principal residence upon his or her return and the current occupant is not a tenant. |
| Not vacant or condemned | The property securing the mortgage loan is not vacant or condemned. |
| Financial hardship | A borrower has documented a financial hardship and represented that he or she does not have sufficient liquid assets to make the monthly mortgage payments. |
| Minimum monthly mortgage payment ratio | The borrower's monthly mortgage payment (including principal, interest, taxes, insurance, and when applicable, association fees, existing escrow shortages) prior to the modification is greater than 31 percent of the borrower's verified monthly gross income. |
| Escrow account established | The borrower agrees to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist. |

| Unpaid principal balance limits | The current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than: <ul><li>1 Unit   $729,750</li><li>2 Units $934,200</li><li>3 Units $1,129,250</li><li>4 Units $1,403,400</li></ul> |
|---|---|
| Program cut-off date | The servicer has received a timely first trial period payment from the borrower on or before December 31, 2012. |

## 1.2 Additional Factors Impacting HAMP Eligibility

Certain factors impacting HAMP eligibility are described below:

| No waiver of legal rights | The servicer may not require a borrower to waive legal rights as a condition of HAMP. |
|---|---|
| No up-front contribution | The servicer may not require a borrower to make any "good faith" payment or up-front cash contribution to be considered for HAMP. |
| Active litigation | A borrower in active litigation regarding the mortgage loan is eligible for HAMP. |
| Redemption rights following foreclosure | Whether a borrower can qualify for HAMP if the mortgage loan is currently in the redemption period after a foreclosure sale is dependent on the amount of time remaining in the redemption period and other legal requirements of the state in which the property is located.  When permissible under state law, the servicer should, on a case-by-case basis, seek investor approval prior to evaluating a borrower for HAMP during a redemption period. |
| Balloon loans | Balloon loans that have matured or that mature during the HAMP trial period are eligible for HAMP subject to investor guidelines. |
| Inter vivos Revocable Trust | A loan secured by a property owned by an inter vivos revocable trust is eligible for HAMP as long as the borrower: <ul><li>Is a trustee of the trust,</li><li>Is a primary beneficiary of the trust, and</li><li>Occupies the property as his or her principal residence.</li></ul> The borrower must sign all HAMP-related documents in both an individual capacity and as trustee of the inter vivos revocable trust. |
| Subordinate Liens | HAMP does not require extinguishment of subordinate lien instruments as a condition of modification.  However, servicers must follow investor guidance to ensure first lien priority. |
| HUD Counseling | Borrowers with back-end ratios of 55 percent or more must agree in writing to obtain HUD-approved counseling as a condition of receiving a permanent modification, even if they recently completed counseling.  See Section 6.7 for more information. |

| | |
|---|---|
| Continued Eligibility | A borrower who has been evaluated for HAMP, but does not meet the minimum eligibility criteria described in Section 1.1, or who meets the minimum eligibility criteria, but is not qualified for HAMP by virtue of a negative NPV test result, excessive forbearance or other financial reason, may request reconsideration for HAMP at a future time if they experience a change in circumstance.<br><br>A servicer's obligation to offer the borrower a modification is considered satisfied, and the borrower is not eligible for a subsequent offer, if either (1) the borrower received a modification and lost good standing (as defined in Section 9.4); (2) for TPPs with effective dates on or after June 1, 2010, the borrower received a TPP offer and failed to make one or more payments by the last day of the month in which it was due; or (3) for TPPs with effective dates prior to June 1, 2010, the borrower received a TPP offer and either (i) failed to make all required payments by the end of the trial period, or (ii) failed to provide all required documents by the end of the trial period. |
| Co-Borrower | An occupying co-borrower may be considered for HAMP if a quitclaim deed evidencing that the non-occupying co-borrower has relinquished all rights to the property has been recorded. Servicers must refer to investor guidance to determine which parties are required to sign the HAMP documents. |
| Non-Occupant Co-Borrower | Income of both a borrower and co-borrower must be used for HAMP evaluation, even if the co-borrower is not an occupant of the property.  Each borrower and co-borrower is eligible for only one HAMP modification even if the co-borrower owns and occupies another property that secures a loan that otherwise would be eligible for HAMP consideration.  If a servicer can discern, from review of the RMA or other income documentation, that a non-occupant co-borrower has a loan on his or her principal residence, the servicer should notify the co-borrower that he or she is only eligible for a HAMP modification on one loan. In the event of a failure of a TPP on a loan where a non-occupant co-borrower's income was used, the co-borrower remains eligible for HAMP consideration on his or her principal residence. |
| Unemployed Borrower | A borrower who is currently receiving unemployment benefits should be evaluated for UP as set forth in Chapter III.<br><br>If a borrower who is eligible for UP declines an offer for an UP forbearance plan, the servicer is not required to offer the borrower a modification under HAMP; however, the servicer may (but is not required to), in accordance with investor guidelines, offer to evaluate the borrower for HAMP. |
| Borrowers in Bankruptcy | Borrowers in active Chapter 7 or Chapter 13 bankruptcy cases are eligible for HAMP at the servicer's discretion in accordance with investor guidelines, but servicers are not required to solicit these borrowers proactively for HAMP. Notwithstanding the foregoing, such borrowers must be considered for HAMP if the borrower, borrower's counsel or bankruptcy trustee submits a request to the servicer.  However, if the borrower is also unemployed, the servicer must evaluate the borrower for UP, subject to any required bankruptcy court approvals, before evaluating the borrower for HAMP. |
| Borrowers Discharged from Chapter 7 Bankruptcy | Borrowers who have received a Chapter 7 bankruptcy discharge in a case involving the first lien mortgage who did not reaffirm the mortgage debt under applicable law are eligible for HAMP. |

| First Lien Home Equity Loans and Lines of Credit | Servicers must consider for modification all first lien home equity loans (HELs) and home equity lines of credit (HELOCs) that meet the basic HAMP eligibility criteria so long as the servicer has the: |
|---|---|
| | • Capability within its servicing system and/or mortgage file to clearly identify the loan as a first lien; and |
| | • Ability to establish an escrow for the loan as required by this Handbook. |
| | Servicers that have servicing systems that do not provide the required functionality are strongly encouraged to complete system enhancements that will allow modification of first lien HELs and HELOCs. |
| | If a servicer utilizes a separate servicing system for first lien mortgage loans other than HELs and HELOCs and would convert the HEL or HELOC to the first lien mortgage system in order to establish an escrow account, then the servicer may wait until the borrower successfully completes the TPP before establishing an escrow account.  However, the servicer is still required to include the escrow amount in the trial period payment. |
| | Any modification of a first lien HELOC must result in a modified loan that is a fixed rate, fully amortizing loan that does not permit the borrower to draw any further amounts from the line of credit. |
| Federally Declared Disaster (FDD) Relief | Borrowers not able to make monthly mortgage payments due to a FDD who are (1) in the process of being evaluated for a TPP; (2) in a TPP; or (3) in a permanent modification should be considered for an FDD forbearance plan in accordance with industry practice and investor guidelines. |
| | Servicers should, in accordance with investor guidelines, offer a minimum of three months of forbearance to a borrower with a loan that is eligible for HAMP who requests forbearance as a result of an FDD and meets the following minimum eligibility criteria: |
| | • The borrower suffered a hardship, such as a loss of employment, reduction in income or increase in expenses, or has been displaced from his or her home and cannot make the monthly mortgage payments as a result of an FDD. |
| | • The location of either (i) the property securing the loan; or (ii) the borrower's principal place of business or employment is located in an area designated by the Federal Emergency Management Agency (FEMA) as being covered by the FDD as set forth at www.fema.gov/news/disasters.fema or as confirmed by the local FEMA office. |
| | Servicers should follow their standard practices with respect to the evaluation of borrowers and documentation of FDD forbearance plans. |
| Loan-to-value (LTV) Ratio | Servicers may not refuse to evaluate an otherwise eligible borrower based on the LTV ratio of the mortgage loan except to the extent it impacts the NPV evaluation or the principal forbearance limit described in Section 6.6. |
| Failure to file Tax Return | A borrower is eligible for HAMP even if the borrower did not file a tax return, as long as the borrower documents the reason for not filing. The servicer must review and approve the borrower's rationale.  A borrower is not eligible for HAMP if the borrower was required to file a tax return but failed to do so. |

## 2 Communication and Borrower Notices

### 2.1 Servicer Requirements

All servicer communications must provide the borrower with clear written information designed to help the borrower understand the modification process in accordance with this Handbook.

**Toll Free Phone Number –** Servicers must provide a toll-free telephone number where the borrower can reach a representative of the servicer capable of providing specific details about the HAMP modification process.  The hours of operation for the toll-free telephone number must be listed.

**Adequate Facilities –** Servicers must have adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

**Cooperation with Authorized Advisors –** Servicers must, subject to receipt of written authorization from the borrower, accept information and other required verification documents submitted by state HFAs with respect to HHF, or a trusted advisor (e.g., HUD-approved housing counseling agencies, non-profit consumer advocacy organizations, legal guardians, powers of attorney or legal counsel) on behalf of a borrower and should use that information to determine HAMP eligibility. Servicers may use written authorization previously received from the borrower or written authorization provided contemporaneously with the submission of the RMA.

A model written authorization form is available on www.HMPadmin.com . When provided by or on behalf of a borrower, this model authorization, subject to applicable law, must be accepted by servicers in lieu of any servicer-specific form(s). Servicers are encouraged to continue to accept other counseling agency, non-profit organization, legal services or other proprietary authorization forms that are substantially similar in content to the model authorization (provided such form complies with any applicable federal, state, or local privacy law, rule or regulation). The authorization must be completed and executed by the borrower and, if applicable, the co-borrower. Servicers may refuse to accept an authorization because it is not signed by all borrowers on the related note.

The borrower is also considered to have provided written authorization if a copy of a power of attorney, order of guardianship, or other legal papers authorizing a third party to act on behalf of the borrower are provided.  Written authorization may be supplanted by the legal documents authorizing a third party to act more generally on behalf of the borrower in cases of disability or borrowers unavailable due to active duty military service.

At their discretion, servicers may pledge any portion of the upfront servicer incentive that is earned in conjunction with a completed HAMP modification to compensate trusted advisors acting on behalf of a borrower, provided that there is no fee charged to the borrower.

**Response to Borrower Inquiries –** Servicers must have written procedures and personnel in place to provide timely and appropriate responses to borrower inquiries and complaints in connection with HAMP within the timelines specified in this Handbook.  These procedures must include a process through which borrowers may escalate disagreements to a supervisory level, where a separate review of the borrower's eligibility or qualification can be performed.

**Electronic Mail –** Electronic mail may only be sent to an e-mail address provided by the borrower when the borrower has agreed to receive communications electronically.  Such e-mail address must be documented in the servicing system and/or mortgage file.

## 2.2 Borrower Solicitation

Each servicer must have clear and comprehensive internal written policies for identification and solicitation of borrowers who are potentially eligible for HAMP based on information in the servicer's possession. These procedures should follow investor guidelines and comply with all contractual restrictions.

Servicers must pre-screen all first lien mortgage loans where two or more payments are due and unpaid to determine if they meet the following basic criteria for consideration under HAMP:

- One-to-four unit residential property,
- Occupied by the borrower as his or her principal residence,
- Not vacant or condemned,
- Loan originated on or before January 1, 2009,
- UPB does not exceed HAMP limits, and
- Not previously modified under HAMP.

Servicers must proactively solicit for HAMP any borrower whose loan passes this pre-screen, unless the servicer has documented that the investor is not willing to participate in HAMP pursuant to the requirements outlined in Section 1.3 of Chapter I.

Solicitation must include written communication clearly describing HAMP.  Use of the form of solicitation letter available on www.HMPadmin.com shall satisfy this requirement. The servicer's HAMP solicitation may also identify other options potentially available to help the borrower cure the delinquency and retain homeownership.

### 2.2.1 Reasonable Effort

A servicer is deemed to have made a "Reasonable Effort" to solicit a borrower if over a period of at least 30 calendar days:

- The servicer made a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; and

- The servicer sent two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.

For borrowers who received a Chapter 7 bankruptcy discharge in a case involving the first lien mortgage who did not reaffirm their first lien mortgage debt, a servicer is deemed to have made a Reasonable Effort to solicit the borrower after sending two written notices to the last address of record in addition to the two required written notices described above. The servicer is not required to make the four telephone calls described above.

Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

- Advise borrowers that they may be eligible for HAMP;

- Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;

- Provide a toll-free telephone number through which the borrower can reach a servicer representative; and

- Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 calendar days prior to a scheduled foreclosure sale date.

All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, re-solicitation of the borrower is not required.

## 2.2.2 Right Party Contact

Successful efforts by a servicer to communicate with the borrower or co-borrower about resolution of the delinquency are termed "Right Party Contact" for purposes of this Handbook.   If Right Party Contact is established and the borrower expresses an interest in HAMP, the servicer must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.  The communication should:

- Describe the income evidence required to be evaluated for HAMP;

- Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit);

- Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary); and

- Include the form of the Dodd-Frank Certification.

The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the servicer must continue to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

If Right Party Contact is established, but the borrower does not submit an Initial Package, the servicer must resend the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer must comply with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers must acknowledge receipt of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

### 2.2.3 Exception to Notice Requirement

The servicer is not required to send an Initial Package if, as a result of discussions with the borrower or based on information in the servicer's possession, the servicer determines that the borrower does not meet the basic eligibility criteria for HAMP as described in Section 1.1 or the servicer estimated monthly mortgage obligation (including principal, interest, taxes, insurance and, when applicable, association fees) is less than 26 percent of the borrower's gross monthly income. Such decision must be documented in the applicable servicing file.

## 2.3 Borrower Notices

A servicer must send a Borrower Notice to every borrower that has been evaluated for HAMP, but is not offered a TPP, is not offered a permanent modification or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation. A borrower has been "evaluated" for HAMP using verified information on or after June 1, 2010 if the borrower has submitted an Initial Package to the servicer.

A borrower has been "evaluated" for HAMP using stated information prior to June 1, 2010 if:

- A written request is submitted (either hardcopy or electronic submission) for consideration for a modification that includes, at a minimum, current borrower income and a reason for default or explanation of hardship, as applicable; or

- A verbal request provided sufficient financial and other data to allow the servicer to complete an NPV analysis; or

- A TPP has been offered.

### 2.3.1 Content of Borrower Notices

The content of the Borrower Notices will vary depending on the information intended to be conveyed or the determination made by the servicer. All Borrower Notices must be written in clear, non-technical language, with acronyms and industry terms such as NPV explained in a manner that is easily understandable.

If a borrower or an authorized representative submits a written request related to principal reduction, the servicer must, within 30 calendar days of receipt of the request, respond in writing. The response, when applicable, must include the reason(s) that principal reduction was not offered to the borrower.

The model clauses for borrower notices that are set forth in Exhibit A provide sample language that may be used to communicate the status of a borrower's request for a HAMP modification. The model clauses relate to the Not Approved/Not Accepted reason codes set forth in the HAMP Additional Data Requirements Data Dictionary available on www.HMPadmin.com. Use of the model clauses is optional; however, they illustrate a level of specificity that is deemed to be in compliance with language requirements of this Handbook.

All Borrower Notices must include the following detail:

- A toll-free number that allows the borrowers to reach a representative of the servicer capable of providing specific details about the contents of the Borrower Notice and reasons for a non-approval determination.

- The Homeowners HOPE™ Hotline Number (888-995-HOPE), with an explanation that the borrower can seek assistance at no charge from HUD-approved housing counselors

and can request assistance in understanding the Borrower Notice by asking for MHA Help.

- Any information, disclosures or notices required by the borrower's mortgage documents and applicable federal, state and local law.

### 2.3.2 Non-Approval Notices

For borrowers not approved for a TPP or permanent HAMP modification, the Non-Approval Notice provides the primary reason(s) for the non-approval. In addition to the information listed in Section 2.3.1, any Non-Approval Notice must also:

- Include a description of other foreclosure alternatives for which the borrower may be eligible, if any, including but not limited to other modification programs, short sale and/or deed in lieu of foreclosure.

- Identify the steps the borrower must take in order to be considered for those options.

- If the servicer has already approved the borrower for a foreclosure alternative program, information necessary to participate in or complete the alternative should be included.

Whenever a non-government foreclosure prevention option is discussed, the notice should be clear that the borrower was considered but is not eligible for HAMP.

The servicer may not conduct a foreclosure sale within the 30 calendar days after the date of a Non-Approval Notice or any longer period required to review supplemental material provided by the borrower in response to a Non-Approval Notice unless the reason for non-approval is (1) ineligible mortgage, (2) ineligible property, (3) offer not accepted by borrower / request withdrawn, or (4) the loan was previously modified under HAMP.

A model clause describing these rights is provided in Exhibit A. Use of the model clause is optional; however, it illustrates the level of specificity that is deemed to be in compliance with the language requirements of this Handbook.

In addition, effective February 1, 2011, if the servicer has performed an NPV evaluation, regardless of whether a negative NPV result was the actual reason for the non-approval of the borrower, the Non-Approval Notice must list the NPV Data Input Fields and Values used in the NPV evaluation as listed in Exhibit A. The purpose of providing this information is to allow a borrower who is ineligible because the transaction is NPV negative the opportunity to correct values that may impact the analysis of the borrower's eligibility. All Non-Approval Notices must include an e-mail address and mailing address for communicating with the servicer if the borrower wishes to dispute the reasons for a non-approval determination and to submit written evidence.  Because the NPV Data Input Fields and Values must be disclosed to a borrower declined for HAMP whenever an NPV evaluation is performed, regardless of whether a negative NPV result was the reason for non-approval, servicers are encouraged to assess all other borrower eligibility criteria before performing an NPV evaluation in order to reduce instances in which NPV Data Input Fields and Values must be disclosed when a negative NPV result is not the reason for non-approval.  In fact, if NPV Data Input Fields and Values are included in a Non-Approval Notice but the reason the for the non-approval was not a negative NPV result, the Non-Approval Notice must include a statement that the borrower is not entitled to dispute the NPV Data Input Fields and Values.

A Non-Approval Notice must be mailed no later than 10 business days following the date of the servicer's determination that a TPP or a permanent HAMP modification will not be offered.

### 2.3.2.1 Non-Approval Notice-Negative NPV Result

When the borrower is not approved for a TPP because the transaction is NPV negative, the borrower will have 30 calendar days from the date of the Non-Approval Notice to submit written evidence to the servicer that one or more of the NPV input values is inaccurate. If the borrower wishes to dispute more than one NPV input, the written evidence for each input being disputed must be provided to the servicer at the same time.  If the borrower identifies material inaccuracies in the NPV input values, the servicer may not conduct a foreclosure sale until the inaccuracies are reconciled.

If the evidence submitted by the borrower is valid and material to the NPV outcome, the servicer must perform the NPV calculation with the corrected input values as set forth in Section 7.7. Following the re-evaluation, the servicer must provide the updated NPV outcome and input values to the borrower.

### 2.3.2.1.1 Dispute of Multiple NPV Data Inputs including the Property Value Input

In the event a borrower disputes the property value input as well as other NPV Data Input Fields and Values, the servicer may elect to validate the other disputed NPV Data Input Fields and Values and perform the NPV re-evaluation changing any other validated inputs while holding the original property value constant.  If this re-evaluation renders a positive NPV result, the servicer may approve the borrower for a TPP without performing an NPV re-evaluation with a new property value or obtaining a new appraisal. If this re-evaluation renders a negative NPV result, the servicer must perform the preliminary NPV re-evaluation with the borrower's estimate of property value.

### 2.3.2.1.2 Insufficient Evidence

If a borrower submits written evidence for some but not all of the NPV inputs that the borrower is disputing, the servicer must notify the borrower promptly that all the necessary written evidence has not been received and that it must be received within the 30 calendar day period provided for borrower disputes of the Non-Approval Notice.  This notification need not be in writing but must be documented in the servicing system and/or mortgage file and be provided promptly and in sufficient time for the borrower to comply with the 30 calendar day requirement. If in the servicer's business judgment the borrower is actively attempting to locate the missing evidence, the servicer may extend the 30 calendar day dispute period to allow the borrower time to send the missing evidence to the servicer.   If the borrower fails to provide the remaining items within the original 30 calendar day period (as extended pursuant to the foregoing sentence, as applicable), the servicer may perform the NPV evaluation with the corrected input values that are supported by the borrower's submitted evidence.

### 2.3.2.1.3 NPV Evaluation Assistance from MHA Help

Prior to disputing a non-approval with the servicer, the borrower may, as directed in the Non-Approval Notice, request assistance from MHA Help to evaluate whether the borrower's disputed NPV inputs would change the NPV outcome from negative to positive. Using the disputed inputs provided by the borrower, MHA Help will conduct a preliminary NPV re-evaluation and will provide the borrower with the printed NPV result, which should be given by the borrower to the servicer when requesting a formal re-evaluation by the servicer. If the borrower is represented by a trusted advisor, that advisor may also request the preliminary NPV re-evaluation from HSC.

A borrower or trusted advisor acting on behalf of a borrower may only request one NPV re-evaluation from MHA Help or HSC prior to contacting the servicer. If the re-evaluation performed by the servicer, MHA Help or HSC using the disputed borrower inputs returns a negative NPV result, the borrower is not eligible for additional appeals of other inputs.

Although the borrower may seek assistance from MHA Help or HSC, the borrower must still make its written request to the servicer within 30 calendar days from the date of the Non-Approval Notice.

### 2.3.2.1.4 Servicer Not Required to Perform NPV Re-Evaluation

The servicer is not required to perform an NPV re-evaluation when a negative NPV result was not the reason for the non-approval, even if the NPV Data Input Fields and Values were included in the Non-Approval Notice.   Furthermore, a servicer is not required to perform an NPV re-evaluation if the servicer, in conjunction with its review of the corrected NPV Data Input Fields and Values, determines that the borrower does not qualify for a TPP on a basis other than a negative NPV result (e.g., if corrected income documentation submitted by the borrower shows that the borrower's current monthly mortgage payment is less than 31 percent of the borrower's monthly gross income).  In such a case, the servicer must send a written communication to the borrower explaining that, after a review of the corrected NPV inputs submitted by the borrower, the borrower continues to be ineligible for HAMP and the reason for the non-approval.  Following receipt of the communication, the borrower is not entitled to an additional 30 calendar day dispute period

### 2.3.2.2 Non-Approval Notice—Payment Default During the Trial Period

This Non-Approval Notice informs the borrower that he or she failed to make one or more trial period payments in a timely manner and, as a result, the borrower has defaulted on the TPP.

### 2.3.2.3 Non-Approval Notice—Loan Paid Off or Reinstated

This Non-Approval Notice confirms that the subject loan was paid off or reinstated and must provide the payoff or reinstatement date.  If the loan was reinstated this notice must include a statement that the borrower may contact the servicer to request reconsideration under HAMP if they experience a subsequent financial hardship.

### 2.3.2.4 Non-Approval Notice—Withdrawal of Request or Non-Acceptance of Offer

This Non-Approval Notice confirms that the borrower either withdrew the request for consideration for a TPP or HAMP modification or did not accept a TPP or a HAMP modification offer. Failure to make the first trial period payment in a timely manner is considered non-acceptance of the TPP.

### 2.3.3 Incomplete Information Notice

If the servicer receives an incomplete Initial Package or needs additional documentation to verify the borrower's eligibility and income, the servicer must send the borrower an Incomplete Information Notice that lists the additional documentation that the servicer requires to verify the borrower's eligibility.  The Incomplete Information Notice must include a specific date by which the documentation must be received, which must be no less than 30 calendar days from the date of the notice.  If the documents are not received by the date specified in the notice, the servicer must make one additional attempt to contact the borrower in writing regarding the incomplete documents.  This additional notice must include the specific date by which the documentation must be received, which must be no less than 15 calendar days from the date of the second notice.  If a borrower is unresponsive to these requests for documentation the servicer may discontinue document collection efforts and determine the borrower to be ineligible for HAMP. In such an instance, the servicer must send the borrower a Non-Approval Notice.

Notwithstanding the foregoing, if a borrower submits an incomplete Initial Package and the servicer can, based on the information and documentation submitted, determine that the borrower is not eligible for HAMP, then the servicer may issue a Non-Approval Notice to the borrower reflecting the reasons for non-approval, without requesting documents to complete the Initial Package.

### 2.3.4 Disputed Property Value Input

When a borrower is not approved for a TPP or permanent modification because the transaction is NPV negative and the borrower believes that the property value input used by the servicer in the NPV evaluation differs from the fair market value of the property as of the NPV Date, the borrower may request an NPV re-evaluation. The borrower must, within 30 calendar days from the date of the Non-Approval Notice, provide the servicer with a recent estimate of the property value and a reasonable basis for that estimate at the same time that the borrower provides evidence of all other disputed NPV value inputs. Upon receipt of the written request, the servicer must perform a preliminary NPV re-evaluation using the borrower's estimate of property value (along with any other material disputed inputs).  As long as the borrower provides any publicly available evidence supporting the borrower's estimate of property value (e.g., sales prices from newspaper for sales of comparable homes, estimates from internet valuation sources, etc.), the servicer must utilize the borrower's evidence and perform the preliminary NPV re-evaluation required, notwithstanding the servicer's disagreement with the borrower's estimate.

If the preliminary re-evaluation performed by the servicer (or MHA Help or HSC as noted above) produces a positive NPV result, the servicer must offer the borrower the opportunity to request an appraisal of the property; provided, however, if the servicer is willing to accept as accurate the borrower's estimate of the property value based on the borrower's submitted evidence, the servicer, subject to investor guidelines, is not required to offer the borrower the opportunity to obtain an appraisal. If an appraisal is obtained, the appraisal will establish the fair market value of the property as of the NPV Date and will be utilized to complete the final NPV re-evaluation.  The borrower must, no later than 15 calendar days from the date of notification that the preliminary NPV result is positive, remit a $200 deposit against the full cost of the appraisal in a manner acceptable to the servicer. The balance of the actual appraisal cost will be added to the borrower's total arrearage under the loan.  If capitalization of the appraisal cost is prohibited by investor guidelines or applicable law, the servicer is permitted to collect the costs from the borrower in equal installments over a period of no less than 24 months and no greater than 60 months in addition to the borrower's modified monthly mortgage payment.  Servicers must maintain evidence of the prohibition in the servicing system and/or mortgage file and provide it to HSC or MHA Help as necessary to resolve any Escalated Case.

The appraisal must be completed in accordance with the Uniform Standards of Professional Appraisal Practice by an appraiser that is not affiliated with the servicer and is licensed in the state where the property is located.

Servicers are not required to obtain a new appraisal if the original NPV property value input was established by an appraisal performed in accordance with the standards listed above. The servicer must provide a copy of such appraisal to the borrower.

Upon receipt of the appraisal, the servicer must perform a final NPV re-evaluation using the appraised value and any other NPV input values materially disputed by the borrower. The servicer must provide the final NPV outcome and input values to the borrower and, based on the NPV outcome, proceed in accordance with program guidelines. If the re-evaluation with the new appraised value results in a trial period plan, the balance of the actual appraisal cost will be capitalized in conjunction with the permanent modification.

### 2.3.5 Borrower NPV Calculator

Treasury is in the process of developing a web-based Borrower NPV Calculator to implement the requirements of Section 1482(b) of the Dodd-Frank Act. The Borrower NPV Calculator will allow borrowers to learn about, interact with and better understand the purpose and role of the NPV model in HAMP. The Borrower NPV Calculator will be able to be used by borrowers to evaluate their potential eligibility for HAMP. In addition, the Borrower NPV Calculator will allow borrowers to enter the NPV input values used by the servicer and provided in the Non-Approval Notice to review the servicer's NPV evaluation. These inputs are set forth in the NPV Input Data Fields and

Values chart set forth in Exhibit A. However, because a borrower using the Borrower NPV Calculator may not use exactly the same data used by the servicer, the Borrower NPV Calculator will only provide an estimated outcome.

# 3 Protections Against Unnecessary Foreclosure

## 3.1 Suspension of a Referral to Foreclosure

### 3.1.1 Certain Circumstances

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:

- The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

- The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or

- The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests; or

- The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or

- The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file; or

- The servicer has resolved the Escalated Case in accordance with Section 3.3 of Chapter I.

### 3.1.2 FDD Forbearance Plan

A servicer may not refer a loan to foreclosure or conduct a scheduled foreclosure sale in the following circumstances:

- If the borrower requested consideration and is being evaluated for an FDD forbearance plan; or

- During an initial FDD forbearance plan or any extension thereof.

## 3.2 Suspension of Foreclosure Proceedings in Process

With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

The servicer will not be in violation of this section to the extent that:  (a) a court with jurisdiction over the foreclosure proceeding (if any), or the bankruptcy court in a bankruptcy case, or the public official charged with carrying out the activity or event, fails or refuses to halt some or all activities or events in the matter after the servicer has made reasonable efforts to move the court

or request the public official for a cessation of the activity or event; (b) the servicer must take some action to protect the interests of the owner, investor, guarantor or servicer of the loan in response to action taken by the borrower or other parties in the foreclosure process; or (c) there is not sufficient time following the borrower's acceptance of the TPP for the servicer to halt the activity or event, provided that in no event shall the servicer permit a sale to go forward.  The servicer must document in the servicing file if any of the foregoing exceptions to the requirement to halt an existing foreclosure sale is applicable.

## 3.3 Suspension of Scheduled Foreclosure Sale

When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to evaluate the borrower for HAMP. Servicers are not required to suspend a foreclosure sale when: (1) a request for HAMP consideration is received after the Deadline; (2) a borrower received a permanent modification and lost good standing (as described in Section 9.4); (3) a borrower received a TPP offer and failed to make one or more payments under the TPP by the last day of the month in which it was due; or (4) a borrower was evaluated based upon an Initial Package and determined to be ineligible under HAMP requirements.

The servicer will not be in violation of this section to the extent that a court with jurisdiction over the foreclosure proceeding (if any), or the bankruptcy court in a bankruptcy case, or the public official charged with carrying out the activity or event, fails or refuses to halt the sale after the servicer has made reasonable efforts to move the court or request the public official for a cessation of the sale.  The servicer must document in the servicing system and/or mortgage file if the foregoing exception to the requirement to suspend an existing foreclosure sale is applicable.

A borrower is deemed to have requested consideration for HAMP when an Initial Package is received by the servicer or its foreclosure attorney/trustee prior to the Deadline.  However, the servicer may establish additional requirements for requests received later than 30 calendar days prior to a scheduled foreclosure sale date, including, for example, a requirement that the Initial Package be delivered through certified/express delivery mail with return receipt/delivery confirmation to either the servicer or the foreclosure attorney/foreclosure trustee. These requirements must be posted on the servicer's Website and communicated to the borrower in writing in accordance with Section 2.2 or through other written communication.

If the borrower contacts the servicer prior to the Deadline, the servicer must inform the borrower of the Deadline and any document submission requirements.

## 3.4 Mitigating Foreclosure Impact

The servicer must take the following actions to mitigate foreclosure impact:

### 3.4.1 Simultaneous Trial Period Plan and Foreclosure Explanation

When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a TPP.  For model language for this notification, refer to Exhibit B.  Use of the model language is optional; however, it illustrates the level of specificity that is deemed to be in compliance with the language requirements of this Handbook.

### 3.4.2 Foreclosure Attorney/Trustee Communication

Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is subject to Section 2.2), and whether the borrower is being evaluated for, or is currently in, a TPP.  Servicers must ensure that their foreclosure attorney/trustee adheres to all of the requirements of Section 3.1, Section 3.2 and Section 3.3 with respect to referral to foreclosure, stay of foreclosure actions and suspension of foreclosure sales.

### 3.4.3 Certification Prior to Foreclosure Sale

Servicers must develop and implement written procedures applicable to all loans that are potentially eligible for HAMP (and are subject to Section 2.2) that require the servicer to provide to the foreclosure attorney/trustee a written certification that (i) one of the circumstances under Section 3.1 exists, and (ii) all other available loss mitigation alternatives have been exhausted and a non-foreclosure outcome could not be reached.  This certification must be provided no sooner than seven business days prior to the scheduled foreclosure sale date (the Deadline) or any extension thereof.

# 4 Request for Modification

For all TPPs with effective dates on or after June 1, 2010, a servicer may evaluate a borrower for HAMP only after the servicer receives the following documents, subsequently referred to as the "Initial Package".  Throughout this Handbook, unless otherwise indicated, all references to the "borrower" include any and all co-borrowers.  The Initial Package includes:

- RMA Form,
- IRS Form 4506-T or 4506T-EZ,
- Evidence of income, and
- Dodd-Frank Certification.

For all documents required by Treasury (other than for IRS Form 4506-T/4506T-EZ), electronic submission and signatures are acceptable.

## 4.1 Request for Modification and Affidavit (RMA) Form

The RMA provides the servicer with borrower financial information, including the cause of the borrower's hardship.  The financial information and hardship sections of the RMA must be completed and executed by the borrower and, if applicable, any co-borrower.  The RMA is available on www.HMPadmin.com.

Servicers may require use of the RMA by all borrowers requesting consideration for HAMP or may use other proprietary financial information forms that are substantially similar in content to the RMA.  When provided by or on behalf of the borrower, the RMA form must be accepted by servicers in lieu of any servicer-specific form(s).  When the RMA is not used, servicers must obtain an executed MHA Hardship Affidavit, which is available on www.HMPadmin.com. Servicers may also incorporate all of the information on this standalone affidavit into their proprietary form.  Throughout this Handbook, the term RMA is used to indicate both the HAMP RMA form and servicer proprietary forms substituted for the RMA.

### 4.1.1 Hardship Affidavit

Included in the RMA is a Hardship Affidavit.  Every borrower seeking a modification, regardless of delinquency status must sign a Hardship Affidavit that attests that the borrower is unable to continue making full mortgage payments and describes one or more of the following types of hardship:

- A reduction in or loss of income that was supporting the mortgage;

- A change in household financial circumstances;

- A recent or upcoming increase in the monthly mortgage payment;

- An increase in other expenses;

- A lack of sufficient cash reserves to maintain payment on the mortgage and cover basic living expenses at the same time.  Cash reserves include assets such as cash, savings, money market funds, marketable stocks or bonds excluding retirement accounts and assets that serve as an emergency fund. Reserves are generally considered to be equal to three times the borrower's monthly debt payments.

- Excessive monthly debt payments and overextension with creditors, e.g., the borrower was required to use credit cards, a home equity loan, or other credit to make the mortgage payment;

- Other reasons for hardship detailed by the borrower.

The borrower is not required to have the Hardship Affidavit notarized.

HAMP does not distinguish between short-term and long-term hardships for eligibility purposes.

### 4.1.2 Government Monitoring Data (GMD)

In addition to financial information, the RMA (or Hardship Affidavit if the RMA form is not used) solicits data related to the race, ethnicity and sex of the borrower and co-borrower, referred to as Government Monitoring Data (GMD).

Treasury has directed the Program Administrator to enter into agreements on behalf of the Department of Housing and Urban Development (HUD) with loan servicers participating in HAMP for the purpose of directing servicers to request GMD in order to monitor compliance with the Fair Housing Act, 42 U.S.C. 3601 et seq., and other applicable fair lending and consumer protection laws.  HUD has informed Treasury that it is requesting the monitoring information pursuant to this authority and its general regulatory authority under the Fair Housing Act.  HUD and Treasury consider any agreements entered into between servicers and the Program Administrator on behalf of HUD to be agreements entered into with an enforcement agency to monitor or enforce compliance with federal law, within the meaning of 12 C.F.R. 202.5(a)(2).

Federal Reserve Board regulations interpreting ECOA permit creditors to collect information on the race, ethnicity and sex of borrowers if the information is "required by a regulation, order, or agreement issued by, or entered into with a court or an enforcement agency (including the Attorney General of the United States or a similar state official) to monitor or enforce compliance with [ECOA], this regulation, or other federal or state statutes or regulations." 12 C.F.R. 202.5(a)(2).

This Handbook (a) constitutes an agreement entered into between the Program Administrator, on behalf of HUD, and servicers participating in HAMP with respect to Non-GSE Mortgages; and (b) is an agreement entered into by participating servicers with an enforcement agency (HUD) to permit the enforcement agency to monitor or enforce compliance with federal law, within the meaning of 12 C.F.R. 202.5(a)(2).

Treasury has specified that GMD shall be collected on the RMA or Hardship Affidavit.  Servicers shall request, but not require, that each borrower who completes the RMA or Hardship Affidavit in connection with HAMP furnish GMD.

Servicers are required to report GMD to the Program Administrator as part of the additional data reporting requirements set forth in Section 11.4.

### 4.1.2.1 Collection of GMD

Servicers should ensure that their servicing staff and managers understand the importance of requesting that borrowers being evaluated for HAMP provide GMD and should provide servicing staff with scripts and other job aids that help them explain to borrowers the importance of providing this information.

When a borrower completes the RMA or Hardship Affidavit by mail or over the Internet, the borrower will be able to read the disclosure contained just beneath the Information for Government Monitoring Purposes section heading, determine whether he or she wishes to furnish the GMD, and complete the remainder of the Information for Government Monitoring Purposes section accordingly.

In a face-to-face interview or over the phone, the servicer should first read to the borrower the disclosure contained just beneath the Information for Government Monitoring Purposes section heading of the RMA or the Hardship Affidavit, explaining that the federal government requests this monitoring information in order to monitor compliance with federal statutes that prohibit lenders from discriminating against borrowers based on the borrower characteristics collected in GMD.  After reading the disclosure to the borrower, the servicer should ask the borrower whether he or she desires to furnish the information.  If the borrower elects to furnish GMD, the servicer should read the race, ethnicity and sex categories and options from the Information for Government Monitoring Purposes section, and check the boxes as directed by the borrower.

Written GMD takes precedence over verbal GMD regardless of the date obtained.  In addition, if the borrower has previously provided verbal GMD, but returns the RMA or Hardship Affidavit and the borrower specifically checks the box that states he or she does not wish to furnish GMD, the RMA or Hardship Affidavit will supersede the previously provided data.  However, if the borrower fails to provide GMD and does not check the box, the servicer should use the information provided verbally.

### 4.1.2.2 Borrower Declines to Provide GMD

If a borrower chooses not to provide GMD, or any part of it, the servicer may not refuse to accept an RMA or Hardship Affidavit. If the borrower completes the RMA or Hardship Affidavit in a face-to-face setting and chooses not to furnish the GMD, he or she should check or direct the servicer to check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the RMA or Hardship Affidavit. If the borrower chooses not to check the box, the servicer should note this fact on the form.

If the borrower completes the RMA or Hardship Affidavit by mail or over the Internet and chooses not to furnish the data, he or she should check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the RMA or Hardship Affidavit.  If the borrower chooses not to furnish the data or checks the box, the servicer should indicate in the appropriate spaces within the Information for Government Monitoring Purposes section that the RMA or Hardship Affidavit was received by mail, telephone, or Internet and note the fact that the borrower chose not to furnish the GMD.

### 4.1.2.3 GMD from Observation or Origination

If a borrower declines to provide GMD, the servicer should attempt to provide the information based on visual observation, information learned from the borrower or surname.  The servicer must note on the form that the information is based on servicer observations.  Servicing staff

should be provided with training and job aids (e.g., desk references, scripts and, where feasible, system prompts) to supply this information based on visual observation or surname.

Alternately, if the servicer has reasonable access to GMD supplied by the borrower at origination and the borrower(s) remain the same, the servicer is required to provide that information.

## 4.2 IRS Form 4506-T or 4506T-EZ

All borrowers must provide a signed and completed IRS Form 4506-T or 4506T-EZ (Request for Transcript of Tax Return) with the Initial Package.  Although either form is acceptable, use of the IRS Form 4506T-EZ is encouraged because of its relative simplicity.  Both forms are posted on www.HMPadmin.com.   Borrowers can locate and complete a version of IRS Form 4506T-EZ in either English or Spanish on www.MakingHomeAffordable.gov.

The servicer must submit the borrower's Form to the IRS for processing unless the borrower provides a signed copy of his or her most recent federal income tax return, including all schedules and forms.

## 4.3 Evidence of Income

The Initial Package must also include documentation to verify the borrower's income as described in Section 5.1.  The income documentation may not be more than 90 days old as of the date the documentation is received by the servicer.  There is no requirement to refresh the income documentation during the TPP.

## 4.4 Reasonably Foreseeable or Imminent Default

A borrower that is current or has only one payment due and unpaid by the end of the month in which it is due and who contacts the servicer to request HAMP consideration must be evaluated to determine if he or she is at risk of imminent default.  Each servicer must have written standards for determining imminent default that are consistent with applicable contractual agreements and accounting standards and must apply the standards equally to all borrowers.

When making an imminent default determination, the servicer must evaluate the borrower's hardship as well as the condition of and circumstances affecting the property securing the mortgage loan.  The servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc.  The hardship and financial condition of the borrower must be verified through documentation.

A servicer must document in its servicing system and/or mortgage file the basis for its determination that a payment default is imminent and retain all documentation used to reach this conclusion.

## 4.5 Acknowledgment of Initial Package

Within 10 business days following receipt of an Initial Package, the servicer must acknowledge in writing the borrower's request for HAMP participation by sending the borrower confirmation that the Initial Package was received and a description of the servicer's evaluation process and timeline. If the Initial Package is received from the borrower via e-mail, the servicer may e-mail the acknowledgment.  Servicers must maintain evidence of the date of receipt of the borrower's Initial Package in its records.

A single written communication sent within 10 business days of receipt of a borrower's request for HAMP participation may also include, at the servicer's discretion, the results of its review of the Initial Package.

### 4.6 Review of Initial Package

Within 30 calendar days from the date an Initial Package is received, the servicer must review the documentation provided by the borrower for completeness. If the documentation is incomplete or insufficient for use in underwriting, the servicer must send the borrower an Incomplete Information Notice in accordance with the guidance set forth in Section 2.3.3.

If the borrower's documentation is complete, the servicer must evaluate the borrower's eligibility for HAMP and either:

- Send the borrower a TPP Notice (see Section 8.1); or

- Make a determination that the borrower is not eligible for HAMP and communicate this determination to the borrower in accordance with the guidance in Section 2.3.2.

## 5 Verification

Servicers must develop and adhere to a written policy and procedures (Verification Policy) that describe the basis on which the servicer will determine a borrower's monthly gross income (or, in the case of co-borrowers, the combined monthly gross income). The Verification Policy must:

- Be compliant with the requirements set forth in this Handbook;

- Reflect the business judgment employed by the servicer when modifying loans held in its own portfolio;

- Be consistent with investor guidelines, when applicable; and

- Contain a level of detail similar to the underwriting guidelines published by Freddie Mac and Fannie Mae.

The Verification Policy must include use of an income calculation worksheet that demonstrates the analysis, assumptions and calculations used by the servicer to determine monthly gross income. The completed worksheet, which may be electronic or in hard copy, must be retained in the servicing system and/or mortgage file and made available to MHA-C upon request. A form of an income calculation worksheet is available on www.HMPadmin.com. Use of this form by servicers is optional; however, any alternative form used by the servicer must include a similar level of detail.

Prior to offering a TPP or sending a Non-Approval Notice to the borrower, servicers must verify a borrower's eligibility for HAMP using the documentation provided in the Initial Package and any other supplemental information provided by the borrower in a timely manner.

In the event a borrower fails a TPP for non-payment of the trial period payment, the servicer must, prior to issuing a Non-Approval Notice in accordance with Section 2.3.2.2, re-calculate the borrower's income to ensure that the trial period payment was accurately determined based on the income information originally provided by the borrower. This re-calculation of income must be conducted by an employee not involved in the original income calculation. No new income information or verification should be included in the re-calculation.

If, as a result of the re-calculation, the servicer determines that the borrower's trial period payment exceeded by 10 percent or more the correct trial period payment, the servicer must cancel the initial TPP using the cancellation code number 8 "Offer Not Accepted by Borrower / Request Withdrawn" and offer the borrower a new TPP with the correct trial period payment. The new written TPP Notice must include an explanation that the borrower is able to re-start the TPP with a lower trial period payment based on a re-calculation of income. Should the borrower fail to

remit the new trial period payment on or before the first trial period payment due date, the servicer must follow the guidelines set forth in Section 8.3. If as a result of the re-calculation the servicer determines that the borrower's trial period payment did not exceed by 10 percent or more the correct trial period payment, the servicer must cancel the TPP in accordance with Section 2.3.2.

Servicers are not required to complete the income re-calculation when the borrower's failure to make timely trial period payments was the result of a significant change in the borrower's circumstances resulting in a reduction of income (e.g., unemployment, divorce). Servicers must retain evidence in the servicing file documenting these changed circumstances. Such evidence may include statements made by the borrower as documented in the servicing notes.

When applicable, servicers must complete the re-calculation within 30 calendar days of the trial period payment default. Until the servicer completes the re-calculation, the servicer shall not report the TPP default in the HAMP Reporting Tool.

## 5.1 Evidence of Income

Servicers must request that the borrower provide the income verification documentation listed below but may, if consistent with investor guidelines and the servicer's Verification Policy, substitute other reliable forms of verification when appropriate. However, servicers may not require verification documentation in addition to the documentation listed below unless the servicer determines that additional documentation is necessary to resolve discrepancies between the RMA, tax documents and income documentation.  Servicers are responsible for determining that any information provided by the borrower that is needed to evaluate the borrower's eligibility for HAMP is complete and accurate.

The servicer's Verification Policy should describe:

- Under what circumstances additional documentation will be required;

- How the servicer will reconcile discrepancies between the RMA, tax documents and income documentation;

- How the servicer will calculate non-traditional income scenarios such as underemployment, recent employment, overtime, seasonal or sporadic income; and

- Circumstances under which servicing personnel may exercise business judgment in calculating the borrower income, and how and where the business judgment is to be documented for the borrower's account.

When verifying a borrower's income and evaluating a borrower's eligibility for HAMP, servicers should use good business judgment consistent with the judgment employed when modifying mortgage loans held in their own portfolio.

### 5.1.1 Wage or Salary Income

Each wage earning borrower must provide copies of two recent pay stubs, not more than 90 calendar days old at time of submission, indicating year-to-date earnings.

A servicer may accept pay stubs that are not consecutive if, in the business judgment of the servicer, it is evident that the borrower's income has been accurately established.  A servicer may also accept pay stubs that do not show year-to-date income, if, in its business judgment, and based on all other documentation, the pay stubs indicate the borrower's recurring monthly income.

When two pay stubs indicate different periodic income, servicers may use year-to-date earnings to determine the average periodic income, and account for any non-periodic income reflected in either of the pay stubs.

The Verification Policy should describe how the servicer will:

- Calculate income based on the frequency of payments;

- Make adjustments when it is likely that sources of additional income (bonus, commissions, etc.) are not likely to continue; and

- Utilize alternative forms of income documentation (IRS Forms 1099, 1040, W-2, and IRS tax transcripts or letters from employers) when pay stubs are not available or sufficient or do not show year-to-date income.

### 5.1.2 Self-Employment Income

Each self-employed borrower must provide his or her most recent quarterly or year-to-date profit and loss statement. Audited financial statements are not required.

When calculating gross income for self-employed borrowers, a servicer must include the borrower's net profit plus any salary or draw amounts that were paid to the borrower in addition to making allowable adjustments used in analyzing the tax returns for the business, if applicable, to decrease gross income (*e.g.* nonrecurring income) or to increase gross income (*e.g.* expenses, depreciation and depletion).

If consistent with the Verification Policy, servicers may require up to four consecutive months of bank statements as an alternative to obtaining a profit and loss statement or if, following receipt, it is determined that the information in the profit and loss statement is insufficient.

### 5.1.3 Other Earned Income

Other earned income includes, but is not limited to, bonus, commission, fee, housing allowance, tips and overtime. Borrowers with other earned income must provide reliable third party documentation describing the nature of the income (e.g., an employment contract or printouts documenting tip income). Educational grant funds that are intended for a specific learning purpose are not a source of income for the purposes of HAMP. The servicer's Verification Policy must describe whether and how the servicer will discount or not consider other earned income when such income is not likely to continue.

### 5.1.4 Benefit Income

Benefit income includes, but is not limited to, social security, disability, survivor benefits, pension, public assistance and adoption assistance. Government benefits granted under the Supplemental Nutrition Assistance Program (i.e., food stamps) are considered to be a source of income for the purposes of HAMP because, like other income, they are used by the borrower to cover reasonable monthly living expenses.

Borrowers who receive benefit income must provide evidence of (i) the amount and frequency of the benefits such as letters, exhibits, a disability policy or benefits statement from the provider, and (ii) receipt of payment, such as copies of the two most recent bank statements or deposit advices showing deposit amounts. If a benefits statement is not available, servicers may rely only on receipt of payment evidence, if it is clear that the borrower's entitlement is ongoing.

### 5.1.5 Unemployment Benefits

Borrowers who receive unemployment benefits and request assistance under HAMP must be evaluated for and, if eligible, offered an UP forbearance plan before the borrower may be considered for HAMP. See Chapter III, Home Affordable Unemployment Program. See also Section 5.1.10 (excluding unemployment benefits from gross income calculations under HAMP).

### 5.1.6 Rental Income

Borrowers who receive rental income must provide evidence of that income, which is generally documented on IRS Schedule E (Supplemental Income and Loss) of the borrower's tax return for the most recent tax year.

When Schedule E is not available to document rental income because the property was not previously rented, servicers may accept a current lease agreement and bank statements or cancelled rent checks.

If the borrower is using income from the rental of a portion of the borrower's principal residence, the income may be calculated at 75 percent of the monthly gross rental income, with the remaining 25 percent considered vacancy loss and maintenance expense.

If the borrower is using rental income from properties other than the borrower's principal residence, the income to be calculated for HAMP purposes should be 75 percent of the monthly gross rental income, reduced by the monthly debt service on the property (i.e., principal, interest, taxes, insurance, including mortgage insurance, and association fees), if applicable.

Rental income should not be included in a borrower's monthly gross income if there is currently no income due to vacancy (even if rental income was identified in their tax return or tax transcript).   The servicer must reconcile any differences between what the borrower communicates and the borrower's information.  For example, the servicer might choose to perform a property inspection of the rental property.

### 5.1.7 Alimony, Separation Maintenance, and Child Support Income

Servicers may not require borrowers to use alimony, separation maintenance or child support income to qualify for HAMP. However, if the borrower chooses to provide this income, it must be documented with (i) copies of the divorce decree, separation agreement or other legal written agreement filed with a court, or a court decree that provides for the payment of alimony or child support and states the amount of the award and the period of time over which it will be received, and (ii) evidence of receipt of payment, such as copies of the two most recent bank statements or deposit advices showing deposit amounts.  If the borrower voluntarily provides such income, and that income renders the borrower ineligible for a HAMP offer, the servicer is allowed to remove that income from consideration and re-evaluate the borrower for HAMP eligibility.

### 5.1.8 Threshold for Documenting Passive and Non-Wage Income

Notwithstanding the other provisions of this Section 5.1, passive and non-wage income (including rental, part-time employment, bonus/tip, investment and benefit income) does not have to be documented if it constitutes less than 20 percent of the borrower's total gross income.  Servicers must identify the specific sources and amount of a borrower's passive or non-wage income and may not assume that a portion of the borrower's income is passive. Servicers must obtain income documentation to verify passive or non-wage income when it equals or exceeds 20 percent of the borrower's total gross income.

### 5.1.9 Non-Borrower Household Income

A non-borrower is someone who is not on the original note (and may or may not be on the original security instrument), but whose income has been relied upon to support the mortgage

payment.  Non-borrower household income that may be considered for HAMP qualification must come from someone who resides in the residence.  Examples include a non-borrower spouse, parent, child or a non-relative, but in each case, a person who shares in the occupancy of the home and provides some support for the household expenses.

Servicers should include non-borrower household income in monthly gross income if it is voluntarily provided by the borrower and if, in the servicer's business judgment, that the income reasonably can continue to be relied upon to support the mortgage payment.  Non-borrower household income included in the monthly gross income must be documented and verified by the servicer using the same standards for verifying a borrower's income.  If income is being used for a non-borrower, the servicer should use only the income that the non-borrower will contribute to the mortgage.  The servicer must verify the occupancy of a non-borrower in the same manner it verifies the occupancy of a borrower under Section 5.3 after obtaining written authorization from the non-borrower to obtain the non-borrower's credit report.

### 5.1.10 Excluded Income

The servicer must not consider the following items when verifying the borrower's income:

- Income tax refunds;

- Non-borrower non-household income;

- Grants, including mortgage assistance payments;

- Severance payments; and

- Unemployment benefits.

## 5.2 Borrowers in Active Bankruptcy-Substitution of Evaluation Documents

When a borrower is in an active Chapter 7 or Chapter 13 bankruptcy, the servicer may accept copies of the bankruptcy schedules and tax returns (if returns are required to be filed) in lieu of the RMA and Form 4506T-EZ, and may use this information to determine borrower eligibility (with the income documentation). Servicers should request the schedules and tax returns from the borrower, borrower's counsel or bankruptcy court. If the bankruptcy schedules are greater than 90 days old as of the date that such schedules are received by the servicer, the borrower must provide updated evidence of income to determine HAMP eligibility. Additionally, either directly or through counsel, borrowers must provide a completed and executed Hardship Affidavit (or RMA).

## 5.3 Occupancy Verification

The servicer must obtain a credit report for each borrower or a joint report for a married couple who are co-borrowers to confirm that the property securing the mortgage loan is the borrower's principal residence.  If the credit report is inconsistent with other information provided by the borrower, the servicer must use good business judgment in reconciling the inconsistency.

A servicer must consider a mortgage loan for HAMP that, while originally secured by non-owner occupied property, has become the borrower's principal residence as long as such occupancy can be verified. However, if an individual's income, whether that individual is a borrower, co-borrower or non-borrower occupant, has previously been used as the basis for a permanent modification, that individual may not be considered for a subsequent permanent modification even if the individual's principal residence has changed.

## 5.4 Verifying Monthly Gross Expenses

Servicers must verify the borrower's monthly gross expenses as reported by the borrower on the RMA using the credit report, tax returns or transcripts and other verification documentation provided by the borrower. Monthly gross expenses include the monthly charges described in the following list:

- The monthly mortgage payment, taxes, property insurance, homeowner's or condominium association fee payments and assessments related to the property whether or not they are included in the mortgage payment.

- Any mortgage insurance premiums.

- Monthly payments on all closed-end subordinate mortgages.

- Alimony, child support and separate maintenance payments with more than ten months of payments remaining, if supplied by the borrower.

- Car lease payments, regardless of the number of payments remaining.

- Monthly payments on revolving or open-end accounts, regardless of the balance.  In the absence of a stated payment, the payment will be calculated by multiplying the outstanding balance by three-percent.

- Aggregate negative net rental income from all investment properties owned, if supplied by the borrower.

- Monthly mortgage payment for second home including principal, interest, taxes and insurance and, when applicable, leasehold payments, homeowner association dues, condominium unit or cooperative unit maintenance fees, but excluding unit utility charges.

- Payments on all installment debts with more than ten months of payments remaining, including debts that are in a period of either deferment or forbearance.  When payments on an installment debt are not on the credit report or are listed as deferred, the servicer must obtain documentation to support the payment amount included in the monthly debt payment.  If no monthly payment is reported on a student loan that is deferred or is in forbearance, the servicer will obtain documentation verifying the proposed monthly payment amount, or use a minimum of 1.5 percent of the balance.

- Monthly payment on a HELOC will be included in the payment ratio using the minimum monthly payment reported on the credit report.  If the HELOC has a balance, but no monthly payment is reported, the servicer will obtain documentation verifying the payment amount, or use a minimum of one percent of the balance.

A servicer should not consider expenses of non-borrower household members when calculating monthly gross expenses.

## 5.5 Fraud

Servicers should not modify a mortgage loan if there is reasonable evidence indicating the borrower submitted income information that is false or misleading or if the borrower otherwise engaged in fraud in connection with the modification.

## 5.6 Document Perfection

Servicers must use good business judgment when determining the level of perfection of the verification documents. Servicers may elect to accept documents with imperfections (blank fields,

erasures, use of correction tape, inaccurate dates, etc.) if the servicer determines that the imperfections are immaterial to the business decision, are not indicative of fraud and do not impact the servicer's ability to verify the completeness and accuracy of the borrower's financial representations.

## 5.7 Borrower Signatures

Unless a borrower is deceased or divorced, all parties who signed the original loan documents or their duly authorized representative(s) should sign HAMP documents. However, servicers may encounter circumstances where a co-borrower signature is not obtainable, for reasons such as mental incapacity, military deployment or contested divorce. Servicers should use good business judgment, in accordance with existing servicing agreements and investor guidelines, when determining whether to accept a document without a co-borrower's signature.

# 6 Underwriting

Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified. Servicers are required to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

## 6.1 Monthly Mortgage Payment Ratio

To qualify for HAMP, verified income documentation must confirm that the borrower's monthly mortgage payment ratio prior to the modification is greater than 31 percent. The monthly mortgage payment ratio is the ratio of the borrower's current monthly mortgage payment to the monthly gross income of all borrowers on the mortgage note, whether or not those borrowers reside in the property.

If the borrower's monthly mortgage payment ratio is less than 31 percent, the borrower is not eligible for HAMP and the servicer must send the borrower a Non-Approval Notice (see Section 2.3.2) and consider the borrower for alternative loss mitigation options in accordance with Section 8.7.

### 6.1.1 Monthly Gross Income

Monthly gross income is the borrower's income amount before any payroll deductions and includes:

- Wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, and/or other compensation for personal services.

- Social Security payments, food stamps and adoption subsidies, including those received by adults on behalf of minors or by minors intended for their own support.

- Monthly income from annuities, insurance policies, retirement funds, pensions and disability or death benefits.

- Rental income and other miscellaneous sources of income.

If only net income is available, the servicer must multiply the net income amount by 1.25 (125 percent) to estimate the monthly gross income. All non-taxed income, including non-taxed social security income, is considered net income.

### 6.1.2 Monthly Mortgage Payment

The monthly mortgage payment used to determine borrower eligibility includes the monthly payment of principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees, as applicable, regardless of whether these expenses are included in the borrower's current mortgage payment.  It also includes any escrow payment shortage amounts that are subject to a repayment plan.   The monthly mortgage payment does not include mortgage insurance premium payments or payments due to holders of subordinate liens.

### 6.1.2.1 Pending ARM Resets

With respect to borrowers with adjustable rate mortgage (ARM) loans that have a rate reset scheduled within 120 days after the date of the evaluation (Reset ARM), the monthly mortgage payment used to determine eligibility will be the fully amortizing monthly mortgage payment based on the note reset rate using the index value as of the date of the evaluation (Reset Interest Rate).

The borrower's current scheduled monthly mortgage payment is used to determine eligibility for adjustable rate loans that reset more than 120 days after the date of the evaluation.

If a borrower has an ARM or interest-only mortgage loan, the mortgage loan will convert to a fixed interest rate, fully amortizing mortgage loan. For ARM loans that provide for a monthly payment option (e.g., specified minimum payment, interest only payment, 30-year fully amortizing payment or 15-year fully amortizing payment), and a rate reset is scheduled within 120 days of the date of HAMP evaluation, the payment used to calculate the 31 percent monthly mortgage payment ratio should be the fully amortizing monthly mortgage payment based on the note reset rate using the index value as of the date of the evaluation. For most option ARMs, the 30-year fully amortizing payment option should be used in the standard modification waterfall to reduce the borrower's monthly mortgage payment ratio as close as possible to, without going below, 31 percent.

For pay option loans (i.e., loans where the borrower has an option to pay a fully amortizing monthly payment, a negative amortizing monthly payment or an interest only monthly payment), the servicer in evaluating the borrower for HAMP must use the fully amortizing monthly payment amount.  For loans where servicemembers are protected by the Servicemembers Civil Relief Act and temporary interest rate caps are imposed, the servicer in evaluating the borrower for HAMP must use the full contractual rate (regardless of the interest rate cap).

### 6.1.2.2 Reasonable Efforts to Obtain Association Fee Information

If a borrower has indicated that there are association fees, but has not been able to provide written documentation to verify the fees, the servicer may rely on the information provided by the borrower if the servicer has made reasonable efforts to obtain the association fee information in writing.

### 6.1.2.3 Loan Secured by Property in a Leasehold Jurisdiction

If a loan is secured by a property in a leasehold jurisdiction such as Hawaii, lease rent payments should be included in the monthly mortgage payment calculation.

## 6.2 Coordination with Hope for Homeowners

Servicers are required to consider a borrower for a refinance through the FHA's HOPE for Homeowners (H4H) program when feasible.  Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice.  The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower

may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:

- Will the loan amount exceed $550,440?

- Has the borrower made less than six (6) full payments during the life of the first lien loan?

- Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties?

- Was the mortgage to be refinanced originated after January 1, 2008?

- Does the property contain more than one (1) unit?

If the answer to all of these questions is "NO", the borrower may be eligible for H4H. In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

Servicers are not under any circumstances required to take an H4H loan application from the borrower.

If the servicer participating in HAMP is not a mortgage loan originator and does not have the capability to appropriately evaluate or consider borrowers for refinancing into H4H, the servicer may counsel a borrower to seek a refinance with an H4H lender.

If the servicer knows that the related owner or third party investor does not permit principal forgiveness, which is required under H4H, no servicer action is required with respect to that loan. However, the servicer may not refuse to consider a borrower for HAMP or refuse to initiate a TPP for an otherwise qualified borrower subject to that borrower applying for and being denied a loan under H4H.

However, the servicer may not refuse to consider a borrower for HAMP or refuse to initiate a TPP for an otherwise qualified borrower subject to that borrower applying for, and being denied a loan under, H4H.

## 6.3 Standard Modification Waterfall

Servicers must apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).  A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

### 6.3.1 Step 1—Capitalization

In the first step, the servicer capitalizes accrued interest, out-of-pocket escrow advances to third parties, and any required escrow advances that will be paid to third parties by the servicer during the TPP. In addition, the servicer capitalizes servicing advances that are made for costs and expenses incurred in performing servicing obligations, such as those related to preservation and protection of the security property and the enforcement of the mortgage, provided such costs and expenses are (i) consistent with the security instrument; (ii) allowable under GSE guidelines; and (iii) not prohibited by applicable law.

For example, foreclosure fees and costs paid to a third party in the ordinary course of business are considered servicing advances and may be capitalized unless the borrower agrees to pay the fees and costs upfront.

However, fees associated with modification of the mortgage, such as modification agreement recording fees and title fees generally are not covered by the security instrument and may not be capitalized. Recording fees and title fees generally are considered administrative costs and may be reimbursable by the investor through the ordinary course of business, subject to applicable investor contracts.

Any prior forbearance amount may be capitalized to the extent that such forbearance is permitted under, and any required disclosures comply with, all applicable laws, rules and regulations.

The servicer should capitalize only those third party delinquency fees that are reasonable and necessary. Fees permitted by Fannie Mae and Freddie Mac for GSE loans shall be considered evidence of fees that would be reasonable for Non-GSE Mortgages.

Late fees may not be capitalized and must be waived if the borrower satisfies all conditions of the TPP.  The servicer may not capitalize junior lien holder subordination fees. Servicers are not required, but may choose to pay those fees out of pocket and offset costs out of their incentive payments.  In addition, lender paid mortgage insurance premium costs should not be capitalized. Lender paid mortgage insurance premiums are a lender obligation and not an obligation of the borrower.

### 6.3.2 Step 2—Interest Rate Reduction

In the second step, the servicer reduces the starting interest rate in increments of 0.125 percent to get as close as possible to the target monthly mortgage payment ratio.  The interest rate floor is 2.0 percent. If a borrower has an ARM or interest-only mortgage, the existing interest rate will convert to a fixed interest rate, fully amortizing loan.

If the loan is a fixed rate mortgage or an adjustable-rate mortgage, the starting interest rate is the current interest rate. If the loan is a Reset ARM, the starting interest rate is the Reset Interest Rate if it is within 120 days of reset.

If the current mortgage rate (or the ARM reset rate, if applicable) is not at a 0.125 percentage point increment, servicers should not round the interest rate first.  Begin with the un-rounded rate and reduce it in 0.125 percentage-point increments until the target monthly mortgage payment ratio is achieved.  Upon reaching the point where a further 0.125 percentage-point increment will reduce the rate below 2.0 percent, set the rate to exactly 2.0 percent with no term extension and determine if the target monthly mortgage payment ratio is achieved.  If it is not, move to the next step of the waterfall (term extension).  The interest rate must be fully reduced to 2.0 percent prior to any term extension.

For example, test for the target monthly mortgage payment ratio at 2.180 percent; if it is not achieved, reduce the rate to 2.055 percent and test again; if it is not achieved, reduce the rate to 2.000 percent and test again; if it is not achieved, fix the rate at 2.000 percent and move to the term extension step of the waterfall.

If the resulting rate is below the Interest Rate Cap (as defined in Section 9.3.6), this reduced rate will be in effect for the first five years.  This is followed by annual increases of one percent per year (or such lesser amount as may be needed) until the interest rate reaches the Interest Rate Cap, at which time the rate will be fixed for the remaining loan term.

If the resulting rate exceeds the Interest Rate Cap, then that rate is the permanent rate.

### 6.3.3 Step 3—Term Extension

If necessary, in the third step the servicer extends the term and re-amortizes the mortgage loan by up to 480 months from the Modification Effective Date to achieve the target monthly mortgage

payment ratio. The Modification Effective Date is the due date for the first payment under the permanent modification. The term extension steps must be made in one-month increments.

If a term extension is not permitted under the applicable servicing agreement or applicable law, reamortize the mortgage loan based upon an amortization schedule of up to 480 months with a balloon payment due at maturity. Negative amortization after the effective date of the modification is prohibited.  The servicer will document the prohibition on the term extension, if applicable.

If the loan's current remaining term is greater than 480 months, it does not disqualify the borrower from HAMP eligibility.  If the borrower is eligible under HAMP and the reduction of their current interest rate to 2.0 percent is not sufficient to reach the target monthly mortgage payment ratio of 31 percent, the servicer will skip the term extension step of the standard modification waterfall. The servicer will proceed to the principal forbearance step of the waterfall to attempt to achieve the target monthly mortgage payment ratio of 31 percent. The servicer will enter the remaining term in the NPV input field labeled "Amortization Term after Modification" so that the number in this field and the "Remaining Term" NPV input field are identical.

### 6.3.4 Step 4—Principal Forbearance

If necessary, the servicer will provide for principal forbearance to achieve the target monthly mortgage payment ratio.  The principal forbearance amount is non-interest bearing and non-amortizing.

The amount of principal forbearance will result in a balloon payment fully due and payable upon the earliest of the borrower's transfer of the property, payoff of the interest bearing UPB, or at maturity of the mortgage loan.

### 6.3.5 Principal Forgiveness

There is no requirement to forgive principal under HAMP. However, servicers may forgive principal either up front or on a deferred basis under PRA to achieve the target monthly mortgage payment ratio. Up front principal forgiveness may be granted on a standalone basis or before any step in the standard waterfall process. If principal is forgiven up front, subsequent steps in the standard waterfall may not be skipped. If principal is forgiven either up front or on a deferred basis under PRA and the interest rate is not reduced, the existing rate will be fixed and treated as the modified rate for the purposes of the Interest Rate Cap.

### 6.3.6 Variation from Standard Modification Waterfall

Servicers, in accordance with investor guidelines, are not precluded from providing borrowers with a more favorable modification than that required by HAMP.  Instances where the servicer deviates from the standard modification waterfall must be noted in the servicing system or mortgage file.  In addition, the borrower, servicer and investor incentive payments will be paid based on modification terms that reflect the monthly mortgage payment ratio and standard modification waterfall terms.  Examples of acceptable deviations are provided below.

- Servicers may agree to a modification where the interest rate does not step up after five years or where the interest rate is reduced to less than 2.0 percent.
- Servicers may agree to a modification where additional principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio of 31 percent.
- Servicers may agree to a modification that reduces the borrower's monthly mortgage payment ratio below 31 percent.

## 6.4 Principal Reduction Alternative

Beginning on October 1, 2010 (PRA Effective Date), servicers must evaluate any mortgage loan that is being considered for HAMP with a mark-to-market LTV ratio greater than 115 percent using both the standard modification waterfall (as described in Section 6.3) and the alternative modification waterfall (as described in Section 6.4.3) that includes principal reduction as the required second step in the waterfall. When determining the loan's UPB, servicers should include any amounts that would be capitalized in accordance with Section 6.3.1. Although servicers are only required to evaluate loans that are being considered for HAMP with a mark-to-market LTV ratio greater than 115 percent for PRA, servicers may evaluate loans with a lower mark-to-market LTV ratio using the alternative modification waterfall.

The primary purpose of completing the alternative modification waterfall analysis is to demonstrate whether reducing principal on a mortgage loan with a mark-to-market LTV ratio greater than 115 percent will produce a positive NPV result. However, when making the determination to reduce principal, servicers may, consistent with investor guidelines and contractual obligations, reduce the UPB of a loan to an amount that results in a mark-to-market LTV ratio that is greater or lesser than the 115 percent target ratio in the alternative modification waterfall. Because servicers have this discretion in offering principal reduction, servicers must develop and adhere to a written policy for making principal reduction determinations (PRA Policy) that treats all similarly situated loans in a consistent manner and in compliance with Section 1.6 of Chapter I. If applicable, the PRA Policy must clearly identify if and how the servicer will exercise the option to vary the alternative modification waterfall. Also, if the servicer plans to enter into equity share arrangements, a copy of the arrangement must be included in the PRA Policy. The servicer's written PRA Policy must be provided to MHA-C by January 1, 2011.

For modifications that include PRA principal reduction, if the UPB established when determining the terms of the permanent modification differs from the UPB used to determine the terms of the TPP, the servicer must, in the permanent modification, grant as PRA principal reduction the lesser of (i) the amount necessary to achieve the mark-to-market LTV generated by the TPP terms or (ii) the amount necessary to achieve the target monthly mortgage payment ratio as established in the TPP. At the time of establishing the permanent modification terms, additional PRA principal reduction may be granted in the servicer's discretion in accordance with investor guidelines.

Investors are eligible for PRA incentives for permanent modifications utilizing PRA with effective dates on or after June 3, 2010.

All borrowers in a TPP or permanent modification as of the PRA Effective Date must be considered under the procedures in Section 6.4.1.

### 6.4.1 Retroactive Consideration of Loans Participating in HAMP prior to the PRA Effective Date

Servicers are not required to perform a PRA analysis on every loan with a mark-to-market LTV ratio greater than 115 percent that has been permanently modified or was in a TPP prior to the PRA Effective Date. However, since principal reduction may significantly reduce the re-default risk for some loans, servicers may perform a PRA analysis and use PRA for any loan with a mark-to-market LTV ratio greater than 105 percent at the time of the initial NPV evaluation that was permanently modified or in a TPP prior to the PRA Effective Date and not previously evaluated for PRA. Investors will be eligible for PRA incentives for these retroactive PRA modifications in accordance with Section 13.3.4.

### 6.4.2 Retroactive PRA Policy

Each servicer must develop a written retroactive PRA evaluation policy (Retroactive PRA Policy), consistent with investor guidelines, that describes the basis on which the servicer will evaluate

the use of PRA and cases where it will offer PRA to borrowers who were not evaluated for PRA and received a permanent modification or TPP prior to the PRA Effective Date. The Retroactive PRA Policy may incorporate such factors as mark-to-market LTV, credit score, home price depreciation data, and existing forbearance amounts. The Retroactive PRA Policy may include different criteria than the servicer's PRA Policy. Servicers are not required to evaluate such loans using the alternative modification waterfall. The Retroactive PRA Policy must treat all similarly situated loans in a consistent manner and in compliance with Section 1.6 of Chapter I. Further, if the servicer intends to enter into equity share arrangements, a copy of the equity share agreement that will be issued to the borrower must be included in the Retroactive PRA Policy. The servicer's written Retroactive PRA Policy must be provided to MHA-C by January 1, 2011.

With respect to a loan that was permanently modified or in a TPP prior to the PRA Effective Date and was not previously evaluated for PRA, a servicer may, subject to investor guidance, convert some or all of an existing principal forbearance amount to PRA principal reduction or otherwise offer any amount of PRA principal reduction as a principal curtailment, but may not change any other terms of the permanent HAMP modification. The servicer must memorialize this arrangement in a notice or agreement sent to the borrower that:

- Explains how the deferred principal reduction will be applied to the loan;

- States that the principal reduction amount will be reported to the IRS in the year in which the curtailment is applied and advises the borrower to seek guidance from a tax professional to determine any potential tax consequences; and

- Explains that the borrower may elect not to accept the offered principal reduction and provide opt-out instructions.

Servicers should, in accordance with investor guidelines, perform a financial analysis to determine if PRA principal reduction on a previously modified loan is in the best interest of the investor. The results of the financial analysis must be documented and retained in the servicing file. The Base NPV Model is not an accurate tool for performing this financial analysis on permanently modified loans.

If the servicer's Retroactive PRA Policy requires the evaluation of any previously modified loans, then those loans must be evaluated for PRA no later than January 31, 2011.

### 6.4.3 Alternative Modification Waterfall

Under the alternative modification waterfall, servicers use principal reduction between Step 1 – Capitalization and Step 2 – Interest Rate Reduction of the standard modification waterfall. After the servicer has performed Step 1 – Capitalization, the servicer will perform the alternative modification waterfall as follows:

- Reduce the UPB by an amount necessary to achieve either the target monthly mortgage payment ratio or a mark-to-market LTV ratio equal to 115 percent, whichever is reached first.

- If the UPB is reduced to create a mark-to-market LTV ratio of 115 percent and the target monthly mortgage payment ratio has not been achieved (based on a fully amortizing principal and interest payment over the remainder of the current loan term and using the current mortgage interest rate), continue with the standard modification waterfall steps of interest rate reduction, term extension and principal forbearance, each as necessary, until the target monthly mortgage payment ratio is achieved.

### 6.4.4 Variation from the Alternative Modification Waterfall Steps

If principal is forgiven in an amount equal to or greater than five percent of the pre-modification UPB (including any capitalized amounts as described in Section 6.3.1), servicers will have flexibility in the application of subsequent steps in the alternative modification waterfall to either:

- Elect not to reduce the interest rate all the way to the two percent interest rate floor before applying a term extension, provided that the servicer must fix the reduced interest rate and treat it as the modified rate for purposes of the Interest Rate Cap; or

- Apply term extension before interest rate reduction, provided that, if the interest rate is not reduced, the servicer must fix the existing interest rate and treat it as the modified rate for purposes of the Interest Rate Cap.

### 6.4.5 Application of Deferred Principal Reduction

If the loan is modified pursuant to PRA, the principal reduction amount should be initially treated as non-interest bearing principal forbearance (PRA Forbearance Amount). The PRA Forbearance Amount is separate and exclusive of any other forbearance that may be offered in conjunction with a permanent modification.

If the borrower is in good standing on the first, second and third anniversaries of the TPP Effective Date, the servicer must reduce the UPB of the loan on each anniversary date in installments equal to one-third of the initial PRA Forbearance Amount.

If a borrower is in good standing and pays the loan in full (i) at any time more than 30 calendar days after the Modification Effective Date; (ii) after the PRA reporting and payment processes are made available; and (iii) prior to application of the entire PRA Forbearance Amount, the borrower shall immediately be fully vested in and entitled to the unapplied PRA Forbearance Amount as a curtailment. When the servicer receives a payoff request on behalf of a borrower that meets these requirements, the unapplied PRA Forbearance Amount must be deducted from the payoff balance.

### 6.4.6 Equity Share Arrangements

Investors that enter into equity share arrangements with borrowers in conjunction with a PRA modification will be eligible to receive the PRA investor incentive if the equity share arrangement includes the following borrower protections:

- The borrower is not required to make any equity share payments until the loan is fully satisfied and may not be assessed a pre-payment penalty;

- The agreement includes a reasonable method to credit the borrower for the cost of capital improvements;

- The borrower is entitled to at least 50 percent of any increase in property value, after credit for the capital improvements, between the date of the permanent modification and the date the loan is fully satisfied;

- The investor is only entitled to recover the amount of principal reduction actually applied to the loan balance less the PRA investor incentive; and

- A method for independently assessing the value of the property at time of loan satisfaction that is acceptable to both the investor and the borrower. The assessment of the property value at the date of the permanent modification must be the property value obtained by the servicer in accordance with Section 6.8 as part of the evaluation of the borrower for a HAMP modification.

## 6.5 Prohibitions on Modification Waterfall Steps

If a servicing agreement, investor guidelines or applicable law restricts or prohibits a modification step in the standard or alternative modification waterfall and the servicer partially performs it or skips it, the modification still qualifies for HAMP.  Servicers must maintain evidence in the loan file documenting the nature of any deviation from taking any sequential modification step in the modification waterfall.

The evidence must demonstrate that the applicable servicing agreement or applicable law restricted or prohibited the servicer from fully performing or taking the modification step.

If a servicer was restricted or prohibited from fully performing or taking the modification step, the documentation must show that the servicer made reasonable efforts to seek a waiver from the applicable investor and whether the requested waiver was approved or denied.

The servicer must adhere as closely as possible to the modification waterfall for each loan.  The servicer may not, for example, solely for the purpose of reducing operational complexity, apply a modified waterfall to all loans if only a portion of the servicer's book is affected by a restriction.

## 6.6 Principal Forbearance

### 6.6.1 Principal Forbearance Limits

With respect to both "positive" and "negative" NPV results, servicers are not required to forbear more than the greater of (i) 30 percent of the UPB of the mortgage loan (after any capitalization under Step 1 of the standard modification waterfall) or (ii) an amount resulting in a modified interest-bearing balance that would create a current mark-to-market LTV ratio equal to 100 percent. For purposes of calculating the principal forbearance limit when applying the alternative modification waterfall, servicers may use the sum of any PRA Forbearance Amount initially set aside as principal forbearance and any principal forbearance created as a result of the final step of the modification waterfall.

If the borrower's monthly mortgage payment cannot be reduced to the target monthly mortgage payment ratio of 31 percent unless the servicer forbears more than the amount described above, the servicer may consider the borrower ineligible for a HAMP modification. However, servicers are permitted, in accordance with existing servicing agreements and investor guidelines, to forbear the principal in excess of the amounts described above in order to achieve the target monthly mortgage payment of 31 percent for both NPV-positive and NPV-negative loans.

In the event a servicer elects to forbear principal in an amount resulting in a modified interest-bearing balance that would create a current mark-to-market LTV ratio less than 100 percent in negative NPV situations, the servicer should ignore the error code and the flag for excessive forbearance that is returned by version 3.0 of the Base NPV Model. This error code has been eliminated in version 4.0 of the Base NPV Model.

### 6.6.2 Accounting Treatment of Principal Forbearance

Except under the circumstances described in the next paragraph, when a mortgage loan within a securitization vehicle is modified under HAMP, the following parties will take the respective actions:

   (i)   The servicer must report to the trustee or securities administrator any forborne principal as a realized loss;

(ii)  The trustee or securities administrator must allocate any such reported forborne principal as a realized loss to the trust[2]; and

(iii)  The servicer must act consistent with the presumption that such allocation has occurred, and may conclusively rely that it has.

The direction to the servicer and the trustee or securities administrator to take the actions described in clauses (i) through (iii) above shall apply to any mortgage loan within a securitization vehicle unless the applicable securitization pooling or trust agreement: (A) explicitly provides for or allows repayment of principal to be postponed or forborne for a long period of time; (B) explicitly provides for or allows interest on such principal amount to be permanently forgiven; and (C) explicitly and affirmatively directs that such forborne principal not be treated as a realized loss. Although securitization pooling or trust agreements often use the term "principal forbearance" in addressing the postponement for short periods of the dates on which certain payments of principal are due, the exception set forth in this paragraph will only apply if the relevant agreement specifically addresses principal forbearance in the manner set forth in (A) through (C) in the immediately preceding sentence.

HFSTHA also states that qualified loss mitigation plan guidelines issued by Treasury under the Emergency Economic Stabilization Act of 2008 (EESA) shall constitute standard industry practice for purposes of all Federal and State laws.  The qualified loss mitigation plan guidelines issued by Treasury under EESA include this Handbook.  Accordingly, actions described in clauses (i) through (iii) above, when taken by a servicer pursuant to this Handbook, shall constitute "standard industry practice" within the meaning of the Servicer Safe Harbor, and, when taken by any other person pursuant to this Handbook, including a trustee or securities administrator under a securitization pooling or trust agreement, shall constitute "cooperation of such person with a servicer when such cooperation is necessary for the servicer to implement a qualified loss mitigation plan" within the meaning of the Servicer Safe Harbor.

### 6.6.3 Reporting of Principal Forbearance to IRS

Servicers can use either IRS Form 1098 or an IRS-compliant Annual Borrower Statement to report principal forbearance to the IRS.  The IRS Form 1098 does not contain the UPB for the applicable loan; therefore, for a loan with a principal forbearance, a notation is not necessary on the Form 1098 to remind the borrower of the principal forbearance. However, if servicers substitute an IRS-compliant Annual Borrower Statement that includes the UPB of the modified loan, then the servicer must include the principal forbearance amount on the statement.

## 6.7 Counseling Requirement

Borrowers with back-end ratios of 55 percent or more must agree in writing to obtain HUD-approved counseling as a condition of receiving a HAMP modification, even if they recently completed counseling. Servicers use income and expense information from borrowers provided on the RMA and other sources to calculate the back-end ratio.  The borrower's total monthly debt ratio (back-end ratio) is the ratio of the borrower's monthly gross expenses divided by the borrower's monthly gross income.

Servicers must send a HAMP Counseling Letter to borrowers with a post-HAMP modification back-end ratio equal to or greater than 55 percent. The HAMP Counseling Letter states that the borrower must work with a HUD-approved housing counselor on a plan to reduce their total indebtedness below 55 percent.   The letter also describes the availability and advantages of counseling and provides a list of local HUD-approved housing counseling agencies and directs

---

[2] The reported forborne principal should be allocated as a realized loss such that, for purposes of calculating distributions to security holders, such forborne amount is no longer outstanding under the amortization schedule applicable to the related mortgage loan.

the borrower to the appropriate HUD Website where such information is located. The borrower must represent in writing in HAMP documents that he or she will obtain such counseling.

Face-to-face counseling is encouraged. However, telephone counseling is also permitted from HUD-approved housing counselors provided it covers the same topics as face-to-face sessions. Telephone counseling sessions provide flexibility to borrowers that are unable to attend face-to-face sessions or for those borrowers that do not have an eligible provider within their area.

### 6.7.1 Approved Counselors

A list of approved housing counseling agencies is available at www.hud.gov/offices/hsg/sfh/hcc/fc/ or by calling the toll-free housing counseling telephone referral service at 1-800-569-4287. Servicers must retain in the mortgage files evidence of the borrower notification.

### 6.7.2 Paying for Counseling

There is no charge to either borrowers or servicers for HUD-approved counseling. Servicers may, at their discretion, use a portion of the servicer incentive compensation to compensate counselors for counseling services provided in conjunction with HAMP.

## 6.8 Property Valuation

Servicers must obtain an assessment of the current value of the property securing the mortgage loan being evaluated for HAMP. Servicers may use either an automated valuation model (AVM), provided that the AVM renders a reliable confidence score, a broker's price opinion (BPO) or an appraisal. Confidence scores deemed reasonable by bank examiners are also considered reasonable for purposes of this program. A servicer may use an AVM provided by one of the GSEs. As an alternative, servicers may rely on their internal AVM provided that:

- The servicer is subject to supervision by a Federal regulatory agency;
- The servicer's primary Federal regulatory agency has reviewed the model; and
- The AVM renders a reliable confidence score.

If a GSE AVM or the servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a BPO, an appraisal or a property valuation method acceptable to the servicer's Federal regulatory supervisor. Such assessment must be rendered in accordance with the Interagency Appraisal and Evaluation Guidelines (as if such guidelines apply to loan modifications). In all cases, the property valuation used cannot be more than 90 days old as of the date the servicer first evaluates the borrower for a TPP using the NPV model. The information will remain valid for the duration of the TPP and does not need to be updated for any subsequent NPV evaluation. Servicers should follow regulatory and investor guidance when selecting the appropriate valuation method to determine the mark-to-market value of the property and use this value for both the NPV model and the PRA mark-to-market LTV ratio calculation.

Treasury does not provide any reimbursement for property valuations. Servicers should review investor guidelines to determine the applicable property valuation reimbursement policy.

## 7 Net Present Value (NPV) Testing

All loans that meet HAMP eligibility criteria and are either deemed to be in imminent default or delinquent as to two or more payments must be evaluated using a standardized NPV test that compares the NPV result for a modification to the NPV result for no modification.

- Using the standard modification waterfall, if the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed "positive" and the servicer must offer the modification.

- If the NPV result for no modification is greater than the NPV result for the modification scenario using the standard modification waterfall, the modification result is deemed "negative" and the servicer has the option of performing the modification in its discretion. For mortgages serviced on behalf of a third-party investor for which the modification result is deemed "negative," however, the servicer may not perform the modification without express permission of the investor.

- With respect to loans with a mark-to-market LTV ratio greater than 115 percent, if the NPV result for the proposed modification generated by applying the alternative modification waterfall is positive, servicers are encouraged, but are not required, to perform a loan modification utilizing PRA, even in instances where the NPV result from the standard modification waterfall is negative or is less positive than the NPV result generated by application of the alternative modification waterfall.

If a modification is not pursued when the NPV result is "negative," the servicer must send a Non-Approval Notice and consider the borrower for other foreclosure prevention options, including alternative modification programs, DILs, and short sale programs.

Whether or not a modification is pursued, the servicer must maintain detailed documentation of the NPV model used, all NPV inputs and assumptions and the NPV results.

As of October 1, 2010, the NPV model reflects principal reduction incentives and will compare the NPV result of modifications with and without principal reduction with the NPV result without modification. In addition to the evaluation using the NPV model, servicers may conduct other evaluations to determine the level of principal reduction that is in the best interest of investors. However, servicers must only submit the results of the standard modification waterfall and alternative modification waterfall evaluations completed with the NPV model to the HAMP Reporting Tool.

## 7.1 Base NPV Model

Participating servicers can access the MHA Base NPV Model (Base NPV Model) software tool on www.HMPadmin.com.   The Base NPV Model Documentation and an NPV Model Overview document are also available on www.HMPadmin.com for further information and user guidance.

The Base NPV Model may not be used by a servicer to evaluate a loan for non-HAMP modification cases.  The Terms and Conditions for use of the NPV Model stipulate that (i) the NPV model documents may be used only by a servicer in connection with servicing responsibilities undertaken pursuant to: (a) the SPA, or (b) an agreement between the servicer and Fannie Mae or Freddie Mac in accordance with HAMP; (ii) any use of the NPV model documents for other purposes is a violation of the Terms and Conditions, and (iii) the NPV model documents are not for public circulation or reproduction, whether in whole or in part, and the servicer may not disclose the NPV model documents to any third party.

## 7.2 NPV Model Updates

From time to time Treasury releases updates to the Base NPV Model. All servicers are required to use the most recent version and loans being evaluated for HAMP for the first time will be tested using the latest available Base NPV Model version. Loans subject to a re-evaluation must be tested using the same NPV version and inputs used for the initial NPV test in accordance with Section 7.6.1 and 7.7.

When a new version of the Base NPV Model is released, both new and participating servicers will have a grace period to implement the new model. The grace period for each new version will be set forth in the applicable NPV release documentation. In addition, the release documentation will provide guidance as to which Base NPV Model version servicers should use during the grace period.

At the completion of the grace period, servicers must use either the most recent version of the Base NPV Model or a customized version that meets the requirements for customization outlined in the model documentation.

## 7.3 Customization of Base NPV Model

Servicers having at least a $40 billion servicing book have the option to create a version of the Base NPV Model that uses a set of cure rates and re-default rates estimated based on the experience of their own portfolios. The default model must take into consideration, if feasible, current LTV, current monthly mortgage payment, current credit score, delinquency status, and other loan or borrower attributes. Customized versions of the NPV model must utilize the Base NPV Model values for variables such as home price projections and foreclosure and REO timelines and costs. These values are posted on www.HMPadmin.com, and will be periodically updated.

### 7.3.1 Compliance for Customized NPV Models

MHA-C will monitor implementation of customization of the NPV model.  Servicers electing either to implement the NPV model on their own systems or create a customized version must successfully pass an NPV output test prior to using the model.  This test ensures that the servicer's NPV model outputs are consistent with those of the Base NPV Model.

MHA-C administers and evaluates the results of all servicer NPV output tests and provides the necessary clearance for servicers to begin using their own NPV models. The test will involve running a dataset of sample modifications against the servicer's NPV model. To pass the test, the servicer NPV model results for the entire dataset of sample modifications must be consistent with the corresponding Base NPV Model results, within a defined threshold of acceptable variance.

Subsequent to the test, those servicers electing to use a customized version of the NPV model will be asked to provide documentation on methodology and key assumptions, as well as evidence that the servicer has instituted adequate controls and governance procedures with respect to the model.

NPV compliance testing will be conducted on an ongoing basis for the life of HAMP, and will be triggered both by changes to the Base NPV Model and by servicer-driven changes, such as migration to new systems, subsequent decisions to use servicer-specific default rates (where permitted) or to change those rates, and other related factors.

## 7.4 NPV Inputs for the Discount Rate

Servicers have the option of using the same discount rate for all loans or choosing one discount rate for loans they service for themselves and a different discount rate for loans serviced for all third-party investors.

The discount rate applied to loans serviced on behalf of third-party investors must be at least as high as the discount rate applied to a servicer's held portfolio, but in no event higher than the maximum rate permitted under the HAMP.  HAMP guidelines establish a base discount rate equal to the PMMS Rate (as defined in Section 9.3.6). Servicers may add a premium of up to 250 basis points to this rate.

### 7.5 NPV Inputs for Mortgage Insurance

Mortgage Insurance (MI) payments reduce investor losses in the event of a default. MI is considered in calculating the NPV of both the modified and unmodified loan. In addition, partial MI claims can be entered into the Base NPV Model to increase the resulting value of the modification to the investor.

## 7.6 NPV Requirements for Stated Income Trials

The following guidance applies only to TPPs based on stated income with an effective date prior to June 1, 2010. Servicers must reevaluate a loan using the NPV model if the borrower's documented income differs from the stated income used in the borrower's initial qualifying NPV test. Servicers may elect, in accordance with existing servicing agreements and investor guidelines, to offer the borrower a permanent HAMP modification without performing an additional NPV evaluation based on the borrower's verified income documentation. If the servicer elects not to perform an additional NPV evaluation in this situation, the servicer should enter the trial period values for NPV Date and NPV Value when reporting the official loan set up file to the Treasury system of record.

### 7.6.1 Borrower Retests Use the Same NPV Model Version as First NPV Assessment

In situations where servicers reevaluate a loan using the NPV model based on the borrower's verified income documentation, servicers should test a borrower using the same major version of the NPV model that was used to test the loan for TPP eligibility. Detailed versioning requirements are included in the Base NPV Model Documentation, which is available on www.HMPadmin.com, and in other NPV Versioning Requirements documentation.

All NPV inputs should remain constant when the borrower is retested, except those that were found to be incorrect at the time of the initial NPV evaluation; and inputs that have been updated based on the borrower's documentation. Inputs that may be updated based on the borrower's documentation are limited to the following:

- Association Dues/Fees before Modification
- Monthly Hazard and Flood Insurance
- Monthly Real Estate Taxes
- Monthly Gross Income
- Unpaid Principal Balance after Modification (interest-bearing UPB)
- Principal Forbearance Amount
- Interest Rate after Modification
- Amortization Term after Modification
- Principal and Interest Payment after Modification

Inputs that may not change regardless of their evolution since the trial's initiation include:

- Unpaid Principal Balance before Modification
- Borrower Credit Score and Co-Borrower Credit Score
- Property Value
- Interest Rate before Modification
- Term before Modification
- Monthly Principal and Interest Payments before Modification
- Months Past Due
- ARM Reset Rate and ARM Reset Date
- Data Collection Date
- Imminent Default Status
- NPV Run Date
- Advances/Escrow

- Discount Rate Risk (spread of discount rate over PMMS rate)

### 7.6.2 Corrected Inputs

Corrected material documentation provided by the borrower can be used to change the data inputs for the NPV retest. Material elements that can change are documents that are limited to borrower-reported information, such as income, homeowner association fees and monthly tax payments. Inputs that have changed in the interim, but were correct on the date of the initial NPV evaluation, are held constant. The terms of the modification, which include the interest rate reduction, term extension, and forbearance amount, may change as the borrower reported inputs are adjusted.

In the portal version of the Base NPV Model located on www.HMPadmin.com, servicers do not change the "Data Collection Date" or the associated UPB and the remaining term information. This identical information is reported for the retest exactly as it was in the original NPV evaluation.

## 7.7 NPV Requirements for Disputed Inputs

When servicers re-evaluate NPV results based on a borrower's written evidence of disputed variables, servicers must conduct the NPV test using the same major version of the NPV model that was used to test the loan for TPP eligibility. Detailed versioning requirements are included in the Base NPV Model Documentation, which is available on www.HMPadmin.com, and in other NPV Versioning Requirements documentation.

All NPV inputs should remain constant when the borrower is re-evaluated, except those inputs that are determined to be materially inaccurate based on the borrower's written evidence. The values must be as of the NPV Date.

## 7.8 NPV Inputs for Unavailable or Low Credit Scores

In performing an NPV evaluation, in the case of two borrowers where a co-borrower has an available credit score and the other co-borrower does not have an available credit score, the servicer must use the credit score that is available.  In the case of a single borrower who does not have an available credit score or where both co-borrowers do not have available credit scores, the servicer must use 557 as the proxy credit score.  If a borrower has a credit score, but it is below 250, the servicer should input 250 as the proxy credit score when performing the NPV evaluation.

# 8 Trial Period Plans

Following underwriting, NPV evaluation and a determination, based on verified income, that a borrower qualifies for HAMP, servicers will place the borrower in a trial period plan (TPP).

The trial period is three months in duration (or longer if necessary to comply with applicable contractual obligations) and governed by terms set forth in the TPP Notice.  Borrowers who make all trial period payments timely and who satisfy all other trial period requirements will be offered a permanent modification.

Servicers should service mortgage loans during the TPP in the same manner as they would service a loan in forbearance.

## 8.1 Trial Period Plan Notice

The TPP Notice describes the terms and conditions of the trial period and sets forth the required payment due dates.  Borrowers are not required to sign or return the TPP Notice.  Servicers should retain a copy of the TPP Notice in the borrower file and note the date that it was sent to the borrower.

## 8.2 Effective Date

A borrower's trial period starts on the TPP Effective Date, as indicated in the TPP Notice.  If the servicer transmits the TPP Notice to the borrower on or before the 15th day of a calendar month, then the servicer should establish the first day of the next month as the TPP Effective Date. If the servicer transmits the TPP Notice to the borrower after the 15th day of a calendar month, the servicer may use either (i) the first day of the month after the next month as the TPP Effective Date; or (ii) the first day of the next month so long as the borrower consents to commencing the TPP earlier. The date that the first trial period payment is due under the terms of the TPP Notice must be the same date as the TPP Effective Date.

For example, if the servicer completes the TPP Notice and transmits it to the borrower on June 2nd, the servicer should use July 1st as the TPP Notice Effective Date. If the servicer completes the TPP Notice and transmits it to the borrower on June 27th, the servicer has the option of using July 1st or August 1st as the TPP Effective Date.

## 8.3 Trial Period Payments

The borrower's monthly trial period payment must be set at the target monthly mortgage payment ratio by applying the standard waterfall as set forth in Section 6.3.

The servicer's receipt of the first payment due under the TPP Notice on or before the last day of the month in which the first payment is due (TPP Offer Deadline) is evidence of the borrower's acceptance of the TPP Notice and its terms and conditions.  If the first trial period payment is not received on or near the first payment due date, servicers should contact the borrower and encourage submission of the first payment prior to the TPP Offer Deadline.  Servicers may not impose any stricter standard for payments due under HAMP than are applied in the servicer's other loss mitigation programs.

Borrowers who do not make current trial period payments are considered to have failed the trial period and are not eligible for a permanent modification.  For TPPs with effective dates on or after June 1, 2010, "current" is defined as the borrower having made each trial period payment by the last day of the month in which it is due.  For TPPs with effective dates before June 1, 2010, "current" is defined as the borrower having made all trial period payments by the last day of the final month of the trial period.

## 8.4 Application of Trial Period Payments

Trial period payments must be applied in accordance with the terms of the existing loan documents. A servicer should not change a borrower's scheduled loan terms in its servicing system and/or mortgage file during the trial period.

If permitted by the applicable loan documents, servicers may accept and hold as "unapplied funds" (held in a T&I custodial account) amounts received which do not constitute a full monthly, contractual principal, interest, tax and insurance (PITI) payment. However, when the total of the reduced payments held as "unapplied funds" is equal to a full PITI payment, the servicer is required to apply all full payments to the mortgage loan.

Any unapplied funds remaining at the end of the trial payment period that do not constitute a full PITI payment should be applied to reduce any amounts that would otherwise be capitalized onto the principal balance.

The borrower may make scheduled payments earlier than expected; however, the payments will not result in acceleration of the modification effective date.

Servicers are encouraged to require automated payment methods, such as automatic payment drafting.  If automatic payment drafting is required, it must be used by all HAMP borrowers, unless a borrower opts out.

If the borrower makes a payment that is greater than his or her trial period payment (e.g., the existing contractual monthly payment rather than the trial period payment), the servicer must review investor guidelines to determine if the borrower remains eligible for HAMP and, if making the contractual payment could jeopardize eligibility, notify the borrower in writing that making payments in excess of the trial period payment may jeopardize the borrower's eligibility for a HAMP modification.

If the borrower fails to make current payments during the trial period or is otherwise determined to be ineligible for a permanent modification, the servicer should apply any unapplied trial period payments in accordance with the terms of the existing loan documents. The payments applied to date during the trial period remain unchanged. In no event should the servicer return the funds to the borrower.

## 8.5 Borrower in Bankruptcy

Borrowers who are currently in a TPP and subsequently file for bankruptcy may not be denied a permanent modification on the basis of the bankruptcy filing.

The servicer and its counsel must work with the borrower or borrower's counsel to obtain any court and/or trustee approvals required in accordance with local court rules and procedures. Servicers should extend the TPP as necessary to accommodate delays in obtaining court approvals or receiving a full remittance of the borrower's trial period payments when they are made to a trustee, but they are not required to extend the trial period beyond two months, resulting in a total five-month trial period.  In the event of a trial period extension, the borrower shall make a trial period payment for each month of the trial period including any extension month.

## 8.6 Borrower in Bankruptcy—Waiver of Trial Period Plan

At the discretion of the servicer, borrowers in an active Chapter 13 bankruptcy who are determined to be eligible for HAMP may be converted to a permanent modification without completing a TPP if:

- The borrower makes all post-petition payments on his or her first lien mortgage loan due prior to the effective date of the Home Affordable Modification Agreement (Modification Agreement), and at least three of those payments are equal to or greater than the proposed modified payment;

- The modification is approved by the bankruptcy court, if required; and

- The TPP waiver is permitted by the applicable investor guidelines.

If payments under a bankruptcy plan are used in lieu of a trial period in accordance with these guidelines, the servicer and borrower are eligible to accrue "pay for success" and "pay for performance" incentives for the length of a standard HAMP trial period.

Servicers will report the bankruptcy in lieu of trial payments (at least three) on the trial set-up record using the Trial Plan Type Code to identify the loan as a Bankruptcy in Lieu of Trial.

When a borrower in an active Chapter 13 bankruptcy is in a trial period plan and the borrower has made post-petition payments on the first lien mortgage in the amount required by the TPP, a servicer must not object to confirmation of a borrower's Chapter 13 plan, move for relief from the

automatic bankruptcy stay, or move for dismissal of the Chapter 13 case on the basis that the borrower paid only the amounts due under the trial period plan, as opposed to the non-modified mortgage payments.

## 8.7 Alternative Loss Mitigation Options

When a borrower is determined to be ineligible for a permanent modification, the servicer must work with the borrower to attempt to cure the delinquency.  If a cure is not possible, the servicer is required to consider the borrower for all other available loss mitigation options, including but not limited to refinance, forbearance, non-HAMP modifications and, to the extent a borrower does not qualify for a home retention alternative, HAFA (short sales or DILs) in accordance with Chapter IV.   As stated in Section 2.3.2, available loss mitigation options should be described in the Non-Approval Notice.

If a borrower in a prolonged TPP (a TPP lasting longer than three months) who has made each trial period payment by the last day of the month in which it was due is subsequently determined to be ineligible for a permanent modification, the servicer is required to consider the borrower for all other available loss mitigation options, including, but not limited to, non-HAMP modifications. Such consideration may not be conditioned on a lump sum borrower contribution for unpaid interest and fees that accrued during the prolonged TPP.

## 8.8 FDD Forbearance Plan During Trial Period Plan

In accordance with investor guidelines, any borrower in a TPP who suffers an FDD-related hardship, meets the eligibility criteria set forth in Section 1.2 for FDD and requests a forbearance should be offered an FDD forbearance plan. Likewise, servicers should offer an FDD forbearance plan to borrowers who are in the process of being evaluated for a TPP at the time they are impacted by an FDD if they request an FDD forbearance plan and meet the eligibility criteria, even if their TPP has not started.

### 8.8.1 Cancellation of Trial Period Plan

If a borrower who is currently in a TPP accepts the FDD forbearance plan, the TPP must be cancelled and the servicer must submit a Trial Fallout reason code indicating that the borrower is entering an FDD forbearance plan. If the borrower made timely payments during the trial period prior to the FDD forbearance plan, the borrower will be eligible for reconsideration for HAMP after the FDD forbearance plan ends. In order to be reconsidered for HAMP, the borrower must submit a new Initial Package with updated documentation. If the borrower is eligible for HAMP based on the updated documentation he or she must enter a new TPP.

The servicer must provide notice to the borrower in writing that, if the FDD forbearance plan is accepted, their TPP will be cancelled and in order to be reconsidered for HAMP in the future the borrower will have to submit a new Initial Package and be re-evaluated. The notice should advise that the borrower may not qualify for HAMP at the time of reconsideration if the borrower's financial circumstances have changed.

A borrower is not obligated to accept an FDD forbearance plan, and a servicer may not require that a borrower in a TPP convert to an FDD forbearance plan.

# 9 Permanent Modification

A borrower in a TPP may receive a permanent modification as long as the servicer has received all required trial period payments timely and all other required documentation from the borrower, including a fully executed Modification Agreement.  Servicers should not modify a mortgage loan if there is reasonable evidence indicating the borrower submitted income information that is false or misleading or if the borrower otherwise engaged in fraud in connection with the modification. If a property securing a loan in a TPP is temporarily vacant due to damage caused by fire, flood,

wind, etc., the borrower may receive a permanent modification so long as it is clear that the borrower intends to repair and occupy the property and there are insurance proceeds or other funds available to complete the work.

## 9.1 Modification Agreement

A servicer should prepare the Modification Agreement early enough in the trial period to allow sufficient processing time so that the modification becomes effective on the first day of the month following the final trial period month.

All documentation must be signed by an authorized representative of the servicer and reflect the actual date of signature by the servicer's representative. The borrower is not required to have the Modification Agreement notarized unless otherwise required by the investor.

The borrower's permanent modification will become effective as of the Modification Effective Date identified in the Modification Agreement when: (i) the borrower has satisfied all of the requirements of the TPP Notice, (ii) the borrower and the servicer have executed the Modification Agreement, (iii) the servicer has returned a fully executed copy of the Modification Agreement to the borrower, and (iv) the Modification Effective Date provided in the Modification Agreement has occurred.

The loan may be modified and the effective date of the modification does not need to be changed if the executed Modification Agreement is received from the borrower by the last day of the month in which the modification becomes effective.  However, a servicer may not submit an official loan set up record to the HAMP system of record to report the permanent modification until the servicer has obtained a fully executed Modification Agreement.

## 9.2 Effective Date Option—Interim Month

In the event the borrower does not make the final trial period payment on or before the due date set forth in the TPP Notice (but does make the final trial period payment before the end of the month in which it is due), then the servicer may, at its option, complete the Modification Agreement such that the modification becomes effective on the first day of the second month following the final trial period month. If the servicer elects this option, the borrower will not be required to make an additional trial period payment during the month (interim month) in between the final trial period month and the month in which the modification becomes effective.  For example, if the last trial period month is March the borrower would not be required to make any payment during April, and the modification would become effective, and the first payment would be due, on May 1st. Neither the borrower nor the servicer will be entitled to accrue incentive compensation for the interim month if the borrower does not make a trial period payment during the interim month.

The servicer must modify the Modification Agreement Cover Letter, which is available on www.HMPadmin.com, to inform the borrower about the impact of delaying the modification effective date by one month, including (i) the impact of the delay on implementation of the modified interest rate; (ii) the increase in the delinquent interest capitalized, and (iii) the loss of one month's accrual of the incentive payment if the borrower does not make an additional trial period payment.

A servicer must treat all borrowers the same in applying this option by developing and implementing a written policy indicating the date by which the final trial period payment must be submitted (cutoff date) before the servicer applies this option. The cutoff date must be after the due date for the final trial period payment as set forth in the TPP Notice.

## 9.3 Conditions of Modification

### 9.3.1 First Lien Position

For all mortgage loans that are modified under HAMP, the servicer will follow investor guidance to ensure that the modified mortgage loan retains its first lien position and is fully enforceable.

### 9.3.2 Late Fees

All late charges, penalties, stop-payment fees, or similar fees must be waived upon the borrower receiving a permanent modification.

Late charges may accrue while the servicer is determining borrower eligibility for an FDD forbearance plan and during the forbearance period. However, a servicer must not collect late charges from the borrower during the forbearance period.

### 9.3.3 Administrative Costs

Servicers may not charge the borrower to cover the administrative processing costs incurred in connection with HAMP.  The servicer pays and will not be reimbursed for any actual out-of-pocket expenses, including, but not limited to, any required notary fees, recordation fees, title costs, property valuation fees, credit report fees, or other allowable and documented expenses.

### 9.3.4 Interest Paid in Arrears

If interest on the loan is paid in arrears, servicers must ensure that the modified interest rate and modified principal balance are considered effective as of the first day of the month prior to the month in which the modification effective date occurs.

### 9.3.5 Monthly Statements

For modifications that include principal forbearance, servicers are encouraged to include the amount of the gross UPB on the borrower's monthly payment statement.  In addition, the borrower should receive information on a monthly basis regarding the accrual of "pay for performance" principal balance reduction payments.

### 9.3.6 Interest Rate Cap and Interest Rate Lock Date

The Interest Rate Cap used for determining the final interest rate for the permanent modification is the Freddie Mac Primary Mortgage Market Survey (PMMS) Rate for 30-year fixed rate conforming loans, rounded to the nearest 0.125 percent, as of the date that the Modification Agreement is prepared.  The PMMS Rate is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin. The weekly PMMS Rate is available on the Freddie Mac home page at www.freddiemac.com.

Servicers should implement the new PMMS Rate to be effective at 12:01 AM ET on the day following publication of the rate.  The rate is normally published mid-day Thursdays and should therefore be updated at 12:01 AM ET on Friday morning.  If the rate is published on another day such as Wednesday, as has occurred when Thursday was a holiday, the rate should be updated at 12:01 AM on the day following publication.

The Interest Rate Lock Date for the modification is the date that the Interest Rate Cap for a modified mortgage loan is determined. For trial set up reporting, the servicer should report the date that it selected the PMMS Rate to determine eligibility for HAMP when establishing the interest rate terms in the standard waterfall process for the trial period payment under the TPP.

### 9.3.7 Escrow Accounts

All of the borrower's monthly payments must include a monthly escrow amount unless prohibited by applicable law.  The servicer must assume full responsibility for administering the borrower's escrow deposit account in accordance with the mortgage documents and all applicable laws and regulations.

Servicers are not required to escrow for the payment of condominium association fees, subject to investor guidelines.  A servicer must determine the monthly payment associated with the condominium association fees to calculate the borrower's monthly mortgage payment and evaluate the borrower for HAMP eligibility.

Once an escrow account is established, the borrower must continue to make monthly escrow payments.  However, if the borrower fails the trial period, a servicer may waive the requirement to make monthly escrow payments, subject to any limitations imposed by applicable law and any investor or other contractual requirements.  These requirements include those servicer obligations to advance tax, insurance and other third-party payments to protect the investor's first lien position.

### 9.3.7.1 Escrow Analysis

Servicers must perform an escrow analysis for all borrowers, including borrowers who do not currently escrow for property taxes and hazard insurance, to determine the exact escrow payments prior to establishment of the trial period payment.  When performing an escrow analysis, servicers must take into consideration tax and insurance premiums that may come due during the trial period.

### 9.3.7.2 Escrow Advances

Servicers should capitalize any escrow advance that has been or will be paid to a third party before the modification effective date.  If capitalization is prohibited by applicable law, the servicer should direct the borrower to repay the advance in accordance with investor guidelines, the underlying security instrument and all applicable laws, rules and regulations.  Servicers may not have the borrower execute a note for any escrow advance.

### 9.3.7.3 Escrow Shortages

In the event the initial escrow analysis identifies an escrow shortage – a deficiency in the escrow deposits needed to pay all future tax and insurance payments – the servicer must take steps to eliminate the shortage.  Any existing escrow shortage currently being paid by the borrower should be included in the borrower's monthly mortgage payment.

### 9.3.7.4 Non-Escrowed Loans

If the mortgage loan being considered for HAMP is a non-escrowed mortgage loan, the servicer must establish an escrow deposit account prior to the beginning of the trial period.  Servicers who do not have this capacity must implement an escrow process within six months of signing the SPA.  However, the servicer must ensure that the trial payments include escrow amounts and must place the escrow funds into a separate account identified for escrow deposits.

### 9.3.7.5 Standard Escrow Provisions

If the existing loan documents do not include standard escrow provisions, servicers will adjust loan documents by replacing Section 4.D. of the Modification Agreement with the industry standard escrow account provisions that are comparable to the escrow account provisions found in the Fannie Mae and Freddie Mac uniform instruments.

### 9.3.7.6 Escrow Changes

When there are changes in a borrower's tax and insurance premium payments during the trial period, but after a verified approval, the servicer does not need to re-evaluate the borrower for HAMP eligibility and obtain a new NPV result.  However, the servicer must provide written notice to the borrower, in addition to any escrow notification required by RESPA that explains the impact of the new escrow payment on borrower's monthly payment set forth in the TPP Notice.

### 9.3.7.7 Prohibitions on Modifications that Increase Principal and Interest

HAMP seeks to lower a borrower's monthly mortgage payment through waterfall steps that use principal and interest payment reductions to achieve the target monthly mortgage payment ratio. However, in some cases, all or most of the payment reduction is comprised of a reduction in required escrow payments, and the principal and interest component under the proposed modification could be greater than the borrower's current principal and interest component. A modification with a post-modification principal and interest component that is greater than the pre-modification principal and interest component is prohibited under HAMP.

Any loans being evaluated for HAMP or currently in a TPP with a post-modification principal and interest component greater than the pre-modification principal and interest component must be re-run through the standard modification waterfall and, if applicable, the alternative modification waterfall while keeping the post-modification principal and interest component equal to the pre-modification principal and interest component. The servicer must perform a new NPV evaluation using the revised modification terms generated by keeping the proposed principal and interest component equal to the borrower's current principal and interest component. All other NPV inputs should remain constant when the borrower is retested in this situation.

### 9.3.8 Mortgages with No Due-on-Sale Provision

When a mortgage is not subject to a due-on-sale provision and the borrower receives a HAMP modification, the borrower agrees that HAMP will cancel the assumability feature of that mortgage.

### 9.3.9 Assignment to MERS

If the original mortgage loan was registered with Mortgage Electronic Registration Systems, Inc. (MERS) and the originator elected to name MERS as the original mortgagee of record, solely as nominee for the lender named in the security instrument and the note, the servicer must make the following changes to the Modification Agreement:

Insert a new definition under the "Property Address" definition on page 1, which reads as follows:

> "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for lender and lender's successors and assigns. MERS is the mortgagee under the Mortgage. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.

Add as section 4.I:

> That MERS holds only legal title to the interests granted by the borrower in the mortgage, but, if necessary to comply with law or custom, MERS (as nominee for lender and lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of lender including, but not limited to, releasing and canceling the mortgage loan.

Add MERS to the signature lines at the end of the Modification Agreement, as follows:

_____
Mortgage Electronic Registration
Systems, Inc. – Nominee for Lender

The servicer may execute the Modification Agreement on behalf of MERS and, if applicable, submit it for recordation.

### 9.3.10 Mortgage Insurer Approval

If applicable, a servicer must obtain mortgage insurer approval for each HAMP modification. Servicers should consult the applicable mortgage insurance provider for specific processes related to the reporting of modified terms, payment of premiums, payment of claims, and other operational matters in connection with mortgage loans modified under HAMP.

## 9.4 Re-default and Loss of Good Standing

If a borrower defaults on a loan modification executed under HAMP (delinquent by the equivalent of three full monthly payments at the end of the month in which the last of the three delinquent payments was due), the loan is no longer considered to be in "good standing." Once lost, good standing cannot be restored even if the borrower subsequently cures the default. A loan that is not in good standing is not eligible to receive borrower, servicer or investor incentives and reimbursements and these payments will no longer accrue for that loan. Furthermore, the mortgage is not eligible for another HAMP modification.

In the event a borrower defaults on the modified loan, the servicer should work with the borrower to cure the modified loan. If this is not possible the servicer should evaluate the borrower for any other loss mitigation alternative prior to commencing foreclosure proceedings. In any event, a servicer cannot refer a HAMP-modified first lien to foreclosure until the loan loses good standing under HAMP.

## 9.5 Delayed Conversion

In situations where an eligible borrower successfully completed the trial period (including providing the required documentation and making the required payments) and should have been converted to a permanent modification, but for reasons beyond his or her control was not timely converted to a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.

If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than 60 days after discovering the error, including, but not limited to, discovery through notification from MHA-C, the servicer's own procedures, or notice provided by the borrower.

The permanent HAMP modification offered must put the borrower in the same position as he or she would have been if the servicer converted the borrower to a permanent modification in accordance with the program requirements. A borrower in this situation remains eligible for a permanent HAMP modification regardless of whether the borrower failed to make trial period payments following the successful completion of the trial period.
In order to achieve this result, the servicer should take the following steps:

- The Modification Effective Date is the date the modification would have become effective if the servicer had converted the borrower in a timely fashion, and the applicable Interest Rate Cap is the first PMMS Rate, rounded to the nearest 0.125 percent, issued in the month prior to the Modification Effective Date.

- o For example, for a loan with a Modification Effective Date of June 1, 2010, the Interest Rate Cap should be 5.00 percent, which is the PMMS Rate issued in May 2010 (the PMMS archives are available at www.freddiemac.com/pmms/docs/30-yr historics.xls).

- The initial UPB of the modification should be the UPB of the loan as of the Modification Effective Date, plus all accrued but unpaid amounts allowed to be capitalized under HAMP as of the Modification Effective Date.

- Any payments made by the borrower after the Modification Effective Date until the time of conversion should be applied retroactively in accordance with the modified terms; however, any shortfalls between the actual payments made by the borrower after the Modification Effective Date (including any missed payments) and payments that are due under the modified terms until the time of conversion must be advanced by the servicer, capitalized and deferred as a non-interest bearing amount that is due and payable by the borrower at the time of payoff, maturity or transfer. The servicer may collect this amount subject to such restrictions as the investor may establish including, but not limited to, restrictions on collecting this amount in the event of a short payoff or other disposition of the loan.

- If due to a shortfall in payments, amounts are deferred, the servicer must amend the Modification Agreement in accordance with the Document Summary for the Modification Agreement.

- The servicer must take the necessary steps to correct any credit reporting for the borrower since the Modification Effective Date.

## 9.6 Principal Curtailments Following Modification

If a principal curtailment is received from or on behalf of the borrower on a loan that has a principal forbearance, servicers are instructed to apply the principal curtailment to the interest bearing UPB. If, however, the principal curtailment amount is greater than or equal to the interest bearing UPB, then the curtailment should be first be applied to the principal forbearance portion. If the curtailment satisfies the principal forbearance portion, any remaining funds should then be applied to the interest bearing UPB. This eliminates the possibility of a curtailment paying off (and satisfying) the interest-bearing portion of the UPB, which would cause the entire loan to become due and payable and force the borrower to pay off the principal forbearance portion of the loan balance as a balloon payment.

## 9.7 FDD Forbearance Plan Following Modification

If a borrower in a permanent modification is eligible for an FDD forbearance plan and has the capacity to make partial payments, the servicer should make every effort to structure the forbearance plan such that the borrower retains good standing during the FDD forbearance period. For example, the servicer may require the borrower to make partial payments during the forbearance period such that the loan at no time becomes delinquent by three full monthly payments during the forbearance plan. If a borrower loses good standing, even as a result of an FDD forbearance plan, the loan is not eligible to receive or accrue borrower, servicer or investor incentives in connection with the loan. In addition, the borrower is not eligible for another HAMP modification. If paying in accordance with the FDD forbearance plan would result in the borrower becoming three full monthly payments past due, then the servicer must inform the borrower in writing at the time the FDD forbearance plan is offered that by paying in accordance with the plan, the borrower may lose good standing under HAMP. In the event a borrower loses good standing, the servicer must work with the borrower to cure the delinquency regardless of the fact that the borrower is unable to regain good standing. If this is not possible, the servicer should evaluate the borrower for any other loss mitigation alternative prior to commencing foreclosure proceedings.

## 10 HAMP Documents

Servicers are strongly encouraged to use the HAMP documents available on www.HMPadmin.com. A single set of model modification documents is provided for all loans regardless of investor. These documents may need to be customized for certain situations that are unique to a particular investor's loan program. Should a servicer decide to revise HAMP documents or draft its own HAMP documents, it must obtain prior written approval from the Program Administrator with the exception of the circumstances for document revisions set forth below. To obtain approval, servicers should contact their Servicer Integration Team lead.

### 10.1 Amending HAMP Documents

Servicers must amend the Modification Agreement and TPP Notice as necessary to comply with applicable federal, state and local law. Servicers may, and in some instances must, make the applicable changes to the Modification Agreement as set forth in the Document Summary available on www.HMPadmin.com. In addition, servicers may amend HAMP documents as follows without prior written approval.

| Event | Detail |
|---|---|
| Non-uniform documents | The servicer may revise non-uniform HAMP documents in accordance with investor requirements, regulations or local real estate practice and may customize the forms with servicer specific logos. |
| Bankruptcy | If the borrower previously received a Chapter 7 bankruptcy discharge but did not reaffirm the mortgage debt under applicable law, the following language must be inserted in Section 1 of the Modification Agreement: "I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement." |
| Automated payment method | The servicer may include language in the TPP Notice providing instructions for borrowers who elect to use an automated payment method to make the trial period payments. |
| Prepayment or assumption provisions | The servicer may insert conditional language in the Modification Agreement to avoid having to review each set of original loan documents to determine if they contain prepayment or assumption provisions to retain first lien position, require subordination agreements and/or title policy endorsements. No prepayment penalties may be assessed in connection with modifications under HAMP. If any provision in the note or in any addendum or amendment to the note allows for the assessment of a penalty for full or partial prepayment of the note, such provision must be waived. |

| Event | Detail |
|---|---|
| Conditional Prepayment language for Modification Agreement | If the servicer is subject to a PSA or other servicing contract that requires payment by the servicer of a material sum to investors if any applicable prepayment penalties are waived, and servicers must use reasonable efforts to eliminate the PSA provision requiring payment by the servicer if the prepayment penalty is waived. |
| | However, if the servicer is unable to eliminate the PSA provision, the servicer is not required to waive the prepayment penalty as part of the modification, provided that the prepayment penalty must be waived with respect to any borrower "pay for performance" principal balance reduction payments that are applied to the borrower's mortgage loan. In such a case, servicers should replace Section 4.I. of the Modification Agreement with the following language: |
| | "That, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note must be waived with respect to any borrower "pay for performance" principal balance reduction payments that are applied to the Loan." |

## 10.2 Principal Reduction Alternative Documents

The documents for PRA are the same as those required under HAMP. However, the TPP Notice, the Modification Agreement and the Modification Agreement document summary were modified to include language regarding the deferred principal reduction terms. This language is set forth in the revised documents that are available on www.HMPadmin.com. This language includes:

- An explanation of how the deferred principal reduction will be applied to the loan;

- A statement that the principal reduction amount will be reported to the IRS in the year in which the curtailment is applied; and

- Advice to the borrower to seek guidance from a tax professional to determine any potential tax consequences.

In addition, the TPP Notice and the Modification Agreement Cover Letter must explain that the borrower may decline any offered principal reduction and include a phone number the borrower may use to decline the offer.

Servicers that offered permanent modifications utilizing PRA prior to issuance of the revised documents must have modified the Modification Agreement to include the deferred principal reduction terms.

# 11 Treasury Reporting Requirements

Servicers are required to provide loan level data reporting to the Program Administrator detailing the process of the evaluation, TPP, modification, and servicing of a loan modified under HAMP. This data must be accurate, complete, and in agreement with the servicer's records.  The loan level reporting requirements, timing, loan attributes and detailed guidelines for submitting data files are posted on www.HMPadmin.com.  Servicers are required to submit four separate data files summarized below using the HAMP Reporting Tool.

## 11.1 Trial Period Reporting Requirements

Services must report a TPP loan setup to the HAMP Reporting Tool no later than the fourth business day of the month immediately following the month in which the TPP Effective Date occurs. Servicers must also report activity monthly during the trial period to the HAMP Reporting Tool no later than the fourth business day of the month immediately following each trial period month in order to substantiate the receipt of borrower trial period payments.

## 11.2 Loan Setup Reporting Requirements

A one-time loan set up is required to establish the permanent modification in the HAMP Reporting Tool. The file layout is the same as that used to submit loans for processing during the trial period.

Servicers are required to input loan set up attributes no later than the fourth business day of the month in which the modification is effective. For example, if a modification is effective as of September 1st, the servicer must enter loan set up attributes in the HAMP Reporting Tool no later than the fourth business day of September. Modifications reported outside of this specified timeframe will be accepted. However, late reporting may adversely impact monthly cumulative modification totals. The HAMP Reporting Tool validates that permanent modification terms are consistent with program requirements and uses the data to calculate the borrower, servicer and investor incentives. The set up file will reflect the status of the loan after the final trial period payment is applied. The set up file will contain data for the current reporting period, including the prior month balances.

A servicer may not submit an official loan set up record to the Program Administrator to report the permanent modification until the servicer has obtained a fully executed Modification Agreement.

## 11.3 Official Monthly Reporting

Once a permanent modification has been set up, servicers must begin reporting activity on a monthly basis. The Official Monthly Report (OMR) is due by the fourth business day each month for any permanent modification with a Modification Effective Date at least one month prior. For example, if the Modification Effective Date is July, the first loan activity report is due by the fourth business day of August for July activity. The monthly reporting attributes are posted on www.HMPadmin.com.

The Program Administrator will work with servicers during each reporting cycle to resolve any edits that arise in the OMR reporting process. Servicers have until two business days prior to the close of the monthly reporting cycle (the 17th calendar day of the month or the prior business day if the 17th is not a business day) to clear up any edits and to report a final OMR to the Program Administrator. For specific dates, servicers should refer to the Operational Reporting calendar, which is located on www.HMPadmin.com.

The HAMP Reporting Tool validates that the borrower payment has been made as expected and that the last paid installment date is current before accruing the appropriate monthly compensation due.

## 11.4 Additional Data Requirements Reporting

Servicers must collect and report the additional data set forth in the HAMP Additional Data Requirements Data Dictionary available on www.HMPadmin.com for all (i) permanent modifications with effective dates on or after December 1, 2009, (ii) TPPs with effective dates on or after December 1, 2009, and (iii) mortgage loans evaluated for HAMP (as defined in Section 2.3) on or after December 1, 2009. This information is used by Treasury to assess program effectiveness and ensure servicer compliance with program requirements. The additional data

must be reported in the HAMP Reporting Tool no later than the fourth business day of each month following the month in which the data were collected.

### 11.4.1 Reason Codes

Servicers must report a Trial Not Accepted/Not Approved reason code for each loan that is evaluated (as defined in Section 2.3) and not offered a TPP or does not accept a TPP. Similarly, servicers must report a Trial Fallout reason code for each loan that falls out of or withdraws from a trial period or completes the trial period but does not result in a permanent modification. A list of reason codes is available in the HAMP Additional Data Requirements Data Dictionary posted on www.HMPadmin.com. When more than one reason under the Trial Not Approved/Not Accepted reason codes or Trial Fallout reason codes is applicable, the servicer must report the prevalent reason for the non-approval, non-acceptance or fallout.

### 11.4.2 Coding Property Condition for the HAMP Reporting Tool

If a servicer does not have the property condition from an appraisal or BPO, the servicer should enter "3" (Fair) in the HAMP Reporting Tool, provided the property meets HAMP eligibility requirements. A servicer must enter "5" if the property is condemned. When a servicer enters "3" because they do not have a property condition from an appraisal or a BPO:

- The "property condition" field in the HAMP Reporting Tool may not be relied on by the servicer as a justification or presumption that the loan qualifies for HAMP and that any subsequent payout based on the information in the HAMP Reporting Tool does not constitute a waiver on the part of the investor and/or Treasury, who reserves all rights to seek reimbursement of an improper payout or repurchase of the loan in the event the property does not meet HAMP eligibility requirements; and

- The "property condition" field in the HAMP Reporting Tool may not be relied on by the investor as grounds for repurchase of the loan due to a breach of a representation and warranty related to the property condition.

## 11.5 Principal Reduction Alternative Reporting

PRA reporting and payment processes are currently under development by the Program Administrator. Subsequent guidance will be provided describing the PRA reporting and payment processes and when they will be available.

The HAMP Data Dictionary and the HAMP Additional Data Requirements Data Dictionary will be revised to reflect new and modified edits for PRA and will be posted on www.HMPadmin.com.

### 11.5.1 Interim Period Reporting

The time period between June 3, 2010 and the date the PRA reporting and payment processes is referred to in this Handbook as the Interim Period. Servicers that offer permanent modifications with PRA during the Interim Period will be required to report the transaction to the HAMP Reporting Tool. Any PRA principal reduction on Interim Period loans should be reported in the existing principal write-down field. Servicers should not, however, reduce the UPB by the amount of any PRA principal reduction in the HAMP Reporting Tool for Interim Period loans (though servicers should reduce the UPB by any principal reduction that is not related to PRA). When the PRA reporting and payment processes are implemented, servicers must submit a correction transaction that will move the PRA principal reduction to a new PRA-specific principal forgiveness field. During the Interim Period, servicers must collect and retain PRA-specific information so that the necessary data can be reported when the processes become available.

### 11.5.2 Reporting PRA Retroactively

The following guidance applies to loans where principal reduction is offered after the loan has been permanently modified in accordance with Section 6.4.1.

During the time period between the application of PRA retroactively and the time the system is available to report such a transaction, servicers must hold their reporting of the principal reduction until such time as the system can accept the values.

## 11.6 Escalated Cases Reporting

### 11.6.1 Summary Reporting

Servicers that are required to provide weekly summary-level data to the Program Administrator via the HAMP Weekly Servicer Survey must include weekly summary-level data for all Escalated Cases. The data must be accurate, complete, and in agreement with the servicer's records, are subject to review by MHA-C, and may be included in public reports made available by Treasury.

### 11.6.2 Reporting During Borrower Dispute Period

Servicers may not cancel a loan from the HAMP Reporting Tool or report a "Trial Not Approved/Not Accepted" reason code within the 30 calendar days after the date of a Non-Approval Notice or any longer period required to review and resolve an Escalated Case. In addition, servicers should continue to report the status of the loan in accordance with HAMP reporting guidelines outlined in Section 12 and on www.HMPadmin.com.

# 12 External Reporting Requirements

## 12.1 Reporting to Mortgage Insurers

Servicers must comply with reporting required by the mortgage insurer for loans modified under HAMP and consult with the mortgage insurer for specific processes related to the reporting of modified terms, payment of premiums, payment of claims, and other operational matters in connection with mortgage HAMP modified loans.

Servicers are required to report permanent HAMP modifications and the terms of those modifications to the appropriate mortgage insurers, if applicable, within 30 days following the end of the trial period and in accordance with procedures that currently exist or may be agreed to between the servicers and the mortgage insurers.

Servicers must collect the mortgage insurance premium in addition to the borrower's modified payment and ensure that any existing mortgage insurance is maintained. Among other things, the servicer must ensure that the mortgage insurance premium is paid.  In addition, servicers must adapt their systems to ensure the proper reporting of modified loan terms and avoid impairing coverage for any existing mortgage insurance.  For example, in the event that the modification includes principal forbearance, servicers must continue to pay the correct mortgage insurance premiums based on the gross UPB, including any principal forbearance amount and include the gross UPB in their delinquency reporting to the mortgage insurer.  Servicers should ensure any principal forbearance does not erroneously trigger automatic mortgage insurance cancellation or termination.

## 12.2 Credit Bureau Reporting

Servicers should report a "full file" status report to the credit reporting agencies for each loan under HAMP in accordance with the Fair Credit Reporting Act as well as other applicable laws and credit bureau requirements as provided by the Consumer Data Industry Association (CDIA).

"Full-file" reporting means that the servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month.

### 12.2.1 Trial Period Reporting

If the borrower was current with payments prior to the trial period and he or she makes each trial period payment on time, servicers must report the borrower as current (Account Status 11) during the trial period and report Special Comment Code 'AC' (Paying under a partial or modified payment agreement). The servicer must also report the modification when it is completed.

If the borrower was delinquent (at least 30 days past the due date) prior to the trial period and the reduced payments do not bring the account current, servicers must report the Account Status Code that reflects the appropriate level of delinquency following the usual and customary reporting standards. The servicer reports the modification when it is completed as well. The servicer should also report Special Comment Code 'AC' (Paying under a partial or modified payment agreement).

### 12.2.2 Post Modification Reporting

Following modification of a loan under HAMP, servicers should use Special Comment Code 'CN' (Loan modified under a federal government plan) to identify loans being paid under a modified payment agreement as described in the guidance below provided by CDIA.

- Servicers should continue to report one trade line under the original Account Number.

- Date Opened = the date the account was originally opened

- Original Loan Amount = the original amount of the loan, including the Balloon Payment Amount, if applicable. If the principal balance increases due to capitalization of delinquent amounts due under the loan, the Original Loan Amount should be increased to reflect the modified principal balance

- Terms Duration = the modified terms

- Scheduled Monthly Payment Amount = the new amount as per the modified agreement

- Current Balance = the principal balance (including the Balloon Payment Amount, if applicable), plus the interest and escrow due during the current reporting period

- Account Status Code = the appropriate code based on the new terms of the loan

- Special Comment Code = CN

- K4 Segment = used to report the Balloon Payment information, if applicable

- Specialized Payment Indicator = 01 (Balloon Payment)

- Payment Due Date = the date the balloon payment is due, which is equal to maturity of the amortizing portion of the loan. Note: The payoff date can be used in this field

- Payment Amount = the Balloon Payment Amount in whole dollars only

Servicers should ensure that all borrowers who receive a permanent modification are reported using the 'CN' Special Comment Code and not the 'AC' Special Comment Code. If the Modification Effective Date has passed, the servicer is not required to make corrections to prior months if the AC code was previously reported. Special Comment Code AC is not "sticky", meaning that it does not persist on the credit file.

### 12.2.3 Principal Reduction Alternative Reporting

For loans modified using PRA, when each installment of the PRA Forbearance Amount is applied to the UPB of the loan, the servicer should update the credit repositories with the current balance owed and amend the K4 segment to reflect the reduced UPB.

The "due date" in the K4 Segment should reflect the scheduled maturity date of the permanent modification. However, if the Principal Forbearance Amount no longer applies after the portion of the loan is forgiven, the servicer should no longer report the K4 Segment.

# 13 Incentive Compensation

Borrowers, servicers and investors are eligible for incentive compensation under HAMP.  The Program Administrator will make incentive payments to the servicer via an automated clearing house (ACH) transaction in a consolidated fashion and will provide detailed loan-level accounting for incentives on a monthly basis.  Upon receipt of such incentive compensation, each servicer must promptly, but not later than 30 calendar days after receipt, apply or remit, as applicable, all borrower and investor compensation with respect to any modified loan, including with respect to any PRA-modified loan.  Treasury is not providing guidance on how funds are to be passed through to security holders of securitization trusts.  However, MHA-C will monitor to ensure that cost share reduction payments are remitted to security holders and borrower pay for performance incentive payments are applied to borrower accounts in accordance with program guidelines.

With respect to payment of any incentive that is predicated on a six percent reduction in the borrower's monthly mortgage payment, the reduction will be calculated by comparing the monthly mortgage payment used to determine eligibility (adjusted as applicable to include property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees) and the borrower's payment under HAMP.

No incentives of any kind will be paid if:

- The servicer has not executed the SPA;

- The servicer has reached its Program Participation Cap, as discussed in Section 1.5 of Chapter I;

- The borrower does not qualify for, or otherwise enter into, a permanent modification; or

- The loan has not been reported to the Program Administrator through the HAMP Reporting Tool.

## 13.1 Servicer Incentive Compensation

A servicer will be entitled to the completed modification incentive and, if applicable, the current borrower incentive once the borrower enters into a permanent modification, provided that the servicer has reported to the Program Administrator any required servicer or loan set up data.  The completed modification incentive and the current borrower incentive will be paid to the servicer in the month that the permanent modification becomes effective.

### 13.1.1 Completed Modification Incentive

A servicer will receive compensation of $1,000 for each completed modification under HAMP.

### 13.1.2 Current Borrower Incentive

If a borrower was current under the original mortgage loan, a servicer will receive an additional compensation amount of $500 for completing the permanent modification.  Pursuant to Section 8.2, when the TPP Notice is transmitted to the borrower after the 15th day of a calendar month,

which calls for a TPP Effective Date as of the first day of the month after the next month, such incentive is paid only if borrowers either (i) make their contractual payment in the intervening month prior to the effective date of the trial period; or (ii) agree to commence their trial period on the first day of next month. Servicers should remind their current borrowers in writing that they must make all contractual payments due under the terms of their original loan documents until the TPP Effective Date.

### 13.1.3 *"Pay for Success" Incentive*

If a particular borrower's monthly mortgage payment is reduced through HAMP by six percent or more, a servicer will also receive an annual "pay for success" fee for a period of three years.  The fee will be equal to the lesser of:

- $1,000 ($83.33/month); or

- One-half of the reduction in the borrower's annualized monthly payment.

The "pay for success" fee will be payable annually for each of the first three years after the anniversary of the month in which the TPP Effective Date occurred as long as the loan is in good standing and has not been paid in full at the time the incentive is paid.

If the loan ceases to be in good standing or is paid in full, the servicer will forfeit any incentive payments that have accrued but are unpaid and will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.

## 13.2 Borrower Incentive Compensation

Borrowers whose monthly mortgage payment is reduced through HAMP by six percent or more and who make timely monthly payments will earn an annual "pay for performance" principal balance reduction payment equal to the lesser of:

- $1,000 ($83.33/month); or

- One-half of the reduction in the borrower's annualized monthly payment for each month a timely payment is made.

The "pay for performance" principal balance reduction payment will accrue for each month in which the borrower makes current payments.  The payment will be payable annually for each of the first five years after the anniversary of the month in which the TPP Effective Date occurred as long as the loan is in good standing and has not been paid in full at the time the incentive is paid.

For example, if the borrower is current and makes 10 out of 12 payments on time, he or she will be credited for 10/12 of the annual incentive payment as long as the loan is in good standing at the time the annual incentive is paid. A borrower whose loan is delinquent on a rolling 30- or 60-day basis will not accrue annual incentive payments.

This payment will be paid to the mortgage servicer to be applied first towards reducing the interest bearing UPB on the mortgage loan and then to any principal forbearance amount (if applicable).  Any applicable prepayment penalties on partial principal prepayments made by the government must be waived.  In the event the borrower is delinquent, but still in good standing, the borrower's incentive should continue to be applied as a curtailment to the interest-bearing UPB.

If the loan ceases to be in good standing or is paid in full, the borrower will forfeit any incentive payments that have accrued but are unpaid and will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.  With respect to PRA, if a borrower loses good standing before the entire PRA Forbearance Amount

has been applied as principal reduction to the UPB, the unapplied PRA Forbearance Amount shall remain as non-interest bearing principal forbearance for the remaining life of the loan.

"Pay for performance" principal balance reduction payments are excluded from gross income for tax reporting purposes.

## 13.3 Investor Incentive Compensation

An investor will be entitled to the payment reduction cost share and, if applicable, the PRA investor incentive and the current borrower incentive, once the borrower enters into a permanent modification.

### 13.3.1 Payment Reduction Cost Share

Investors are entitled to payment reduction cost share compensation equal to one-half of the dollar difference between the borrower's monthly payment (principal and interest only) under the modification calculated at 31 percent of the borrower's monthly gross income and the lesser of:

- What the borrower's monthly payment (principal and interest only) would be at a 38 percent monthly mortgage payment ratio; or

- The borrower's pre-modification monthly payment (principal and interest only).

Payment reduction cost share compensation is paid monthly beginning the month following the month of the effective date of the permanent HAMP modification so long as the loan is in good standing.  This compensation will be provided for up to five years or until the loan is paid off, whichever is earlier.

### 13.3.2 Current Borrower Incentive

If a borrower was current under the original mortgage loan and the borrower's monthly mortgage payment was reduced by at least six percent, an investor will receive an additional compensation amount of $1,500 for completing the permanent modification.  Pursuant to Section 8.2, when the TPP Notice is transmitted to the borrower after the 15th day of a calendar month, which calls for a TPP Effective Date as of the first day of the month after the next month, such incentive is paid only if borrowers either (i) make their contractual payment in the intervening month prior to the effective date of the trial period; or (ii) agree to commence their trial period on the first day of next month.  Servicers should remind their current borrowers in writing that they must make all contractual payments due under the terms of their original loan documents until the TPP Effective Date.

### 13.3.3 Home Price Decline Protection (HPDP) Incentives

The HPDP initiative provides investors with additional incentives for modifications of loans on properties located in areas where home prices have recently declined and where investors are concerned that price declines may persist. HPDP incentive payments are linked to the rate of recent home price decline in a local housing market, as well as the UPB and mark-to-market LTV ratio of the mortgage loan.

HPDP incentive payments will be made only with respect to modifications with TPP Effective Dates and NPV Dates (as defined in Section 13.3.3.1) on or after September 1, 2009. HPDP incentives are conditional upon at least a six percent reduction in the borrower's monthly mortgage payment.

### 13.3.3.1 HPDP Calculation

The HPDP incentive payments are calculated based upon the following three characteristics (outlined further in Exhibit C) of the mortgage loan receiving a modification:

- An estimate of the cumulative projected home price decline over the next year, as measured by changes in the home price index over the previous two quarters in the applicable local market (MSA or non-MSA region) in which the related mortgaged property is located;

- The UPB of the mortgage loan prior to modification; and

- The mark-to-market LTV of the mortgage loan based on the UPB of the mortgage loan prior to modification.

The Program Administrator will determine the potential HPDP incentive payable for a modification as of the date the NPV Model initially is run by the servicer to evaluate the borrower's eligibility to receive a HAMP offer (NPV Date). The NPV Date for determining the potential HPDP incentive payment is the same date that the servicer must report in the NPV Date data field as part of the trial period set up file for the mortgage loan.

The HPDP incentive payment is an input in the Base NPV Model.  The Base NPV Model accesses the proper HPDP incentive payment for each NPV calculation, so servicers that use the Base NPV Model will not need to take any action with respect to the HPDP incentive payment. Servicers that integrate the Base NPV model into their systems or customize the NPV model in accordance with HAMP requirements are responsible for ensuring that they incorporate the required HPDP determination functionality into their version of the NPV model. The HPDP incentive payment amount used for a mortgage loan in the NPV model on the NPV Date used to determine the borrower's HAMP eligibility should be used in any subsequent runs of the NPV model for that mortgage loan.

Specific details regarding the use of the HPDP incentive payment in the NPV model are in the model documentation of the Base NPV Model.

An example of the HPDP calculation is provided in Exhibit D.

### 13.3.3.2 HPDP Accrual and Payments

The potential HPDP incentive payable for a modification will accrue over a two-year period. An investor will accrue 1/24th of the total HPDP incentive payment for every month in which the borrower remains in good standing. The accrued HPDP incentive payments to the investor will include payments for each trial period month. However, if the trial period is not completed successfully, no HPDP incentives will be paid to an investor. HPDP incentive payments will cease to accrue once a borrower loses good standing under HAMP or is paid in full. However, investors will be entitled to all accrued, but unpaid HPDP incentive payments.

Payments of accrued HPDP incentives will be made on an annual basis on each of the first anniversary and the second anniversary of the TPP Effective Date. Accrued but unpaid HPDP incentive payments are payable on the HAMP incentive payment date in the month in which the loss of good standing or payment in full is reported to the Treasury system of record.

### 13.3.4 Principal Reduction Alternative Investor Incentive Payments

Investors will qualify for PRA investor incentive payments for reductions creating a mark-to-market LTV ratio as low as 105 percent, even if (i) the reduction results in a monthly mortgage payment ratio below the 31 percent target or (ii) the pre-modification mark-to-market LTV ratio is greater than 105 percent but less than or equal to 115 percent. Servicers are not precluded from reducing principal below a 105 percent mark-to-market LTV ratio; however, PRA investor incentives will not be paid on the portion of any principal reduction that reduces the mark-to-market LTV ratio below 105 percent. Additionally, pursuant to Section 13.3.1, Investor Payment Reduction Cost Share Incentives will only be paid based on modification terms that reflect the

target monthly mortgage payment ratio. PRA investor incentives will only be paid in conjunction with principal reduction that is deferred over three years in accordance with the requirements of Section 6.4.5.

### 13.3.4.1 Principal Reduction Incentive Schedule

**PRA Compensation**

**Per Dollar of UPB Forgiven in Mark-to-Market LTV Ratio Range**

**(Loans Less than or Equal to Six Months Past Due)**

| 105% to <115% | 115% to 140% | >140% |
|---|---|---|
| 0.21 | 0.15 | 0.10 |

With respect to loans that were less than or equal to six months past due at all times during the 12-month period prior to the NPV Date, investors will be entitled to receive $0.21 per dollar of principal reduction equal to or greater than 105 percent and less than 115 percent mark-to-market LTV ratio; $0.15 per dollar of principal reduction equal to or greater than 115 percent and less than or equal to 140 percent mark-to-market LTV ratio; and $0.10 per dollar of principal reduction in excess of 140 percent mark-to-market LTV ratio.

With respect to loans that were more than six months past due at any time during the 12-month period prior to the NPV Date, irrespective of mark-to-market LTV ratio range, investors will be paid $0.06 per dollar of principal reduction and will not be eligible for incentives in the above extinguishment schedule. PRA investor incentive payments will be earned by investors in the month in which the applicable principal reduction amount is actually applied to reduce the borrower's UPB as set forth in Section 6.4.5.

### 13.3.4.2 Interim Period Incentive Compensation

Loans with a pre-modification mark-to-market LTV greater than 105 percent that are permanently modified under HAMP during the Interim Period and include PRA principal reduction may be eligible for PRA investor incentives in compliance with Section 13.3.4.1 so long as:

- The loan remains in good standing as defined in Section 9.4 on the implementation date of the PRA reporting and payment processes by the Program Administrator;

- The modification otherwise complies with HAMP requirements;

- The modification terms are accurately entered into the HAMP Reporting Tool at the time of modification in compliance with the guidance set forth in Section 13.3.4; and

- When the PRA reporting and payment processes become available, a correction transaction is submitted moving the PRA principal reduction to the new PRA specific principal forgiveness field and all additional PRA specific data retained by the servicer is reported to the HAMP Reporting Tool.

Servicers providing principal reduction during the Interim Period will not be required to perform an alternative NPV evaluation for loans modified prior to the PRA Effective Date. Notwithstanding the foregoing, Interim Period loans that are fully satisfied prior to implementation of the PRA reporting and payment processes are not eligible for PRA investor incentives.



# Chapter III

# Home Affordable Unemployment Program
# (UP)

# 1 Introduction

The Home Affordable Unemployment Program (UP) provides servicers the flexibility to provide assistance to borrowers whose hardship is related to unemployment.  Servicers that are participating in HAMP with respect to Non-GSE Mortgages must follow the guidance set forth in this Chapter when borrowers seeking assistance are unemployed.

MHA-C will incorporate an evaluation of UP implementation, processes, and controls into its servicer reviews. Servicers should refer to Section 2 of Chapter I.

# 2 Eligibility

## 2.1 UP Eligibility Requirements

A borrower or co-borrower who is unemployed and requests assistance under HAMP must be evaluated for and, if qualified, must receive an UP forbearance plan before the borrower may be considered for HAMP. Servicers are required to offer an UP forbearance plan to a borrower who meets the following HAMP minimum eligibility criteria:

| First Lien | The mortgage loan is a first lien mortgage loan originated on or before January 1, 2009. This includes mortgages secured by:<br><br>• Cooperative shares,<br><br>• Condominium units, and<br><br>• Manufactured housing (the first lien mortgage loan must secure the manufactured home and the land, both of which must be classified as real property under applicable state law). |
|---|---|
| Unpaid principal balance limits | The current UPB of the mortgage loan prior to capitalization is not greater than:<br><br>• 1 Unit   $729,750<br><br>• 2 Units  $934,200<br><br>• 3 Units  $1,129,250<br><br>• 4 Units  $1,403,400 |
| Owner-occupied, single family property | The mortgage loan is secured by a one- to four-unit property, one unit of which is the borrower's principal residence.  Additionally, a loan may be considered for UP if the property was originally non-owner occupied, but the servicer can verify that it is currently the borrower's principal residence. |
| Not vacant or condemned | The property securing the mortgage loan is not vacant or condemned. |
| Delinquent or in imminent default | The mortgage loan is delinquent or default is reasonably foreseeable. |
| Not previously HAMP modified | The mortgage loan has not been previously modified under HAMP and the borrower has not previously received an UP forbearance. |

## *2.2 Additional Factors Impacting UP Eligibility*

| | |
|---|---|
| Minimum monthly mortgage payment ratio | The borrower's monthly mortgage payment (including principal, interest, taxes, insurance, and when applicable, homeowners assessments) prior to the modification is greater than 31 percent of the borrower's verified monthly gross income.<br><br>Servicers may waive this criterion for UP forbearance plan eligibility. However, servicers are not required to offer an UP forbearance plan to borrowers whose total monthly mortgage payment is less than or equal to 31 percent of the borrower's monthly gross income, including unemployment benefits.  Servicers are not required to offer an UP forbearance plan if a household member that is not a borrower becomes unemployed, even if that income contributed to the mortgage payment. |
| Request prior to serious delinquency | The borrower makes a request before the first mortgage lien is seriously delinquent (before three monthly payments are due and unpaid on the last day of the third month). |
| Unemployed at date of UP request | The borrower is unemployed at the date of the request. |
| Receipt of unemployment benefits | The borrower will receive unemployment benefits in the month of the Forbearance Period Effective Date.  The borrower's unemployment benefit eligibility need not extend for the entire duration of the UP forbearance period.<br><br>The servicer may, pursuant to investor or regulator guidelines, require that a borrower has already received unemployment benefits for up to three months before the UP forbearance period begins.<br><br>A borrower who has received unemployment benefits for less than the minimum time period required by the servicer may request consideration for an UP forbearance plan; however, the forbearance period will not begin until after the borrower has received unemployment benefits for the minimum time period required by the servicer.<br><br>Servicers must have written procedures for determining when a borrower must be in receipt of up to three months of unemployment benefits and must consistently apply those procedures. |

## 2.3 Eligibility of HAMP Borrowers

| HAMP Ineligible | A borrower who was previously determined to be ineligible for a HAMP modification may request consideration for an UP forbearance plan if the borrower meets the UP eligibility requirements. |
|---|---|
| Borrower in an Active Trial Period Plan | A borrower who is currently in a TPP and becomes unemployed may seek consideration under UP if the borrower has made all required TPP payments by the end of the month in which the payment was due and was not seriously delinquent (before three monthly payments are due and unpaid on the last day of the third month) as of the first payment due date of the HAMP TPP.  A borrower may not simultaneously be in a HAMP TPP and an UP forbearance plan.<br><br>A servicer may not require an unemployed borrower in a TPP to convert to an UP forbearance plan. |
| Borrower in a permanent modification | A borrower in a permanent modification that becomes unemployed is not eligible for an UP forbearance plan. In addition, a borrower is not eligible for an UP forbearance plan if the borrower either (1) received a modification and lost good standing (as defined in Section 9.4 of Chapter II) or (2) received a TPP offer and failed to make one or more payments by the last day of the month in which it was due. |

## 2.4 Borrower Not Eligible for UP

Unemployed borrowers who do not meet the eligibility criteria for an UP forbearance plan should be evaluated for other proprietary forbearance programs similar to UP. Borrowers that are not offered any type of forbearance plan related to unemployment must be evaluated for HAMP, excluding from monthly gross income unemployment benefits and any other temporary sources of income related to unemployment, such as severance payments. If the borrower is not eligible for HAMP, the servicer must send the borrower a Non-Approval Notice in accordance with Section 2.3.2 of Chapter II.

## 2.5 Borrower Declines UP

If a borrower who is eligible for UP declines an offer for an UP forbearance plan, the servicer is not required to offer the borrower a modification under HAMP; provided, however, the servicer may (but is not required to), in accordance with investor guidelines, offer to evaluate the borrower for HAMP. The servicer must notify the borrower that, if they are eligible for an UP forbearance plan but they do not accept it, they may not be considered for a modification under HAMP while they are eligible for an UP forbearance plan. The borrower may request reconsideration under HAMP at a future time if the requirements of the "Continued Eligibility" guidance set forth in Section 1.2 of Chapter II are met.

# 3 Protections Against Unnecessary Foreclosure

Servicers may not refer any loan to foreclosure or conduct a scheduled foreclosure sale in the following circumstances:

- After a borrower makes a request for UP consideration and while the borrower is being evaluated for UP;

- After the servicer mails the Forbearance Plan Notice (FPN) as described in Section 4.3, even if the servicer requires the borrower to be in receipt of up to three months of unemployment benefits before commencement of the forbearance plan;

- During the initial UP forbearance plan or any extension thereof; and

- Following the UP forbearance plan while the borrower is being evaluated for or participating in HAMP or HAFA.

- Until the servicer has resolved the Escalated Case in accordance with Section 3 of Chapter I.

In addition, servicers must follow the solicitation and foreclosure provisions in Section 2.2 and Section 3.4 of Chapter II, respectively.

# 4 UP Forbearance Plans

## 4.1 Request for UP Forbearance

A request for UP consideration may be made by phone, mail or e-mail. Servicers must document the date of the UP request in the servicing file.  Once the borrower requests consideration for UP, the servicer must send the borrower a written notice within 10 business days confirming the receipt of the request and providing a list of the required documentation, including unemployment benefit information. The due date for the required documentation may not be less than 15 calendar days from the date of the servicer communication. The servicer must indicate in the servicing system when it determines all required documentation has been received.

After receiving the borrower's required documentation, the servicer must determine the borrower's eligibility for UP within 30 calendar days.  The servicer must mail an FPN or a Non-Approval Notice to the borrower within 10 business days following the date of the servicer's determination.

## 4.2 UP Forbearance Plan Terms

### 4.2.1 Duration

The minimum UP forbearance period is the lesser of three months or upon notification that the borrower has become re-employed. Servicers should establish procedures for tracking borrowers' employment status and include any applicable borrower instructions in the FPN, as described below.

### 4.2.2 Extension

Servicers may extend the minimum forbearance period in increments at the servicer's discretion, in accordance with investor and regulatory guidelines.  Any borrower eligibility review or recertification documentation requirements that may apply after the initial forbearance period are at the servicer's discretion, in accordance with investor and regulatory guidelines.

### 4.2.3 Monthly Payments

The borrower's monthly mortgage payment must be reduced to an amount that is no more than 31 percent of the borrower's monthly gross income (as defined in Section 6.1.1 of Chapter II). In determining monthly gross income, the servicer may rely on stated income provided by the borrower or may require documentation of income. At the discretion of the servicer, the borrower's monthly mortgage payments may be suspended in full.  The payment amount, if any, will be determined by the servicer in accordance with investor and regulator guidelines and applicable laws and regulations. Servicers must have written procedures for determining when a payment will be required during an UP forbearance plan and how the payment amount will be determined, and must consistently apply those procedures.

### 4.2.4 Late Fees

Late charges may accrue while the servicer is determining borrower eligibility for an UP forbearance plan and during the forbearance period. However, a servicer must not collect late charges from the borrower during the forbearance period. Additionally, all accrued and unpaid late charges must be waived in the event the borrower receives a permanent HAMP modification.

## 4.3 Forbearance Plan Notice (FPN)

As described above in Section 4.1, after receiving the borrower's required documentation, the servicer is required to determine the borrower's eligibility for UP and send the borrower either an FPN or a Non-Approval Notice. For existing UP forbearance plans, at least 30 days prior to the expiration date, the servicer is required to determine if an extension will be provided and mail an FPN, as applicable, within 10 business days following the determination. A Non-Approval Notice is not required when an extension is not granted.

If a borrower is eligible for UP and any extension thereof, the servicer must send the borrower an FPN that describes the terms and conditions of the initial UP forbearance plan or extension and, which at a minimum must include the following:

- Duration of the forbearance plan along with the Forbearance Period Effective Date and the expiration date;

- Periodic payment amount, if any;

- Brief explanation regarding what will occur when the borrower is re-employed or when the forbearance plan expires; and

- Borrower's responsibility to provide updates to his or her employment status during the forbearance plan, if applicable.

Borrowers are not required to sign or return the FPN. However, servicers may require the borrower to execute and return a written forbearance plan agreement if required by investor guidelines. Servicers should retain a copy of the FPN in the applicable servicing file and note the date that it was sent to the borrower.

If a borrower is determined to be ineligible for forbearance, servicers must communicate this determination to the borrower by sending a Non-Approval Notice that includes the primary reason for ineligibility. The notice must also describe other foreclosure alternatives for which the borrower may be eligible, if any, including but not limited to HAMP, other home retention programs, HAFA or other short sale or deed-in-lieu programs, and identify the steps the borrower must take in order to be considered for those options. Servicers may use the applicable non-approval model clause provided in Exhibit A. Use of the model clauses is optional; however, they illustrate a level of specificity that is deemed to be in compliance with the language requirements of this Handbook.

## 4.4 Commencement and Timing of Payments

A borrower's UP forbearance plan starts on the Forbearance Period Effective Date. If the servicer transmits the FPN to the borrower on or before the 15th day of a calendar month, then the servicer should insert the first day of the next month as the Forbearance Period Effective Date. If the servicer transmits the FPN to the borrower after the 15th day of a calendar month, the servicer may, as an alternative, use the first day of the month after the next month as the Forbearance Period Effective Date. Servicers who elect this alternative and require the borrower to have received unemployment benefits for up to three months should factor the additional month towards meeting the established requirement for unemployment benefits so that the forbearance period may begin immediately after meeting the requirement and must do so

consistently for all borrowers in accordance with written policies and procedures. This determination should be based on the date that the FPN is sent to the borrower.

If the servicer requires a reduced monthly payment, the servicer must receive the borrower's reduced payment on or before the last day of the month in which it is due. If the borrower fails to make timely payments, the UP forbearance plan may be canceled and the borrower is not eligible for HAMP consideration. Servicers are instructed to use good business judgment in determining whether UP forbearance payments were received timely or if mitigating circumstances caused the payment to be late. Exceptions should be documented by the servicer.

### 4.5 Transition from HAMP to UP Forbearance

Upon receipt of a request for consideration for an UP forbearance plan by an unemployed borrower in a TPP and evidence that the borrower is or will be eligible for unemployment benefits, the servicer must cancel the TPP and send the borrower an FPN in accordance with Section 4.3.

The servicer may not impose a waiting period before commencement of the forbearance plan by requiring the borrower to be in receipt of unemployment benefit for a longer period than required by UP. If following an UP forbearance plan the borrower is determined to again be eligible for HAMP, the borrower must complete a new TPP. To determine eligibility, the borrower will be required to submit complete and updated HAMP documentation (including the RMA, the Dodd-Frank Certification and updated proof of income), but will not be required to re-submit IRS Form 4506T-EZ if the servicer has already obtained a tax transcript for the most recent tax year.

### 4.6 Interaction of FDD Forbearance Plans with UP

If a borrower is unemployed when requesting an FDD forbearance plan and is eligible for both an FDD forbearance plan and an UP forbearance plan, or is currently in an UP forbearance plan, the servicer may utilize both forbearance plans consecutively. The first three months of forbearance should be considered part of the FDD forbearance plan. If the borrower is still unemployed at the end of the FDD forbearance period, the borrower must be moved to an UP forbearance plan or, at the borrower's request, be considered for HAFA.

## 5 Transition from Forbearance to HAMP

At the earlier of 30 days following notification that the borrower has found employment or 30 days prior to expiration of the forbearance period, the servicer must provide a HAMP-eligible borrower with an Initial Package of HAMP documents and, upon receipt of an Initial Package (as defined in Section 4 of Chapter II) from the borrower, must evaluate the borrower for HAMP. Both the borrower and the servicer must adhere to the timing and notice requirements in Section 4.5 and Section 4.6 of Chapter II. The servicer may extend the forbearance period by a maximum of 30 days as needed to allow the borrower time to submit the needed documentation. If the borrower is determined to be ineligible for HAMP or other home retention options, the borrower must be considered for other foreclosure alternatives, such as HAFA or other short sale and deed-in-lieu programs.

When evaluating a borrower for HAMP and calculating the borrower's total monthly mortgage payment ratio prior to the modification, the borrower's monthly gross income must include the new employment income as verified by an offer letter, first pay stub or other documentation consistent with the judgment employed by servicers when modifying mortgage loans held in their own portfolio. Any missed payments prior to and during the UP forbearance plan should be capitalized as part of the standard HAMP modification process.

# 6 Reporting Requirements

## 6.1 Treasury Reporting

All UP forbearance plan data submitted by the servicer must be accurate, complete, timely, and agree with the servicer's records.

### 6.1.1 Summary Reporting

During the UP forbearance plan, servicers are required to provide monthly UP forbearance plan summary level data to the Program Administrator.  A list of the required summary level data, which may be updated periodically, is available on www.HMPadmin.com.

### 6.1.2 System Reporting

Servicers will also be required to provide loan level reporting at the following key transition milestones:

- Exit from TPP to an UP forbearance plan – Servicers are required to submit applicable data pursuant to Section 11.4.1 of Chapter II including a Trial Fallout reason code indicating that the borrower is entering into an UP forbearance plan.

- Transition from an UP forbearance plan to TPP – If the borrower transitions from an UP forbearance plan into a TPP, servicers are required to submit a HAMP trial set up transaction with attributes indicating that the borrower had an UP forbearance plan.

Changes to several data reporting attributes under HAMP are required to enable servicers to report an exit from a TPP to an UP forbearance plan and a transition from an UP forbearance plan to a TPP.  All UP forbearance plan reporting requirements and any updates will be posted on the servicer web portal at www.HMPadmin.com.

## 6.2 Credit Bureau Reporting

The servicer should continue to report a "full-file" status report to the credit repositories for each loan in an UP forbearance plan in accordance with the Fair Credit Reporting Act and credit bureau requirements as provided by the CDIA.



**Chapter IV**

**Home Affordable Foreclosure Alternatives Program (HAFA)**

## 1 Introduction

The Home Affordable Foreclosure Alternatives (HAFA) Program provides financial incentives to servicers and borrowers who utilize a short sale or DIL as an alternative to foreclosure on an eligible loan under HAMP.   HAMP servicers must follow the guidance set forth in this Chapter to determine the extent to which short sales or DILs will be offered.

## 2 Eligibility

A loan is eligible for HAFA if the servicer verifies that all of the following criteria are met:

| | |
|---|---|
| First lien | The mortgage loan is a first lien mortgage loan originated on or before January 1, 2009. This includes mortgages secured by:<br><br>• Cooperative shares,<br><br>• Condominium units, and<br><br>• Manufactured housing (the first lien mortgage loan must be secured by the manufactured home and the land, both of which must be classified as real property under applicable state law). |
| Delinquent or in imminent default, foreclosure or bankruptcy | The mortgage loan is delinquent or default is reasonably foreseeable.  Loans currently in foreclosure or bankruptcy are eligible. |
| Owner-occupied, single family property | The mortgage loan is secured by a one- to four-unit property, one unit of which is the borrower's principal residence.  Additionally, a loan may be considered for HAFA if:<br><br>• The property was originally non-owner occupied, but the servicer can verify that it is currently the borrower's principal residence.<br><br>• The borrower is temporarily displaced (e.g., military service, temporary foreign service assignment, or incarceration) but was occupying the property as his or her principal residence immediately prior to his or her displacement and the current occupant is not a tenant. |
| Not vacant or condemned | The property securing the mortgage loan is not condemned.<br><br>The property securing the mortgage loan is not vacant, except that the property can be vacant up to 12 months prior to the date of the Short Sale Agreement (SSA), Alternative Request for Approval of Short Sale (Alternative RASS) or DIL Agreement if the borrower provides documentation that it was their principal residence prior to relocation and there is no evidence indicating that the borrower has purchased a one- to four-unit property during the 12-month period prior to the date of the SSA, Alternative RASS or DIL Agreement.<br><br>Each servicer must include in its HAFA Policy the evidentiary materials that it will accept to validate the residency requirement.  At a minimum, servicers are required to obtain some third-party verification that the property was the borrower's primary residence at some point within the prior 12 months and servicers may not rely exclusively on an affidavit provided by the borrower. |

| Unpaid principal balance limits | The current UPB of the mortgage loan not including arrearages is not greater than:<br>• 1 Unit $729,750<br>• 2 Units $934,200<br>• 3 Units $1,129,250<br>• 4 Units $1,403,400 |
|---|---|
| Financial hardship | A borrower has documented a financial hardship, evidenced by a signed Hardship Affidavit or RMA, wherein the borrower has represented that he or she does not have sufficient liquid assets to make the monthly mortgage payments. |
| Program cut-off date | The servicer has received an executed HAFA SSA or DIL Agreement by the borrower on or before December 31, 2012. |

# 3 HAFA Consideration

Servicers may not solicit a borrower for HAFA until the borrower has been evaluated for HAMP in accordance with the requirements of Chapter II. Borrowers that meet the eligibility criteria for HAMP but who are not offered a TPP, do not successfully complete a TPP, or default on a permanent HAMP modification should first be considered for other loan modification or retention programs offered by the servicer prior to being evaluated for HAFA.

Each participating servicer must develop a written policy, consistent with investor guidelines, that describes the basis on which the servicer will offer HAFA to borrowers (HAFA Policy). A servicer's HAFA Policy must: (i) identify the circumstances under which the servicer will require monthly mortgage payments and how that payment will be determined, in accordance with applicable laws, rules and regulations; (ii) describe the basis on which the minimum acceptable net proceeds will be determined; (iii) describe how subordinate lien holders will be paid, whether by percentage of the UPB of their loan or some other determination; (iv) describe if and when the servicer will require income documentation; (v) if servicer has a program with an option for deed-for-lease or an opportunity for the borrower to repurchase the property at some future time, describe such program and conditions; (vi) describe if and when a borrower that was determined to be ineligible for HAFA prior to February 1, 2011 will be re-evaluated; and (vii) may incorporate such factors as:

• The severity of the loss involved;

• Local market conditions,

• The timing of pending foreclosure actions;

• Borrower motivation and cooperation;

• Customary transactional costs of short sales and DILs; and

• The amounts that may be required to release any subordinate liens on the property.

The date and outcome of the HAFA consideration must be documented in the servicer's file.

Servicers must consider possible HAMP-eligible borrowers for HAFA within 30 calendar days of the date the borrower:

• Does not qualify for a TPP;

- Does not successfully complete a TPP; or
- Is delinquent on a HAMP modification by missing at least two consecutive payments.

If a borrower requests a short sale or DIL (whether such request is in response to a servicer's solicitation under the first paragraph of Section 4 or initiated by the borrower), within 45 days of such request the servicer must consider the borrower for HAFA and send the SSA, DIL Agreement, a written notification that the borrower will not be offered a SSA or DIL or a written response to the Alternative RASS, in accordance with Section 4.2 and Section 7.4.

Borrowers in active Chapter 7 or Chapter 13 bankruptcy cases must be considered for HAFA if the borrower, borrower's counsel or bankruptcy trustee submits a request to the servicer. With the borrower's permission, a bankruptcy trustee may contact the servicer to request a short sale or DIL under HAFA. Servicers are not required to solicit these borrowers proactively for HAFA. The servicer and its counsel must work with the borrower or borrower's counsel to obtain any court and/or trustee approvals required in accordance with local court rules and procedures. Servicers should extend HAFA timeframes as necessary to accommodate delays in obtaining court approvals or receiving any periodic payment when they are made to a trustee.

# 4 Communication and Borrower Notices

If the servicer determines that a borrower is eligible for a HAFA offer based on its HAFA Policy and the guidance provided in this Chapter, and the borrower did not initiate the request for a short sale or DIL, the servicer must proactively notify the borrower in writing of the availability of HAFA and allow the borrower 14 calendar days from the date of the notification to contact the servicer by verbal or written communication and request consideration under HAFA. If the borrower fails to contact the servicer within the time frame or at any time indicates that he or she is not interested in HAFA, the servicer has no further obligation to extend a HAFA offer.

When a borrower, who was not previously evaluated for HAMP, requests a short sale or DIL, the servicer must evaluate the borrower for HAFA based on its HAFA Policy and the guidance provided in this Chapter.  If, as part of this evaluation, the servicer determines that the borrower also meets the HAMP eligibility requirements, the servicer must notify the borrower verbally or in writing of the availability of HAMP and allow the borrower 14 calendar days from the date of the notification to contact the servicer by verbal or written communication and request consideration for HAMP.  This notification may be given simultaneously with the servicer's consideration of the borrower for HAFA.  If the borrower does not wish to be considered for HAMP, the servicer is not required to send the borrower a Non-Approval Notice under Section 2.3.2 of Chapter II.

## 4.1    Acknowledgment of Borrower Requests

Within 10 business days following receipt of a request for a short sale or DIL (whether the request is in response to the servicer's notification as described in the first paragraph of this Section or was initiated by a borrower) or receipt of an Alternative RASS, the servicer must send written confirmation to the borrower acknowledging the request.  The acknowledgment must include a description of the servicer's HAFA evaluation process and a timeline for decision, which must be no later than 45 calendar days from the date of the request.

## 4.2    Notice for Borrowers not Eligible for HAFA

When a HAFA short sale or DIL is not available, the servicer must communicate this decision in writing to any borrower that requested consideration. The notice must explain why a short sale or DIL under HAFA cannot be offered, provide a toll free telephone number that the customer may call to discuss the decision and otherwise comply with the notice requirements set forth in Section 2 of Chapter II.

## *5 Protections Against Unnecessary Foreclosure*

Pursuant to the servicer's HAFA Policy, every potentially eligible borrower must be considered for HAFA before the borrower's loan is referred to foreclosure or the servicer allows a pending foreclosure sale to be conducted.  At the servicer's discretion, the servicer may initiate foreclosure or continue with an existing foreclosure proceeding during the HAFA process, but may not complete a foreclosure sale:

- While determining the borrower's eligibility and qualification for HAFA.

- While awaiting the timely return of a fully executed SSA.

- During the term of a fully executed SSA.

- Pending transfer of property ownership based on an approved sales contract per the RASS or Alternative RASS.

- Pending transfer of property ownership via a DIL by the date specified in the SSA or DIL Agreement.

- Until the servicer has resolved the Escalated Case in accordance with Section 3 of Chapter I.

## *6 HAFA Evaluation and Conditions*

### *6.1 HAFA Evaluation*

Once the servicer has determined that a borrower is eligible for a HAFA offer based on its HAFA Policy and the guidance provided in this Chapter, the servicer must complete the following actions prior to issuing an SSA or DIL Agreement.

#### *6.1.1 Documentation Requirements and Borrower Financial Information*

If a borrower's hardship information is documented and verified as part of the HAMP evaluation and the servicer is in possession of a signed Hardship Affidavit or RMA, no additional financial or hardship assessment is required under HAFA.  However, in accordance with a servicer's HAFA Policy, the servicer may request updated financial information to evaluate the borrower.

When a borrower who was not previously evaluated for HAMP requests a short sale or DIL, the servicer must determine the basic eligibility of the borrower as set forth in Section 2.  In addition, the servicer must obtain a completed Hardship Affidavit or RMA to verify that the borrower has experienced a hardship.  The servicer is not required to:

- Obtain an IRS Form 4506-T or 4506T-EZ, unless it is necessary to verify the borrower's income;

- Evaluate the mortgage loan using the NPV test; or

- Apply the standard or alternative modification waterfall set forth in Section 6.3 and Section 6.4 of Chapter II, respectively.

#### *6.1.2 Property Valuation*

The servicer must, independent of the borrower and any other parties to the transaction, assess the current value of the property in accordance with the investor's guidelines.

### 6.1.3 Expected Recovery Analysis

Although not a HAFA requirement, it is expected that servicers will, in accordance with investor guidelines, perform a financial analysis to determine if a short sale or DIL is in the best interest of the investor, guarantor and/or mortgage insurer. The results of any analysis must be retained in the servicing system and/or mortgage file.  The Base NPV Model does not project investor cash flows from either a short sale or DIL and should be used only to evaluate a loan for HAMP.

### 6.1.4 Title Review

The servicer must review readily available information provided by the borrower, the borrower's credit report, the loan file or other sources to identify subordinate liens and other claims on title to determine if the borrower will be able to deliver clear, marketable title to a prospective purchaser or the investor. Although not required by HAFA, the servicer may order a title search or preliminary title report.

## 6.2 HAFA Conditions

### 6.2.1 Mortgage Insurer Approval

For loans that have mortgage insurance coverage, the servicer/investor must obtain mortgage insurer approval for HAFA foreclosure alternatives. A mortgage loan does not qualify for HAFA unless the mortgage insurer waives any right to collect additional sums (cash contribution or a promissory note) from the borrower.

### 6.2.2 Payment Forbearance

In accordance with its HAFA Policy, the servicer must identify in the SSA, Alternative RASS, or DIL Agreement the amount of the monthly mortgage payment, if any, that the borrower is required to make during the term of the applicable agreement and pending transfer of property ownership, as applicable.  In no event may the amount of the borrower's monthly mortgage payment exceed the equivalent of 31 percent of the borrower's monthly gross income.

### 6.2.3 Borrower Fees

Servicers may not charge the borrower for any administrative processing fees in connection with HAFA. The servicer must pay all out-of-pocket expenses, including but not limited to notary fees, recordation fees, release fees, title review costs, property valuation fees, credit report fees, or other allowable and documented expenses, but the servicer may add these expenses to the outstanding debt in accordance with the borrower's mortgage documents and applicable laws in the event the short sale or DIL is not completed. Servicers may require borrowers to waive reimbursement of any remaining escrow, buy down funds or prepaid items, and to assign any insurance proceeds to the investor, if applicable. Those funds will not be applied to reduce the total net proceeds from the sale.

### 6.2.4 Release of Liens

### 6.2.4.1 First Mortgage Lien

The servicer should follow local or state laws or regulations to time the release of its first mortgage lien after receipt of sale proceeds from a short sale or delivery of the deed and property in a DIL transaction. If local or state law does not require release of the lien within a specified time from the date the servicer receives payment and satisfies the mortgage, the servicer must release its first mortgage lien within 30 business days. Additionally, the investor must waive all rights to seek a deficiency judgment and may not require the borrower to sign a promissory note for the deficiency.

### 6.2.4.2 Subordinate Liens

It is the responsibility of the borrower to deliver clear marketable title to the purchaser or investor and to work with the listing broker, settlement agent and/or lien holders to clear title impediments. The servicer may, but is not required to, negotiate with subordinate lien holders on behalf of the borrower. The servicer, on behalf of the investor, will authorize the settlement agent to allow a portion of the gross sale proceeds as payment(s) to subordinate mortgage/lien holder(s) in exchange for a lien release and full release of borrower liability.  Subordinate mortgage/lien holders will be paid in order of priority and may be paid no more than an aggregate cap of $6,000. Payments will be made at closing from the gross sale proceeds and must be reflected on the HUD-1 Settlement Statement.

### 6.2.4.2.1 Written Commitment from Subordinate Lien Holders

Prior to releasing any funds to subordinate mortgage/lien holder(s), the servicer through its agent must obtain written commitment from the subordinate lien holder that it will release the borrower from all claims and liability relating to the subordinate lien in exchange for receiving the agreed upon payoff amount. Although servicers have discretion to draft policies and procedures for ensuring that the commitment of subordinate lien holders is documented prior to closing and such documentation is retained in the servicing system and/or mortgage file, they would be in compliance with HAFA guidelines if they further required the closing attorney or agent to either confirm that they are in receipt of this commitment from subordinate lien holders on the HUD-1 Settlement Statement, or request that a copy of the written commitment provided by the subordinate lien holder be sent to the servicer with the HUD-1 Settlement Statement which is provided in advance of the closing.

### 6.2.4.2.2 Prohibition on Contributions

Subordinate mortgage/lien holder(s) may not require contributions from either the real estate agent or borrower as a condition for releasing its lien and releasing the borrower from personal liability. In addition, any payments to subordinate mortgage/lien holder(s) related to the short sale or DIL must be reflected on the HUD-1 Settlement Statement, as applicable.

## 7 Short Sale Process

The HAFA short sale process employs standard form documents and defined performance timeframes to facilitate clear communication between the parties to the listing and sale transaction. Servicers must adhere to the following guidelines in connection with the issuance of an SSA.

## 7.1 Minimum Acceptable Net Proceeds

Prior to approving a borrower to participate in a HAFA short sale, the servicer must determine the minimum acceptable net proceeds (Minimum Net) that the investor will accept from the transaction and in accordance with its HAFA Policy.  The Minimum Net may be expressed as a fixed dollar amount, as a percentage of the current market value of the property, or as a percentage of the list price as approved by the servicer.   However, the Minimum Net must be at least equal to or less than the list price minus the sum of allowable costs that may be deducted from gross sale proceeds (or the acceptable sale proceeds).

Once determined, the servicer must document the minimum net in the servicing system and/or mortgage file for each property subject to HAFA. After signing an SSA, the servicer may not increase the minimum net requirement until the initial SSA termination date is reached (not less than 120 calendar days).  Subsequent changes to the minimum net when the SSA is extended must be documented.

## 7.2 Allowable Transaction Costs

In determining the Minimum Net, the servicer must consider reasonable and customary real estate transaction costs for the community in which the property is located and determine which of these costs the servicer or investor is willing to pay from sale proceeds. The servicer must describe the costs that may be deducted from the gross sale proceeds in the SSA.

## 7.3 Arm's Length Transaction

The short sale must be an arm's length transaction with the net sale proceeds (after deductions for reasonable and customary selling costs) being applied to a discounted (short) mortgage payoff acceptable to the servicer.

A servicer may in its discretion approve a transaction under HAFA that provides an option for the property to be sold to a non-profit organization with the stated purpose that the property will be rented or resold to the borrower so long as all other HAFA program requirements are met. Servicers offering programs of this type must include program descriptions and conditions in their HAFA Policy as well as retain evidence demonstrating that any such organization is a non-profit organization.

## 7.4 Short Sale Agreement

At the request of an eligible borrower (whether the request is in response to the servicer's notification as described in the first paragraph of Section 4 or was initiated by a borrower), the servicer will prepare and send an SSA to the borrower after determining that the proposed sale is in the best interest of the investor.  The servicer must complete and send the SSA to the borrower no later than 45 calendar days from the date the borrower responds affirmatively to the servicer's HAFA solicitation described in the first paragraph of Section 4.  Alternatively, if a borrower initiates a request for a short sale or DIL, the servicer must evaluate the borrower's eligibility for HAFA and, if eligible, must complete and send the SSA or DIL Agreement to the borrower no later than 45 calendar days from the date of the borrower's request for a short sale or DIL.  If the servicer is unable to respond within the 45-calendar day period, the servicer must send a written status notice to the borrower on or before the 45th calendar day, with written updates every 15 calendar days thereafter, until the servicer is able to provide either an SSA or a DIL Agreement, as applicable, or written notification that the borrower will not be offered a short sale or DIL.

A borrower may not participate in a TPP and agree to an SSA simultaneously.  The servicer will also provide the borrower a RASS, pre-populated with contact information for the servicer, the property address and the loan number.

While servicers may amend the terms of the SSA in accordance with investor guidelines, applicable laws or local real estate practice, at a minimum the SSA must include the following:

- A fixed termination date not less than 120 calendar days from the effective date of the SSA (SSA Effective Date). The SSA Effective Date must be stated in the SSA and is the date the SSA is mailed to the borrower. The term of the SSA may be extended at the discretion of the servicer up to a total term of 12 months if agreed to by the borrower, in accordance with investor guidelines.

- A requirement that the property be listed with a licensed real estate professional who is regularly doing business in the community where the property is located.

- Either a list price approved by the servicer or the acceptable sale proceeds, expressed as a net amount after subtracting allowable costs that the servicer will accept from the transaction.

- The amount of closing costs or other expenses the servicer will permit to be deducted from the gross sale proceeds expressed as a dollar amount, a percentage of the list price

or a list by category of reasonable closing costs and other expenses that the servicer will permit to be deducted from the gross sale proceeds.

- The amount of the real estate commission that may be paid, not to exceed six percent of the contract sales price, and when applicable, notification that the servicer retained a contractor or vendor to assist the listing broker with the transaction and a statement that any associated vendor fees will not be charged to the borrower or deducted from the real estate commission along with the payment amount (expressed as a fixed dollar amount or percentage of the contract sales price) if paid from sale proceeds.

- A statement by the borrower authorizing the servicer to communicate the borrower's personal financial information to other parties (including Treasury and its agents) as necessary to complete the transaction.

- Cancellation and contingency clauses that must be included in listing and sale agreements notifying prospective purchasers that the sale is subject to approval by the servicer and/or third parties.

- Notice that the sale must represent an arm's length transaction and that the purchaser may not sell the property within 90 calendar days of closing, including certification language regarding the arm's length transaction that must be included in the sales contract.

- An agreement that upon successful closing of a short sale acceptable to the servicer, the borrower will be released from all liability for repayment of the first mortgage debt.

- An agreement that upon successful closing of a short sale acceptable to the servicer the borrower will be entitled to a relocation incentive of $3,000, which will be deducted from the gross sale proceeds at closing.

- Notice that the servicer will allow a portion of gross sale proceeds to be paid to subordinate lien holders in exchange for release and full satisfaction of their liens.

- Notice that a short sale may have income tax consequences and/or may have a negative impact on the borrower's credit score and a recommendation that the borrower seek professional advice regarding these matters.

- The amount of the monthly mortgage payment, if any, that the borrower will be required to pay during the term of the SSA, which amount must not exceed 31 percent of the borrower's monthly gross income.

- An agreement that so long as the borrower performs in accordance with the terms of the SSA, the servicer will not complete a foreclosure sale.

- Terms under which the SSA can be terminated.

## 7.5 Borrower Obligations

The borrower must sign and return the SSA within 14 calendar days from the SSA Effective Date along with a copy of the real estate broker listing agreement and information regarding any subordinate liens. In returning and signing the SSA the borrower agrees to:

- Provide all information and sign documents required to verify program eligibility.

- Cooperate with the listing broker to actively market the property and respond to servicer inquiries.

- Maintain the interior and exterior of the property in a manner that facilitates marketability.

- Work to clear any liens or other impediments to title that would prevent conveyance.

- Make the monthly payment stipulated in the SSA, if applicable.

## 7.6 Reasons for Termination

During the term of the SSA, the servicer may terminate the SSA before its expiration due to any of the following events:

- The borrower's financial situation improves significantly, the borrower qualifies for a modification, or the borrower brings the account current or pays the mortgage in full.

- The borrower or the listing broker fails to act in good faith in listing, marketing and/or closing the sale, or otherwise fails to abide by the terms of the SSA.

- A significant change occurs to the property condition and/or value.

- There is evidence of fraud or misrepresentation.

- The borrower files for bankruptcy and the Bankruptcy Court declines to approve the SSA.

- Litigation is initiated or threatened that could affect title to the property or interfere with a valid conveyance.

- The borrower fails to make the monthly payment stipulated in the SSA, if applicable.

## 7.7 Offer Receipt and Response

Within three business days following receipt of an executed purchase offer, the borrower or the listing broker should deliver to the servicer a completed Request for Approval of Short Sale (RASS) describing the terms of the sale transaction.  With the RASS, the borrower must submit to the servicer:

- A copy of the executed sales contract and all addenda.

- Buyer's documentation of funds or buyer's pre-approval or commitment letter on letterhead from a lender.

- All information regarding the status of subordinate liens and/or negotiations with subordinate lien holders.

## 7.8 Approval or Disapproval of Sale

Within 10 business days of receipt of the RASS and all required attachments, the servicer must indicate its approval or disapproval of the proposed sale by signing the appropriate section of the RASS and mailing it to the borrower.

The servicer must approve a RASS if the net sale proceeds available for payment to the servicer equal or exceed the Minimum Net determined by the servicer prior to the execution or extension of the SSA and all other sales terms and conditions in the SSA have been met.   Additionally, the servicer may not require, as a condition of approving a short sale, a reduction in the real estate commission below the commission stated in the SSA.

The servicer may require that the sale closing take place within a reasonable period following acceptance of the RASS, but in no event may the servicer require that a transaction close in less than 45 calendar days from the date of the sales contract without the consent of the borrower.

## *8 Alternative Request for Approval of Short Sale*

If the borrower has an executed sales contract and requests the servicer to approve a short sale under HAFA before an SSA has been executed, then the borrower must submit the request to the servicer in the form of the Alternative RASS accompanied by a signed Hardship Affidavit or RMA. Upon receipt of the Alternative RASS and signed Hardship Affidavit or RMA, the servicer must determine the borrower's eligibility as set forth in Section 6.1.1.  If the borrower appears to be eligible and was not previously considered for HAMP, the servicer must notify the borrower of the availability of HAMP as set forth in Section 4.   Additionally, the servicer must acknowledge receipt of the borrower's request for a short sale and the Alternative RASS as set forth in Section 4.1.

Within 45 calendar days of receipt of an executed sales contract, Alternative RASS and signed Hardship Affidavit or RMA, the servicer must communicate approval or disapproval of the sale, or provide a counter offer on the Alternative RASS form.  If the servicer is unable to respond within 45 calendar days the servicer must send a written status notice to the borrower on or before the 45th calendar day, with written updates every 15 calendar days thereafter, until the servicer is able to provide a written response to the Alternative RASS.

Servicers may not, as a condition of sale, require that the real estate commission stated in the sales contract be reduced to less than six percent of the contract sale price.  If a servicer retains a contractor or vendor to assist the listing broker with completion of the transaction, the servicer must include a statement in the Alternative RASS form that any associated vendor fees will not be charged to the borrower or deducted from the real estate commission.

## *9 Deed-In-Lieu Process*

In accordance with its HAFA Policy and investor guidelines, servicers have the discretion to offer and accept a DIL as part of the HAFA program.  Acceptance of a DIL requires a full release of the debt and a waiver of all claims against the borrower.  Unless the borrower and servicer enter into a deed-to-lease or other alternative arrangement, generally, the borrower must agree to vacate the property by a date certain, leave the property in broom clean condition and deliver clear, marketable title.

Typically, servicers require that the borrower make a good faith effort to list and market the property before the servicer will agree to accept a DIL. Under circumstances acceptable to the investor, servicers may agree to accept a DIL without requiring a marketing period.

### *9.1 DIL Language in the SSA*

The SSA may contain language stating that the investor will accept a DIL in accordance with the terms of the SSA if the SSA expires without resulting in the sale of the property.  If this optional DIL language is included, the investor is obligated to accept a DIL following expiration of the SSA.

If the servicer offers the DIL option separately from the SSA or without a marketing period, the servicer must provide the DIL Agreement form to the borrower.

### *9.2 DIL Terms*

The following terms apply to a HAFA DIL:

- The borrower must be able to convey clear, marketable title to the servicer or investor. The requirements for extinguishment of subordinate liens set forth in Section 6.2.4.2 apply to DIL transactions.

- The conditions for acceptance of a DIL must be in writing and signed by both the servicer and borrower.  They may be set forth in the SSA if approved with the short sale, or in a separate DIL Agreement.

- The SSA or DIL Agreement must specify the date by which the borrower must vacate the property, which in no event shall be less than 30 calendar days from the date of the termination date of the SSA or the date of a separate DIL Agreement, unless the borrower voluntarily agrees to an earlier date.

- The SSA or DIL Agreement may provide an option for the borrower to continue to occupy the property on a rental basis (deed-for-lease) or provide an opportunity for the borrower to repurchase the property at some future time. Such transactions are eligible for financial incentives under HAFA, so long as all other program requirements are met. At the discretion of the servicer in accordance with investor guidelines, the borrower relocation incentive may be paid either upon the successful closing of the DIL or at a future time when the borrower vacates or repurchases the property. Servicers offering programs of this type must include program descriptions and conditions in their HAFA Policy.

- Conditional DIL agreements that allow a borrower to reinstate the original loan following some period of rental occupancy are not eligible for HAFA incentives unless and until the DIL is successfully closed and the borrower no longer has the option of reinstating or modifying the original first mortgage lien.

## 10 HAFA Documents

Servicers are required to use the HAFA documents provided on www.HMPadmin.com or forms that are substantially similar in content to the forms provided, except that the servicer may amend the terms of the SSA or DIL Agreement in accordance with investor requirements, applicable laws or local real estate practice and may customize the forms with servicer specific logos.

All HAFA documentation must be signed by an authorized representative of the servicer and reflect the actual date of signature by the servicer's representative.

Unless a borrower or co-borrower is deceased or a borrower and a co-borrower are divorced, all parties who signed the original loan documents or their duly authorized representatives must execute the HAFA documents. If a borrower and a co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property is not required to execute the HAFA documents. Servicers may evaluate requests on a case-by-case basis when the borrower is unable to sign due to circumstances such as mental incapacity or military deployment.

Any party to a document utilized in HAFA may, subject to applicable law and any investor guidelines, prepare, sign and send the document through electronic means provided: (a) appropriate technology is used to store an authentic record of the executed document and the technology otherwise ensures the security, confidentiality and privacy of the transaction, (b) the document is enforceable under applicable law, (c) the servicer obtains the borrower's consent to use electronic means to enter into the document, (d) the servicer ensures that the borrower is able to retain a copy of the document and provides a copy to the borrower that the borrower may download, store and print, and (e) the borrower, at any time, may elect to enter into the document through paper means or to receive a paper copy of the document.

# 11 Reporting Requirements

## 11.1 Treasury Reporting

Servicers are required to report periodic HAFA loan level data to the Program Administrator via the HAMP Reporting Tool. The data submitted must be accurate, complete, timely, and agree with the servicer's records. Data will be reported by a servicer at key milestones in the transaction:

- Notification – when the SSA or DIL Agreement is signed and executed, or updated following an extension of the marketing terms;

- Short Sale/DIL Loan Set Up – at the transfer of property ownership (closing of a short sale or acceptance of DIL); and/or

- Termination – when the SSA or DIL Agreement expires or when the SSA or DIL Agreement is terminated by the servicer.

Each milestone is a separate data transmission and must be reported no later than the fourth business day of the month following the event. Note also that servicers must provide the additional data set forth in the HAMP Additional Data Requirements Data Dictionary for all HAFA transactions. Detailed HAFA reporting requirements are available on www.HMPadmin.com.

## 11.2 Credit Bureau Reporting

The servicer should continue to report a "full file" status to the major credit repositories for each loan under the HAFA program in accordance with the Fair Credit Reporting Act and the CDIA's Metro 2 Format credit bureau requirements. "Full file" reporting means that the servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month. The Payment Rating code should be the code that properly identifies whether the account is current or past due within the activity period being reported – prior to completion of the HAFA transaction. Because CDIA's Metro 2 format does not provide an Account Status Code allowable value for a short sale, a short sale should be identified with the reporting of Special Comment Code "AU". The information below is consistent with "CDIA Mortgage and Home Equity Reporting Guidelines in Response to Current Financial Conditions" (May 2009).

Reporting for short sales should be as follows:

- Account Status Code = 13 (paid or closed/zero balance)
- Payment Rating = 0, 1, 2, 3, 4, 5, or 6
- Special Comment Code = AU (account paid in full for less than the full balance)
- Current Balance = $0
- Amount Past Due = $0
- Date Closed = MMDDYYYY
- Date of Last Payment = MMDDYYYY

Reporting for DILs should be as follows:

- Account Status Code = 89 (deed-in-lieu of foreclosure on a defaulted loan)
- Payment Rating = 0, 1, 2, 3, 4, 5, or 6
- Current Balance = $0
- Amount Past Due = $0
- Date Closed = MMDDYYYY
- Date of Last Payment = MMDDYYYY

# 12 Incentive Compensation

Borrowers, servicers and investors will be eligible for HAFA incentives upon successful completion of the short sale or DIL. However, no incentives will be paid to the borrower, servicer or investor if the net proceeds from a sale exceed the total amount due on the first mortgage when title is transferred. The amount of any contribution paid by a mortgage insurer or other provider of credit enhancement shall not be considered in determining whether the mortgage was paid in full and whether servicers are eligible for such incentive compensation.

## 12.1 Borrower Relocation Assistance

Following the successful closing of a short sale or DIL, the borrower shall be entitled to an incentive payment of $3,000 to assist with relocation expenses.  In a short sale transaction, the servicer must instruct the settlement agent to pay the borrower from sale proceeds at the same time that all other payments, including the payoff to the servicer, are disbursed by the settlement agent.  The amount paid to the borrower must appear on the HUD-1 Settlement Statement.

If the servicer conducts a formal closing for a DIL transaction and the borrower has vacated the property, the borrower relocation incentive of $3,000 must be paid at closing and reflected on the HUD-1 Settlement Statement.  If at the time of closing the borrower has not vacated the property, the servicer must mail a check to the borrower within five business days of the borrower's vacancy and delivery of keys to the servicer or the servicer's agent.  Similarly, if the DIL transaction is not conducted as a formal closing, the servicer must mail a check to the borrower within five business days from the later of the borrower's execution of the deed or the borrower's vacancy and delivery of keys to the servicer or servicer's agent.

Servicers will be reimbursed for the full amount of this incentive payment after the HAFA transaction is reported in the HAMP Reporting Tool.

## 12.2 Servicer Incentive

The servicer will be paid $1,500 to cover administrative and processing costs for a short sale or DIL completed in accordance with the requirements of HAFA and the applicable documents. Investors may elect to pay additional incentive compensation to servicers, which will not affect the HAFA servicer incentive.

## 12.3 Investor Reimbursement for Subordinate Lien Releases

The investor will be paid a maximum of $2,000 for allowing a portion of the short sale proceeds to be distributed to or paid to subordinate lien holders. This reimbursement will be earned on a one-for-three matching basis.   For each three dollars an investor pays to secure release of a subordinate lien, the investor will be entitled to one dollar of reimbursement up to the maximum reimbursement of $2,000.   To receive an incentive, subordinate lien holders must agree to release their liens and waive all future claims against the borrower. The servicer is not responsible for any future actions or claims against the borrower by such subordinate lien holders or creditors.



# Chapter V

## Second Lien Modification Program (2MP)

# 1 Introduction

This Chapter provides guidance on Second Lien Modification Program (2MP), which is designed to work in tandem with HAMP.  Together, HAMP and 2MP create a comprehensive solution to help borrowers achieve greater affordability by lowering payments on both first lien and second lien mortgage loans.  Under 2MP, when a borrower's first lien is modified under HAMP and the servicer of the second lien is a 2MP participant, that servicer must offer to modify the borrower's second lien according to a defined protocol, to accept a lump sum payment from Treasury in exchange for full extinguishment of the second lien, or to accept a lump sum payment from Treasury in exchange for a partial extinguishment and modify the remaining borrower's second lien according to a defined protocol.

MHA-C will incorporate an evaluation of 2MP implementation, processes, and controls into its servicer reviews. Servicers should refer to Section 2 of Chapter I.

# 2 Participation

In order to participate in 2MP, a servicer must have executed the SPA and the 2MP Service Schedule prior to October 3, 2010.  A servicer need not service the related first lien or participate in HAMP in order to participate in 2MP.  See Chapter I for the servicer participation requirements. Servicers that are participating in 2MP (2MP servicers) with respect to Non-GSE Mortgages must follow the guidance set forth in this Chapter when borrowers seeking assistance have a second lien mortgage loan.

# 3 Eligibility

## 3.1 2MP Modification and Extinguishment Eligibility Criteria

| | |
|---|---|
| Second lien | The mortgage loan is a second lien mortgage loan originated on or before January 1, 2009. This includes a mortgage lien that would be in second lien position but for a tax lien, a mechanic's lien or other non-mortgage related lien that has priority. |
| First lien HAMP modified | The mortgage loan is a second lien mortgage loan with a corresponding first lien mortgage loan that has received a permanent HAMP modification and is in good standing. |
| Not previously 2MP modified | The second lien mortgage loan has not been previously modified under 2MP. |
| Unpaid principal balance limits | The second lien mortgage loan (current or delinquent) has a UPB at initial consideration for modification or partial extinguishment under 2MP of $5,000 or more and a pre-modification scheduled monthly payment equal to or greater than $100.  The servicer must determine the thresholds as of the date of the initial 2MP evaluation. Payments and interest rate fluctuations during the evaluation period or trial period do not affect the initial 2MP eligibility determination.

There are no UPB limits for full extinguishment under 2MP. |
| Program cut-off date | Borrowers may be accepted into the program if a fully executed 2MP modification agreement is in the servicer's possession or if a 2MP trial period is effective on or before December 31, 2012. |

### 3.2 Additional Factors Impacting 2MP and Extinguishment Eligibility

| First Lien Home Equity Loans and Lines of Credit | A HEL or HELOC that is in first lien position is not eligible under 2MP and should be evaluated for HAMP as set forth in Chapter II. |
|---|---|
| Partial claim or equity appreciation loans | A second lien mortgage loan on which no interest is charged and no payments are due until the first lien is paid in full (e.g., FHA partial claim liens and/or equity appreciation loans) is not eligible under 2MP. |
| Insured or guaranteed by federal government | Second lien mortgage loans insured, guaranteed or held by a federal government agency (e.g. FHA, VA and RHS) are not eligible for 2MP. |
| Incentive Compensation | If a second lien mortgage loan is modified under 2MP, it is not later eligible for payment of full or partial extinguishment incentives under 2MP.  However, when a partial extinguishment of principal is combined with a modification of an eligible second lien, incentives can be paid for each activity. |
| Subordinate mortgage loan | A mortgage loan that is subordinate to a second lien is ineligible under 2MP. Modification or extinguishment of such a subordinate mortgage loan in place of the second lien will not satisfy the 2MP servicer's obligation to modify or extinguish the second lien.<br><br>If a second lien is fully extinguished under 2MP, no other subordinate lien shall become eligible for modification or extinguishment. |
| Federally Declared Disaster Relief | Borrowers not able to make monthly mortgage payments due to an FDD who are (1) in the process of being evaluated for a 2MP trial period; (2) in a 2MP trial period; or (3) in a permanent 2MP modification should be considered for an FDD forbearance plan in accordance with industry practice and investor guidelines.<br><br>Servicers should, in accordance with investor guidelines, offer a minimum of three months of forbearance to a borrower with a loan that is eligible for 2MP who requests forbearance as a result of an FDD and meets the following minimum eligibility criteria:<br><br>• The borrower suffered a hardship, such as a loss of employment, reduction in income or increase in expenses, or has been displaced from his or her home and cannot make the monthly mortgage payments as a result of an FDD.<br><br>• The location of either (i) the property securing the loan; or (ii) the borrower's principal place of business or employment is located in an area designated by FEMA as being covered by the FDD as set forth at www.fema.gov/news/disasters.fema or as confirmed by the local FEMA office.<br><br>Servicers should follow their standard practices with respect to the evaluation of borrowers and documentation of FDD forbearance plans. |

### 3.3 Borrower Notice for 2MP

When a servicer had contact with a borrower in connection with a potential 2MP modification, the borrower is evaluated for 2MP and the borrower is not offered a 2MP modification, the 2MP servicer must mail a notice to the borrower no later than 10 business days following the date of the 2MP servicer's determination that a modification will not be offered.  The notice must describe

the reason(s) why the borrower is not eligible for a 2MP modification, and the reason(s) should relate to one or more of the reason codes required to be reported by the 2MP servicer to the Program Administrator pursuant to Section 9.2.3.  Such notices may be sent electronically only if the borrower has previously agreed to exchange correspondence relating to the modification with the 2MP servicer electronically. The content of the notice to the borrower may vary depending on the information intended to be conveyed or the determination made by the 2MP servicer. All notices must be written in clear, non-technical language, with acronyms and industry terms explained in a manner that is easily understandable.

# 4 2MP Process

When a borrower's first lien is modified under HAMP, the 2MP servicer must offer to modify or extinguish the corresponding second lien according to the steps outlined in Section 5.  In addition, if the borrower's first lien is modified under HAMP, the 2MP servicer must dismiss any outstanding foreclosure action on the borrower's second lien.

If the 2MP servicer is evaluating a borrower for 2MP and for its own second lien proprietary modification program, the 2MP servicer must offer 2MP first (or at least simultaneously) with the second lien proprietary modification, regardless of the terms of the second lien proprietary modification.   If the 2MP servicer already has modified the borrower's second lien with a proprietary modification, the 2MP servicer should still make a 2MP offer.

## 4.1 Matching Second Liens to HAMP First Liens

### 4.1.1 LPS Matching

To facilitate the communication of HAMP modification information between HAMP and 2MP servicers, Lender Processing Services' Applied Analytics Division (LPS) has built and is maintaining a database of second liens that may be eligible under 2MP.  Information from the database will be used to match first and second liens and to notify 2MP servicers of the HAMP modification status and details necessary for the 2MP servicer to offer a 2MP modification to the borrower.  LPS will provide matching information to 2MP servicers via a secure transmission. 2MP servicers must enter into a contract directly with LPS to facilitate this program and will be required to pay a one-time set up fee and nominal transaction fees for each second lien matched, regardless of whether a 2MP modification is completed.

As part of its contract with LPS, a 2MP servicer will agree to provide the following categories of information on all eligible second liens loans that it services to LPS for matching:

- Loan Identifying Information
- Borrower/Co-Borrower Identifying Data
- Property Identifying Data
- 2MP Servicer Contact Information

If the 2MP servicer identifies matching first and second liens on its own system, it should work with LPS so that the required loan information is accurately reflected in the LPS database.   In addition, the 2MP servicer must provide monthly updates of this information to LPS.   The information provided to LPS will be used for matching first and second liens to facilitate 2MP modifications and for program analysis and reporting.

A "multiple subordinate lien match" will be deemed to exist when there are multiple second lien matches for a single HAMP-modified first lien. LPS will identify multiple matches that are discovered during the regular match process and will provide certain limited information to the 2MP servicer.

A "probable lien match" will be deemed to exist for a HAMP-modified first lien and second lien where the property addresses for both loans are not an exact match but the social security numbers of the borrowers and the property zip codes are the same for both liens.

### 4.1.2 Enhanced Matching Capabilities

In some cases, information in the LPS database may not identify a match between a first lien HAMP modification and corresponding eligible second lien, but the 2MP servicer may have sufficient information to identify a match. A 2MP servicer may direct LPS to match a second lien to a HAMP-modified first lien where the 2MP servicer is confident that the first and second lien should be matched because the 2MP servicer obtains sufficient documentation of the HAMP modification from (1) the probable lien matches that LPS provided or (2) sources independent of LPS (e.g. the 2MP servicer itself, if the 2MP servicer services both the first and second liens, reliable borrower communications or direct communications with the HAMP first lien servicer).

In addition, to facilitate modifications, the HAMP Reporting Tool is being updated to allow reporting of valid 2MP modifications for which the corresponding first lien match was not confirmed through LPS. Therefore, participating 2MP servicers may offer and report a 2MP modification when the servicer identifies the match, even if the match is not reflected in the LPS system.

If servicers choose to offer and report 2MP modifications outside of the LPS process, the 2MP servicer must be able to provide sufficient documentation that the borrower is entitled to the 2MP modification being offered. Such documentation includes a copy of the fully executed HAMP modification agreement, and the information that must match includes, at a minimum, borrower name(s), social security number(s), property address and the first lien loan number. For servicer-identified matches where the servicer services both the first and second liens, the servicer can rely on the executed HAMP documents in the servicer's possession and the servicer must verify the HAMP-modified first lien's good standing. For servicer-identified matches where the 2MP servicer does not servicer the first lien, the 2MP servicer can rely on a copy of the executed HAMP modification agreement obtained from the first lien servicer and verification from the first lien servicer of the HAMP-modified first lien's good standing. Under the modification agreement and the RMA, borrowers have consented to the disclosure of their personal information and the terms of their modification agreement to servicers of both their first and second lien loans.

All copies of documents validating the match of the first and second liens must be placed in the borrower's mortgage loan file and/or servicing system along with a record of the terms of the HAMP modification at the time the 2MP offer was sent to the borrower. Additionally, any communication with the first lien servicer where the 2MP servicer is not the servicer of the first lien, including discussions about the first lien modification and the first lien servicer contact information, must also be noted in the borrower's loan file and/or servicing system. Servicers must make this information available to MHA-C upon request.

## 4.2 2MP Timing

The modification of a second lien may not become effective unless and until (i) the modification of a corresponding first lien becomes effective under HAMP and, when applicable, (ii) the borrower has made all required 2MP trial period payments. In addition, if the HAMP-modified first lien loses good standing prior to the 2MP modification becoming effective, the 2MP servicer is not required to offer a 2MP modification to the borrower.

### 4.2.1 LPS Matches

In cases of a match through the LPS process, a 2MP servicer must offer a 2MP trial period or 2MP modification, as applicable, to a second lien borrower no later than:

- For the first match file provided by LPS after the 2MP servicer goes into production with LPS, 120 calendar days from the date the servicer receives the notification of a match from LPS of the related permanent HAMP modification.

- For all subsequent match files provided by LPS, 60 calendar days from the date the 2MP servicer receives the notification of a match from LPS of the related permanent HAMP modification.

- For all match files where a borrower is in a bankruptcy, 60 calendar days from the later of (1) the date the borrower, the borrower's counsel or the bankruptcy trustee requests consideration for a 2MP modification and (2) the date the 2MP servicer receives the notification of a match from LPS of the related permanent HAMP modification. The servicer must work with the borrower or borrower's counsel to obtain any court and/or trustee approvals required in accordance with local court rules and procedures and should extend time frames as necessary to accommodate dates in obtaining the approvals.

Servicers are not required to offer 2MP trial periods or modifications for probable lien matches which the servicer has not confirmed with LPS the probable lien match.  2MP servicers must record the date when they obtained information from LPS to use for the modification.

### 4.2.2 Matches Outside of the LPS Process

If a servicer chooses to offer a 2MP modification outside of the LPS process where the servicer services both the first and second liens, the servicer must offer a 2MP trial period or 2MP modification, as applicable, to the borrower no later than 60 calendar days after the effective date of the related permanent HAMP modification.

If a servicer chooses to offer a 2MP modification outside of the LPS process where the 2MP servicer does not service the first lien, the 2MP servicer must offer a 2MP trial period or 2MP modification, as applicable, to the borrower no later than 60 calendar days after the date the copy of the executed HAMP modification agreement is obtained from the first lien servicer and verification from the first lien servicer of the HAMP modified first lien's good standing.

For information on matches for a borrower in bankruptcy, refer to guidance in Section 4.2.1.

Servicers must record in the borrower's mortgage loan file and/or the servicing system the date it receives the information from the first lien servicer.

## 4.3 Reliance on First Lien Data

The terms of the HAMP modification of the first lien will be used to determine the terms of the 2MP modification of the second lien.  2MP servicers are not required to verify any of the financial information provided by the borrower in connection with the HAMP modification.  In general, modification of the first lien under HAMP confers a benefit on any associated second liens. Because the first lien was, as required by Section 1.1 of Chapter II, delinquent or in imminent default prior to receiving a permanent modification, 2MP servicers may reasonably conclude that default is foreseeable with respect to a related second lien.  Therefore, it can be reasonably concluded that the combination of the modification of the first lien under HAMP and the second lien under 2MP will be NPV positive, and for that reason, the 2MP servicer is not required to perform an additional NPV analysis on the related second lien.

Furthermore, post-foreclosure recoveries of second liens, as a class, are likely to be de minimis if the first lien is delinquent or at risk of default.  Accordingly, it is reasonable for 2MP servicers to conclude that modification of second lien mortgages in accordance with this guidance is likely to

provide an anticipated recovery on the outstanding principal mortgage debt that, as a class, will exceed the anticipated recovery through foreclosure.

2MP servicers may rely on the first lien information provided by LPS at the time of the 2MP offer, even if the terms of the HAMP modification subsequently are updated or corrected in the HAMP Reporting Tool. Servicers should retain a record from the match file of the terms of the HAMP modification at the time the 2MP offer is sent to the borrower and must make this information available to MHA-C upon request.

2MP servicers are not required to verify any of the financial information provided by the borrower in connection with the HAMP modification. However, if the 2MP servicer has questions or concerns regarding attributes of a HAMP-modified first lien that are material to the terms of an individual 2MP modification (e.g., forbearance percentage, forgiveness percentage, term after modification), the 2MP servicer should notify the Program Administrator via secure e-mail at support@HMPadmin.com so the Program Administrator can be involved in the resolution of the issue. 2MP servicers must include the following information relating to the second lien: servicer name, servicer number, contact name, phone number and e-mail address, loan number, borrower name and property address. 2MP servicers must also include the following information relating to the first lien information received in the match file: servicer name, servicer number, loan number, borrower name and property address, and identify the data that is being disputed. If the 2MP servicer has general questions or concerns regarding the match files maintained by LPS, the 2MP servicer should contact LPS.

## 4.4 Fraud

Unless there is evidence of fraud or misrepresentation (such as when the 2MP servicer is aware that a property is not owner-occupied), evidence that the HAMP-modified first lien does not meet the basic eligibility requirements of HAMP or evidence that the property valuation provided is incorrect, there is no additional responsibility on the part of the 2MP servicer to verify the information provided by the first lien servicer through LPS. If the 2MP servicer identifies such evidence, the 2MP servicer should not proceed with the 2MP modification and must notify the Program Administrator at Escalations@HMPadmin.com and shall be given an opportunity to present such evidence.

# 5 Modification and Extinguishment

## 5.1 2MP Modification Steps

2MP servicers must follow the standard modification steps set forth below to modify the second lien.

### 5.1.1 Step 1 – Capitalization

In the first step, the 2MP servicer capitalizes accrued interest and servicing advances (costs and expenses incurred in performing second lien servicing obligations, such as those related to preservation and protection of the security property and enforcement of the mortgage) paid to third parties in the ordinary course of business and not retained by the 2MP servicer, if allowed by applicable state law. Accrued interest may be waived or deferred at the discretion of the 2MP servicer.

2MP servicers should capitalize only those third-party delinquency fees that are reasonable and necessary. Fees permitted by Fannie Mae and Freddie Mac for GSE mortgage loans shall be considered evidence of fees that would be reasonable for Non-GSE Mortgages.

Late fees and other ancillary income fees (e.g., insufficient funds fees, over limit fees and annual fees) may not be capitalized and must be waived if the second lien is permanently modified under 2MP.

### 5.1.2 Step 2 – Reduce Interest Rate

#### 5.1.2.1 Step 2.A – For amortizing second liens (payment of both principal and interest)

In the second step, the 2MP servicer reduces the interest rate of the second lien to 1.0 percent. After five years, the interest rate on the second lien will reset at the then-current interest rate on the HAMP-modified first lien.  If applicable, following the initial interest rate reset, the interest rate of the modified second lien will reset on the same terms and schedule as the interest rate of the HAMP-modified first lien. At any time, the 2MP servicer may, in its discretion, offer a rate of interest that is lower than the HAMP-modified first lien.

Example: The Interest Rate Cap (as defined in Section 9.3.6 of Chapter II) on the modified first lien is 6.5%.  The interest rate on the modified first lien is fixed at 5.0% for the first five years and then increases by 1.0% in year six to 6.0%, and by 0.5% in year seven to 6.5%.  Thereafter, the interest rate remains at 6.5% for the remaining term of the first lien.  Accordingly, the interest rate of the modified second lien will be fixed at 1.0% for the first five years and then increase by 5.0% in year six to 6.0%, and by 0.5% in year seven to 6.5%.

#### 5.1.2.2 Step 2.B – For second liens with interest-only payments

In the second step, the 2MP servicer may, in accordance with investor and regulatory guidance, either (i) follow the procedure above to convert interest-only payments to amortizing payments at 1.0 percent interest, or (ii) retain the interest-only payment schedule and reduce the interest rate of the second lien to 2.0 percent.  After five years, the interest rate on the second lien will reset at the then-current interest rate on the HAMP-modified first lien.  If applicable, following the initial rate reset, the interest rate of the modified second lien will reset on the same terms and schedule as the interest rate of the HAMP-modified first lien. At any time, the 2MP servicer may, in its discretion, offer a rate of interest that is lower than the HAMP-modified first lien.

Example: The Interest Rate Cap on the modified first lien is 6.5%. The interest rate on the modified first lien is fixed at 5.0% for the first five years and then increases by 1.0% in year six to 6.0%, and by 0.5% in year seven to 6.5%. Thereafter, the interest rate remains at 6.5% for the remaining term of the first lien.  Accordingly, the interest rate of the modified second lien will be fixed at 2.0% for the first five years and then increase by 4.0% in year six to 6.0%, and by 0.5% in year seven to 6.5%.

#### 5.1.2.3 Step 2.C – For partially amortizing second liens (such as convertible HELOCs)

In the second step, if 50 percent or more of a second lien (based on the unmodified aggregate UPB as of the date the 2MP offer is made to the borrower) is currently amortizing, the 2MP servicer should follow Section 5.1.2.1 to reduce the interest rate of the second lien.  If less than 50 percent of a second lien (based on the unmodified aggregate UPB as of the date the 2MP offer is made to the borrower) is currently amortizing, the 2MP servicer should follow Section 5.1.2.2 to reduce the interest rate of the second lien.

In the alternative, and at the discretion of the 2MP servicer in accordance with investor guidelines, for the steps above in Sections 5.1.2.1, 5.1.2.2 or 5.1.2.3, the terms of the 2MP modification may include a more gradual interest rate step-up after five years.  At no time may the interest rate on the modified second lien exceed the interest rate on the HAMP-modified first lien.

### 5.1.3 Step 3 – Extend Term

#### 5.1.3.1 Step 3.A – For amortizing second liens (payment of both principal and interest)

In the third step, if the original term of the second lien is shorter than the remaining term of the HAMP-modified first lien, the 2MP servicer extends the term of the second lien to match, at a minimum, the term of the HAMP-modified first lien.  The 2MP servicer must amortize the modified UPB of the second lien over the term of the modified second lien.  If a term extension is not permitted under applicable investor guidelines or applicable law, but an extension of the amortization period is permissible, then the 2MP servicer must reamortize the second lien with a balloon payment due at maturity so that the new amortization period matches, at a minimum, either the amortization period or the term of the HAMP-modified first lien.  Subject to regulatory and investor guidance, a 2MP servicer may extend the term or the amortization period of the second lien up to 40 years, regardless of the term or amortization period on the first lien.

#### 5.1.3.2 Step 3.B – For second liens with interest-only payments

In the third step, if the original term of the second lien is shorter than the remaining term of the HAMP-modified first lien, the 2MP servicer extends the term of the second lien to match, at a minimum, the term of the HAMP-modified first lien. The 2MP servicer must amortize the modified UPB of the second lien beginning at the time specified in the original second lien documents or after year five, whichever is later.  If, however, the second lien is interest-only until the maturity date under the original loan documents and does not become amortizing, then amortization on the 2MP-modified second lien must begin after year five.  If a term extension is not permitted under applicable investor guidelines or applicable law, but an extension of the amortization period is permissible, the 2MP servicer must reamortize the second lien with a balloon payment due at maturity so that the new amortization period matches, at a minimum, either the amortization period or the term of the modified first lien.  Subject to regulatory and investor guidance, a 2MP servicer may extend the term or the amortization period of the second lien up to 40 years, regardless of the term or amortization period on the first lien.

#### 5.1.3.3 Step 3.C – For partially amortizing second liens (such as convertible HELOCs)

In the third step, if 50 percent or more of a second lien (based on the unmodified aggregate UPB as of the date the 2MP offer is made to the borrower) is currently amortizing, the 2MP servicer should follow Section 5.1.3.1 to extend the term of the second lien.  If less than 50 percent (based on the unmodified aggregate UPB as of the date the 2MP offer is made to the borrower) of a second lien is currently amortizing, the 2MP servicer may, in accordance with investor guidance, follow either Section 5.1.3.1 or Section 5.1.3.2 to extend the term of the second lien.

### 5.1.4 Step 4 – Principal Forbearance / Principal Forgiveness

In the fourth step, if there was principal forbearance or forgiveness on the HAMP-modified first lien, a 2MP servicer must forbear or forgive principal on the second lien in at least the same proportion; however, the 2MP servicer may, in its discretion and in accordance with investor guidelines, forbear or forgive more than the required proportionate amount. If the 2MP servicer has deferred accrued interest in lieu of capitalization in Section 5.1.1, the deferred amount will be in addition to any principal forbearance or forgiveness required under this Section 5.1.4. The 2MP servicer may, at its discretion and as permitted under applicable investor guidelines, choose to forgive any amounts that are required to be forborne. All principal forgiveness required or provided under 2MP will be applied at the time of the permanent 2MP modification and will not be deferred.

Example: The total UPB plus the forgiveness amount of the HAMP-modified first lien on its Modification Effective Date is $100,000, the amount of principal forbearance on the first lien is $5,000 and the amount of principal forgiveness is $5,000. Therefore, the 2MP servicer must forbear five percent of the second lien and must forgive five percent of the second lien. If the total UPB of the second lien on the Modification Effective Date is $40,000, the 2MP servicer must

forbear $2,000 and must forgive $2,000, or the 2MP servicer may elect to forgive a larger amount.

## 5.2 Partial Extinguishment Option

In addition to any required forgiveness in Section 5.1.4 of the 2MP modification waterfall, 2MP servicers may, at their discretion and when permitted under applicable investor guidelines, agree to partial extinguishment of additional principal as part of a 2MP modification and will be eligible for both modification incentives and extinguishment incentives on any partial amount of principal that is extinguished so long as the UPB of the second lien at initial consideration for 2MP is equal to or greater than $5,000 and the second lien has a pre-modification scheduled monthly payment equal to or greater than $100.

Additionally, a 2MP servicer may elect to use partial extinguishment rather than interest rate reduction to achieve an affordable monthly payment and will be eligible for both extinguishment incentives on any partial amount of principal that is extinguished and modification incentives so long as the UPB of the second lien at initial consideration for 2MP is equal to or greater than $5,000 and the second lien has a pre-modification scheduled monthly payment equal to or greater than $100.  In this instance, the 2MP servicer must first determine what the modified monthly payment on the second lien would be under the 2MP modification waterfall ("target payment").  The monthly payment during the first five years of the 2MP modification must be no greater than the target payment.  The interest rate may exceed the 2MP modification waterfall interest rate of 1% for amortizing loans and 2% for interest-only loans, but in no event may be higher than the Interest Rate Cap plus 200 basis points.

## 5.3 Full Extinguishment Option

As an alternative to modifying an eligible second lien, a 2MP servicer, in accordance with investor guidelines, may elect to extinguish second lien in exchange for a lump sum payment paid in accordance with the formula set forth in Section 11.3.2.  2MP servicers may, at their discretion, fully extinguish a second lien with a UPB at initial consideration for 2MP of less than $5,000 or a pre-modification scheduled monthly payment less than $100.

### 5.3.1 Extinguishment Timing

When extinguishment is selected, the extinguishment of the second lien or any part thereof may not become effective unless and until the modification of the first lien becomes effective under HAMP.  The same timing requirements set forth in Section 4.2 apply to extinguishments.

## 5.4 Investor and Other Prohibitions

If the applicable investor guidelines prohibit the 2MP servicer from entering into a modification of the second lien, the 2MP servicer must seek approval from the investor or its representative for an exception.  In the event that investor guidelines or applicable law restricts or prohibits a modification step (e.g., extension of term beyond a specific point in time), a 2MP servicer may either skip the modification step or perform the step within the limitations of the law or investor guidelines without obtaining prior approval from the investor.

# 6 2MP Trial Period Requirements

Borrowers must demonstrate their ability and willingness to support the modified payment on the second lien; therefore, a 2MP trial period may be required based on the borrower's delinquency status.  A borrower's delinquency status on the second lien is determined as of the date the 2MP offer is made to the borrower.

When a borrower is current on the existing second lien and the current contractual payment amount is equal to or greater than the monthly payment that will be due following the 2MP

modification, a 2MP trial period is not required (unless a trial period is necessary to comply with applicable contractual obligations). The 2MP servicer and borrower may execute a modification of the second lien immediately following modification of the HAMP-modified first lien.

When a borrower has two or more payments that are due and unpaid on the second lien at the time of the 2MP offer, the borrower must complete a 2MP trial period with payments that reflect the terms of the proposed 2MP modification to be eligible for a permanent 2MP modification.

## 6.1 Duration of 2MP Trial Period

The 2MP trial period must be three months in duration (or longer if necessary to comply with applicable contractual obligations).  If the 2MP servicer does not service the first lien, the 2MP trial period may only begin after the HAMP modification becomes effective.  In cases where the 2MP servicer services both the first and second liens, at the servicer's option in accordance with investor guidelines, the 2MP trial period may run concurrently or overlap in time with the HAMP trial period for the related first lien.  The 2MP trial period for the second lien may be longer than three months if it overlaps with the HAMP trial period.  If this occurs, the borrower must continue to make timely 2MP trial period payments throughout the 2MP trial period regardless of its length.

Timely payment by the borrower of the first 2MP trial period payment is evidence of the borrower's acceptance of the terms of the 2MP trial period.  If the 2MP trial period is not accepted by the last day of the month in which the first trial period payment is due, the 2MP servicer may permanently withdraw the 2MP offer and will not be obligated to modify the second lien.

## 6.2 2MP Trial Period Payments

2MP trial period payment due dates may be any day of the month.  However, the 2MP modification agreement must require that payments are due on the first day of each month. If the final 2MP trial period due date is not the first day of the month, then the 2MP servicer may, at its option, extend the trial period by one additional month.  If the 2MP servicer elects this option, the borrower will not be required to make an additional trial period payment during the month in between the final trial period month and the month in which the modification becomes effective. A 2MP servicer must treat all borrowers the same in applying this flexibility by developing and applying a written policy.

The borrower must make each trial period payment no later than 30 days from the date such trial period payment is due in order to receive a 2MP modification, though 2MP servicers may use business judgment in accepting late payments when there are mitigating circumstances and must document that decision in the servicing file.  Although the borrower may make scheduled payments earlier than expected, the early payments do not affect the length of the trial period or accelerate the 2MP modification effective date.

If the borrower does not pay the final trial period payment on or before the last due date of the trial period, then the 2MP servicer may, at its option, extend the trial period by one additional month.  If the 2MP servicer elects this option, the borrower will not be required to make an additional trial period payment during the month in between the final trial period month and the month in which the modification becomes effective. A 2MP servicer must treat all borrowers the same in applying this flexibility by developing and applying a written policy by which the final trial period payment must be submitted before the servicer applies this option (cutoff date).  The cutoff date must be after the due date for the final trial period payment.

In addition, the 2MP servicer must inform the borrower in writing about (i) the delay of the modification effective date by one month and (ii) the effects of the interim month and the delay in the effective date of the modification, including, but not limited to, the delay in the effective date of the modified interest rate and the increase in the delinquent interest capitalized if the borrower does not make an additional trial period payment.

If a 2MP servicer entered a borrower in a second lien trial period prior to executing the SPA and the corresponding first lien has been converted to a permanent modification, that trial period will satisfy the 2MP trial period requirements if the trial period is at least three months in duration and the second lien modification follows the modification steps set forth in Section 5.1.  However, the 2MP servicer must have executed the SPA prior to the effective date of a permanent 2MP modification in order for the modification to be eligible for any 2MP incentives.

## 6.3 Application of 2MP Trial Period Payments

During a 2MP trial period, and if permitted by the applicable loan documents and the 2MP servicer's business practices, 2MP servicers may accept and hold as "unapplied funds" (held in a custodial account) amounts received that do not constitute a full monthly, contractual payment. However, when the total of the reduced payments held as "unapplied funds" is equal to a full contractual payment, the 2MP servicer is required to apply the payment to the second lien.

Any unapplied funds remaining at the end of any 2MP trial period that do not constitute a full monthly, contractual payment should be applied to reduce any amounts that would otherwise be capitalized as part of the modified principal balance.

## 6.4 Borrowers in Active Bankruptcy

Borrowers in active Chapter 7 or Chapter 13 bankruptcy cases are eligible for 2MP if the borrower, borrower's counsel or bankruptcy trustee contacts the 2MP servicer to request consideration.  With the borrower's permission, a bankruptcy trustee may contact the 2MP servicer to request a 2MP modification.  2MP servicers are not required to solicit these borrowers for 2MP when they are under bankruptcy protection.

Borrowers who are currently in a 2MP trial period and subsequently file for bankruptcy may not be denied a permanent 2MP modification on the basis of the bankruptcy filing.  The 2MP servicer and its counsel must work with the borrower or borrower's counsel to obtain any court and/or trustee approvals required in accordance with local court rules and procedures.

## 6.5 Impact of PRA Retroactivity on 2MP Trial Period

With respect to borrowers who have been offered a 2MP trial period and principal reduction under PRA is retroactively applied to the related first lien, the 2MP servicer may, but is not required to, apply PRA retroactively to the second lien under 2MP.  With respect to borrowers who have not yet been offered a 2MP trial period, if the 2MP servicer is notified of a matching first lien modification that includes retroactive PRA principal reduction, the 2MP servicer must include the retroactive PRA principal reduction when determining the amount of principal forgiveness required as part of the 2MP modification as set forth in Section 5.1.4.

## 6.6 FDD Forbearance Plan During 2MP Trial Period

In accordance with investor guidelines, any borrower in a 2MP trial period who suffers an FDD-related hardship, meets the eligibility criteria set forth in Section 3.2 for FDD and requests a forbearance should be offered an FDD forbearance plan.  Likewise, servicers should offer an FDD forbearance plan to borrowers who are in the process of being evaluated for a 2MP trial period at the time they are impacted by an FDD if they request an FDD forbearance plan and meet the eligibility criteria, even if their 2MP trial period has not started.

### 6.6.1 Cancellation of 2MP Trial Period

If a borrower who is currently in a 2MP trial period accepts the FDD forbearance plan, the 2MP trial period must be cancelled.  No action is required in the HAMP Reporting Tool when cancelling a 2MP trial period.  If the borrower made timely payments during the 2MP trial period prior to the

FDD forbearance plan, the borrower will be eligible for reconsideration for 2MP after the FDD forbearance plan ends.  At the time of reconsideration, servicers must confirm that the borrower has a corresponding permanent HAMP-modified first lien, or a HAMP TPP, if applicable, and that the HAMP-modified first lien is in good standing. If the borrower is eligible for 2MP upon reconsideration, he or she must enter a new 2MP trial period.

The servicer must provide notice to the borrower in writing that, if the FDD forbearance plan is accepted, their 2MP trial period will be cancelled and they will be reconsidered for 2MP in the future. The notice should advise that the borrower may not qualify for 2MP at the time of reconsideration if the borrower's first lien loses good standing under HAMP.

A borrower is not obligated to accept an FDD forbearance plan, and a servicer may not require that a borrower in a 2MP trial period convert to an FDD forbearance plan.

# 7 Permanent Modification

The 2MP modification offer may not be made to the borrower until after the first lien permanent HAMP modification is effective.  If the HAMP-modified first lien loses good standing while the second lien is in a 2MP trial period, the 2MP servicer is not required to offer a permanent 2MP modification to the borrower.

## 7.1 2MP Modification Agreement

The borrower must sign the 2MP modification agreement within 30 calendar days from the date of the permanent 2MP modification offer.  If the modification offer is not accepted by the borrower within 30 calendar days, the 2MP servicer may permanently withdraw the offer and will not be obligated to modify the second lien under 2MP.

## 7.2 Effective Date

The 2MP permanent modification may not become effective unless and until (i) the modification of the corresponding first lien becomes effective under HAMP, and, when applicable (ii) the borrower has made all required 2MP trial period payments in accordance with Section 6.2.  The 2MP servicer is responsible for ensuring that the final 2MP terms match the final terms of the HAMP modification of the related first lien.

## 7.3 Conditions of Modification

### 7.3.1 Re-Subordinate Junior Liens

To ensure alignment of all programs within MHA, 2MP servicers must re-subordinate junior liens within their servicing portfolio to facilitate the modification of a first lien under HAMP or the refinance of a mortgage loan under the Home Affordable Refinance Program.

### 7.3.2 Lien Release

When partial or full extinguishment is utilized, the 2MP servicer, investor and any mortgage or other insurer must relinquish, in whole or in part, all rights and remedies against the borrower(s) related to the portion of the second lien obligation that is forgiven, and the borrower(s) may not be required to sign a promissory note or be charged a fee.

Following an extinguishment of the entire second lien, 2MP servicers must take all necessary action to cancel the indebtedness and release the second lien in a timely manner.  When the mortgage note is cancelled and the required release and/or satisfaction documents are executed and filed, the 2MP servicer must promptly send the cancelled documents to the borrower with a cover letter instructing the borrower to retain the evidence of cancellation.  The 2MP servicer must not charge the borrower a fee for cancelling the indebtedness and releasing or discharging

the second lien against the property.   When a second lien is fully extinguished, no other subordinate lien shall become eligible for modification or extinguishment.

Following an extinguishment of a portion of the second lien, 2MP servicers must take all necessary action to reflect the new UPB of the loan in the 2MP modification documents.

### 7.3.3 Closed-end Second Liens

All loans modified under 2MP must result in closed-end second liens.  If the second lien is an open-end line of credit, 2MP servicers must terminate the borrower's ability to draw additional amounts on the credit line when the 2MP modification becomes effective.   In addition, immediately upon notification that the first lien is entering a HAMP trial period or has been modified under HAMP, 2MP servicers should terminate the borrower's ability to draw additional amounts on open-end lines of credit if permitted by applicable law and the second lien loan documents.   When terminating the borrower's ability to draw additional amounts under an open-end line of credit, the 2MP servicer must provide the borrower with disclosures in a manner consistent with applicable law.

### 7.3.4 Mortgage and Other Insurer Approval

Typically, mortgage insurance for a second lien is issued through a master pool policy placed by the investor or holder of the mortgage.  As a result, the 2MP servicer might not be aware of the existence of mortgage insurance. When a 2MP servicer is servicing second liens on behalf of an investor, the 2MP servicer should ensure that the investor has identified those second liens that have mortgage insurance. The second lien investor should seek to obtain a blanket delegation of authority from mortgage insurers to modify and/or extinguish second liens under 2MP.

As an alternative to a blanket delegation of authority, 2MP servicers may obtain mortgage insurer approval to modify and/or extinguish second liens under 2MP on a case-by-case basis.  2MP servicers should consult their mortgage insurance providers for specific processes related to the reporting of modified terms, payment of premiums, payment of claims, and other operational matters in connection with loans modified and/or extinguished under 2MP.

2MP servicers should also obtain insurer approval for other types of lender placed protection policies, such as lien protection policies.  Lien protection policies provide coverage for the lender against liens and encumbrances that assert a priority over an insured mortgage.

### 7.3.5 Assignment to MERS

If the original second lien was registered with MERS and the originator elected to name MERS as the original mortgagee of record, solely as nominee for the lender named in the security instrument and the note, the 2MP servicer must ensure the 2MP modification agreement it is using contains the following language:

 A new definition under the "Property Address" definition must read as follows:

> "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for lender and lender's successors and assigns. MERS is the mortgagee under the Mortgage. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.

The following section must also be included:

> That MERS holds only legal title to the interests granted by the borrower in the mortgage, but, if necessary to comply with law or custom, MERS (as nominee for lender and lender's successors and assigns) has the right: to exercise any or all of those interests,

including, but not limited to, the right to foreclose and sell the Property; and to take any action required of lender including, but not limited to, releasing and canceling the mortgage loan.

MERS must be added to the signature lines at the end of the 2MP modification agreement, as follows:

_____
Mortgage Electronic Registration
Systems, Inc. – Nominee for Lender

According to MERS Policy Number 2010-1, the 2MP servicer is required to complete a certification process before being authorized to execute documents as a MERS Certifying Officer. Once certified, the 2MP servicer may then execute the 2MP modification agreement on behalf of MERS and, if applicable, submit it for recordation.

### 7.3.6 Monthly Statements

For modifications that include principal forbearance, 2MP servicers are encouraged to include the amount of the gross UPB on the borrower's monthly payment statement.

## 7.4 Re-default and Loss of Good Standing

If a borrower misses three consecutive payments at any time on his or her second lien following the execution of a 2MP modification (three monthly payments are due and unpaid on the last day of the third month), the second lien is no longer considered to be in "good standing." A loan that is not in good standing permanently loses eligibility to receive further 2MP servicer and borrower incentives and reimbursements under the program. Undisbursed incentive payments to borrowers and 2MP servicers, even if accrued, will not be made. Once lost, good standing cannot be restored and eligibility for incentives and interest reimbursements cannot be reclaimed, even if the borrower fully cures the delinquency. Further, the second lien is not eligible for another 2MP modification or extinguishment.

## 7.5 Principal Curtailments Following 2MP Modification

If principal curtailment is received from or on behalf of the borrower on a 2MP modification that includes principal forbearance, 2MP servicers are instructed to apply the principal curtailment to the interest-bearing UPB. If, however, the principal curtailment amount is greater than or equal to the interest-bearing UPB, then the curtailment should be applied to the principal forbearance portion. If the curtailment satisfies the principal forbearance portion, any remaining funds should then be applied to the interest-bearing UPB. This eliminates the possibility of a curtailment paying off (and satisfying) the interest-bearing portion of the UPB, which would cause the entire loan to become due and payable and force the borrower to pay off the principal forbearance portion of the loan balance as a balloon payment.

## 7.6 Impact of PRA Retroactivity on 2MP Modification

With respect to borrowers who have been offered a 2MP modification and principal reduction under PRA is retroactively applied to the related first lien, the 2MP servicer may, but is not required to, apply PRA retroactively to the second lien under 2MP.

A 2MP servicer may, subject to investor guidance, convert some or all of an existing principal forbearance amount to principal reduction or otherwise offer any amount of principal reduction pursuant to a principal curtailment, but may not change any other terms of the 2MP modification. The servicer must memorialize this arrangement in a notice or agreement sent to the borrower that:

Explains how the deferred principal reduction will be applied to the loan;

States that the principal reduction amount will be reported to the IRS in the year in which the curtailment is applied and advises the borrower to seek guidance from a tax professional to determine any potential tax consequences; and

Explains that the borrower may elect not to accept the offered principal reduction and provide opt-out instructions.

Because 2MP servicers have this discretion in offering PRA retroactively on second liens, this treatment should be addressed in the servicer's Retroactive PRA Policy that treats all similarly-situated loans in a consistent manner and in compliance with Section 1.6 of Chapter I.

## 7.7 FDD Forbearance Plan Following 2MP Modification

If a borrower in a permanent 2MP modification is eligible for an FDD forbearance plan and has the capacity to make partial payments, the servicer should make every effort to structure the forbearance plan such that the borrower retains good standing during the FDD forbearance period.  For example, the 2MP servicer may require the borrower to make partial payments during the forbearance period such that the 2MP loan at no time becomes delinquent by three full monthly payments during the forbearance plan.  If a 2MP borrower loses good standing, even as a result of an FDD forbearance plan, the loan is not eligible to receive or accrue borrower, servicer or investor incentives in connection with the loan.  In addition, the borrower would not be eligible for another 2MP modification.  If paying in accordance with the FDD forbearance plan would result in the borrower becoming three full monthly payments past due, then the 2MP servicer must inform the borrower in writing at the time the FDD forbearance plan is offered that by paying in accordance with the plan, the borrower may lose good standing under 2MP.  In the event a borrower loses good standing, the 2MP servicer must work with the borrower to cure the delinquency regardless of the fact that the borrower is unable to regain good standing. If this is not possible, the 2MP servicer should evaluate the borrower for any other loss mitigation alternative prior to commencing foreclosure proceedings.

## 8 2MP Documents

Treasury will not issue standard modification documents for 2MP. 2MP servicers may rely on their existing second lien modification documents, revised as necessary to include 2MP program requirements and to ensure that the documents comply with applicable federal, state, and local laws. At a minimum, the modification documents used must include the following:

- A representation by the borrower that, under penalty of perjury, all documents and information provided by borrower to the 2MP servicer are true and correct.

- A statement from the borrower that the modification documents supersede the terms of any modification, forbearance, trial period plan or workout plan previously entered into in connection with the borrower's second lien.

- A statement from the borrower that the borrower will comply with and is bound by all covenants, agreements, and requirements of his/her loan documents except to the extent that such loan documents are modified by the modification agreement.

- A statement from the borrower that the loan documents are composed of duly valid, binding agreements, enforceable in accordance with their terms.

- A statement from the borrower that nothing in the modification agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents as modified by the modification agreement.

- A due on sale provision to the extent enforceable under federal law.

- A statement that prohibits any subsequent assumption of the loan after modification.

- A statement that declares any provision providing for a penalty for full or partial prepayment of the modified principal balance null and void.

- A statement where the borrower agrees that the modification agreement will be null and void if the 2MP servicer does not receive all necessary title endorsement(s), title insurance product(s) and/or subordination agreement(s).

- A statement in which the borrower agrees to execute any documents, including corrected documents and replacements for lost documents, necessary to consummate the transactions contemplated in the modification agreement.

- A statement from the borrower that if the second lien is an open-end line of credit, the borrower consents to the termination of his or her ability to draw additional amounts on the line.

- A statement in which the borrower consents to the disclosure of his/her personal information, including the terms of the modification, to (a) Treasury for purposes related to HAMP and 2MP, (b) any investor, insurer, or guarantor that owns, insures or guarantees his/her mortgage, (c) the 2MP servicer of his/her first lien, (d) the Program Administrator and MHA-C, and (e) companies that perform support services for HAMP and 2MP, including marketing HAMP or 2MP, conducting surveys or providing marketing research or other borrower outreach, data processing, and technical systems consulting.

# 9 2MP Reporting Requirements

2MP servicers are required to provide loan level data reporting to the Program Administrator detailing the modification and servicing of a loan modified under 2MP. This data must be accurate, complete, and in agreement with the servicer's records. The loan level reporting requirements, timing, loan attributes and detailed guidelines for submitting data files are posted on www.HMPadmin.com. 2MP servicers are required to submit 2MP data using the HAMP Reporting Tool.

## 9.1 2MP Trial Period Reporting

2MP servicers are not required to report the initiation of a 2MP trial period or the receipt of 2MP trial period payments to the Program Administrator.

## 9.2 2MP Modification Reporting

### 9.2.1 2MP Modification and Extinguishment Set Up

2MP servicers must report a 2MP permanent modification, 2MP extinguishment, or a 2MP partial extinguishment. 2MP servicers have the ability to cancel and resubmit this information.

2MP servicers are required to provide the following categories of information to the Program Administrator, to set up the second lien loan official modification:

- Loan Identifying Information
- General Loan Information
- Borrower/Co-Borrower Identifying Data
- Property Identifying Data
- Loan Characteristics Before Modification
- Loan Characteristics After Modification

### 9.2.2 2MP Official Monthly Reporting

Once a permanent 2MP modification (with or without a partial extinguishment) is reported, 2MP servicers are required to provide the following categories of information on a monthly basis to the Program Administrator:

- Loan Identifying Information
- Monthly Loan Activity

### 9.2.3 2MP Reason Codes

2MP servicers are required to provide to the Program Administrator, for all second liens for which 2MP modifications were not approved, approved but not accepted or approved but failed the 2MP trial period, the following categories of information:

- Loan Identifying Information
- Borrower/Co-Borrower Identifying Data
- Property Identifying Data
- Reason Code

# 10 External Reporting Requirements

## 10.1 Credit Bureau Reporting

2MP servicers must report a "full-file" status report to the credit repositories for each loan under 2MP in accordance with the Fair Credit Reporting Act as well as other applicable law and credit bureau requirements as provided by the CDIA. "Full-file" reporting means that the 2MP servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month. Following modification of a second lien under 2MP, 2MP servicers should use Special Comment Code "CN" to identify loans being paid under a modified payment agreement as described in the guidance below provided by CDIA.

### 10.1.1 Trial Period Reporting

If the borrower was current with payments prior to the trial period and he or she makes each trial period payment on time, 2MP servicers must report the borrower as current (Account Status 11) during the trial period and report Special Comment Code 'AC' (Paying under a partial payment agreement).

If the borrower was delinquent (at least 30 days past the due date) prior to the TPP and the reduced payments do not bring the account current, 2MP servicers must report the Account Status Code that reflects the appropriate level of delinquency and report Special Comment Code 'AC' (Paying under a partial payment agreement).

### 10.1.2 Post Modification Reporting

2MP servicers should continue to report one trade line under the original Account Number.

- Date Opened = the date the account was originally opened

- Original Loan Amount = the original amount of the loan, including the Balloon Payment Amount, if applicable. If the principal balance increases due to capitalization of delinquent amounts due under the loan, the Original Loan Amount should be increased to reflect the modified principal balance

- Terms Duration = the modified terms

- Scheduled Monthly Payment Amount = the new amount as per the modified agreement

- Current Balance = the principal balance (including the Balloon Payment Amount, if applicable), plus the interest and escrow due during the current reporting period

- Account Status Code = the appropriate code based on the new terms of the loan

- Special Comment Code = CN

- K4 Segment = used to report the Balloon Payment information, if applicable:

  o Specialized Payment Indicator = 01 (Balloon Payment)

  o Payment Due Date = the date the balloon payment is due which is equal to maturity of the amortizing portion of the loan. Note: The payoff date can be used in this field

  o Payment Amount = the amount of the balloon payment in whole dollars only

### 10.1.3 Extinguishment Reporting

For second liens that are extinguished in their entirety under 2MP, the 2MP servicer must report the following to the credit repositories:

- Account Status Code = 13 (Paid)

- Payment Rating = the appropriate code that identifies the status of the account within the activity period being reported

- Special Comment Code = AU (Paid in full for less than the full balance)

- Current Balance and Amount Past Due = zero

- Date Closed = date the accounts are forgiven and considered to be paid

Note that payment history for the forgiven accounts will be retained.

For second liens where a portion of the principal is extinguished in conjunction with a modification under 2MP, the 2MP servicer must report to the credit repositories in the same manner as it would a modification under 2MP as set forth in Section 10.1.2.

## 11 Incentive Compensation

Borrowers, 2MP servicers and investors are eligible for incentive compensation under 2MP.  The Program Administrator will make incentive payments to the 2MP servicer via an ACH transaction in a consolidated fashion and will provide detailed loan-level accounting for incentives on a monthly basis.  Upon receipt of such incentive compensation, each 2MP servicer must promptly apply or remit, as applicable, all borrower and investor compensation with respect to any modified or extinguished loan.  Treasury is not providing guidance on how funds are to be passed through to security holders of securitization trusts.  However, MHA-C will monitor to ensure that cost share reduction payments are remitted to security holders and borrower pay for performance incentive payments are applied to borrower accounts in accordance with program guidelines.

With respect to payment of any incentive that is predicated on a six percent reduction in the borrower's monthly second lien payment, the reduction will be calculated by comparing the monthly payment prior to the 2MP modification and the borrower's payment under 2MP.

No incentives of any kind will be paid if:

- The 2MP servicer has not executed the SPA to participate in 2MP;

- The 2MP servicer has reached its Program Participation Cap, as discussed in Section 1.5 of Chapter I;

- The borrower does not qualify for, or otherwise enter into, a permanent 2MP modification; or

- The loan has not been reported to the Program Administrator through the HAMP Reporting Tool.

As long as the HAMP-modified first lien was in good standing and was not paid off as of the effective date of the 2MP modification or partial extinguishment (Modification or Extinguishment Effective Date), incentive compensation will be paid for 2MP modifications and partial extinguishments for the period between the Modification or Extinguishment Effective Date and the date the HAMP-modified first lien loses good standing or is paid off. Furthermore, servicer and investors will be entitled to incentive compensation for 2MP full extinguishments when the servicer does not also service the HAMP-modified first lien and as long as the 2MP servicer relied on the most recent LPS match file provided to the servicer before the effective date of the full extinguishment that indicated that the HAMP-modified first lien was in good standing and not paid off, even if the HAMP-modified first lien information is subsequently updated or corrected. Each servicer should retain in the servicing system and/or mortgage file the most recent LPS match file on which the servicer relied to determine that the HAMP-modified first lien was reported as in good standing and not paid off before the effective date of the full extinguishment.

Incentive compensation will accrue from the 2MP modification effective date for all modifications.

## 11.1 Servicer Incentive Compensation

### 11.1.1 Completed Modification Incentive

A 2MP servicer will receive one-time compensation of $500 for each completed 2MP modification.  The completed modification will be paid to the servicer in the month that the permanent 2MP modification becomes effective.

### 11.1.2 Pay-for-Success Incentive

If a particular borrower's monthly second lien mortgage payment is reduced through 2MP by six percent or more, a 2MP servicer will receive an annual pay-for-success fee of $250 for up to three years.  The pay-for-success fee does not accrue during the 2MP trial period, if any. The pay-for-success fee accrues monthly and is payable annually for each of the first three years after the anniversary of the month in which the permanent 2MP modification became effective.

If either the first or second lien loan ceases to be in good standing under HAMP or 2MP, respectively, or either loan is paid in full, the 2MP servicer will forfeit any incentive payments that have accrued but are unpaid and will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.

### 11.1.3 Extinguishment Incentive

A 2MP servicer will receive one-time compensation of $500 for each second mortgage lien with a UPB equal to or greater than $5,000 and a pre-modification scheduled monthly payment equal to or greater than $100 that is fully extinguished under 2MP. No additional compensation is payable to a 2MP servicer for partial extinguishment other than the completed modification incentive provided in conjunction with the modification of the remaining loan balance.

## 11.2 Borrower Incentive Compensation

Borrowers whose monthly second lien mortgage payment is reduced through 2MP by six percent or more and who make timely monthly payments will earn an annual pay-for-performance principal balance reduction payment of up to $250 for up to five years.

The pay-for-performance principal balance reduction payment will accrue for each month in which the borrower makes current payments (made by the last day of the month in which they are due) on both the first and second liens. The payment will be applied annually for each of the first five years after the anniversary of the month in which the permanent 2MP modification became effective. The pay-for-performance principal balance reduction payments do not accrue during the 2MP trial period, if any.

For example, if the borrower is current and makes 10 out of 12 payments on time, he or she will be credited for 10/12 of the annual incentive payment as long as the first and second lien loans are in good standing and have not been paid in full at the time the annual incentive is paid. A borrower whose first and/or second lien loan is delinquent on a rolling 30- or 60-day basis will not accrue annual incentive payments.

The borrower pay-for-performance principal balance reduction payment will be paid to the 2MP servicer to be applied first towards reducing the interest-bearing UPB on the second lien and then to any principal forbearance amount (if applicable). Any applicable prepayment penalties on partial principal prepayments made by the government must be waived. In the event the borrower is delinquent, but still in good standing, the borrower's incentive should continue to be applied as a curtailment to the interest-bearing UPB.

If the first or second lien loan ceases to be in good standing or either is paid in full, the borrower will forfeit any incentive payments that have accrued, but are unpaid, and will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.

"Pay for performance" principal balance reduction payments are excluded from gross income for tax reporting purposes.

## 11.3 Investor Incentive Compensation

### 11.3.1 Payment Reduction Cost Share Incentive

Investors are entitled to payment reduction cost share compensation equal to 160 basis points multiplied by the unmodified UPB (less any partial principal forgiveness, if applicable) of the second lien, converted to a monthly rate. The calculation formula is:

- 160 basis points x unmodified UPB (less any partial principal forgiveness, if applicable) of second lien / 12.

Payment reduction cost share compensation is paid monthly beginning the month following the month the permanent 2MP modification becomes effective. This compensation will be provided for up to five years as long as the first lien modified under HAMP remains in good standing and neither the first lien nor the second lien has been paid in full.

### 11.3.2 Extinguishment Incentive

For purposes of determining the incentive payment to the investor for extinguishing a second lien, the 2MP servicer must know the borrower's combined loan-to-value (CLTV) ratio. The CLTV is the ratio of the current total UPB of the HAMP-modified first lien and the current total UPB of the unmodified second lien divided by the property value obtained in connection with the permanent HAMP modification. LPS will provide the 2MP servicer with the current total UPB of the HAMP-

modified first lien and the value of the property that secures the HAMP-modified first lien in the second lien match notification.

Investors are entitled to compensation per dollar of UPB extinguished in CLTV range based on the table below.

**2MP Compensation Per Dollar of UPB Extinguished in CLTV Range**
**(Loans Less than or Equal to Six Months Past Due)**

| <115% | 115% to 140% | >140% |
|---|---|---|
| 0.21 | 0.15 | 0.10 |

Notwithstanding the foregoing, the investor will be paid $0.06 per dollar of the UPB being extinguished for second mortgage liens that were greater than six months past due at any time during the 12 months prior to the date of extinguishment.

Second lien extinguishment compensation is paid in the month following receipt by the Program Administrator of all required data relating to the second lien extinguishment.  The 2MP servicer must represent and warrant that the second lien has been released in compliance with applicable laws when submitting a request for 2MP extinguishment payment.



**Chapter VI**

**Government Loans**

# 1 Introduction

Both FHA and RHS have implemented programs to provide eligible borrowers with sustainable mortgage payments through modification of FHA-insured or RHS-guaranteed first lien mortgage loans in a manner complementary to HAMP.  Similar to HAMP, each of these programs provides a borrower with an affordable monthly mortgage payment equal to 31 percent of his or her monthly gross income and requires the borrower to complete a trial payment plan before the loan is permanently modified.  If the FHA-insured or RHS-guaranteed mortgage loan meets Treasury's eligibility criteria, the borrower is eligible for pay-for-performance compensation and the servicer is eligible for pay-for-success compensation from Treasury.

# 2 Eligibility and Underwriting

## 2.1 Treasury FHA-HAMP

In July 2009, FHA launched FHA-HAMP through Mortgagee Letter 2009-23.  The effective date of FHA-HAMP was August 15, 2009.  The guidance in Mortgagee Letter 2009-23, including any attachments and Questions and Answers, and Mortgagee Letters 2009-35, 2009-39, 2010-04 and 2010-11, are incorporated by reference into this Handbook. Servicers should consult only these Mortgagee Letters and other existing or future guidance issued by FHA for requirements related to eligibility, underwriting and administration of FHA-HAMP (hereafter referred to as FHA-HAMP Mortgagee Letters), with the exception of the specific requirements of Treasury FHA-HAMP set forth in this Handbook. In addition to any guidance provided by FHA, to be eligible for Treasury FHA-HAMP, the first lien mortgage loan must have been originated on or before January 1, 2009 and the servicer must be in receipt of the borrower's first trial payment by December 31, 2012.

## 2.2 RD-HAMP

In August 2010, RHS published its Final Rule providing guidance for Special Loan Servicing modifications to RHS-guaranteed loans.  The guidance in the Final Rule is incorporated by reference into this Handbook.  Servicers should consult the Final Rule and other existing or future guidance issued by RHS for requirements related to eligibility, underwriting and administration of Special Loan Servicing, with the exception of the specific requirements of RD-HAMP.  In addition to any guidance provided by RHS, to be eligible for RD-HAMP, all borrowers must execute a Hardship Affidavit (as described in Section 4.1.1 of Chapter II), the first lien mortgage loan must have been originated on or before January 1, 2009, and the servicer must be in receipt of the borrower's first trial payment by December 31, 2012.

# 3 Participation, Incentive Compensation, Treasury Reporting Requirements, Compliance

## 3.1 Participation

Participation in Treasury FHA-HAMP or RD-HAMP requires execution of a SPA on or before October 3, 2010.  Servicers that previously executed a SPA are required to execute an Amended or Restated SPA or an additional Service Schedule that includes Treasury FHA-HAMP or RD-HAMP, as applicable.  Servicers may execute a SPA that is applicable only to Treasury FHA-HAMP or RD-HAMP loans without the obligation to apply HAMP to other loans that they service. See Chapter I for the servicer participation requirements.

### 3.2 Incentive Compensation

Borrowers and servicers are eligible for incentive compensation under Treasury FHA-HAMP and RD-HAMP.  The Program Administrator will make incentive payments to the servicer via an ACH transaction in a consolidated fashion and will provide detailed loan-level accounting for incentives on a monthly basis.  Upon receipt of such incentive compensation, each servicer must promptly apply or remit, as applicable, all borrower and investor compensation with respect to any modified loan.  MHA-C will monitor to ensure that borrower pay-for-performance incentive payments are applied to borrower accounts in accordance with program guidelines.

With respect to payment of any incentive that is predicated on a six percent reduction in the borrower's monthly mortgage payment, the reduction will be calculated by comparing the monthly mortgage payment used to determine eligibility (as defined in Section 6.1.2 of Chapter II)[2] and the borrower's payment under FHA-HAMP and Special Loan Servicing.

No incentives of any kind will be paid if:

- The servicer has not executed the SPA;

- The servicer has reached its Program Participation Cap, as discussed in Section 1.5 of Chapter I;

- The borrower does not meet the basic eligibility qualifications for FHA-HAMP and Treasury FHA-HAMP or Special Loan Servicing and RD-HAMP, as applicable;

- The borrower is no longer in good standing or the loan has been paid in full; or

- The loan has not been reported to the Program Administrator through the HAMP Reporting Tool.

Furthermore, no incentives of any kind will be paid if the FHA-HAMP modifications with effective dates on or after March 30, 2011 if the modified monthly mortgage payment does not achieve the target monthly mortgage payment ratio of 31 percent. In accordance with FHA guidance, if a servicer cannot achieve the target monthly mortgage payment ratio of 31 percent, it should contact the FHA National Servicing Center for assistance.

### 3.2.1 Servicer Incentive Compensation

If a particular borrower's monthly mortgage payment is reduced through FHA-HAMP or Special Loan Servicing by six percent or more, a servicer will receive an annual pay-for-success fee for a period of three years.  The fee will be equal to the lesser of:

- $1,000 ($83.33/month); or

- One-half of the reduction in the borrower's annualized monthly payment.

The pay-for-success fee will be payable annually for each of the first three years after the anniversary of the first trial payment due date under FHA-HAMP or Special Loan Servicing, as long as the loan is in good standing and has not been paid in full at the time the incentive is paid.

If the loan ceases to be in good standing or is paid in full, the servicer will forfeit any incentive payments that have accrued but are unpaid and will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.

---

[2] For Treasury FHA-HAMP this will also include mortgage insurance.

### 3.2.2 Borrower Incentive Compensation

Borrowers whose monthly mortgage payment is reduced through FHA-HAMP or Special Loan Servicing by six percent or more and who make timely monthly payments will earn an annual pay-for-performance principal balance reduction payment equal to the lesser of:

- $1,000 ($83.33/month); or

- One-half of the reduction in the borrower's annualized monthly payment for each month a timely payment is made.

The pay-for-performance principal balance reduction payment will accrue for each month in which the borrower makes current payments.  The payment will be payable annually for each of the first five years after the anniversary of the first trial payment due date under FHA-HAMP or Special Loan Servicing occurred as long as the loan is in good standing and has not been paid in full at the time the incentive is paid.

For example, if the borrower is current and makes 10 out of 12 payments on time, he or she will be credited for 10/12 of the annual incentive payment as long as the loan is in good standing and has not been paid in full at the time the annual incentive is paid. A borrower whose loan is delinquent on a rolling 30- or 60-day basis will not accrue annual incentive payments.

This payment will be paid to the mortgage servicer to be applied first towards reducing the interest-bearing UPB on the mortgage loan and then to any principal forbearance amount (if applicable).  In the event the borrower is delinquent, but still in good standing, the borrower's incentive payment should continue to be applied as a curtailment to the interest-bearing UPB.

If the loan ceases to be in good standing or is paid in full, the borrower will forfeit any incentive payments that have accrued but are unpaid and will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.

Pay for-performance principal balance reduction payments are excluded from gross income for tax reporting purposes.

### 3.2.3 Re-default and Loss of Good Standing

If a borrower defaults on a loan modification executed under FHA-HAMP or Special Loan Servicing (delinquent by the equivalent of three full monthly payments at the end of the month in which the last of the three delinquent payments was due), the loan is no longer considered to be in "good standing" for purposes of Treasury FHA-HAMP or RD-HAMP, as applicable.  Once lost, good standing cannot be restored even if the borrower subsequently cures the default.  A loan that is not in good standing is not eligible to receive borrower or servicer incentives and reimbursements and these payments will no longer accrue for that loan.

In the event a borrower defaults on the modified loan, the servicer should work with the borrower to cure the modified loan.  If this is not possible, the servicer should evaluate the borrower for any other loss mitigation alternative prior to commencing foreclosure proceedings.

## 3.3 Treasury Reporting Requirements

Servicers are required to provide Treasury FHA-HAMP or RD-HAMP loan level data reporting to the Program Administrator at the start of the modification trial period, during the modification trial period, at loan set up of the permanent modification and monthly after the modification is set up.  This data must be accurate, complete, and in agreement with the servicer's records.  The loan level reporting requirements, timing, loan attributes and detailed guidelines for submitting data files are posted on www.HMPadmin.com.  Servicers are required to submit four separate data files using the HAMP Reporting Tool.

The Treasury FHA-HAMP Data Dictionary, accessible on www.HMPadmin.com, provides details of all the data fields that must be reported for Treasury FHA-HAMP.  For RD-HAMP, servicers will be required to report the majority of the data fields in the Treasury FHA-HAMP Data Dictionary.  However, certain data fields may be optional or the values modified to accommodate RD-HAMP loans.

A reporting and payment process will be in 2011 for RD-HAMP.   In addition, a new Data Dictionary for RD-HAMP will be available on www.HMPadmin.com prior to the reporting and payment process being deployed.   RD-HAMP servicers should begin using the applicable reporting process as soon as feasible upon notification of its availability, but in no event later than 60 days from notification of system availability.

Incentive compensation will accrue as described in Section 3.2.1 for servicers and 3.2.2 for borrowers for all RD-HAMP modifications.  However, servicer and borrower incentive payments will be made only following implementation of the reporting and payment processes and the servicer commencing reporting.

### 3.4 Compliance

Treasury has agreed with FHA and RHS that each has specific responsibilities to ensure program compliance as described in Section 2.4 of Chapter I.



**Chapter VII**

**Treasury/FHA Second Lien Program
(FHA2LP)**

# 1 Introduction

This Chapter provides guidance to second lien servicers for adoption and implementation of the Treasury/FHA Second Lien Program (FHA2LP). In addition, this Chapter provides guidance to first lien servicers that have modified loans through HAMP with respect to the servicer's responsibility for terminating those loans in the HAMP Reporting Tool upon closing of the FHA Refinance. FHA2LP became effective on September 27, 2010.

# 2 Participation

In order to participate in FHA2LP, a servicer must have executed the SPA and the FHA2LP Service Schedule prior to October 3, 2010. A servicer need not service the related first lien or participate in HAMP in order to participate in FHA2LP. See Chapter I for the servicer participation requirements. Servicers that are participating in FHA2LP (FHA2LP servicers) with respect to Non-GSE Mortgages must follow the guidance set forth in this Chapter when borrowers seeking assistance refinance through FHA Refinance have a second lien mortgage loan.

# 3 Eligibility

All guidance in the FHA Refinance Mortgagee Letter 2010-23, including any attachments and Questions and Answers (collectively, the FHA Refinance ML), is incorporated by reference into this Handbook. Servicers should rely on the FHA Refinance ML and other relevant FHA documents for requirements related to eligibility, underwriting and administration of FHA Refinance, while this Handbook addresses the specific requirements of FHA2LP.

In addition to the requirements of the FHA Refinance ML, a loan is eligible for FHA2LP if the servicer verifies that all of the following criteria are met:

| Second lien | The mortgage loan is a second lien mortgage loan originated on or before January 1, 2009. The loan must hold second mortgage lien priority prior to the FHA Refinance; however, a mortgage loan that would be in second lien position but for a tax lien, mechanic's lien or other non-mortgage related lien is eligible. |
|---|---|
| Monthly mortgage payment | The borrower is required to make a monthly payment. For example, second liens on which payments have been deferred for 36 or more months are not eligible. |
| Unpaid principal balance | The second lien has a UPB of $2,500 or more on the day prior to the closing of the FHA Refinance. |
| Program cut-off date | The FHA Refinance must close on or before December 31, 2012. |

# 4 Extinguishment

An FHA2LP servicer, in accordance with any investor guidelines, may elect to extinguish a portion of or the entire second lien balance in order to facilitate an FHA Refinance. Because FHA2LP servicers have discretion in offering partial or full extinguishment, servicers must develop and adhere to a written policy for making extinguishment determinations that treat all similarly situated loans in a consistent manner and in compliance with Section 1.6 of Chapter I.

## 4.1 Partial Extinguishment

In conjunction with the partial extinguishment of a second lien, FHA2LP servicers may curtail the UPB by the agreed upon extinguishment amount and leave all other repayment terms as scheduled, or may elect to modify the loan by re-amortizing the payment schedule based on the reduced UPB, reducing the interest rate or extending the repayment term to achieve a lower

second lien monthly payment. Additionally, FHA2LP servicers may convert an adjustable-rate or interest-only second lien to a fixed-rate, fully amortizing second lien.

FHA2LP servicers may not, as a condition of extinguishment, increase the scheduled interest rate or change the payment terms to include an interest-only or an adjustable rate interest repayment schedule.

## 4.2 Conditions of Partial or Full Extinguishment

### 4.2.1 Lien Release

The FHA2LP servicer, investor and any mortgage or other insurer must relinquish all rights and remedies against the borrower(s) related to the portion of the second lien obligation that is extinguished. The borrower(s) may not be required to sign a promissory note and may not be charged a fee as a condition of, or in conjunction with, such release.

In conjunction with the closing of an FHA Refinance, the FHA2LP servicer, either on its own or through the settlement agent, must take all necessary actions to cancel the indebtedness and release the second lien, or the extinguished portion thereof, in a timely manner. When the cancelled or modified mortgage note and the required release and/or satisfaction documents are executed and recorded, the servicer or settlement agent must promptly send the documents to the borrower.

### 4.2.2 Re-Subordinate Junior Liens

The FHA2LP servicer, either on its own or through the settlement agent, must take all necessary actions to subordinate the remaining portion of the second lien to the new FHA first lien.

### 4.2.3 Closed-end Second Liens

All loans partially extinguished under FHA2LP must result in closed-end second liens. If the second lien is an open-end line of credit, FHA2LP servicers must terminate the borrower's ability to draw additional amounts on the credit line when the FHA Refinance closes. When terminating the borrower's ability to draw additional amounts under an open-end line of credit, the FHA2LP servicer must provide the borrower with disclosures in a manner consistent with applicable law. Any permanent changes to the loan terms must be documented in a written modification agreement signed by the servicer and borrower(s).

### 4.2.4 Mortgage Insurer Approval

FHA2LP servicers must be able to identify second liens in their servicing portfolio that have mortgage insurance and should seek to obtain a blanket delegation of authority from each mortgage insurer to partially or fully extinguish second liens under FHA2LP. As an alternative to a blanket delegation of authority, FHA2LP servicers must obtain mortgage insurer approval to partially or fully extinguish the second lien under FHA2LP on a case-by-case basis.

# 5 Reporting Requirements

## 5.1 Treasury Reporting

FHA2LP servicers are required to provide loan level data reporting to Bank of New York Mellon (BNYM) as Incentives Processor for FHA2LP detailing the partial or full extinguishment of a second lien under FHA2LP.  This data must be accurate, complete, and in agreement with the servicer's records.  Each FHA2LP servicer is required to have registered with the Program Administrator using the FHA2LP Registration Form on www.HMPadmin.com.  The loan level reporting requirements, timing, loan attributes and detailed guidelines for submitting data files are available on www.HMPadmin.com.

FHA2LP servicers are required to provide the following categories of information to the BYNM System of Record:

- General Transaction Information
- Loan Identifying Information
- General Loan Information
- Borrower/Co-Borrower Identifying Data
- Loan Characteristics Before Refinance
- Loan Characteristics After Refinance

Data must be reported by the FHA2LP servicer no later than the third business day of the month following the closing of the FHA Refinance.  A full description and detail of the required attributes is provided in the FHA2LP Data Dictionary posted on www.HMPadmin.com.

FHA2LP servicers must represent and warrant that all or a portion of the second lien has been released in compliance with applicable laws when submitting a request to the Incentives Processor for payment of FHA2LP incentives.

## 5.2 Reporting Conversion of HAMP or 2MP Loans to FHA Refinance

Servicers of any HAMP-modified first lien that is paid off through FHA Refinance must follow the guidance in the HAMP Servicer Reporting Requirements on www.HMPadmin.com regarding the reporting of the loan as "paid off" in the HAMP Reporting Tool. In addition, the servicer must submit the OMR that reflects the payoff within the first four business days of the month following the FHA Refinance closing.

For 2MP loans that are partially or fully extinguished through FHA2LP or where the corresponding first lien is paid off through FHA Refinance, servicers must follow the guidance in the HAMP Servicer Reporting Requirements on www.HMPadmin.com regarding the reporting of the loan as "paid off" in the HAMP Reporting Tool. In addition, the servicer must submit the 2OMR that reflects the payoff within the first four business days of the month following the FHA Refinance closing.

## 5.3 Credit Bureau Reporting

### 5.3.1 Reporting Full Extinguishments

For second liens that are extinguished in their entirety under FHA Refinance, the servicer must report the following to the credit repositories:

- Account Status Code = 13 (Paid)

- Payment Rating = the appropriate code that identifies the status of the account within the activity period being reported

- Special Comment Code = AU (Paid in full for less than the full balance)

- Current Balance and Amount Past Due = zero

- Date Closed = date the accounts are forgiven and considered to be paid

Note that payment history for the forgiven accounts will be retained.

### 5.3.2 Reporting Partial Extinguishment

For second liens that are partially extinguished under FHA Refinance, the servicer must report the following to the credit repositories:

- Date Opened = the date the account was originally opened

- Original Loan Amount = the original amount of the loan, including the Balloon Payment Amount, if applicable. If the principal balance increases due to capitalization of delinquent amounts due under the loan, the Original Loan Amount should be increased to reflect the modified principal balance

- Terms Duration = the modified terms

- Scheduled Monthly Payment Amount = the new amount as per the modified agreement

- Current Balance = the principal balance (including the Balloon Payment Amount, if applicable), plus the interest and escrow due during the current reporting period

- Account Status Code = the appropriate code based on the new terms of the loan

- Special Comment Code = CN

- K4 Segment = used to report the Balloon Payment information, if applicable:

  o Specialized Payment Indicator = 01 (Balloon Payment)

  o Payment Due Date = the date the balloon payment is due which is equal to maturity of the amortizing portion of the loan. Note: The payoff date can be used in this field

  o Payment Amount = the amount of the balloon payment in whole dollars only

Servicers should continue to report one trade line under the original account number.

# 6 Incentive Compensation

Servicers and investors are eligible for incentive compensation under FHA2LP.  The Incentives Processor will make incentive payments to the servicer via an ACH transaction in a consolidated fashion and will provide detailed loan-level accounting for incentives on a monthly basis.  Upon receipt of such incentive compensation, each servicer must promptly apply or remit, as applicable, all investor compensation with respect to any partially or fully extinguished loan. Treasury is not providing guidance on how funds are to be passed through to security holders of securitization trusts.  However, MHA-C will monitor to ensure that cost share reduction payments are remitted to security holders.

FHA2LP incentive payments will be made in the month following the later of (i) the date of receipt by the Incentives Processor of all required data relating to the second lien extinguishment or (ii) the date of confirmation from FHA that the new FHA first lien mortgage has been endorsed. The Incentives Processor will match the data entered into the BNYM System of Record by the servicer with the data received from FHA related to the endorsed first lien mortgage. Payment of FHA2LP incentives is also contingent upon, if applicable, the servicer reporting the loan as "paid off" in the HAMP Reporting Tool as set forth in Section 5.2.

Servicers and investors are not eligible for incentive compensation under FHA2LP if the second lien servicer or investor charges a subordination fee or other administrative fee to the borrower or the first lien servicer or investor in conjunction with the full or partial extinguishment of a second lien to facilitate an FHA refinancing transaction.

## 6.1 Servicer Incentive Compensation

An FHA2LP servicer of a second lien that is partially or fully extinguished under FHA Refinance will receive one-time compensation of $500 for each second lien with a UPB equal to or greater than $2,500 on the day prior to the closing date of the FHA Refinance.

Servicers of second liens that were previously modified under 2MP will not be eligible for the $500 incentive if the closing date of the FHA Refinance occurs within 180 calendar days of the effective date of the 2MP modification.

## 6.2 Investor Incentive Compensation

An FHA2LP second lien investor is eligible for incentive payments for the amount of principal extinguishment that reduces the borrower's CLTV ratio to between 105 percent and 115 percent based on the amount of post-refinance mortgage debt. The post-refinance CLTV is the ratio of all mortgage debt, including the new principal balance of the refinanced first lien and any subordinate liens to the current FHA appraised value of the property.

However, the amount of investor incentive payment to be paid under FHA2LP will be calculated using the pre-refinance (rather than post) CLTV ratio, the delinquency status of the loan at the time of the FHA Refinance, and the dollar amount of the principal extinguishment. The pre-refinance CLTV is the ratio of the UPB of the existing first lien and the UPB of the second lien prior to any extinguishment divided by the current FHA appraised value of the property.

| Treasury FHA2LP Compensation Per Dollar of UPB Extinguished in CLTV Range (Loans Less than or Equal to Six Months Past Due) | | |
|---|---|---|
| 105% to <115% | 115% to 140% | >140% |
| 0.21 | 0.15 | 0.10 |

With respect to second liens that were less than or equal to six months past due at all times during the 12-month period before the FHA Refinance closing date, second lien investors will be entitled to receive $0.21 per dollar of principal extinguishment equal to or greater than 105 percent and less than 115 percent CLTV ratio; $0.15 per dollar of principal extinguishment equal to or greater than 115 percent and less than or equal to 140 percent CLTV ratio; and $0.10 per dollar of principal extinguishment in excess of 140 percent CLTV ratio.

With respect to second liens that were more than six months past due at any time during the 12-month period prior to the FHA Refinance closing date, regardless of the CLTV ratio range, second lien investors will be paid $0.06 per dollar of principal extinguishment and will not be eligible for incentives in the above extinguishment schedule.



**Chapter VIII**

**Interactions with HFA Hardest Hit Fund Programs**

# 1 Introduction

Hardest Hit Fund (HHF) programs may interact with or complement assistance provided through MHA programs. While voluntary, Treasury encourages servicers to work with the HFAs to implement their programs for borrowers in states with HHF programs. Servicers that are participating in an MHA program must follow the guidance set forth in this Chapter when borrowers seeking assistance are participating in an HHF program.

# 2 Communication

## 2.1 Communication between Servicers and HFAs

To ensure that HHF programs operate effectively and that applicants are matched to the appropriate program, HFAs may need access to information about an HHF-qualified borrower's HAMP status. When working with a state HFA and in receipt of a Borrower Authorization, an example of which is available on www.HMPadmin.com, a servicer must provide the HFA with applicable borrower-specific information including, but not limited to:

- The status of the borrower's request to be considered for HAMP, UP, HAFA, 2MP or another MHA program (including, if applicable, the primary reason for ineligibility);

- The terms of the borrower's TPP or permanent modification;

- A print out of the NPV result(s) from both the standard modification waterfall and alternative modification waterfall evaluations (as described in Section 6.3 and Section 6.4 of Chapter II, respectively), as applicable; and

- Other relevant loan information.

## 2.2 Communication between Servicers and Borrowers

A servicer may not directly solicit the borrower for participation in an HHF program without express written consent from the HFA.

Servicers may not deny or delay consideration of a borrower for any MHA program pending acceptance of that borrower into an HHF program and may not require borrowers first request HFF program assistance through an HFA or housing counselor as a condition of consideration for an MHA program. If a borrower is denied assistance under any MHA program, and the servicer is aware of an HHF program that may help the borrower qualify for an MHA program, the servicer may notify the borrower of this option (or alternative) if authorized by the HFA. If a servicer is actively working with an HHF program to find an affordability solution for the borrower, the servicer may suspend the time frames detailed in Section 4.5, Section 6 and Section 2.3.2 of Chapter II, for an additional 30 days to allow the HFA to decide about appropriate assistance for that borrower. In addition, if HHF program assistance enables a TPP offer within these timeframes, verification of the borrower's income documentation will not be required if it was previously verified in accordance with Section 5 of Chapter II where assistance was denied.

# 3 Interactions with HAMP

HHF programs may target assistance to borrowers who are not HAMP-eligible because the proposed modification is NPV negative (as described in Section 7 of Chapter II). HFAs hope to make modifications NPV positive by providing assistance in the form of upfront principal reduction to enable the modification. Depending on the HHF program rules, the investor may be required to contribute to or match, on a dollar-for-dollar basis, this assistance. The Base NPV Model does not evaluate the impact of principal reduction payments made by a third party on investor cash flows.

In order to estimate the impact of HHF principal reduction payments, servicers who participate in these types of programs should follow a different analysis protocol than that required for PRA or for HAMP.

Generally, the NPV result will improve by an amount greater than the principal reduction contribution provided by the HHF. However, the precise contribution required to generate an NPV positive result depends on individual loan and borrower characteristics and is difficult to predict. Servicers working with HHF programs to find an amount of principal reduction that will produce an NPV positive result may be required to iteratively increase the HHF contribution amount. HHF programs and servicers may wish to jointly establish a threshold NPV positive amount beyond which further testing is not required. HHF programs should provide written testing instructions to participating servicers detailing preferred iteration amounts and allowed thresholds. Such instructions must reflect a minimum contribution amount of $1,000 and increases in increments of not less than $1,000, up to the maximum amount established by the applicable HHF program. The last NPV run should reflect the final terms of the modification.

- **Generate the modification terms**: Similar to the steps of the standard or alternative modification waterfall, servicers should first capitalize allowable costs into the pre-modification UPB. Then servicers should subtract the projected amount of principal reduction, including any required investor contributions, to determine an adjusted UPB that should be used to calculate any interest rate, term, and forbearance changes required to achieve the 31 percent target monthly mortgage payment ratio.

- **Run the NPV Test**: Servicers will use only the input fields for the standard modification waterfall in testing for HHF principal reduction. The servicer should enter into the NPV model the adjusted UPB, interest rate, term and forbearance generated by applying the guidance in the paragraph above. The servicer should enter all principal reduction associated with the modification – including PRA reduction, HHF reduction, and any investor match for HHF reduction – into the input field labeled "Principal Forgiveness Amount."

- **Calculate NPV**: After the NPV evaluation, the servicer must add the amount of the HHF principal reduction payment to the NPV result to determine the cash flow to the investor. Any principal reduction contributions from the investor should not be added to the NPV result.

## 3.1 Interactions with PRA

As detailed in the program guidance set forth in Section 6.4 of Chapter II, under PRA, servicers must evaluate every HAMP-eligible borrower with an LTV ratio greater than 115 percent for possible principal reduction by completing both the standard modification waterfall and the alternative modification waterfall that includes principal reduction.  If as a result of this evaluation the servicer elects to offer principal reduction as part of a permanent modification, Treasury will pay principal reduction incentives to the investor.  These incentives are in addition to any investor cost share or home price decline protection incentives the investor may be eligible to receive.

Several HHF programs are designed to assist borrowers whose homes are significantly underwater by providing principal reduction payments, which may or may not require a matching contribution from the first lien investor.  Loans modified under HAMP that include HHF principal reduction are eligible for standard borrower, servicer and investor incentives as described in Section 13 of Chapter II.

Investors are not eligible to receive PRA incentives for any principal reduction contributions made as part of an HHF program with principal reduction.  However, if the servicer agrees to provide a greater amount of principal reduction than is required under an HHF program, the investor may be eligible for PRA incentives if, after subtracting the total HHF principal reduction and any

required investor match from the UPB after capitalization in accordance with Section 6.3.1 of Chapter II, the adjusted LTV ratio is greater than 105 percent.  If the adjusted LTV ratio is equal to or less than 105 percent, the loan is not eligible for PRA investor incentives (as discussed in Section 13.3.4 of Chapter II).

HHF programs can be used to pay escrow shortages and reduce arrearages.  If these amounts have been capitalized, the payments are treated as principal reduction.

## 4 Interactions with UP

As detailed in the program guidance set forth in Chapter III, UP requires servicers to offer eligible borrowers receiving unemployment benefits a minimum three-month forbearance period.   In connection with UP, servicers may require a borrower to make a minimum monthly mortgage payment not to exceed 31 percent of the borrower's monthly gross income.  Many HHF programs also provide assistance to unemployed borrowers by paying all or some of the borrower's monthly mortgage payment for a period of time.   HHF unemployment assistance may precede an UP forbearance, run concurrently with UP or be used to extend it.   Servicers are required to have a written policy detailing when a monthly mortgage payment under UP will be required and how it will be determined, and the policy cannot change based on the availability of an HHF program.

- If the servicer accepts unemployment assistance payments from an HHF program that, when combined with payments made by the borrower, are less than or equal to 31 percent of the borrower's monthly gross income, the servicer will have satisfied the UP forbearance requirement.

- If the servicer accepts unemployment assistance payments from an HHF program that, when combined with payments made by the borrower, exceed 31 percent of the borrower's monthly gross income, the servicer will not have satisfied the UP forbearance requirement.   In this circumstance, following expiration of the HHF unemployment assistance program:

  o Qualified unemployed borrowers must be provided with at least three months of UP forbearance before being evaluated for HAMP; or

  o A borrower that has obtained employment, but still has a financial hardship and otherwise meets HAMP eligibility criteria, must be considered for HAMP prior to considering other loss mitigation alternatives.

Any unemployment assistance from an HHF program may not be considered as income for HAMP, and an unemployed borrower in a TPP may not use HHF funds to make their trial period payments. If a borrower receives a permanent modification, and subsequently becomes unemployed, he or she can use unemployment assistance from an HHF program to help them to continue to make their monthly mortgage payments.

## 5 Interactions with HAFA

As detailed in the program guidance set forth in Chapter IV, under HAFA, incentives are paid to borrowers, servicers and investors to facilitate a short sale or DIL.  A borrower that is participating in HAFA may receive funds from an HHF program to assist with monthly payments required during the short sale marketing period or to provide additional borrower relocation assistance following a successful short sale or DIL.   HHF program funds may not be used to provide compensation to extinguish subordinate liens in a HAFA transaction.

Additionally, Chapter IV requires each servicer to develop and implement a written policy, consistent with investor guidelines, describing the basis on which the servicer will offer HAFA and whether they will require monthly payments during the short sale/DIL process.  Servicers may not

establish different policies applicable to borrowers in a state where there is an HHF short sale assistance program.

# 6 Interactions with 2MP

As detailed in the program guidance in Chapter V, a 2MP servicer is required to modify or extinguish a second lien mortgage loan if the first lien mortgage loan is modified under HAMP.  If a second lien mortgage loan has already been modified or is eligible for modification under 2MP, the servicer/investor is prohibited from accepting any fees, incentives or remuneration from an HFA for additional modification or extinguishment of the second lien mortgage loan.  If the first lien mortgage loan is not in a TPP, has not been permanently modified under HAMP or if the servicer does not participate in 2MP, the second lien may be modified or extinguished under an HHF Program.  If the corresponding first lien mortgage loan is subsequently modified under HAMP, and the second lien is otherwise eligible for 2MP, the participating servicer must modify the loan according to 2MP program guidelines. Servicers and investors are not eligible for any 2MP incentives in conjunction with a second lien modified or extinguished through an HHF program, but they will be eligible for 2MP incentives relating to additional modification or extinguishment as part of 2MP.  For all purposes of 2MP, the pre-modification loan characteristics must take into account any HHF contributions.

Servicers must document in their loan files and servicing systems all interactions between HHF programs and 2MP in a manner sufficient to determine the accuracy and appropriateness of processing, and make this information available to MHA-C on request.

# 7 Government Insured or Guaranteed Loans

As detailed in program guidance set forth in Chapter VI, under Treasury FHA-HAMP and RD-HAMP, Treasury provides pay-for-performance compensation for borrowers and pay-for-success compensation to servicers for FHA-insured or RHS-guaranteed first lien mortgages that are modified under FHA-HAMP and Special Loan Servicing, respectively.  HHF programs may be able to facilitate modifications through the payment of arrearages, reduction of forborne amounts or settlement of other debt (to bring a borrower below a 55% back-end debt-to-income ratio). HHF programs should work with servicers and the government insurer or guarantor to determine the most efficient and effective use of resources.

# 8 Interactions with FHA2LP

As detailed in program guidance set forth in Chapter VII, under FHA2LP, Treasury provides servicer and investor compensation for the full or partial extinguishment of second lien mortgage loans in conjunction with an FHA Refinance closing.  Servicers and investors of second mortgage liens are not eligible for any FHA2LP incentives if they have accepted any amount of compensation from an HHF program for partial or full extinguishment of a second mortgage lien.

# 9 Treasury Reporting Requirements

Servicers will be required to report to the Program Administrator certain information related to any loan in the HAMP Reporting Tool (whether through HAMP, 2MP, HAFA or another program) that has received assistance from an HHF program.  The specific data elements to be reported will be posted at www.HMPadmin.com.

The HAMP Reporting Tool will be modified to facilitate these reporting requirements.  Within 30 calendar days of the availability of this new functionality, servicers must begin reporting the required data into the HAMP Reporting Tool.  Until such time, servicers must retain the required data elements for reporting when the system functionality is available.  If information is not received or is inaccurate as determined by audits and other compliance activities, it may result in financial remedies, including the withholding or recapture of incentives.  Any principal reduction

that occurs through an HHF program should be reported as standard principal reduction in the HAMP Reporting Tool and be deducted from the UPB after modification (not as incentivized forgiveness for PRA).



**Exhibits**

## EXHIBIT A:  Model Clauses for Borrower Notices

The model clauses in this exhibit provide sample language that may be used to communicate the status of a borrower's request for a Home Affordable Modification. Use of the model clauses is optional; however, they illustrate a level of specificity that is deemed to be in compliance with language requirements of the program.

**Non Approval Notice**

1. **Ineligible Mortgage**.  We are unable to offer you a Home Affordable Modification because your loan did not meet one or more of the basic eligibility criteria of the Home Affordable Modification Program.
   - ☐   You did not obtain your loan on or before January 1, 2009.
   - ☐   Your loan with us is not a first lien mortgage.
   - ☐   The current unpaid principal balance on your loan is higher than the program limit. ($729,750 for a one unit property, $934,200 for a two unit property, $1,129,250 for a three unit property and $1,403,400 for a four unit property).

2. **Ineligible Borrower**.  We are unable to offer you a Home Affordable Modification because your current monthly housing expense, which includes the monthly principal and interest payment on your first lien mortgage loan plus property taxes, hazard insurance and homeowner's dues (if any) is less than or equal to 31% of your gross monthly income (your income before taxes and other deductions) which, (select one) [you told us is $_____] OR [we verified as $_____]. Your housing expense must be greater than 31% of your gross monthly income to be eligible for a Home Affordable Modification.  If you believe this verified income is incorrect, please contact us at the number provided below.

3. **Property Not Owner Occupied**.  We are unable to offer you a Home Affordable Modification because you do not live in the property as your primary residence.

4. **Ineligible Property**.  We are unable to offer a Home Affordable Modification because your property:
   - ☐   Is vacant
   - ☐   Has been condemned
   - ☐   Have more than four dwelling units

5. **Investor Guarantor Not Participating**.  We are unable to offer you a Home Affordable Modification because:
   - ☐   We service your loan on behalf of an investor or group of investors that has not given us the contractual authority to modify your loan under the Home Affordable Modification Program.
   - ☐   Your loan is insured by a private mortgage insurance company that has not approved a modification under the Home Affordable Modification Program.
   - ☐   Your loan is guaranteed and the guarantor has not approved a modification under the Home Affordable Modification Program.

6. **Court/Public Official Declined**.  We are unable to offer you a Home Affordable Modification because the proposed modified loan terms were not approved by the court with authority to direct action of this account. You may wish to contact your counsel or trustee to discuss this decision.

7. **Negative NPV**.  The Home Affordable Modification Program requires a calculation of the net present value (NPV) of a modification using a formula developed by the Department of the Treasury. The NPV calculation requires us to input certain financial information about your income and your loan including the factors listed below. When combined with other data in

the Treasury model, these inputs estimate the cash flow the investor (owner) of your loan is likely to receive if the loan is modified and the investor's cash flow if the loan is not modified. Based on the NPV results the owner of your loan has not approved a modification.

The NPV input values we used in your NPV evaluation are listed in the NPV Data Input Fields and Values chart in this letter. You have 30 calendar days from the date of this letter to provide us with written evidence that one or more of the NPV input values is inaccurate. If you wish to dispute more than one NPV input, you must provide us with the written evidence for each input being disputed at the same time. If your written evidence identifies material inaccuracies in the NPV input values, we will not conduct a foreclosure sale until the inaccuracies are reconciled.   If your written evidence is valid and material to the NPV outcome, we will re-perform the NPV evaluation with the corrected input values. Following the re-evaluation, we will provide you with the updated NPV outcome and input values.

If you believe that the "Property Value" input used in the NPV evaluation differs from the fair market value of your home, you must provide us with a recent estimate of the property value and a reasonable basis for that estimate at the same time that you provide evidence of any other disputed NPV value inputs. We will then perform a test NPV using your estimated value. If the test provides an NPV positive outcome, you have the right to request that we obtain an appraisal to confirm the value of your home and use that appraised value to conduct a new NPV evaluation.

The estimated cost of an appraisal in your community is $____. If you wish to exercise this option we must, within 15 calendar days of the date we notify you that the preliminary NPV result is positive, receive a check [or other payment source acceptable to the servicer] for $200 as a deposit against the full cost of an appraisal. Once the appraisal is completed, we will perform a final NPV evaluation using the appraised value and any other corrected NPV inputs. Following the re-evaluation, we will provide you with the updated NPV outcome and input values.

Alternatively, you may request assistance from MHA Help at the telephone number set forth in this letter prior to contacting us to evaluate whether your disputed NPV inputs, including "Property Value," would change the NPV outcome from negative to positive. Using the disputed inputs you provide, MHA Help will conduct a preliminary NPV re-evaluation and will provide you with the printed NPV result. You should provide that result to us as part of your written evidence that one or more of the NPV input values is inaccurate within 30 calendar days from the date of this letter.

You may only request one NPV re-evaluation from MHA Help prior to contacting us. If the re-evaluation performed by MHA Help or us using the disputed inputs returns a negative NPV result, you will not be eligible for additional appeals of other inputs.

8. **Default Not Imminent**.  We are unable to offer you a Home Affordable Modification because you are current on your mortgage loan and after reviewing the financial information you provided us we have determined that you are not at risk of default because:
   - ☐ You have not documented a financial hardship that has reduced your income or increased your expenses, thereby impacting your ability to pay your mortgage as agreed.
   - ☐ You have sufficient net income to pay your current mortgage payment.
   - ☐ You have the ability to pay your current mortgage payment using cash reserves or other assets.

9. **Excessive Forbearance**.  We are unable to offer you a Home Affordable Modification because we are unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms of your loan beyond the requirements of the program.

10. **Previous HAMP Modification**. We are unable to offer you a Home Affordable Modification because your loan was previously modified under the Home Affordable Modification Program. The program does not allow more than one modification.

11. **Request Incomplete**. We are unable to offer you a Home Affordable Modification because you did not provide us with the documents we requested. A notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago.

12. **Trial Plan Default**. We are unable to offer you a Home Affordable Modification because you did not make the required Trial Period Plan payments.

*__Loan Paid Off or Reinstated__*. We are not considering your request for a modification because:
- ☐ Your loan was paid in full on _____.
- ☐ Your loan was reinstated on _____ and you no longer appear to be in need of modification. If you feel that you are at risk of default please contact us to discuss your eligibility and qualification for a Home Affordable Modification.

*__Offer Not Accepted by Borrower / Request Withdrawn__*. We are not considering your request for a modification because:
- ☐ After being offered a Trial Period Plan or Home Affordable Modification you notified us on _____ that you did not wish to accept the offer.
- ☐ After initially asking to be considered for a Home Affordable Modification you withdrew that request on _____.

*__Incomplete Information Notice__* - We cannot continue to review your request for a Home Affordable Modification because:
- ☐ You are currently in a Trial Period Plan; however you have not provided all of the documentation we previously requested. If we do not receive the required documents by [insert expiration date of Trial Period Plan but no less than 30 days from the date of the letter] we will terminate your Trial Period Plan and may resume other means to collect any amounts due on your account. The documents we need are: [Insert list of required documents]
- ☐ You have requested consideration for a Trial Period Plan, however, you have not provided all of the documentation we previously requested. If we do not receive the required documents by [insert date no less than 30 days from the date of the letter] we will consider that you have withdrawn your request for a modification and may resume other means to collect any amounts due on your account. The documents we need are: [Insert list of required documents.]

*__Borrower Response Period__* - You have 30 calendar days from the date of this notice to contact [name of servicer] to discuss the reason for non-approval for a HAMP modification or to discuss alternative loss mitigation options that may be available to you. Your loan may be referred to foreclosure during this time, or any pending foreclosure action may continue. However, **no foreclosure sale will be conducted and you will not lose your home** during this 30-day period [or any longer period required for us to review supplemental material you may provide in response to this Notice].

*__Unemployment Program__* - We are unable to offer you forbearance plan under the Home Affordable Unemployment Program because:
- ☐ As of the date of your request, you did not provide us with documentation that you are receiving or will receive unemployment benefits [insert only if applicable: for at least ___ months].

☐ As of the date of your request, your loan was delinquent by three or more monthly mortgage payments.

☐ Your total monthly mortgage payment is less than or equal to 31 percent of the household monthly gross income, including unemployment benefits.

# NVA INPUT DATA FIELDS AND VALUES

| Input Data Fields | Explanation | Value used in NPV calculation to determine the HAMP eligibility of your mortgage |
|---|---|---|
| **I.   Borrower Information** | | |
| 1. **Current Borrower Credit Score** | This field identifies your credit score as provided by one or more of the three national credit reporting agencies. | |
| 2. **Current Co-borrower Credit Score** | If a co-borrower is listed on the mortgage, this field identifies the co-borrower's credit score as provided by one or more of the three national credit reporting agencies. | |
| 3. **Monthly Gross Income** | This field identifies the monthly gross income of all borrowers on your loan before any payroll deductions or taxes. | |
| **II.   Property Information** | | |
| 4. **Property - State** | This field identifies the two letter state code of the property securing your mortgage. | |
| 5. **Property - Zip Code** | This field identifies the zip code of the property securing your mortgage. | |
| 6. **Property Value** | This field identifies the estimated fair market value of your property used by us, your servicer for this analysis. | |
| 7. **Property Valuation Type** | This field identifies the method by which your property was valued (as noted in Field 6, Property Value)<br>1 – Automated Valuation Model (AVM)<br>2 – Exterior Broker Price Opinion (BPO) / Appraisal (as is value)<br>3 – Interior BPO / Appraisal (as is value) | |
| **III.   Mortgage Information** | | |
| 8. **Data Collection Date** | This field identifies the date on which the Unpaid Principal Balance and other data used in the NPV analysis was collected by us, your servicer. | |
| 9. **Imminent Default Flag** | This field indicates your default status as of the Data Collection Date.  If you have not missed any payments or less than two payments are due and unpaid by the end of the month in which they are due, you are considered to be in imminent default and the value in this field is "Y".  If two or more payments are due and unpaid by the end of the month in which they are due at the time of application, the value in this field is "N". | |
| 10. **Investor Code** | This field identifies the owner of your mortgage.<br>1 – Fannie Mae<br>2 – Freddie Mac<br>3 – Owned by a private investor other than us, your servicer<br>4 – Owned by us, your servicer or an affiliated company<br>5 – Ginnie Mae | |
| 11. **Unpaid Principal Balance at Origination** | This field identifies the amount of your mortgage at the time it was originated (i.e., the amount you borrowed). | |
| 12. **First Payment Date at Origination** | This field identifies the date the first payment on your mortgage was due after it was originated. | |

| Input Data Fields | Explanation | Value used in NPV calculation to determine the HAMP eligibility of your mortgage |
|---|---|---|
| 13. **Product Before Modification** | This field uses codes to identify the type of mortgage you held prior to applying for a HAMP modification:<br>1. Adjustable Rate Mortgage (ARM) and/or Interest Only mortgage loan<br>2. Fixed Rate<br>3. Step Rate<br>4. One Step Variable<br>5. Two Step Variable<br>6. Three Step Variable<br>7. Four Step Variable<br>8. Five Step Variable<br>9. Six Step Variable<br>10. Seven Step Variable<br>11. Eight Step Variable–<br>12. Nine Step Variable–<br>13. Ten Step Variable–<br>14. Eleven Step Variable–<br>15. Twelve Step Variable–<br>16. Thirteen Step Variable,<br>17. Fourteen Step Variable | |
| 14. **Adjustable Rate Mortgage (ARM) Reset Date** | This field applies only to Adjustable Rate Mortgage (ARM) loans. If you do not have an ARM loan this field will be blank.<br><br>This field identifies the date on which the next Adjustable Rate Mortgage (ARM) reset was due to occur, as of the Data Collection Date (Field 8). | |
| 15. **Next Adjustable Rate Mortgage (ARM) Reset Rate** | This field identifies the rate at which your mortgage was expected to change based on when the next reset date (Field 14) is scheduled to occur. Please look to your mortgage loan documentation for information on how your mortgage's rate is recalculated at its reset date.<br><br>If the reset date on your ARM loan is within 120 days of the Data Collection Date, this value in this field is the expected interest rate on your mortgage at the next reset date.<br><br>If the reset date on your ARM loan is more than 120 days from the Data Collection Date, the value in this field is your current interest rate at the time of NPV evaluation. | |
| 16. **Unpaid Principal Balance Before Modification** | This field identifies the unpaid amount of principal (money you borrowed) on your mortgage as of the Data Collection Date. It does not include any unpaid interest or other amounts that you may owe. | |
| 17. **Interest Rate Before Modification** | This field identifies the interest rate on your mortgage as of the Data Collection Date. | |
| 18. **Remaining Term (# of Payment Months Remaining)** | This field identifies the remaining number of months you have left to pay under the original term of your mortgage as of the Data Collection Date. | |
| 19. **Principal and Interest Payment Before Modification** | This field is the amount of principal and interest you were scheduled to pay each month as of the Data Collection Date.<br><br>A. If your loan had an adjustable rate scheduled to reset within 120 days, this field will reflect the principal and interest payment associated with the new interest rate.<br><br>B. If your mortgage is an Interest Only loan and your loan was in the interest only period, the value in this field is the interest payment that was due each month.<br><br>C. If your mortgage is a negative-amortization loan, the value in this field is the greater of: | |

| Input Data Fields | Explanation | Value used in NPV calculation to determine the HAMP eligibility of your mortgage |
|---|---|---|
| | a. the principal and interest payment you sent on the most recent payment date; or<br>b. the minimum payment required on your loan. | |
| 20. **Monthly Real Estate Taxes** | This field identifies the monthly cost of your real estate taxes. If your taxes are paid annually this amount will be 1/12th of the annual cost. | |
| 21. **Monthly Hazard and Flood Insurance** | This field identifies the monthly cost of your hazard and flood insurance coverage. If your insurance is paid annually this amount will be 1/12th of the annual cost. | |
| 22. **Homeowners Association Dues/Fees** | This field identifies your monthly homeowner's or condominium association fee payments, if any, and/or any future monthly escrow shortages. If your homeowner's or condominium association fee payments are paid annually, this will be 1/12th of the annual cost.<br><br>If your property has no association fee payments and/or any future monthly escrow shortages, this field is blank. | |
| 23. **Months Past Due** | This field identifies the number of mortgage payments you would have had to make in order to make your mortgage current, as of the Data Collection Date. | |
| 24. **Mortgage Insurance Coverage Percent** | This field identifies the percentage of private mortgage insurance coverage on your loan. If you do not have private mortgage insurance this field is blank. | |

### IV.   Proposed Modification Information

**The fields below describe the proposed HAMP modification that was calculated by your servicer according to the HAMP program guidelines (subject to investor restrictions) that were used in your Net Present Value (NPV) evaluation.**

| | | |
|---|---|---|
| 25. **NPV Date** | This field identifies the date that the Net Present Value evaluation was conducted on your mortgage. | |
| 26. **Unpaid Principal Balance of the Proposed HAMP Modification (Net of Forbearance & Principal Reduction)** | This field identifies the beginning principal balance on which you would have been required to pay interest if you had received a HAMP modification.<br>It is likely to be different than your current principal balance because it includes amounts you owe for missed mortgage payments and unpaid expenses that are allowed to be added (capitalized) to your principal balance. Additionally, it may be reduced by proposed principal forbearance (Field 32) or proposed principal forgiveness (Field 33). | |
| 27. **Interest Rate of the Proposed HAMP Modification** | This field identifies the starting interest rate of the proposed HAMP modified mortgage. This rate is fixed for at least the first 5 years after modification. | |
| 28. **Amortization Term of the Proposed HAMP Modification** | This field identifies the number of months left to pay the proposed HAMP modified mortgage. | |
| 29. **Principal and Interest Payment of the Proposed HAMP Modification** | This field identifies the amount of the monthly principal and interest payment on the proposed HAMP modified mortgage. | |
| 30. **Principal Forbearance Amount of the Proposed HAMP Modification** | This field identifies the amount of principal your investor was willing to forbear on the proposed HAMP modified mortgage. You would have still owed this amount, but you would not be charged interest on it and no payments would have been due on this amount until you paid off your loan. | |
| 31. **Principal Forgiveness Amount of the Proposed HAMP Modification** | This field identifies the amount of principal your investor was willing to forgive under the proposed HAMP modified mortgage. | |

| Input Data Fields | Explanation | Value used in NPV calculation to determine the HAMP eligibility of your mortgage |
|---|---|---|
| 32. **Modification Fees** | This field identifies the total amount of costs and fees that would have been paid by the investor (owner) of your loan, if you had been approved for a HAMP modification.  It includes expenses such as notary fees, property valuation, credit report and other required fees. | |
| 33. **Mortgage Insurance Partial Claim Amount of the Proposed HAMP Modification** | This field identifies any mortgage insurance payout amount as part of the proposed HAMP modified mortgage, which is, at the discretion of your mortgage insurance company.<br><br>This should be zero if you were not approved for a trial period plan or permanent HAMP modification for reason of negative NPV. | |

# EXHIBIT B:  Model Letter for Simultaneous Trial Plan – Foreclosure Process Explanation

[Servicer Logo]
[Date]
[Name]
[Address 1]
[Address 2]

Dear [borrower and co-borrower name(s)]:

We are committed to helping you retain your home. That's why we are currently evaluating your mortgage for eligibility in the Home Affordable Modification Program ("HAMP") which would modify the terms of your loan and make your mortgage payments more affordable. Your loan has been previously referred to foreclosure and we will continue the foreclosure process while we evaluate your loan for HAMP. However, **no foreclosure sale will be conducted and you will not lose your home** during the HAMP evaluation.

**HAMP Eligibility**
If you are eligible for HAMP, you will enter into a "trial period". You will receive a Trial Period Plan Notice which will contain a new trial payment amount (this will temporarily replace your current mortgage payment during the HAMP trial period). To accept the Trial Period Plan, you must make your first trial payment by the specified due date. Once you accept, we will halt the foreclosure process as long as you continue to make your required trial plan payments.

If you do not qualify for HAMP, or if you fail to comply with the terms of the Trial Period Plan, you will be sent a Non-Approval Notice. In most cases, you will have 30 days to review the reason for non-approval and contact us to discuss any concerns you may have. During this 30-day review period, we may continue with the pending foreclosure action, but **no foreclosure sale will be conducted and you will not lose your home**.

**Important—Do not ignore any foreclosure notices.**
The HAMP evaluation and the process of foreclosure may proceed at the same time. You may receive foreclosure/eviction notices - delivered by mail or in person - or you may see steps being taken to proceed with a foreclosure sale of your home. While you will not lose your home during the HAMP evaluation, to protect your rights under applicable foreclosure law, you may need to respond to these foreclosure notices or take other actions. If you have any questions about the foreclosure process and the evaluation of your HAMP request, contact us at [XXX.XXX.XXXX]. If you do not understand the legal consequences of the foreclosure, you are also encouraged to contact a lawyer or housing counselor for assistance.

**Questions**
Call XXX.XXX.XXXX if you cannot afford to make your trial period payments, but want to remain in your home. Or if you have decided to leave your home, contact us—we have other options that may be able to help you avoid foreclosure. Additionally, if you have any questions about the foreclosure (or other legal notices that you receive), please call us for assistance. You can also call the Homeowner's HOPE™ Hotline at 1-888-995-HOPE (4673) if you need further counseling. They offer free HUD-certified counseling services in English and Spanish, and can help answer any questions you have.

Sincerely,
[Servicer Contact Person Name]
[Servicer Contact Person Title]
[Servicer Name]

## *EXHIBIT C:  Characteristics of the HPDP Incentive Calculation*

**First characteristic—**The cumulative projected home price decline over the next year, expressed in percentage points (projected home price decline), is related to recent momentum in local market home prices. The projection is calculated from the percentage changes in the local home price index in the most recent previous two quarters for which data is available.

**Note**: A table of home price index values for each local market (Home Price Index Table) is provided on www.HMPadmin.com. The Home Price Index Table is updated quarterly, and the updated values are effective for the following calendar quarter.

**Second characteristic—**The UPB of the mortgage loan prior to modification under HAMP involves assignment of the loan to one of five UPB quintiles. The quintile assignments determine the dollar payment per percentage point of projected price decline by UPB. Quintile assignments will not change over the course of the program.   Refer to Exhibit D for UPB Quintile Base Amounts.

**Third characteristic—**The mark-to-market LTV of the mortgage loan based on the UPB of the mortgage loan prior to modification under HAMP, further affects HPDP incentive payments by applying a weighting factor to the payment. HPDP incentive payments will be weighted according to a mortgage loan's mark-to-market LTV in accordance with the chart in Exhibit D.

The HPDP incentive payment is calculated by multiplying the mark-to-market LTV weighting factor by the UPB quintile amount, and then multiplying the result by the projected home price decline. The example HPDP calculation in Exhibit D illustrates the calculation of the HPDP incentive payment for a hypothetical mortgage loan modified under HAMP.

Exhibit C                                    MHA Handbook v3.2                                    176

# EXHIBIT D:  Example HPDP Calculation

This example illustrates the calculation of the HPDP incentive payment for a hypothetical mortgage loan modified under HAMP.  The HPDP incentive payment is calculated by multiplying the MTM-LTV weighting factor by the UPB quintile amount, and then multiplying the result by the projected home price decline.

Assume for a hypothetical mortgage loan being modified under HAMP:

- The NPV Date for the HAMP modification is September 1, 2009;
- The projected home price decline value based on the Home Price Index Table is 10;
- The UPB is $110,000, which results in a quintile assignment of 2, and, as a result, a quintile base amount of $300; and
- The loan's MTM-LTV is 85%, which results in a weighting factor of 2/3.

The resulting total HPDP incentive payment potentially payable to an investor over a two-year period relating to a HAMP modification of this hypothetical mortgage loan would be:

- HPD Value * UPB Quintile Payment * MTM-LTV Weighting Factor
- 10 * $300 * 2/3 = $2,000

If the borrower of this hypothetical mortgage loan above has a TPP Effective Date of October 2009, successfully completes the trial period and then loses good standing in December 2010, the investor would be paid 12/24 of the total HPDP incentive payment, or $1,000, on October 1, 2010, and 2/24 of the total HPDP incentive payment, or $166.67, on October 1, 2011.

**UPB Quintile Base Amounts**

| Quintile | UPB Prior to Modification | Quintile Payment per Percentage Point Decline in House Price Index |
|---|---|---|
| 1 | $0 – $73,000 | $200 |
| 2 | greater than $73,000 – $116,000 | $300 |
| 3 | greater than $116,000 – $169,000 | $400 |
| 4 | greater than $169,000 – $259,000 | $500 |
| 5 | greater than $259,000 | $600 |

**MTM-LTV Weighting Factors**

| MTM-LTV (based on UPB prior to modification) | Weighting Factor |
|---|---|
| less than 70% | 0 |
| at least 70% but less than 80% | 1/3 |
| at least 80% but less than 90% | 2/3 |
| 90% or greater | 1 |



# Index

2MP ............................................................12
2MP servicers ..........................................128
Alternative RASS ......................................114
Annual Certification ...................................34
appraisal ...................................................80
ARM ...........................................................71
assignment and assumption agreement ...........19
AVM ...........................................................80
back-end ratio ...........................................80
Base NPV Model ........................................81
BNYM ......................................................157
Borrower Notice .........................................53
BPO ...........................................................80
Cap Determination Date ............................19
CDIA ..........................................................98
Certification ...............................................35
CLTV........................................................148
cutoff date ................................................89
Deadline ....................................................59
DIL ............................................................12
DIL Agreement .........................................114
Document Summary ..................................94
Dodd-Frank Act ........................................24
Dodd-Frank Certification ...........................24
ECOA .........................................................24
EESA .........................................................79
Eligible Loans ............................................19
Escalated Case .........................................42
Fannie Mae ...............................................16
FAQs .........................................................11
FDD ...........................................................49
FEMA .........................................................49
FHA ...........................................................12
FHA Refinance ..........................................13
FHA Refinance ML....................................155
FHA2LP ......................................................13
FHA2LP servicers .....................................155
FHA-HAMP ................................................12
FHA-HAMP Mortgagee Letters .................150
Final Rule ..................................................13
FPN..........................................................109
Freddie Mac ..............................................16
Full-file .....................................................99
GMD ..........................................................61
H4H ...........................................................72
HAFA .........................................................12
HAFA Policy .............................................115
HAMP ........................................................12
HAMP Counseling Letter ...........................80
HAMP Reporting Tool .................................95
Handbook ...................................................11
Hardship Affidavit......................................60
HEL ...........................................................49
HELOC .......................................................49
HFAs ..........................................................13
HFSTHA ......................................................18
HHF ...........................................................13
home price index table ............................176
HOPE™ Hotline .........................................41
HPDP .......................................................102

HSC ...........................................................41
HUD ...........................................................61
Incentives Processor ...............................157
Incomplete Information Notice.....................56
Initial Certification .....................................34
Initial Certification Due Date.......................34
Initial Certification Effective Date...............34
Initial Package ...........................................60
interim month ............................................88
Investor Participation List ..........................18
IRS.............................................................52
IRS Form 4506-T or 4506T-EZ ....................63
LPS ..........................................................130
LTV ............................................................49
MERS.........................................................91
MHA ..........................................................11
MHA Help...................................................41
MHA-C .......................................................26
Minimum Net ...........................................119
Modification Effective Date.........................74
Modification or Extinguishment Effective
     Date ...................................................146
negative equity ..........................................13
Non-Approval Notice ..................................54
Non-GSE Mortgages...................................11
NPV............................................................81
NPV Date .................................................103
OMR...........................................................96
PII...............................................................43
PMMS Rate ...............................................89
PRA............................................................18
PRA Effective Date .....................................75
PRA Forbearance Amount ..........................77
PRA Policy .................................................75
Program Administrator ...............................11
Program Participation Cap ..........................19
PSAs .........................................................18
QA...............................................................38
qualified loss mitigation plan .....................18
RASS .......................................................122
RD-HAMP ..................................................12
Reasonable Effort .....................................51
Requestor ..................................................42
Reset ARM ................................................71
Reset Interest Rate ....................................71
Resolution Categories ................................43
Resolution Date..........................................43
RESPA........................................................24
Retroactive PRA Policy ...............................76
RHS ...........................................................12
Right Party Contact ....................................52
RMA ...........................................................60
Schedule E .................................................67
SDs ............................................................11
Service Schedules .....................................18
Servicer Cap Model....................................19
Servicer Safe Harbor..................................18
Services .....................................................18
SPA ............................................................18
Special Loan Servicing................................12

SSA.....................................................114
SSA Effective Date ..............................120
Subsequent Certification.....................35
Subsequent Certification Due Date...................36
Subsequent Certification Effective Date............36
Supplemental Nutrition Assistance
    Program .......................................66
target monthly mortgage payment ratio ............72
TPP ...................................................84
TPP Effective Date..............................85

TPP Notice........................................85
TPP Offer Deadline ............................85
Treasury...........................................11
Treasury FHA-HAMP .......................12
UP.....................................................12
UPB...................................................13
VA .....................................................12
VA-HAMP..........................................13
Verification Policy..............................64