UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL No. 2193<br><br>**Centralized before the Honorable Rya W. Zobel** |
| This Document Relates To:<br><br>ALL ACTIONS | |

**REDACTED**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION TO COMPEL DISCOVERY**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...........................................................................................................1

II.   ARGUMENT ................................................................................................................2

      A.    The Court Should Order BOA to Perform a Targeted Search for Emails and
            Attachments, and Produce the Responsive Documents to Plaintiffs .......................2

            1.    Plaintiffs' request for email searches is reasonable and limited. .................4

            2.    An email search will uncover responsive, relevant documents. ..................6

                  a.    An email search would uncover evidence relevant to
                        Plaintiffs' bad-faith and unfair-practices claims, including
                        evidence related to BOA's scheme to wrongfully deny
                        mortgage modifications. .................................................................7

                  b.    An email search would result in the production of relevant
                        internal BOA reports.....................................................................11

      B.    The Court Should Order BOA to Produce _Complete_ Data Regarding
            Class Members, So That Plaintiffs Can Demonstrate that the Class is
            Ascertainable...............................................................................................13

      C.    The Court Must Enforce its Initial Order Requiring BOA to Produce a
            Randomly Selected Sample of 3,000 Borrowers' Account Files ..........................16

III.  CONCLUSION.............................................................................................................18

## I.    INTRODUCTION

After months of meeting and conferring with Bank of America ("BOA") about outstanding discovery issues, Plaintiffs find they have no choice but to move to compel several categories of information that BOA simply refuses to produce.  This includes production of information the Court compelled BOA to produce in February 2012.  And eighteen months into discovery, BOA still refuses to produce internal emails to and from key BOA employees containing relevant information about the claims in this case.  As discovery progresses, it becomes increasingly clear that the information BOA continues to withhold goes to the core of issues for class certification, as well as to the meat of Plaintiffs' allegations of bad faith and unfair practices.  Plaintiffs especially need electronic discovery to fully investigate facts that recently came to light in discovery:  that BOA encouraged and even directed contractors to wrongfully deny homeowners the permanent loan modifications to which they were entitled.  These allegations from current and former contractors are serious, and came to light despite BOA's efforts to keep them hidden.  BOA should not be allowed to continue to hide emails on this or other relevant issues.

Consistent with the Court's directive to be as specific as possible, on June 14, 2012, Plaintiffs provided BOA with specific, targeted requests in an effort to move forward on the outstanding discovery issues.  Unfortunately, BOA responded with little more than obstruction and refuses to produce material in response to specific requests.

Plaintiffs ask that the Court compel BOA to produce the following:

- Electronic documents, including email, based on a targeted search for relevant electronic documents, which BOA still refuses to even perform in this case.

- Data that BOA has withheld that is necessary to complete the dataset that BOA

provided to the Treasury Department as produced in response to the Court's ruling of

last February.

- Specific data and documents for a randomly selected sample of borrower account
  files, which the Court compelled last February.

This is basic information that BOA refuses to produce.  Its refusal is causing Plaintiffs

prejudice because they are unable to obtain necessary information to prepare for class

certification.  Plaintiffs met and conferred in good faith, only to be repeatedly rebuffed.

Meanwhile, thousands of people continue to be subject to foreclosure at BOA's whim.  Plaintiffs

regularly learn of individuals who were entitled to permanent modifications, but against whom

BOA has aggressively moved to foreclose.  While a few foreclosure sales have been stayed

based on BOA's commitments to this Court, the vast majority continue to go forward.  While

BOA delays in this case, people whose homes would be saved if the Court rules in Plaintiffs'

favor in this case are losing their homes to foreclosure.  Plaintiffs urge the Court to compel

discovery so that Plaintiffs and the Court can finally move towards class certification and

possible resolution of this matter for these thousands of homeowners who have been unable to

modify their mortgages despite meeting all requirements for doing so.

## II.     ARGUMENT

**A.     The Court Should Order BOA to Perform a Targeted Search for Emails and
Attachments, and Produce the Responsive Documents to Plaintiffs**

Nothing shows the inadequate nature of BOA's production more clearly than its failure to

produce even a single email in this case – including emails from files of custodians the parties

know to possess directly relevant information.  These electronic documents are responsive to

- 2 -

every one of Plaintiffs' document requests. *See* Ex. 1.[1] Yet BOA has consistently refused to even search emails of ***anyone*** – even people it designated as 30(b)(6) witnesses.

The witnesses thus far deposed in this case acknowledge that substantial relevant information is communicated at BOA by email.  Indeed, at deposition, BOA witnesses have testified that they could not provide substantive testimony on key issues without seeing copies of their emails.  *See, e.g.,* Ex. 11, 64:8-:17 (witness Smith cannot recall what happened in meetings to formulate BOA's HAMP policies without seeing related documents that came via email); Ex. 12, pp. 77-78 (witness Duarte cannot recall what inquiries she made of colleagues regarding ability to locate data without having her emails in front of her).

In addition, it now appears that BOA's emails almost certainly contain a damning paper trail of their communications with, and about, the practices of the third-party contractors they hired to administer their obligations under HAMP.  As detailed in section II.A.2.a below, Plaintiffs obtained compelling evidence that BOA knew its contractors were wrongfully denying mortgage modifications by the thousands, did ***nothing*** to stop it, and actively encouraged, or even ordered, these practices, despite knowing it would exact irreparable damage on thousands of homeowners who were already in dire straits.  This evidence is directly relevant to Plaintiffs' claims and witnesses identified specific email correspondences discussing this conduct.  Still, BOA refuses to search for emails or attachments that bear on this disturbing practice.

It is perhaps the existence of such evidence that has led BOA to be intractable in its refusal to engage in basic electronic discovery.  When Plaintiffs first raised the absence of emails in BOA's production, BOA objected that it could not produce relevant emails because it would require them to search the files of thousands of custodians.  As a compromise, on June 14, 2012,

---

[1] All "Ex." references are references to the Declaration of Tyler Weaver in Support of Plaintiffs' Motion to Compel.

Plaintiffs sent a detailed proposed protocol that defined the limited time scope of the searches, provided a limited list of 24 custodians, and provided a list of search terms designed to find relevant documents. Ex. 6.

BOA first claimed it needed more time to review the request. Ex. 2. Two weeks later, BOA simply declared Plaintiffs' proposal to be unreasonable and refused to make a counterproposal. Ex. 7. Without explanation or justification, BOA claimed it would cost "millions of dollars" and could take *years* to collect and search the email of 24 custodians. *See id.* When Plaintiffs again invited BOA to make a counterproposal, or to explain its claim of extreme burden (Ex. 8), BOA offered no explanation but made clear it would not respond with a counterproposal unless Plaintiffs "present a more reasonable protocol." Ex. 9. BOA essentially told Plaintiffs to "go fish" and try again without even attempting to move toward a consensus. *See id.* Plaintiffs have spent considerable time and thousands of dollars taking depositions around the country of BOA witnesses who claim to not be able to recall specific information without the reviewing email that they concede exists. The discussions regarding email are headed nowhere without the Court's assistance.

      **1.    Plaintiffs' request for email searches is reasonable and limited.**

Courts increasingly recognize the role electronic discovery and email searches now play in litigation. Electronic searches are faster and cheaper to conduct than manual document searches and the use of Boolean search terms has reduced the time, burden and expense involved. *See, e.g.*, *Trusz v. UBS Realty Investors LLC*, 2010 U.S. Dist. LEXIS 92603, 2010 WL 3583064, at \*4-5 (D. Conn. Sept. 7, 2010). In a substantially similar multi-district proceeding challenging CitiMortgage's failure to implement HAMP, Magistrate Judge Paul Abrams in the Central District of California compelled CitiMortgage to perform a robust search and produce emails using the exact same protocol that Plaintiffs proposed to BOA. *In re CitiMortgage, Inc.,*

- 4 -

*Home Affordable Modification Program ("HAMP") Litigation*, Case No. 2:11-ml-02274-DSF-

PLA (C.D. Cal. 2012) (Order on Plaintiffs' Motion to Compel Document Production, pp. 8-9)

[Docket No. 86].[2]  A true and correct copy of the *In re CitiMortgage* decision is attached as

Exhibit 15.

Plaintiffs' proposal is reasonable and the Court should order BOA to comply with it.

Plaintiffs proposed a search protocol that is limited in both time and scope.  Plaintiffs seek

targeted, relevant emails (and attachments) to and from designated custodians from January 1,

2009 to the present.  Plaintiffs have identified 24 specific custodians they know to have directly

participated in BOA's administration of the HAMP program, based on depositions that have

already taken place.

In addition, Plaintiffs provided a carefully-tailored list of search terms which is aimed at

returning relevant documents without being overbroad.  Ex. 7.  The list contains over 270

requested search terms because Plaintiffs did not simply ask for (for example) any email or

attachment which contains the word "HAMP," but instead specified more specific and therefore

more numerous search terms.  Plaintiffs tailored their proposed search terms to target only

documents referencing HAMP that are likely to have relevant information (*e.g.*, "(HAMP or

HMP or MHA) and (perm! w/5 mod!)").  *See id.*  Plaintiffs wrote their proposed search terms in

---

[2] As Judge Abrams pointed out, "[t]he mere fact that responding to a discovery request will require the objecting party to expend considerable time, effort and expense consulting, reviewing and analyzing huge volumes of documents and information is an insufficient basis to object to a relevant discovery request." *In re CitiMortgage,* at 6 (quoting *Cappetta v. GC Services Ltd. Partnership*, 2008 WL 5377934, at *3 (E.D. Va. Dec. 24, 2008) (internal citations and quotations omitted)).  "Further, large corporations and institutions … are expected to have means for locating documents requested in legal matters." *Id*. (quoting *Herring v. Clark*, 2011 WL 2433672, at *9 (E.D. Cal. June 14, 2011)).  "A recipient that is a large or complex organization or that has received a lengthy or complex document request should be able to demonstrate a procedure for systematic compliance with the document request." *Id*. at 6-7 (quoting *Meeks v. Parsons*, 2009 WL 3003718, at *4 (E.D. Cal. Sept. 18, 2009) (internal citation omitted)).

- 5 -

standard Boolean language, so that the terms can be run mechanically, as a group, through a chosen database and return any responsive emails or attachments.  The protocol builds in a mechanism to deal with Boolean search terms that an initial search reveals to have been overly broad.  Therefore, BOA's assertion that the list is too long simply rings hollow.  It should not take substantially longer to mechanically search emails for a list with hundreds of terms than it does to search a list with 20 terms.  *See, e.g., Manual for Complex Litig., Fourth*, § 11.446 ("computerized data are far more easily searched, located, and organized than paper data").

Plaintiffs' proposal is in line with the standard practice for searching for, and producing, electronic documents.  *See, e.g., Adair v. EQT Prod. Co.*, 2012 U.S. Dist. LEXIS 90250 (W.D. Va. June 29, 2012) (ordering defendant to search emails for selected custodians using selected search terms, and mechanically controlling for privileged materials); *Walker v. Asset Mktg. Sys. Ins. Serv.*, 2012 U.S. Dist. LEXIS 32009, at*4-5, *12 (S.D. Cal. Mar. 9, 2012) (defendant required to produce electronic documents found on a search of all of its servers "using two full pages of very broad search terms"); *In re CitiMortgage, Inc., supra*.  It is nothing short of remarkable in this day and age, when electronic communication is prevalent, and Rule 26 specifically requires electronic discovery, that BOA has not, on its own, so much as searched for a single email.

> ### 2.     An email search will uncover responsive, relevant documents.

BOA apparently contends that this is not the type of case that warrants a search of email. That is not true.  Multiple witnesses have now testified that they cannot even remember what their job was, or what meetings were about, or what documents they might have drafted or read, without referring to their old emails.  *See, e.g.,* Ex. 10, 93:7-:9 (witness Martin: "███████████

████████████████████████████████████████████████████

████.");  Ex. 11, 64:8-:17 (witness Smith cannot recall what happened in meetings regarding

- 6 -

HAMP without seeing related documents that were sent via email); Ex. 12, pp. 77-78 (witness Duarte cannot recall what inquiries she made of colleagues regarding ability to locate data without having her emails in front of her).  BOA cannot be allowed to produce witnesses who claim to have insufficient memory without documents, at the same time that BOA has refused to search those witnesses' own files for relevant and responsive materials.

This, on its own, demonstrates the relevance and importance of these emails, and should be sufficient to compel production of the 24 custodians Plaintiffs have requested a search for.  In addition, however, there are specific, relevant types of communications and attachments that email would uncover.  This includes, at a minimum, evidence of bad faith and unfair practices, and relevant reports which individuals have already testified to the existence of but which have not been produced.

> a.  **An email search would uncover evidence relevant to Plaintiffs' bad-faith and unfair-practices claims, including evidence related to BOA's scheme to wrongfully deny mortgage modifications.**

Many claims in this case involve evidence that is extremely likely to be found in employee email and attachments.  Among the claims in this case are breach of the covenant of good faith and fair dealing, and claims under state unfair-practices statutes.  *See* Third Amended Complaint, ¶¶ 542-544, 568-615.  Under these claims, it is directly relevant whether BOA administered HAMP in good faith and whether it ever intended to provide permanent mortgage modifications to all borrowers who qualified for them.  For example, Plaintiffs have specifically alleged that BOA "[e]ncourag[ed] and/or allow[ed] its employees and agents to make inaccurate statements regarding Plaintiffs' and class members' eligibility for permanent loan modifications

under HAMP," and "fail[ed] to properly train and supervise its agents and employees, including

… personnel implementing its modification programs." *See id.* at ¶¶ 543, 611.[3]

Witnesses have identified emails to, from, and about third-party vendors that BOA has

employed to administer the bulk of its obligations under HAMP.  These vendors are Urban

Settlement Services and Stewart Lending Services.  Through informal discovery and depositions,

Plaintiffs have uncovered evidence that BOA either directed, or knowingly allowed, these

contractors (and certainly Urban) to fraudulently deny homeowners who had done all they were

required to do, the right to a permanent modification under HAMP.

As Bert Sheeks, one former Urban employee stated in a sworn declaration:

> We were instructed to close the files for [a] borrower's presumed failure to respond to requests for documentation.  The presence of a draft letter on the electronic file system noting that information was missing or not received was sufficient to conclude that the … file could be closed.  We were instructed to close the ... file based on the existence of the draft letter, whether or not the borrower actually had sent in the require documents – even cases where we knew the borrower had, in fact, responded with complete documents.

> … Our job [in my department at Urban] was to find any pretext in the file to justify closing.

> The written notices that borrowers were missing documents and requests that they submit additional documents were often suspect, and likely sent without proper due diligence as to whether the documents were indeed missing.

> I recall several instances in which I personally viewed financial documents from a particular borrower on Bank of America's document system and then personally updated the references on the system, only to see later notation that the same documents were re-requested from the same borrower and electronic file as missing.

Ex. 14.

---

[3] BOA may claim that this information, while relevant to the merits, is not relevant to class certification.  Plaintiffs disagree, and in any event, discovery in this case has not been bifurcated.  Nor should it be, as courts are increasingly attentive about the merits of a case at the class certification state.  *See, e.g., Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 (2011) ("Frequently that 'rigorous analysis' [of class certification] will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.").

Plaintiffs learned of and then deposed Christopher Orris – a current Urban employee. Mr. Orris testified that outright fraudulent denials of modifications were done at the direction of BOA executives:



Ex. 13, 184:15 – 185:12.

███████ Sheeks confirmed that "closing" files resulted in BOA denying a homeowner's modification application under the HAMP process they had been participating.

███████ ; Ex. 14 ¶4.  This mentality, that BOA's HAMP contractors were to close the maximum number of applications, led to the inevitable result that thousands of homeowners were wrongfully denied mortgage modifications.  This included denials of modifications where borrowers had complied with all the requirements for obtaining a modification, which often

resulted in those borrowers getting foreclosed on by BOA.  Ex. 13, 68:7-71:13.  Mr. Orris

testified ████████████████████████████████████████ *Id.*, 142:22 – 146:17.

Perhaps the most striking example of this behavior was a scheme known as '████

█████████████████████████████████████████████████████ Ex.

13, 189:1-:18.  The purpose of ████████████████████████████

███████████████████████████████████████████████

██████████████████ *Id.*, 83:5 – 85:23.  This resulted in ████████████

███████████████████████████████████████████

████████████████████████ *id.* at 147:7 – 148:22, ████████████

████████████████████████████████████████████

*See id.* at 149:25 – 150:19.

Urban employee Chris Orris ████████████████████████

████████████████████████████████████████████████████

████. *See id.* at 79:10-82:15. ████████████████████████████████

*See id.* at 65:4-66:8, 95:14-:24. ████████████████████████ *Id.* at

93:12-22. ██████████████████████████████████

██████████████████████████████████████████████████

██████████. *Id.* at 97:16-104:1.

Plaintiffs managed to secure this evidence without so much as a single document from

BOA or any third party bearing on any of these issues.  It is time that Plaintiffs were given access

to existing electronic documents on this issue.  Plaintiffs are entitled to discover what BOA knew

and did with regard to quotas imposed on its contractors, the effects of those quotas, and the

thousands of knowingly wrongful refusals to give permanent modifications to homeowners.

These acts are directly relevant to Plaintiffs' claims of breach of the covenant of good faith and fair dealing and for violations of consumer-protection laws.  Moreover, the creation of Urban and other contractors as a "black hole," and the evidence to support it, is directly relevant to rebutting BOA's anticipated argument that class members were not harmed because their permanent modifications were denied for legitimate reasons.

Common sense tells us that evidence bearing on these issues will be found in BOA emails to and from, and about, Urban and Stewart.  Plaintiffs know, for example, that at least some people in charge of BOA's HAMP program ████████████████████████████ ████████████████████████████ *See, e.g.*, Ex. 10 (Martin deposition), 124:17-:25.

████████████████████████████████████████████████████

████████████████████ *See id.,* 125:10-:17. ████████████████████

████████████████████████████████████. *See, e.g.,* Ex. 10, 19:8-:21, 113:6-:16; Ex. 11, 20:5-:7, 28:3-:14.

Plaintiffs' proposed search terms are designed, in part, to discover emails and other electronic documents bearing directly on BOA's actions and knowledge about its contractors, and the wrongful denial of permanent HAMP modifications.  Plaintiffs are entitled to this information, and the Court should compel BOA to finally search for and produce it.

      **b.**    **An email search would result in the production of relevant internal BOA reports.**

Plaintiffs have also learned at depositions that BOA's email files ████████████████ ████████████████████████████████ *See, e.g.,* Ex. 10, 58:17-59:3, 144; Ex. 12, 26-27; Ex. 13, 27:7 – 30:22.  These reports contain information relevant to Plaintiffs' claims, and especially to issues of class certification and identification of borrowers who are in the Class.

- 11 -

For example, designee Jinja Martin testified that ███████████████████
███████████████████████████████████████████████████████████
███████████████████████████. Ex. 10, 50:22 – 51:24.  BOA also generated

"pipeline reports" which contain summarized information regarding the number and status of

borrowers that were in the process of HAMP modifications.  *Id*. at 145:15.  And BOA generated

weekly MHA summary reports that contain information regarding the number of active trial

plans and information about their status.  *Id*. at 144:13 – 145:4.  Among other things, these

reports are directly relevant to numerosity and to show that BOA's conduct has commonly

affected this group of borrowers. For the named Plaintiffs, their inclusion in these reports and/or

data compilations will show that their experiences are typical of the putative class members they

seek to represent.  BOA's ability to identify class members and ascertain from its data shows that

the class action mechanism is the superior method for resolving this dispute.  *All* of these reports

were communicated and received via email.  *See* cites above.

These sorts of reports, and the information contained in them, are directly relevant to

issues of whether the Class can be ascertained by an analysis of BOA data.  Unless BOA is

willing to concede that the members of the Class are ascertainable (and they have not made any

such indication), Plaintiffs must have access to BOA's data and internal reports in order to

demonstrate that the Class can be ascertained and that the class is manageable.  BOA will

undoubtedly oppose class certification by arguing that information needed to ascertain the class

can only be gleaned by a manual review and that automated data inquiries are not possible.  One

way to prove that automated inquiries are possible is to view the actual reports BOA used for its

own purposes.  But Plaintiffs should not have to argue in the abstract.  They should be able to

review the reports so that they can show how BOA has used borrower data for its own purposes.

In addition, these sorts of reports are likely to bear on whether BOA intended to properly administer HAMP in good faith and to honor its agreements stated in the TPP, or whether it fully intended to turn the program into a train wreck.  If BOA indeed monitored its own performance using daily and periodic reports from the start as witnesses suggest, saw how poor its performance was right from the outset, and did little to rectify its shortcomings, this would suggest that BOA's conduct was more nefarious than it claims and that it never intended to honor TPP Agreements in good faith.

Deposition testimony has confirmed that BOA has these reports, that it used them regularly for its own purposes, and that their content is directly relevant to key issues in this case, including to the issues of manageability for purposes of class certification.  Based on the testimony, these reports should come up in email searches – if BOA were willing to actually conduct the searches Plaintiffs have asked it to undertake.   Plaintiffs have designed their search terms to uncover these sorts of reports, and Plaintiffs request that the Court order that those searches finally take place, as they should have months ago.

**B.      The Court Should Order BOA to Produce _Complete_ Data Regarding Class Members, So That Plaintiffs Can Demonstrate that the Class is Ascertainable**

In February, the Court ordered BOA to produce the data it provided to the Treasury Department regarding the status of borrowers who have participated, or attempted to participate, in the HAMP program which is at the center of the case.  This data is contained in a database called the "IR2 Database."  BOA partially complied with the Court's order, but the data BOA produced omits important information.  After meeting and conferring regarding the database production and the deficiencies with it, BOA has refused to supplement the missing information.  Plaintiffs now must seek an order from the Court compelling BOA to provide the missing information.

- 13 -

On April 2, 2012, BOA produced a "snapshot" of the IR2 Database as of March 2012. This "snapshot" includes historical information for each borrower, such as who got a trial-payment plan ("TPP"), the date on which the TPP was set to become a permanent modification, and whether the borrower received or was denied a permanent modification.  *See* Weaver Decl., ¶ 4.  This data is a starting point, but because the data was produced as a "snapshot" as of the date of production instead of how it was produced to the Treasury Department, Plaintiffs cannot tell when each borrower actually received notice that they would not receive a permanent modification.  *See id.*

The date on which a borrower received notice of denial of a permanent modification is key to Plaintiffs' case for class certification.  The putative class consists of borrowers who (1) received a TPP, (2) made timely payments pursuant to that TPP, and (3) *did not receive a notice denying a permanent modification before the TPP's "effective date" for the permanent modification.*  Third Amended Complaint, ¶ 499.  The date on which a borrower actually received a denial letter is thus relevant to the borrower's inclusion in the putative class.

BOA does not deny that this data is available for every borrower, and that it can be retrieved.  Indeed, BOA admitted during the parties' telephonic meet and confer that it has retained every data update it has ever provided to the Treasury Department. Ex. 1 (June 15, 2012 letter summarizing June 11 meet and confer).  BOA simply claims it would be too burdensome to provide Plaintiffs with every update given to the Treasury Department so that Plaintiffs can determine when, precisely, a borrower received notice that they would not receive a permanent modification.

Plaintiffs offered two potential options to address the burden:  (1) provide any periodic summaries that were given to the Treasury, rather than copies of the daily updates, or (2) simply

provide for each borrower the file in which BOA notified the Treasury that the borrower had been denied a permanent modification under HAMP (*i.e.,* the "trial cancel" date).  *See id.*  BOA responded that it will not provide the information, and failed refused to indicate whether periodic summary reports exist.  *See* Ex. 2 (June 19, 2012 letter).

 Plaintiffs now ask the Court to order either the production of any periodic summary data that were provided to the Treasury, or to simply provide Plaintiffs with data sufficient to identify when each borrower in the IR2 database received a denial letter, if any.

 Plaintiffs expect BOA will continue to protest that the information is too burdensome to produce.  Therefore, as another alternative remedy, Plaintiffs suggest that the Court consider ordering BOA to make a computer or server available which contains all of the databases which contain information about when borrowers received notice that they would not be provided a permanent modification, and allow Plaintiffs to designate a database expert to review the data and determine whether a report can be run that contains the date of denial for each borrower in question.  This type of relief has been granted before, in a case involving complex bank "overdraft" records that the defendants in that case claimed were too voluminous to produce.  In that case, by stipulation following a court order that required it, the bank made available the records of hundreds of thousands of Class members, to be search by the plaintiffs' expert with security protection for both sides.  Ex. 17.  This is precisely the same situation here, and allowing this sort of secure access here would relieve BOA of the burden of production but allow Plaintiffs access to the information so that they can analyze it and use it as needed in support of class certification.

**C.    The Court Must Enforce its Initial Order Requiring BOA to Produce a Randomly Selected Sample of 3,000 Borrowers' Account Files**

In February, the Court also ordered BOA to produce a sample of documents from 3,000 randomly selected homeowners who had applied for permanent modifications under HAMP. Despite Plaintiffs' efforts to be as clear as possible about what information they seek in this sample, BOA has delayed producing this sample, and has refused to even certify that the 3,000 borrowers will be randomly selected.  BOA has refused to respond substantively, claiming that Plaintiffs must be more specific and specify what databases BOA should use to collect the data. Plaintiffs require the Court's assistance in finally wrangling the sample from BOA.

As the Court may recall, Plaintiffs' Document Request No. 2 seeks, "[a] randomly selected set of electronically maintained Loan Level Account Records … [with] a unique identifier for each Borrower, other than the Borrower's name and social security number, for 350 Borrowers who applied for a HAMP loan modification from each of the 17 states in which an action consolidated into MDL 2193 was filed, for a total of 5,600 files."  Ex. 16, p. 7.  In February 2012, at a status conference with the parties, the Court ordered BOA to produce a sample, and the parties later agreed that the sample size would be 3,000 randomly selected borrowers.

Since that order, the parties have repeatedly met and conferred about whether BOA will produce the sample, and when it will do so, but there has been no resolution.  In May 2012, BOA finally identified a methodology for determining the 3,000 borrowers in the sample, but then refused to even agree to have an employee certify that the sample was compiled according to that methodology.  *See* Ex. 3.

The parties also have not been able to agree on what information will be provided for the homeowners who are chosen in the sample.  In the June 11, 2012, conference call with defense

- 16 -

counsel regarding discovery matters, Plaintiffs attempted to restart this process by being as specific as they reasonably could be about what information Plaintiffs want for each of the 3,000 sampled homeowners.  Weaver Decl., ¶ 5.  Plaintiffs followed this with a letter specifying all of the electronic data points that they seek for the sample, with as much specificity as Plaintiffs can provide without having access to the databases themselves (*e.g.*, "the date on which a TPP commenced," "the date and amount of any payments made pursuant to the TPP," and "calculations used to determine HAMP eligibility").  Ex. 4.  Plaintiffs sought these data in spreadsheet format with an indication of where the data came from.  *Id.*  Plaintiffs also asked for a limited set of documents for each homeowner in the sample, such as a copy of the TPP and any denial letters sent to the homeowner.  *Id.*

BOA responded that it was unable to "respond substantively" because it (1) was supposedly unable to understand what Plaintiffs meant by basic terms such as "notation" and "notice," and (2) because BOA wanted *Plaintiffs* to identify what databases BOA should retrieve the information from, and what type of data or documents would be responsive.  Ex. 5.  BOA has made no reasonable effort to move toward a consensus on the sample, despite being ordered to produce a sample *months* ago.  Instead, BOA is demanding that Plaintiffs specify documents and data to be produced by name, and to where in BOA's own records it should search for them. Clearly, BOA is in a superior position to understand its internal operations and electronic systems to which Plaintiffs are not privy. But rather than work cooperatively with Plaintiffs, BOA refuses to suggest alternatives or particular databases, and has not even attempted to indicate why it has difficulty understanding Plaintiffs' terms.  *See id.* (*e.g.*, "Please identify the calculations Plaintiffs seek;" "identify the information and/or documents that Plaintiffs contend are part of such analysis"; "identify the source(s) or location(s) from which Plaintiffs propose

that the Bank collect and produce such outcomes").  Plaintiffs do not see any expedient way to

move forward on this sample with BOA, when it will not respond substantively or cooperatively

to Plaintiffs' attempts to be specific in their demands.

This Court has already ordered that the sample be produced, and Plaintiffs have specified

the data and documents they want for each homeowner.  BOA has not claimed that this cannot be

done, or that the information Plaintiffs have requested does not exist.  Plaintiffs request that the

Court order the production of the data Plaintiffs have demanded, for a randomly selected group

of 3,000 homeowners.

## III.    CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' motion to compel

discovery.

Dated:  July 23, 2012

Respectfully Submitted,


/s/ Steve W. Berman
Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
Tyler S. Weaver
1918 8th Avenue, Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com
tyler@hbsslaw.com

/s/ Gary Klein
Roddy Klein & Ryan
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
727 Atlantic Avenue, 2nd Floor
Boston, MA 02111

617.357.5500 (p)
617.357.5030 (f)
klein@roddykleinryan.com
kavanagh@roddykleinryan.com
costello@roddykleinryan.com

*Interim Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2012, a true and correct copy of this document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Steve W. Berman*
Hagens Berman Sobol Shapiro LLP

- 19 -