# Exhibit 2

HONORABLE RYA W. ZOBEL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE BANK OF AMERICA HOME
AFFORDABLE MODIFICATION PROGRAM
(HAMP) CONTRACT LITIGATION

No.  1:10-md-2193 RWZ

**REPLY DECLARATION OF TYLER WEAVER IN SUPPORT
OF PLAINTIFFS' MOTION TO COMPEL**

I, Tyler Weaver, declare as follows:

1.      I am a partner at the law firm of Hagens Berman Sobol Shapiro LLP.  I am one of

the co-lead attorneys representing Plaintiffs in this MDL.  I am over the age of 18, otherwise

competent to testify and state the following based on my personal knowledge.

2.      On June 11, 2012, following the most recent status conference with the Court in

May 2012, counsel for Plaintiffs and counsel for Defendant met and conferred in an attempt to

resolve numerous outstanding discovery disputes.

3.      During that phone call, we indicated we would provide Defendant a list of

custodians and search terms, and a proposed protocol in a few days.  We specifically indicated

on that call that we wanted to work with them on the terms, and that if there were terms that

returned an excessive amount of documents, or that Defendant found otherwise objectionable,

we would be willing to talk about whether those terms should be modified or dropped.  We then memorialized that proposal in our June 14, 2012 letter and proposed protocol that I attached to my previous declaration as Exhibit 6.

4.     Plaintiffs have always been inclined to work with defense counsel to make sure we get relevant documents, but without placing unnecessary burdens on everyone involved in the process.  To be clear:  we do not want to be burdened with irrelevant documents, and we have no interest in creating unnecessary review of irrelevant documents.  We simply need the relevant emails and attachments from the custodians we have identified.  However, without specific information from BOA indicating particular terms are returning too many documents and thus need adjustment, or some counterproposal from BOA, it is essentially impossible for us to know how to meaningfully modify our searches in a way that BOA would accept.

5.     The parties have met and conferred on several occasions regarding various reports generated by Defendant that Plaintiffs believe to be relevant to the current motion to compel. Most recently, we were able to determine after much discussion that Defendant has a total of 150 "audit reports" of its HAMP program.  In a phone conference (in which I did not participate but have received reports about), Plaintiffs specifically requested that Defendant produce all the audit reports.  This was later memorialized in an email, a true and correct copy of which is attached as Exhibit 18.  I understand that defense counsel indicated on the phone call that we would learn BOA's position on this issue early on the week of August 13th.  However, we have not heard anything in response.

6.     Attached as Exhibit 19 is a true and correct copy of excerpted pages from the transcript of the deposition of Tawnya Schoolitz, taken on May 9, 2012.

7.      Attached as Exhibit 20 is a true and correct copy of excerpted pages from the transcript of the deposition of Lourdes Duarte, taken on May 23, 2012.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 27, 2012 in Seattle, Washington.

s/ Tyler S. Weaver
Tyler W. Weaver

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2012, a true and correct copy of this document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Tyler S. Weaver
Hagens Berman Sobol Shapiro LLP

# Exhibit 18

## Tyler Weaver

| | |
|---|---|
| **From:** | Ari Brown |
| **Sent:** | Thursday, August 09, 2012 1:55 PM |
| **To:** | Goldstein, Seth (SGoldstein@goodwinprocter.com) |
| **Cc:** | Shennan Kavanagh; Gary Klein; Kevin Costello; Tyler Weaver; McGarry, James W; Sherman, Lee |
| **Subject:** | production of HAMP related audit reports |

Seth,

Following up on our discussion of this week regarding the audits that Plaintiffs need produced. We explained that, in light of the fact that Bank of America has identified only 130 audits as having been conducted as "HAMP related audit reports," and another 23 audit reports (listed on Exhibit 1 of your letter dated June 29), it is Plaintiffs' position that they should all be produced. It has now been six months since the Court ordered Bank of America to produce the reports. When requesting a list of audit reports that we would then narrow down, we were under the impression that there were several hundred or even several thousand reports and that we would then designate a smaller number of reports for production. This was offered as a courtesy to reduce the burden of production. We explained that it would have been likely that we would likely have designated approximately 150 reports.

We understand that the list of audit reports includes only those that Bank of America believes involve HAMP and that Bank of America has excluded many categories of audits such as those involving REO management, origination, insurance products and several others. We are waiting for a written explanation of the categories of audits that were included versus those that were excluded. Given the culling that Bank of America has apparently already performed, and the relatively small number of audit reports you now claim to be responsive, we do not believe it necessary to reduce the number further. Please let us know as soon as possible when we can expect to see this production.

We look forward to your prompt response.

Thank you,

**Ari Brown** | Attorney
**Hagens Berman Sobol Shapiro LLP**
1918 Eighth Ave Suite 3300 - Seattle, WA 98101
Direct: (206) 268-9311
ari@hbsslaw.com | www.hbsslaw.com | HBSS Blog



Named to 2011 Plaintiff's Hot List by *The National Law Journal*

 

# Exhibit 19

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In Re: Bank of America Home          )

Affordable Modification Program     )   No. 1:10-md-02193-RWZ

(HAMP) Contract Litigation,         )

                                    )

                                    )

DEPOSITION OF TAWNYA SCHOOLITZ

Phoenix, Arizona
May 9, 2012
9:04 a.m.

REPORTED BY:

Debra Riggs Torres, RPR

Certified Reporter

Certificate No. 50647

PREPARED FOR:

(ASCII/COPY)

Page 122

1    Q.   And under a special forbearance program, when a
2  customer skips monthly payments, does their indebtedness
3  rise?
4         MR. MCGARRY:  Objection.  Foundation.
5         THE WITNESS:  You'll tell me if I answer
6  this incorrectly, they are left with a past-due and they
7  do accrue delinquency.
8    Q.   BY MR. BROWN:  And the past-due amount is added
9  to the amount owing?
10   A.   Correct.
11   Q.   What information -- what data is input into
12 Profiler to make the determination?
13   A.   Stated income and stated expenses.  So your gross
14 income for yourself and your spouse or a contributing
15 party, and then total debt, including your house payment,
16 car payment, roughly what do you pay in credit cards.  So
17 a stated kind of P & L, if you will, from a customer's
18 perspective.
19   Q.   Who inputs that?
20   A.   The frontline associate speaking to the customer.
21   Q.   So there are data fields for them to put in --
22   A.   Yes.
23   Q.   And those data fields include -- are they
24 detailed, like car payment amount, house payment amount,
25 food monthly?

Page 123

1    A.   Yes.
2    Q.   So it's a line item set of fields?
3    A.   Yes, as is the income.  So if you have more than
4  one borrower, or if I work for Bank of America and I am
5  self-employed, there would be line items for my Bank of
6  America income, my self-employment income, if I'm getting
7  a pension.  So income is line-itemed as well as debt.
8    Q.   These data points are exportable to like Excel?
9         MR. MCGARRY:  Objection to the form and
10 foundation.
11        THE WITNESS:  I don't know the answer to
12 that.
13   Q.   BY MR. BROWN:  But they're separate fields?
14   A.   Right.  I would assume we can query.  I've never
15 queried from Profiler, but --
16   Q.   Okay.
17   A.   -- but it would stand to reason that we could.
18   Q.   Does Profiler -- is information from Profiler
19 accessible from AS400?
20   A.   No, sir.
21   Q.   Does information from Profiler get uploaded to
22 AS400 in any way?
23   A.   No, sir.
24   Q.   Is Profiler a completely standalone system or
25 integrated with any other system?

Page 124

1         MR. MCGARRY:  Objection to the form and
2  foundation.
3         THE WITNESS:  It is standalone.
4    Q.   BY MR. BROWN:  Okay.  A Profiler report -- can a
5  Profiler report be generated as per a particular borrower
6  using their own number?
7         MR. MCGARRY:  Objection to the form.
8  Foundation.
9         THE WITNESS:  Profiler can be accessed for a
10 particular customer by loan number, yes.  Again, the
11 ability to export, query, or report off that, I'm not
12 sure.
13   Q.   BY MR. BROWN:  But you can make inquiries of
14 Profiler using a borrower's loan number?
15   A.   Yes.
16   Q.   For specific data?  A car payment?
17   A.   I would be able to get that information, yes.  I
18 can't ask Profiler to filter just by car payment, if that
19 makes sense, but I could obviously see that field and
20 report back.
21   Q.   Could you filter as to the ultimate decision from
22 Profiler?
23        MR. MCGARRY:  Objection to the form and
24 foundation.
25        THE WITNESS:  I don't know.  I'm sorry.

Page 125

1         MR. BROWN:  It's okay.
2    Q.   BY MR. BROWN:  Okay.  If you would turn to
3  page 84608, please.  Working backwards on the document, if
4  that helps you.
5    A.   Yes.
6    Q.   See a notation down at the bottom, you see the
7  one second from the bottom?  It says, "Please advise
8  documents missing."  Would you read in English what
9  follows the word "need" and the colon.
10   A.   Are you referencing the note on 4/13?
11   Q.   Yes, I am.
12   A.   "Two most recent pay stubs and hardship affidavit
13 with social security and date of birth on form.  Fax to
14 888-808-4814, attention Latoya."
15   Q.   Is Latoya a Bank of America employee?
16   A.   That would be my assumption.
17   Q.   Is this notation referencing the documents that
18 Bank of America needs for a complete package?
19        MR. MCGARRY:  Objection to the form and
20 foundation.
21        THE WITNESS:  Income validation is point in
22 time, and I'll explain that.  On 4/13 we needed pay stubs,
23 hardship affidavit.  If there were something on that pay
24 stub, for instance, that would prompt another request for
25 documentation.  It may not be safe to say that 4/13 was

Page 142

1    Q.   BY MR. BROWN:  So this review that we just did
2  supports Ms. Torrico's claim that she sent in all the
3  documentation, does it not?
4         MR. MCGARRY:  Objection to the form and
5  mischaracterizes the documented testimony.
6         THE WITNESS:  The notation that the appeals
7  associate makes indicates that they agreed that she had
8  sent all the documentation and then forwarded her file
9  to -- for review for the HAMP program.
10        MR. MCGARRY:  Off the record.
11        (Discussion off the record.)
12        (Deposition Exhibit No. 5 marked for
13        identification.)
14   Q.   BY MR. BROWN:  Showing you what's been marked
15  Exhibit 5 entitled HomeSaver Workout Notes.  Do you
16  recognize these screen prints?
17   A.   Yes.
18   Q.   What do you recognize them as?
19   A.   Notes within HomeSaver, the HomeSaver system.
20   Q.   The HomeSaver system being another database?
21   A.   Yes.
22   Q.   And the one we were looking at in Exhibit 4 was
23  from HomeBase; correct?
24   A.   Correct.
25   Q.   Both HomeSaver and HomeBase feed into AS400;

Page 143

1  correct?
2   A.   Not in their entirety.  There are notes within
3  each that will write back to AS400.  In HomeSaver's
4  example, based on the type of note, for lack of a better
5  term.  So it's not a hundred percent match back to AS400.
6   Q.   So to get a complete picture, you would need
7  HomeBase, HomeSaver, and AS400?
8         MR. MCGARRY:  Objection to the form.
9         THE WITNESS:  If by that you mean a full
10  picture of notes, yes, you would need all three systems.
11   Q.   BY MR. BROWN:  What distinction are you making?
12   A.   If you ask me how many systems I use to research
13  a timeline that we spoke about earlier, it is more than
14  three.
15   Q.   Which other ones?
16   A.   HomeBase, HomeSaver, AS400, Loss Mitigation
17  Financials, Loss Mitigation Plan, Urban, Stewart, iPortal.
18   Q.   Anything else?
19   A.   I'm thinking.  One moment please.
20   Q.   Sorry.
21   A.   Loss Mitigation Profiler, Workout Package
22  Tracking.  Without having my system in front of me, those
23  are the systems that I recall.
24   Q.   Okay.  Are any of the systems you listed mutually
25  exclusive?  In other words, if something is in Urban,

Page 144

1  would you not have to look in Stewart?
2   A.   It's dependent on the customer.  There should not
3  be a reason to have to look in both places.  As matter of
4  course, I do look in both places because it has happened
5  that we have documents in both vendor systems for one
6  reason or another.
7   Q.   Are there any other of the systems that you
8  mentioned that should be one or the other?
9   A.   No, sir.
10   Q.   Is the information in Loss Mitigation Financials
11  kept in data fields?
12        MR. MCGARRY:  Objection to the form.
13        THE WITNESS:  Yes.  This is what we talked
14  about before with the income and the expense line
15  itemization type of activities.  That is in LMF, to use
16  the acronym.  So we would be able to -- I should qualify
17  that.  I don't know if it can be queried in the way you
18  might think of a SQL query being able to extract.  But the
19  information is there, it is in fields and available.
20   Q.   BY MR. BROWN:  Is it exportable?
21        MR. MCGARRY:  Objection.  Foundation.
22        THE WITNESS:  I don't know.
23   Q.   BY MR. BROWN:  How about Loss Mitigation Plan?
24  Is that in fields?
25   A.   That is also in fields, yes.

Page 145

1    Q.   Loss Mitigation -- and it's in fields in the same
2  way you talked about Loss Mitigation Financials?
3   A.   Yes.
4   Q.   How about Loss Mitigation Profiler?  Is that data
5  in fields?
6   A.   It is in fields, yes, in the same way.
7   Q.   How about Workout Tracking -- Package Tracking?
8  Is that information in fields?
9   A.   Yes.
10   Q.   And in the same way as Loss Mitigation Financial?
11   A.   No, in that Workout Package Tracking does not
12  include customer financial information.
13   Q.   Yes.
14        That sounds like it's a difference in the
15  type of data it keeps.
16   A.   Yes.
17   Q.   I'm asking about the type of fields that they
18  are.
19   A.   Fair enough, then.
20   Q.   Are the fields the same way?  They have separate,
21  distinct fields that may be able to be exported?
22   A.   Yes.
23        MR. MCGARRY:  Objection to the form and lack
24  of foundation.
25   Q.   BY MR. BROWN:  How about iPortal?  Is information

Page 146

1  in fields?
2      A. Yes.
3      Q. Same way, possibly exportable?
4          MR. MCGARRY: Objection to the form.
5          THE WITNESS: Yes.
6      Q. BY MR. BROWN: How about Urban? Information in
7  fields there?
8      A. Yes.
9      Q. Also exportable?
10         MR. MCGARRY: Objection. Foundation.
11         THE WITNESS: Yes.
12     Q. BY MR. BROWN: And Stewart, is information in
13 Stewart -- in the Stewart database in fields?
14     A. Yes.
15     Q. Also exportable?
16         MR. MCGARRY: Objection. Foundation.
17         THE WITNESS: Yes.
18     Q. BY MR. BROWN: I think I hit them all.
19         Let's look at Exhibit 5, turning to the back
20 again, we'll work back to front. Now, HomeSaver workout
21 notes appears to have information that is not included in
22 HomeBase. Is that consistent with your understanding?
23     A. Yes.
24     Q. Okay. Starting at 84743, does this give a better
25 indication of what documents were sent on May 11, 2009?

Page 147

1      A. No.
2          MR. MCGARRY: Objection to the form.
3          THE WITNESS: No, it does not.
4      Q. BY MR. BROWN: I should clarify my question.
5  That wasn't well put.
6          In HomeBase, earlier we looked at notations
7  from May 2009 and I believe you had said you didn't know
8  what documents were submitted?
9      A. Correct.
10     Q. Does the notation here in HomeSaver, Exhibit 5,
11 give you a better idea as to what documents were
12 submitted?
13         MR. MCGARRY: Same objection.
14         MR. BROWN: I'm looking specifically at
15 notes text, items received, workout cover letter, workout
16 letter.
17         MR. MCGARRY: Objection to the form and
18 foundation.
19         THE WITNESS: Gives me different information
20 than I had in HomeBase. HomeBase does not have the entry
21 from 5/11. As for content, it is no more descriptive in
22 HomeSaver than it is in HomeBase. I know that I did
23 receive a cover letter and a workout letter. That is
24 vague verbiage. I don't know if that's a hardship letter
25 from the customer or some other document. In this time

Page 148

1  frame, that was a pretty generic label for some documents,
2  so ...
3      Q. BY MR. BROWN: So in this time frame, could that
4  mean that the -- there were bank statements included?
5          MR. MCGARRY: Objection. Foundation.
6          THE WITNESS: No.
7          MR. BROWN: Okay.
8          THE WITNESS: The confusion you're reading
9  honestly on my face is whether or not this was an incoming
10 or outgoing letter. Workout letter can be used for an
11 incoming document from the customer that is, in fact, a
12 letter. This was also the time frame, you'll remember me
13 saying, that we did not have upload capability in iPortal,
14 so we were faxing information to be uploaded to iPortal,
15 so this could have been something we sent. Without being
16 able to see the imaging system itself, I cannot tell you
17 whether it was incoming or outgoing.
18     Q. BY MR. BROWN: Sent to whom?
19     A. The borrower.
20     Q. So when it says "Items received: Workout cover
21 letter, workout letter," that doesn't -- it implies to me
22 that these were items that were received. Do you have a
23 different understanding?
24     A. No. I -- I have a picky understanding, and I
25 apologize. Again, without the ability for an associate at

Page 149

1  the desktop to upload to iPortal, they were responsible
2  for faxing documents to, frankly, the India team, the
3  India team having upload capabilities within iPortal.
4      Q. I'm sorry. I'm going to interrupt you. What's
5  "the India team"?
6      A. The team in India that works --
7      Q. India the country?
8      A. India the country, I'm sorry, that works
9  overnight specifically ingesting documents. It's a very
10 clerical-type function, so that's an offshore play that
11 we've made.
12         And I know I'm splitting hairs, and I
13 apologize, but what this says to me is that the India team
14 received something that they needed to upload. What I
15 cannot tell from this description is if they received it
16 from the borrower or from the internal BAC associate.
17     Q. Okay. It does tell you, however, then, that
18 there were some documents that had to come initially from
19 the borrower, doesn't it?
20     A. Not necessarily. So if you recall in HomeBase,
21 we saw that the appeals representative had to upload their
22 screen print, their workout information. This is a very
23 generic term for me, "workout cover letter" and "workout
24 letter" is very generic. It -- just to be more confusing,
25 I apologize, it also could be not related to the workout.

# Exhibit 20

Lourdes Duarte

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In Re:  Bank of America Home           Case No.
Affordable Modification Program        1:10-md-02193-RWZ
(HAMP) Contract Litigation

—————————————————————————————

DEPOSITION OF LOURDES DUARTE

May 23, 2012

9:10 a.m.

15250 Ventura Boulevard, Suite 410

Sherman Oaks, California

REPORTED BY:

Jean F. Holliday

CSR No. 4535, CRR

Page 1

Lourdes Duarte

---

**Page 34**

1    Q.  And reporting group, is that a group of people?
2    A.  I have one contact.
3    Q.  Who is that contact?
4    A.  I don't remember his name.  He's from India so
5    it's hard to remember.  I think it's Shaanghi or
6    Saanghi.
7    Q.  Is this person located in India?
8    A.  I don't know.
9    Q.  Have you ever met this person in person?
10   A.  No.
11   Q.  Now, I gave you a specific example.  How about
12   if you were asked to create a table with the addresses,
13   outstanding principal balances and whether or not the
14   person is late, for all people within a particular
15   state, would you know how to query the system to find
16   that information?
17       MR. BROOKS BROWN:  Objection as to the form.
18       THE WITNESS:  Which system?
19   BY MR. ARI BROWN:
20   Q.  AS400.
21       MR. BROOKS BROWN:  Same objection.
22       THE WITNESS:  The information I need to
23   retrieve is unpaid principal balance, paid through date,
24   and what else?
25   ///

---

**Page 35**

1    BY MR. ARI BROWN:
2    Q.  Geographic location.
3    A.  And in the specific state.  Because of the
4    amount of loans that could be involved, I would have to
5    reach out to the AS400 data reporting group.
6    Q.  How many data reporting groups do you have to
7    reach out to to -- well, let me -- let me rephrase that.
8        You said you have to reach out to the AS400
9    reporting group.  Are there other reporting groups you
10   can reach out to?
11   A.  For this specific information that --
12   Q.  No.  Just in general.
13   A.  It all depends what information I need to get.
14   Q.  I know.  Just in general are there other
15   options at your disposal in terms of reporting groups?
16   A.  And again, it all depends on what information
17   we need to get.  That's information that I can pull from
18   AS400.
19   Q.  What about information --
20   A.  So I would go to the AS400 data keepers.
21   Q.  What about information you had to pull out of
22   HomeBase?
23   A.  HomeBase it's a more complicated system because
24   HomeBase, although it has fields, it also have a lot of
25   information in their comments section that can't be --

---

**Page 36**

1    that has to be reviewed in order to make an assessment
2    or evaluate the loan or see it, or see what's really
3    happening.  It's not a system that it's only feed of
4    fields.
5    Q.  Is it your understanding that you cannot search
6    within comments in HomeBase?
7    A.  I'm sorry.  What?
8    Q.  Is it your understanding that you cannot search
9    in comments within HomeBase?
10   A.  I can search in comments.  What I mentioned was
11   it's a more complex database where the information is
12   not only in fields but it's also in a lot of the
13   comments section.  A lot of the information on the loans
14   in HomeBase, HomeSaver is saved in their comments.
15   Q.  I understand.  What I'm asking is those
16   comments fields, is it your understanding that you
17   cannot create an automatic search to search for data
18   within comments?
19       MR. BROOKS BROWN:  Objection as to the form.
20       THE WITNESS:  You would have to read the full
21   comments to get --
22   BY MR. ARI BROWN:
23   Q.  It's a simple question.
24   A.  -- to get the information from the loan.
25   Q.  Let me ask you this way:  Have you received any

---

**Page 37**

1    training on how to do an automated search of the
2    comments fields within HomeSaver?
3        MR. BROOKS BROWN:  Objection as to the form.
4    BY MR. ARI BROWN:
5    Q.  Within AS400, have you received training as to
6    that?
7        MR. BROOKS BROWN:  Same objections.
8        THE WITNESS:  No, I have not.
9    BY MR. ARI BROWN:
10   Q.  Do you have any experience in doing computer
11   searches, automated searches of the comments fields
12   within HomeBase?
13       MR. BROOKS BROWN:  Objection as to the form.
14       THE WITNESS:  I'm trying to understand your
15   question on how the comment transforms into data.  A
16   comment, because it could be so different and varies
17   comment from comment, it's -- you can't -- I can't
18   search for let's say a word "document." and would give
19   me a full understanding of the loan.  The comment
20   section is not just a field that is exact.  It's not a
21   loan number.  It's not an unpaid principal balance.
22   It's not a paid through date.  The comment section there
23   is several comments fed by several people that work on
24   the loan.
25   ///

---

10  (Pages 34 to 37)

Lourdes Duarte

## Page 38

1  BY MR. ARI BROWN:
2     Q. And just so I understand your testimony, are
3  you saying that you personally cannot search the
4  comments field for the word "document," or that nobody
5  can search the comments field for the word "document"?
6        MR. BROOKS BROWN: Objection as to the form.
7        THE WITNESS: I said that that would not give
8  me an understanding of the loan. I said that searching
9  by a word that would be data does not give me
10  information on a loan.
11  BY MR. ARI BROWN:
12     Q. Okay. I'd ask you to please listen to my
13  question because you're not answering it. So when I say
14  "data" I mean any word, any word can be data. But let's
15  take the word that is in a comment field. The example
16  you gave was the word "document." I believe you said
17  that you cannot search HomeSaver or HomeBase to find all
18  the occurrences of the word "document" in the comments
19  field; is that right?
20     A. I don't think I said that. We can go back.
21     Q. Okay. Can you?
22     A. We can.
23     Q. You can?
24     A. I can look for the word "document" and find all
25  the "document" words in HomeBase or in one specific loan

## Page 39

1  that that word was, you know, written. My -- and I
2  guess my point here was that that -- that searching a
3  word doesn't give me a full understanding of the loan.
4     Q. I understand that and we are going to -- you're
5  going to have to stop repeating the end result. I'm
6  asking you a specific question. I'm not asking you as
7  to whether you can understand the loan by querying the
8  comments field. I am asking you simply mechanically do
9  you know how to query the comments field on an automated
10  basis?
11        MR. BROOKS BROWN: Objection as to the form.
12        THE WITNESS: Well, that sounds like a
13  different question, so --
14  BY MR. ARI BROWN:
15     Q. Okay. Well, please answer it.
16     A. So what was your question again?
17     Q. My question is do you know how to query the
18  comments field for a particular word or string of words
19  on an automated basis?
20        MR. BROOKS BROWN: Objection as to the form.
21        THE WITNESS: The way I've been -- or the way I
22  work HomeBase is never automated.
23  BY MR. ARI BROWN:
24     Q. Okay. I'm asking do you know how to query the
25  comments field for a particular word or strings of word

## Page 40

1  on an automated basis?
2        MR. BROOKS BROWN: Objection as to the form.
3        THE WITNESS: And like I said, the way I work
4  HomeBase it's never automated.
5  BY MR. ARI BROWN:
6     Q. I understand. Do you know how to do it?
7        MR. BROOKS BROWN: Objection as to the form.
8        THE WITNESS: I could search for one word.
9  BY MR. ARI BROWN:
10     Q. But you don't do it?
11     A. I haven't needed to.
12     Q. Okay. Have you received any training on how to
13  search for data in the Loss Mitigation Financials
14  database?
15     A. I don't work on that database.
16     Q. Have you received any training on how to search
17  for information in the Loss Mitigation Portal?
18     A. Which one is the Loss Mitigation Portal?
19     Q. It's commonly known as LMP. Have you received
20  any training on how to search for information within
21  LMP?
22     A. I don't think we've been trained, no.
23     Q. What's that?
24     A. I don't think we've been trained.
25     Q. Okay. And you have no experience working with

## Page 41

1  that database?
2     A. LMP is -- the way I've worked through it is a
3  partition on I-portal.
4     Q. And have you had any training on how to query
5  information from LMP?
6     A. No.
7     Q. Have you received any training on how to query
8  information from Loss Mitigation Profiler?
9     A. No.
10     Q. Have you received any training on how to query
11  information from Workout Package Tracking?
12     A. Excuse me. Just for the record, I don't work
13  in the loss mitigation department, so I have not
14  received the training specifically, but I think you're
15  asking, you know, for specifics of the loss mit that I'm
16  not fully familiar with.
17     Q. I'm asking for your familiarity with these
18  particular databases. Have you received any training
19  with the databases I've mentioned?
20        MR. BROOKS BROWN: Objection as to the form.
21        THE WITNESS: I think I answered one by one.
22  BY MR. ARI BROWN:
23     Q. Okay. Have you received any training for
24  querying information from the Workout Model?
25        MR. BROOKS BROWN: Objection as to the form.

11  (Pages 38 to 41)

Lourdes Duarte

| | |
|---|---|
| 1   THE WITNESS: I don't think so. | 1   Q. And is it your testimony that I-portal has no |
| 2   BY MR. ARI BROWN: | 2   information other than the images of documents or |
| 3   Q. Have you received any training for querying | 3   records? |
| 4   information from Loan Modification Application, | 4   MR. BROOKS BROWN: Objection as to the form. |
| 5   otherwise known as LMA? | 5   THE WITNESS: The partitions of I-portal that I |
| 6   MR. BROOKS BROWN: Objection as to the form. | 6   have accessed are documents, imaging of documents. |
| 7   THE WITNESS: I don't think so. | 7   BY MR. ARI BROWN: |
| 8   BY MR. ARI BROWN: | 8   Q. And so you have -- you do not have access -- |
| 9   Q. You said you don't think so? | 9   let me ask -- sorry. |
| 10   A. Yeah. | 10   Do you have access to any other facets of |
| 11   Q. Have you received any training on how to query | 11   I-portal other than the images of documents? |
| 12   information from Urban Portal? | 12   A. There are several partitions in I-portal. I |
| 13   A. No. | 13   can only attest to the ones that I -- that I work with. |
| 14   Q. Have you received any training on how to query | 14   Q. Okay. |
| 15   information from Stewart Portal? | 15   A. I don't know if there are any more out there. |
| 16   A. No. | 16   Q. Again, please listen to the question. Do you |
| 17   Q. Have you received any training on how to query | 17   have access to any other portions of I-portal other than |
| 18   information from I-portal? | 18   the images of documents? |
| 19   MR. BROOKS BROWN: Objection as to the form. | 19   A. I don't think so. |
| 20   THE WITNESS: I -- I work with I-portal on a | 20   Before we read that can I have a quick break? |
| 21   daily basis. | 21   Q. Absolutely. |
| 22   BY MR. ARI BROWN: | 22   A. Thank you. |
| 23   Q. Have you received training on how to query | 23   (Recess) |
| 24   information out of I-portal? | 24   BY MR. ARI BROWN: |
| 25   MR. BROOKS BROWN: Objection as to the form. | 25   Q. Ms. Duarte, do you have any formal education in |
| Page 42 | Page 44 |

| | |
|---|---|
| 1   THE WITNESS: Again, with I-portal we enter | 1   computer programming? |
| 2   loan by loan. | 2   A. No. |
| 3   BY MR. ARI BROWN: | 3   Q. Have you had any training in SQL? |
| 4   Q. That's -- please listen to what I'm asking. | 4   A. No. |
| 5   Have you received any training on how to query | 5   Q. Have you had any training in any kind of |
| 6   information out of I-portal? | 6   computer programming? |
| 7   A. I don't think we've received formal training. | 7   A. No, not programming. |
| 8   Q. Have you received informal training? | 8   Q. Okay. Do you have any formal education in |
| 9   A. What do you exactly mean by querying | 9   database management? |
| 10   information out of I-portal? | 10   A. No. |
| 11   Q. Input -- inputting information into a computer | 11   Q. Where did you go to college? |
| 12   that you are searching for and finding the instances on | 12   A. I went to school in Peru. |
| 13   which it occurs in I-portal. | 13   Q. What kind of school? |
| 14   A. I'm sorry. I still don't understand your | 14   A. I went to law school in Peru. |
| 15   question. | 15   Q. Was that -- in Peru is that an undergraduate or |
| 16   Q. Let's ask this way: What training have you | 16   graduate degree? |
| 17   received on how to retrieve information from I-portal? | 17   A. It's a graduate degree. |
| 18   A. We've received basic training on how to | 18   Q. Did you complete it? |
| 19   retrieve the needed information from I-portal. | 19   A. Yes, I did. |
| 20   Q. Just basic training. like surfing and -- | 20   Q. Did you pass the equivalent of a Bar exam? |
| 21   A. No. I-portal is different because I-portal is | 21   A. No. We don't have a Bar exam. We have a -- |
| 22   a database that keeps documents and records. | 22   you get a -- go through a thesis or show two files. |
| 23   Q. Okay. | 23   present two files. |
| 24   A. So we pull those documents or records as | 24   Q. Did you complete that? |
| 25   needed. | 25   A. No, I didn't. |
| Page 43 | Page 45 |

12 (Pages 42 to 45)

Lourdes Duarte

| | |
|---|---|
| 1 way for us to produce a reporting as it was requested. | 1     MR. BROOKS BROWN: When you get to a natural |
| 2     Q. You have no firsthand knowledge -- well, let me | 2 stopping point I'd like a break. |
| 3 ask you this: You have no training in writing SQL | 3 BY MR. ARI BROWN: |
| 4 queries; correct? | 4     Q. Have you seen IR-2 data that is uploaded to the |
| 5     MR. BROOKS BROWN: Objection as to the form. | 5 IR-2 system? |
| 6 BY MR. ARI BROWN: | 6     MR. BROOKS BROWN: Objection as to the form. |
| 7     Q. I believe you testified to that earlier? | 7     THE WITNESS: No, I have not. |
| 8     A. I said no. Yes. | 8 BY MR. ARI BROWN: |
| 9     Q. And you don't -- you don't regularly generate | 9     Q. Have you worked with the IR-2 system? |
| 10 queries on your own; correct? | 10     A. Not -- I don't think so. |
| 11     MR. BROOKS BROWN: Objection as to the form. | 11     Q. Do you have an understanding of how data is |
| 12     THE WITNESS: That's not part of my job. | 12 uploaded to the IR-2 system? |
| 13 BY MR. ARI BROWN: | 13     A. No, I don't think so. |
| 14     Q. So that you don't usually -- I don't care why. | 14     Q. Okay. If I told you the topic 4, category 4, |
| 15 Do you or do you not regularly create queries on your | 15 date and terms of the HAMP TPP, do you see that? |
| 16 own? | 16     A. Which one? I'm sorry. |
| 17     A. I don't usually do. | 17     Q. Paragraph 4, category 4. |
| 18     Q. Okay. Do you even -- do you know how to write | 18     A. Okay. |
| 19 a Boolean query? | 19     Q. Do you know whether the date and terms of HAMP |
| 20     MR. BROOKS BROWN: Objection as to the form. | 20 TPP are regularly uploaded to the IR-2 system for |
| 21     THE WITNESS: I'm not a technology person. | 21 thousands of loans at a single time? |
| 22 BY MR. ARI BROWN: | 22     A. No, I don't know. |
| 23     Q. Do you know how to write a boolean query for | 23     Q. Do you know whether that's done actually on a |
| 24 AS400? | 24 regular basis? |
| 25     A. No. | 25     A. That's not -- I don't know. |
| Page 82 | Page 84 |

| | |
|---|---|
| 1     Q. Do you know how to write an SQL query for | 1     Q. Okay. Is it your testimony that that is not |
| 2 AS400? | 2 done? |
| 3     A. No. | 3     MR. BROOKS BROWN: Objection. |
| 4     Q. So when you want to determine whether an SQL | 4     THE WITNESS: I didn't say that. I said that's |
| 5 query can be written for AS400, you have to ask someone | 5 not my department. That's what I was going to say. |
| 6 else; right? | 6 BY MR. ARI BROWN: |
| 7     MR. BROOKS BROWN: Objection as to the form. | 7     Q. Okay. That's not your department. |
| 8     THE WITNESS: When I need a report from AS400 I | 8     In seeking -- in writing Paragraph 4, or |
| 9 need to ask somebody else. | 9 attesting to Paragraph 4, did you endeavor to find out |
| 10 BY MR. ARI BROWN: | 10 whether any of these categories were actually reported |
| 11     Q. Okay. And in determining that -- and I think | 11 to the Department of the Treasury on a regular basis? |
| 12 you said no query could be written for topics -- for the | 12     MR. BROOKS BROWN: Objection as to the form. |
| 13 topics listed in Paragraph 4. You don't know that | 13     THE WITNESS: What's your question? |
| 14 firsthand, do you? | 14 BY MR. ARI BROWN: |
| 15     A. I said to my knowledge I don't know. | 15     Q. Did you endeavor to determine whether any of |
| 16     Q. Right. | 16 these categories of information as listed in Paragraph 4 |
| 17     A. To my knowledge there is no query that could be | 17 were reported to the Department of the Treasury on a |
| 18 written. | 18 regular basis? |
| 19     Q. Okay. To your knowledge, based on your | 19     MR. BROOKS BROWN: Same objections. |
| 20 background and your training and your education, no | 20     THE WITNESS: No, I did not. |
| 21 query that you know of could be written to answer the | 21 BY MR. ARI BROWN: |
| 22 topics in Paragraph 4; correct? | 22     Q. Okay. If indeed any of these categories were |
| 23     MR. BROOKS BROWN: Objection as to the form. | 23 reported to the Department of the Treasury using |
| 24     THE WITNESS: On the use of the systems on a | 24 automated queries, that would contradict your sworn |
| 25 daily day basis, I know how the system works. | 25 statement, would it not? |
| Page 83 | Page 85 |

22 (Pages 82 to 85)

1  category 2 could be answered on an automated basis?
2      A.  As I stated before, I reach out to several
3  reporting groups.
4      Q.  Did you reach out -- when you reached out to
5  several reporting groups that you cannot name -- well,
6  I'm sorry.  Can you name the reporting groups?
7          MR. BROOKS BROWN:  Objection as to the form.
8          THE WITNESS:  We have internal procedures.  We
9  have different lines of business that I contact.  You
10 want specific names that I don't remember now.
11 BY MR. ARI BROWN:
12     Q.  Okay.  So no, you can't?
13         MR. BROOKS BROWN:  Objection as to the form.
14         THE WITNESS:  I said I can't remember today.
15 BY MR. ARI BROWN:
16     Q.  Okay.  When you inquired of these unrecalled
17 people, did you inquire specifically as to whether
18 category 2 could be answered in an automated fashion?
19     A.  I, as I said before, I provided them the list
20 of what was requested.
21     Q.  And what I'm asking is did you segregate
22 category 2 -- or did you ask anybody whether category 2
23 and nothing else could be answered in a segregated -- in
24 an automated fashion?
25         MR. BROOKS BROWN:  Objection as to the form.

                                        Page 94

1          THE WITNESS:  No, I did not.  The request was
2  made as a whole.
3  BY MR. ARI BROWN:
4      Q.  Did you inquire of any reporting groups or any
5  other technology person whether category 3, the date of
6  HAMP application, final approval and/or denial could be
7  queried of any database in an automated fashion?
8          MR. BROOKS BROWN:  Objection as to the form.
9          THE WITNESS:  Like I said, and if you're going
10 to go one by one; I made a request as a whole.
11 BY MR. ARI BROWN:
12     Q.  Okay.  And I am going to go one by one unless
13 you can answer the question directly, which is did you
14 inquire of any technology person or any data reporting
15 group or any person whether each of these categories
16 standing alone could be answered on an automated fashion
17 for 9,100 accounts?
18         MR. BROOKS BROWN:  Objection as to the form.
19         THE WITNESS:  And like I said, I made a request
20 as a whole --
21 BY MR. ARI BROWN:
22     Q.  Is your answer no?
23     A.  -- like it was made.
24     Q.  Is your answer to my question no?
25         MR. BROOKS BROWN:  Objection as to the form.

                                        Page 95

1          THE WITNESS:  I don't think I asked for it
2  separately.
3  BY MR. ARI BROWN:
4      Q.  You didn't ask --
5      A.  That I remember right now.  I don't think so.
6      Q.  Your testimony is that you did not ask for any
7  of the categories listed in Paragraph 4 separately?
8          MR. BROOKS BROWN:  Objection as to the form.
9          THE WITNESS:  My testimony is that I don't
10 remember.  I am not sure.  I don't think I asked for
11 this request individually or separately.  I asked for it
12 as a whole.
13 BY MR. ARI BROWN:
14     Q.  So based on the inquiry that you did make as
15 you recall it, do you know one way or the other whether
16 it was an inability to do one -- to inquire as to one
17 and only one of these categories on an automated basis
18 that caused the answer to your inquiry to be no?
19         MR. BROOKS BROWN:  Objection as to the form.
20         THE WITNESS:  Can you ask me again?
21 BY MR. ARI BROWN:
22     Q.  Sure.  Let me try and explain what I'm getting
23 at.
24     And then can we just have a quick break, like
25 right after?

                                        Page 96

1      Q.  Sure.  I think we've established that you asked
2  the inquiry, whoever you asked it, only as a whole as to
3  whether these 11 categories could be determined on an
4  automated basis; is that correct?
5          MR. BROOKS BROWN:  Objection as to the form.
6          THE WITNESS:  That's what I remember.
7  BY MR. ARI BROWN:
8      Q.  Okay.  And you did not make an inquiry as to
9  any single topic regarding whether it could be
10 determined on an automated basis?
11     A.  Not that I remember right now.
12     Q.  Okay.  So you have no way of knowing one way or
13 the other whether 10 out of the 11 categories could be
14 done, could be queried on an automated basis?
15     A.  I know from my use of the system what can be
16 done.
17     Q.  I understand that.  I am asking and I think --
18     A.  And the nature of the request.
19     Q.  I am asking simply -- strictly as to what
20 information you got from other people who have a
21 better -- a more extensive technological background, who
22 know how to write SQL queries, who knew how to do
23 boolean searches, which you do not know; correct?
24         MR. BROOKS BROWN:  Objection as to the form.
25         THE WITNESS:  I don't know how to make those

                                        Page 97

                          25  (Pages 94 to 97)

1 queries.
2 BY MR. ARI BROWN:
3 Q. All right. And so I am asking strictly based
4 on your inquiries of other people whether you have any
5 way of knowing whether or not 10 out of the 11 topics
6 could or could not be queried by a computer programmer?
7 MR. BROOKS BROWN: Objection as to the form.
8 THE WITNESS: I know from the usage of the
9 system and the type of request -- and if it doesn't
10 satisfy you, then I'm sorry --
11 BY MR. ARI BROWN:
12 Q. Well, I --
13 A. But I know, from what the type of request here,
14 you needed more information that had to be pulled loan
15 by loan. That I know; that I signed; that was my
16 declaration.
17 Q. Okay. I understand that, but I'd like you to
18 still -- the reason we're here -- I understand what you
19 said in your declaration, but we're here to answer
20 questions that go beyond it. So the question you just
21 answered is not the question I asked. The question I
22 asked was --
23 Would you please read it back?
24 (Record read as follows:
25 "QUESTION: And so I am asking strictly

Page 98

1 based on your inquiries of other people
2 whether you have any way of knowing
3 whether or not 10 out of the 11 topics
4 could or could not be queried by a
5 computer programmer?")
6 MR. BROOKS BROWN: Same objection.
7 THE WITNESS: From my communication from other
8 people the response was you can't.
9 BY MR. ARI BROWN:
10 Q. And the response was to your question which
11 asked it solely as a whole; correct?
12 A. That's what I remember.
13 Q. Okay. So and the answer was a yes-or-no
14 question; correct, can this be done or can it not be
15 done?
16 MR. BROOKS BROWN: Objection as to the form.
17 THE WITNESS: Yes. I think so, that was the
18 question.
19 BY MR. ARI BROWN:
20 Q. Did you ask any reporting groups or any
21 technological -- technology-savvy person which of these
22 categories could be queried on an automated basis?
23 MR. BROOKS BROWN: Objection as to the form.
24 THE WITNESS: I don't think so, as I remember
25 right now.

Page 99

1 BY MR. ARI BROWN:
2 Q. Did you ask any reporting group or any
3 technologically savvy person how many of these 11
4 categories could be queried on an automated basis?
5 MR. BROOKS BROWN: Objection as to the form.
6 THE WITNESS: I don't think I made that
7 question.
8 BY MR. ARI BROWN:
9 Q. And so when you say it cannot be done -- well,
10 strike that.
11 In looking at these bullet points I see you
12 reference HomeSaver, HomeBase, AS400, and CIWI. Did you
13 try and determine whether the categories listed in
14 Paragraph 4 could be answered on an automated basis from
15 any other database?
16 MR. BROOKS BROWN: Objection as to the form.
17 THE WITNESS: What do you mean "from any other
18 database"?
19 BY MR. ARI BROWN:
20 Q. Did you inquire as to whether the categories
21 listed in Paragraph 4 could be determined from the Loss
22 Mitigation Financials?
23 A. I reached out to the loss mitigation group at
24 that time.
25 Q. And did you inquire which, if any, of the

Page 100

1 categories listed in Paragraph 4 could be answered using
2 Loss Mitigation Financials?
3 A. I don't think I asked that specific question.
4 Q. I'm sorry. I didn't catch that. Was your
5 answer no?
6 A. I said I don't think I asked that specific
7 question.
8 Q. Okay. So you did not inquire as to whether any
9 of the categories listed in Paragraph 4 could be
10 determined using Loss Mitigation Financials?
11 MR. BROOKS BROWN: Objection as to the form.
12 THE WITNESS: Yeah, I don't think I asked that
13 question.
14 BY MR. ARI BROWN:
15 Q. Did you inquire as to whether any of the
16 categories listed in Paragraph 4 could be determined --
17 A. And I'm sorry. Can I really have a break? I
18 was going to ask you for one like 30 minutes ago.
19 Q. Okay. Let me just finish this question.
20 A. Okay. I think I did ask.
21 Q. Did you inquire as to whether any of the
22 categories of information listed in Paragraph 4 could be
23 determined using Loss Mitigation Portal?
24 A. I don't think that I asked that specific
25 question either.

Page 101

26 (Pages 98 to 101)

Lourdes Duarte

1    MR. ARI BROWN: All right. Why don't we take a
2 break.
3    THE WITNESS: Thank you.
4    (Recess)
5 BY MR. ARI BROWN:
6    Q. Ms. Duarte, in coming -- in attesting to
7 statements listed in Exhibit 1 did you inquire as to
8 anybody whether Loss Mitigation Profiler could be used
9 to answer any of the categories listed in Paragraph 4 on
10 an automated basis?
11    A. I don't think I asked that specific question.
12    Q. Did you ask anybody who works with Loss
13 Mitigation Profiler whether any of the topics in
14 Paragraph 4 could be answered on an automated basis?
15    A. I reach out to HRD.
16    Q. And did you ask whether Loss Mitigation
17 Profiler could be used to answer any of the categories
18 in Paragraph 4 on an automated basis?
19    MR. BROOKS BROWN: Objection as to the form.
20    THE WITNESS: I did not ask that specific
21 question.
22 BY MR. ARI BROWN:
23    Q. Okay. Did you ask anybody whether Workout
24 Package Tracking could be used to answer any of the
25 categories listed in paragraph Number 4 on an automated

Page 102

1 basis?
2    A. No.
3    Q. Did you ask anybody whether Workout Model could
4 be used or queried to answer any of the categories
5 listed in Paragraph 4 on an automated basis?
6    A. No.
7    Q. Did you inquire of anybody whether Loan
8 Modification Application, also known as LMA, could be
9 used or queried to answer any of the topics listed in
10 paragraph Number 4 on an automated basis?
11    A. As I said before, I didn't ask specific
12 questions for specific systems, but I did reach out to
13 HRD.
14    Q. And what response did you get as to whether
15 Loan Modification Application could be used to answer
16 any of these topics?
17    MR. BROOKS BROWN: Objection as to the form.
18    THE WITNESS: And I said I didn't ask that
19 specific question.
20 BY MR. ARI BROWN:
21    Q. Did you get a specific answer as to whether
22 Loan Modification Application could be used at all to
23 answer any of these topics?
24    A. I don't think so.
25    Q. Do you have any knowledge one way or the other

Page 103

1 as to whether Loss Mitigation Profiler contains fields?
2    A. I don't work with that system.
3    Q. So do you have any knowledge as to whether it
4 contains fields?
5    A. I don't work with it. I don't know.
6    Q. Okay.
7    A. I don't know.
8    Q. Do you know one way or the other as to whether
9 the fields in Loss Mitigation Profiler can be searched?
10    A. I don't know that system.
11    Q. Okay. So the answer is no, you don't know one
12 way or the other?
13    A. I said I don't know.
14    Q. You said you don't know that system. I'm
15 asking you do you know one way or the other whether the
16 fields in Loss Mitigation Profiler can be searched?
17    A. And I said I don't know.
18    Q. Okay. Do you know whether the fields -- the
19 data located in fields in Loss Mitigation Profiler can
20 be exported?
21    MR. BROOKS BROWN: Objection as to the form.
22    THE WITNESS: I don't know. I'm not familiar
23 with that system.
24 BY MR. ARI BROWN:
25    Q. Do you know whether the fields in Workout

Page 104

1 Package Tracking can be exported?
2    MR. BROOKS BROWN: Objection as to the form.
3    THE WITNESS: No, I don't know.
4 BY MR. ARI BROWN:
5    Q. Do you know -- do you know whether -- do you
6 know whether Loss Mitigation Financial even has fields?
7    A. No. Those are systems that I don't use.
8    Q. So you don't know if it has fields. You don't
9 know if it can be exported; is that correct?
10    MR. BROOKS BROWN: Objection as to the form.
11    THE WITNESS: I don't know those specific
12 systems.
13 BY MR. ARI BROWN:
14    Q. Okay. And what I'm asking is do you know,
15 without knowing the systems, do you know whether it has
16 fields that can be exported?
17    A. I don't know.
18    Q. Did you make -- in swearing to the fact that
19 these fields cannot be searched on an automated basis,
20 what efforts did you make, if any, to determine whether
21 data from Loss Mitigation Financials could be exported
22 and then searched?
23    MR. BROOKS BROWN: Objection as to the form.
24    THE WITNESS: I reach out to the Home Retention
25 Department.

Page 105

27 (Pages 102 to 105)

Lourdes Duarte

BY MR. ARI BROWN:

1 Q. In what form did you reach out to the Home
2 Retention Department?
3 A. I don't remember.
4 Q. Okay. Who did you reach out to in Home
5 Retention Department?
6 A. I probably reached out to several people.
7 Q. Who?
8 A. I have several contacts. It could be -- I
9 don't remember exactly who I reached out to, but I know
10 I did reach out to them.
11 Q. How many people from Home Retention Department
12 did you reach out to?
13 A. I don't remember.
14 Q. You signed this declaration on the 29th of
15 December, 2011. How long before the 29th of December,
16 2011, did you reach out to Home -- the Home Retention
17 Department?
18 A. For the specific declaration? Or for other
19 reasons?
20 Q. For this declaration.
21 A. For this specific declaration, I don't remember
22 exactly when.
23 Q. How long before December 29th, 2011 did you
24 start work researching the facts attested in this

Page 106

Q. Did you search -- have you been asked to search
to see whether you have sent an e-mail to HRD regarding
whether it was possible to use certain databases to
answer the topics in Paragraph 4?



Page 108

---

declaration?
2 A. I don't remember exactly the date.
3 Q. Was it weeks before?
4 A. Probably days, a few days.
5 Q. Was it less than a week?
6 A. I'm not certain.
7 Q. Less than a month?
8 A. Less than a month, yes.
9 Q. Probably sometime around a week?
10 A. I don't really remember how many days it took
11 me.
12 Q. And how did you reach out to the Home Retention
13 Division -- I'm sorry, Home Retention Department?
14 MR. BROOKS BROWN: Objection as to the form.
15 THE WITNESS: I usually communicate via my
16 communicator, my Instant Messaging or by e-mail or by
17 phone.
18 BY MR. ARI BROWN:
19 Q. You say that's how you usually communicate.
20 How did you communicate your inquiry as to whether
21 certain databases could be used to query the topics
22 listed in Paragraph 4?
23 A. I don't remember exactly which method I used.
24 Q. Is it possible you sent them an e-mail?
25 A. It's a possibility.

Page 107

Page 109

28 (Pages 106 to 109)

1 create a query or run a query that would answer
2 questions as to the various fields here, such as what is
3 the principal balance on a particular date?
4     MR. BROOKS BROWN: Objection as to the form.
5     THE WITNESS: I'm not sure what you're asking
6 me.
7 BY MR. ARI BROWN:
8     Q. Do you know how to write a query that would ask
9 what the principal balance was for a particular date
10 from AS400 for thousands of borrowers?
11     A. I think we established that I don't write
12 queries.
13     Q. And you don't know how?
14     MR. BROOKS BROWN: Objection as to the form.
15     THE WITNESS: I don't do it.
16 BY MR. ARI BROWN:
17     Q. And you don't know how?
18     MR. BROOKS BROWN: Same objection.
19     THE WITNESS: No, I don't.
20 BY MR. ARI BROWN:
21     Q. Okay. And so on what basis do you say that the
22 loan history here is not searchable on an automated
23 basis?
24     MR. BROOKS BROWN: Objection as to the form.
25     THE WITNESS: What are you asking me? Where

Page 130

1 did I --
2 BY MR. ARI BROWN:
3     Q. Don't worry why I'm asking you. I'm asking you
4 on what basis --
5     A. I said what are you asking me? I'm sorry.
6     Q. On what basis do you say that payment history
7 cannot be queried from AS400 on an automated basis?
8     A. In my testimony I said that -- and can I go
9 back to the declaration, please? Thank you. On
10 Paragraph 4, Number 2 it says, "Payment history from
11 date of delinquency or date of HAMP Trial Period Plan,
12 TPP, application, whichever is earlier."
13     Q. Uh-huh.
14     A. So what I said in my declaration, I repeat it
15 today, was that that specific request to determine and
16 gather the information of the payment history breakdown
17 by the date of delinquency or the date of HAMP,
18 whichever is earlier, that also had to be done manually
19 because of these specifics that they were asking.
20 You're asking me a different question right now.
21     Q. I'm asking you don't know -- you just don't
22 have the background to -- is it your testimony that a
23 computer programmer could not write that query of AS400,
24 is that your testimony?
25     MR. BROOKS BROWN: Objection as to the form.

Page 131

1     THE WITNESS: My testimony was that the request
2 that was made was not possible in a lump sum. It had to
3 be done loan by loan.
4 BY MR. ARI BROWN:
5     Q. You just -- you almost answered the question,
6 but when you said "lump sum" you went back to the full
7 scope of the 11 topics, I think. Is it your testimony
8 that Number 4, topic Number 4, that a computer
9 programmer could not write a query of the AS400 payment
10 history to determine the answer to category Number 4?
11     MR. BROOKS BROWN: Objection as to the form.
12     THE WITNESS: I don't know what a computer
13 programmer is so capable of.
14 BY MR. ARI BROWN:
15     Q. Okay. You don't know what a computer
16 programmer is capable of. You are not a computer
17 programmer; correct?
18     A. No, I'm not.
19     Q. Okay. And so you do not know one way or the
20 other what a computer programmer is capable of in terms
21 of querying through AS400; correct?
22     A. I don't know how far a computer programmer
23 could go.
24     Q. Okay. So when you made the statement you made
25 in your declaration that this query could not be done on

Page 132

1 an automated basis, you meant you could not do this
2 query on an automated basis, not a computer programmer
3 could not do this query on an automated basis?
4     MR. BROOKS BROWN: Objection as to the form,
5 and it mischaracterizes the declaration.
6     THE WITNESS: When I made this declaration I
7 said, after reaching out to our data reporting people,
8 that it was not possible to be made the way it was
9 requested.
10 BY MR. ARI BROWN:
11     Q. Okay.
12     A. If you're asking to pull simply one number,
13 that's different.
14     Q. I understand. But you don't know -- well,
15 okay.
16     88134, please.
17     A. Okay.
18     Q. Okay. On January 9th, the first entry on
19 January 9th, 2011, do you see where it says, "Uploaded
20 documents in I-portal for viewing"?
21     A. Okay, yes.
22     Q. Is it your testimony that a query could be
23 written or could not be written that would determine the
24 date on which documents were uploaded in I-portal for
25 viewing?

Page 133

34 (Pages 130 to 133)

```
1        MR. BROOKS BROWN: Objection as to the form.
2        THE WITNESS: I'm sorry. What did you say?
3    BY MR. ARI BROWN:
4        Q. Is it your testimony that a programmer could
5    not write a query that would determine on which date
6    documents were uploaded in I-portal for viewing?
7        MR. BROOKS BROWN: Same objections.
8        THE WITNESS: I don't think I've said that.
9    BY MR. ARI BROWN:
10       Q. I'm asking now, is it your testimony that a
11   computer programmer could not write an inquiry -- could
12   not write a query that would determine which date or
13   dates documents were uploaded in I-portal for viewing
14   based on AS400 records?
15       MR. BROOKS BROWN: Same objections.
16       THE WITNESS: Like I said, I don't know how far
17   a computer programmer can go.
18   BY MR. ARI BROWN:
19       Q. Okay. So you don't know one way or the other
20   whether a programmer could write a query that would
21   adequately answer the dates on which documents were
22   uploaded in I-portal?
23       MR. BROOKS BROWN: Objection as to the form.
24       THE WITNESS: I don't know. It is from my
25   experience, and maybe because I'm not a technology
```
Page 134

```
1    manually?
2        A. I try those requests to be accurate. In order
3    to get an accurate result, an accurate data, it has to
4    be done manually.
5        Q. So your testimony is that a computer programmer
6    or someone with a better understanding of AS400 could
7    not write a query that would allow automated searching,
8    is that your testimony?
9        MR. BROOKS BROWN: Objection as to the form.
10       THE WITNESS: My testimony again is in order to
11   have accurate data, and I repeat accurate data, has to
12   be done manually.
13   BY MR. ARI BROWN:
14
15
16
17
18
19       Q. Would you concede that the trial period amount
20   and the dates the payment are due is something that a
21   programmer could inquire of AS400 on an automated basis?
22       MR. BROOKS BROWN: Objection as to the form.
23       THE WITNESS: Like I said, I don't know what
24   the programmer could ultimately do. This is one
25   comment. This is one whole.
```
Page 136

```
1    person, that things and the documents that we review are
2    always -- could be even named different. So let's say
3    you're looking for a title policy in I-portal, it could
4    be named "title," it could be named "title policy," it
5    could be named "title commitment." So I'm not sure what
6    kind of query could they create to pull the specific
7    documents for the specific dates in I-portal.
8    BY MR. ARI BROWN:
9        Q. So you don't know what kind of queries someone
10   could create, but you don't -- are you categorically
11   saying that a programmer could not write a proper query,
12   is that what you're saying?
13       MR. BROOKS BROWN: Objection as to the form.
14       THE WITNESS: Like I said multiple times, I
15   don't know how far a programmer can go and what he's
16   ultimately capable of.
17   BY MR. ARI BROWN:
18       Q. So you don't know whether a programmer could
19   write a query that would search this database?
20       MR. BROOKS BROWN: Objection as to the form.
21       THE WITNESS: I'm not sure, no, I don't know.
22   BY MR. ARI BROWN:
23       Q. So when you say that it has to be done
24   manually, you mean you or someone of your background,
25   technological background would have to search it
```
Page 135

```
1    BY MR. ARI BROWN:
2        Q. You've answered the question. Please don't --
3    you don't need to argue with me.
4        A. I'm not arguing.
5        MR. BROOKS BROWN: She's trying to answer your
6    question, Ari. Let's be fair.
7    BY MR. ARI BROWN:
8        Q. I just want to know, so you -- okay. Your
9    testimony is that even this could not be queried on an
10   automated basis; right?
11       MR. BROOKS BROWN: Objection as to the form.
12       THE WITNESS: I said I don't know how far a
13   programmer could go.
14   BY MR. ARI BROWN:
15       Q. And when you made your declaration that it
16   would take days -- or half an hour through days to
17   answer this query, you based it on reviewing the payment
18   amount and the payment due dates as listed on Page 88165
19   manually; is that right?
20       MR. BROOKS BROWN: Objection as to the form.
21       THE WITNESS: My declaration is based on a
22   manual review.
23   BY MR. ARI BROWN:
24       Q. Okay. Solely on a manual review?
25       MR. BROOKS BROWN: Objection as to the form.
```
Page 137

35  (Pages 134 to 137)

1     THE WITNESS: From what I recall, yes.
2     MR. ARI BROWN: Okay.
3     (Exhibit 4 marked)
4     BY MR. ARI BROWN:
5     Q. Showing you what's been marked as Exhibit 4.
6  Do you recognize the form of this database?
7     MR. BROOKS BROWN: Objection as to the form.
8     THE WITNESS: No. I don't work with this
9  database.
10    BY MR. ARI BROWN:
11    Q. Do you --
12    A. Seems like something underwriting would work
13  on.
14    Q. Okay. Do you recognize even the form of it?
15    MR. BROOKS BROWN: Objection as to the form.
16  Seems weird to say that in the question.
17    THE WITNESS: No, I don't. That's something
18  that I don't work with.
19    BY MR. ARI BROWN:
20    Q. When you made your declaration -- when you
21  signed your declaration Exhibit 1 did you consider
22  whether this database shown in Exhibit 4 could be
23  queried to answer some or all of the questions?
24    MR. BROOKS BROWN: Objection as to the form.
25    THE WITNESS: I'm sorry. What was your

Page 138

1  question again?
2     BY MR. ARI BROWN:
3     Q. When you -- at the time you signed the
4  declaration on Exhibit 1 back in December of 2011, did
5  you inquire as to whether the database reflected in
6  Exhibit 4 could be queried to answer some of the
7  questions?
8     MR. BROOKS BROWN: Objection as to the form.
9     THE WITNESS: Things could be named differently
10  and they could be seen differently depending on the
11  systems. So unless you told me exactly which name this
12  database is. I can't tell you.
13    BY MR. ARI BROWN:
14    Q. Do you even recognize this database?
15    A. I don't --
16    MR. BROOKS BROWN: Objection as to the form.
17    THE WITNESS: This is a -- it's a document
18  that's been filled out but could appear in a system
19  differently.
20    BY MR. ARI BROWN:
21    Q. So when claiming that the review had to be
22  manual in order to answer the categories in Exhibit 4,
23  did you even consult as to whether this database
24  reflected in Exhibit 4 could even be used?
25    MR. BROOKS BROWN: Objection as to the form.

Page 139

1     THE WITNESS: Unless I know the name, I can't
2  tell you what I inquiry or not.
3     BY MR. ARI BROWN:
4     Q. Would you agree -- you would agree, would you
5  not, that this database reflects the income calculations
6  that were used?
7     MR. BROOKS BROWN: Objection as to the form.
8     THE WITNESS: Like I said, I'm not familiar
9  with this document or database. I can read through it
10  but I said I'm not familiar.
11    BY MR. ARI BROWN:
12    Q. I understand. And why don't you read for it --
13  do you dispute that the principal and interest that
14  this -- that this particular borrower, well, Deborah
15  Gaffey had to pay is reflected in the database?
16    MR. BROOKS BROWN: Objection as to the form.
17    THE WITNESS: Unless I have my system open I
18  couldn't attest that this is the amount or -- I wouldn't
19  know.
20    BY MR. ARI BROWN:
21    Q. Okay. And are you saying that you do not know
22  whether a -- based on this document, whether it
23  reflects -- whether or not a Form 4506-T was returned?
24    MR. BROOKS BROWN: Objection as to the form.
25    THE WITNESS: This document it's not -- for me,

Page 140

1  okay, it's not a set document. It has fields that could
2  be removed, deleted. The way I see it I could delete
3  anything and even change the loan number. For what I
4  know that's not even the loan number.
5     BY MR. ARI BROWN:
6     Q. Sure.
7     A. So they could click and not click. This is not
8  a document that I could base on.
9     Q. I see.
10    A. When you show me --
11    Q. So you do not --
12    MR. BROOKS BROWN: Go ahead and finish with
13  your answer.
14    BY MR. ARI BROWN:
15    Q. Go ahead.
16    A. When you show me AS400. those are set -- that
17  information is set. It's not an open fields that could
18  be changed. So I can't really confirm what's in this
19  document.
20    Q. Okay. So we established that you cannot trust
21  the integrity of the information in this document, is
22  that what you're saying?
23    MR. BROOKS BROWN: Objection.
24    BY MR. ARI BROWN:
25    Q. Fields can be changed. You don't even know if

Page 141

36 (Pages 138 to 141)