# Exhibit 18

**Tyler Weaver**

**From:** Ari Brown
**Sent:** Thursday, August 09, 2012 1:55 PM
**To:** Goldstein, Seth (SGoldstein@goodwinprocter.com)
**Cc:** Shennan Kavanagh; Gary Klein; Kevin Costello; Tyler Weaver; McGarry, James W; Sherman, Lee
**Subject:** production of HAMP related audit reports

Seth,

Following up on our discussion of this week regarding the audits that Plaintiffs need produced. We explained that, in light of the fact that Bank of America has identified only 130 audits as having been conducted as "HAMP related audit reports," and another 23 audit reports (listed on Exhibit 1 of your letter dated June 29), it is Plaintiffs' position that they should all be produced. It has now been six months since the Court ordered Bank of America to produce the reports. When requesting a list of audit reports that we would then narrow down, we were under the impression that there were several hundred or even several thousand reports and that we would then designate a smaller number of reports for production. This was offered as a courtesy to reduce the burden of production. We explained that it would have been likely that we would likely have designated approximately 150 reports.

We understand that the list of audit reports includes only those that Bank of America believes involve HAMP and that Bank of America has excluded many categories of audits such as those involving REO management, origination, insurance products and several others. We are waiting for a written explanation of the categories of audits that were included versus those that were excluded. Given the culling that Bank of America has apparently already performed, and the relatively small number of audit reports you now claim to be responsive, we do not believe it necessary to reduce the number further. Please let us know as soon as possible when we can expect to see this production.

We look forward to your prompt response.

Thank you,

**Ari Brown** | Attorney
**Hagens Berman Sobol Shapiro LLP**
1918 Eighth Ave Suite 3300 - Seattle, WA 98101
Direct: (206) 268-9311
ari@hbsslaw.com | www.hbsslaw.com | HBSS Blog

Named to 2011 **Plaintiff's Hot List** by *The National Law Journal*

# Exhibit 19

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In Re: Bank of America Home | ) | |
| Affordable Modification Program | ) | No. 1:10-md-02193-RWZ |
| (HAMP) Contract Litigation, | ) | |
| | ) | |
| | ) | |

DEPOSITION OF TAWNYA SCHOOLITZ

Phoenix, Arizona
May 9, 2012
9:04 a.m.

REPORTED BY:
Debra Riggs Torres, RPR
Certified Reporter
Certificate No. 50647

PREPARED FOR:
(ASCII/COPY)

Page 122

Q. And under a special forbearance program, when a customer skips monthly payments, does their indebtedness rise?
MR. MCGARRY: Objection. Foundation.
THE WITNESS: You'll tell me if I answer this incorrectly, they are left with a past-due and they do accrue delinquency.
Q. BY MR. BROWN: And the past-due amount is added to the amount owing?
A. Correct.
Q. What information -- what data is input into Profiler to make the determination?
A. Stated income and stated expenses. So your gross income for yourself and your spouse or a contributing party, and then total debt, including your house payment, car payment, roughly what do you pay in credit cards. So a stated kind of P & L, if you will, from a customer's perspective.
Q. Who inputs that?
A. The frontline associate speaking to the customer.
Q. So there are data fields for them to put in --
A. Yes.
Q. And those data fields include -- are they detailed, like car payment amount, house payment amount, food monthly?

Page 123

A. Yes.
Q. So it's a line item set of fields?
A. Yes, as is the income. So if you have more than one borrower, or if I work for Bank of America and I am self-employed, there would be line items for my Bank of America income, my self-employment income, if I'm getting a pension. So income is line-itemed as well as debt.
Q. These data points are exportable to like Excel?
MR. MCGARRY: Objection to the form and foundation.
THE WITNESS: I don't know the answer to that.
Q. BY MR. BROWN: But they're separate fields?
A. Right. I would assume we can query. I've never queried from Profiler, but --
Q. Okay.
A. -- but it would stand to reason that we could.
Q. Does Profiler -- is information from Profiler accessible from AS400?
A. No, sir.
Q. Does information from Profiler get uploaded to AS400 in any way?
A. No, sir.
Q. Is Profiler a completely standalone system or integrated with any other system?

Page 124

MR. MCGARRY: Objection to the form and foundation.
THE WITNESS: It is standalone.
Q. BY MR. BROWN: Okay. A Profiler report -- can a Profiler report be generated as per a particular borrower using their own number?
MR. MCGARRY: Objection to the form. Foundation.
THE WITNESS: Profiler can be accessed for a particular customer by loan number, yes. Again, the ability to export, query, or report off that, I'm not sure.
Q. BY MR. BROWN: But you can make inquiries of Profiler using a borrower's loan number?
A. Yes.
Q. For specific data? A car payment?
A. I would be able to get that information, yes. I can't ask Profiler to filter just by car payment, if that makes sense, but I could obviously see that field and report back.
Q. Could you filter as to the ultimate decision from Profiler?
MR. MCGARRY: Objection to the form and foundation.
THE WITNESS: I don't know. I'm sorry.

Page 125

MR. BROWN: It's okay.
Q. BY MR. BROWN: Okay. If you would turn to page 84608, please. Working backwards on the document, if that helps you.
A. Yes.
Q. See a notation down at the bottom, you see the one second from the bottom? It says, "Please advise documents missing." Would you read in English what follows the word "need" and the colon.
A. Are you referencing the note on 4/13?
Q. Yes, I am.
A. "Two most recent pay stubs and hardship affidavit with social security and date of birth on form. Fax to 888-808-4814, attention Latoya."
Q. Is Latoya a Bank of America employee?
A. That would be my assumption.
Q. Is this notation referencing the documents that Bank of America needs for a complete package?
MR. MCGARRY: Objection to the form and foundation.
THE WITNESS: Income validation is point in time, and I'll explain that. On 4/13 we needed pay stubs, hardship affidavit. If there were something on that pay stub, for instance, that would prompt another request for documentation. It may not be safe to say that 4/13 was

Q. BY MR. BROWN: So this review that we just did supports Ms. Torrico's claim that she sent in all the documentation, does it not?
MR. MCGARRY: Objection to the form and mischaracterizes the documented testimony.
THE WITNESS: The notation that the appeals associate makes indicates that they agreed that she had sent all the documentation and then forwarded her file to -- for review for the HAMP program.
MR. MCGARRY: Off the record.
(Discussion off the record.)
(Deposition Exhibit No. 5 marked for identification.)
Q. BY MR. BROWN: Showing you what's been marked Exhibit 5 entitled HomeSaver Workout Notes. Do you recognize these screen prints?
A. Yes.
Q. What do you recognize them as?
A. Notes within HomeSaver, the HomeSaver system.
Q. The HomeSaver system being another database?
A. Yes.
Q. And the one we were looking at in Exhibit 4 was from HomeBase; correct?
A. Correct.
Q. Both HomeSaver and HomeBase feed into AS400; correct?

A. Not in their entirety. There are notes within each that will write back to AS400. In HomeSaver's example, based on the type of note, for lack of a better term. So it's not a hundred percent match back to AS400.
Q. So to get a complete picture, you would need HomeBase, HomeSaver, and AS400?
MR. MCGARRY: Objection to the form.
THE WITNESS: If by that you mean a full picture of notes, yes, you would need all three systems.
Q. BY MR. BROWN: What distinction are you making?
A. If you ask me how many systems I use to research a timeline that we spoke about earlier, it is more than three.
Q. Which other ones?
A. HomeBase, HomeSaver, AS400, Loss Mitigation Financials, Loss Mitigation Plan, Urban, Stewart, iPortal.
Q. Anything else?
A. I'm thinking. One moment please.
Q. Sorry.
A. Loss Mitigation Profiler, Workout Package Tracking. Without having my system in front of me, those are the systems that I recall.
Q. Okay. Are any of the systems you listed mutually exclusive? In other words, if something is in Urban, would you not have to look in Stewart?

A. It's dependent on the customer. There should not be a reason to have to look in both places. As matter of course, I do look in both places because it has happened that we have documents in both vendor systems for one reason or another.
Q. Are there any other of the systems that you mentioned that should be one or the other?
A. No, sir.
Q. Is the information in Loss Mitigation Financials kept in data fields?
MR. MCGARRY: Objection to the form.
THE WITNESS: Yes. This is what we talked about before with the income and the expense line itemization type of activities. That is in LMF, to use the acronym. So we would be able to -- I should qualify that. I don't know if it can be queried in the way you might think of a SQL query being able to extract. But the information is there, it is in fields and available.
Q. BY MR. BROWN: Is it exportable?
MR. MCGARRY: Objection. Foundation.
THE WITNESS: I don't know.
Q. BY MR. BROWN: How about Loss Mitigation Plan? Is that in fields?
A. That is also in fields, yes.

Q. Loss Mitigation -- and it's in fields in the same way you talked about Loss Mitigation Financials?
A. Yes.
Q. How about Loss Mitigation Profiler? Is that data in fields?
A. It is in fields, yes, in the same way.
Q. How about Workout Tracking -- Package Tracking? Is that information in fields?
A. Yes.
Q. And in the same way as Loss Mitigation Financial?
A. No, in that Workout Package Tracking does not include customer financial information.
Q. Yes.
That sounds like it's a difference in the type of data it keeps.
A. Yes.
Q. I'm asking about the type of fields that they are.
A. Fair enough, then.
Q. Are the fields the same way? They have separate, distinct fields that may be able to be exported?
A. Yes.
MR. MCGARRY: Objection to the form and lack of foundation.
Q. BY MR. BROWN: How about iPortal? Is information

Page 146

in fields?
A. Yes.
Q. Same way, possibly exportable?
MR. MCGARRY: Objection to the form.
THE WITNESS: Yes.
Q. BY MR. BROWN: How about Urban? Information in fields there?
A. Yes.
Q. Also exportable?
MR. MCGARRY: Objection. Foundation.
THE WITNESS: Yes.
Q. BY MR. BROWN: And Stewart, is information in Stewart -- in the Stewart database in fields?
A. Yes.
Q. Also exportable?
MR. MCGARRY: Objection. Foundation.
THE WITNESS: Yes.
Q. BY MR. BROWN: I think I hit them all.
Let's look at Exhibit 5, turning to the back again, we'll work back to front. Now, HomeSaver workout notes appears to have information that is not included in HomeBase. Is that consistent with your understanding?
A. Yes.
Q. Okay. Starting at 84743, does this give a better indication of what documents were sent on May 11, 2009?

Page 147

A. No.
MR. MCGARRY: Objection to the form.
THE WITNESS: No, it does not.
Q. BY MR. BROWN: I should clarify my question. That wasn't well put.
In HomeBase, earlier we looked at notations from May 2009 and I believe you had said you didn't know what documents were submitted?
A. Correct.
Q. Does the notation here in HomeSaver, Exhibit 5, give you a better idea as to what documents were submitted?
MR. MCGARRY: Same objection.
MR. BROWN: I'm looking specifically at notes text, items received, workout cover letter, workout letter.
MR. MCGARRY: Objection to the form and foundation.
THE WITNESS: Gives me different information than I had in HomeBase. HomeBase does not have the entry from 5/11. As for content, it is no more descriptive in HomeSaver than it is in HomeBase. I know that I did receive a cover letter and a workout letter. That is vague verbiage. I don't know if that's a hardship letter from the customer or some other document. In this time

Page 148

frame, that was a pretty generic label for some documents, so ...
Q. BY MR. BROWN: So in this time frame, could that mean that the -- there were bank statements included?
MR. MCGARRY: Objection. Foundation.
THE WITNESS: No.
MR. BROWN: Okay.
THE WITNESS: The confusion you're reading honestly on my face is whether or not this was an incoming or outgoing letter. Workout letter can be used for an incoming document from the customer that is, in fact, a letter. This was also the time frame, you'll remember me saying, that we did not have upload capability in iPortal, so we were faxing information to be uploaded to iPortal, so this could have been something we sent. Without being able to see the imaging system itself, I cannot tell you whether it was incoming or outgoing.
Q. BY MR. BROWN: Sent to whom?
A. The borrower.
Q. So when it says "Items received: Workout cover letter, workout letter," that doesn't -- it implies to me that these were items that were received. Do you have an different understanding?
A. No. I -- I have a picky understanding, and I apologize. Again, without the ability for an associate at

Page 149

the desktop to upload to iPortal, they were responsible for faxing documents to, frankly, the India team, the India team having upload capabilities within iPortal.
Q. I'm sorry. I'm going to interrupt you. What's "the India team"?
A. The team in India that works --
Q. India the country?
A. India the country, I'm sorry, that works overnight specifically ingesting documents. It's a very clerical-type function, so that's an offshore play that we've made.
And I know I'm splitting hairs, and I apologize, but what this says to me is that the India team received something that they needed to upload. What I cannot tell from this description is if they received it from the borrower or from the internal BAC associate.
Q. Okay. It does tell you, however, then, that there were some documents that had to come initially from the borrower, doesn't it?
A. Not necessarily. So if you recall in HomeBase, we saw that the appeals representative had to upload their screen print, their workout information. This is a very generic term for me, "workout cover letter" and "workout letter" is very generic. It -- just to be more confusing, I apologize, it also could be not related to the workout.

# Exhibit 20

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In Re: Bank of America Home Affordable Modification Program (HAMP) Contract Litigation

Case No. 1:10-md-02193-RWZ

DEPOSITION OF LOURDES DUARTE

May 23, 2012

9:10 a.m.

15250 Ventura Boulevard, Suite 410

Sherman Oaks, California

REPORTED BY:

Jean F. Holliday

CSR No. 4535, CRR

Q. And reporting group, is that a group of people?
A. I have one contact.
Q. Who is that contact?
A. I don't remember his name. He's from India so it's hard to remember. I think it's Shaanghi or Saanghi.
Q. Is this person located in India?
A. I don't know.
Q. Have you ever met this person in person?
A. No.
Q. Now, I gave you a specific example. How about if you were asked to create a table with the addresses, outstanding principal balances and whether or not the person is late, for all people within a particular state, would you know how to query the system to find that information?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Which system?
BY MR. ARI BROWN:
Q. AS400.
MR. BROOKS BROWN: Same objection.
THE WITNESS: The information I need to retrieve is unpaid principal balance, paid through date, and what else?
///

Page 34

BY MR. ARI BROWN:
Q. Geographic location.
A. And in the specific state. Because of the amount of loans that could be involved, I would have to reach out to the AS400 data reporting group.
Q. How many data reporting groups do you have to reach out to to -- well, let me -- let me rephrase that.
You said you have to reach out to the AS400 reporting group. Are there other reporting groups you can reach out to?
A. For this specific information that --
Q. No. Just in general.
A. It all depends what information I need to get.
Q. I know. Just in general are there other options at your disposal in terms of reporting groups?
A. And again, it all depends on what information we need to get. That's information that I can pull from AS400.
Q. What about information --
A. So I would go to the AS400 data keepers.
Q. What about information you had to pull out of HomeBase?
A. HomeBase it's a more complicated system because HomeBase, although it has fields, it also have a lot of information in their comments section that can't be --

Page 35

that has to be reviewed in order to make an assessment or evaluate the loan or see it, or see what's really happening. It's not a system that it's only feed of fields.
Q. Is it your understanding that you cannot search within comments in HomeBase?
A. I'm sorry. What?
Q. Is it your understanding that you cannot search in comments within HomeBase?
A. I can search in comments. What I mentioned was it's a more complex database where the information is not only in fields but it's also in a lot of the comments section. A lot of the information on the loans in HomeBase, HomeSaver is saved in their comments.
Q. I understand. What I'm asking is those comments fields, is it your understanding that you cannot create an automatic search to search for data within comments?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: You would have to read the full comments to get --
BY MR. ARI BROWN:
Q. It's a simple question.
A. -- to get the information from the loan.
Q. Let me ask you this way: Have you received any

Page 36

training on how to do an automated search of the comments fields within HomeSaver?
MR. BROOKS BROWN: Objection as to the form.
BY MR. ARI BROWN:
Q. Within AS400, have you received training as to that?
MR. BROOKS BROWN: Same objections.
THE WITNESS: No, I have not.
BY MR. ARI BROWN:
Q. Do you have any experience in doing computer searches, automated searches of the comments fields within HomeBase?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I'm trying to understand your question on how the comment transforms into data. A comment, because it could be so different and varies comment from comment, it's -- you can't -- I can't search for let's say a word "document," and would give me a full understanding of the loan. The comment section is not just a field that is exact. It's not a loan number. It's not an unpaid principal balance. It's not a paid through date. The comment section there is several comments fed by several people that work on the loan.
///

Page 37

BY MR. ARI BROWN:
Q. And just so I understand your testimony, are you saying that you personally cannot search the comments field for the word "document," or that nobody can search the comments field for the word "document"?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I said that that would not give me an understanding of the loan. I said that searching by a word that would be data does not give me information on a loan.
BY MR. ARI BROWN:
Q. Okay. I'd ask you to please listen to my question because you're not answering it. So when I say "data" I mean any word, any word can be data. But let's take the word that is in a comment field. The example you gave was the word "document." I believe you said that you cannot search HomeSaver or HomeBase to find all the occurrences of the word "document" in the comments field; is that right?
A. I don't think I said that. We can go back.
Q. Okay. Can you?
A. We can.
Q. You can?
A. I can look for the word "document" and find all the "document" words in HomeBase or in one specific loan

Page 38

that that word was, you know, written. My -- and I guess my point here was that that -- that searching a word doesn't give me a full understanding of the loan.
Q. I understand that and we are going to -- you're going to have to stop repeating the end result. I'm asking you a specific question. I'm not asking you as to whether you can understand the loan by querying the comments field. I am asking you simply mechanically do you know how to query the comments field on an automated basis?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Well, that sounds like a different question, so --
BY MR. ARI BROWN:
Q. Okay. Well, please answer it.
A. So what was your question again?
Q. My question is do you know how to query the comments field for a particular word or string of words on an automated basis?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: The way I've been -- or the way I work HomeBase is never automated.
BY MR. ARI BROWN:
Q. Okay. I'm asking do you know how to query the comments field for a particular word or strings of word

Page 39

on an automated basis?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: And like I said, the way I work HomeBase it's never automated.
BY MR. ARI BROWN:
Q. I understand. Do you know how to do it?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I could search for one word.
BY MR. ARI BROWN:
Q. But you don't do it?
A. I haven't needed to.
Q. Okay. Have you received any training on how to search for data in the Loss Mitigation Financials database?
A. I don't work on that database.
Q. Have you received any training on how to search for information in the Loss Mitigation Portal?
A. Which one is the Loss Mitigation Portal?
Q. It's commonly known as LMP. Have you received any training on how to search for information within LMP?
A. I don't think we've been trained, no.
Q. What's that?
A. I don't think we've been trained.
Q. Okay. And you have no experience working with

Page 40

that database?
A. LMP is -- the way I've worked through it is a partition on I-portal.
Q. And have you had any training on how to query information from LMP?
A. No.
Q. Have you received any training on how to query information from Loss Mitigation Profiler?
A. No.
Q. Have you received any training on how to query information from Workout Package Tracking?
A. Excuse me. Just for the record, I don't work in the loss mitigation department, so I have not received the training specifically, but I think you're asking, you know, for specifics of the loss mit that I'm not fully familiar with.
Q. I'm asking for your familiarity with these particular databases. Have you received any training with the databases I've mentioned?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I think I answered one by one.
BY MR. ARI BROWN:
Q. Okay. Have you received any training for querying information from the Workout Model?
MR. BROOKS BROWN: Objection as to the form.

Page 41

THE WITNESS: I don't think so.
BY MR. ARI BROWN:
Q. Have you received any training for querying information from Loan Modification Application, otherwise known as LMA?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I don't think so.
BY MR. ARI BROWN:
Q. You said you don't think so?
A. Yeah.
Q. Have you received any training on how to query information from Urban Portal?
A. No.
Q. Have you received any training on how to query information from Stewart Portal?
A. No.
Q. Have you received any training on how to query information from I-portal?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I -- I work with I-portal on a daily basis.
BY MR. ARI BROWN:
Q. Have you received training on how to query information out of I-portal?
MR. BROOKS BROWN: Objection as to the form.

Page 42

THE WITNESS: Again, with I-portal we enter loan by loan.
BY MR. ARI BROWN:
Q. That's -- please listen to what I'm asking. Have you received any training on how to query information out of I-portal?
A. I don't think we've received formal training.
Q. Have you received informal training?
A. What do you exactly mean by querying information out of I-portal?
Q. Input -- inputting information into a computer that you are searching for and finding the instances on which it occurs in I-portal.
A. I'm sorry. I still don't understand your question.
Q. Let's ask this way: What training have you received on how to retrieve information from I-portal?
A. We've received basic training on how to retrieve the needed information from I-portal.
Q. Just basic training. like surfing and --
A. No. I-portal is different because I-portal is a database that keeps documents and records.
Q. Okay.
A. So we pull those documents or records as needed.

Page 43

Q. And is it your testimony that I-portal has no information other than the images of documents or records?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: The partitions of I-portal that I have accessed are documents, imaging of documents.
BY MR. ARI BROWN:
Q. And so you have -- you do not have access -- let me ask -- sorry.
Do you have access to any other facets of I-portal other than the images of documents?
A. There are several partitions in I-portal. I can only attest to the ones that I -- that I work with.
Q. Okay.
A. I don't know if there are any more out there.
Q. Again, please listen to the question. Do you have access to any other portions of I-portal other than the images of documents?
A. I don't think so.
Before we read that can I have a quick break?
Q. Absolutely.
A. Thank you.
(Recess)
BY MR. ARI BROWN:
Q. Ms. Duarte, do you have any formal education in

Page 44

computer programming?
A. No.
Q. Have you had any training in SQL?
A. No.
Q. Have you had any training in any kind of computer programming?
A. No, not programming.
Q. Okay. Do you have any formal education in database management?
A. No.
Q. Where did you go to college?
A. I went to school in Peru.
Q. What kind of school?
A. I went to law school in Peru.
Q. Was that -- in Peru is that an undergraduate or graduate degree?
A. It's a graduate degree.
Q. Did you complete it?
A. Yes, I did.
Q. Did you pass the equivalent of a Bar exam?
A. No. We don't have a Bar exam. We have a -- you get a -- go through a thesis or show two files. present two files.
Q. Did you complete that?
A. No, I didn't.

Page 45

way for us to produce a reporting as it was requested.
Q. You have no firsthand knowledge -- well, let me ask you this: You have no training in writing SQL queries; correct?
MR. BROOKS BROWN: Objection as to the form.
BY MR. ARI BROWN:
Q. I believe you testified to that earlier?
A. I said no. Yes.
Q. And you don't -- you don't regularly generate queries on your own; correct?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: That's not part of my job.
BY MR. ARI BROWN:
Q. So that you don't usually -- I don't care why. Do you or do you not regularly create queries on your own?
A. I don't usually do.
Q. Okay. Do you even -- do you know how to write a Boolean query?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I'm not a technology person.
BY MR. ARI BROWN:
Q. Do you know how to write a boolean query for AS400?
A. No.

Page 82

Q. Do you know how to write an SQL query for AS400?
A. No.
Q. So when you want to determine whether an SQL query can be written for AS400, you have to ask someone else; right?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: When I need a report from AS400 I need to ask somebody else.
BY MR. ARI BROWN:
Q. Okay. And in determining that -- and I think you said no query could be written for topics -- for the topics listed in Paragraph 4. You don't know that firsthand, do you?
A. I said to my knowledge I don't know.
Q. Right.
A. To my knowledge there is no query that could be written.
Q. Okay. To your knowledge, based on your background and your training and your education, no query that you know of could be written to answer the topics in Paragraph 4; correct?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: On the use of the systems on a daily day basis, I know how the system works.

Page 83

MR. BROOKS BROWN: When you get to a natural stopping point I'd like a break.
BY MR. ARI BROWN:
Q. Have you seen IR-2 data that is uploaded to the IR-2 system?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: No, I have not.
BY MR. ARI BROWN:
Q. Have you worked with the IR-2 system?
A. Not -- I don't think so.
Q. Do you have an understanding of how data is uploaded to the IR-2 system?
A. No, I don't think so.
Q. Okay. If I told you the topic 4, category 4, date and terms of the HAMP TPP, do you see that?
A. Which one? I'm sorry.
Q. Paragraph 4, category 4.
A. Okay.
Q. Do you know whether the date and terms of HAMP TPP are regularly uploaded to the IR-2 system for thousands of loans at a single time?
A. No, I don't know.
Q. Do you know whether that's done actually on a regular basis?
A. That's not -- I don't know.

Page 84

Q. Okay. Is it your testimony that that is not done?
MR. BROOKS BROWN: Objection.
THE WITNESS: I didn't say that. I said that's not my department. That's what I was going to say.
BY MR. ARI BROWN:
Q. Okay. That's not your department.
In seeking -- in writing Paragraph 4, or attesting to Paragraph 4, did you endeavor to find out whether any of these categories were actually reported to the Department of the Treasury on a regular basis?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: What's your question?
BY MR. ARI BROWN:
Q. Did you endeavor to determine whether any of these categories of information as listed in Paragraph 4 were reported to the Department of the Treasury on a regular basis?
MR. BROOKS BROWN: Same objections.
THE WITNESS: No, I did not.
BY MR. ARI BROWN:
Q. Okay. If indeed any of these categories were reported to the Department of the Treasury using automated queries, that would contradict your sworn statement, would it not?

Page 85

category 2 could be answered on an automated basis?
A. As I stated before, I reach out to several reporting groups.
Q. Did you reach out -- when you reached out to several reporting groups that you cannot name -- well, I'm sorry. Can you name the reporting groups?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: We have internal procedures. We have different lines of business that I contact. You want specific names that I don't remember now.
BY MR. ARI BROWN:
Q. Okay. So no, you can't?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I said I can't remember today.
BY MR. ARI BROWN:
Q. Okay. When you inquired of these unrecalled people, did you inquire specifically as to whether category 2 could be answered in an automated fashion?
A. I, as I said before, I provided them the list of what was requested.
Q. And what I'm asking is did you segregate category 2 -- or did you ask anybody whether category 2 and nothing else could be answered in a segregated -- in an automated fashion?
MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: No, I did not. The request was made as a whole.
BY MR. ARI BROWN:
Q. Did you inquire of any reporting groups or any other technology person whether category 3, the date of HAMP application, final approval and/or denial could be queried of any database in an automated fashion?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Like I said, and if you're going to go one by one, I made a request as a whole.
BY MR. ARI BROWN:
Q. Okay. And I am going to go one by one unless you can answer the question directly, which is did you inquire of any technology person or any data reporting group or any person whether each of these categories standing alone could be answered on an automated fashion for 9,100 accounts?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: And like I said, I made a request as a whole --
BY MR. ARI BROWN:
Q. Is your answer no?
A. -- like it was made.
Q. Is your answer to my question no?
MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I don't think I asked for it separately.
BY MR. ARI BROWN:
Q. You didn't ask --
A. That I remember right now. I don't think so.
Q. Your testimony is that you did not ask for any of the categories listed in Paragraph 4 separately?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: My testimony is that I don't remember. I am not sure. I don't think I asked for this request individually or separately. I asked for it as a whole.
BY MR. ARI BROWN:
Q. So based on the inquiry that you did make as you recall it, do you know one way or the other whether it was an inability to do one -- to inquire as to one and only one of these categories on an automated basis that caused the answer to your inquiry to be no?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Can you ask me again?
BY MR. ARI BROWN:
Q. Sure. Let me try and explain what I'm getting at.
A. And then can we just have a quick break, like right after?

Q. Sure. I think we've established that you asked the inquiry, whoever you asked it, only as a whole as to whether these 11 categories could be determined on an automated basis; is that correct?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: That's what I remember.
BY MR. ARI BROWN:
Q. Okay. And you did not make an inquiry as to any single topic regarding whether it could be determined on an automated basis?
A. Not that I remember right now.
Q. Okay. So you have no way of knowing one way or the other whether 10 out of the 11 categories could be done, could be queried on an automated basis?
A. I know from my use of the system what can be done.
Q. I understand that. I am asking and I think --
A. And the nature of the request.
Q. I am asking simply -- strictly as to what information you got from other people who have a better -- a more extensive technological background, who know how to write SQL queries, who knew how to do boolean searches, which you do not know; correct?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I don't know how to make those

queries.

BY MR. ARI BROWN:

Q. All right. And so I am asking strictly based on your inquiries of other people whether you have any way of knowing whether or not 10 out of the 11 topics could or could not be queried by a computer programmer?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I know from the usage of the system and the type of request -- and if it doesn't satisfy you, then I'm sorry --

BY MR. ARI BROWN:

Q. Well, I --

A. But I know, from what the type of request here, you needed more information that had to be pulled loan by loan. That I know; that I signed; that was my declaration.

Q. Okay. I understand that, but I'd like you to still -- the reason we're here -- I understand what you said in your declaration, but we're here to answer questions that go beyond it. So the question you just answered is not the question I asked. The question I asked was --

Would you please read it back?

(Record read as follows:

"QUESTION: And so I am asking strictly

based on your inquiries of other people whether you have any way of knowing whether or not 10 out of the 11 topics could or could not be queried by a computer programmer?")

MR. BROOKS BROWN: Same objection.

THE WITNESS: From my communication from other people the response was you can't.

BY MR. ARI BROWN:

Q. And the response was to your question which asked it solely as a whole; correct?

A. That's what I remember.

Q. Okay. So and the answer was a yes-or-no question; correct, can this be done or can it not be done?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: Yes. I think so, that was the question.

BY MR. ARI BROWN:

Q. Did you ask any reporting groups or any technological -- technology-savvy person which of these categories could be queried on an automated basis?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I don't think so, as I remember right now.

BY MR. ARI BROWN:

Q. Did you ask any reporting group or any technologically savvy person how many of these 11 categories could be queried on an automated basis?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I don't think I made that question.

BY MR. ARI BROWN:

Q. And so when you say it cannot be done -- well, strike that.

In looking at these bullet points I see you reference HomeSaver, HomeBase, AS400, and CIWI. Did you try and determine whether the categories listed in Paragraph 4 could be answered on an automated basis from any other database?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: What do you mean "from any other database"?

BY MR. ARI BROWN:

Q. Did you inquire as to whether the categories listed in Paragraph 4 could be determined from the Loss Mitigation Financials?

A. I reached out to the loss mitigation group at that time.

Q. And did you inquire which, if any, of the

categories listed in Paragraph 4 could be answered using Loss Mitigation Financials?

A. I don't think I asked that specific question.

Q. I'm sorry. I didn't catch that. Was your answer no?

A. I said I don't think I asked that specific question.

Q. Okay. So you did not inquire as to whether any of the categories listed in Paragraph 4 could be determined using Loss Mitigation Financials?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: Yeah, I don't think I asked that question.

BY MR. ARI BROWN:

Q. Did you inquire as to whether any of the categories listed in Paragraph 4 could be determined --

A. And I'm sorry. Can I really have a break? I was going to ask you for one like 30 minutes ago.

Q. Okay. Let me just finish this question.

A. Okay. I think I did ask.

Q. Did you inquire as to whether any of the categories of information listed in Paragraph 4 could be determined using Loss Mitigation Portal?

A. I don't think that I asked that specific question either.

MR. ARI BROWN: All right. Why don't we take a break.

THE WITNESS: Thank you.

(Recess)

BY MR. ARI BROWN:

Q. Ms. Duarte, in coming -- in attesting to statements listed in Exhibit 1 did you inquire as to anybody whether Loss Mitigation Profiler could be used to answer any of the categories listed in Paragraph 4 on an automated basis?

A. I don't think I asked that specific question.

Q. Did you ask anybody who works with Loss Mitigation Profiler whether any of the topics in Paragraph 4 could be answered on an automated basis?

A. I reach out to HRD.

Q. And did you ask whether Loss Mitigation Profiler could be used to answer any of the categories in Paragraph 4 on an automated basis?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I did not ask that specific question.

BY MR. ARI BROWN:

Q. Okay. Did you ask anybody whether Workout Package Tracking could be used to answer any of the categories listed in paragraph Number 4 on an automated

basis?

A. No.

Q. Did you ask anybody whether Workout Model could be used or queried to answer any of the categories listed in Paragraph 4 on an automated basis?

A. No.

Q. Did you inquire of anybody whether Loan Modification Application, also known as LMA, could be used or queried to answer any of the topics listed in paragraph Number 4 on an automated basis?

A. As I said before, I didn't ask specific questions for specific systems, but I did reach out to HRD.

Q. And what response did you get as to whether Loan Modification Application could be used to answer any of these topics?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: And I said I didn't ask that specific question.

BY MR. ARI BROWN:

Q. Did you get a specific answer as to whether Loan Modification Application could be used at all to answer any of these topics?

A. I don't think so.

Q. Do you have any knowledge one way or the other

as to whether Loss Mitigation Profiler contains fields?

A. I don't work with that system.

Q. So do you have any knowledge as to whether it contains fields?

A. I don't work with it. I don't know.

Q. Okay.

A. I don't know.

Q. Do you know one way or the other as to whether the fields in Loss Mitigation Profiler can be searched?

A. I don't know that system.

Q. Okay. So the answer is no, you don't know one way or the other?

A. I said I don't know.

Q. You said you don't know that system. I'm asking you do you know one way or the other whether the fields in Loss Mitigation Profiler can be searched?

A. And I said I don't know.

Q. Okay. Do you know whether the fields -- the data located in fields in Loss Mitigation Profiler can be exported?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I don't know. I'm not familiar with that system.

BY MR. ARI BROWN:

Q. Do you know whether the fields in Workout

Package Tracking can be exported?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: No, I don't know.

BY MR. ARI BROWN:

Q. Do you know -- do you know whether -- do you know whether Loss Mitigation Financial even has fields?

A. No. Those are systems that I don't use.

Q. So you don't know if it has fields. You don't know if it can be exported; is that correct?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I don't know those specific systems.

BY MR. ARI BROWN:

Q. Okay. And what I'm asking is do you know, without knowing the systems, do you know whether it has fields that can be exported?

A. I don't know.

Q. Did you make -- in swearing to the fact that these fields cannot be searched on an automated basis, what efforts did you make, if any, to determine whether data from Loss Mitigation Financials could be exported and then searched?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I reach out to the Home Retention Department.

BY MR. ARI BROWN:
Q. In what form did you reach out to the Home Retention Department?
A. I don't remember.
Q. Okay. Who did you reach out to in Home Retention Department?
A. I probably reached out to several people.
Q. Who?
A. I have several contacts. It could be -- I don't remember exactly who I reached out to, but I know I did reach out to them.
Q. How many people from Home Retention Department did you reach out to?
A. I don't remember.
Q. You signed this declaration on the 29th of December, 2011. How long before the 29th of December, 2011, did you reach out to Home -- the Home Retention Department?
A. For the specific declaration? Or for other reasons?
Q. For this declaration.
A. For this specific declaration, I don't remember exactly when.
Q. How long before December 29th, 2011 did you start work researching the facts attested in this

Page 106

declaration?
A. I don't remember exactly the date.
Q. Was it weeks before?
A. Probably days, a few days.
Q. Was it less than a week?
A. I'm not certain.
Q. Less than a month?
A. Less than a month, yes.
Q. Probably sometime around a week?
A. I don't really remember how many days it took me.
Q. And how did you reach out to the Home Retention Division -- I'm sorry, Home Retention Department?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I usually communicate via my communicator, my Instant Messaging or by e-mail or by phone.
BY MR. ARI BROWN:
Q. You say that's how you usually communicate. How did you communicate your inquiry as to whether certain databases could be used to query the topics listed in Paragraph 4?
A. I don't remember exactly which method I used.
Q. Is it possible you sent them an e-mail?
A. It's a possibility.

Page 107

Q. Did you search -- have you been asked to search to see whether you have sent an e-mail to HRD regarding whether it was possible to use certain databases to answer the topics in Paragraph 4?

Page 108

Page 109

create a query or run a query that would answer questions as to the various fields here, such as what is the principal balance on a particular date?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I'm not sure what you're asking me.

BY MR. ARI BROWN:

Q. Do you know how to write a query that would ask what the principal balance was for a particular date from AS400 for thousands of borrowers?

A. I think we established that I don't write queries.

Q. And you don't know how?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I don't do it.

BY MR. ARI BROWN:

Q. And you don't know how?

MR. BROOKS BROWN: Same objection.

THE WITNESS: No, I don't.

BY MR. ARI BROWN:

Q. Okay. And so on what basis do you say that the loan history here is not searchable on an automated basis?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: What are you asking me? Where

Page 130

did I --

BY MR. ARI BROWN:

Q. Don't worry why I'm asking you. I'm asking you on what basis --

A. I said what are you asking me? I'm sorry.

Q. On what basis do you say that payment history cannot be queried from AS400 on an automated basis?

A. In my testimony I said that -- and can I go back to the declaration, please? Thank you. On Paragraph 4, Number 2 it says, "Payment history from date of delinquency or date of HAMP Trial Period Plan, TPP, application, whichever is earlier."

Q. Uh-huh.

A. So what I said in my declaration, I repeat it today, was that that specific request to determine and gather the information of the payment history breakdown by the date of delinquency or the date of HAMP, whichever is earlier, that also had to be done manually because of these specifics that they were asking. You're asking me a different question right now.

Q. I'm asking you don't know -- you just don't have the background to -- is it your testimony that a computer programmer could not write that query of AS400, is that your testimony?

MR. BROOKS BROWN: Objection as to the form.

Page 131

THE WITNESS: My testimony was that the request that was made was not possible in a lump sum. It had to be done loan by loan.

BY MR. ARI BROWN:

Q. You just -- you almost answered the question, but when you said "lump sum" you went back to the full scope of the 11 topics, I think. Is it your testimony that Number 4, topic Number 4, that a computer programmer could not write a query of the AS400 payment history to determine the answer to category Number 4?

MR. BROOKS BROWN: Objection as to the form.

THE WITNESS: I don't know what a computer programmer is so capable of.

BY MR. ARI BROWN:

Q. Okay. You don't know what a computer programmer is capable of. You are not a computer programmer; correct?

A. No, I'm not.

Q. Okay. And so you do not know one way or the other what a computer programmer is capable of in terms of querying through AS400; correct?

A. I don't know how far a computer programmer could go.

Q. Okay. So when you made the statement you made in your declaration that this query could not be done on

Page 132

an automated basis, you meant you could not do this query on an automated basis, not a computer programmer could not do this query on an automated basis?

MR. BROOKS BROWN: Objection as to the form, and it mischaracterizes the declaration.

THE WITNESS: When I made this declaration I said, after reaching out to our data reporting people, that it was not possible to be made the way it was requested.

BY MR. ARI BROWN:

Q. Okay.

A. If you're asking to pull simply one number, that's different.

Q. I understand. But you don't know -- well, okay.

88134, please.

A. Okay.

Q. Okay. On January 9th, the first entry on January 9th, 2011, do you see where it says, "Uploaded documents in I-portal for viewing"?

A. Okay, yes.

Q. Is it your testimony that a query could be written or could not be written that would determine the date on which documents were uploaded in I-portal for viewing?

Page 133

MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I'm sorry. What did you say?
BY MR. ARI BROWN:
Q. Is it your testimony that a programmer could not write a query that would determine on which date documents were uploaded in I-portal for viewing?
MR. BROOKS BROWN: Same objections.
THE WITNESS: I don't think I've said that.
BY MR. ARI BROWN:
Q. I'm asking now, is it your testimony that a computer programmer could not write an inquiry -- could not write a query that would determine which date or dates documents were uploaded in I-portal for viewing based on AS400 records?
MR. BROOKS BROWN: Same objections.
THE WITNESS: Like I said, I don't know how far a computer programmer can go.
BY MR. ARI BROWN:
Q. Okay. So you don't know one way or the other whether a programmer could write a query that would adequately answer the dates on which documents were uploaded in I-portal?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I don't know. It is from my experience, and maybe because I'm not a technology

person, that things and the documents that we review are always -- could be even named different. So let's say you're looking for a title policy in I-portal, it could be named "title," it could be named "title policy," it could be named "title commitment." So I'm not sure what kind of query could they create to pull the specific documents for the specific dates in I-portal.
BY MR. ARI BROWN:
Q. So you don't know what kind of queries someone could create, but you don't -- are you categorically saying that a programmer could not write a proper query, is that what you're saying?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Like I said multiple times, I don't know how far a programmer can go and what he's ultimately capable of.
BY MR. ARI BROWN:
Q. So you don't know whether a programmer could write a query that would search this database?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I'm not sure, no, I don't know.
BY MR. ARI BROWN:
Q. So when you say that it has to be done manually, you mean you or someone of your background, technological background would have to search it

manually?
A. I try those requests to be accurate. In order to get an accurate result, an accurate data, it has to be done manually.
Q. So your testimony is that a computer programmer or someone with a better understanding of AS400 could not write a query that would allow automated searching, is that your testimony?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: My testimony again is in order to have accurate data, and I repeat accurate data, has to be done manually.
BY MR. ARI BROWN:
[redacted]
Q. Would you concede that the trial period amount and the dates the payment are due is something that a programmer could inquire of AS400 on an automated basis?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Like I said, I don't know what the programmer could ultimately do. This is one comment. This is one whole.

BY MR. ARI BROWN:
Q. You've answered the question. Please don't -- you don't need to argue with me.
A. I'm not arguing.
MR. BROOKS BROWN: She's trying to answer your question, Ari. Let's be fair.
BY MR. ARI BROWN:
Q. I just want to know, so you -- okay. Your testimony is that even this could not be queried on an automated basis, right?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I said I don't know how far a programmer could go.
BY MR. ARI BROWN:
Q. And when you made your declaration that it would take days -- or half an hour through days to answer this query, you based it on reviewing the payment amount and the payment due dates as listed on Page 88165 manually; is that right?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: My declaration is based on a manual review.
BY MR. ARI BROWN:
Q. Okay. Solely on a manual review?
MR. BROOKS BROWN: Objection as to the form.

U.S. LEGAL SUPPORT
(800) 993-4464

THE WITNESS: From what I recall, yes.
MR. ARI BROWN: Okay.
(Exhibit 4 marked)
BY MR. ARI BROWN:
Q. Showing you what's been marked as Exhibit 4. Do you recognize the form of this database?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: No. I don't work with this database.
BY MR. ARI BROWN:
Q. Do you --
A. Seems like something underwriting would work on.
Q. Okay. Do you recognize even the form of it?
MR. BROOKS BROWN: Objection as to the form. Seems weird to say that in the question.
THE WITNESS: No, I don't. That's something that I don't work with.
BY MR. ARI BROWN:
Q. When you made your declaration -- when you signed your declaration Exhibit 1 did you consider whether this database shown in Exhibit 4 could be queried to answer some or all of the questions?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: I'm sorry. What was your

Page 138

question again?
BY MR. ARI BROWN:
Q. When you -- at the time you signed the declaration on Exhibit 1 back in December of 2011, did you inquire as to whether the database reflected in Exhibit 4 could be queried to answer some of the questions?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Things could be named differently and they could be seen differently depending on the systems. So unless you told me exactly which name this database is. I can't tell you.
BY MR. ARI BROWN:
Q. Do you even recognize this database?
A. I don't --
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: This is a -- it's a document that's been filled out but could appear in a system differently.
BY MR. ARI BROWN:
Q. So when claiming that the review had to be manual in order to answer the categories in Exhibit 4, did you even consult as to whether this database reflected in Exhibit 4 could even be used?
MR. BROOKS BROWN: Objection as to the form.

Page 139

THE WITNESS: Unless I know the name, I can't tell you what I inquiry or not.
BY MR. ARI BROWN:
Q. Would you agree -- you would agree, would you not, that this database reflects the income calculations that were used?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Like I said, I'm not familiar with this document or database. I can read through it but I said I'm not familiar.
BY MR. ARI BROWN:
Q. I understand. And why don't you read for it -- do you dispute that the principal and interest that this -- that this particular borrower, well, Deborah Gaffey had to pay is reflected in the database?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: Unless I have my system open I couldn't attest that this is the amount or -- I wouldn't know.
BY MR. ARI BROWN:
Q. Okay. And are you saying that you do not know whether a -- based on this document, whether it reflects -- whether or not a Form 4506-T was returned?
MR. BROOKS BROWN: Objection as to the form.
THE WITNESS: This document it's not -- for me,

Page 140

okay, it's not a set document. It has fields that could be removed, deleted. The way I see it I could delete anything and even change the loan number. For what I know that's not even the loan number.
BY MR. ARI BROWN:
Q. Sure.
A. So they could click and not click. This is not a document that I could base on.
Q. I see.
A. When you show me --
Q. So you do not --
MR. BROOKS BROWN: Go ahead and finish with your answer.
BY MR. ARI BROWN:
Q. Go ahead.
A. When you show me AS400, those are set -- that information is set. It's not an open fields that could be changed. So I can't really confirm what's in this document.
Q. Okay. So we established that you cannot trust the integrity of the information in this document, is that what you're saying?
MR. BROOKS BROWN: Objection.
BY MR. ARI BROWN:
Q. Fields can be changed. You don't even know if

Page 141