```
              UNITED STATES DISTRICT COURT FOR
               THE DISTRICT OF MASSACHUSETTS


IN RE BANK OF AMERICA HOME        )
AFFORDABLE MODIFICATION           )
PROGRAM (HAMP) CONTRACT           )
LITIGATION                        )
                                  )    Civil Action
                                  )    No. 10-MD-2193-RWZ
                                  )
                                  )
                                  )
                                  )
```

**MOTION HEARING**

```
          BEFORE THE HONORABLE RYA W. ZOBEL
          UNITED STATES DISTRICT COURT JUDGE


            UNITED STATES DISTRICT COURT
          John J. Moakley U.S. Courthouse
                 1 Courthouse Way
            Boston, Massachusetts 02210
                 October 10, 2012
                    9:30 a.m.


               *   *   *   *


         CATHERINE A. HANDEL, RPR-CM, CRR
              Official Court Reporter
          John J. Moakley U.S. Courthouse
                 1 Courthouse Way
            Boston, Massachusetts 02210
                 (617) 261-0555
```

```
 1    APPEARANCES:

 2
      For the Plaintiffs:
 3

 4    KLEIN KAVANAGH COSTELLO, LLP
      By:  Gary E. Klein, Esq., and
 5         Kevin M. Costello, Esq.
           85 Merrimac Street
 6         4th Floor
           Boston, MA 02114
 7
      -and-
 8
      HAGENS BERMAN SOBOL SHAPIRO LLP
 9    By:  Tyler S. Weaver, Esq.
           1918 Eighth Avenue
10         Suite 3300
           Seattle, WA 98101
11

12

13    For the Defendant:

14
      GOODWIN PROCTER LLP
15    By:  James W. McGarry, Esq.
           53 State Street
16         Exchange Place
           Boston, MA 02109
17
      -and-
18
      GOODWIN PROCTER LLP
19    By:   Brooks R. Brown, Esq.
            901 New York Avenue, NW
20          Washington, DC 20001

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (The following proceedings were held in open court
3      before the Honorable Rya W. Zobel, United States District Judge,
4      United States District Court, District of Massachusetts, at the
5      John J. Moakley United States Courthouse, 1 Courthouse Way,
6      Boston, Massachusetts, on October 10, 2012.)
7              THE COURT:  Good morning.  Please be seated.
8              COURTROOM DEPUTY CLERK URSO:  This is In Re Bank of
9      America.  This is MD-10-2193.  If counsel could please
10     identify themselves slowly so the Judge can go through --
11             THE COURT:  Slowly because I have at least 50 pages
12     of names.
13             All right.  Mr. Klein.
14             MR. KLEIN:  Gary Klein and Kevin Costello for the
15     plaintiffs.  Tyler Weaver of Hagens Berman is going to handle
16     the argument this morning.
17             THE COURT:  I have Mr. Weaver.  I have Mr. Klein and
18     Kevin Costello.  Okay.  That was easy.
19             MR. KLEIN:  Thank you, your Honor.
20             THE COURT:  And for defendant we have Mr. McGarry.
21             MR. McGARRY:  Good morning, your Honor.
22             THE COURT:  And?
23             MR. BROWN:  And Brooks Brown, your Honor.
24             THE COURT:  Okay.  Got you.
25             Now, as I understand it, this is discovery over which
```

1   the parties have a dispute that all pertains to class

2   certification.  Is that right, Mr. Klein?

3          MR. KLEIN:  Yes, your Honor, this is class

4   certification discovery for the purposes of getting us to

5   where we need -- to put our motion for class certification

6   together.

7          THE COURT:  What are the issues on class

8   certification as to which you need this information?

9          MR. KLEIN:  I'm going to let Mr. Weaver handle the

10  argument this morning, if that's okay, your Honor.

11         THE COURT:  Sure.

12         MR. KLEIN:  If I can help, I'm happy to do it, but

13  Mr. Weaver came prepared.

14         THE COURT:  Okay.

15         MR. WEAVER:  Your Honor, would you like me to stand

16  here or come up to the podium?

17         THE COURT:  Whatever suits you.  So long as I can

18  happy you, I'm happy.

19         MR. WEAVER:  Okay.  I'll come closer, make sure you

20  can hear me.

21          First of all, your Honor, it's my understanding that

22  there specifically has not been a bifurcation of discovery as

23  to merits and class discovery in this case, but --

24         THE COURT:  Well, tell me what the issues are as to

25  each category for which you need the data that you're looking

1   for.

2         MR. WEAVER:  Okay.  Well, there's three categories of

3   information that are specifically at issue in the motion.

4   One, in particular, is directly relevant to our class

5   certification motion.  It deals --

6         THE COURT:  The emails?

7         MR. WEAVER:  The emails.  There's the emails, your

8   Honor, which contain -- which we know are going to contain a

9   wide variety of information, including internal reports.

10         THE COURT:  Well, the question is, Why do you need

11   it?  I mean, my interest is in trying to focus on what you

12   need to the -- what information you need, number one, for the

13   class certification, and then for the merits, if you're going

14   there.

15         MR. WEAVER:  Well, your Honor, with regard to the

16   email, as we indicated in our papers, there are some very

17   specific things that we expect to find in the email.  Probably

18   foremost in our minds right now is any communications or

19   internal discussions or communications with third-party

20   vendors, including Urban Settlement Services, which --

21         THE COURT:  The contractor.

22         MR. WEAVER:  The Contractor, which they basically

23   hired out most of their HAMP settlement services to a third

24   party and --

25         THE COURT:  How is that relevant to class

1    certification?

2           MR. WEAVER:  That is -- that information specifically

3    may not be that relevant to class certification, again,

4    depending on what we find, but it's clearly relevant to the

5    merits and specifically as to our claims of breach of duty of

6    good faith and fair dealing and unfair practices claims, since

7    we do have the evidence and your Honor has seen in the record,

8    I believe, as far as what appears to have been going on at

9    Urban Settlement Services, and we need the emails, we need the

10   documents to verify that.

11          THE COURT:  Okay.

12          MR. WEAVER:  Also in the emails -- I'm sorry, your

13   Honor, I didn't mean to talk over you.

14          THE COURT:  Go ahead.

15          MR. WEAVER:  Also in the email we expect to find

16   PowerPoints of meetings regarding how they set up HAMP.  Those

17   may bear on how they set things up specifically, bearing on

18   the entire class, your Honor.  We also expect to find in the

19   email --

20          THE COURT:  When you say "it bears on the entire

21   class," we are at the point where we're going to have to hear

22   the parties on class certification and you have to meet

23   certain requirements for class certification.  So, "bearing on

24   the class" doesn't help me very much in deciding what

25   specifically it has to do with class certification.  It may

1    not and that's okay, too.  I mean, you're entitled to seek

2    discovery on the merits, but to the extent that we have been

3    focusing on class certification, I just want to know which of

4    these three categories of documents bear on class

5    certification and how.

6            MR. WEAVER:  Okay.  The second category is the most

7    clearly bearing on class certification.  It has to do with

8    when people received --

9            THE COURT:  The data?

10           MR. WEAVER:  Yes, the data.  When people received

11   their denials.  That specifically has to do with us being able

12   to demonstrate that we can ascertain the class.

13           Now, as I understand it from the briefing, this is

14   information that the defendants can give us.  We thought that

15   we needed the IR2 data.  From what I can tell -- and Mr.

16   McGarry can tell you if I'm wrong.  From what I can tell from

17   their response, they can provide it to us, but they haven't

18   done it.  That's clearly -- that is the most clearly relevant

19   for class certification.

20           THE COURT:  And how about the stuff that completes

21   the Treasury reports?

22           MR. WEAVER:  That's the issue.  I think, from my

23   understanding where things stand, your Honor, is that we don't

24   -- that would be the information that would complete the

25   Treasury.  It would not be the Treasury data itself.  They

1  would be able to pull it from a different source and then we

2  could match it up with the Treasury data.

3          THE COURT:  This is the second category?

4          MR. WEAVER:  The second category.

5          THE COURT:  The complete data?

6          MR. WEAVER:  The second category, the complete data.

7          THE COURT:  So, the complete data and the Treasury

8  stuff are sort of together?

9          MR. WEAVER:  Yes.

10          THE COURT:  Okay.

11          MR. WEAVER:  There's a third category of information.

12  There's the sample of the borrowers that your Honor compelled

13  back in February that we still don't have anything for.

14          THE COURT:  You don't have the names of borrowers who

15  would be within the sample for whom BOA would produce?

16          MR. WEAVER:  That's correct.  We have nothing, your

17  Honor.  We don't have names of the samples.  We don't have

18  data that could be easily retrieved.  We have nothing on the

19  sample and --

20          THE COURT:  So, at the moment you're proceeding with

21  the named plaintiffs only?

22          MR. WEAVER:  Those are the only people we have data

23  for.  Basically, what we have received in discovery so far is

24  data for the named plaintiffs and policy manuals and a few

25  sample reports internally, including two audit reports that

1    were produced a couple of weeks ago.

2              THE COURT:  Sample reports about what?

3              MR. WEAVER:  Audits that the government did of the

4    HAMP program, audits that the Treasury Department performed.

5    There has been a lot of back and forth on that, your Honor.

6    I'm not sure our discussions about the audit reports are

7    completely over with.

8              THE COURT:  Okay.  Let me hear from Mr. McGarry on

9    this and I'm come back to you.

10             MR. McGARRY:  Your Honor, of the --

11             THE COURT:  Let me start at the last one.

12             MR. McGARRY:  Sure.

13             THE COURT:  I do believe that we talked about your

14   producing a pile of stuff with respect to a sample.

15             MR. McGARRY:  Correct, your Honor.  The Court ordered

16   the parties to -- the Court ordered Bank of America to produce

17   a sampling based on specific discovery requests that the

18   plaintiffs had propounded, discovery request number two from

19   the first request for production.

20             THE COURT:  And was that done?

21             MR. McGARRY:  It was not because your Honor ordered

22   the parties to confer about the number of the sample and we

23   did that and agreed eventually on the number of the sample,

24   and you ordered us to confer on the actual data points

25   requested because there was a discussion, I want to say, two

1   scheduling conferences ago in which --

2           THE COURT:  This is the February one?

3           MR. McGARRY:  No.  It was after the February --

4           THE COURT:  March one?

5           MR. McGARRY:  The February one your Honor ordered the

6   sampling and ordered the parties to further meet and confer on

7   narrowing the sample request.  Various discussions with

8   counsel later, the issue came up again, I believe it was two

9   scheduling conferences ago, and at that point for the -- the

10  defendant learned, at least from our perspective, for the

11  first time that the plaintiffs wanted specific types of data

12  and in a specific form, different from what had been produced

13  for all of the named plaintiffs.

14          THE COURT:  My notes indicate that there was a

15  remaining problem with respect to the data for class members

16  and the sample and that the parties agreed on the number, but

17  not on the methodology for randomizing and what data was to be

18  produced.

19          MR. McGARRY:  That's exactly right, your Honor, and

20  you ordered us to confer further on it, which we did.  The

21  plaintiffs sent us a list of specific pieces of information

22  that they requested as data points.  In other words,

23  reasonably-retrievable electronic data points.  And we

24  responded with a series of questions about those data points,

25  and the plaintiffs declared an impasse, and we're here.

1          Now, I'm happy to talk about them in much more
2     specific --
3          THE COURT:  So, with respect to the production of
4     these -- of the data, there is no reason not to order that
5     such production should take place.  And then the only question
6     is what the data points are.
7          MR. McGARRY:  And in fairness to the plaintiffs, your
8     Honor, I think you already ordered that the production should
9     take place and you ordered the parties to confer on what those
10    data points should be and what the size of the data --
11         THE COURT:  Right.  So, how do we resolve the data
12    point issue?
13         MR. McGARRY:  Well, your Honor, I would suggest that
14    we -- you know, the plaintiffs constantly accuse us of not
15    producing data dictionaries and telling us they don't know
16    what information we have, when, in fact, four months ago --
17         THE COURT:  Well, they're probably right.
18         MR. McGARRY:  Well, four months ago we produced the
19    data dictionary from the primary source that the bank uses to
20    track and report on HAMP modifications, and there has been no
21    attempt whatsoever by the plaintiffs to actually ask for any
22    of those data points.
23         Instead, what they asked for is broad categories of
24    information which are in some cases accessible and we have a
25    declaration that we submitted in connection with our

1    opposition that says we can give you these five, these seven

2    points, whatever they are, and then there are other categories

3    of information which are described so broadly that they either

4    can't be retrieved reasonably through an electronic search

5    mechanism, which is the whole point of the sampling, is to

6    reduce the burden on both parties to have to reduce -- to

7    review hardcopy documents, or there's not enough information

8    that we have from the plaintiffs in order to determine whether

9    or not certain data points or certain categories of

10   information can be retrieved as data points.

11          THE COURT:  So, the -- what you gave to the

12   plaintiffs are 25 categories of data points, or what?

13          MR. McGARRY:  No.

14          THE COURT:  I'm sorry, I'm not speaking the correct

15   language here --

16          MR. McGARRY:  That's okay.

17          THE COURT:  -- because I don't know it.

18          MR. McGARRY:  So, the plaintiffs requested of us --

19   so, remember, your order --

20          THE COURT:  But you gave them something in return

21   and --

22          MR. McGARRY:  We gave them -- right around the same

23   time we gave them what's called a data dictionary, which

24   essentially lists fields of information that can be retrieved

25   from various sources.

1          THE COURT:  For example, what is a field?

2          MR. McGARRY:  For example, the date that a HAMP trial

3   plan was mailed.

4          THE COURT:  Okay.

5          MR. McGARRY:  The one that Mr. Weaver referred to,

6   the date that an adverse action letter; in other words, the

7   denial letter, was sent, and there are -- those are a few

8   examples.  There are something like 75 different data points

9   on that data dictionary that come out of the primary source

10  that the bank uses to track and report on HAMP modifications.

11         But instead of getting a response point by point, we

12  want these ten or these 20 or these 50 data points that could

13  in fact be retrieved, we have sort of broad categories of

14  requests for information, which (A) as we put in the

15  declaration of Michael Sunni (phonetic) submitted in

16  connection with these papers, many of them can't be retrieved

17  on a -- as a data point, and a lot of them are broader than

18  the actual document request that generated the -- your Honor's

19  order that we produce the sample in the first place.  So, your

20  Honor directed us to narrow and the plaintiffs expanded, from

21  our perspective.

22         THE COURT:  So, if the plaintiffs were to say we want

23  all 75 for the sample, all 75 terms in the data dictionary,

24  what would you do?  Say no?

25         MR. McGARRY:  No.  We would produce it.

```
 1              THE COURT:  Wait a minute.  One of you at a time.  I
 2     thought this was Mr. Weaver's issue.
 3              MR. WEAVER:  Your Honor, I think Mr. Klein has some
 4     information that I am not privy to regarding what sort of
 5     central database Bank of America might have.  So, if you allow
 6     me to defer to him for a moment to explain to you something
 7     that I, frankly, can't explain.
 8              THE COURT:  All right.
 9              So, Mr. Klein, why can't you use the data dictionary
10     that they have given you?
11              MR. KLEIN:  There's a number of issues here that are
12     tied together, your Honor, and it isn't that Mr. Weaver isn't
13     privy to all the information about this case that I know.
14     It's that -- because I've litigated against Bank of America in
15     a variety of contexts over a number of years that --
16              THE COURT:  Tell me.  Why can't you proceed to what
17     you need on the basis of the bank's data dictionary?
18              MR. KLEIN:  Here's the answer.  This is a bit of a
19     cat-and-mouse game.  The data dictionary plainly does not
20     include every item of data that's relevant to this case.  The
21     data dictionary, your Honor, is a summary of certain data
22     points related to a certain form of report that Bank of
23     America uses in its HAMP processing, but the reality is there
24     are probably several thousand data points that Bank of America
25     maintains on any -- in its database that are relevant to HAMP
```

1      processing.

2             So, what's happened here, your Honor, is we sent a

3      request for production and, like you, we don't have the

4      information Bank of America has.  It lists categories of

5      information, and when Mr. McGarry says we've expanded and not

6      narrowed, that's not true at all.  What we've done is we've

7      tried to work with what --

8             THE COURT:  I don't want to hear the nah, nah, nah.

9      I just want to understand what it is that you need and what it

10     is that the bank is willing to give you.

11            Assume for the moment that you take these 75 data

12     points or these 75 terms, or whatever you call them, in the

13     dictionary.  Why can't you start with that and then decide,

14     once you see what is there, what else you may need?

15            MR. KLEIN:  Well, first of all, Mr. McGarry never

16     offered us the 75 data points and, in fact --

17            THE COURT:  He just did.

18            MR. KLEIN:  That would be helpful and it would be a

19     start.

20            THE COURT:  So, why don't you start with that?

21            MR. KLEIN:  Because there's still a problem, your

22     Honor.  The data dictionary that he's talking about is not a

23     data dictionary that covers the entire range of data that is

24     applicable to HAMP -- Bank of America's processing of HAMP

25     applications.  It covers one certain form of reporting.  It

1    does not include all the milestones that are relevant to the

2    problems that borrowers had.

3            For example, as I understand the data dictionary Mr.

4    McGarry is talking about, it doesn't include information from

5    vendors about when borrowers were told about certain problems

6    with their application, much of which happened long after --

7            THE COURT:  By vendors you mean contractors?

8            MR. KLEIN:  Vendors and contractors I'm using

9    interchangeably.

10           The vendors are third parties that Bank of America

11   used, for example, to contact borrowers about problems with

12   their HAMP application.  In our -- based on what our clients

13   have told us, what the plaintiffs have told us and what we can

14   see in the data that we do have, which is the Treasury data,

15   much of the correspondence about what was deficient in a

16   particular borrower's application happened long after Bank of

17   America's duty of performance under the TPP arose.

18           And so, what we're looking for is a series of data

19   that includes all of the information, not just about the form

20   of communication between borrowers and Bank of America, but

21   also the dates of that communication, because the dates are

22   entirely relevant to the theory of the case, which is Bank of

23   America didn't timely act within the time limits set by their

24   agreements with borrowers.

25           THE COURT:  But I don't understand why if they're

1    offering you data that is apparently relevant, although in

2    your eyes not complete, why you don't take that and then use

3    it to decide exactly what more you need.

4        MR. KLEIN:  We couldn't take it because it wasn't

5    offered until we came here today.

6        THE COURT:  Well, they gave you the dictionary to

7    look at and tell them what you wanted, and I guess you didn't

8    get the --

9        MR. KLEIN:  But the dictionary is not -- it's not by

10   any stretch of anyone's imagination -- I don't think Mr.

11   McGarry would represent to you that it is a complete data

12   dictionary of all of the data that Bank of America maintains,

13   not just on the plaintiffs, but on all of the borrowers --

14   affected borrowers' processes under HAMP.

15       So, a good deal of what we've been fighting back and

16   forth and, frankly, what you ordered, goes well beyond the

17   data points in that data dictionary.

18       So, we could accept that.  I guess it would give us a

19   start.  I think it would actually lengthen the time that we

20   need because we would have to look at what they give us.  They

21   claim it would take months to produce it.  They give it to us

22   in January and then we'd have to wait and look at it and have

23   our experts look at it and then come back to you and say,

24   Well, this doesn't include these other 75 data points that

25   they claim they have based on deposition testimony, based on

1    other reports that we've seen and now based on a declaration

2    that we didn't even -- we didn't even have in our meet-and-

3    confer process.  Until we filed this motion, we were in the

4    dark about some of the issues that they're first presenting to

5    the Court in the context --

6            THE COURT:  Well, are you now prepared to answer

7    those difficulties that they point out in their affidavits?

8            MR. KLEIN:  Frankly, I don't think they are

9    difficulties.  They have not in any way established for me any

10   more than that these are asserted difficulties.  The issue is

11   that they've got a database.  They know what's in the

12   database.  They know how to pull information from their

13   database.  They've actually done some work in the last few

14   years to simplify this process of using relevant data because

15   they moved it into a Microsoft sequel database, which is

16   easily searchable.  In fact, the whole change to their

17   processing of this data is to make the data more accessible

18   and not less accessible.  So, much of their assertion before

19   the Court we think is essentially bogus.

20           THE COURT:  Okay.  I don't know where you want to

21   continue.

22           MR. McGARRY:  Let me start with the end there.

23           The person at Bank of America who is most

24   knowledgeable about retrieving data points from various

25   systems -- Mr. Klein suggests to your Honor, and I would say

1    somewhat sheepishly, that there is a database, that everything

2    that Bank of America does is contained in a database and it

3    can easily be queried, which is simply not true and, in fact,

4    we put in a declaration from the person who would go and try

5    to do these things or coordinate any searching.

6          Now, there is a database -- and Mr. Klein is correct

7    -- where Bank of America has assembled sort of the primary

8    pieces of data that it uses in its internal analysis and its

9    reporting for the MHA program, the HAMP program.  That's the

10   database for which we provided the data dictionary.  Now --

11         THE COURT:  Does the dictionary take care of all

12   possible things that the database might produce?

13         MR. McGARRY:  No.  Well, the dictionary lists

14   everything -- every field that is available in the database,

15   in this particular database.  I mean, there's not -- every

16   field is not going to be complete for every borrower and that

17   sort of thing and it's going to change over time, but the --

18   and I think it's 75.  It might be 72.  It may be 78.  I may be

19   off by a few, but the 75 pieces of information can be pulled

20   for each of the 3,000 people in the sample.

21         What Mr. Klein is referring to in terms of

22   communications, oral communications, written communications,

23   that material is not in -- well, I shouldn't say that.  There

24   are data points that do reflect certain dates of

25   communications.  So, if a borrower got declined for a

1    modification, there's a data point that will tell you the date

2    of the decline.  There is a data point that will tell you the

3    date that a borrower got a missing-information notice or an

4    incomplete-information notice or something along those lines,

5    but the notice itself is not in the database.  What's written

6    in it is not in the database.

7         The communications with borrowers are typically

8    reflected in the bank's servicing records, which are not --

9    they can be produced and we've produced them for all of the

10   named plaintiffs, but they can't be produced in a nice

11   easy-to-sort, easy-to-read spreadsheet.

12        And so, if the plaintiffs want the bank's records of

13   communications with borrowers, we can give them that, but it's

14   the information that they've rejected earlier because they

15   want it in a format that we just can't provide it in.

16        THE COURT:  Are you still prepared to give them in --

17   give those documents or those -- that data for the sample in

18   the way in which you have it?

19        MR. McGARRY:  Yes.  It's a very time-consuming

20   process because they have to be manually retrieved and

21   reviewed and produced, but, yes.

22        THE COURT:  Are you prepared to do that?

23        MR. McGARRY:  Yes.

24        MR. KLEIN:  I have to say, I'm a little bit at a

25   loss.  It's not manual --

1          THE COURT:  As I understand it, what Mr. McGarry is

2    proposing is to produce the -- I've forgotten what you call

3    them, the files.

4          MR. McGARRY:  The servicing records.

5          THE COURT:  The servicing record of each member of

6    the sample.

7          MR. KLEIN:  And, your Honor, that's something that we

8    don't want.  So, what we do want is what he's promised, which

9    is -- for the first time today he said, We'll give you the

10   information in this database for all of the borrowers.  And,

11   frankly, his offer to give us essentially all of the

12   information --

13         THE COURT:  Wait a minute.  What are you talking

14   about now, the 75 data points of the dictionary?

15         MR. KLEIN:  The 75 data -- right.  Right.

16         THE COURT:  You're now prepared to take it?

17         MR. KLEIN:  Well, we're prepared to take it, but I

18   want to point out that there is something on which Bank of

19   America is consistently hiding the ball here, which is that we

20   now have evidence in the form of deposition testimony that in

21   addition to what's in this database, they also have

22   retrievable records.

23         For example, when they direct their vendor to send

24   out a particular missing-information letter, the form of that

25   letter is coded into their system.  That is, the vendor

1    doesn't get a narrative saying, Send out this letter saying

2    you're missing your tax return.  There's a code that tells the

3    vendor what letter goes out and that's a form and that's not,

4    as I understand it, maintained, unless I'm -- I guess I could

5    be wrong because they have the database and we don't and

6    that's where the frustration lies here, but my understanding

7    is that is separate, but also retrievable, as well as the

8    information that comes back to the -- from the vendor to Bank

9    of America saying, We sent out the letter you directed us to

10   send on a given day.

11          THE COURT:  Is that the only thing that you're

12   missing from the 75 or 72 or 78 data point dictionary?

13          MR. KLEIN:  I think that would -- that combination of

14   things would be a very good start.  I can't say as I stand

15   here because I haven't seen what is the database.

16          THE COURT:  Well, why don't you take what he's

17   offering?

18          MR. KLEIN:  Right.  That's fine, we'll take what he's

19   offering, but I want that to be a starting point and not the

20   ending point.

21          THE COURT:  So, it is agreed now that you will give

22   them all of the stuff that is encompassed with the 75, 72, 78

23   data point dictionary.

24          MR. McGARRY:  Yes.

25          THE COURT:  Okay.  So, that's number one.

1      Mr. Klein and Mr. Weaver are happy to take it, but

2 they think they may want more and when they decide what more

3 they want, they will tell you as precisely as they can and

4 then you can fight over it, or whatever, or produce it.

5      And, as I understand it, the "more" as best as they

6 now know is communications between the bank and the

7 contractors concerning particular accounts within the sample,

8 not the named plaintiffs, but the sample; is that right?

9      MR. KLEIN:  That's correct, your Honor.

10      THE COURT:  Okay.

11      MR. KLEIN:  It's those pieces of information that

12 have been reduced to data points but are maintained in other

13 systems.

14      THE COURT:  So, that should take care of your Item B

15 in your brief, correct?

16      MR. WEAVER:  That's correct.  I think it's Item C,

17 your Honor, but it's one of the items that has been resolved.

18      THE COURT:  (C) is produce a randomly-selected sample

19 of account files.  (B) is complete data regarding class

20 members.

21      MR. WEAVER:  Yes.  Your Honor, (B) is the -- (C) had

22 to do with the random sample.  (B) has --

23      THE COURT:  Okay, (C).  We have now dealt with (C).

24      MR. WEAVER:  Yes.

25      THE COURT:  And we understand with respect to (C),

1    the bank will produce the data encompassed within the

2    dictionary that they have furnished to the plaintiffs.  The

3    plaintiffs may come back and say, We need additional data, but

4    based on the dictionary, they are more likely to be able to be

5    highly pinpointed, right?

6             MR. WEAVER:  I believe so, your Honor.

7             THE COURT:  And then you will look at what additional

8    they want and decide how you can produce it, if you can

9    produce it.

10            MR. McGARRY:  Understood, your Honor.

11            THE COURT:  Okay.  So, that takes care of (C), all of

12   (C), right?

13            MR. WEAVER:  That's correct.  And then --

14            THE COURT:  Now we come back to the email search.

15            MR. WEAVER:  Yes.

16            THE COURT:  Where are we on that, Mr. McGarry?

17            MR. McGARRY:  The -- well, we're no further in than

18   the parties have put in their briefs.  So, let me summarize,

19   if I can.

20            The plaintiffs propounded a request for emails for 24

21   custodians with 274 search terms across the custodians.

22            THE COURT:  What's the definition of "custodian"?

23            MR. McGARRY:  An individual person.  So, it would be

24   emails sent, received, forwarded by an individual person.

25   So, there's a list of 24 names that the plaintiffs have asked

1   for --

2            THE COURT:  Of people who have sent emails and

3   received them?

4            MR. McGARRY:  Correct.

5            And the -- and then there are 274 search terms,

6   including all source of derivatives of expletives and lots of

7   non-case specific information.  You know, the most case-

8   specific things, say, like, you know, HAMP with five of

9   modification, you know, other extremely vague terms.  So that

10  the problem -- there are a number of problems.  One is -- and

11  we have a detailed declaration from the Bank of America person

12  who is responsible for doing --

13           THE COURT:  This is Sunni (phonetic) or something

14  like that?

15           MR. McGARRY:  I'm sorry?

16           THE COURT:  Who is the affiant?

17           MR. McGARRY:  It is Mr. Daniel, Robert Daniel.

18           THE COURT:  Okay.

19           MR. McGARRY:  Mr. Daniel is the person at Bank of

20  America who is charged with overseeing exactly this type of

21  process.  Bank of America is a big company.  They get sued.

22  They have to do email searches from time to time.  He's the

23  guy who oversees this process.

24           We have a detailed declaration that describes the

25  process, the time and the cost associated with retrieving the

1    number of -- the emails from the number of custodians that the

2    plaintiffs have requested and the number of terms that they

3    have requested and the -- so, the plaintiffs sent us this

4    request.  We responded by letter concerned that it was

5    overbroad, although he's not here today.  So, I feel a little

6    bit like piling on suggesting it.  In the telephone

7    conversation we had with plaintiffs' counsel the day before we

8    received the letter -- Ari Brown is not here today -- told me

9    we would find it overly broad and unreasonable.

10         We got it.  We did.  We wrote a letter that said, You

11   got to do something with this.  This is too broad.  We got

12   another letter like the one we got on sampling that said, We

13   disagree.  We're at an impasse.

14         So, where we are today is the plaintiffs would like

15   us to produce email that would cost between $3 and $6 million

16   to retrieve and produce and would cost tens -- would take tens

17   of thousands of hours to retrieve and produce, and all the

18   information about that process is set forth in the

19   declaration.

20         Now, to just jump back to where your Honor started

21   the hearing, what does this have to do with class

22   certification?  The plaintiffs have not articulated a single

23   thing to my knowledge that would indicate what the email

24   searches -- as distinguished from the sampling, which I think

25   we agree is targeted toward class certification.  I've not

1   heard any argument as to why the email retrieval has anything

2   to do with class certification.

3           Your Honor recalls, the class -- the only class

4   defined in this case that is not tied to a cause of action

5   that your Honor has dismissed is, essentially, trying to

6   define borrowers who received a trial plan, made their

7   payments and didn't get a HAMP modification or didn't get a

8   timely denial under the plaintiffs' view.  That's the class.

9   What searching 24 people's emails at the cost of $3 to $6

10  million over thousands and thousands of hours is going to do

11  to accomplish the plaintiffs' goal of proving class

12  certification is beyond me.

13          THE COURT:  All right.  Mr. Weaver.

14          MR. WEAVER:  Your Honor, I just want to talk

15  generally about email.

16          Bank of America has not produced a single email.

17  They haven't searched for a single email in this case.  Email

18  is the standard communication of business.

19          THE COURT:  I know, but email is so endemic, that

20  there has to be some definition of what emails.  Even I, who

21  is not in the email business, get, I don't know, a lot every

22  day.  In fact, I have gotten to the point where I simply

23  eliminate email before I start.  They just go.

24          MR. WEAVER:  I get a lot of email too, your Honor.

25          THE COURT:  My trash is huge.

1          So, you know, there are bound to be a lot of emails

2    with 24 custodians that have nothing to do with anything.

3          MR. WEAVER:  That's correct.

4          THE COURT:  Now, I think that there is a reason that

5    it is appropriate to focus primarily on class certification

6    because if, in fact, class certification doesn't succeed, I

7    think that's pretty much the end of the lawsuit.  You know,

8    then we can focus on the named plaintiffs and finish with

9    that, but class certification you've got to do in order to

10   really continue with this lawsuit, as a practical matter;

11   isn't that right?

12         MR. WEAVER:  Your Honor, let me just say even without

13   class certification, we still have approximately 60 people at

14   issue in this case.

15         THE COURT:  All right.  But 60 is a lot different

16   from hundreds.

17         MR. WEAVER:  That's correct.  And this information is

18   still --

19         THE COURT:  It's a national class we're talking about

20   for HAMP purposes, isn't it?

21         MR. WEAVER:  That's correct.  This is still going to

22   be relevant to their claims, your Honor.  So, this is --

23         THE COURT:  It may be, but we need to focus.  We need

24   to focus.  There may be more stuff later on, but right now it

25   is important to get over the hump of class certification, it

1    seems to me.  I mean, that's what we've been working on.

2            MR. WEAVER:  We have given a focused request.

3            Now, let me tell you specifically what we requested.

4    We sent them a letter with specific custodians we have

5    identified through discovery and a list of terms and said,

6    Please get back to us and work with us on this.  We also

7    proposed that they run a search and if there were terms that

8    were coming back with too many emails, we confer about that

9    and we talk about which -- and then we can eliminate some.

10           Their response was, No, this is too much.  We aren't

11   going to respond.  Try Again, your Honor.  And we're trying --

12   we are mindful of the burden, but at the same time, your

13   Honor, the real information in this case lies in this email.

14           There are witnesses who have been testifying that

15   they can't really remember things, but they think if they look

16   back at their email, if they had their email, they might have

17   that PowerPoint from that meeting in which they set up HAMP,

18   but they don't have it.  So, they can't really remember it.

19           THE COURT:  Well, based on what the defendants

20   apparently gave you, the 24 custodians and whatever surrounded

21   it, you cannot with that go back to them and tell them which

22   of the 24 custodians and/or what they said they would have to

23   produce in response to your requests for $3 to $6 million?

24           MR. WEAVER:  To be clear, they didn't give us

25   anything, your Honor.  We gave them a list of 24 custodians

1    and a list of proposed search terms, along with a protocol

2    that said, Hey, if you run these terms and some of them come

3    back with huge amounts of documents, tell us, show us the

4    numbers, because we aren't interested in reviewing somebody's

5    spam from, you know, the store that sent them something.  We

6    only want the relevant documents.  They only want to produce

7    the relevant documents.

8            THE COURT:  Would it be helpful if I were to appoint

9    a discovery master who sat with you while you guys talked to

10   each other?

11           MR. WEAVER:  It might help to have a magistrate, your

12   Honor.  I understand that this is -- that we're burdening you

13   with an awful lot.

14           THE COURT:  No, it's not a question of burdening me.

15   It's just that one side says he gave you stuff and you should

16   have come back and he said to come back, and the other side

17   said, You just threw it at us and there wasn't anything to

18   come back with.

19           I mean, if we're going to have conversations -- if

20   you're going to have conversations in which there is such

21   total disagreement, it might be helpful to have someone there

22   who can interpret.

23           MR. McGARRY:  Your Honor, if I can respond on your

24   last question.

25           THE COURT:  Mr. McGarry.

1          MR. McGARRY:  I think it may be helpful, but my

2   suggestion would be that the email issue in particular,

3   because -- I mean, Mr. Weaver conceded at the very beginning

4   of the argument today that the emails were, generally

5   speaking, not relevant to class certification, that they are

6   more focused on the merits.

7          So, I think it may be helpful at some point if we

8   continue to have communication difficulties, to have a

9   magistrate or a discovery master assist us with this process,

10  but my suggestion would be as to emails, that we get class

11  certification done first because the plaintiffs concede that

12  the emails aren't particularly relevant to class

13  certification.

14         As your Honor points out, that's the major obstacle

15  in the case.  That's the next major event that needs to occur

16  and whether your Honor grants or declines a class

17  certification motion is going to significantly impact what's

18  going to happen in terms of the merits, including the email.

19         THE COURT:  How would it be if I suggested that you

20  have these conversations and when you reach an impasse, you

21  call me, whenever.  You know, you're talking and you're

22  talking past each other or you're meeting -- one of you thinks

23  that you're meeting a wall that you can't get through, call.

24         MR. McGARRY:  From the defense perspective, your

25  Honor, we would always be open to that.

1          MR. WEAVER:  We can try that, your Honor.  I'm just

2     going to be frank with you.  Sometimes we aren't in agreement

3     that we're at an impasse.  Communication is sometimes

4     difficult and I'm not going to put the blame on one side or

5     the other for that.

6          THE COURT:  Have you tried talking -- doing it in

7     French?

8          (Laughter.)

9          MR. WEAVER:  I do want to address -- I have not

10    conceded that the email is irrelevant to class certification.

11    Certainly, there are a lot of merits issues in there, your

12    Honor, but, frankly, we don't know everything that's in there.

13    What we do know is in there, for example, are going to be

14    discussions about general policy that Bank of America set up

15    that are going to be applicable to the entire HAMP program

16    and, you know, I can't say for -- you know, this particular

17    document is in there and I know that this particular document

18    is going to relate to class certification in this way.

19         THE COURT:  You know, I don't think it's appropriate

20    for me to order them to produce emails that's going to cost

21    them 10,000 hours, or whatever, and $3 to $6 million.  I don't

22    think that's in the cards.  So, there has to be a way in which

23    this gets focused so that you get what you need and they can

24    produce it at, unquestionably, still a high cost, but not that

25    high a cost.

1          MR. WEAVER:  We haven't even gotten from the

2    defendants what they believe would be a reasonable search at

3    this point.

4          Your Honor, in other cases, in other HAMP cases,

5    including Judge Stearns in this court recently, have ordered

6    email production prior to class certification and --

7          THE COURT:  I'm not saying that I won't, but I'm not

8    going to order them to produce 24 custodians' worth of stuff

9    that they say will cost them $3 to $6 million to produce.  I

10   think that's unreasonable.  So, it behooves counsel to talk to

11   each other to try to narrow this.

12         I don't think it's appropriate to say that all emails

13   have to have relevance only to class certification because I

14   think that's essentially impossible.  There has to be some

15   leeway that takes it beyond class certification, but that's

16   the primary aim right now.

17         MR. WEAVER:  Your Honor, would you be willing to give

18   us the number of custodians and the number of search terms?  I

19   think that would help advance things considerably coming out

20   of here today.

21         THE COURT:  If I were to give you a number, it would

22   be totally arbitrary because I haven't the foggiest idea what

23   I'm talking about in this area.

24         What I am prepared to do is what I told you I was

25   prepared to do, which is you guys talk.  If you reach an

1    impasse or you start throwing things at each other, call me

2    instead.

3          MR. WEAVER:  We definitely haven't thrown things at

4    each other, your Honor.

5          THE COURT:  Well, that's good.

6          MR. McGARRY:  It's because those calls are done over

7    the phone, your Honor.  There may be that.

8          THE COURT:  I was speaking figuratively.

9          MR. McGARRY:  We understand.

10          MR. WEAVER:  I'm aware, your Honor.

11          THE COURT:  I mean, if you want, I'll appoint a

12    magistrate judge or a magistrate or somebody else, a discovery

13    master, to mediate these discussions and to try to get you to

14    the point where the bank produces some stuff that you need and

15    you're clear that you really need it.

16          MR. WEAVER:  I think I would defer to your Honor what

17    you think is best.  I do think that there are going to be

18    further impasses.

19          THE COURT:  No.  I want you to tell me what you want

20    me to do.

21          MR. McGARRY:  Your Honor, from the defendant's

22    perspective, I think the -- the spectre of having to call you

23    every time we have a dispute is likely to focus the parties on

24    actually getting somewhere to resolve the issue.  So, my

25    suggestion --

```
1              THE COURT:  That's what I was hoping.
2              MR. McGARRY:  My suggestion would be, your Honor,
3    that we take you up on your suggestion.
4              MR. WEAVER:  That's fine with us, your Honor.
5              THE COURT:  Okay.
6              MR. WEAVER:  I do think that maybe we should try to
7    set some deadlines for ourselves.
8              THE COURT:  Tell me what deadlines and I'll adopt
9    them.
10             MR. WEAVER:  Well, I --
11             THE COURT:  I think the first thing is for you to
12   look at what they have produced with respect to the email.  As
13   I understand it from Mr. McGarry, they told you what would be
14   involved in getting you what you asked for and that it would
15   be very expensive to do that and very time consuming to do it,
16   and let's talk about what it is that you really need out of
17   this, which would involve a discussion about -- partly about
18   what is available, you know, what the details are of what is
19   being offered and you're taking that into account in deciding
20   what it is that you want.  Maybe you cut down on the number of
21   custodians.  Maybe you cut down on the time period.  I don't
22   know.  I don't know enough about this.
23             MR. WEAVER:  Your Honor, we will look at that and we
24   will get back to the defendants no later than next Wednesday.
25   I would ask that they get back to us no later than a week
```

1    after that.

2              THE COURT:  Fine.

3              MR. WEAVER:  Let us know if there is any issue.

4              THE COURT:  Okay.

5              MR. McGARRY:  That's agreeable, your Honor.

6              THE COURT:  And then you can begin the negotiations

7    about this.  You have informed each other now.  You will give

8    them -- or you already have given them the 24 custodians and

9    all the stuff that -- and how much it would cost to do it.

10             MR. McGARRY:  The declaration is in the motion

11   papers.  They have it, your Honor.

12             THE COURT:  Okay.  So, you have now some information

13   about what the parameters of this request mean to the bank.

14             MR. WEAVER:  Some information, your Honor.  We have

15   reason to doubt that it actually would be that large or that

16   expensive.  I don't think it takes into account the

17   duplication and other things, but we will see if we can cut it

18   back in the interest of trying to move forward.

19             THE COURT:  Okay.  And then you will tell them within

20   a week after that.  So, we're talking about October --

21             MR. WEAVER:  24th, I believe, your Honor.  So, we

22   would get back to them by the 17th.

23             THE COURT:  Okay.  Yes, you will get back to them by

24   the 17th to tell them how you might tailor your requests to

25   accommodate what they say is a problem or where you perceive

1    it is not a problem, and by the 24th they will come back and

2    tell you to what extent they can, in fact, accommodate you,

3    and then the discussions can begin and at that point if you

4    need to call, call Ms. Urso, telling her that you want to talk

5    to me and we'll set a time as quickly as we can.  You know,

6    maybe immediately.  Maybe in an hour.  Okay?

7              MR. WEAVER:  All right.

8              THE COURT:  So that would take care of the emails,

9    which is item number -- which is the A item, right?

10             MR. WEAVER:  That's correct.

11             And if I could go to the issue of the sample that --

12   and when that's going to be produced and things that Mr.

13   McGarry has told us now he's going to produce on that.

14             THE COURT:  What sample are you talking about?

15             MR. WEAVER:  The Item C that we were talking about

16   earlier, the random sample of borrowers.

17             MR. McGARRY:  The data points that we discussed

18   earlier, your Honor.  I would say minimum of 30 days on --

19             THE COURT:  Well, give them what you have in 30 days

20   and tell them how much longer it will take to get the rest.

21             MR. McGARRY:  Okay.

22             THE COURT:  30 days would be November --

23             COURTROOM DEPUTY CLERK URSO:  9th.

24             THE COURT:  -- November 9th.

25             COURTROOM DEPUTY CLERK URSO:  Okay.

```
1            THE COURT:  Are you making notes of this?
2            COURTROOM DEPUTY CLERK URSO:  Yes.
3            THE COURT:  Are you making notes?  Because I've
4  stopped making notes.
5            COURTROOM DEPUTY CLERK URSO:  Yes.  So, 11/9 will
6  be --
7            THE COURT:  Also throw out stupid suggestions.
8            COURTROOM DEPUTY CLERK URSO:  Judge, what would 11/9
9  be?  What was that for?
10           THE COURT:  That's for producing the materials
11 underlying the 72, 5 or 8 data points in the dictionary.
12           So, now we have finished (A) and (B).  How about (C)?
13           MR. WEAVER:  I think we're on (B), your Honor.
14           THE COURT:  (B), right.  We did (A) and (C).  Now we
15 come to (B).
16           MR. WEAVER:  Yes.
17           Here's my understanding where things stand on (B).
18 What we are looking for are the data points for all class
19 members related to when they got a notice saying you are not
20 in the HAMP plan.  You don't meet it for whatever reason.  The
21 date on which that was sent.
22           THE COURT:  Who are the class members at this stage
23 for this purpose?
24           MR. WEAVER:  I'm sorry, your Honor?
25           THE COURT:  Who are the class members?  Because at
```

 1    the moment we -- I mean, I suppose we have, at best, a

 2    putative class.

 3              MR. WEAVER:  We have a putative class, your Honor.

 4              Basically, what they have gotten from the defendants

 5    is what they sent to the Treasury, okay?  A giant database of

 6    information that has a bunch of data points.

 7              One data point that database does not have is what we

 8    call a trial cancellation date, the date on which people were

 9    told, You're not going to be getting a modification.

10              From what I understand from the declarations they've

11    submitted in response to the briefing, that is a point of data

12    that is easily retrievable.  We want that point of data for

13    all the people who are list -- whose loans aren't contained in

14    the Treasury IR2 data, along with the loan identifier number

15    so we can --

16              THE COURT:  Simply the date of denial?

17              MR. WEAVER:  That's correct.  The date they were

18    informed of the denial.  The date the letter was sent out

19    saying, You're not getting a modification.

20              THE COURT:  Problem with that?

21              MR. McGARRY:  Well, the problem with that is only the

22    scope.  So, what we put in the declaration is that that

23    information could be retrieved in connection with the sample

24    of 3,000 borrowers.

25              What Mr. Weaver is talking about is a million

1    borrowers.  That's a completely different task, completely

2    different search, and I don't understand what -- if the whole

3    purpose of the 3,000 borrowers --

4              THE COURT:  Why can't it be for the 3,000, Mr.

5    Weaver?

6              MR. WEAVER:  We definitely need them for the 3,000,

7    your Honor.  Our concern --

8              THE COURT:  For the 3,000.  And then you would, in

9    any event, since we're working from the sample toward class

10   certification, have to extrapolate to the million, or

11   whatever.

12             MR. WEAVER:  I guess our concern would be that the

13   defendants are going to claim, Well, yeah, maybe that's true

14   for that sample, but it's not true for the universe you don't

15   have and --

16             THE COURT:  Well, at the moment we don't know that.

17   I mean, if they say that, then they're going to produce more

18   stuff.  But, as I understood it, the case for class

19   certification is to be built on the basis of the sample,

20   right?

21             MR. WEAVER:  Partially, your Honor, yes.

22             THE COURT:  So?  I mean, until they come back and say

23   that the sample is a no good sample because you don't have all

24   the information that you should have, then they should produce

25   more.

```
 1              MR. WEAVER:  I suppose I can defer this until we see

 2     what data points they produce for those people in this

 3     information.

 4              THE COURT:  You're going back to (C) now?

 5              MR. WEAVER:  Well, you're relating -- we're melding

 6     (B) and (C) at this point.

 7              THE COURT:  So, with respect to (B), you are, without

 8     prejudice, agreeing that the information of termination

 9     letters should be supplied for the sample only, not the

10     million or however many there may be.

11              MR. WEAVER:  I think we can do that.

12              THE COURT:  Initially.  We're talking about

13     initially.

14              MR. WEAVER:  Yes, initially.

15              THE COURT:  Okay.  So, can you do that?

16              MR. McGARRY:  Yes, your Honor.

17              THE COURT:  Okay.  What else do we have to do now?

18              MR. WEAVER:  Your Honor, there's another motion

19     before you that I don't know if you want to hear today.  It's

20     regarding the motion for protective order regarding

21     specifically some deposition testimony and whether it has been

22     properly designated as confidential.  I don't know if you're

23     prepared to hear that motion today or not.

24              THE COURT:  I haven't -- I don't know about that

25     motion.
```

1        MR. WEAVER:  Let me just tell you basically what the

2   motion is.  It primarily deals with the deposition of an

3   individual named Christopher Orris.

4        THE COURT:  How do you spell the last name?

5        MR. WEAVER:  O-r-r-i-s.

6        He works at -- I believe he still works at Urban, one

7   of the contractors that have been performing HAMP services for

8   Bank of America.

9        THE COURT:  Excuse me for interrupting.

10       Do you, by any chance, know the number on the docket

11   of that particular --

12       MR. WEAVER:  I believe I may.

13       MR. McGARRY:  Your Honor, the motion itself is 141.

14       THE COURT:  Okay.

15       MR. WEAVER:  And, essentially, the issue here, your

16   Honor, is that Mr. Orris gave substantial testimony regarding

17   -- regarding his experiences at Urban working on behalf of

18   Bank of America and specifically talked about how he was

19   instructed to -- and other people within his area at Urban

20   were instructed to wrongfully deny modifications to people on

21   false bases in order to basically churn them through the mill

22   as fast as possible.

23       He testified that, in fact, Bank of America

24   executives told him directly, in fact, told the entire

25   operation over at Urban, Your job is to get through these and

1    to get through them as fast as you can.  Basically, he

2    testified that this was true, even though it sometimes meant

3    that people would go into foreclosure.

4          Defendants marked all that confidential and we had a

5    meet-and-confer about why they had designated that as

6    confidential.  We still don't know what their actual argument

7    is, your Honor.  It's not a trade secret.  It's obviously

8    embarrassing.  It's something that they don't want to come

9    out, but it's not properly designated as confidential.

10         We aren't seeking to disclose, for example, any of

11   their policy manuals, any of their reports.  It's testimony

12   about what Mr. Orris himself observed and, frankly, we think

13   it's just the tip of the iceberg as far as what we're going to

14   find at -- regarding Bank of America's practices on this

15   program.

16              THE COURT:  Okay.

17              MR. WEAVER:  And that's essentially what the motion

18   is about from plaintiffs' perspective.

19              THE COURT:  Mr. McGarry.

20              MR. McGARRY:  Your Honor, this is my motion.

21         What I didn't hear Mr. Weaver say in that discussion

22   was why -- putting aside the propriety of the challenge to the

23   designation, how in any way the confidentiality designation

24   impacts the plaintiffs' ability to prosecute their case.  It

25   doesn't.  They have the information.  They've submitted under

1   seal to your Honor about it, but the motion for protective

2   order had citations under seal with respect to Mr. Orris'

3   testimony.

4        But stepping back, the Court entered a protective

5   order in this case.  The defendants produced documents, put

6   witnesses up for deposition and did not move to quash third-

7   party subpoenas because we have a protective order in place.

8   The whole purpose of a protective order is so that the parties

9   can engage in discovery without having to engage the Court

10  every time if there's some sort of dispute over

11  confidentiality.

12       The plaintiffs now focus on the deposition of Mr.

13  Orris, who they would like your Honor to lift our

14  confidentiality designations on.  Mr. Orris was a third-party

15  witness.  He is subject to his own confidentiality agreement,

16  which is in our papers, with Urban.  Urban is the vendor that

17  we talked about earlier.

18       Urban has an agreement with Bank of America whereby

19  all of its -- all of the information involving the processes

20  the parties use is confidential between the parties.  Bank of

21  America can't disclose it to other vendors that it uses.

22  Urban can't disclose it to anyone else.  Mr. Orris has his own

23  confidentiality agreement with Urban, as I said, which

24  furthers the parties' attempt to protect the confidentiality

25  of that relationship.

1          Now, it is -- there's no dispute.  The plaintiffs

2    don't challenge the validity of Mr. Orris' confidentiality

3    agreement with his employer.  They don't challenge the

4    validity of Bank of America's confidentiality agreement with

5    its vendor.  There is no dispute that Mr. Orris could not --

6    does not have the ability to go out and tell the world about

7    the work he was doing at Bank of America because he is under a

8    confidentiality agreement with his employer.

9          What the plaintiffs have done, they subpoena him

10   under Rule 45, force him to show up and testify and now

11   because they've done that, they want to undo his

12   confidentiality agreement and Urban's with Bank of America.

13   There is absolutely no way that this gentleman could provide

14   public information about his testimony and the plaintiffs are

15   back-ending the Rule 45 process and abusing it, in our view,

16   by taking the testimony and then asking the Court to make it

17   public.  No one else has sought to make it public, just the

18   plaintiffs.

19         There is a substantial body of caselaw that we

20   discuss in our papers, your Honor.  The plaintiffs argue, as

21   one typically would in this situation, that the courts are

22   generally open to the public, but the Supreme Court in the

23   Seattle Times case, the First Circuit in the San Juan Star

24   case, and others cited in our papers, talk about the fact that

25   discovery, discovery, is not necessarily and not typically the

1     type of information that is available to the public.

2           Mr. Weaver's recitation of what Mr. Orris testified

3     about we completely disagree with.  He not only

4     mischaracterized the testimony itself, but the -- it is our

5     view that the vast majority of that testimony, when put to it,

6     when the plaintiffs actually submitted as evidence in support

7     of case certification or summary judgment, or whatever, won't

8     pass basic standards of admissibility, but until your Honor

9     makes that determination, what the *Seattle Times* case says and

10    the *San Juan Star* case says is the general public doesn't get

11    the opportunity to review every deposition and review every

12    document produced and there is absolutely nothing in the

13    Public Right of Access Law to suggest that it does, because

14    the Public Right of Access has to do with decisions that the

15    court makes and the public's right to see what factors go into

16    the court's decision.  There is no substantive motion pending

17    before your Honor.  So, it is our contention --

18          THE COURT:  Well, the motion that is pending is your

19    motion for protective order.

20          MR. McGARRY:  Correct.

21          THE COURT:  Which is, as counsel suggested, No. 141

22    on the docket, followed by a memorandum and a bunch of

23    declarations.

24          MR. McGARRY:  That's correct, your Honor.

25          THE COURT:  No. 153 is the response to the motion by

1    plaintiffs, together with declarations -- with a declaration,

2    and then there is a memorandum in support of the motion, which

3    is No. 159 and a reply, No. 163.  Those are the documents I

4    need to look at, I think.

5              MR. McGARRY:  That's correct.

6              THE COURT:  Right?

7              MR. WEAVER:  Yes, your Honor.

8              THE COURT:  Okay.  So, is there anything else that

9    either counsel wishes to say about these documents which I

10   haven't seen?

11             MR. WEAVER:  I would just like to say, your Honor,

12   that the burden is on the defendants to establish good cause

13   for the confidentiality designation.  The burden is not on us

14   to explain why they haven't met it.  It's their burden to come

15   forward with something explaining why this has to be

16   protected.  All they've come up with is that they tried to

17   paper over their entire relationship with Urban and keep the

18   entire thing secret.  That's not sufficient, your Honor.

19             There are cases like *Seattle Times* that deal with the

20   First Amendment.  You'll see in the papers when you get to

21   them, there's a --

22             COURT REPORTER:  I'm sorry?

23             MR. WEAVER:  -- *Public Citizen vs. Liggett* case which

24   talks about the standard -- the good cause standard and the

25   burden, your Honor, but the burden clearly rests on the

1    defendants to tell -- to explain why this stuff is protected,

2    and it is admissible.  He's clearly testified that he was told

3    by Bank of America executives to wrongfully deny HAMP

4    applications.  This is a public program affecting thousands of

5    people and -- you know, I understand why they don't want it to

6    be public information, your Honor, but that doesn't entitle

7    them to blanket it over.

8         MR. McGARRY:  Your Honor, I just want to point out

9    with respect to Mr. Weaver -- and I will assume it was an

10   inadvertent misstatement, but the statement he just made about

11   Mr. Orris' testimony is absolutely untrue.  You can read it

12   for yourself.  It's there.

13        I will point out, your Honor, that the *Public Citizen*

14   case and every other case that the plaintiffs cite has to do

15   with a decision at the time of summary judgment or the *Public*

16   *Citizen* case was about a third party seeking information after

17   the lawsuit was dismissed.  So, the public access cases that

18   the plaintiffs are fond of reporting don't have anything to do

19   with discovery in general at the point in the case when there

20   is no substantive motion pending before the court or after.  A

21   number of the cases involve trade secret allegations where the

22   defendants have already shared the trade secret information,

23   so there was nothing left to protect.  If you actually read

24   the cases that the plaintiffs cite, none of them address this

25   issue here.

1          THE COURT:  Okay.

2          MR. WEAVER:  And, your Honor, I would encourage you

3   to look at Pages 184 and 185 of the Orris transcript to see

4   whether or not I have misrepresented --

5          THE COURT:  Do I have to read the ones before that?

6          MR. WEAVER:  I think it's pretty clear, that you'll

7   see that he testified he was instructed by Bank of America.

8          THE COURT:  Okay.  So, apart from that, which I will

9   need to look at, we have now resolved, I think, all of the

10  issues on the motion to compel in one way or another.  Not

11  resolved them, but gotten to a way of dealing with them.  And

12  I will wait to hear from you if you run into problems on (A).

13  (B) I think you -- we have also addressed, and (C) is done

14  with time limits, and such.

15         MR. WEAVER:  That's correct, your Honor.

16         THE COURT:  What else can I do today to make your

17  lives happier?

18         MR. WEAVER:  I think that's it for now, your Honor.

19         THE COURT:  Well, I'm much relieved.  Thank you.

20         MR. McGARRY:  Thank you, your Honor.

21         MR. BROWN:  Thank you.

22         THE COURT:  Let me ask you one other thing.

23         With respect -- we have sort of fallen behind in our

24  periodic meetings about where we are.  I suppose we should

25  wait for the next two weeks and see how the discovery develops

1    and then I should schedule another telephone conference to see

2    what needs to be done in order to move these cases along.

3           MR. WEAVER:  Your Honor, I don't think it hurts to

4    have another schedule -- another conference scheduled.  I

5    think it might actually help discussions further.

6           THE COURT:  But I think it would be -- it would be

7    useful to wait until the two weeks are up for the things that

8    you're going to be doing.  So, maybe in about three weeks we

9    should schedule another meeting by telephone and at that time

10   you will also let me know what, if any, settlement discussions

11   you have, right?

12          MR. McGARRY:  Certainly, your Honor.

13          THE COURT:  Which would be very helpful.

14          MR. WEAVER:  I think that will be a very brief

15   discussion, your Honor.

16          THE COURT:  Well, talk to each other.  I mean, it

17   shouldn't be brief.  These cases are settling all over the

18   place.  I don't know why people want to spend a whole lot of

19   money litigating this one when others -- the same defendants

20   are settling.

21          MR. WEAVER:  I agree, your Honor.

22          THE COURT:  Thank you.

23          MR. McGARRY:  Thank you.

24          MR. BROWN:  Thank you, your Honor.

25          (Adjourned, 10:40 p.m.)

```
 1                    C E R T I F I C A T E

 2            I, Catherine A. Handel, Official Court Reporter of

 3    the United States District Court, do hereby certify that the

 4    foregoing transcript, from Page 1 to Page 50, constitutes to the

 5    best of my skill and ability a true and accurate transcription

 6    of my stenotype notes taken in the matter of Civil Action No.

 7    10-MD-2193-RWZ, In Re Bank of America Home Affordable

 8    Modification Program (HAMP) Contract Litigation.

 9


10
      October 17, 2012      /s/Catherine A. Handel
11    Date                  Catherine A. RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```