UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL No. 2193 **Centralized before the Honorable Rya W. Zobel** |
| This Document Relates To: ALL ACTIONS | |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

*REDACTED*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................2

        A.      Each class members satisfied a Trial Period Plan Agreement................................2

        B.      Bank of America failed to properly administer its duties under HAMP ................4

        C.      Bank of America issued wrongful denials *en masse* to reduce its
                HAMP backlog .......................................................................................................6

        D.      Bank of America kept meticulous internal records.................................................9

        E.      Bank of America's records regarding Plaintiffs Antoun and Sabah Moussa
                exemplify many of the flaws about which employees testified.............................10

III.    ARGUMENT .........................................................................................................11

        A.      Plaintiffs Seek Certification of Liability Issues for 26 State Classes ...................11

        B.      Rule 23(c)(4) Specifically Authorizes Certification of Common Issues
                of Liability ............................................................................................................12

        C.      Plaintiffs Satisfy Rule 23(a) on Issues of Liability..............................................14

                1.      The Classes are ascertainable and sufficiently numerous.........................14

                2.      The issues plaintiffs seek to certify are common to each Class member...15

                3.      The claims of the Class Representatives are typical of those of
                        the classes..................................................................................................17

                4.      Plaintiffs are adequate representatives of the classes ...............................18

        D.      Plaintiffs Satisfy Rule 23(b) for Issues of Liability .............................................18

                1.      Plaintiffs satisfy 23(b)(3) ..........................................................................18

                        a.      Common issues predominate on all questions of liability. ...........19

                        b.      A certification of state classes for liability is both manageable
                                and superior to thousands of individual actions litigating
                                the same issues ................................................................................20

        E.      The Court Should Appoint Hagens Berman Sobol Shapiro LLP and Klein
                Kavanagh Costello LLP as Class Counsel............................................................25

IV.     CONCLUSION......................................................................................................25

010176-16  613150 V1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Allstate Ins. Co.*,
    400 F.3d 505 (7th Cir. 2005) ...............................................................13

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985) ...............................................................18

*Bobbitt v. Acad. of Ct. Reporting*,
    252 F.R.D. 327 (E.D. Mich. 2008) .......................................................20

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ................................................................13

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013)..................................................................13, 19

*Donovan v. Philip Morris USA, Inc.*,
    2012 U.S. Dist. LEXIS 37974 (D. Mass. Mar. 21, 2012).......................14

*Dupler v. Costco Wholesale Corp.*,
    249 F.R.D. 29 (E.D.N.Y. 2008) ...........................................................19

*Gintis v. Bouchard Transp. Co., Inc.*,
    596 F.3d 64 (1st Cir. 2010)..................................................................21

*Gooch v. Life Investors Ins. Co. of Am.*,
    672 F.3d 402 (6th Cir. 2012) ..............................................................16

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) ..............................................................13

*Levya v. Medline Ind., Inc.*,
    __ F.3d __, 2013 WL 2306567 (9th Cir. May 28, 2013)........................20

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998).............................................................................22

*Matamoros v. Starbucks Corp.*,
    699 F.3d 129 (1st Cir. 2012)...........................................................14, 21

*In re McKesson Gov'tl Entities Average Wholesale Price Litig.*,
    767 F. Supp. 2d 263 (D. Mass. 2011) ..............................................12, 17

*McReynolds v. Merrill Lynch*,
    672 F.3d 482 (7th Cir. 2012) ..............................................................23

*In re Motor Fuel Temperature Sales Practices Litig.*,
   2013 U.S. Dist. LEXIS 50667 (D. Kan. Apr. 5, 2013).....................................................13, 19

*In re Nassau Cnty. Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006)...................................................................................13, 19

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*,
   248 F.R.D. 363 (D. Mass. 2008)...........................................................................12

*In re One Bancorp Sec. Litig.*,
   136 F.R.D. 526 (D. Me. 1991)...............................................................................12

*Pella Corp. v. Saltzman*,
   606 F.3d 391 (7th Cir. 2010) ................................................................................13, 24

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
   252 F.R.D. 83 (D. Mass. 2008).............................................................................20

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001)..................................................................................24

*Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*,
   711 F.3d 675 (6th Cir. 2013) ................................................................................19

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
   323 F.3d 32 (1st Cir. 2003)....................................................................... *passim*

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
   2012 U.S. Dist. LEXIS 178793 (D. Mass. Dec. 18, 2012).....................................14

*Tardiff v. Knox Cnty.*,
   365 F.3d 1 (1st Cir. 2004)....................................................................12, 21, 23

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
   2005 U.S. Dist. LEXIS 29656 (D. Mass. Nov. 28, 2005) ...........................15, 19, 21

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ................................................................................13, 19

*In re VISA Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)..................................................................................13, 23

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011).........................................................................................15

*Wallace v. Powell*,
   2013 U.S. Dist. LEXIS 69001 (M.D. Pa. May 14, 2003).......................................13

*Young v. Wells Fargo Bank, N.A.*,
  __ F.3d __, 2013 U.S. App. LEXIS 10189 (1st Cir. May 21, 2013) ..................................4, 16

**STATUTES**

28 U.S.C. § 1407(a) .............................................................................................................21

**OTHER AUTHORITIES**

Rest. (Second) Contracts, §§ 84, 242..........................................................................16

010176-16  613150 V1

## I.      INTRODUCTION

In early 2009, Bank of America ("BoA") received more than $45 billion in government

bail-out money.  BoA was thus required to participate in the Home Affordable Modification

Program ("HAMP") – a program designed to stem the foreclosure crisis by providing affordable

mortgage modifications to eligible homeowners.[1]  Despite that, BoA actively sought to thwart

the program's goals and prevent eligible borrowers from receiving promised modifications.  This

case involves a fraction of those who BoA precluded from securing an affordable modification.

Each proposed class member received and executed a Trial Period Plan Agreement

("TPP" or "TPP Agreement").  Though BoA did not find any borrowers' performance deficient

in the time required under the TPP Agreement, no proposed class member received the

permanent modification due under the TPP Agreement.  The evidence shows that BoA schemed

to modify as few mortgages as possible.  In the process, BoA deceived homeowners.

Plaintiffs seek to certify liability under Rule 23(c)(4) on behalf of 26 state-wide, issue-

classes that are comprised of people who received a TPP, made their payments, but did not

receive the permanent modification BoA promised.  The proposed classes satisfy each of the

required elements of Rule 23.  Certification of liability issues will make this litigation

manageable, whereas a denial of certification would cause confusion, massive waste, and

widespread injustice.  BoA's own electronic data allows Plaintiffs to ascertain which customers

are class members.  While the ultimate damages each class member suffered may vary, all

members of each class share a common nucleus of facts.  BoA subjected all class members to the

same contractual terms with the same promises.  All class members performed their key duties,

---

[1] *See* Ex. 13, Class Certification Report of Ian Ayres ("Ayres Report") ¶¶ 22-23.  HAMP is part of the Making Homes Affordable ("MHA") program, and is alternatively referred to as MHA.  (All references to "Ex. __" are to the Exhibits attached to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification, filed herewith.)

and all were confronted with the same breach, born of the same deliberate bad faith.

## II.   STATEMENT OF FACTS

### A.   Each class members satisfied a Trial Period Plan Agreement

HAMP sets out a detailed two-stage process that, if successful, results in homeowners obtaining a permanently modified mortgage on affordable terms.  In the first stage, BoA used information from the borrower and from its own files, to determine whether a homeowner met each of HAMP's threshold requirements and, if so, evaluated a homeowner's eligibility via the waterfall and NPV processes.[2]  If BoA determined that the homeowner passed the various tests and qualified for a HAMP modification, BoA would then offer the homeowner a TPP Agreement.[3]  The second stage is governed by the TPP.  Homeowners who completed a trial plan were promised permanent modifications on terms consistent with the TPP.

Each proposed class member received a TPP.  As a prerequisite, BoA had already determined that each class member satisfied the initial HAMP criteria; that each loan was owned by a participating investor; that each class member's mortgage payment exceeded 31% of their monthly income; that each passed the "NPV" test; and BoA determined each class member's trial payments due using HAMP's "waterfall" method.[4]  BoA made these calculations by reviewing class members' tax returns, pay stubs, credit reports and other financial documents.[5]

---

[2] *See id.* at ¶¶ 26-35 for a summary of the process to determine HAMP eligibility including initial criteria, use of Debt to Income calculations, the NPV test, and "Waterfall" formula.

[3] *See id.*

[4] Ex. 14 (Walsh Dep.) at 91-92; 104-05; 113-14; 118-19; Ex. 15 (Lindemann Dep.) at 53:16-24. *See also* Ex. 25 at BOA-HAMP 292909.  The Net Present Value "NPV" test (included at Ex. 21 (BAC-HAMP 54230-54265)) calculates whether the present value of the investor's expected cash flow under modification exceeds the present value of expected cash flows without modification.  *See also* Ex. 13 (Ayres Report) at ¶¶ 32-35.

[5] Ex. 4 (Cupples Dec.) ¶ 9; Ex. 3 (Terrelonge Dec.) ¶ 5; Ex. 2 (Gordon Dec.) ¶ 3; Ex. 1 (Wilson Dec.) ¶ 6; *see also* Ex. 16 (Opiela Dep.) at 64:8-22, 74:8-77:14.

The TPP Agreements that lie at the center of Plaintiffs' allegations are form contracts between BoA and each class member which, as this Court found, are supported by consideration.[6]  While there have been minor changes in versions over time, the substantive terms are the same in each TPP.[7]  The central promise is stated in its first sentence:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ….

The homeowner representations are itemized in Section 1, and a Payment Schedule with a Trial Period Payment amount is set out in Section 2.  The TPP, by its terms, is a contract of finite duration.  Following the Payment Schedule, the TPP defines the "trial period" as commencing on the "Trial Period Effective Date" (specified on the second page of each TPP), and ending on the ***earlier*** of:  (i) the "Modification Effective Date ("MED") or (ii) the termination of this Plan.[8]  Therefore, according to the TPP terms, BoA had to determine whether the borrower met the conditions for a permanent modification no later than the MED.

To be sure, after BoA determined a homeowner to be qualified and eligible, and sent a TPP, it still had more than three months to verify information the borrower submitted.  BoA could terminate the Trial Plan if, before the MED, it determined the borrower did not qualify because, for example, of failure to make required payments, because of an error in the NPV calculation, or because BoA determined that representations in Section 1 were no longer true.[9]

---

[6] *See* Memorandum of Decision on Defendants' Motion to Dismiss DE #66 at 9-10.

[7] *See* Ex. 20 (each class representative's TPP).

[8] The TPP defines the Modification Effective Date as "the first day of the month following the month in which the last Trial Period Payment is due."  *See* Ex. 20 at PLTF-ANTO 00057.  Therefore, a TPP in which the last payment is due on October 1, or on any day in the month of October, would have a MED of November 1.

[9] Ex. 20 (TPP) at PLTF-ANTO 00057 Section 2F.  *See also* Ex. 14 (Walsh Dep.) at 157:10-159:10; 172:9-173:5; Ex. 13 (Ayres Report) ¶ 40.

The time for this determination, however, was not open ended and BoA could not withhold a decision indefinitely. According to the TPP, BoA had to make the determination "prior to the Modification Effective Date."[10] In those instances where the borrower didn't qualify, BoA had ten business days to notify the borrower, in writing, that the plan was terminated and why.[11]

For borrowers who did not receive a termination notice before the MED, the only remaining condition to satisfy was to timely make all required payments.[12] As the classes are defined, each class member made all payments as required by their respective TPP. No class member received a notice of termination before their respective MED. Nor did any class member receive a permanent Modification Agreement within the required timeframe.[13] Hence, all class members have been injured.

**B.      Bank of America failed to properly administer its duties under HAMP**

At the time it entered the HAMP program, BoA knew its loan portfolio included ███ ███ homeowners potentially eligible for HAMP modifications.[14] Nonetheless, BoA did not dedicate anything near the underwriters, staff, ████████████████████████████

---

[10] *See* Ex. 20 (TPP) at PLTF-ANTO 00057 Section 2F; *see also Young v. Wells Fargo*, _ F.3d _, 2013 U.S. Dist. LEXIS 10189, *24-25 (1st Cir. May 21, 2013).

[11] U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 09-08*, Nov. 3, 2009 ("SD 09-08"), at 2.

[12] Ex. 20 (TPP) at PLTF-ANTO 00057 Section 2F. ███████████████████ ████████████████████████████████████ Ex. 22 (BAC-HAMP 494759). ███████ *See* Ex. 14 (Walsh Dep.) at 202:17 – 203:14; Ex. 23 (BAC-HAMP 772932-34).

[13] *See* Ex. 13 (Ayres Report) ¶¶ 70-84; *see also* Ex. 24 (BAC-HAMP 489990-92) ████ ██████████████████████████████

[14] *See, e.g.*, Ex. 25 at BOA-HAMP 292893 ███████████████████ ████████████████████████████████████

need to keep up with the volume of requests for HAMP modifications.[15]  Nor did BoA provide training or information regarding basic HAMP requirements to the staff it assigned to evaluate homeowners and to underwrite loan modifications.[16]

From the outset, BoA worked hard to offer as few permanent HAMP modifications as possible while leading the public and the government to believe it was trying to comply with HAMP.[17]  Though BoA agreed to proactively search its records to identify loans potentially eligible for HAMP modifications, it immediately launched a "special project" to solicit distressed borrowers for *internal* refinances.[18]  BoA did not change its regular servicing to account for HAMP and continued to refer homeowners to outside counsel for foreclosure without regard for the HAMP process.[19]  BoA managers recognized that its policies and procedures were *ad hoc*, ██████████████████████████████████████████ ███████████████████████████████.[20]  BoA even referred borrowers who successfully completed trial plans to foreclosure.[21]

---

[15] *See* Ex. 4 (Cupples Dec.) ¶ 7; Ex. 1 (Wilson Dec.) ¶ 3; *see also* Ex. 26 (BAC-HAMP 486996-98)██████████████████████████████████ Ex. 27 (BAC-HAMP 491657)██████████████████████████████████████████████████████ Ex. 28 (BAC-HAMP 490477)██████████████████████████████████████████

[16] Ex. 4 (Cupples Dec.) ¶ 5; *see also* Ex. 3 (Terrelonge Dec.) ¶ 3.

[17] Ex. 3 (Terrelonge Dec.) ¶ 6.

[18] Ex. 4 (Cupples Dec.) ¶ 4; Ex. 3 (Terrelonge Dec.) ¶ 17; *see also* Ex. 29 (BAC-HAMP 501075-78); Ex. 25 (BOA-HAMP 292888-292910).

[19] Ex. 4 (Cupples Dec.) ¶ 8; Ex. 17 (Duarte Dep.) at 158-160, 167-170.

[20] Ex. 4 (Cupples Dec.) ¶ 8; *see also* Ex. 30 (BAC-HAMP 491563)████████████████████████ ██████████████████████████████████ Ex. 31 (BAC-HAMP 511718 ██████████████████████████ Ex. 32 (BAC-HAMP 491793-94) (itemizing ████████████████████████████████████████████████████████████

[21] Ex. 1 (Wilson Dec.) ¶ 11; Ex. 5 (Simon Dec.) ¶ 17; Ex. 6 (E. Brown Dec.) ¶ 6.

Evidence shows that BoA's shortcomings were not due to mere lack of preparation or even incompetence.  They were deliberate.  BoA explicitly instructed its employees to delay applications and to lie to customers as part of a deliberate practice of stringing homeowners along.[22]  It ordered employees to hold financial documents for at least thirty days before reviewing them.[23]  It directed employees to falsely tell homeowners that BoA had not received the documents they sent.[24]  When homeowners inquired as to the status of their modifications, employees were instructed to tell them their files were "under review" when, in fact, their files had not been accessed for months or when the file had been rejected.[25]  BoA used these strategies to shepherd homeowners into in-house modifications that were more expensive for homeowners, but more profitable for BoA.[26]  BoA closely monitored employees who spoke to customers. Supervisors would regularly plug into ongoing phone calls without warning.  Employees caught admitting BoA had received financial documents, or admitting the borrower was entitled to a modification, were subject to discipline including immediate termination.[27]

**C.     Bank of America issued wrongful denials *en masse* to reduce its HAMP backlog**

By early 2010, BoA identified ███████████████████████████████████

███████████████████████████████████████████████████████████████

---

[22] Ex. 3 (Terrelonge Dec.) ¶ 8; Ex. 2 (Gordon Dec.) ¶¶ 6, 10; *see also* Ex. 18 (Orris Dep.) at 153:15-155:12.  BoA ████████████████████████████████████████████
████████████ *See* Ex. 33 (BAC-HAMP 489161); *see, e.g.*, Ex. 34 (BAC-HAMP 549765-66).

[23] Ex. 2 (Gordon Dec.) ¶ 7.

[24] Ex. 3 (Terrelonge Dec.) ¶ 9; Ex. 2 (Gordon Dec.) ¶ 5; Ex. 5 (Simon Dec.) ¶¶ 20, 23; Ex. 6 (E. Brown Dec.) ¶ 5.  This was further confirmed by Bert Sheeks, a former employee of Urban Settlement Services.  Ex. 7 (Sheeks Dec.) ¶ 8; Ex. 35 (BAC-HAMP 486706).

[25] Ex. 3 (Terrelonge Dec.) ¶ 8; Ex. 2 (Gordon Dec.) ¶¶ 6, 10.

[26] Ex. 1 (Wilson Dec.) ¶ 8.

[27] Ex. 2 (Gordon Dec.) ¶ 10.

████████████████████████████████[28] Several former employees and supervisors each testified to viewing records regarding hundreds of homeowners who had not received permanent loan modifications long after their respective MEDs despite having made all required trial payments.[29] Treasury Department reports repeatedly showed that BoA failed to timely modify loans.[30] By the fall of 2010, BoA ████████████████████████████████████.[31]

Rather than issue permanent modifications, BoA ████████████████████████████ ████████████████████[32] Whereas permanent modifications had to be fully justified to the investor, denials could be quick and with little oversight. Approximately twice a month, BoA cleaned out its HAMP backlog with a "blitz" in which each "team" declined hundreds of files at a time for no reason other than the financial documents were more than 60 days old.[33] Former employees and supervisors recount seeing hundreds of files where the computer systems showed the homeowner to have been entitled to a permanent modification, but was declined based on information that was obviously wrong, and even falsified.[34] ████████████████████████████

---

[28] Ex. 36 (BAC-HAMP 487751-57). *See also* Ex. 37 at (BAC-HAMP 511436-37)████████████ ████████████████████████████████ Ex. 8 (Schoolitz Dep.) at 68:10-19

[29] *See, e.g.*, Ex. 1 (Wilson Dec.) ¶ 7; Ex. 6 (Brown Dec.) ¶ 8; Ex. 2 (Gordon Dec.) ¶¶ 4, 5; Ex. 3 (Terrelonge Dec.) ¶ 7; Ex. 4 (Cupples Dec.) ¶ 8; Ex. 5 (Simon Dec.) ¶ 13; *see also* Ex. 38 at BAC-HAMP 489099; Ex. 39 (BAC-HAMP 511719-22).

[30] *See, e.g.*, Ex. 13 (Ayres Report) ¶¶ 41-42 (citing U.S. Department of Treasury, *Making Home Affordable Program Performance Reports* (June, 2011 – March, 2013)).

[31] Ex. 36 (BAC-HAMP 487751-57); Ex 40 (BAC-HAMP 693816-17); *see also* Ex. 4 (Cupples Dec.) ¶ 12.

[32] *See* Ex. 41 (BAC-HAMP 512097-98); Ex. 42 (BAC-HAMP 489196); Ex. 43 (BAC-HAMP 500477-78)████████████████████████████████████

[33] Ex. 1 (Wilson Dec.) ¶¶ 9-10.

[34] *Id*. ¶ 10; Ex. 3 (Terrelonge Dec.) ¶¶ 15, 16; Ex. 18 (Orris Dep.) at 80:12-82:15; 104:8-105:5.

- 7 -

████████████████████████████████████████████ [35]

In its zeal to decline more loan modifications and reduce backlog, BoA placed production goals on its employees and managers.  Employees were awarded cash incentives or restaurant gift cards based on the number of loan modifications they could decline in a given day or week.[36] An employee who placed ten or more accounts into foreclosure in a month could receive a $500 bonus – this included accounts in which the homeowner had fulfilled all TPP requirements.[37]  On the other hand, employees who did not place enough accounts into foreclosure each month were subject to termination.[38]  One former supervisor decried BoA's practices to his supervisors as "ridiculous and immoral."  The practices did not change.[39]

Employees of Urban Settlement Services ("Urban"), with whom BoA contracted to perform key HAMP functions, report ████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████  ████████████████████████████████
████████████████████████████████  ██  ████████

---

[35] *See, e.g.*, Ex. 44 (BAC-HAMP 499377) ████████████████████████
████████████████████ Ex. 45 (BAC-HAMP 495529-30) █████████
████████████████████████████████████  ████

[36] Ex. 3 (Terrelonge Dec.) ¶ 15; *see also* Ex. 46 (BAC-HAMP 511433-35); Ex. 47 (BAC-HAMP 512103-04) ████████████████████████████████████

[37] Ex. 2 (Gordon Dec.) ¶ 8.

[38] *Id.* ¶ 9; *see also* Ex. 1 (Wilson Dec.) ¶ 12.

[39] Ex. 1 (Wilson Dec.) ¶ 14.

[40] Ex. 18 (Orris Dep.) at 142-146; *see also id.* at 59:23-61:12.

[41] *Id.* at 56:19-57:25; 68:19-69:14; *see also* Ex. 48 (BOA-HAMP 070787).

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ [42]

## D.     Bank of America kept meticulous internal records

BoA kept detailed records of each loan modification process.  BoA's computer systems

allowed employees to view the terms of a TPP, the date and amount of each payment, and each

document requested of and received from each homeowner.[43] ████████████████████████████

████████████████████████████████████████████.[44]  Indeed, BoA internally

measured every facet of its HAMP processes with all sorts of reports detailing the number of

loans in each HAMP stage, the number of customers who returned documents, the documents

they returned, the performance of departments and employees, and dozens of other matrices.[45]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ [46]

       ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

────────────────

       [42] Ex. 18 (Orris Dep.) at 82:8-85:15; 91:3-92:24; 113:19-117:22; 134-35; 141-44; 184.  Former Urban employee Burt Sheeks also described being instructed to close files and issue denials, based on fraudulent claims that homeowners had not sent in requested documents.  Mr. Sheeks testified to being given daily grids of "hundreds or even thousands of files with instructions to close the file." Ex. 7 (Sheeks Dec.) ¶¶ 5-8.

       [43] *See* Ex. 1 (Wilson Dec.) ¶ 14; Ex. 5 (Simon Dec.) ¶¶ 10, 14; Ex. 3 (Terrelonge Dec.) ¶ 4; Ex. 6 (Brown Dec.) ¶¶ 5, 8; Ex. 2 (Gordon Dec.) ¶ 4; Ex. 4 (Cupples Dec.) ¶ 6.

       [44] *See* Ex. 8 (Schoolitz Dep.) at 42-44; 144-146; Ex. 19 (Parkinson Dep.) at 32:16-33:24.

       [45] Ex. 4 (Cupples Dec.) ¶ 13; *see also, e.g.*, Ex. 36 at BAC-HAMP 487755.

       [46] Ex 13 (Ayres Report) ¶ 57.

- 9 -



**E.   Bank of America's records regarding Plaintiffs Antoun and Sabah Moussa exemplify many of the flaws about which employees testified**

Much of the testimony from BoA and Urban employees is exemplified by the experience

of Plaintiffs Antoun and Sabah Moussa.



---

[47] Ex. 49 (BAC-HAMP 696525-27).

[48] *Id.*; but see Ex. 50 (BAC-HAMP 511911-95)

[49] *See* Ex. 51 at BAC-HAMP 90413.

[50] Ex. 52 at BAC-HAMP 32038.

[51] *Id.* at BAC-HAMP 32034-37; *see also* Ex. 51 at BAC-HAMP 90392, 90415; Ex. 8 (Schoolitz Dep.) at 188:10-189:8.

[52] Ex. 52 at BAC-HAMP 32032; *see also* Ex. 51 at BAC-HAMP 90417; Ex. 8 (Schoolitz Dep.) at 191.

[53] Ex. 53 at BAC-HAMP 32829-30; *see also* Ex. 8 (Schoolitz Dep.) at 196-197.

[54] Ex. 53 at BAC-HAMP 32830-32.

[55] Ex. 52 at BAC-HAMP 32025-26.



## III.   ARGUMENT

### A.   Plaintiffs Seek Certification of Liability Issues for 26 State Classes

Plaintiffs seek certification of 26 separate liability-only classes pursuant to Rule 23(c)(4), consisting of individuals in 26 states[60] who meet the following definition:[61]

> All individuals with home mortgage loans on properties in [state] whose loans have been serviced by Bank of America and who, since April 13, 2009, have entered into a Trial Period Plan Agreement with Bank of America and made all trial payments required by their Trial Period Plan Agreement, other than borrowers to whom Bank of America tendered either:
>
> (a) A Home Affordable Mortgage Agreement sent to the borrower prior to the Modification Effective Date specified in the Trial Period Plan Agreement; or

---

[56] Ex. 54 (BAC-HAMP 77864, 77865).

[57] Ex. 8 (Schoolitz Dep.) at 189:24-191:11.  BoA previously submitted a declaration from Tawnya Schoolitz supporting the propriety of the denial.  But when cross examined, Ms. Schoolitz admitted that the Moussas provided requested documents and timely made their TPP payments.  She concluded the denial was proper based **solely** on the existence of a "decline letter" in the file.  She made no effort to determine whether the letter was accurate or proper.

[58] *Id*. at 199; *see also* Ex. 18 (Orris Dep.) at 87:19-89:16.

[59] Ex. 55 (BAC-HAMP 77638).

[60] The 26 states are stated in the Third Amended Complaint ("Complaint"), ¶ 502:  Alabama, Alaska, Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Virginia, Washington, and Wisconsin.

[61] This definition is slightly different than the definition stated in the Complaint.  ¶¶ 409-501. However, all individuals who meet this definition are included within the definition in the Complaint, and the definition stated in a complaint is not dispositive; the Court can amend a definition at any time, even *sua sponte*.  Rule 23(c)(1)(C).

- 11 -

(b) A written denial of eligibility sent to the borrower prior to the
Modification Effective Date specified in the Trial Period Plan Agreement.

"Trial Period Plan Agreement," as used in this definition, refers to the agreements BoA provided

to borrowers in 2009 and the first part of 2010, pursuant to Treasury Directive SD-09 (and

*excludes* agreements BoA made for FHA loans pursuant to different contracts).  Numerous

examples of the TPPs signed by the Class Representatives[62] can be found at Ex. 20.

In all states, Plaintiffs seek to certify for a breach of contract claim.  In certain states,

Plaintiffs also seek to certify claims for breach of the implied covenant of good faith and fair

dealing, promissory estoppel, and violation of consumer protection statutes.  A list of which

claims Plaintiffs seek to certify, and for which states, is set forth in Ex. 10.

**B.     Rule 23(c)(4) Specifically Authorizes Certification of Common Issues of Liability**

In order to allow the Court to address core common issues in an efficient manner,

Plaintiffs seek to certify the 26 proposed statewide classes for liability issues only, pursuant to

Rule 23(c)(4).  The First Circuit has specifically endorsed this approach to class certification, and

other judges in this District and within the Circuit have certified liability-only classes in large,

complex matters.  *See, e.g., Tardiff v. Knox Cnty.*, 365 F.3d 1, 6-7 (1st Cir. 2004) ("If the class

action resolved liability [only] … this would be a legitimate function.  At that point, the court

would have further options" for resolving damage issues); *In re McKesson Gov'tl Entities*

*Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 269, 278 (D. Mass. 2011) (Saris, J.)

(certifying a class of all U.S. non-federal and non-state governments in an MDL, only as to

liability under RICO and equitable relief); *New England Carpenters Health Benefits Fund v.*

*First DataBank, Inc.*, 248 F.R.D. 363, 369, 372 (D. Mass. 2008) (Saris, J.) (similar); *In re One*

---

[62] A complete list of all named Plaintiffs put forth as Class Representatives, and the states they
represent, can be found at Ex. 9.

*Bancorp Sec. Litig.*, 136 F.R.D. 526, 533 (D. Me. 1991) (MDL; "[t]he Court retains the discretion, acting on an appropriate motion or *sua sponte* …, to try damages issues separately").

This approach, moreover, is widely recognized throughout the federal courts. *See, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1437 (2013) (dissent) ("a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings"); *Wallace v. Powell,* 2013 U.S. Dist. LEXIS 69001 (M.D. Pa. May 14, 2003) (certifying liability class under Rule 23(c)(4) and distinguishing *Comcast*, *Dukes*, and other recent authority); *In re Motor Fuel Temperature Sales Practices Litig.*, 2013 U.S. Dist. LEXIS 50667, *109-112 (D. Kan. Apr. 5, 2013) (MDL; certifying liability-only class of every consumer who purchased gas from Chevron in California during a period of more than nine years); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (affirming certification of six state classes of window purchasers for liability issues only); *In re VISA Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) (Sotomayor, J.); When considering whether a class should be certified only for certain issues pursuant to Rule 23(c)(4), the Court's inquiry is whether the factors of 23(a) and 23(b) are met with regard to the issues sought to be certified. *See, e.g.*, *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226-27 (2d Cir. 2006); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir. 2003); *In re Motor Fuel*, 2013 U.S. Dist. LEXIS 50667, at *109-112.[63]  The factors are met here for all 26 classes.

---

[63] The Fifth Circuit has taken a different view, and has been widely criticized for it.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n. 21 (5th Cir. 1996); *Nassau Cnty.*, 461 F.3d at 226 ("the Fifth Circuit's view renders subsection (c)(4) virtually null").

C.     **Plaintiffs Satisfy Rule 23(a) on Issues of Liability**

1.     **The Classes are ascertainable and sufficiently numerous**

As a threshold matter under Rule 23(a), a class must be both ascertainable and sufficiently numerous, neither of which are taxing standards.  To clear the hurdle of ascertainability, all that is required is that a court can determine who is included in the classes, based on stable and objective criteria.  *See, e.g., Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012); *Donovan v. Philip Morris USA, Inc.*, 2012 U.S. Dist. LEXIS 37974, *91 (D. Mass. Mar. 21, 2012) (citations omitted).  As for numerosity, it "does not set a specific numerical threshold, but classes of forty or more are generally considered numerous." *Sparkle Hill, Inc. v. Interstate Mat Corp.*, 2012 U.S. Dist. LEXIS 178793, *5 (D. Mass. Dec. 18, 2012).

The classes in this case are defined using objective criteria (state, contract received, trial payments, and lack of a modification or denial by a specific date).  As explained in detail by Plaintiffs' expert, Professor Ian Ayres, this information can be easily retrieved and sorted for all class members using BoA's internal databases.  Ex. 13, ¶¶ 69-100.  Using a sample of BoA's data for 3,000 people (and similar data for the named plaintiffs) and guidance from deposition testimony of BoA employees, Dr. Ayres was able to sort the data and determine which BoA borrowers meet the class definition based on objective criteria.  *Id.* at ¶¶ 69-87.  Dr. Ayres has also identified other internal BoA data sources that would further inform and verify the ultimate identification of particular class members once that information is produced.  *Id.* at ¶¶ 88-100.

Within the limited sample of 3,000 borrowers (out of approximately 375,000 in the full pool), Dr. Ayres identified sufficiently large numbers of borrowers in each of the states to satisfy the numerosity requirement.  *See id.*, Appx. 4 (SD-09 columns).  Even in the state with the fewest loans at issue, Alaska, Dr. Ayres identified 26 class members, and it appears that there are more than 170 borrowers in the Alaska class.  *Id.* (74% of 241).

- 14 -

### 2.     The issues plaintiffs seek to certify are common to each Class member

"The threshold of commonality is not a difficult one to meet, especially when there are a number of common issues of fact and law that the class members would be required to establish to prove the defendants' liability." *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 29656, *8-9 (D. Mass. Nov. 28, 2005) (Zobel, J.). All that is required is a single common question, the answer to which will "drive the resolution of the litigation." *See, e.g., Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

In this case, the Class Representatives have extensive issues of liability in common with the state classes, and the overwhelming majority of these issues are common even across the states. Plaintiffs have prepared tables setting forth (a) the common issues of liability for each state class, *see* Plaintiffs' Trial Plan and Appx. D thereto (filed herewith), and (b) the various states' law on Plaintiffs' claims other than breach of contract, *see id.* and Appxs. A-C thereto. The issues described in these charts are shared by every Class Representative, because each Class Representative is in the same situation as the class members:  they received the same contract, made their trial payments, and did not receive either a promised loan modification or a timely written denial.

Plaintiffs will briefly summarize the core issues common to all states for the claims at issue.[64] First, as to the breach-of-contract claim, all of the class members have substantially identical contracts.[65] Where a class's claims are based on a standard form contract, those claims

---

[64] Plaintiffs note that in order to certify the 26 state classes, the Court needs only find that certification is proper for each state individually, and does not need to find that all states can be certified in a single group. Plaintiffs demonstrate here, and in the Trial Plan, that there are common issues across the states merely to demonstrate to the Court that resolution of common issues for multiple state classes is manageable.

[65] The Court has previously ruled that the TPPs are contracts supported by consideration. *See* Memorandum of Decision on Defendants' Motion to Dismiss DE #66 at 9-10. Plaintiffs believe all

necessarily have a "common factual basis [that] is found in the terms of the contract, which are identical for all class members." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003). By the same logic, the class members necessarily have a common legal question as to whether the terms of the contract were breached. *See id.*[66]

In this case, the class members are subject to the same contractual terms, and all of them made all payments required under that contract, and therefore all of them share the common question of whether BoA breached their TPPs when it failed to provide either a written denial or a permanent loan modification as of the Modification Effective Date. *Cf. Young v. Wells Fargo Bank, N.A.*, __ F.3d __, 2013 U.S. App. LEXIS 10189, *17-25 (1st Cir. May 21, 2013) (reversing dismissal of claim that TPP was breached when modification was not provided as of MED). Resolution of this question will be common for all class members, thereby resolving in one fell swoop, and for 26 states, the most central question in this litigation.[67]

As to breach of the implied covenant of good faith and fair dealing, all class members in all states share the same basic factual question: did BoA have a common practice of encouraging or requiring the wrongful refusal of timely HAMP modifications to the thousands of borrowers who qualified for them? *Cf. id.* at *34-35 (the question, at least in Massachusetts, is whether BoA "acted with an improper purpose"). As evidence cited above demonstrates, this is a serious question common to all class members. That question will be answered with common discovery

---

of the TPPs issued by BoA were materially identical, but reserve the right to suggest subclasses or amend the definitions if BoA points to a variant of which Plaintiffs are unaware.

[66] Because the interpretation of the TPP is a matter of law, the Court could also enter declaratory judgment on behalf of the classes pursuant to Rule 23(b)(2). *See, e.g., Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 427 (6th Cir. 2012) ("Rule 23(b)(2) certification remains available … when the plaintiffs seek a declaration about the meaning of a contract ….").

[67] If BoA contends that it can assert individual defenses and decline modifications after the MED based on borrower circumstances, Plaintiffs note the question of whether BoA waived its ability to decline modifications once the MED passed is simply another common issue for each of the 26 state classes. *See, e.g.,* Rest. (Second) Contracts, §§ 84, 242.

and common findings, because BoA administered HAMP as a national program.  The evidence, the issue, and the ultimate factual determination, will be common for each statewide class.

Plaintiffs' promissory estoppel claims also emanate from the same written promise, thereby giving rise to common liability questions for each state class.  *See* Appxs. B & D to Plaintiffs' Trial Plan.  As those appendices demonstrate, those elements are common for all class members within each state.  *See also infra* at 20.

Plaintiffs' consumer-protection claims also have numerous questions common to all borrowers in the states where Plaintiffs seek certification.  For example, as demonstrated in Appxs. C-D to the Trial Plan, 19 of the 21 state statutes at issue have a "deception" prong which requires an objective determination as to whether the TPP had the tendency or capacity to deceive borrowers in light of BoA's practices, as described above.  *See supra* at II.B, C.  Many of the states also have numerous objective criteria bearing on whether BoA's actions with regard to TPPs were "unfair."  *See* Appxs. C-D to Trial Plan.  These issues are common to all class members in these states, and can and will be resolved without reference to individual issues.

### 3.  The claims of the Class Representatives are typical of those of the classes

Pursuant to Rule 23(a)(3), the claims of the Class Representatives must be typical. "Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."  *In re McKesson*, 767 F. Supp. 2d at 270 (citation omitted).

The Class Representatives' claims are typical of those of the classes they seek to represent.  Like all of the class members, they provided sufficient information for BoA to deem them eligible for HAMP, received and accepted a TPP, made their monthly trial payments, and did not receive a permanent modification or a written denial by the Modification Effective Date. Expert analysis has concluded that each of the proposed Class Representatives is identifiable

- 17 -

through BoA data records as a member of the class they are seeking to represent.  *See* Ex. 13

(Ayres report) ¶ 102; all Class Representatives meet criteria); Ex. 20 (TPPs of Class

Representatives).  As a result, the Class Representatives have the same claims as the class

members, and are seeking resolution of the same issues.

> ### 4.        Plaintiffs are adequate representatives of the classes

Adequacy under Rule 23(a)(4) "has two parts.  The moving party must show first that the

interests of the representative party will not conflict with the interests of any of the class

members, and second, that counsel chosen by the representative party is qualified, experienced,

and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780

F.2d 124, 130 (1st Cir. 1985).  Both of these elements are satisfied here.  There are no conflicts

of interest between any of the Class Representatives and the members of the classes:  they all

have the same claims, and the same interests in determining BoA's liability for breaching the

TPP contract and in resolution of their other claims.  And this Court already found, Klein

Kavanagh Costello and Hagens Berman Sobol Shapiro are sufficiently qualified to represent the

class members in this case.  *See* Dkt. No. 10, ¶ 9; *see also* Exs. 11 and 12 (firm résumés).

### D.     Plaintiffs Satisfy Rule 23(b) for Issues of Liability

> ### 1.        Plaintiffs satisfy 23(b)(3)

A class may be certified under Rule 23(b)(3) if "the questions of law or fact predominate

over any questions affecting individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  "The core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other

groups of people whose individual claims would be too small to warrant litigation."  *Smilow*, 323

F.3d at 41.  And as previously mentioned, pursuant to certification under Rule 23(c)(4), the

proper analysis is whether predominance and superiority are met as to the specific issues to be

certified.  *See, e.g.*, *In re Nassau Cnty.*, 461 F.3d at 226-27; *Valentino*, 97 F.3d at 1234; *In re*

*Motor Fuel*, 2013 U.S. Dist. LEXIS 50667, at *109-112.

> **a.      Common issues predominate on all questions of liability.**

Rule 23(b)(3) requires that, as to certified issues, common issues predominate.  This is to

"ensure 'merely that common issues predominate, not that all issues be common to the class.'"

*In re Transkaryotic,* 2005 U.S. Dist. LEXIS 29656, at *9 (quoting *Smilow*, 323 F.3d at 39).

Courts routinely find that predominance is met in cases which have, at their core, a form

contract.  *See, e.g., Smilow*, 323 F.3d at 39; *Schumacher v. AK Steel Corp. Ret. Accumulation*

*Pension Plan*, 711 F.3d 675, 684 (6th Cir. 2013) ("The court was correct to begin by determining

the scope and validity of the agreements as a common issue of law for the class certification

motion."); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 46 (E.D.N.Y. 2008) ("the alleged

breach of standard-form contracts are particularly appropriate for class action").  When claims

arise from uniform written documents, those claims necessarily rise or fall on the interpretation

and legal significance of the common document.  That is the case here, where all of the claims

Plaintiffs seek to certify are based on:  (1) the written terms of the TPP, and/or (2) BoA's

common course of conduct in how it approached HAMP modifications and its obligations in

light of the TPP.  The factual and legal ramifications of the TPP terms, and BoA's conduct in

discharging those agreements are common among class members, and those issues predominate.

The fact that Plaintiffs do not seek certification of damages, at least at this stage, does not

mean that common issues do not predominate.  Even when a party seeks certification of both

liability and damages, predominance is not normally defeated where damages will vary, or where

there are individual determinations yet to be made.  *See, e.g., Comcast*, 133 S. Ct. at 1437

(dissent) ("Recognition that individual damages calculations do not preclude class certification

under Rule 23(b)(3) is well nigh universal."); *Smilow*, 323 F.3d at 40 ("Where … common

questions predominate regarding liability … courts generally find the predominance requirement to be satisfied even if individual damages issues remain."); *Levya v. Medline Ind., Inc.*, __ F.3d __, 2013 WL 2306567, *3 (9th Cir. May 28, 2013).   The existence of different consequences of BoA's actions does not defeat predominance here, where Plaintiffs seek only to certify liability. To the extent BoA contends that individual damages issues render the case unmanageable or not superior to individual cases, Plaintiffs address those concerns in section III.D.2, *infra*.

Plaintiffs also expect BoA will argue, with regard to promissory estoppel claims and the handful of states that require reliance as part of a consumer-protection cause of action, that the Court should not certify those claims because inducement or reliance cannot be demonstrated on a class-wide basis.   However, the class definition itself resolves this issue:  the state classes consist *solely* of individuals who entered into TPPs, promised to undergo credit counseling if asked, made legal representations about their personal circumstances, and made the payments mandated by the TPP.   At an absolute minimum, this creates a question common to all class members of whether those acts demonstrate sufficient inducement by, or reliance on, the provisions of the TPP.   *See, e.g., In re Pharm. Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 96-97 (D. Mass. 2008) (reliance does not preclude certification where payments were made pursuant to contract); *Bobbitt v. Acad. of Ct. Reporting*, 252 F.R.D. 327, 342 (E.D. Mich. 2008) (in face of argument that promissory estoppel could not be certified due to reliance issues, "the Court is satisfied that the plaintiffs have put forth allegations and evidence that appears to follow a pattern, and the people they claim made the representations are largely the same people").

**b.   A certification of state classes for liability is both manageable and superior to thousands of individual actions litigating the same issues**

Rule 23(b)(3) requires a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."   A class action can be found to be superior simply

- 20 -

because common issues predominate.  *See Matamoros*, 699 F.3d at 139; *Smilow*, 323 F.3d at 40.

A class action is also superior when the alternative is "[t]he piecemeal adjudication of numerous

separate lawsuits" and where many "potential class members with relatively small claims would

not have the financial incentive or wherewithal to seek legal redress."  *In re Transkyarotic*, 2005

U.S. Dist. LEXIS 29656, at *10.  *See also, e.g., Gintis v. Bouchard Transp. Co., Inc.*, 596 F.3d

64, 67-68 (1st Cir. 2010); *Tardiff*, 365 F.3d at 7.

Certification of liability issues will make this litigation manageable, whereas a denial of

certification would simply prolong the confusion, waste, and injustice that has been the hallmark

of BoA's participation in HAMP.  As explained in Plaintiffs' Proposed Trial Plan, coordinated

pretrial discovery and summary judgment motions and rulings will significantly advance the core

issues in this case as to all Class members and all cases.  Discovery into BoA's practices and

policies on HAMP modifications will continue to be common as to all Class members and all

states, because BoA treated all TPPs and HAMP modifications as part of a national program.

And summary judgment proceedings on the 26 states will be manageable, and likely not require

separate motions for each state, because the facts for all the classes significantly (or completely)

overlap.  Any variations in liability issues under state law are not so large as to render the

process unmanageable.  *See* Plaintiffs' Trial Plan, and esp. Appx. D.

Following dispositive motions, the Court has several options as to how to resolve any

issues in the cases remaining before it.  First, consistent with 28 U.S.C. § 1407(a), the Court

could remand each case that was not originated in this Court to the transferor court for trial.[68]

---

[68] Because several of the constituent cases were filed directly in the District of Massachusetts
following consolidation, this Court will retain jurisdiction for cases covering many different states in
any event.  Because the law between the classes is similar, and the evidence bearing on liability will
be common across all states, a single trial would allow for resolution of liability issues for thousands
of people in a single proceeding.  *See id.* and Appxs. A-D.

- 21 -

Second, the Court could ask the parties if they consent to its retention of jurisdiction for trial, or the transferor courts could re-transfer following remand.  *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 39-40 (1998).  Whatever the trial court, this Court's pretrial rulings will have defined the boundaries of any liability trial.

In contrast, proceeding without certification of the common issues would be unmanageable chaos.  Without certification, thousands of homeowners would have to decide whether to file their own lawsuits, while at continued risk of losing their homes to foreclosure[69] - if they could even find counsel to represent them *pro bono* or on a contingent basis.  Most would go without representation, and unable to prosecute meritorious claims, because their claims cannot support contingent litigation on an individual basis.  Absent a prior ruling on liability, many class members will simply not be able to find counsel willing to take on an individual case with the complex factual and legal issues, and attendant discovery burdens, that such a case entails.[70]  This would mean large numbers of class members would almost certainly forfeit their rights, and possibly their homes, even if multiple courts ruled in individual cases that BoA breached its TPPs and administered its HAMP program in bad faith.

And in cases that actually were filed, courts across the country (including bankruptcy and state courts) would engage in competing and overlapping discovery proceedings, and make overlapping and possibly contradictory rulings on obviously common issues.  This would exponentially increase class members' costs (and BoA's own costs due to duplicative discovery and multiplied attorneys' fees), and waste judicial resources.  Yet BoA presumably prefers this approach because it knows that only a fraction of putative class members would be able to bring

---

[69] Plaintiffs' counsel have been contacted by thousands of individuals who have potential claims involving HAMP modifications, but who have not yet filed their own suits.  *See* Berman Decl., ¶ 2.

[70] This dynamic would dramatically change if a class member sought counsel with a liability verdict in hand, and counsel could focus on harm.

- 22 -

their own suits.  A class action is clearly superior in such circumstances, as it would answer common questions of liability for all class members in a single proceeding, and provide notice of this case, the claims, and the eventual rulings to the people most directly impacted by them.

BoA may contend that if the Court were to only certify liability, and not damages, Plaintiffs would render this litigation unmanageable, or not materially advance the litigation. This would be incorrect.  By certifying and resolving the numerous common questions of liability, the Court would resolve fundamental liability questions for all Class members, thereby eliminating the need for each class member to litigate those questions.  *Cf. McReynolds v. Merrill Lynch*, 672 F.3d 482, 491 (7th Cir. 2012) (if individual damages proceedings are necessary following rulings, "at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful").

And following liability rulings, there would not necessarily be individual damages proceedings for all class members.  Once issues of liability have been resolved, the Court's specific findings on liability with regard to the nature of the breach, and other violations, would yield a common basis from which damages might be calculated.  As the First Circuit has stated:

> At that point, the court would have further options, such as an agreement on …
> uniform damages for those not claiming special injury, with masters to determine
> the (potentially few) serious claims to special injury.
>
> Failing some practical solution allowing full resolution of all class damage claims
> in a single case, the court could enter a judgment of liability, leaving class
> members to pursue damages claims in separate lawsuits.  In addition, if and when
> liability is established and the remaining dispute is only the amount of damages, it
> is common experience that a great many claims settle.

*Tardiff*, 365 F.3d at 6-7 (citations omitted).  In addition to options listed by the First Circuit, the Court could include appointing a magistrate judge or special master to preside over individual damages proceedings, providing notice to class members following liability determinations so that they could understand how to proceed, or altering or amending the class.  *See, e.g., In re*

*VISA Check*, 280 F.3d at 141 (collecting cases).  *See also, e.g., Pella*, 606 F.3d at 394-396 (following liability rulings, damages issues could be resolved in groups or through a claims process; "district courts are permitted to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues").

Depending on the ultimate liability findings, the parties may be able to stipulate as to proper remedy measurements, the Court may be able to set up administrative processes using a special master, or it may become clear that the Court should certify damages classes.  At least some resulting damages can be calculated without further proceedings based on BoA's internal records.[71]  For example, BoA's systems store all information needed to calculate the difference between the stream of payments due under a borrower's unmodified loan, as compared to payments that would have been due if the loan had been modified (or the amounts BoA accepted and should have treated as full contractual payments).  *See* Ex. 13 (Ayres Report) ¶ 103.  And if mechanical means are not available or sufficient, the Court could also use tools such as bellwether trials or other methods for narrowing any remaining issues as to damages.

Most importantly, the Court would have control over, and the ability to streamline, the process in ways that would be completely lost if the Court denied certification and sent class members to the four winds.  "A class action should not be found unmanageable without [first] exploring the procedural devices available for bringing it in line." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 169 (2d Cir. 2001) (quoting Edward F. Sherman, *Class Actions and Duplicative Litigation,* 62 Ind. L.J. 507, 516 (1987)).  A certification of a liability

---

[71] *See* Ex. 13 (Ayres Report), ¶ 103.  *See also, e.g., Smilow*, 323 F.3d at 40 ("there is even less reason to decertify a class where the possible existence of individual damages issues is a matter of conjecture.  …  Common issues predominate where individual factual determinations can be accomplished using computer records … and objective criteria.")

- 24 -

class pursuant to 23(c)(4) is both superior and manageable – the substantial efficiencies yielded

by the common resolution of liability more than justify certification.

**E.      The Court Should Appoint Hagens Berman Sobol Shapiro LLP and Klein Kavanagh Costello LLP as Class Counsel**

Pursuant to 23(g), the Court should appoint the firms of Hagens Berman Sobol Shapiro

LLP and Klein Kavanagh Costello LLP as class counsel for each of the state classes.  The Court

has previously concluded that these firms were sufficiently experienced and knowledgeable to

act as class counsel prior to class certification, Ct. Rec. No. 10, ¶ 9, and Plaintiffs trust that the

Court has found their counsel to be knowledgeable and diligent in pursuing the claims to this

point.  *See also* Exs. 11 and 12 (firm résumés).

**IV.      CONCLUSION**

For the reasons stated above, the Court should grant Plaintiffs' motion for class

certification.

Dated:  June 7, 2013

Respectfully Submitted,

*/s/ Steve W. Berman*
Hagens Berman Sobol Shapiro LLP
Steve W. Berman
Ari Y. Brown
Tyler S. Weaver
1918 8th Avenue, Suite 3300
Seattle, WA 98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com
tyler@hbsslaw.com

- 25 -

*/s/ Gary Klein*
Klein Kavanagh & Costello
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
85 Merrimac Street
Boston, MA 02114617
617.357.5500 (p)
klein@kkcllp.com
kavanagh@kkcllp.com
costello@kkcllp.com

*Interim Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2013, a true and correct copy of this document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Steve W. Berman*
Hagens Berman Sobol Shapiro LLP