# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL NO. 2193<br><br>**<u>Centralized before the Honorable Rya W. Zobel</u>** |
| **This Document Relates To:**<br><br>**All Actions** | |

### DECLARATION OF William E. Wilson Jr.

I, William E. Wilson Jr., declare as follows:

1. I am over the age of 18 and I am otherwise competent to testify to the following based on my own personal knowledge.

2. From June 2010 through August 2012 I was employed by Bank of America in Charlotte, North Carolina. I was first employed as an underwriter. In July, 2011, I was promoted to Case Management Team Manager where I supervised a team of thirteen employees known as "Customer Relationship Managers" ("CRMs"). In both positions, my work primarily involved working with files of homeowners seeking loan modifications as part of the Home Affordable Modification Program (HAMP).

3. As an underwriter, I worked with a team of approximately 100 other underwriters. Each underwriter in our Charlotte location carried a load of approximately 400 HAMP modification files in their pipeline at any given time. This volume was many times the normal workload for an underwriter. It was impossible to sustain and Bank of America had a significant backlog of applications for HAMP loan modifications.

4. In July, 2011, Bank of America created a new department it termed the "Case Management Department" in response to reports that it was not meeting its HAMP

obligations. I was among those that opened the Charlotte division of this new department when it was created. This department was staffed by CRM's. Each was supposed to be a "single point of contact" for customers seeking HAMP modifications. I supervised a team of thirteen CRMs. I regularly reviewed the files each CRM was working on using electronic databases and computer systems. I also regularly spoke with customers inquiring about the status of their loan modification when calls were escalated to me.

5. As both an underwriter and as a Case Management Team Manager, I used Bank of America's computer systems to review the status of loans in the modification process. The computer systems I regularly used included HomeBase, HomeSaver, AS400, I-Portal, LMA, LMF, and Seibel. I primarily used HomeSaver and AS400. Using these systems, I was able to fully review terms of a homeowner's Trial Period Plan and the process that homeowner had undergone to that point. I could determine the payments due from the homeowner, the date and amount of each payment made, the documents requested from the homeowner, the documents provided and the dates the homeowner provided those documents. If needed, I could view the actual using Bank of America's "I-portal" system. Essentially, I could review any borrower's modification process from the start to the time I was reviewing the file on the computer system.

6. From the start of its participation in HAMP, Bank of America determined whether each applicant would receive a Trial Period Plan based on written financial documentation. Bank of America calculated each borrower's debt to income ratio ("DTI"), performed the HAMP Net Present Value ("NPV") test, and determined the amount of each borrower's trial payment by reviewing documents such as tax returns, pay stubs, bank statements, credit reports and other financial information the borrower provided. Bank of America required HAMP applicants to document their assets and income and would not issue a Trial Period Plan without a borrower first providing extensive financial documentation. Bank of America did not issue Trial Period Plans based on verbal estimates of income, debt, or assets at any time.

7. Though Bank of America required that applicants immediately provide financial documents – often on short notice, Bank of America allowed these documents to sit for months without ever reviewing them. I regularly received calls from homeowners and reports from CRM's stating that the homeowner had sent in documents months earlier, often multiple times, made payments under a Trial Period Plan, but had not gotten a permanent modification or even a decision regarding their modification. I was able to confirm that homeowners had indeed sent in documents and made their payments using the HomeSaver and AS400 systems. I was able to actually view the documents using the I-Portal system. It was clear that Bank of America was regularly receiving time sensitive financial documents from homeowners seeking HAMP modifications and not acting on the documents for months on end.

8. Bank of America employed a common strategy of delaying HAMP applications. Delay was achieved using tactics including claiming that documents were incomplete or missing when they were not, or simply claiming the file was "under review" when it was not. We were instructed to delay and then push homeowners to accept an internal refinance so that Bank of America would profit. Once an applicant was finally rejected after a long delay, the bank would offer them an in-house alternative. Bank of America would charge a higher interest rate, ranging up to 5%, as compared to the 2% if the loan had been modified under HAMP. The unfortunate truth is that many and possibly most of these people were entitled to a HAMP loan modification, but had little choice but to accept a more expensive and less favorable in-house modification.

9. Upon joining the newly formed Case Management Department, I began to experience what Bank of America termed a "blitz." Approximately twice a month, Bank of America would order that case managers and underwriters "clean out" the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old. These included files in which the homeowner had provided all required financial documents and fully complied with the terms of a Trial Period Plan.

10. During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than that the documents were more than 60 days old. Bank of America instructed its CRMs, underwriters and other employees to enter a reason that would justify declining the modification to the Treasury Department. Justifications commonly included claiming that the homeowner had failed to return requested documents or had failed to make payments. In reality, these justifications were untrue. I personally reviewed hundreds of files in which the computer systems showed that the homeowner had fulfilled a Trial Period Plan and was entitled to a permanent loan modification, but was nevertheless declined for a permanent modification during a blitz.

11. On many occasions, homeowners who did not receive the permanent modification that they were entitled to, ultimately lost their homes to foreclosure.

12. The delay and rejection programs within Bank of America were methodically carried out under the overall direction of Patrick Kerry, a Vice President who oversaw the entire eastern region's loan modification process. Discussions took place in meetings, some of which I attended, in which Mr. Kerry outlined how certain percentages to reduce the backlog had to be met by certain dates – no matter what.

13. Employees who challenged or questioned the ethics of Bank of America's practice of declining modifications for false and fraudulent reasons were often fired. There was an extremely high level of turnover in every HAMP related Bank of America department that I saw. Employees worked in fear of losing their jobs if they called any of Bank of America's practices into question.

14. I told my supervisors that these practices were ridiculous and immoral. People who had done everything that Bank of America had asked of them were losing their homes to foreclosure because Bank of America had chosen not to hire enough underwriters and was reducing its backlog with unethical and even fraudulent methods. I raised these concerns several times in 2011 and 2012. These practices did not change. Eventually I was fired despite having excellent performance results.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

EXECUTED this ___ day of June 5, 2013 at Charlotte, North Carolina

By _____
William E. Wilson, Jr.