# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL NO. 2193<br><br>Centralized before the Honorable Rya W. Zobel |
|---|---|
| This Document Relates To:<br><br>All Actions | |

## Declaration of Steven Cupples.

I, Steven Cupples, declare as follows:

1. I am over the age of 18 and I am otherwise competent to testify to the following based on my own personal knowledge.

2. I was employed by Bank of America until June, 2012. I worked for Countrywide Home Loans as a Loan Originator and a Loan Officer and became a Bank of America employee when Bank of America acquired Countrywide.

3. Beginning in 2009, my work involved Bank of America's efforts to modify mortgages under the Home Affordable Modification Program (HAMP). I was titled an Underwriter throughout the time I was employed by Bank of America. In June, 2011 I was promoted to a Team Leader where I supervised a team of 11 to 15 underwriters. At various times, my job included certain special projects regarding Bank of America's efforts under HAMP.

4. In April, 2009, I was assigned to a special project in which a team of employees identified customers who were in default on their mortgage and solicited them for internal Bank of America refinances. I worked on this project for approximately five months. .

5. In September, 2009 I was among a team of underwriters to receive training to underwrite HAMP loan modifications. This training lasted for a week. It covered basic underwriting topics such as the documents used to verify income and basic methods to calculate a borrower's monthly income. This training did not cover substantive HAMP requirements, or basic information needed to underwrite a HAMP application. The other underwriters and I did not receive even basic training on how to use the HAMP waterfall formula, how or when to use the NPV test, the guidelines set out in Treasury directives, or other basic aspects of HAMP.

6. Beginning in September, 2009, my job consisted of underwriting HAMP loan modifications. I learned the guidelines on the job. Underwriters could access document images using Bank of America's IPortal document system. However, all pertinent information was recorded as data points in one of Bank of America's computer systems. Using these computer systems, I was able to view virtually all relevant information regarding a borrower's loan and loan modification including the modified payments due under a Trial Period Plan, the dates payments were due, all documents the borrower sent in an effort to obtain a HAMP modification, and all information needed to determine whether a borrower was eligible for a HAMP Trial Period plan, and whether they fulfilled a Trial Period Plan and should be receiving a permanent loan modification.

7. At the time I was underwriting loans, it was clear that Bank of America had not dedicated sufficient underwriters, staff, or even basic supplies like the printers or hardware needed to keep up with the volume of HAMP loan modifications. Bank of America executives including Rebecca Mairone, John Berens, and Patricia Feltch were made aware of some of the most obvious shortcomings, but Bank of America made no substantial effort that I saw to fulfill its obligations under HAMP in anything that could be described as a good faith or honest effort.

8. An obvious problem I noticed almost immediately was that Bank of America had not changed its regular loan servicing programs to account for HAMP. A delinquent loan would progress from regular servicing, to collections, loss mitigation, and to foreclosure, just as it had before HAMP started. If Bank of America intended to use HAMP to reduce the number of defaults and foreclosures as it claimed, it would have inserted HAMP as a mandatory step in the loan servicing program across the board. Instead, Bank of America was running HAMP as an ad-hoc, parallel program. Loans that were eligible to be considered under HAMP, and even loans in which the borrowers fulfilled Trial Period Plans, were still sent to the foreclosure department. The system

Bank of America used either made no sense, or was nothing more than an effort to give a false appearance of complying with HAMP requirements when it was not.

9. From the start, Bank of America determined whether an applicant would receive a HAMP Trial Period Plan based on written financial documentation. Bank of America calculated each borrower's debt to income ratio, performed the HAMP Net Present Value test, and determined the amount of the trial payments due by reviewing a borrower's tax returns, pay stubs, credit reports and other financial documents. Bank of America would not issue a Trial Period Plan without a borrower first providing extensive financial documentation, and it did not issue Trial Period Plans based on verbal estimates of income, debt, or assets at any time.

10. Bank of America retained outside vendors to manage the documents being sent to and received from borrowers applying for HAMP modifications. Urban Lending Solutions was one of the vendors tasked to receive and upload financial documents from borrowers. I quickly realized that if the loan had documents that were sent to Urban, those documents would be scattered over various links in the computer systems. The documents were present, but they often could not be viewed using a single system. An underwriter would need to know to go to other systems such as IPORTAL, LMA, LMF, or HomeSaver to review documents the borrower had sent. Most underwriters did not know that they needed to look for documents in multiple systems and often assumed documents had not been sent. As a result, many borrowers were declined loan modifications they should have received.

11. For approximately six months in the first half of 2010, I was placed on a special project to help analyze Bank of America's performance under HAMP. This involved generating a variety of reports to measure various facets of Bank of America's HAMP processes. Much of this analysis involved trial and error to generate the types of reports that would be most useful. For example, we had reports generated that would measure the number of HAMP applications received, number of loans in stages of

delinquency, how long loans sat in each stage of the HAMP process, the number of trial payments customers had returned, the number of loans assigned to each underwriter, the particular types of documents customers had been asked to return and the documents they had returned, performance by region, department, and by individual employee, and a host of other topics. Information could be tracked by region, subject matter, individual loan number, and by dozens of other categories. I regularly submitted requests to Bank of America's offices in Plano, Texas for reports to be generated regarding any of these topics. Typically the reports were returned in a matter of hours or days – depending on how busy the Plano office was at a particular time. I found that Bank of America's systems captured and stored the data needed to perform just about any report I could think of and was able to generate reports quickly by putting all sorts of data points on excel spreadsheets.

12.  I observed that Bank of America reported to the Treasury department and made public statements regarding the volume of loans it was successfully modifying, and the efforts it was making to catch up with the volume. Often this involved double counting loans that were in different stages of the modification process. It also involved counting loans that were entitled to modifications as having been modified – only to foreclose on those same loans later. It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true.

13.  Employees who challenged or questioned the ethics of Bank of America's practice for any reason were often fired. There was an extremely high level of turnover in every HAMP related Bank of America department that I saw. Employees worked in fear of losing their jobs if they called any of Bank of America's practices into question.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

EXECUTED this 15 day of May, 2013 at Fort Worth, Texas

By _____
Steven Cupples