# Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In Re: Bank of America Home            )
Affordable Modification Program        )   No. 1:10-md-02193-RWZ
(HAMP) Contract Litigation,            )
                                       )
                                       )

DEPOSITION OF TAWNYA SCHOOLITZ

Phoenix, Arizona
May 9, 2012
9:04 a.m.

REPORTED BY:
Debra Riggs Torres, RPR
Certified Reporter
Certificate No. 50647

PREPARED FOR:
(ASCII/COPY)

Page 42

1  trial payments were made?
2    A.  If pertinent to that customer situation.
3    Q.  Okay.  In a -- in your typical response in a
4  timeline, if a date includes -- sorry.
5        If a timeline includes the dates on which
6  trial payments were due, is it assumed that they were
7  made, unless otherwise stated?
8        MR. MCGARRY:  Objection to the form.
9        THE WITNESS:  Not assumed.  Trial plan
10 payments, due date and payment date, come into play when
11 we're investigating something that has to do with a trial
12 plan default situation or an appeal situation.  But
13 otherwise, we would not necessarily indicate it was due on
14 July 1st and paid on July 3rd.  We would indicate that
15 they were due on July, August, September 1st, but we don't
16 necessarily provide when they were made.
17   Q.  BY MR. BROWN:  Okay.  Does the timeline indicate
18 whether they were timely made or not?
19        MR. MCGARRY:  Objection to the form.
20        THE WITNESS:  If pertinent.  Again, in a
21 trial plan default or appeal situation, we would.  In a
22 normal course of a timeline, it might not be included if
23 it's not relevant.
24   Q.  BY MR. BROWN:  When creating the timeline, and
25 let's take, for example, dates payments were made or not

Page 43

1  made or received or not received, assuming for a moment
2  that it's pertinent, where would a member of the research
3  team turn to make that determination?
4        MR. MCGARRY:  Objection to the form.
5        THE WITNESS:  We would have the trial plan
6  document showing us the dates that they were due and we
7  would have the AS400 payment posting to show when they
8  were made.
9    Q.  BY MR. BROWN:  So you would look in AS400 for
10 this information?
11   A.  Yes.
12   Q.  Any other databases you would have to turn to?
13   A.  No.
14   Q.  Any other databases you could turn to?
15   A.  Not that I'm aware of.
16   Q.  In the course of generating a timeline, do you
17 include dates on which documents were requested?
18   A.  Yes.
19   Q.  In the course of creating a timeline, do you
20 include the specific documents that were requested?
21   A.  Yes.
22   Q.  And I think you already said that you -- the
23 timeline would include the dates on which documents were
24 received?
25   A.  Yes.

Page 44

1    Q.  Would it -- would the timeline also include the
2  itemization of the documents that were received on
3  specific dates?
4    A.  Thematically, yes.  We do not comment on
5  completion or validity of the document because we're not
6  underwriters.  But we will say that we received a 4506-T,
7  we received a tax return.
8    Q.  Okay.  In the course of creating a timeline, does
9  it -- does the report back include notices of decline?
10   A.  Yes.
11   Q.  Does the timeline include all notices of missing
12 document, missing information letter?
13        MR. MCGARRY:  Objection to the form.
14        THE WITNESS:  Yes.
15   Q.  BY MR. BROWN:  Does the -- in the course of
16 reporting regarding a timeline, does it include credit
17 reporting made regarding a particular homeowner?
18   A.  No.
19   Q.  Does the timeline include foreclosure activity?
20   A.  Referral to foreclosure, yes.  Actual foreclosure
21 activity, no.
22   Q.  When you say "referral to foreclosure," does that
23 mean referral to Bank of America's foreclosure department?
24   A.  Correct.
25   Q.  Is there any other information regarding

Page 45

1  foreclosure?
2    A.  Date, if there is one.
3    Q.  Does date mean the notice date -- notice of --
4    A.  I'm sorry.  Sale date, if there's one resident on
5  the loan.
6    Q.  Does it include the date of a notice of default?
7    A.  No.
8    Q.  Does it include an acceleration date?
9    A.  Only if requested.
10   Q.  Does the timeline include the amount of the trial
11 payment?
12   A.  Yes.
13   Q.  Does the timeline include the amount of the
14 unmodified monthly payment due?
15        MR. MCGARRY:  Objection to the form.
16        THE WITNESS:  Not generally, unless
17 requested.
18   Q.  BY MR. BROWN:  Does the timeline include the date
19 on which the NPV test was run?  That would be N, as is
20 Nancy, P as in Paul, V as in Victor.
21   A.  Only if requested.
22   Q.  Again, it can, and would you get that information
23 from AS400?
24   A.  For the NPV run, no, sir.
25   Q.  Where would you get the NPV run date?

Page 66

1  MR. MCGARRY: Objection. Lack of
2  foundation.
3  THE WITNESS: Again, that is managed by
4  vendor management, and I wouldn't be able to say with
5  certainty.
6  Q. BY MR. BROWN: But you do, in the course of
7  making your job, making reports and timelines, rely on the
8  integrity of the data that is put in by Urban; is that
9  correct?
10  MR. MCGARRY: Objection to the form.
11  THE WITNESS: Yes.
12  Q. BY MR. BROWN: Have you, in the course of
13  performing this job, made inquiries as to what quality
14  control has been performed on Urban?
15  MR. MCGARRY: Objection to the form.
16  THE WITNESS: If pertinent to a very
17  specific case, but not as matter of course for their
18  process. And what I mean by that is, if it is necessary
19  for the customer I'm trying to help, I will ask what
20  happened to that customer, to that file, to those
21  documents.
22  Q. BY MR. BROWN: But you will not -- you have not,
23  as a systemic matter, inquired into what, if any, quality
24  control has been performed at Urban?
25  MR. MCGARRY: Objection to the form.

Page 67

1  THE WITNESS: Not as a general rule. Again,
2  very specific to a customer situation.
3  Q. BY MR. BROWN: Okay. And I'm just not -- I'm not
4  asking as a rule, I'm just asking whether you have
5  inquired as to what quality control has been done over
6  Urban?
7  MR. MCGARRY: Objection. Asked and answered
8  twice. You can answer a third time.
9  THE WITNESS: If you're asking have I
10  questioned the process, no. If you're asking if I've
11  questioned for a particular borrower, yes.
12  MR. BROWN: Okay. Thank you. That
13  clarifies.
14  Q. BY MR. BROWN: Now, going back to this last
15  sentence in paragraph 7, the last sentence we read in
16  paragraph 7 -- sorry. In paragraph 7 completely, you say
17  that servicers are not permitted to offer permanent
18  modifications based on income documentation that is more
19  than 90 days old as of the date -- as of the determination
20  of eligibility.
21  Now, help me understand something. My
22  understanding is that the trial period lasts for at least
23  90 days; correct?
24  A. Correct.
25  Q. If a borrower submits documentation at the start

Page 68

1  or before the start of the trial period, will it
2  necessarily mean that the documentation will be too old to
3  issue a permanent modification based on the same
4  documentation?
5  MR. MCGARRY: Objection to the form and
6  foundation.
7  THE WITNESS: Not necessarily, no.
8  Q. BY MR. BROWN: Okay. Explain to me how it
9  wouldn't.
10  A. That would indicate that we would need to wait
11  until the end of the trial period or sometime very late in
12  the trial period to review those documents from an
13  underwriting perspective, and we would not do that unless
14  we had an incomplete package.
15  So the clock, if you will, starts with the
16  ingestion of documents, and then the underwriter's ability
17  to call it a complete package. So if that happened very
18  early in the process, we would underwrite very early in
19  the process. If by chance it took 90 days for a customer
20  to get us a final piece of documentation, older documents
21  could have aged and we could have to refresh, if you will.
22  But it's not just to say that a trial is 90
23  days, that documents were automatically aged from the
24  get-go.
25  Q. Okay. So what -- is it true that what you are

Page 69

1  saying in paragraph 7 is this 90-day clock, if you will,
2  goes from the submission of documents to the underwriting?
3  MR. MCGARRY: Objection. Foundation.
4  THE WITNESS: The 90 days -- the 90-day
5  clock would have started in this instance, in SD 9 ruling,
6  when the document was ingested by BAC -- by Bank of
7  America -- excuse me -- not that they were considered
8  eligible by means of -- it's not the solicitation date,
9  it's not the ask-for-help; it is when we receive that
10  first document, the clock starts for the 90 days.
11  Q. BY MR. BROWN: That's when it starts. And it
12  closes at the time the underwriter underwrites?
13  A. Yes. In SD.09 time frame, yes.
14  Q. So in the SD.09 time frame, the intent was to
15  underwrite within -- in a period less than 90 days from
16  receipt of documents?
17  A. Yes.
18  Q. Now, in this 90-day clock that you describe in
19  paragraph 7, is it true that Bank of America could sit on
20  documents, in other words, not underwrite, and then
21  consider them aged and require new documentation to
22  submit -- to be submitted?
23  MR. MCGARRY: Objection to the form.
24  THE WITNESS: There could be delays in
25  processing within Bank of America that could cause the

Page 142

1  Q.  BY MR. BROWN:  So this review that we just did
2  supports Ms. Torrico's claim that she sent in all the
3  documentation, does it not?
4         MR. MCGARRY:  Objection to the form and
5  mischaracterizes the documented testimony.
6         THE WITNESS:  The notation that the appeals
7  associate makes indicates that they agreed that she had
8  sent all the documentation and then forwarded her file
9  to -- for review for the HAMP program.
10        MR. MCGARRY:  Off the record.
11        (Discussion off the record.)
12        (Deposition Exhibit No. 5 marked for
13        identification.)
14 Q.  BY MR. BROWN:  Showing you what's been marked
15 Exhibit 5 entitled HomeSaver Workout Notes.  Do you
16 recognize these screen prints?
17 A.  Yes.
18 Q.  What do you recognize them as?
19 A.  Notes within HomeSaver, the HomeSaver system.
20 Q.  The HomeSaver system being another database?
21 A.  Yes.
22 Q.  And the one we were looking at in Exhibit 4 was
23 from HomeBase; correct?
24 A.  Correct.
25 Q.  Both HomeSaver and HomeBase feed into AS400;

Page 143

1  correct?
2  A.  Not in their entirety.  There are notes within
3  each that will write back to AS400.  In HomeSaver's
4  example, based on the type of note, for lack of a better
5  term.  So it's not a hundred percent match back to AS400.
6  Q.  So to get a complete picture, you would need
7  HomeBase, HomeSaver, and AS400?
8         MR. MCGARRY:  Objection to the form.
9         THE WITNESS:  If by that you mean a full
10 picture of notes, yes, you would need all three systems.
11 Q.  BY MR. BROWN:  What distinction are you making?
12 A.  If you ask me how many systems I use to research
13 a timeline that we spoke about earlier, it is more than
14 three.
15 Q.  Which other ones?
16 A.  HomeBase, HomeSaver, AS400, Loss Mitigation
17 Financials, Loss Mitigation Plan, Urban, Stewart, iPortal.
18 Q.  Anything else?
19 A.  I'm thinking.  One moment please.
20 Q.  Sorry.
21 A.  Loss Mitigation Profiler, Workout Package
22 Tracking.  Without having my system in front of me, those
23 are the systems that I recall.
24 Q.  Okay.  Are any of the systems you listed mutually
25 exclusive?  In other words, if something is in Urban,

Page 144

1  would you not have to look in Stewart?
2  A.  It's dependent on the customer.  There should not
3  be a reason to have to look in both places.  As matter of
4  course, I do look in both places because it has happened
5  that we have documents in both vendor systems for one
6  reason or another.
7  Q.  Are there any other of the systems that you
8  mentioned that should be one or the other?
9  A.  No, sir.
10 Q.  Is the information in Loss Mitigation Financials
11 kept in data fields?
12        MR. MCGARRY:  Objection to the form.
13        THE WITNESS:  Yes.  This is what we talked
14 about before with the income and the expense line
15 itemization type of activities.  That is in LMF, to use
16 the acronym.  So we would be able to -- I should qualify
17 that.  I don't know if it can be queried in the way you
18 might think of a SQL query being able to extract.  But the
19 information is there, it is in fields and available.
20 Q.  BY MR. BROWN:  Is it exportable?
21        MR. MCGARRY:  Objection.  Foundation.
22        THE WITNESS:  I don't know.
23 Q.  BY MR. BROWN:  How about Loss Mitigation Plan?
24 Is that in fields?
25 A.  That is also in fields, yes.

Page 145

1  Q.  Loss Mitigation -- and it's in fields in the same
2  way you talked about Loss Mitigation Financials?
3  A.  Yes.
4  Q.  How about Loss Mitigation Profiler?  Is that data
5  in fields?
6  A.  It is in fields, yes, in the same way.
7  Q.  How about Workout Tracking -- Package Tracking?
8  Is that information in fields?
9  A.  Yes.
10 Q.  And in the same way as Loss Mitigation Financial?
11 A.  No, in that Workout Package Tracking does not
12 include customer financial information.
13 Q.  Yes.
14        That sounds like it's a difference in the
15 type of data it keeps.
16 A.  Yes.
17 Q.  I'm asking about the type of fields that they
18 are.
19 A.  Fair enough, then.
20 Q.  Are the fields the same way?  They have separate,
21 distinct fields that may be able to be exported?
22 A.  Yes.
23        MR. MCGARRY:  Objection to the form and lack
24 of foundation.
25 Q.  BY MR. BROWN:  How about iPortal?  Is information

Page 146

1  in fields?
2  A. Yes.
3  Q. Same way, possibly exportable?
4      MR. MCGARRY: Objection to the form.
5      THE WITNESS: Yes.
6  Q. BY MR. BROWN: How about Urban? Information in
7  fields there?
8  A. Yes.
9  Q. Also exportable?
10     MR. MCGARRY: Objection. Foundation.
11     THE WITNESS: Yes.
12 Q. BY MR. BROWN: And Stewart, is information in
13 Stewart -- in the Stewart database in fields?
14 A. Yes.
15 Q. Also exportable?
16     MR. MCGARRY: Objection. Foundation.
17     THE WITNESS: Yes.
18 Q. BY MR. BROWN: I think I hit them all.
19     Let's look at Exhibit 5, turning to the back
20 again, we'll work back to front. Now, HomeSaver workout
21 notes appears to have information that is not included in
22 HomeBase. Is that consistent with your understanding?
23 A. Yes.
24 Q. Okay. Starting at 84743, does this give a better
25 indication of what documents were sent on May 11, 2009?

Page 147

1  A. No.
2      MR. MCGARRY: Objection to the form.
3      THE WITNESS: No, it does not.
4  Q. BY MR. BROWN: I should clarify my question.
5  That wasn't well put.
6      In HomeBase, earlier we looked at notations
7  from May 2009 and I believe you had said you didn't know
8  what documents were submitted?
9  A. Correct.
10 Q. Does the notation here in HomeSaver, Exhibit 5,
11 give you a better idea as to what documents were
12 submitted?
13     MR. MCGARRY: Same objection.
14     MR. BROWN: I'm looking specifically at
15 notes text, items received, workout cover letter, workout
16 letter.
17     MR. MCGARRY: Objection to the form and
18 foundation.
19     THE WITNESS: Gives me different information
20 than I had in HomeBase. HomeBase does not have the entry
21 from 5/11. As for content, it is no more descriptive in
22 HomeSaver than it is in HomeBase. I know that I did
23 receive a cover letter and a workout letter. That is
24 vague verbiage. I don't know if that's a hardship letter
25 from the customer or some other document. In this time

Page 148

1  frame, that was a pretty generic label for some documents,
2  so ...
3  Q. BY MR. BROWN: So in this time frame, could that
4  mean that the -- there were bank statements included?
5      MR. MCGARRY: Objection. Foundation.
6      THE WITNESS: No.
7      MR. BROWN: Okay.
8      THE WITNESS: The confusion you're reading
9  honestly on my face is whether or not this was an incoming
10 or outgoing letter. Workout letter can be used for an
11 incoming document from the customer that is, in fact, a
12 letter. This was also the time frame, you'll remember me
13 saying, that we did not have upload capability in iPortal,
14 so we were faxing information to be uploaded to iPortal,
15 so this could have been something we sent. Without being
16 able to see the imaging system itself, I cannot tell you
17 whether it was incoming or outgoing.
18 Q. BY MR. BROWN: Sent to whom?
19 A. The borrower.
20 Q. So when it says "Items received: Workout cover
21 letter, workout letter," that doesn't -- it implies to me
22 that these were items that were received. Do you have an
23 different understanding?
24 A. No. I -- I have a picky understanding, and I
25 apologize. Again, without the ability for an associate at

Page 149

1  the desktop to upload to iPortal, they were responsible
2  for faxing documents to, frankly, the India team, the
3  India team having upload capabilities within iPortal.
4  Q. I'm sorry. I'm going to interrupt you. What's
5  "the India team"?
6  A. The team in India that works --
7  Q. India the country?
8  A. India the country, I'm sorry, that works
9  overnight specifically ingesting documents. It's a very
10 clerical-type function, so that's an offshore play that
11 we've made.
12     And I know I'm splitting hairs, and I
13 apologize, but what this says to me is that the India team
14 received something that they needed to upload. What I
15 cannot tell from this description is if they received it
16 from the borrower or from the internal BAC associate.
17 Q. Okay. It does tell you, however, then, that
18 there were some documents that had to come initially from
19 the borrower, doesn't it?
20 A. Not necessarily. So if you recall in HomeBase,
21 we saw that the appeals representative had to upload their
22 screen print, their workout information. This is a very
23 generic term for me, "workout cover letter" and "workout
24 letter" is very generic. It -- just to be more confusing,
25 I apologize, it also could be not related to the workout.

Page 186

1  often happened that the borrowers had done everything in
2  their control, meaning they had provided all the written
3  information and documentation, prior to receiving a trial
4  plan?
5          MR. MCGARRY:  Same objections.
6          THE WITNESS:  Struggling only with the word
7  "often."  Did it happen?  Yes.  We could have well had
8  documentation on borrowers prior to them receiving their
9  trial.
10    Q.  BY MR. BROWN:  In the Moussas case, on the two
11 pages we had just looked at, on October 8, 2009, and
12 November 8, 2009, does this indicate that the Moussas may
13 well have sent every document that was required of them,
14 recognizing that you would need to verify?
15         MR. MCGARRY:  Objection.  Asked and answered
16 and, objection, the question --
17         MR. BROWN:  That's enough.  You've stated
18 your objection.  You can make your arguments later.
19         MR. MCGARRY:  I have a second objection,
20 which is --
21         MR. BROWN:  You don't need to --
22         MR. MCGARRY:  -- the question is internally
23 inconsistent.
24         MR. BROWN:  You've stated your objection.
25 You can argue about it later.

Page 187

1          THE WITNESS:  I'm sorry.  10/8 and 11/9 are
2  the two in question?
3          MR. BROWN:  Yes.
4          THE WITNESS:  These notes indicate to me
5  that I did receive pay stub, unclear on timing; tax
6  return, I'm also unclear on timing.  So to say a complete
7  package, these two notes would not lead me to believe
8  that.  I -- I don't have bank statements.  I don't have
9  utility bills.  And, again, I don't know what periods the
10 pay stubs and tax returns are referring to.
11    Q.  BY MR. BROWN:  But you'd have to check that?
12    A.  Yes.
13    Q.  And it is possible that it was sent?
14         MR. MCGARRY:  Objection to the form.
15         THE WITNESS:  Yes.
16    Q.  BY MR. BROWN:  And if so, the Moussas would have
17 done everything in their control to give verifiable
18 information?
19         MR. MCGARRY:  Objection.  Improper
20 hypothetical and calls for speculation.
21         THE WITNESS:  Yes, they could have.
22    Q.  BY MR. BROWN:  If you would look to page 32028,
23 we see another notation for workout documents received via
24 fax on February 1, 2010.  This would be consistent, would
25 it not, with Ms. Moussa's letter indicating she sent

Page 188

1  documents on January 26, 2010?
2          MR. MCGARRY:  Objection to the form.
3          THE WITNESS:  Yes.
4     Q.  BY MR. BROWN:  And the documents -- the notation
5  simply wasn't made and the documents were sent on
6  January 26th, it could be the notation simply wasn't made
7  until February 1st?
8          MR. MCGARRY:  Objection.  Foundation.
9          THE WITNESS:  Correct.
10    Q.  BY MR. BROWN:  If you look at page 32026, what
11 does the note "MHA mod pass" mean?
12    A.  This is a note from an underwriter indicating
13 that they had completed the income validation portion and
14 that they were sending it forward to compliance for
15 review.
16    Q.  So this indicates that as of February 25th, the
17 documentation package was at least ready to have been sent
18 to an underwriter?
19    A.  Correct.
20    Q.  If you look at the previous page, 32027,
21 February 23, 2010, says docs needed.  They need to send in
22 page 2 of the 1040 form of the 2008 tax returns signed and
23 dated by both borrowers on the second-to-last section
24 where it says "sign here."  And that's on February 23,
25 2010.  Does the following notation that we just looked at

Page 189

1  on February 25th indicate that they had sent it?
2     A.  Yes.
3     Q.  So this notation on February 25th indicates that
4  the Moussas -- Mr. and Mrs. Moussa had sent in everything
5  that was required of them?
6          MR. MCGARRY:  Objection.  Asked and
7  answered.
8          THE WITNESS:  Yes.
9     Q.  BY MR. BROWN:  The notation on February 25th --
10 on 32024 there's another notation on February 25th, and
11 could you explain what these ratios, front-end and
12 back-end, refer to?
13    A.  Absolutely.  A front-end is the ratio of the
14 mortgage payment, as the numerator, and the gross monthly
15 income as the denominator.  Taking those two,
16 51.5 percent.  Back end is everything else.  Back end has
17 to do with the other debt the Moussas would have, car,
18 credit cards, other loans, things of that nature.  Back
19 end, then, being 95 percent.
20    Q.  And are these ratios consistent with someone who
21 would be eligible for a HAMP loan modification?
22         MR. MCGARRY:  Objection to the form.
23         THE WITNESS:  Yes.
24    Q.  BY MR. BROWN:  On what basis did you determine
25 that the Moussas had failed their modification due to

Page 190

1 excessive forbearance?
2   A. That was the HAMP exit code in the decision
3 engine as well as the -- it would have -- also would have
4 been -- excuse me -- the decline letter sent to the
5 Moussas.
6   Q. Is there anything else you looked at?
7   A. No.
8   Q. Did you do any sort of confirmation as to whether
9 that was a proper conclusion based on the data?
10  A. No.
11  Q. When were the Moussas informed that -- well, hold
12 on.
13      Going back to page 23032, that had the terms
14 of the temporary -- the trial modification, when would the
15 modification effective date be? Can you tell when the
16 modification effective date would be based on this
17 information?
18  A. The trial effective date was January 1, 2010.
19 There's no indication here on when a permanent
20 modification would be effective.
21  Q. Do you have an understanding when a modification
22 date effective is, as the first month following the date
23 on which the last payment is made?
24  A. In the absence of a delayed conversion situation,
25 that is a reasonable assumption. That had this gone to

Page 191

1 permanent modification, the permanent modification should
2 have taken effect 3/1/2010. I'm sorry, 4/1/2010.
3   Q. Right.
4       The Moussas were not informed -- there was
5 no denial letter issued until June 4, 2010, according to
6 your declaration?
7   A. Correct.
8   Q. So they were not -- there was no rejection
9 within -- or prior to the modification effective date;
10 correct?
11  A. Correct.
12  Q. Now, it says in your declaration, "After the
13 Moussas were found ineligible for the permanent
14 modification, BAC offered the Moussas an alternative
15 modification. The Moussas declined that offer." Did you
16 do research to determine why the Moussas may have declined
17 that offer?
18  A. I don't recall. I'm sorry.
19  Q. Did you review documents in which the Moussas
20 explained specifically why they declined the offer?
21  A. Again, I'm sorry, I don't recall at this point.
22  Q. Did you check to see whether the offer was
23 consistent -- the -- sorry.
24      Did you check to see whether the alternative
25 modification was consistent with the applicable

Page 192

1 guidelines?
2       MR. MCGARRY: Objection to the form.
3       THE WITNESS: I'm sorry. I don't recall.
4   Q. BY MR. BROWN: Did you check to see whether the
5 alternative modification even had their address correct?
6       MR. MCGARRY: Objection to the form.
7       THE WITNESS: I don't recall.
8   Q. BY MR. BROWN: Are you -- were you made aware
9 that the reason the Moussas declined the offer was that it
10 listed the wrong county?
11  A. Again, I don't recall. I'm sorry.
12  Q. So in your declaration, why is there no
13 explanation as to why they may have declined the offer?
14      MR. MCGARRY: Objection to the form.
15      THE WITNESS: These are short statements
16 about the status. We did not go into deep commentary.
17 That was not what was requested. I was asked to provide
18 milestones, if you will, on the process.
19  Q. BY MR. BROWN: So is it your contention that
20 clarifying as to whether an alternative modification was
21 proper or consistent with previous modifications would be
22 deep commentary?
23      MR. MCGARRY: Objection to the form.
24      THE WITNESS: In this situation, yes.
25  Q. BY MR. BROWN: Okay. And you do not believe that

Page 193

1 stating that Bank of America offered the Moussas an
2 alternative modification and they declined the offer is
3 misleading?
4       MR. MCGARRY: Objection to the form.
5       THE WITNESS: No.
6   Q. BY MR. BROWN: You don't believe it suggests --
7 it gives the impression that they -- that Bank of America
8 did everything that was required of them and the Moussas
9 simply declined it at their whim?
10      MR. MCGARRY: Objection to the form.
11      THE WITNESS: I don't think it does, no.
12  Q. BY MR. BROWN: Okay. That's not your intention?
13  A. No, sir.
14  Q. And who wrote this narrative regarding Antoun and
15 Sabah Moussa?
16  A. This would have been the collaboration between
17 myself and Nicholas Miller.
18  Q. Did you write it?
19  A. I can't say with certainty the pieces that were
20 authored entirely by myself versus Nick. I'm sorry.
21  Q. Would you agree that this is not a complete
22 description of the process of modification to Antoun and
23 Sabah Moussa?
24      MR. MCGARRY: Objection to the form. The
25 question assumes it's intended to be.

Page 194

1  MR. BROWN: Way to go, Coach.
2  THE WITNESS: I think this describes
3  milestones, as I said. I don't think it describes intent
4  or the human response, if you will, from the Moussas as
5  for why, for instance, the modification offer was
6  declined.
7  Q. BY MR. BROWN: Where in the declaration does it
8  clarify that these are really high-level milestones --
9  MR. MCGARRY: Objection to --
10 MR. BROWN: -- or as however you described
11 them, rather than a complete description?
12 MR. MCGARRY: Objection to the form. The
13 question is improper. It assumes that the declaration is
14 supposed to say one or the other.
15 MR. BROWN: That's not the question.
16 MR. MCGARRY: Yeah, it is.
17 MR. BROWN: Mr. McGarry --
18 MR. MCGARRY: Yeah, it is.
19 MR. BROWN: -- cut it out.
20 MR. MCGARRY: That's what the question
21 implies.
22 THE WITNESS: It does not say that.
23 Q. BY MR. BROWN: Okay. How would you go about
24 determining how a conclusion of excessive forbearance came
25 about?

Page 195

1  MR. MCGARRY: Objection. Asked and
2  answered.
3  THE WITNESS: It would have been through the
4  HAMP exit code in the NPV test as well as the resulting
5  decline letter to the borrower.
6  Q. BY MR. BROWN: Okay. I'm asking a slightly
7  different question.
8  A. Oh.
9  Q. You see a resulting decline letter that says,
10 you're declined for excessive forbearance. How would you
11 go about determining whether that conclusion of excessive
12 forbearance was correct?
13 MR. MCGARRY: Objection. Foundation.
14 THE WITNESS: That is outside of my area of
15 expertise. My team would not conclude if excessive
16 forbearance was the appropriate outcome or not. We would
17 have to refer that to a different area.
18 (Deposition Exhibit No. 8 marked for
19 identification.)
20 Q. BY MR. BROWN: Showing you what's been marked as
21 Exhibit 8. Turn to the next page. Do you recognize this
22 as a payment history regarding the Moussas?
23 A. I'm sorry, I'm struggling only with -- oh,
24 there's the loan number. Yes, sir.
25 Q. And I just looked to see. Did you just confirm

Page 196

1  the loan number?
2  A. Yes.
3  Q. Okay. From what database is this payment history
4  taken?
5  A. I don't know.
6  Q. In what database is payment history available?
7  MR. MCGARRY: Objection. Foundation.
8  THE WITNESS: AS400.
9  Q. BY MR. BROWN: I'd like you to turn to
10 page 32829. You see towards the bottom there's a notation
11 on 12/10/2009, miscellaneous posting?
12 A. Yes.
13 Q. For 1932.99?
14 A. Yes.
15 Q. Made on 12/10/2009. Did I just said that?
16 A. Yes.
17 MR. MCGARRY: You did.
18 Q. BY MR. BROWN: That would be consistent with the
19 first payment of the trial modification based on the date
20 and the amount, wouldn't it?
21 A. Based on the amount, yes.
22 Q. And the date?
23 A. It was due on January 1st, posting on
24 December 10, one could assume that that was the
25 January payment.

Page 197

1  Q. And then on the next page of the payment
2  history --
3  MR. MCGARRY: I'm sorry, are you going --
4  THE WITNESS: Forward or backward?
5  MR. MCGARRY: On 28?
6  MR. BROWN: I'm on 32830. No, this one goes
7  forward.
8  MR. MCGARRY: 830?
9  MR. BROWN: I'm changing up on you.
10 MR. MCGARRY: All right.
11 Q. BY MR. BROWN: On 32830, we see, starting from
12 the top, two consecutive miscellaneous postings for the
13 same amount, 1932.99, on January 22nd and February 24,
14 2010. Those would be consistent with the trial payment,
15 wouldn't they?
16 A. Yes.
17 Q. And we see a fourth payment on 3/23 for the same
18 amount?
19 A. Yes.
20 Q. And on 4/22?
21 A. Yes.
22 Q. And on 6/1?
23 A. Yes.
24 Q. It would seem that the Moussas are paying 1932.99
25 each month?

Page 198

1    A.  Yes.
2    Q.  Now, I'd like you to look over toward the far
3  right column, and "Unapplied Total," what does that mean?
4    A.  I honestly am not an expert on payment posting.
5  I don't know what that means.
6    Q.  Okay.  Do you know whether the determination --
7  well, we saw several notifications in home -- not that
8  one -- HomeBase saying "partial," "applied partial
9  payment"?
10   A.  Correct.
11   Q.  And is it your understanding that each of these
12 trial plan payments were applied as partial payments
13 because they were less than the total amount due?
14       MR. MCGARRY:  Objection.  Lack of
15 foundation.
16       THE WITNESS:  Yes.
17   Q.  BY MR. BROWN:  And the difference between the
18 partial payment and the total amount due, total amount due
19 was added to the indebtedness, was it not?
20       MR. MCGARRY:  Objection to the form and
21 foundation.
22       THE WITNESS:  Yes.
23   Q.  BY MR. BROWN:  And adding it to the indebtedness
24 would increase the forbearance amount ultimately in a
25 modification?

Page 199

1        MR. MCGARRY:  Objection to the form.
2        THE WITNESS:  Yes.
3    Q.  BY MR. BROWN:  So a borrower -- the longer a
4  borrower stayed in the trial plan, the greater amount of
5  the forbearance that Bank of America was considering
6  itself to have to make with a permanent modification?
7        MR. MCGARRY:  Objection to the form and
8  foundation.
9        THE WITNESS:  Yes.
10   Q.  BY MR. BROWN:  And that could lead -- ultimately,
11 it could lead to a finding of excessive forbearance, if
12 the amount got high enough --
13       MR. MCGARRY:  Objection to the form.
14       MR. BROWN:  -- month after month?
15       MR. MCGARRY:  Excuse me.
16       Objection to the form.  Improper
17 hypothetical.
18       THE WITNESS:  Yes.
19       (Deposition Exhibit No. 9 marked for
20       identification.)
21   Q.  BY MR. BROWN:  Showing you what's been marked as
22 Exhibit 9.  Do you recognize this as printouts from the
23 database?
24   A.  Yes.
25   Q.  Is this AS400?

Page 200

1    A.  Yes.
2    Q.  If you would turn to page 90393, please.  Would
3  you just confirm that the notation on 12/15/09, the one
4  that begins with the "WO."
5    A.  Yes.
6    Q.  Is that consistent with a notation that we looked
7  at earlier on HomeSaver, that had the terms -- some of the
8  terms of the trial period plan?
9    A.  Yes.
10   Q.  Is this -- is the documentation in the AS400 --
11 sorry.  Let me rephrase that.
12       Did this data in AS400 that we're looking at
13 right now come from HomeSaver?
14   A.  Yes.
15   Q.  If you would look at the following page, 90394,
16 there is the notation that we looked at earlier in
17 HomeSaver on 2/23/2010 which says, after the WO, "MHA mod
18 attempt number one.  Left message for borrower."
19   A.  Yes.
20   Q.  "Docs needed."  They need to send in page 2 of
21 the 1040.  I believe we looked at that same notation in
22 HomeSaver; right?
23   A.  Yes.
24   Q.  Now, if there were a previous request for a
25 signed 1040, would it -- should it have been reflected in

Page 201

1  AS400?
2        MR. MCGARRY:  Objection.  Foundation.
3        THE WITNESS:  I honestly don't know.  I'm
4  sorry.  What -- what that's bringing up is what we had
5  from an associate training or documentation perspective,
6  and I just don't know.  I'm sorry.
7    Q.  BY MR. BROWN:  I'm just trying to follow that
8  explanation you gave just now.
9    A.  Asking if a note should show up in AS400 is
10 leading me to a place of, was that the process for the
11 associate; would the associate have updated AS400 as part
12 of their training or matter of course.  So I don't know if
13 I'm misunderstanding you.
14   Q.  I'm -- in recreating -- in doing a comprehensive
15 timeline and -- in creating a comprehensive timeline, I
16 think you testified earlier that you would -- you would
17 note which documents were requested and when?
18   A.  Yes.
19   Q.  And what I'm trying to determine is where you
20 would get that information, and would it be in AS400?
21   A.  Thank you.
22       No.  It would be in HomeSaver or HomeBase,
23 because as I -- I think I said earlier, not everything
24 translates from those two systems to AS400, so I use
25 HomeBase and HomeSaver.