UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

M.D.L. NO. 10-2193-RWZ

IN RE BANK OF AMERICA
HOME AFFORDABLE MODIFICATION PROGRAM (HAMP)
CONTRACT LITIGATION

MEMORANDUM OF DECISION

September 4, 2013

ZOBEL, D.J.

In this consolidated litigation, individual borrowers from around the country claim

that Bank of America[1] mismanaged their requests for loan modifications under the

Home Affordable Modification Program ("HAMP"). Plaintiffs now seek to resolve the

issue of liability on a classwide basis. They move to certify twenty-six classes, one for

each state in which named plaintiffs reside.

I.    **Background**

HAMP is a federal government program designed to prevent mortgage

foreclosures. Through HAMP, the government has encouraged mortgage lenders and

servicers to provide loan modifications for eligible borrowers. The U.S. Department of

the Treasury has administered HAMP by issuing regulations in the form of HAMP

Guidelines and Supplemental Directives. See Program Guidance, Home Affordable

Modification Program, https://www.hmpadmin.com/portal/programs/guidance .jsp (last

---

[1] I use "Bank of America" to refer collectively to defendant Bank of America, N.A. and its subsidiary, defendant BAC Home Loans Servicing, LP.

visited Aug. 22, 2013).

The HAMP modification process begins with a preliminary evaluation by the mortgage servicer of the borrower's eligibility. From April 2009 through early 2010, under the Treasury Department's Supplemental Directive 09-01, the servicer could use a borrower's unverified statements about her financial situation to do that preliminary evaluation. See U.S. Dep't of the Treasury, Supplemental Directive 09-01, at 5 (Apr. 6, 2009), available at https://www.hmpadmin.com//portal/programs/docs/hamp_servicer /sd0901.pdf. If the preliminary evaluation indicated the borrower was eligible for a HAMP modification, the servicer would then offer the borrower a Trial Period Plan ("TPP"). Each TPP established a trial modification period, usually lasting three months. During that trial period, the borrower was obligated to make reduced monthly payments, provide any required financial documents, and meet other stated conditions. If the borrower complied with the required terms and remained otherwise eligible, then (according to each TPP) the servicer would provide a permanent HAMP modification. That permanent modification would become effective on the Modification Effective Date, the first day of the month after the last trial period payment was due.

Bank of America is one of many mortgage lenders and servicers that participated in HAMP and issued TPPs. Plaintiffs are a number of individual borrowers who claim that they entered into TPPs serviced by Bank of America and made all the required trial payments, but did not receive either a permanent loan modification or a written denial of eligibility by the Modification Effective Date. They assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory

estoppel, and unfair and deceptive acts and practices.

The named plaintiffs include forty-three individuals and couples from twenty-six different states. They now seek to certify twenty-six different classes, one from each state they represent,[2] on the issue of liability. They propose the following class definition:

> All individuals with home mortgage loans on properties in [state] whose loans have been serviced by Bank of America and who, since April 13, 2009, have entered into a Trial Period Plan Agreement with Bank of America and made all trial payments required by their Trial Period Plan Agreement, other than borrowers to whom Bank of America tendered either:
>
> (a) A Home Affordable Mortgage Agreement sent to the borrower prior to the Modification Effective Date specified in the Trial Period Plan Agreement; or
>
> (b) A written denial of eligibility sent to the borrower prior to the Modification Effective Date specified in the Trial Period Plan Agreement.

Docket # 208 (Mot.) at 1. The term "Trial Period Plan Agreement" is defined to include only TPPs issued under Supplemental Directive 09-01. Id. at 2.[3]

## II.  Legal Standard

Federal Rule of Civil Procedure 23 governs class certification. The district court

---

[2] The states involved are Alabama, Alaska, Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Virginia, Washington, and Wisconsin. Plaintiffs seek to certify their breach of contract claim and their implied covenant claim in every state listed, either separately or as a single claim. They seek to certify their promissory estoppel claim in every state listed except for North Carolina and Virginia, and their unfair and deceptive acts and practices claim in every state listed except for Alabama, Georgia, Ohio, Texas, and Virginia. See Docket # 210, Ex. 10.

[3] Supplemental Directive 09-01 was superseded by Supplemental Directive 10-01, which required servicers to obtain fully verified financial information to determine eligibility before issuing any TPP with an effective date after June 1, 2010. See U.S. Dep't of the Treasury, Supplemental Directive 10-01 (Jan. 28, 2010), available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1001.pdf.

may only certify a class after a "rigorous analysis of the prerequisites established by Rule 23." <u>Smilow v. Sw. Bell Mobile Tel. Sys.</u>, 323 F.3d 32, 38 (1st Cir. 2003); <u>see also</u> <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2551 (2011). Under Rule 23(a), a party seeking class certification must show that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four requirements are known as numerosity, commonality, typicality, and adequacy. <u>See Smilow</u>, 323 F.3d at 38.

In addition, the party seeking certification must show that one of the requirements of Rule 23(b) is met. Plaintiffs seek to proceed under Rule 23(b)(3), which allows a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Here, plaintiffs seek to certify their twenty-six classes only as to liability; they propose that damages should be resolved separately in subsequent proceedings. <u>Cf.</u> <u>Smilow</u>, 323 F.3d at 41 ("[E]ven if individualized determinations were necessary to calculate damages, Rule 23(c)(4) . . . would still allow the court to maintain the class action with respect to other issues.").

### III.     Analysis

To achieve certification, plaintiffs must "affirmatively demonstrate" that they have met the requirements of Rule 23. Wal-Mart, 131 S. Ct. at 2551. "[T]hat is, [they] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Id.

### A.     Ascertainability

Although not explicitly mentioned in Rule 23, one essential prerequisite for class certification is that any proposed class must be ascertainable. In other words, the class must be defined by objective criteria that make it "administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright et al., Federal Practice & Procedure § 1760 (West 2013); Matamoros v. Starbucks Corp., 699 F.3d 129, 139 (1st Cir. 2012); Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 9 (D. Mass. 2010). Plaintiffs' proposed classes are defined by objective criteria—primarily the state where the individual's property was located, the identity of the servicer, the type of TPP the individual received, whether the individual made trial payments, and whether Bank of America sent a loan modification or a written denial by the specified date. Plaintiffs have presented expert testimony showing that individuals meeting these objective criteria can be identified by relatively efficient searches on a Bank of America internal database called "MHA Summary." See Docket # 240, Ex. 13 (Ayres Report), ¶¶ 69-80. The information in the MHA Summary database can apparently be supplemented by and cross-checked against other internal Bank of America databases. See id. ¶¶ 85-100.

Bank of America notes that plaintiffs' class definition depends on when Bank of America <u>sent</u> permanent loan modification offers, but the MHA Summary database only shows when permanent loan modifications were <u>implemented</u>. That distinction would make a difference in cases where Bank of America sent an individual borrower a permanent loan modification offer before the Modification Effective Date, but the borrower did not accept it (or Bank of America did not implement it) until after that date. <u>See</u> Docket # 224, Ex. 14 (Ayres Dep.) at 80. Plaintiffs' expert testified, however, that it appeared there were relatively few borrowers in that situation, and that they could be identified and removed from the proposed classes by adjusting the search algorithm. <u>See id.</u> In any case, "the class does not have to be so ascertainable that every potential member can be identified at the commencement of the action." Wright et al., <u>supra</u>, § 1760; <u>see</u> <u>Donovan</u>, 268 F.R.D. at 9. The criteria that plaintiffs have set forth are sufficiently stable and objective that "the general outlines of the membership of the class are determinable." Wright et al., <u>supra</u>, § 1760. Plaintiffs have therefore satisfied the threshold requirement of ascertainability.

**B.     Rule 23(a)**

As described above, Rule 23(a) sets forth four mandatory requirements for class certification. I discuss each in turn.

**1.     Numerosity**

The numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This standard "does not impose a precise numerical requirement," but classes of forty or more are generally considered

sufficiently numerous. <u>Connor B. ex rel. Vigurs v. Patrick</u>, 272 F.R.D. 288, 292 (D. Mass. 2011).

Plaintiffs' expert examined a random sample of 3,000 loans out of approximately 375,000 that were given trial modifications by Bank of America. Within that sample, 2,264 loans (about 75%) received TPPs meeting the class definition (i.e., TPPs issued under Supplemental Directive 09-01). Out of those 2,264 loans, plaintiffs' expert found that 1,814 (about 80%) met the class definition assuming a uniform three-month trial period length. By state, the number of observed class members in the 3,000-loan sample ranged from 26 in Alaska to 298 in California, with a median value of 62 observed class members per state. Ayres Report at app. 4. Extrapolating from that sample, the smallest expected class (Alaska's) should have some 123 borrowers in it.[4] I conclude that plaintiffs' showing is sufficient to satisfy the "relatively 'low threshold'" of the numerosity requirement. <u>Connor B.</u>, 272 F.R.D. at 292 (quoting <u>Garcia-Rubiera v. Calderon</u>, 570 F.3d 443, 460 (1st Cir. 2009)).

### 2.    Commonality

Commonality asks whether there are "questions of law or fact common to the

---

[4] Expanding the mathematics somewhat: Plaintiffs' expert reports that there are 241 mortgage loans in Alaska to which Bank of America provided trial modifications. The random sample produced a total of 51 such loans from Alaska, of which 35 (about 69%) received TPPs under Supplemental Directive 09-01. Out of those 35 loans, according to plaintiffs' expert, 26 (about 74%) were class loans (i.e., their borrowers did not receive either a permanent modification or a written denial before the Modification Effective Date). The best available inference, then, is that about $241 \times 69\% \times 74\% \approx 123$ Alaska loans belong to borrowers meeting the class definition.

Of course, these statistics rest on a number of questionable assumptions. For example, the sample of 3,000 loans, which the parties describe as "random," included 51 loans from Alaska (about 21% of the asserted total of 241 such loans) but only 516 loans from California (about 0.5% of the asserted total of 99,654 such loans). That distribution would be highly unlikely in a truly random sample. I nevertheless conclude plaintiffs have produced sufficient evidence to meet their burden.

class." Fed. R. Civ. P. 23(a)(2). It requires the party seeking certification to show a "common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. Even a single common question can be enough to satisfy Rule 23(a)(2), as long as answering that question will "drive the resolution of the litigation." Id. (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)); see also id. at 2556.

The primary common question that plaintiffs advance is whether Bank of America breached the TPPs it issued to each class member by failing to send either a permanent modification offer or a written denial of eligibility by the Modification Effective Date. Plaintiffs argue that the TPPs contractually required Bank of America to send either a permanent modification or a written denial by that date; Bank of America argues they did not.

While each individual class member had a separate TPP, it appears the relevant terms of each TPP were essentially the same; only the amount of the trial payments and the timing of the trial period changed. See Docket # 240, Ex. 20 (named plaintiffs' TPPs). The court could therefore interpret the common terms of these form contracts on a classwide basis. See Smilow, 323 F.3d 32, 39 (1st Cir. 2003) ("The common factual basis is found in the terms of the contract, which are identical for all class members. The common question of law is [how to interpret that contract]."); see also Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan, 711 F.3d 675, 684 (6th Cir. 2013)

("The determination of the scope and validity of the agreements involved common questions of law that lend themselves well for class certification.").

Bank of America argues there is no common question because plaintiffs cannot succeed on their breach of contract claim without prevailing on other individualized questions, such as each plaintiff's own performance and damages. But Rule 23(a)(2) "does not require that all questions of law or fact raised in the litigation be common." George v. Nat'l Water Main Cleaning Co., 286 F.R.D. 168, 174 (D. Mass. 2012); see also Wright et al., supra, § 1763. While plaintiffs' case certainly raises a number of individualized questions, it also raises at least one common one: how to interpret the TPPs. That is enough to satisfy Rule 23(a)(2).

Likewise, Bank of America argues that interpreting the TPPs will not "drive the resolution of the litigation," Wal-Mart, 131 S. Ct. at 2551 (quoting Nagareda, supra, at 132), because individual questions about plaintiffs' performance and damages will remain even if plaintiffs establish their interpretation of the TPPs' terms is correct. That argument fails for two reasons. First, if Bank of America's interpretation of the TPPs prevails, then the entire breach of contract claim fails, which would surely drive the resolution of the litigation. Second, and more importantly, plaintiffs need not show that answering their common question will completely end the litigation; they need only show that it will "resolve an issue that is central to the validity of each one of the claims in one stroke." Id. The correct interpretation of the TPPs is surely central to the validity of each class member's contract claims, and it can be resolved for each class member in a single decision. It therefore presents a sufficient common issue. See Gaudin v.

9

Saxon Mortg. Servs., Civil Action No. 11-1663-JST, 2013 WL 4029043, at *5 (N.D. Cal. Aug. 5, 2013) ("By determining whether the TPP is an enforceable contract and whether the parties' performance obligations are fully contained within it, the Court can resolve an issue central to the viability of the Proposed Class Members' claims."). But see Campusano v. BAC Home Loans Servicing LP, 2013 WL 2302676, at *6 (C.D. Cal. Apr. 29, 2013) (finding a lack of commonality in part because interpreting the contracts at issue might not completely resolve the parties' dispute).

This same issue of how the TPPs should be interpreted is also central to the validity of plaintiffs' other claims. Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing depends on their contention that the contract required Bank of America to provide either a permanent modification or a written denial by the Modification Effective Date, since the implied covenant "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Latson v. Plaza Home Mortg., 708 F.3d 324, 326 (1st Cir. 2013) (omission in original) (quoting Uno Rests. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004)).[5] Their alternative claim for promissory estoppel insists that

---

[5] Plaintiffs allege a number of unscrupulous practices by Bank of America that they claim are evidence of bad faith. For instance, they describe deliberate delays in reviewing borrowers' documents, lies about whether required documents had been received, lies about whether borrowers' modifications were actually under review, baseless denials intended only to reduce the TPP backlog, etc. Plaintiffs' claim for breach of the implied covenant, however, only allows them to recover insofar as they were denied their intended and expected benefits from the contract. The only such benefit that plaintiffs claim all class members were denied is the right to either a permanent modification or a written denial by the Modification Effective Date. To the extent plaintiffs claim some class members were harmed in other ways by Bank of America's unscrupulous practices, they have failed to show—indeed, they do not even attempt to show—that any one of those unscrupulous practices affected each class member individually and so raises an issue common to each proposed class. See Wal-Mart, 131 S. Ct. at 2551 ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' This does not mean merely that they have all suffered a violation of the same provision of law."

Bank of America promised in each TPP to provide a permanent modification or a

written denial by the Modification Effective Date—the same interpretive question raised

in the breach of contract claim. As for plaintiffs' claim of unfair and deceptive acts and

practices, it is not entirely clear what acts and practices form the basis for that claim;

but to the extent plaintiffs claim that Bank of America acted unfairly by breaching their

TPPs intentionally and in bad faith, they raise the same common interpretive issue of

what Bank of America's duties were under the TPPs.[6]

Bank of America also argues that differences among the laws of the twenty-six

different states at issue defeat commonality. But plaintiffs seek to certify a separate

class for each state, meaning that the same state law applies to all persons within each

class. Of course, "a court must be careful not to certify too many groups." Klay v.

Humana, Inc., 382 F.3d 1241, 1262 (11th Cir. 2004). The problems that arise from

certifying many different classes in a single case, however, are problems of class

adjudication that are more appropriately addressed under the superiority requirement of

Rule 23(b)(3). Cf. In re Am. Med. Sys., 75 F.3d 1069, 1085 (6th Cir. 1996) (finding

plaintiffs had failed to show superiority for a nationwide class because "[i]f more than a

---

(citation omitted) (quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 157 (1982)).

[6] Plaintiffs' currently active complaint, the third amended complaint, refers only to Bank of America's "conduct as set forth herein and as alleged in the underlying complaints" and its "false, deceptive and misleading statements and omissions" in describing the grounds for the claim of unfair and deceptive acts and practices. Docket # 84 (Third Am. Compl.), ¶¶ 555-95. Of course, the third amended complaint describes a wide array of allegedly unfair conduct, much of which was only experienced by some plaintiffs and not by others. See id. at ¶¶ 135-473 (describing the different experiences of each named plaintiff). As with plaintiffs' implied covenant claim, to the extent plaintiffs' unfair and deceptive acts and practices claim rests on the different individual experiences of the named plaintiffs, it does not raise a common issue appropriate for class treatment. See Wal-Mart, 131 S. Ct. at 2551; cf. Smilow, 323 F.3d at 42 (plaintiffs relying on individual oral misrepresentations "risk losing class status").

few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law"); 7AA Wright et al., supra, § 1780.1. The asserted differences in state law across the different proposed classes do not prevent commonality within each class.

I therefore conclude plaintiffs have shown their proposed classes meet Rule 23(a)(2)'s commonality requirement.

### 3. Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The claims of the entire class need not be identical, but the class representatives must generally 'possess the same interests and suffer the same injury' as the unnamed class members." Connor B., 272 F.R.D. at 296 (quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 156 (1982)). In general, a representative plaintiff is sufficiently typical if his claims and the class members' claims (1) arise from the same event, practice, or course of conduct, and (2) are based on the same legal theory. See Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009).

At the broadest level, all of the named plaintiffs' claims arise from the same allegedly wrongful practice—Bank of America's failure to provide a permanent modification or a written denial by the Modification Effective Date—and are based on the same legal theories. However, Bank of America raises a number of particular issues with respect to certain named plaintiffs.

First, Bank of America argues that plaintiff Kimberley George and plaintiffs

12

Matthew Nelson and Angelica Huato-Nelson ("the Nelsons") are not actually members of the proposed classes. Specifically, it claims they did not make all of their trial period payments in a timely fashion. See Mot. at 1 (defining the classes to include only borrowers who "made all trial payments required by their Trial Plan Period Agreement"). Bank of America's argument plainly fails as to George, who timely made all three of the trial payments required by her TPP. Bank of America only tasks George with nonpayment because she fell behind after Bank of America granted her a "Trial Offer Extension," which extended her trial plan by an additional month beyond the Modification Effective Date specified in her TPP. Docket # 223 (Schoolitz Decl.), ¶ 10 & Ex. 24. But George asserts—like the other members of her proposed class—that she had fully complied with her TPP by making the three payments it specified. Any subsequent late or missed payment is not directly relevant to her claim. As for the Nelsons, the record shows a disputed issue of fact over whether they made their third trial payment in a timely fashion. Compare Schoolitz Decl., ¶ 31 & Exs. 127-128 (indicating the Nelsons' first three trial payments were those that posted on June 18, July 10, and September 15, 2009, making the third trial payment late), with Docket # 248, Ex. 65 (Ayres Decl.), ¶ 12 & n.16 (indicating the Nelsons' first three trial payments were those that posted on May 5, June 18, and July 10, 2009, making all three payments timely). Plaintiffs' evidence on this disputed question is sufficient to show the Nelsons' typicality for present purposes. If further factual development were to demonstrate that the Nelsons did not make their third trial payment on time, the

Nelsons could be replaced by a different class representative.[7]

Bank of America next argues that named plaintiffs Magali and Manuel Alvarenga, Donald and Maria Hall, Marie Freeman, and Jason Volpe are not typical because they entered into TPPs with Wilshire Credit Corporation ("Wilshire"), not Bank of America. Wilshire is described in the complaint as a "subsidiary or sister company" of Bank of America. Third Am Compl., ¶ 167. Loans previously serviced by Wilshire are apparently now serviced by Bank of America, and the standard terms of the TPPs issued by Wilshire are apparently identical to those issued by Bank of America. However, the Modification Effective Date on the Alvarengas' TPP, the Halls' TPP, and Freeman's TPP had already passed before Bank of America began servicing their loans. (The Modification Effective Date on Volpe's TPP occurred about a month after Bank of America began servicing his loan.)

Although the typicality requirement "may be satisfied even though varying fact patterns support the claims or defenses of individual class members." Wright et al., supra, § 1764, I conclude Bank of America is correct to argue that named plaintiffs whose TPPs were issued by Wilshire are not typical of the proposed classes. In the first place, they are outside the plain meaning of the class definition, which explicitly limits the proposed classes to individuals who "have entered into a Trial Plan Period Agreement with Bank of America." Mot. at 1. The Alvarengas, the Halls, Freeman, and Volpe entered into TPPs with Wilshire, not with Bank of America. And this issue cannot

---

[7] The Nelsons currently represent the proposed California class, which is also represented by Magali and Manuel Alvarenga and by Jesus Carillo. Because Carillo appears to meet the typicality requirement, the proposed California class could be certified even without the Nelsons.

be avoided by simply redefining the classes: To pursue their claims, these plaintiffs would have to explain the relationship between Wilshire and Bank of America, and show why Bank of America should be liable for the alleged breach of Wilshire's TPPs. That showing may be simple, but it may not—especially where the alleged breach was committed by Wilshire (which failed to send a permanent modification or a written denial before the Modification Effective Date) well before Bank of America began servicing the loan. These individual issues frustrate any confidence in the ability of these named plaintiffs to represent the proposed classes. See Swanson v. Lord & Taylor LLC, 278 F.R.D. 36, 41 (D. Mass. 2011) ("[T]ypicality and adequacy may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation." (quoting In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008)). I therefore find the Alvarengas, the Halls, Freeman, and Volpe do not meet Rule 23(a)(3)'s typicality requirement.

Finally, Bank of America argues that most of the remaining named plaintiffs are unique in various ways. For instance, Bank of America asserts that many named plaintiffs themselves failed to perform as required by their TPPs: some because they made untrue representations in their TPPs, others because they failed to provide documents as required by their TPPs, and still others because they failed to complete credit counseling as required by their TPPs. Likewise, Bank of America asserts that some named plaintiffs have no damages or have failed to mitigate their damages. It also argues that some named plaintiffs have other unique circumstances: for instance, one named plaintiff filed for bankruptcy during her trial period, and another named

plaintiff claims he had an oral agreement with Bank of America in addition to his TPP. Because of these individual issues, Bank of America argues, most of the named plaintiffs are not typical of the proposed classes.

Bank of America's arguments do cast substantial doubt on whether class action treatment is appropriate here. Nevertheless, I conclude that the remaining named plaintiffs have adequately shown typicality. No two individual class members in any class are exactly identical; the typicality requirement may be satisfied despite some variation in the individual situations of the named plaintiffs and the class members. Wright et al., supra, § 1764. At bottom, the typicality requirement seeks to illuminate "whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff[s'] claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Wal-Mart, 131 S. Ct. at 2551 n.5 (quoting Falcon, 457 U.S. at 158 n.13). Here, the claim that the named plaintiffs seek to advance on behalf of their respective classes is that the TPPs required Bank of America to provide a permanent modification or a written denial by the Modification Effective Date, and that Bank of America is liable for damages if and when it failed to do so. As regards that claim, the remaining named plaintiffs are typical of their classes; they each received a TPP from Bank of America with terms like those of the other class members, and Bank of America failed to send them either a permanent modification or a written denial by their respective Modification Effective Dates. Beyond that, any individual differences between the remaining named plaintiffs and the class members are primarily relevant to

the predominance requirement of Rule 23(b)(3) rather than the typicality requirement of

Rule 23(a)(3). See Gaudin, 2013 WL 4029043 at *5-6 (finding typicality satisfied in a

similar case).

I therefore find that the named plaintiffs other than the Alvarengas, the Halls,

Freeman, and Volpe raise claims that are typical of the proposed classes.[8]

### 4.    Adequacy

Adequacy of representation requires that "the representative parties will fairly

and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This

prerequisite has two parts: "(1) the attorneys representing the class must be qualified

and competent; and (2) the class representatives must not have interests antagonistic

to or in conflict with the unnamed members of the class." Connor B., 272 F.R.D. at 297

(citing Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)). Plaintiffs'

counsel here are experienced litigators with years of experience in class action work; I

have no difficulty concluding that they can adequately represent the proposed classes.

I also see no conflict of interest, and Bank of America has identified none, between the

remaining named plaintiffs and the other members of the proposed classes. The

adequacy requirement is thus satisfied.

### C.    Rule 23(b)(3)

Plaintiffs seek to certify their proposed classes under Rule 23(b)(3), which

---

[8] The Alvarengas intended to represent the proposed California class; Freeman intended to represent the proposed New York class; and the Halls and Volpe intended to represent the proposed Pennsylvania class. Each of these proposed state classes is represented by other named plaintiffs who meet the typicality requirement, so the disqualification of these named plaintiffs does not bar certification of any of these classes.

authorizes a class action where "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[9] Certifying a class under Rule 23(b)(3) requires "a close look at the case before it is accepted as a class action." In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 18 (1st Cir. 2008) (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 615 (1997)).

### 1.   Predominance

The predominance requirement determines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. Common questions may predominate despite the existence of individual differences, as long as "a sufficient constellation of common issues binds class members together." Waste Mgmt. Holdings v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000). However, the predominance standard is "far more demanding" than the commonality requirement of Rule 23(a)(2). In re New Motor Vehicles, 522 F.3d at 20 (quoting Amchem, 521 U.S. at 624). Deciding what questions predominate requires the

---

[9] In a single footnote, plaintiffs also mention Rule 23(b)(2), which allows certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). But plaintiffs' motion explicitly seeks to certify twenty-six classes only on the issue of liability; it does not describe any proposed injunctive relief or corresponding declaratory relief. See 7AA Wright et al., supra, § 1775 ("[A]n action seeking a declaration concerning defendant's conduct that appears designed simply to lay the basis for a damage award rather than injunctive relief would not qualify under Rule 23(b)(2)."). In any case, classwide declaratory relief would be inappropriate here; given the individualized issues described below, plaintiffs have failed to make the required preliminary showing that Bank of America has acted or refused to act on grounds that apply generally to the proposed classes. See Wal-Mart, 131 S. Ct. at 2557-61 (holding that Rule 23(b)(2) cannot be used to deprive a defendant of individualized defenses).

court to "formulate some prediction as to how specific issues will play out." Waste

Mgmt., 208 F.3d at 298.

The predominance analysis is somewhat nuanced in this case because plaintiffs

seek to certify their proposed classes only for adjudication of liability. See Fed. R. Civ.

P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class

action with respect to particular issues."). The Second and Ninth Circuits have held that

when plaintiffs seek to certify a class on a particular issue, they need only show that

common questions predominate as to that issue. See In re Nassau Cnty. Strip Search

Cases, 461 F.3d 219, 226-27 (2d Cir. 2006); Valentino v. Carter-Wallace, Inc., 97 F.3d

1227, 1234 (9th Cir. 1996). The Fifth Circuit, on the other hand, has held that "a cause

of action, as a whole, must satisfy the predominance requirement" in order for plaintiffs

to certify a class on any issue. Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n.21 (5th

Cir. 1996). I need not decide which position is correct. Even assuming plaintiffs need

only show common questions predominate on the specific issue of liability, not the

entire cause of action, they have failed to make that showing.

### a.    Breach of Contract

Plaintiffs' primary theory of liability is that each TPP represented an enforceable

contract between the individual borrower and Bank of America, and Bank of America

breached those contracts by failing to send either a permanent modification or a written

denial by the modification effective date. I have previously determined that plaintiffs'

TPPs were enforceable contracts supported by consideration. See Docket # 66 (Mem.

of Decision) at 8-11. That decision is supported by a number of recent circuit court

cases. See Corvello v. Wells Fargo Bank, Nos. 11-16234 & 11-16242, 2013 WL 4017279, at *4-6 (9th Cir. Aug. 8, 2013); Young v. Wells Fargo Bank, 717 F.3d 224, 233-36 (1st Cir. 2013); Wigod v. Wells Fargo Bank, 673 F.3d 547, 560-66 (7th Cir. 2012).

The TPPs do not explicitly state that Bank of America is required to send either a permanent modification agreement or a written denial by the Modification Effective Date. Nevertheless, plaintiffs argue that the contracts implicitly impose that obligation on Bank of America. The First Circuit recently accepted a similar argument; in Young v. Wells Fargo Bank, it held that another TPP could plausibly be read to require the servicer to offer a permanent modification by the Modification Effective Date if the borrower met her obligations under the agreement. Young, 717 F.3d at 233-36. That TPP used somewhat different language from the TPPs at issue here, see id. at 234-35, so Young's holding is not directly applicable. Still, Young indicates that plaintiffs have raised a plausible common question about Bank of America's duties under the TPPs.

But that common question is outweighed by the numerous individual questions affecting liability. In order to show that Bank of America is liable for a breach of contract, each plaintiff must show that a contract existed, that he performed as required by that contract, and that Bank of America breached the contract.[10]  See, e.g., Amicas,

---

[10] Although plaintiffs bring their contract claims under the laws of several different states, the contract principles at issue here do not vary materially.

Inc. v. GMG Health Sys., 676 F.3d 227, 231 (1st Cir. 2012).[11] The second
element—plaintiffs' own performance—poses the difficulty here. The TPPs placed
numerous obligations on borrowers who sought a modification. Each borrower had to
"provid[e] confirmation of the reasons I cannot afford my mortgage payment and
documents to permit verification of all of my income." Docket # 240, Ex. 20 ("TPP") at 1.
Each borrower had to "certify, represent . . . and agree" that he was "unable to afford
his mortgage payments," id. § 1.A; that he "live[d] in the Property" and it was his
"principal residence," id. § 1.B; that there had been no change in the ownership of the
property, id. § 1.C; that he would "provide[] documentation for all income," id. § 1.D;
that all the documents and information he had provided were true and correct, id. § 1.E;
and that he would obtain credit counseling if required to do so, id. § 1.F. In addition,
each borrower had to make the required trial payments on a timely basis. Id. § 2. The
new obligations imposed on plaintiffs by their TPPs are the consideration that they
provided to Bank of America. See Mem. of Decision at 9-10; Third Am. Compl., ¶ 520;
see also Bosque v. Wells Fargo Bank, 762 F. Supp. 2d 342, 351-52 (D. Mass. 2011);
Durmic v. J.P. Morgan Chase Bank, Civil Action No. 10-10380-RGS, 2010 WL
4825632, at *3 (D. Mass. Nov. 24, 2010) (noting that similar TPPs required plaintiffs to
"provide documentation of their current income, make legal representations about their
personal circumstances, and agree to undergo credit counseling if requested to do

---

[11]If a plaintiff seeks damages, he must also show causation and the amount of damages.
See Amicas, 676 F.3d at 231. But those elements are distinct from the issue of liability, and plaintiffs
seek certification only on liability. Cf. In re Nassau Cnty., 461 F.3d at 226-27; Valentino, 97 F.3d at 1234.

so").[12]

Deciding whether each plaintiff fulfilled his obligations under his TPP depends on a nearly endless series of individual questions: "Did Plaintiff A provide accurate documents permitting verification of all his income? Did Plaintiff A live in the property as his principal residence? Did Plaintiff A obtain credit counseling if required to do so? Did Plaintiff A make his trial payments on a timely basis? Did Plaintiff B provide accurate documents permitting verification of all his income? Did Plaintiff B live in the property as his principal residence? . . ." And so on, and so on, and so on, for each obligation of each member of each of the twenty-six classes.

Of course, the mere existence of these individual questions is not enough to show that they predominate. Predominance is not "determined simply by counting noses: that is, by determining whether there are more common issues or more individual issues." Butler v. Sears, Roebuck & Co., Nos. 11-8029 & 12-8030, 2013 WL 4478200, at *4 (7th Cir. Aug. 22, 2013). Common questions may still predominate over numerous individual questions where "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim." Smilow, 323 F.3d at 40. But the present record shows that the individual questions presented in this case are

---

[12] The parties do not discuss whether the representations in Section 1 constitute duties imposed on the borrower, conditions precedent to Bank of America's duties, or both. See Restatement (Second) of Contracts § 227 (West 2013); 13 Williston on Contracts § 38:7 (West 2013); cf. Mem. of Decision at 9-10 (considering both obligations and conditions precedent in the TPPs). The difference is not material here—in either case, these provisions raise factual questions that must be answered on an individual basis before plaintiffs can recover. Likewise, it does not matter whether these individual questions are parts of plaintiffs' breach of contract claim or affirmative defenses, since "affirmative defenses should be considered in making class certification decisions." Waste Mgmt., 208 F.3d at 295.

not susceptible to simple, routine resolution. They will instead require separate factual inquiries that will overwhelm any common questions.

A brief survey of the named plaintiffs' claims shows how individual questions will predominate. Borrowers entering a TPP were required to make their trial payments in a timely fashion; the class definition purportedly eliminates any individual questions here, since the proposed classes include only borrowers who met that requirement. But we have already seen an individual factual question arise over whether two named plaintiffs, the Nelsons, actually met that obligation. See supra Part III.B.3. Compare Schoolitz Decl., ¶ 31 & Exs. 127-128, with Docket # 248, Ex. 65 (Ayres Decl.), ¶ 12 & n.16. Borrowers were also required to certify that they were unable to afford their mortgage payments; the record shows an individual factual question over whether named plaintiff Heather Galasso could in fact afford her mortgage payments before beginning her TPP. Compare Docket # 224, Ex. 4 at 71-72, 76-77, 135 (indicating Galasso had the financial ability to make her full mortgage payments), with Docket # 248, Ex. 79 (indicating Galasso's credit card debt was excessive). Borrowers were required to certify that they lived in the mortgaged property as their principal residence. Bank of America's records indicate that named plaintiff Darren Kunsky did not live in the mortgaged property as his principal residence, see Docket # 223, Ex. 92; but Kunsky himself has testified that he did live in the property at the relevant time, see Docket # 248, Ex. 84. Borrowers were required to obtain credit counseling if Bank of America asked them to do so; named plaintiff Aissatou Balde was asked to obtain credit counseling, but never did, because (she testified) the phone number that Bank of

America gave her did not work. See Docket # 224, Ex. 15. Finally, borrowers were required to provide documents permitting verification of all of their income. This is the individual question that arises most frequently, given the Kafkaesque bureaucracy that decided which documents were required of which borrowers. Bank of America asserts that more than a quarter of the proposed class representatives failed to return the necessary documents, and has produced some evidence in each case to back its assertions. Plaintiffs dispute Bank of America's assertions with respect to each borrower. But those disputes, like all the others discussed above, can only be decided by individual inquiries into each plaintiff's performance. Factual questions like these cannot be resolved by just "computer records, clerical assistance, and objective criteria." Smilow, 323 F.3d at 40. Instead, they will require separate evidentiary hearings for many if not all of the proposed class members. These individual factual disputes will predominate in determining Bank of America's liability as to each plaintiff.

Plaintiffs raise several arguments that seek to avoid these individual questions. First, they argue that Bank of America would only issue a TPP when it was satisfied that the borrower receiving the TPP already met the criteria set out in Section 1 of the agreement (financial hardship, residence in the mortgaged property, documentation of income, etc.). According to plaintiffs, the fact that each class member received a TPP is itself enough to show they had each satisfied all obligations under Section 1; the only remaining obligation was to make the trial payments. But that argument plainly fails. The TPPs explicitly contemplate that borrowers may be required to provide documentation or meet other obligations after they enter into their TPPs. See, e.g.,

TPP, pmbl. ("If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all my income . . . ."); id. § 1.D ("I am providing or already have provided documentation for all income that I receive . . . ."); id. § 1.F ("If Servicer requires me to obtain credit counseling, I will do so."). Moreover, the first sentence of each TPP indicates that Bank of America is only required to provide a permanent modification if the borrower's "representations in Section 1 continue to be true in all material respects." Id. pmbl. In other words, each borrower had ongoing obligations that continued after she entered into her TPP.[13] The mere fact that each class member received a TPP is not enough to show that they each complied with all obligations under the TPPs—especially since Bank of America has adduced some evidence indicating that many class members did not in fact comply with their obligations.

Next, plaintiffs claim Bank of America has waived any objection to individual borrowers' nonperformance, thereby obviating any relevant individual questions. Plaintiffs rest largely on Section 2.F of the TPPs, which states (as relevant): "If prior to the Modification Effective Date . . . the Servicer [Bank of America] determines that [the borrower's] representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate." TPP, § 2.F. Plaintiffs characterize this provision as placing a duty on Bank of America to verify the borrower's representations, and to raise any objections to those representations, before

---

[13] Indeed, those ongoing obligations constitute the consideration that each borrower provided to support the contract. Obligations that have already been performed generally cannot stand as consideration. See, e.g., Hodgkins v. New Eng. Tel. Co., 82 F.3d 1226, 1231-32 (1st Cir. 1996).

the Modification Effective Date. Another federal district court recently accepted a similar argument regarding a similar TPP, holding that under this provision the court was not required to consider whether the individual borrowers actually performed but only whether the defendant mortgage servicer determined that they performed. See Gaudin, 2013 WL 4029043 at *7-8.

I do not find that argument persuasive. Plaintiffs' individual performance is a necessary part of their breach of contract claim; unless plaintiffs actually performed, Bank of America is not liable under the contract. See TPP, pmbl. (stating Bank of America will provide a permanent modification only if the borrower is "in compliance with this [TPP]"). Section 2.F does nothing to change that. It says that if Bank of America does determine the borrower's representations are false before the Modification Effective Date, the borrower will not receive a permanent modification. But it nowhere explicitly requires Bank of America to object to a borrower's nonperformance before the Modification Effective Date or else waive that objection forever.[14]

Moreover, plaintiffs' interpretation would "render large swaths of the TPP nugatory," Young, 717 F.3d at 235. It would mean plaintiffs were not actually required to perform any of their obligations under Section 1, as long as Bank of America failed to discover the nonperformance before the Modification Effective Date. While I need not conclusively interpret this provision of the contract now, I consider plaintiffs' interpretation of Section 2.F so unlikely to succeed that it does not cause common

---

[14] As Bank of America points out, such a provision in the TPPs would raise serious practical problems. A borrower might not comply with his obligations—for example, sending a required document or obtaining required credit counseling—until the day before the Modification Effective Date. That would give Bank of America no time to determine if the borrower's obligations had been met.

questions to predominate. See Waste Mgmt., 208 F.3d at 298 (deciding predominance requires "some prediction as to how specific issues will play out"). I reach the same conclusion with respect to plaintiffs' alternative argument that Bank of America waived plaintiffs' nonperformance by simply accepting plaintiffs' trial payments. Cf. Bosque, 762 F. Supp. 2d at 351-52 (noting borrowers' trial payments were already required by "their undisputed pre-existing mortgage loan obligations").

In sum, whether Bank of America is liable for breach of contract depends on numerous individual questions about each class member's performance. Those individual questions predominate over the questions common to the proposed classes. Plaintiffs' breach of contract claim therefore cannot be certified under Rule 23(b)(3).[15]

### b.     Breach of the Implied Covenant

Individual questions will likewise predominate in the adjudication of plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. That implied covenant "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Latson, 708 F.3d at 326 (omission in original) (quoting Uno Rests.,

---

[15] Bank of America also argues that individual questions predominate because of the numerous individual questions involved in determining whether each plaintiff suffered actual damages. It recognizes that plaintiffs seek only to certify their classes on the issue of liability, and that the amount of damages is not relevant to that issue; but it argues that plaintiffs cannot establish liability without showing some actual damages. See In re New Motor Vehicles, 522 F.3d at 28 ("Establishing liability, however, still requires showing that class members were injured . . . ."). Plaintiffs disagree, claiming actual damages are not an element of liability in a breach of contract action because a defendant may be liable solely for nominal damages. See, e.g., Flynn v. AK Peters, Ltd., 377 F.3d 13, 23 (1st Cir. 2004); cf. In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig., 286 F.R.D. 155, 159 n.4 (D. Mass. 2012). I need not resolve this issue, because individual questions already predominate on liability even without considering the additional individual questions that would arise if each plaintiff was required to show actual damages.

805 N.E.2d at 964). As discussed above, each TPP makes clear that Bank of America's duties are predicated on plaintiffs' performance of their own obligations. See, e.g., TPP, pmbl. ("If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then [Bank of America] will provide me with a [permanent modification]."). If plaintiffs did not perform, then Bank of America did not violate the intended and agreed expectations of the parties by failing to perform in turn. Moreover, insofar as plaintiffs base their implied covenant claim on other misdeeds beyond the failure to provide a permanent modification or a written denial by the Modification Effective Date, they raise further individual questions as to which of these alleged misdeeds affected which individual class members. See supra note 5; cf. Third Am. Compl., ¶ 530.

### c.    Promissory Estoppel

For their promissory estoppel claim (pled in the alternative), plaintiffs allege that Bank of America "by way of its TPP Agreements, made representations to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications." Third Am. Compl., ¶ 543. In other words, the alleged promise was a conditional one—that if plaintiffs complied with their obligations under their TPPs, Bank of America would provide them permanent loan modifications. Like the breach of contract claim and the implied covenant claim, then, this promissory estoppel claim raises the same individual questions as to whether each plaintiff performed under her TPP. Once again, these individual performance questions predominate over the relevant common questions.

####    d.    Unfair and Deceptive Acts and Practices

Finally, individual questions also predominate on plaintiffs' claims regarding Bank of America's allegedly unfair and deceptive acts and practices. To the extent these claims are based on Bank of America's alleged breach of the TPPs, they raise the same individual questions of plaintiffs' performance discussed above. See Campusano, 2013 WL 2302676, at *7 ("Whether [Bank of America's] conduct was unfair depends on whether the conduct breached the loan modification agreements. Because plaintiffs have not shown that there are questions capable of classwide resolution relating to the breach of the modification agreements, neither is the alleged fairness of those supposed breaches.") To the extent these claims are based on other unfair practices, there are individual factual issues as to whether each plaintiff was actually affected by the same alleged practices. See supra notes 5 & 6; cf. Wal-Mart, 131 S.Ct. at 2551 (no commonality where plaintiffs did not suffer the same injury from the same practice).

####    2.    Superiority

As well as failing the predominance requirement, plaintiffs' proposed classes also fail the superiority requirement. Superiority looks to whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs argue that liability can be more efficiently determined on a classwide basis rather than on an individual basis. See Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 273 (D. Mass. 2005) (superiority is met where "the piecemeal adjudication of numerous separate lawsuits

covering the same or substantially similar issues . . . would be an inefficient allocation of limited court resources"). Likewise, plaintiffs argue that many class members would lack "the financial incentives or wherewithal to seek legal redress for their injuries." Id.; cf. Gintis v. Bouchard Transp. Co., 596 F.3d 64, 67-68 (noting "the very reason for Rule 23(b)(3)" is "to make room for claims that plaintiffs could never afford to press one by one"). These arguments are certainly forceful; but they are outweighed by the unmanageable difficulty that would attend plaintiffs' twenty-six proposed class actions. As described above, plaintiffs' claims depend predominantly on individual factual questions. A class action cannot sensibly adjudicate those individual questions. It would either ignore them, denying the parties a fair trial on the merits of each plaintiff's claim; or it would attempt to resolve them all, and wind up hopelessly entangled in each plaintiff's idiosyncratic facts. Neither option is acceptable. See Wal-Mart, 131 S. Ct. at 2560-61 (defendant is entitled to litigate its defenses to individual claims); Fed. R. Civ. P. 23(b)(3)(D) (superiority depends in part on "the likely difficulties in managing a class action"). Moreover, as the many mortgage-related cases in the federal courts attest, individual plaintiffs are normally well-motivated to bring any claims they might have in order to save their homes. This is not a case where class action treatment is required "to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." Smilow, 323 F.3d at 41; see Fed. R. Civ. P. 23(b)(3)(B) (superiority depends in part on "the extent and nature of any litigation concerning the controversy already begun by or against class members"). Under these circumstances, separate individual actions would more fairly and

efficiently resolve the liability issues that plaintiffs seek to certify for classwide adjudication.

## IV.    Conclusion

This case demonstrates the vast frustration that many Americans have felt over the mismanagement of the HAMP modification process. Plaintiffs have plausibly alleged that Bank of America utterly failed to administer its HAMP modifications in a timely and efficient way; that in many cases it lost documents, or pretended it had not received them, or arbitrarily denied permanent modifications. See Third Am. Compl., ¶¶ 135-473 (describing the different experiences of each named plaintiff). Plaintiffs' claims may well be meritorious; but they rest on so many individual factual questions that they cannot sensibly be adjudicated on a classwide basis. Because plaintiffs have failed to meet the predominance and superiority requirements of Rule 23(b)(3), their motion for class certification (Docket # 208) is DENIED.

Plaintiffs' motions to compel discovery (Docket ## 91 & 126) and their motions to strike (Docket ## 242 & 263) are also DENIED.


    September 4, 2013          /s/Rya W. Zobel
         DATE                      RYA W. ZOBEL
                         UNITED STATES DISTRICT JUDGE